**No. 24-3162**

In the

# United States Court of Appeals for the District of Columbia Circuit

———

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## STEPHEN JOHNSON,

*Appellant.*

———

**Appeal from the United States District Court for the District of Columbia**

———

## JOINT APPENDIX
## VOLUME VI

———

Courtney R. Forrest
KAISER PLLC
1099 14th Street, NW, 8th Fl. West
Washington, DC 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
cforrest@kaiserlaw.com

*Attorney for Appellant*
STEPHEN JOHNSON

# TABLE OF CONTENTS

## VOLUME I (pages 1 – 543)

District Court Docket Sheet, 1:22-cr-00176-CJN-1 ....................................JA0001–27

District Court Docket Sheet, 1:20-sw-00321-UNA-1 ..............................JA0028–30

Indictment (May 20, 2022, ECF No. 43) ......................................................JA0031–32

Mr. Johnson's Motion to Suppress Evidence from Google Account (November 22, 2023, ECF No. 82) .........................................................................JA0033–80

Mr. Johnson's Motion to Suppress Evidence from Electronic and Storage Devices (November 22, 2023, ECF No. 84) ...............................................................JA0081–140

    Exhibit 1 (Residential Search Warrant, October 5, 2021).......................JA0091

    Exhibit 2 (Attachment A to the Residential Search Warrant) ................JA0095

    Exhibit 3 (Attachment B to the Residential Search Warrant) ................JA0097

    Exhibit 4 (Affidavit in Support of the Residential Search Warrant, October 5, 2021).................................................................................................JA0104

Government's Consolidated Memorandum in Opposition to Defendant Stephen Johnson's Motions to Suppress Evidence from Google Account, Seized from Residence, and from Electronic and Storage Devices (December 6, 2023, ECF No. 94) ...........................................................................................JA0141–376

    Exhibit A (Google CyberTip Warrant Application, March 23, 2021) ..JA0169

    Exhibit B (Google Product Manager Declaration, April 21, 2021) .......JA0189

    Exhibit C (Order in 20-sw-321 (ZMF), May 22, 2021)..........................JA0246

    Exhibit D (Google Account Search Warrant, March 30, 2021)..............JA0261

    Exhibit E (Residential Search Warrant, October 5, 2021) ......................JA0292

    Exhibit F (FBI 302 and Documentation Pertaining to Examination of Seized Digital Devices) ................................................................................JA0339

i

Mr. Johnson's Reply to United States' Consolidated Memorandum in Opposition to Defendant Stephen Johnson's Motions to Suppress Evidence (December 19, 2023, ECF No. 99) ...............................................................................JA0377–393

Superseding Indictment (December 21, 2023, ECF No. 101) ..................JA0394–397

Second Superseding Indictment (February 8, 2024, ECF No. 110) ...... JA0398–401

Mr. Johnson's Pre-Hearing Submission on Motion to Suppress Evidence from Search Warrant to Google (March 20, 2024, ECF No. 128).....................JA0402–406

Motion Hearing Transcript (March 21, 2024, ECF No. 171) ...................JA0407–472

Government's Supplement to Its Memoranda in Opposition to Defendant Stephen Johnson's Suppression Motions (March 21, 2024, ECF No. 133) ..........JA0473–480

Mr. Johnson's Response to the Government's Supplement to Its Opposition to Motion to Suppress Evidence from Google Warrant and Mr. Johnson's Supplement Regarding Motion to Suppress Evidence from Electronic Devices (March 22, 2024, ECF No. 134) ...............................................................................JA0481–487

Application for a Warrant for the Search of Two Laptop Computers and Three Cellphones, November 20, 2023 (March 22, 2024, ECF No. 135).........JA0488–526

Government's Reply to Defendant's March 22, 2024, Response (March 22, 2024, ECF No. 136) ...............................................................................JA0527–529

Government's Pre-Hearing Memorandum (March 28, 2024, ECF No. 140) ...............................................................................JA0530–540

Mr. Johnson's Response to the Government's Pre-Hearing Memorandum on the Independent Source Doctrine (March 31, 2024, ECF No. 142)...............JA0541–543

**VOLUME II (pages 544 – 962)**

Evidentiary Hearing Transcript (April 1, 2024, ECF No. 197)................JA0544–622

Pretrial Conference Transcript (April 2, 2024, ECF No. 198) ................JA0623–685

Jury Trial Day 1 Transcript (April 8, 2024, ECF No. 199) .......................JA0686–962

　　　Jury Selection................................................................................JA0692

　　　Preliminary Matters.......................................................................JA0905

**VOLUME III (pages 963 – 1486)**

Jury Trial Day 2 Transcript (April 9, 2024, ECF No. 200).................JA0962–1243

    Preliminary Jury Instructions...............................................................JA0966

    Opening Statements ...............................................................................JA0980

        By the Government...................................................................JA0980
        By Mr. Johnson ........................................................................JA0989

    Government's Evidence...........................................................................JA1000

        Daniel Hollar      Direct Examination ...............................................JA1000
                                              Cross-Examination by Mr. Johnson...............JA1010

        Susan Lafontant  Direct Examination ...............................................JA1020
                                              Cross-Examination by Mr. Johnson...............JA1032
                                            Redirect Examination ........................................JA1034

        Joseph Harvey    Direct Examination ...............................................JA1035
                                              Cross-Examination by Mr. Johnson...............JA1046

        Laura Calvillo    Direct Examination................................................JA1062
                                              Cross-Examination by Mr. Johnson...............JA1137

Jury Trial Day 3 Transcript (April 10, 2024, ECF No. 201) ...............JA1244–1486

    Preliminary Matters................................................................................JA1246

    Government's Evidence, Continued .......................................................JA1260

        Laura Calvillo    Cross-Examination by Mr. Johnson .................JA1260
                                              Redirect Examination ........................................JA1264

        Dero Tucker      Direct Examination................................................JA1277
                                              Cross-Examination by Mr. Johnson...............JA1352
                                              Redirect Examination ........................................JA1424

    Government Rests...................................................................................JA1432

    Preliminary Matters................................................................................JA1433

    Mr. Johnson's Rule 29 Motion..............................................................JA1435

iii

Court's Ruling ...................................................................................JA1439

**VOLUME IV (pages 1487 – 1848)**

Jury Trial Day 5 Transcript (April 12, 2024, ECF No. 205)................JA1487–1703

Voir Dire of Juror No. 3 ......................................................JA1489

Preliminary Matters .............................................................JA1495

Mr. Johnson's Renewed Rule 29 Motion ..................................JA1495

Defense Rests .......................................................................JA1496

Government's Rebuttal ..........................................................JA1496

Dero Tucker        Direct Examination.................................JA1497
                   Cross-Examination by Mr. Johnson................JA1515
                   Redirect Examination ........................................JA1527

Government Rests..................................................................JA1530

Jury Instruction Conference ...................................................JA1531

Jury Instructions ..................................................................JA1557

Closing Arguments................................................................JA1577

By the Government.........................................................JA1577
By Mr. Johnson.............................................................JA1599
Rebuttal by the Government...........................................JA1628

Final Jury Instructions .........................................................JA1633

Verdict Form Conference .......................................................JA1641

Jury Note Conference ............................................................JA1644

Jury Note (April 16, 2024, ECF No. 156)...............................JA1704

Jury Trial Day 8 Transcript (April 17, 2024, ECF No. 208)................JA1705–1798

Return of Verdict .................................................................JA1707

Jury Polling ........................................................................JA1712

iv

Mr. Johnson's Motion for a Mistrial ................................................JA1713

Government's Motion to Clear the Courtroom ..........................JA1715

Mr. Johnson's Renewed Motion for a Mistrial ..........................JA1719

Court's Ruling on Mr. Johnson's Motion for a Mistrial ...........JA1728

Additional Jury Instructions ..........................................................JA1729

Forfeiture Conference ......................................................................JA1731

Court's Ruling on the Motion to Clear the Courtroom ............JA1734

Mr. Johnson's Renewed Motion for a Mistrial ..........................JA1735

Court's Ruling on Mr. Johnson's Motion for a Mistrial ...........JA1743

Return of Verdict ..............................................................................JA1745

Jury Polling .........................................................................................JA1749

Mr. Johnson's Renewed Motion for a Mistrial ..........................JA1750

Court's Ruling and Individual Polling of Juror No. 1 ...............JA1752

Mr. Johnson's Renewed Motion for a Mistrial ..........................JA1754

Court's Ruling ...................................................................................JA1755

Verdict Form (April 17, 2024, ECF No. 166) ....................................JA1799–1802

Jury Instructions (April 17, 2024, ECF No. 169) .............................JA1803–1848

**VOLUME V (pages 1849 – 2188)**

Trial Exhibits....................................................................................JA1849–2188

Government Exhibit No. 100-1 (CyberTipline Report 80805184) ........JA1849

Government Exhibit No. 100-11 (CyberTipline Report 80886510) ......JA1904

Government Exhibit No. 100-13 (CyberTipline Report 80891261) ......JA1916

Government Exhibit No. 412 (Jumplists) ....................................JA1929

Government Exhibit No. 412A (Summary of Jump List Showing Charged Files on Lenovo Desktop) ...........................................................................JA2185

Government Exhibit No. 412B (Summary of Jump List Showing "Goldberg" Files)............................................................................................................JA2186

## VOLUME VI (pages 2189 – 2732)

Mr. Johnson's Motion for a New Trial (July 3, 2024, ECF No. 179) ..JA2189–2234

Government's Memorandum in Opposition to Defendant Stephen Johnson's Motion for a New Trial (July 24, 2024, ECF No. 182).....................................JA2235–2264

Mr. Johnson's Reply in Support of His Motion for a New Trial (July 31, 2024, ECF No. 183)...............................................................................................JA2265–2289

Mr. Johnson's Supplemental Notice of Authority (August 20, 2024, ECF No. 188) .............................................................................................................JA2290–2323

Government's Response to Defendant's Supplemental Notice of Authority (September 12, 2024, ECF No. 192).....................................................JA2324–2327

Mr. Johnson's Reply in Support of His Supplemental Notice of Authority (September 17, 2024, ECF No. 193)...........................................................JA2328–2334

Order Denying Motion for New Trial (October 10, 2024, ECF No. 210) .............................................................................................................JA2335–2347

Sentencing Memorandum by Stephen Johnson (exhibits omitted) (October 24, 2024, ECF No. 214) ............................................................................JA2348–2468

Government's Memorandum in Aid of Sentencing (October 28, 2024, ECF No. 217) .............................................................................................................JA2469–2499

Mr. Johnson's Response to the Government's Memorandum in Aid of Sentencing (October 30, 2024, ECF No. 218)................................................JA2500–2597

Sentencing Hearing Transcript (October 31, 2024) ...............................JA2598–2717

Judgment (November 4, 2024, ECF No. 219) ..........................................JA2718–2726

Statement of Reasons (November 4, 2024, ECF No. 220).....................JA2727–2730

Notice of Appeal (November 13, 2024, ECF No. 221)...........................JA2731–2732

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br><div align="center">**v.**</div><br><br>**STEPHEN JOHNSON**<br>  **Defendant.** | **Case No. 22-cr-0176 (CJN)** |

## <u>STEPHEN JOHNSON'S MOTION FOR A NEW TRIAL</u>

Stephen Johnson, through undersigned counsel, respectfully submits this Motion for a New Trial ("Motion"). For reasons that follow, pursuant to Fed. R. Crim. P. 33, the Court should grant the Motion and order a new trial.

## <u>INTRODUCTION</u>

Mr. Johnson's trial involved highly prejudicial errors. The result of those errors was to deny Mr. Johnson a fair trial consistent with his rights under the United States Constitution.

The trial included at least five serious errors, each of which compels a new trial. First, the Court admitted evidence from Mr. Johnson's laptop computer and smartphone recovered from an illegal search of those devices. The warrantless search of Mr. Johnson's electronic devices was a clear violation of his rights under the Fourth Amendment and, standing alone, compels a new trial at which the tainted evidence is excluded. Second, the Court allowed the government to present evidence from Mr. Johnson's account with Google LLC that law enforcement had again obtained through an unlawful search. While the Court correctly recognized that the government's warrantless search of the contents of Mr. Johnson's Google drive was unconstitutional, the Court erred in admitting the illegally seized evidence under the

good faith doctrine, which does not apply here.  Third, the Court erred in denying a mistrial after

a juror favoring acquittal on all counts was publicly identified in open court, particularly under

the coercive atmosphere that began with the failed jury poll.  Fourth, the Court erred in denying a

mistrial based on the inappropriate provision of the parties' exhibit lists (which included

descriptions of evidence not admitted at trial) to the jury.  Fifth, the Court erred under Rule

404(b) in admitting the quantity and quality of "other bad acts" evidence it did.  Mr. Johnson did

not receive a fair trial in the face of such evidence, which had no direct relevance to the charges

and yet was extremely prejudicial to the jury's consideration of the case.  And finally, to the

extent the Court does not find any one error significantly consequential, the Court should grant

Mr. Johnson's Motion based on the cumulative effect of the errors, which plainly meets the

standard for a new trial.

## **BACKGROUND**

### I.    **CyberTip Reports and Search Warrants**

In October of 2020, Google LLC ("Google") provided the National Center for Missing

and Exploited Children ("NCMEC") CyberTip reports concerning a Google account belonging

to Stephen Johnson.  The CyberTip reports alerted NCMEC that, on September 21, 2020, and

October 1, 2020, unreviewed files matching the hash values for apparent child pornography were

suspected to have been uploaded to Mr. Johnson's Google account.  *See, e.g.,* ECF 123, Ex. A.

Google's CyberTips were based on the "hash-matching" of images that Google employees or

contractors had previously classified as apparent child pornography with certain images

uploaded to Mr. Johnson's Google Drive.[1]  No one at Google had viewed the specific images

---

[1] Defense counsel repeatedly raised concerns about the training and reliability of the employees
and contractors who performed this work.  The government failed to address defense counsel's
concerns about several critical issues, including (1) whether the amount of training provided was

2

from Mr. Johnson's Google Drive prior to Google's transmission of the CyberTip reports to NCMEC. *See* 4/2 Tr. 5.

Once received from Google, NCMEC forwarded the CyberTips to the Northern Virginia Internet Crimes Against Children ("ICAC") Task Force. The Virginia ICAC Task Force—without reviewing the images—sent them to the District of Columbia's Metropolitan Police Department and ICAC Task Force member Detective Thomas Sullivan. In December 2020, and without first obtaining a search warrant, Detective Sullivan reviewed several of the allegedly pornographic images from the CyberTip Reports. Detective Sullivan confirmed that the images constituted child pornography. On December 16, 2020, as a result of his warrantless review, Detective Sullivan issued an administrative subpoena to Comcast for subscriber information regarding the IP addresses identified in the CyberTips. On December 22, 2020, law enforcement also served subpoenas on Sprint Corporation and T-Mobile as part of its investigation.

On December 28, 2020—*after* law enforcement had taken the above steps—the government applied for a warrant for the CyberTip material. The application for the warrant stated that "the materials provided by Google ... were based solely on hash value matches and were not reviewed by someone at Google." 3/21 Tr. 29. The government also noted in the warrant application that the affiant (Detective Sullivan) was "not relying on any information obtained from these media files to form the basis of the probable cause in this search warrant." *Id*. After holding several hearings, Magistrate Judge Faruqui denied the application for a warrant as unnecessary based on the private search doctrine. *See* ECF 94, Ex. C.

---

sufficient enough to enable them to do their job properly; (2) whether any training accurately informed them about what constitutes child pornography under federal law; (3) whether any training methods effectively provided them with the knowledge and tools necessary for identifying and tagging child pornographic material; and (4) whether any training they received was conducted by a credible and reliable vendor.

3

On October 5, 2021, the government obtained a warrant to search Mr. Johnson's residence.  *See* ECF 5; *see also* ECF 84, Ex. 1.  The search warrant included two separate attachments: one specifying property to be searched (Attachment A) and the other specifying property to be seized (Attachment B).  Attachment A listed Mr. Johnson's apartment as the thing to be searched.  Attachment B, the things to be seized, listed, *inter alia*, Mr. Johnson's "digital devices."  *See* ECF 84, Ex. 1 (search warrant application); *see also* ECF 84, Ex. 2-3 (Attachments A and B of the search warrant application).  The search warrant was executed on October 7, 2021.  *See* ECF 5.  Based on this warrant alone, the FBI forensically searched all of Mr. Johnson's electronic devices, including his computers and phones.[2]

## II.    The Indictment and Pre-Trial Hearings

On May 20, 2022, the government obtained an indictment against Mr. Johnson.  *See* ECF 43.  The indictment charged Mr. Johnson with a single count of Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1).  *Id.*  Mr. Johnson filed several pretrial motions on November 22, 2023, including a Motion to Suppress Evidence from Google Account ("Google Account Motion"), and a Motion to Suppress Evidence from Electronic and Storage Devices ("Devices Motion").  *See* ECF 82-87.[3]

---

[2] As discussed *infra*, the evidence recovered from Mr. Johnson's electronic devices formed the bulk of the government's trial presentation, including on the issue of Mr. Johnson's knowledge of the content of the images.

[3] On December 21, 2023, the government obtained a superseding indictment.   The government obtained a second superseding indictment on February 8, 2024.  ECF 110.  Like the first superseding indictment, the second superseding indictment charged Mr. Johnson with fifteen counts of Transportation of Child Pornography and one count of Possession of Child Pornography.  *Id.*

Also on November 22, 2020, the government filed a notice of its intent to introduce bad acts evidence under Fed. R. Evid. 404(b) ("Rule 404(b) Notice" or "Notice"). *See* ECF 81.[4]  In its Notice, the government stated its intent to offer several categories of evidence to show that Mr. Johnson allegedly "searched for and visited online material associated with the sexualization of underage teenage children." *Id.* at 14.  The government identified as 404(b) evidence material from Mr. Johnson's browser history from between April 8 and October 2, 2020, showing navigation to certain files and folders on Dropbox.  The government also proposed to admit 404(b) evidence regarding Mr. Johnson's use of the Telegram messenger application in 2021, including three files extracted from Mr. Johnson's phone allegedly depicting child pornography. *Id.* at 5, 10.  In a later-filed Supplement to its Rule 404(b) Notice, the government further identified Mr. Johnson's alleged membership in Telegram groups and participation in Google Photos Communities advertising child pornography. *See* ECF 126.  The defense opposed admission of this evidence as the type of prejudicial propensity evidence that is inadmissible under Rule 404(b) and under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, misleading jurors, confusing the issues, and wasting time. *See* ECF 93.

On March 21, 2024, the Court held a motions hearing on certain of the pretrial motions. The Court addressed Mr. Johnson's Google Account Motion, Devices Motion, and several motions in limine at this hearing.[5]  *See* 3/21 Tr. 2.

---

[4] The defense filed an opposition to the Rule 404(b) Notice on December 6, 2023 (ECF 93), and the government filed a reply on December 19 (ECF 97).  The government filed a supplement to its 404(b) Notice on March 19, 2024.  *See* ECF 126.

[5] *See* ECF 82, 83, 84, 85, 95.

Regarding the Google Account Motion, the defense argued that the material seized from Mr. Johnson's Google Account must be suppressed because Detective Sullivan's warrantless review of the CyberTip material provided by NCMEC violated the Fourth Amendment. *Id.* at 3-5. Mr. Johnson argued that, due to Detective Sullivan reviewing the CyberTip material before applying for a search warrant, the government was precluded from introducing evidence from Mr. Johnson's Google account at trial.[6] *Id.* The defense explained that neither the private search doctrine nor the good-faith exception prevented application of the exclusionary rule. *Id.* at 6-15. The defense also argued that the Google Account evidence should be suppressed due to an unconstitutional trespass under *United States v. Jones*, 565 U.S. 400, 404-407 (2012), which held that governmental trespass onto property "for the purpose of obtaining information" requires a warrant, even if a private actor had already trespassed upon the same property. *See* 3/21 Tr. 5, 15; *see also* ECF 99 at 4-5, ECF 134 at 3-4.

The government argued that a warrant was not required for Detective Sullivan to view the images sent by NCMEC. *See* 3/21 Tr. 28. The government maintained that the private search doctrine exception to the warrant requirement applied and that, in any event, Detective Sullivan had acted within the parameters of the good faith exception to the exclusionary rule. *Id.* at 32-33, 36-37.[7]

Concerning the Devices Motion, the defense submitted that "it's very clear" that "there is no warrant for the search of the electronic devices, just no warrant." *Id.* at 16. Without a warrant, "there is no judicial officer who ever authorized a search of the digital devices." *Id.*

---

[6] To support this argument, defense counsel noted that there was no evidence that Google's system for determining whether material constituted child pornography was reliable. *See* 3/21 Tr. 7-9.

[7] The magistrate judge declined to issue a warrant for purposes of judicial economy. *See* 3/21 Tr. 10.

The defense relied upon the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), holding that a warrant is required before searching cell phones, and argued that "[i]t would just be a complete abrogation of [*Riley*] to allow the government to introduce the contents of a cell phone or a computer or anything else where they didn't get a warrant to do it." 3/21 Tr. 16.

The Court responded by referencing Attachment B, which authorized law enforcement to seize Mr. Johnson's fingerprint to unlock his phone. The Court asked:

> Why would the warrant say that the government could get Mr. Johnson's fingerprint if it wasn't authorizing the search of his electronic devices? It says, "for the purpose of attempting to unlock devices in order to search the contents as authorized by this warrant."

*Id.* at 17. Counsel responded that the warrant itself states "In the matter of the search of 600 H Street, Apartment 749." *Id.* (quoting ECF 94, Ex. E at 2). Counsel noted that Attachment A to the warrant identifies the property to be searched, which lists Mr. Johnson's apartment, but "doesn't say anything about the electronic devices." *Id.* Counsel further noted that the language the Court was referring to was in Attachment B, and Attachment B was expressly limited only to items that may be seized—not items that may be searched. *Id.* at 18-20. The defense noted that the warrant "does not incorporate Attachment B into the property to be searched on the plain face of the warrant." *Id.* at 56. The only thing particularly described in the warrant concerning what *could be searched* was the apartment described in Attachment A. *Id.*

The government's position concerning its search of the devices was that "[t]he warrant expressly … authorizes the search of digital devices recovered from the residence." *Id.* at 41. The government conceded that the attachment to the warrant application describing the property to be searched, Attachment A, did *not* mention electronic devices that may be recovered from the residence, *id.* at 42, but asked the Court to ignore the term "seized" on Attachment B and to

7

replace it with "searched."  The government argued that the terms are "functionally equivalent," *id*. at 43, notwithstanding the use of distinct attachments that on their face served distinct purposes.

The Court took the motions under advisement.  *Id*. at 61.  The Court noted that the hearing had altered its understanding of the chronology of events surrounding Detective Sullivan's review of CyberTip material.  *Id*. at 61; *see also id*. at 30 (the Court explaining it "had not realized before today that Detective Sullivan had reviewed all of the relevant files before the warrant application.").

On April 1, 2024, the Court held an evidentiary hearing on Mr. Johnson's Google Account Motion.  *See* 4/1 Tr. 3.  Detective Sullivan was the sole witness to testify at the hearing. He testified that he was the law enforcement officer who was exclusively responsible for investigating the CyberTips relating to Mr. Johnson's case.  *Id*. at 9-10.  He further testified that, through his prior experience handling CyberTip cases, he knew to get a search warrant before viewing CyberTip content when there is any uncertainty about whether a human had viewed the material being reported by the CyberTip.  *Id*. at 15-16.[8]

Detective Sullivan told the Court that, at the time he initially reviewed Mr. Johnson's CyberTip files, he believed that a human, at some time in the past, reviewed the files.  However, other portions of Detective Sullivan's testimony revealed that, from the moment he first received the CyberTip reports in Mr. Johnson's case, he could not possibly have known that the files in those reports were reviewed by a human.  The CyberTip reports themselves warned that a human

---

[8] Detective Sullivan testified about a specific instance in 2018 when he applied for a search warrant where he received a CyberTip from an ESP that used a hash matching system to identify suspected child pornography, but where the ESP did not indicate "whether or not a human reviewed the files."  4/1 Tr. at 16.

had not reviewed the material reported in the CyberTip reports. *Id.* at 19, 44; *see also* ECF 123, Ex. A, B. Detective Sullivan admitted that, at the time he first viewed the CyberTip material submitted by Google, he was "unsure of how they were hash matching." 4/1 Tr. 40. And he acknowledged stating later in a sworn affidavit that the CyberTip files "were not reviewed by Google, nor NCMEC, prior to being sent to the Northern Virginia Regional Internet Crimes Against Children task force[.]" *Id.* at 39-40. Detective Sullivan saw no indication that anyone with the Northern Virginia ICAC Task Force had reviewed the CyberTip images before the files were sent to him. Detective Sullivan also admitted that he was aware that the definition for child pornography used by Google in its CyberTip reports differed from the federal definition. *Id.* at 54.

Despite his awareness of evidence that a human had not viewed Mr. Johnson's CyberTip files, and that Google's definition for child pornography did not match the federal definition, Detective Sullivan conducted a "general review" of the contents of the CyberTip files. *Id.* at 11.[9] His "general review" involved viewing the contents of individual files by first looking at large thumbnail versions to determine if he recognized any child abuse material. *Id.* His review also included a more detailed search that constituted clicking, opening, and viewing an unspecified number of video files in Mr. Johnson's CyberTip report. *Id.* at 12-13, 56-57. When asked by government counsel whether he had a warrant when conducting this general review of Mr. Johnson's CyberTip files, Detective Sullivan replied "[n]o, I did not." *Id.* at 15.

Detective Sullivan further testified that the United States applied for warrants to search Mr. Johnson's Google account and to search the CyberTip files that Detective Sullivan had

---

[9] Because Detective Sullivan had difficulty recalling details about his search of Mr. Johnson's CyberTip files, much of his testimony concerning his search of these files was based on his general searching practices in other similar cases.

already searched.  *Id* at 24-26.  Both warrant applications relied on video files in Mr. Johnson's CyberTip report that Detective Sullivan reviewed without a warrant.  *Id*. at 58-59.  According to Detective Sullivan, "because we were seeing CSAM [Child Sexual Abuse Material] in those files, that there was a likelihood we were then going to follow up with a Google search warrant and investigate the case for prosecution, potentially."  *Id*. at 59.

On April 2, 2024, the Court held a Pretrial Conference at which it ruled on most of the pending motions.  Regarding the Google Account Motion, the Court acknowledged that the government's review of the images from the CyberTips constituted a "warrantless viewing of the files."  4/2 Tr. 4.  The Court rejected the government's argument that law enforcement did not need a warrant to view the CyberTip material due to the private search doctrine.  *Id*. at 5.  Nevertheless, the Court found that the exclusionary rule did not apply to Detective Sullivan's warrantless search of materials provided by Google because "the good faith exception clearly applies to the government's ultimate viewing of all of the files in 2021."  *Id*. at 8.  As a result, the Court ruled that "[a]ny evidence obtained as a result of that viewing of the files will not be excluded."  *Id*. at 10.

With respect to Mr. Johnson's Devices Motion, the Court found that "the warrant's incorporation of Attachment B authorize[d] the government to seize and examine Mr. Johnson's digital devices and their contents."  *Id*. at 16.  The Court determined that Attachment B, when "read in context, indicates that the warrant allows the government to do what might be called a search in order to seize information contained within the devices found within the residence."  *Id*.

### III.    Mr. Johnson's Trial and The Court's Evidentiary Rulings

Mr. Johnson's trial began on April 8, 2024.  The Court ruled on certain of the disputed 404(b) issues on the first day of the trial, after jury selection.  *See generally* 4/8 Tr. 227-229.  The

Court held the 404(b) evidence generally "admissible as probative of intent, knowledge, non-mistake[]" or "not actually … 404(b)" and reserved judgment on specific uses of the evidence for the trial, based on the "particular use of a particular piece of information," suggesting that the Court would exclude the proposed evidence if it became overly prejudicial or cumulative.  *Id.*

During the trial, however, the Court did not exclude a single piece of the government's evidence as inadmissible under Rule 404(b) or Rule 403.  Over defense objections, the Court admitted evidence that Mr. Johnson: (1) visited certain Dropbox folders several months prior to the charged conduct; (2) belonged to Telegram groups advertising child pornography and had three uncharged CSAM images on his phone many months after the charged conduct ("Telegram Evidence"); (3) was added by other Google users to Google photo albums alluding to child pornography, long after the charged conduct ("Google Photos Evidence"); and (4) had the Tor browser installed on his computer.

Government witness Special Agent Laura Cavillo testified that Mr. Johnson's Google Chrome browser history showed that he had visited a Dropbox folder labeled "black teens and underage thots" ten times between June 26 and July 2, 2020.  4/9 Tr. 445-447; 4/10 Tr. 588-589. She further testified that "thot" refers to "that ho over there."  4/9 Tr. 446.  The government introduced no evidence that any of the files in that Dropbox folder were later found on Mr. Johnson's computer, phone, or Google drive.  During the defense case, forensic expert Michelle Bush testified without challenge from the government that there was no evidence Mr. Johnson had ever downloaded material from this Dropbox folder.  *See* 4/11 Tr. 857-858.

The Court also permitted the government to introduce documents and elicit extensive testimony about Mr. Johnson's alleged use of the Telegram messenger app and his purported membership in Telegram groups advertising child pornography.  *See* 4/10 Tr. 569-571.  All of the

Telegram evidence was from 2021, months after the charged conduct in the case. The government's digital forensics expert, Dero Tucker, testified that individuals use Telegram to "communicate in an encrypted channel and exchange and send and receive, view CSAM." *Id.* at 645. Mr. Tucker went on to describe messages found on Mr. Johnson's phone that did not involve Mr. Johnson, but in which other users were advertising or seeking child pornography. Mr. Tucker also described three CSAM images found in a "Telegram images" folder extracted from Mr. Johnson's phone. *Id.* at 649, 652. On cross-examination, Mr. Tucker admitted that *none* of the relevant messages were sent by Mr. Johnson, and that the government had no evidence Mr. Johnson had ever read those messages—which were among 1.5 million total messages recovered from his phone. *Id.* at 726-727. The defense's expert Ms. Bush testified that Mr. Johnson had been added to over a hundred Telegram groups, but that there was no evidence of any engagement by him in the groups relating to CSAM. 4/11 Tr. 968. She also testified that Telegram defaults to automatically downloading media content from chats or channels, such that Mr. Johnson did not knowingly download the Telegram images. *Id.* at 956-959. The government recalled Mr. Tucker in rebuttal on the issue of whether the three images of child pornography found on Mr. Johnson's phone were automatically downloaded. 4/12 Tr. 1155-1156.

Additionally, the Court allowed the government to introduce evidence, through Mr. Tucker, of three Google Photo albums that had been shared with Mr. Johnson nearly a year after the charged conduct in this case. These albums were titled "13-17 lesbian cp," "CINCITY PYT," and "pyt videos." 4/10 Tr. 640-642. Mr. Tucker admitted on cross-examination that none of these albums were created by Mr. Johnson, and that the government had no evidence Mr. Johnson had seen the albums or the accompanying chats. *Id.* at 720-722. Once again, the defense had to call its expert, Ms. Bush, to rebut this evidence. She explained that the forensic

evidence showed no interaction by Mr. Johnson with these albums, the albums were not present

on his phone, and that no CSAM material was recovered from the albums.  4/11 Tr. 852-854,

919-921, 964-966.

Finally, the Court allowed the government to introduce evidence about the Tor browser.[10]

The government elicited from Mr. Tucker that Tor was installed on Mr. Johnson's computer and

that "Tor is a specialized web browser that allows the user to access the dark web."  4/10 Tr. 611.

Yet Mr. Tucker admitted on cross examination that there was no allegation in this case involving

the use of Tor and that he did not see any browsing artifacts on Mr. Johnson's computer that

showed visits to Tor websites.  *Id.* at 705.  Defense forensic expert Ms. Bush subsequently

testified that if Mr. Johnson had been using Tor, there would be evidence of it on the extraction

from his laptop computer, which there was not.  4/11 Tr. 969-971.

### IV.    Provision of the Clerk's Draft Exhibit Lists to the Jury

The jury began deliberating on Friday, April 12, 2024.  *See* 4/12 Tr. 1268.  On Tuesday,

April 16, the Court notified the parties that a courtroom deputy had given the courtroom clerk's

annotated drafts of both parties' exhibits lists to the jury on Friday afternoon.  *See* 4/16 Tr. 1338.

Those drafts included descriptions of all proposed evidence, including evidence that was never

admitted, though the clerk had unsuccessfully attempted to "black[] out [the descriptions] with

black highlighter."  *Id.*  The Court had not been aware that the jury had access to the lists and

"would not have authorized that[.]"  *Id.*

---

[10] When discussing motions in limine, the government represented that it did not intend to
introduce anything relating to the Tor browser.  *See, e.g.,* 4/2 Tr. 26.  At trial, during cross-
examination of Special Agent Cavillo, the defense sought to establish that Mr. Johnson only
accessed CSAM through legitimate Internet sites, as opposed to the dark web.  *See* 4/9 Tr. 467-
470.  The Court then ruled, over the defense's objection, that "the government's evidence as to
Tor is now both more probative than it was before and less prejudicial than it would have been
because of the line of questioning yesterday."  4/10 Tr. 570.

The Court noted that "it's possible that some of the redacted names could be viewed, if someone wanted to look … even not that hard." *Id.* at 1340. Defense counsel reported that it appeared that each "blacked out" exhibit entry could be seen through and read "without much difficulty" and without any need to "have to hold it up to a light or anything extra to see through." *Id.* at 1345. The Court agreed and assumed "that the jury could and did read each and every one of the blacked out entries." *Id.* at 1349. Among other things, the "blacked-out" entries on the exhibit lists revealed to jurors that Mr. Johnson had given a post-arrest statement, and the statement was on the government's list but not the defense's list. *Id.* at 1346. It also revealed that the "vast majority" of the defendant's proposed evidence was not admitted, while almost all of the government's had been. *Id.* at 1345-1346; *see also* ECF 161, 162.

The defense moved for a mistrial, which the Court denied. *Id.* at 1349. Instead, the Court adopted a curative jury instruction the parties agreed upon given the Court's denial of the motion for a mistrial. *Id.* at 1346-1350. The Court instructed the jury to disregard the exhibit lists, stating that "you should not weigh anything in those documents, including their length, as evidence in this case" and "the lightly redacted or the drawn-through entries concerned exhibits never entered into evidence, so you should disregard those entirely as well." *Id.* at 1352-1353.

## V.    The Two Verdicts, Jury Polling and the Lone Holdout Juror

Around mid-day on April 17 (after approximately three days of deliberation), the jury informed the Court it had reached unanimous verdicts. *See* 4/17 Tr. 1358-1359. The foreman announced that Mr. Johnson had been found guilty of six counts of transportation of child pornography and the one count of possession of child pornography, and acquitted him of the remaining nine counts of transportation of child pornography. *Id.* at 1359-1362. The Court then polled the jury. *Id.* at 1363. The Deputy Clerk asked Juror No. 1 whether his "individual verdict is the same as that just announced." *Id.* Juror No. 1 cried "No." *Id.* at 1363. As agreed by both

14

parties and the Court, in rejecting the verdict announced by the foreperson, Juror No. 1 "slumped

forward in his seat and began sobbing and crying[,]" he "bent over and sobbed[,]" and

"immediate[ly] … unequivocal[ly]" said "No."  *Id.* at 1368, 1370.  The Court then proceeded to

poll the remaining eleven jurors, who all said "Yes."  *Id.* at 1363-1364.  The jury was sent back

to the jury room and told to continue its deliberations because they had "not reached a

unanimous verdict[.]"  *Id.* at 1364, 1381.

Immediately after the jury was excused, Mr. Johnson moved for a mistrial.  Id. at 1365.

Mr. Johnson's motion for a mistrial was summarily denied.  *Id.*

After a short break, Mr. Johnson renewed his motion for a mistrial, pointing to Juror No.

1's "reaction" and the "dynamics" surrounding the polling of the entire jury.  *Id*. at 1370.  Given

these circumstances, Mr. Johnson argued that there was an "extreme risk of coercion," and that

"the other jurors could coerce [Juror No. 1] into a verdict that's not consistent with the verdict

[Juror No. 1] wants to give."  *Id.*  Mr. Johnson expressed further concern about the potential

pressure that the lone holdout juror would face in the jury room, particularly as the jury had

indicated just the day before that it might come to a decision in "15 more minutes," but did not,

even after several more hours.  *Id.* at 1370-1371.

The parties argued differing legal standards for a mistrial.  Defense counsel agreed with

the government that Rule 31 allows the Court to have the jury continue deliberations or declare a

mistrial, and agreed that "manifest necessity" is the standard.  *Id.* at 1375-1376.  However, citing

*United States v. Khatallah*, 41 F.4th 608, 638 (D.C. Cir. 2022), the defense submitted that the

"central issue" for the manifest necessity standard is "substantial prejudice" to the defendant and

reviewed the factors the *Khatallah* court had looked to, which supported defendant's motion for

a mistrial.  4/17 Tr. 1376.  Defense counsel explained how Juror No. 1's reaction, both verbal

and non-verbal, was clear evidence that the verdict was "inconsistent with what his wishes were" and "he feels coerced to give a different answer to his fellow jurors." *Id.* at 1377. Counsel argued that the factors for manifest necessity under *Khatallah* were met: the "closeness of the case … the centrality of the issue … [a]nd … steps to mitigate the errors of effect." *Id.* at 1377-1378.

The Court denied the motion for a mistrial and adopted Mr. Johnson's proposed alternative instruction, which it read to the jury. *Id.* at 1379-1381.

When the Court reconvened, Mr. Johnson renewed his motion and explained further reasons to declare a mistrial, including that "when the numerical division of the jurors has been disclosed … especially when it's 11 to 1 … that he's the holdout," the circumstances are unduly coercive and require a mistrial. *Id.* at 1386 (citing *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991)). Counsel also noted that a publicly disclosed 11 to 1 split among the jurors was coercive "as a matter of law," because it jeopardized the secrecy of the deliberations. 4/17 Tr. 1387-1392. In response to the Court's inquiry about whether a mistrial is required in such situations considering that Rule 31 permits resuming jury deliberations after polling jurors, counsel explained, and the Court later acknowledged, it would have been possible for the Court to abort polling as soon as a "No" was revealed so that the full numerical split was not revealed. *Id*. at 1388, 1391. Mr. Johnson's counsel argued that allowing the jurors to resume deliberations would be unfairly prejudicial to Mr. Johnson and that "unfair prejudice[] to the defendant" is the "most important consideration" for a motion for mistrial. *Id.* at 1392.

The Court denied the motion again, stating that "it would mean Rule 31 is a nullity[,]" even though "one could conduct a poll and stop it such as to reveal part but less than full numerical disclosure[.]" *Id.* at 1394-1396.

16

Approximately three hours after the jury poll, the jury notified the Court it had again reached verdicts. *Id.* at 1396-1400. This time, Mr. Johnson was found guilty of five counts of transportation of child pornography and one count of possession of child pornography, acquitting him of the remaining ten counts of transportation of child pornography. *Id; see also* ECF 166.

The jury was polled again. 4/17 Tr. 1400. When asked whether he or she agreed with the verdict, each juror answered "Yes," but Juror No. 1 did so with "his head down … unable to look anybody in the eye … and in a very soft-spoken manner and … a reluctant tone[.]" *Id.* at 1401. The Court also noted that Juror 11 "also reflected some small hesitation … in answering the verdict." *Id.* at 1402. The defense renewed its motion for mistrial, which was denied. *Id.*

All jurors except Juror No. 1 were excused. *Id.* at 1403. The Court questioned Juror No. 1 about his assent to the verdict, particularly whether "that verdict was your verdict" and "that the evidence … establishes the defendant's guilt on every count the jury found him guilty of … just the ones that the jury found guilt on." *Id.* at 1404-1405. Juror No. 1 repeatedly cut the Court short, curtly stating "Yes" and "Yes, it's fine." *Id.* He began, again, with his "head down, very reluctant, long pause, and then very soft spoken said yes[,]" which he strengthened as the Court kept repeating the question whether he "in fact, agree[d] that the government proved the defendant guilty[.]" *Id.* at 1405-1406. Eventually, Juror No. 1 stated that "it's a very serious charge … it's a bad situation for everybody" and agreed with his fellow jurors' verdict "for the charges that we all agreed upon." *Id.* at 1404-1405. Defense counsel renewed the motion for a mistrial, which the government opposed, and the Court denied. *Id.* at 1406-1407.

## LEGAL STANDARDS

The Federal Rules of Criminal Procedure permit the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33; *see also* 3 Wright &

Miller, Federal Prac. & Proc. § 556 (1982) ("Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial."). Trial courts have "wide discretion in determining whether to grant a new trial." *United States v. Williams*, 113 F.3d 243, 247 (D.C. Cir. 1997) (citing *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988)); *see also United States v. Kelly*, 790 F.2d 130, 133-134 (D.C. Cir. 1986) (describing the standard for a motion for a new trial, applied at the "sound discretion of the trial judge"); *see also United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (collecting case law on the discretion of trial courts in ruling on Rule 33 motions). Courts have inquired into whether there were "exceptional circumstances" that "prevented the defendant from receiving a fair trial." *Greene v. United States*, 279 A.3d 363, 368 (D.C. 2022) (citing *Tyer v. United States*, 912 A.2d 1150, 1167 (D.C. 2006)). Where a motion for a new trial is timely filed and does not rest on newly discovered evidence, the "interest of justice … is broader in scope than the limitations which have been held applicable where the motion is based on newly discovered evidence." *Benton v. United States*, 188 F.2d 625, 627 (D.C. Cir. 1951).

Similarly, an error affects "substantial rights" where it had a "substantial and injurious effect or influence in determining the … verdict." *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (quoting *United States v. Dominguez Benitez,* 542 U.S. 74, 81 (2004)); *see generally United States v. Olano*, 507 U.S. 725, 725 (1993) (holding "substantial rights" for appellate purposes "normally means that the error must be prejudicial, affecting the outcome of the district court proceedings."); *see also United States v. Linares*, 367 F.3d 941, 952 (D.C. Cir. 2004) (drawing parallels between substantial rights and constitutional rights). Where extrinsic, prejudicial evidence was improperly taken into the jury room, reversal is required if there is "the slightest possibility that harm could have resulted." *Dallago v. United States*, 427 F.2d 546, 560

& n. 58 (D.C. Cir. 1969) (citing *United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967);

*see also United States v. Vasquez*, 597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law

throughout federal circuits).

  Finally, if any one error alone is not deemed sufficient, "the total effect of numerous

small missteps may deprive a defendant of a fair trial[.]" *United States v. McGill*, 815 F.3d 846,

947 (D.C. Cir. 2016) (quoting *United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010)).  The

Court must "analyze[] each ground for the defendant's motion separately," while also

"consider[ing] the cumulative effect of all the prosecution's missteps." *United States v.

Khatallah*, 313 F. Supp. 3d 176, 196 (D.D.C. 2018) (citing *United States v. Holmes*, 413 F.3d

770, 774-775 (8th Cir. 2005)).

## <u>ARGUMENT</u>

**I.**   **The Court Should Grant Mr. Johnson a New Trial Because the Government Relied On Evidence Recovered From the Unconstitutional Searches of His Electronic and Storage Devices in Violation of the Fourth Amendment.**

  The bulk of the government's evidence at trial—both its direct evidence and evidence the

Court admitted under Rule 404(b)—was derived from Mr. Johnson's phone and laptop computer.

Because law enforcement seized this evidence in violation of the Fourth Amendment, Mr.

Johnson should receive a new trial.

  Searches conducted by government agents without a warrant are presumptively

unreasonable under the Fourth Amendment.  *See Arizona v. Gant*, 556 U.S. 332, 338 (2009)

("searches conducted outside the judicial process, without prior approval by judge or magistrate,

are *per se* unreasonable under the Fourth Amendment").  Government searches of electronic

devices capable of storing large amounts of data, such as cell phones and computer hard drives,

violate the Fourth Amendment if conducted without a warrant.  *See Riley v. California*, 573 U.S.

373, 401 (2014) ("a warrant is generally required before [searching a cell phone], even when a

19

cell phone is seized incident to arrest").

The warrant on which the government purportedly relied to search Mr. Johnson's

electronic devices did not authorize a search of those devices.  The warrant only permitted law

enforcement to search Mr. Johnson's apartment.  *See* ECF 84, Ex. 1 at 2.  This limitation is plain

from the face of the warrant.  The warrant's caption states, "In the Matter of the Search of 600 H

STREET APARTMENT #749 NORTHEAST WASHINGTON, DC 20002 UNDER RULE 41."

*Id*.  The other part of the warrant specifying what may be searched under the warrant is

"Attachment A." That document, which is entitled "Property to be searched," states in its

entirety:

> The property to be searched is 600 H Street, Apartment #749, Northeast,
> Washington DC 20002. (the "PREMISES") which is a multi-unit
> apartment building named "The Apollo."  Apartment #749 is located on
> the seventh floor of the apartment building and is described as a gray door
> with a placard labeled 749 to the right of the door in white font on a gray
> background as depicted in the below photograph.[11]

ECF 84, Ex. 2.  Another attachment to the warrant, Attachment B, concerns "the property to be

seized."  *See* ECF 84, Ex. 1 at 2.  Attachment B identifies various devices such as mobile phones

and computers.  ECF 84, Ex. 3.  As Attachment B's title makes very clear, the items listed in that

attachment may be seized only.  Accordingly, while the warrant's incorporation of Attachment B

authorized *the seizure* of various electronic devices found in Mr. Johnson's residence, it did not

authorize law enforcement to search those devices because the things that may be searched were

expressly limited to what was identified in Attachment A.

This Court denied Mr. Johnson's Devices Motion, finding that "the warrant's

incorporation of Attachment B authorize[d] the government to seize and examine Mr. Johnson's

---

[11] The photograph in Attachment A depicts what is apparently the front door to Mr. Johnson's
apartment.

digital devices and their contents."  4/2 Tr. 16.  The Court explained further that "the body of the attachment, read in context, indicates that the warrant allows the government to do what might be called a search in order to seize information contained within the devices found in the residence."  *Id.*

The Court's ruling was erroneous.  The Supreme Court has unambiguously held that searches and seizures of items not specifically identified in the warrant are warrantless searches and seizures.  *See Groh v. Ramirez*, 540 U.S. 551 (2004).  In *Groh*, a law enforcement officer applied for a search warrant to search an individual's property and to seize various weapons suspected of being unlawfully located at the property.  *Id.* at 554.  The officer's search warrant application identified various types of weapons suspected of being unlawfully located at the property, and stated that the anticipated search of the property was for those suspected illegal weapons.  *Id.*  The application was supported by a detailed affidavit "that set forth the basis for [the officer's] belief that the listed items were concealed on the [property]."  *Id.*  The application, affidavit, and a warrant form completed by the officer were presented to a magistrate judge for approval.  *Id.*  While the warrant described the house the officer sought to search, "it failed to identify any of the items that petitioner intended to seize."  *Id.*  The warrant was signed by the magistrate judge, and a team of law enforcement officers, which included the officer who applied for the search warrant, searched the property for the weapons described in the search warrant application.  *Id* at 554-555.  No illegal weapons were recovered during the search and criminal charges were never filed against the property's owner.  *Id.* at 555.

The property's owner eventually sued the officers raising various claims, including that the officers' conduct violated the Fourth Amendment to the United States Constitution.  *Id.*  Regarding the Fourth Amendment claim, the Supreme Court held that "[t]he warrant was plainly

invalid" and, by not describing the items to be seized, "the warrant was so obviously deficient that [the Supreme Court] must regard the search as 'warrantless.'"  *Id*. at 557-558.  The Court explained that "[t]he fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity."  *Id*. at 558 (emphasis in the original).

The Court in *Groh* noted that a warrant may cross-reference other documents and those other documents may be incorporated into the warrant only if, through appropriate words of incorporation, the documents convey the intent of the judicial officer issuing the warrant.  *See id*. at 557-560.  To properly incorporate documents into a warrant, the documents must accompany the warrant and the warrant must use satisfactory language to incorporate the documents by reference.  *See United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990) (an affidavit in support of a search warrant may be construed as part of the warrant "only if (1) the affidavit accompanies the warrant, and in addition (2) the warrant uses suitable words of reference which incorporate the affidavit by reference") (internal quotations and citations omitted).

The only documents incorporated into the warrant in the instant case are Attachments A and B, as both attachments are mentioned in the warrant followed by the words "incorporated by reference."  ECF 84, Ex. 1 at 2.  But even if these attachments were properly incorporated into the warrant by reference, each attachment must be understood in the express manner in which it was incorporated.  Attachment A was incorporated to describe the property to be *searched*; and Attachment B was incorporated to describe only the property to be *seized*.  Thus, the plain meaning of the warrant, even when incorporating Attachments A and B, is that the items described in Attachment B may only be seized and the only property that may be searched is the apartment described in Attachment A.

Interpreting the incorporation of Attachment B into the warrant to mean that the items

described in that attachment may only be seized and not searched also makes sense given the context. Attachment B begins by stating that "[t]he items to be seized are fruits, evidence, information, contraband, or instrumentalities" relating to specifically identified child abuse offenses. *See* ECF 84, Ex. 3 at 1. References in the body of Attachment B to "child pornography," "correspondence or communications," and "internet usage" are not authorizations to search seized devices for this type of evidence. Rather, Attachment B is merely describing with particularity the type of devices that may be seized from the residence. The detailed information provided in Attachment B serves to limit the scope of the type of devices that may be seized to only devices that may contain evidence of the crimes being investigated. Therefore, only devices that could contain child pornography, correspondence or communications, information about internet usage, and other types of evidence described in Attachment B may be seized. By limiting the scope to only devices that may contain evidence of the specified child abuse offenses, Attachment B precludes law enforcement from seizing electronic devices that could not possibly contain evidence of the crimes at issue. Thus, for example, Attachment B does not authorize the seizure of electronic devices such as radios, stereo equipment, clocks, watches, headphones, coffee makers, or televisions that cannot connect to the internet. The descriptive information provided in Attachment B serves to narrow the scope of the kinds of devices that law enforcement may seize from Mr. Johnson's residence to devices that could contain evidence about the child abuse offenses being investigated—devices such as computers, smart phones, external hard drives, and thumb drives.

Language in Attachment B about obtaining from Mr. Johnson physical biometric characteristics that may be needed to unlock devices seized from his residence is consistent with the defense's position that this warrant did not authorize a search of the seized devices. The

23

magistrate may have allowed the government to access biometric characteristics from Mr. Johnson while he was in their presence and custody to make it much easier and more efficient for the government to search those devices *later* in the event a warrant to search those devices was applied for and granted in the *future*.  Delaying collection of the biometric information from Mr. Johnson until after a warrant to search the devices has been issued would have been unnecessarily complicated and time consuming.  The government would likely need to file a motion with the Court seeking an order compelling Mr. Johnson to accompany law enforcement to allow them to gather biometric characteristics from him to unlock his electronic devices. From the government's perspective, proceeding in this manner is also riskier and more difficult because the government's motion may be opposed by defense counsel.  And, even if the government's challenged motion is granted, the government must then deal with the logistics of arranging a meeting with the defendant (an arrangement that can be particularly burdensome if the defendant is incarcerated) and ensuring that proper protocols are in place as law enforcement interact with a defendant who is represented by counsel.  Given these risks and complexities, it makes sense that the government would seek a warrant to immediately obtain physical biometric characteristics from Mr. Johnson to unlock devices seized from his residence *before* obtaining a warrant to search those devices.

Moreover, the officer's statement in Attachment B about obtaining Mr. Johnson's biometric characteristics "to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant" does not grant law enforcement additional authority beyond what the warrant by its plain terms authorizes.  *See* ECF 84, Ex. 3 at 5.  The government's claim that the warrant authorizes the search of the contents of any device is simply incorrect and nonsensical given the distinct attachments.  There is no assurance that the

24

magistrate found probable cause for law enforcement to search the contents of any devices or that the magistrate intended to authorize a search of any device. And, if the magistrate intended to authorize the search of the contents of seized devices, the Fourth Amendment requires that the court's authorization be stated in the warrant with greater particularity than the vague and overly broad description provided by Detective Sullivan in Attachment B.

For reasons discussed above, law enforcement officers violated Mr. Johnson's Fourth Amendment rights by searching his electronic devices without a warrant. The Court should accordingly grant Mr. Johnson a new trial which does not involve the admission of evidence obtained in violation of the Fourth Amendment, including (1) the "jump lists;" (2) the metadata from the devices; (3) the name and structure of folders on the laptop; and (4) the evidence admitted under Rule 404(b), as described above and in Section III *infra*.

## II.    The Court Should Grant Mr. Johnson a New Trial Because Evidence from His Google Account Should Have Been Suppressed, As Law Enforcement Searched His Google Account in Violation of the Fourth Amendment and the Good Faith Exception Does Not Apply.

The government also violated Mr. Johnson's Fourth Amendment rights when searching material from his Google account. First, Detective Sullivan conducted a warrantless review of files from Mr. Johnson's Google account that were contained within Google CyberTip reports that had been forwarded to law enforcement by NCMEC. Second, the government violated Mr. Johnson's Fourth Amendment rights again when it searched his entire Google account based on a warrant that was tainted by Detective Sullivan's initial unlawful search.

After several hearings on Mr. Johnson's motion to suppress evidence from his Google account, the Court found that the government's warrantless review of material from Mr. Johnson's Google account raised a "significant question." 4/2 Tr. 4. The Court was unpersuaded by the government's argument that evidence from Mr. Johnson's Google account

was admissible under the private search exception or the independent source doctrine.  *Id*. at 4-7, 11-13.  And without making any definitive findings about whether a warrant was required for Detective Sullivan to view material from Mr. Johnson's Google account in the CyberTip reports, the Court concluded that the good-faith exception rendered the exclusionary rule inapplicable in this case.  *Id*. at 7-8.  For reasons discussed below, this Court's ruling that the good-faith exception applied was erroneous.

The good-faith exception to the exclusionary rule was created to avoid suppression of evidence in cases where the impact of excluding unlawfully obtained evidence is unlikely to deter future police misconduct.  *See United States v. Leon*, 468 U.S. 897, 916 (1984).  The good-faith exception is reserved for situations where law enforcement acts with an "objectively reasonable good-faith belief that their conduct is lawful."  *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotations omitted).  When Fourth Amendment violations by law enforcement are not based on an officer's good-faith belief that he was acting lawfully, the good-faith exception does not apply and exclusion of the unlawfully obtained evidence remains the appropriate remedy.  *Leon*, 564 U.S. at 922-923.  For example, when a law enforcement officer's affidavit in support of a search warrant is knowingly or recklessly misleading, or when a police officer unreasonably relies on a deficient warrant, the exclusionary rule applies.  *Id*. at 923.

In the instant case, Detective Sullivan did not act in good faith under an objective test. The government concedes that, soon after Detective Sullivan obtained the CyberTip reports and accompanying files from Mr. Johnson's Google account, he reviewed those files—which he knew no law enforcement officer had previously reviewed—without a warrant.  Detective Sullivan could not have had an objectively reasonable belief that his conduct was lawful.  First, he had no warrant to rely on at all, but instead merely the hope that an *exception* to the warrant

requirement justified his actions, thereby lacking the bare minimum for the good-faith exception to apply—a warrant, however flawed. *See, e.g., United States v. Raymond*, No. CR 21-380 (CKK), 2023 WL 7005341, at *11 (D.D.C. Oct. 24, 2023) (collecting good-faith exception case law to show they are "innocuous" and "tend to revolve around a defective warrant."); *see also Herring v. United States*, 555 U.S. 135, 143-144 (2009) (holding the lack of a search warrant underlying "patently unconstitutional" conduct meant the good-faith exception did not apply); *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017) (holding an obviously overbroad and defective warrant meant the good-faith exception did not apply "notwithstanding the absence of any reason to suppose that officers acted in bad faith in relying on an invalid warrant."); *see also* 3/21 Tr. 16 ("there was no warrant for the search of the electronic devices, just no warrant.").

Even if Detective Sullivan's reliance on an *exception* to the warrant requirement was permissible, his testimony revealed that, at the time he conducted the warrantless search of the CyberTip files from Mr. Johnson's Google account, he knew or should have known his search was illegal. Specifically, Detective Sullivan knew (or acted in reckless disregard of) the following:

- Files identified as "child pornography" in the CyberTip reports may include files that do not violate federal child pornography laws because the definition for child pornography used in CyberTip reports differed from the definition used in the federal child abuse statutes relevant to the potential crimes Detective Sullivan was investigating. 4/1 Tr. 54.[12]

- He "was unsure of how they [Google] were hash matching." *Id.* at 40.

---

[12] In his applications for warrants in connection with Mr. Johnson's case, Detective Sullivan cited 18 U.S.C. §§ 2252 and 2252A as the relevant statues pertaining to his investigation. *See, e.g.*, ECF 94, Ex. A. These statutes prohibit material depicting "sexually explicit conduct," as defined in 18 U.S.C. § 2256. The definition used by the CyberTips to determine what constitutes "child pornography" is much broader than the "sexually explicit conduct" definition provided in 18 U.S.C. § 2256. *See* ECF 123, Ex. A at 11; *but see* 18 U.S.C. § 2256(2)(A).

- The CyberTip reports associated with Mr. Johnson's case indicated that no human at Google reviewed the files reported in the CyberTips.[13] *Id.* at 44-45; Gov. Ex. 1.

- There was no evidence that any law enforcement officer had previously reviewed the CyberTip files. *See* 4/1 Tr. 32.

- A warrant was required if the service provider "had not had a human review that file prior to NCMEC." *Id.* at 15.

- Based on his prior experience with CyberTips, he needed to seek a warrant before reviewing CyberTip material that had been identified only through a company's hash matching system. *Id.* at 15-16.

- He had access to multiple resources, including Assistant United States Attorneys, FBI agents, Google representatives, and NCMEC staff, that could have advised him whether a warrant was needed before searching Mr. Johnson's CyberTip files. *Id.* at 34-37.

Despite knowing all of the above, Detective Sullivan chose not to seek a search warrant for the CyberTip files or even to consult with anyone before viewing Mr. Johnson's CyberTip files. *Id.* at 40-41. Instead, Detective Sullivan reviewed them without a warrant and then, based on his warrantless review of the files, submitted a draft application to the United States Attorney's Office for a warrant to search Mr. Johnson's entire Google account. *Id.* at 22-23.

Additionally, by not obtaining any information about the details of the alleged training received by Google contractors who determine which files get classified as containing child pornography, law enforcement knew—or, at least, should have known—that the reliability of Google's entire hash matching system was precarious. While the government obtained from Google statements about Google employees and contractors being "trained on the federal statutory definition of child pornography and how to recognize it on [Google's] products and services," despite repeated challenges from defense counsel, the government never provided any

---

[13] After considering the evidence and arguments by counsel, the Court found that "it appears that no Google employee had viewed Johnson's images and videos, as opposed to someone else's copy or partial copy of those images and videos." 4/2 Tr. 5.

detail about the alleged training these individuals received.  *See* ECF 94, Ex. B at 3, ¶ 6.  The lack of information about the alleged "training" Google employees and contractors received to make determinations about what constitutes child pornography should have increased Detective Sullivan's concerns regarding the uncertainty of how Google was making hash matching decisions.  Without more information about the extent of any training, the accuracy of the information conveyed during any training, and the source of the training, a well-trained officer had no good-faith basis for relying on representations by Google about what constitutes child pornography.

Based on the above facts, Detective Sullivan could not possibly have had an objectively good faith belief that he was acting lawfully when he reviewed the contents of Mr. Johnson's Google CyberTip file without a warrant.  He viewed the CyberTip files despite his awareness that videos and images in the files were classified as child pornography based on a definition for child pornography that was significantly different than the one that applied to the potential crimes he was investigating.  He also viewed the CyberTip files despite knowing that a human may not have ever viewed the files to confirm that they contained evidence of suspected child pornography offenses.  In a similar CyberTip investigation that Detective Sullivan had handled prior to Mr. Johnson's case, Detective Sullivan knew that he was obligated to get a warrant.  And, if Detective Sullivan had any questions or uncertainty, he had a multitude of resources available to him from which he could have sought guidance.  Under these circumstances, Detective Sullivan's warrantless search of Mr. Johnson's CyberTip files was a reckless, if not deliberate, disregard of Mr. Johnson's Fourth Amendment rights.

In addition, Supreme Court precedent makes it clear that Detective Sullivan violated Mr. Johnson's Fourth Amendment rights through unconstitutional trespass, regardless of the nature of

the antecedent private search.  *See* ECF 99 at 4-5; ECF 134 at 3-4; *see also* 3/21 Tr. 5, 15, 51.

Under the *Jones* trespass test, the government needs a warrant to search property "for the

purpose of obtaining information," even when a private party had previously entered into or

interfered with the property, and even if the evidence sought to be suppressed is digital in nature.

*United States v. Jones*, 565 U.S. 400, 404-407 (2012); *see also* Andrew MacKie-Mason, *The*

*Private Search Doctrine After Jones*, 126 Yale L.J. F. 326, 328 (2017) (explaining the *Jones*

theory of trespass applies "even if the trespass does not violate the property owner's reasonable

expectation of privacy … [t]he fact that someone has previously entered or interfered does

almost nothing to erode the interest in exclusion.").  Put simply, it did not matter whether Google

or anyone else looked through the Google Account evidence before Detective Sullivan did—he

needed a warrant, and without one, he trespassed in violation of the Fourth Amendment.

Because the issuance of the warrant permitting the government to search Mr. Johnson's

entire Google account was tainted by Detective Sullivan's warrantless search of the CyberTip

files, all evidence seized from Mr. Johnson's Google account should have been suppressed.  The

impact Detective Sullivan's unlawful search had on his application for a warrant to search Mr.

Johnson's Google account was significant.  Detective Sullivan admitted that he understood the

government would seek a warrant to search Mr. Johnson's Google account "because we were

seeing CSAM in those files" that Detective Sullivan reviewed without a warrant.  4/1 Tr. 59.

And, as the affidavit in support of the Google search warrant shows, Detective Sullivan informed

the magistrate judge that he "reviewed the files provided by Google" and he included in his

affidavit graphic details of about four video files from the CyberTip reports that he was able to

offer only because of his warrantless review of those files.  *See* ECF 94, Ex. D at 21.

Accordingly, the good-faith exception to the exclusionary rule does not save the evidence from

Mr. Johnson's Google account from being suppressed.

### III.    The Resumption of Deliberations After Jury Polling Revealed the Identity of a Lone Holdout Juror Was Coercive, Mandating a New Trial.

The Court erred when it resumed deliberations, over the defense's motion for a mistrial, after Juror No. 1 openly disagreed with the verdicts, slumped forward, covered his face with his hands, began crying, and unequivocally stated that he did not agree with the verdict just announced. *See* 4/17 Tr. 1363-1370. Instead of discontinuing the jury poll at that point, the Court continued polling until the 11-to-1 split among the jurors was revealed—publicly identifying Juror No. 1 as the lone holdout—and then sent the jury back to continue its deliberations. This created a substantial risk of juror coercion and requires a new trial.

Jury polling has "long been regarded as a useful and necessary device for preserving the defendant's right to a unanimous verdict." *United States v. Brooks*, 420 F.2d 1350, 1354 (D.C. Cir. 1969). However, "[t]he Supreme Court has condemned, as coercive in its tendency, a judge's action in asking a jury reporting inability to agree to reveal its division and then sending the jury back." *Williams v. United States*, 419 F.2d 740, 746 (D.C. Cir. 1969) (citing *Brasfield v. United States*, 272 U.S. 448, 450 (1926)). As another court in this District has explained, "polls of the jury are dangerous since responses about the numerical division of the jury have been held to be error *per se* … [t]his rule is designed to prevent coerced verdicts." *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991) (citing *United States v. Amaya*, 509 F.2d 8 (5th Cir.1975)).

Contrary to the Court's concern when it denied Mr. Johnson's motion for mistrial, *see* 4/17 Tr. 1395, the Supreme Court's holding that revelation of the numerical division of a jury is coercive is not inconsistent with Federal Rule of Criminal Procedure 31(d). Rule 31 provides that if a juror poll "reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury." Fed. R. Crim. P. 31(d); *see also United States*

31

*v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("The purpose of the poll is to test the uncoerced unanimity of the verdict … eliminating any uncertainty as to the verdict announced by the foreman." (internal citations omitted)).  There are several ways in which a "lack of unanimity" could be revealed during a jury poll in a non-coercive way, permitting a court to direct the jury to continue deliberating without violating the defendant's Constitutional right to a unanimous verdict (though that is not what happened here).  Critically, Rule 31 does *not* require that the exact split as to a jury's votes be revealed during the poll.  For example, in *United States v. Dorsey*, the D.C. Circuit affirmed the District Court's decision when it "immediately stopped the polling" upon reveal of a dissenting juror (there, Juror No. 4) and then gave a jury instruction to, "return to the juryroom [sic] for further consideration of [the jury's] verdict", "continue your deliberations" if the jury has not reached a unanimous verdict and remember "any member is free to change his or her vote on any issue submitted to you."  865 F.2d 1275, 1276-1278 (D.C. Cir. 1989).[14]

Rule 31 also encompasses situations in which an apparent lack of unanimity is a result of confusion rather than disagreement with the substance of the verdict (though, again, that is not what happened here).  For example, in *Williams*, the court found that when a juror appeared to be confused by the polling methodology as well as by difficulty hearing the clerk, it was not coercive to ask the jury to return to the jury room, where further discussion may "clear up that

---

[14] That instruction "tracked almost exactly the instruction prescribed for aborted jury polls by Instruction 2.93 [of the District of Columbia Bar Model Criminal Jury Instructions,]" which is currently codified in Instruction 2.603 of the Model Criminal Jury Instructions, "Return of the Jury After Polling."  *See* Young Lawyers Section, Bar Association of the District of Columbia, Criminal Jury Instructions, District of Columbia 2-143 (5th Ed. 2016); *see also Dorsey*, 865 F.2d at 1276 (stating the trial judge's instruction in full).  Indeed, that Model Instruction offers additional language for use "where there has been a particularly high likelihood of juror coercion," including lone dissenter cases.  *Id.* at 2.603 (comment).

whatever seemed to suggest a division in the courtroom was merely a mistake in hearing, or understanding, and that in fact there was unanimity." *Williams*, 419 F.2d at 745-46; *see generally United States v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("jury polls are a matter where the need for clarity is at its zenith … the court should shape the form of the poll so as to minimize possible confusion by the jurors." (internal citations omitted)); *but see United States v. McCoy*, 429 F.2d 739, 741-742 (D.C. Cir. 1970) (holding the conviction "must be reversed" where the case is much closer to one with "no assurance that the jury freely and fairly arrived at a unanimous verdict" rather than one where the juror was "merely confused.").

In this case, however, Juror No. 1 was not confused by the poll. His disagreement with the verdict was clear and unequivocal, as demonstrated by his tone of voice, body language, and crying. *See* 4/17 Tr. 1363-1370. And unlike *Dorsey*, the Court did not stop the poll after Juror No. 1 disagreed with the verdict. By continuing to poll the rest of the jury, singling out Juror No. 1 as the single holdout, the Court created the substantial risk of coercion that the Constitution and Supreme Court precedent forbids. *Id.* at 1363. Mr. Johnson must be granted a new trial to ensure that his right to a unanimous verdict, free of coercion, is not infringed.

**IV.    The Jury's Access to the Draft Exhibit List Warrants a New Trial.**

A conviction must be reversed and a new trial granted where the jury received evidence not admitted during trial and its presence raised "the slightest possibility that harm could have resulted." *Dallago v. United States*, 427 F.2d 546, 560 & n. 58 (D.C. Cir. 1969) (quoting *United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967)). As other circuits have summarized, the "reasonable possibility that the extrinsic material could have affected the verdict" must lead to a new trial, as it is a "fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under

JA2221

circumstances assuring the accused all the safeguards of a fair trial." *United States v. Vasquez*, 597 F.2d 192, 193-194 & n. 1 (9th Cir. 1979) (collecting case law); *see also Turner v. State of La.*, 379 U.S. 466, 472-473 (1965) ("evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel").

On April 16, the parties and the Court were informed via jury note that the deputy clerk's annotated drafts of the exhibit lists and witness lists had been provided to the jury.[15] *See* 4/16 Tr. 1337-1338. The exhibits that were not admitted during trial were "[s]harpied over the name of the exhibit[,]" but a review of the pages revealed that for all of the entries "without much difficulty, [one could] see through the redactions and read what's there." *Id.* at 1341, 1345. The Court agreed it "would not have authorized" access to the draft lists and assumed "that the jury could and did read each and every one of those blacked out entries."[16] *Id.* at 1338, 1349.

A new trial must be granted because there is a strong likelihood that the jury's access to the extraneous information in the draft, annotated exhibit list was prejudicial to Mr. Johnson. *See Dallago*, 427 F.2d at 553 & n. 23 ("it is perfectly plain that the jury room must be kept free of

---

[15] It is unclear how long the draft exhibit lists had been present in the jury room. The jury began its deliberations in the afternoon on Friday, April 12. They deliberated all day on Monday, April 15, and the parties were not notified about the exhibit list error until midday on April 16. But even if the lists were not present for that entire period, the effect would still be prejudicial, particularly given that the import of the lists could be understood with little more than a glance. *See Dallago*, 427 F.2d at 556 (finding extrinsic evidence prejudicial when it was present in the jury room for only three hours out of five days of deliberations and was buried in the last two pages of an 87-page exhibit).

[16] The Court was correct to presume, without inquiring, that the jurors had reviewed the contents of the draft exhibit and witness lists. *See Vasquez*, 597 F.2d at 193 ([T]he actual impact upon the jury of such [extrinsic] evidence cannot be accurately measured or ascertained. ... Consequently, it is a useless exercise even to ask jurors whether such evidence in fact affected their verdict."); *Dallago*, 427 F.2d at 556 ("with its [extrinsic evidence's] presence in the jury room incontrovertibly appearing, we could not prudently presume that it was not read.")

34

evidence not received during trial, and that its presence, if prejudicial, will vitiate the verdict.") First, the exhibit list revealed to the jury a key fact that was not admitted during the trial: Mr. Johnson had made a post-arrest statement to the police. Significantly, Mr. Johnson's post-arrest statement was on the government's list—but *not* defense counsel's list—which could have led jurors to conclude that the contents of the statement were inculpatory. *See* ECF 162 (Defendant's Exhibit List); *see also* ECF 161 (Government Exhibit List) at 20, Ex. 202-202A.[17]

Second, based on the number of exhibits crossed out on each party's draft list, the lists telegraphed to the jury that the "vast majority" of the evidence proposed by Mr. Johnson was deemed inadmissible by the Court or insignificant by counsel, whereas a much greater quantity of the government's evidence was admitted. *See* 4/16 Tr. 1345-1346.[18] This may have left jurors with the impression, even implicitly, that the government's case was stronger than it actually was, and/or that defense counsel had doubts about the strength of their proposed evidence.

Although the weight of the government's evidence must be considered when determining whether the error was prejudicial, *see Dallago*, 427 F.2d at 558, in this case the evidence was not so overwhelming as to render harmless the erroneous provision of extrinsic evidence to the jury. This was a close case. The jury deliberated for more than three days before reaching a verdict, "and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner." *Id.* at 559; *see also Osborne v. United States*, 351 F.2d 111, 118 (8th

---

[17] The draft exhibit lists with the blacked-out "draft redactions" are no longer available, as they were not made part of the record. However, the annotated exhibit lists were available on the docket. *See* ECF 161, 162, 163. These drafts contain annotations of the date that any given evidence was marked for identification and/or received in evidence, with those cells left blank when neither occurred or evidence was not received in evidence. The Court can infer from the blank cells in the "Received in Evidence" column which entries would have been blacked out.

[18] Based on the annotated exhibit lists, 14 out of 18 entries in Mr. Johnson's list (approximately 77.8%) were blacked out, against only 21 out of 349 (approximately 6%) entries blacked out in the government's list.

(Page 42 of Total)

Cir. 1965) (jury's deliberation for two full working days, requesting an additional exhibit and re-reading of instructions, all "lends credence to the view that the case was a close and difficult one."). The jury also ultimately acquitted Mr. Johnson on ten counts of transportation of child pornography that were very similar to the charges upon which the jury convicted him, indicating that the jurors were drawing a very fine line between guilt and innocence. Under these circumstances, there was much more than the required "slightest possibility that harm could have resulted" from the provision of the draft exhibit lists. *Dallago*, 427 F.2d at 560. A new trial should therefore be granted.

## V. Mr. Johnson Should Be Granted a New Trial Because the Court Erroneously Admitted Evidence Under Rule 404(b) and Rule 403.

Rule 404(b)(2) permits the introduction of evidence of other bad acts for purposes other than propensity, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2). However, any such evidence should not be admitted unless the court also finds that its probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403. A court must exclude evidence under Rule 404(b) if the evidence is insufficient to find that the defendant actually committed the other crime or act. *See United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). "The exclusion of bad acts evidence is founded not on a belief that the evidence is irrelevant, but rather on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985) (citing *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)).

Courts in this Circuit thus follow a two-step analysis when determining whether to admit evidence of a defendant's other bad acts. "First, we inquire whether that evidence is relevant to a material issue other than character. If so, we proceed to the second inquiry, whether the probative value is substantially outweighed by the prejudice" under Rule 403. *United States v. Mitchell*, 49 F.3d 769, 774-775 (D.C. Cir. 1995).

In this case, the Court abused its discretion by admitting evidence under Rule 404(b) where there was insufficient evidence to establish that Mr. Johnson had actually committed the alleged other bad acts, when the other acts allegedly occurred long after the charged conduct, and/or because its probative value was substantially outweighed by the risk of unfair prejudice and other considerations under Rule 403. This was a close case, in which Mr. Johnson was acquitted on 10 of 16 counts and therefore the Court cannot find these errors harmless, either individually or in combination.

### a. Dropbox Folders

The Court permitted the government to introduce evidence that Mr. Johnson clicked on a Dropbox folder entitled "black teens and underage thots" ten times in June and July, 2020, purportedly to show his intent, knowledge, or lack of mistake when allegedly possessing and transporting child pornography between September 21 and October 1, 2020— several months later.

Even if the Court found that the government had satisfied the relevance requirement under Rule 404(b), this evidence should have been excluded under Rule 403. The probative value of this evidence was minimal because, unlike with similar files on Mega, none of the CSAM files in the Dropbox folder were found in Mr. Johnson's computer, phone, or Google drive, and the defense was able to show that Mr. Johnson never downloaded any files from that

Dropbox folder.  *See* 4/11 Tr. 857-858.  Particularly when the government was introducing other evidence from Mr. Johnson's browser history referring to files that *were* later found in his Google drive, the Dropbox evidence was highly likely to confuse jurors.  The risk of unfair prejudice was particularly high because many of the files in the charged counts were innocuous-looking strings of letters and numbers, *see* Counts 1, 3, 10-15, whereas the phrase "black teens and *underage thots*" was much more inflammatory.  Indeed, the government repeated this folder name approximately four times in its opening and closing arguments.  *See* 4/9 Tr. 301, 446; *see also* 4/12 Tr. 1207, 1222.  Moreover, the Dropbox evidence was needlessly cumulative given the other evidence that the government introduced of Mr. Johnson's knowledge, intent, and lack of mistake, including the Mega evidence and discussion of the alterations to the file structure from "courses" to "Haute Gurls."  *See, e.g.,* 4/12 Tr. 1207-1210, 1215-1217, 1219.

### b. Telegram Evidence

The Court also erred in allowing the government to introduce extensive evidence about the Telegram application, messages that Mr. Johnson received there, and three images of child pornography extracted from Telegram on Mr. Johnson's phone when it was seized in October 2021—a year after the charged conduct (collectively, the "Telegram evidence").  The Telegram evidence failed both prongs of the admissibility test for other bad acts evidence.  *See Mitchell*, 49 F.3d at 774-775.

*First*, the Telegram evidence failed to meet the relevancy test under Rule 404(b)(2).  The government had no evidence—and did not represent to the Court that it could show—that Mr. Johnson sent, *or even read*, any Telegram messages related to child pornography.  *See* 4/10 Tr.

38

726-728; *see also* 4/11 Tr. 902-903.[19]  Mr. Johnson's passive presence on Telegram without

interacting with any child pornography content does not tend to show that he knowingly and

intentionally possessed or transported the charged files.

Likewise, the government had insufficient evidence that Mr. Johnson *knowingly*

possessed the three child pornography images recovered from a "Telegram images" folder on his

phone.  The government's expert Mr. Tucker and the defense's expert Ms. Bush strongly

disagreed about whether Telegram's *default* settings would have caused these images to be

automatically downloaded onto Mr. Johnson's phone without his knowledge.  *See* 4/10 Tr. 731-

732, 734-735, 739-740; *but see* 4/11 Tr. 896-897, 957-959.  Yet there was no testimony

whatsoever about the *actual* settings in the Telegram app on Mr. Johnson's phone.  Moreover,

one of the images had "white gurlz" written across it, *see* 4/10 Tr. 648; Gov. Ex. 401-D, which

was inconsistent with all other evidence in the case demonstrating Mr. Johnson's sexual interest

in African Americans.  Thus, the Court should have excluded evidence of the Telegram images

under Rule 404(b) because there was insufficient evidence for the jury to find that Mr. Johnson

actually committed the bad act of knowingly possessing those images.  *See Bowie*, 232 F.3d at

930.

Furthermore, the Telegram evidence all post-dated the charged conduct by several

months.  The Telegram messages the government introduced were allegedly received by Mr.

Johnson between January 31 and June 15, 2021.  4/10 Tr. 645-652.  The government did not

establish when the Telegram images were downloaded to Mr. Johnson's phone, but they were

recovered in October 2021.  The relevancy of subsequent acts that occur long after the charged

---

[19] The government did not contest this point, eliciting only that one could affirmatively leave a
group after being added.  *See* 4/11 Tr. 922-923.

conduct is minimal.  *See Mitchell*, 49 F.3d at 776.  Thus, Mr. Johnson's alleged conduct in 2021

is not probative of his knowledge or intent during the charged conduct four to twelve months

*earlier*.

    *Second*, even if relevant, any probative value of the Telegram evidence was substantially

outweighed by countervailing concerns in Rule 403, particularly the danger of unfair prejudice,

wasting time, and needlessly presenting cumulative evidence.  *See* Fed. R. Evid. 403.  The unfair

prejudice to Mr. Johnson was significant.  Although Telegram has many legitimate uses, Mr.

Tucker was permitted to testify broadly that "individuals" use Telegram to "communicate in an

encrypted channel and exchange and send and receive, view CSAM or child sexual abuse

material."  4/10 Tr. 645.  Then, without any evidence that Mr. Johnson even read the messages,

Mr. Tucker read to the jury graphic and offensive language from them, including "pyt black teen

no limit," "includes young hos, cp, fetishes, incest, rape," and "links to young hose *(sic)* and no

limit and cp."  *Id.* at 645-651.  And, as discussed above, the government introduced three graphic

images of child pornography, without establishing that Mr. Johnson knowingly possessed them.

    In addition, the Telegram evidence essentially became a trial-within-a-trial, with literally

*hours* of expert testimony presented about how one gets added to a Telegram chat and how

Telegram's default settings operate.  Indeed, a significant portion of the government's rebuttal

case was devoted to the Telegram evidence, including testimony about further investigation that

Mr. Tucker had done after his testimony in the government's case-in-chief.  *See* 4/12 Tr. 1144.

This was a significant waste of time.

    Finally, to the extent any of the Telegram evidence was relevant and probative of Mr.

Johnson's knowledge and intent for the charged offenses, it was needlessly cumulative.  The

government introduced significant evidence of Mr. Johnson's conduct in the period leading up to

the charged offenses that was relevant to those elements, as well as direct evidence about aspects of the charged files and their folder structure that it argued was proof of knowledge, intent, and lack of mistake.  The Telegram evidence was surplusage that should never have been admitted.

### c.  Google Photos Evidence

Similarly, the Google Photos Evidence also failed both prongs of the admissibility test for other bad acts evidence.  *See Mitchell*, 49 F.3d at 774-775.

This evidence failed the relevancy prong of Rule 404(b) because there was insufficient evidence for the jury to conclude that Mr. Johnson committed any "bad act" with respect to Google Photos.  *See Bowie*, 232 F.3d at 930.  Mr. Johnson did not create the albums, *see* 4/10 Tr. 720-722; there was no evidence he had seen any chats or comments posted in the albums, *see id.*; there was no evidence Mr. Johnson knew he had been added to the albums, *see* 4/11 Tr. 852-854, 919-921, 964-967; and no child pornography material was recovered from the albums, *see id.*

In addition, the Google Photos Evidence was even more remote in time than the Telegram Evidence.  For example, the shared photo album "pyt videos" was created on September 21, 2021, *see id.* at 920, Gov. Ex. 401-G,—almost a year after the charged conduct—and thus not probative for the same reasons discussed above.

The Google Photos Evidence also failed to meet the second prong because its minimal probative value was substantially outweighed by unfair prejudice, wasting time, and needlessly presenting cumulative evidence.  *See* Fed. R. Evid. 403.  It was unfairly prejudicial for the government to introduce evidence implying that Mr. Johnson was seeking out child pornography in Google photo groups when it had no evidence that he ever interacted with any of those groups or their users.  This evidence also wasted time because it required the defense to elicit testimony from Ms. Bush to interpret the technical information in the Google photos section of the search

41

warrant return, *see* 4/11 Tr. 852-854, and explain how artifacts from a Google photo album could end up on an extraction from Mr. Johnson's phone without his doing anything to make that happen, *see id.* at 964-966.  Finally, to the extent any of the Google Photos Evidence was relevant and probative of Mr. Johnson's knowledge and intent for the charged offenses, it was needlessly cumulative, for the same reasons discussed above.

### d. Tor Browser

Evidence of the Tor browser on Mr. Johnson's computer should have been excluded as irrelevant and/or more prejudicial than probative.  *See* Fed. R. Evid. 402, 403.

Before trial, the government had told the Court and defense that it did not intend to introduce evidence about Tor.  *See* 4/10 Tr. 565-567.  At trial, during cross-examination of Special Agent Cavillo, the defense sought to establish that Mr. Johnson only accessed CSAM through legitimate internet sites, as opposed to the dark web.  *Id; see also* 4/9 Tr. 466-473.  The government then notified the Court that it would seek to introduce Tor evidence through its digital forensic expert.  4/9 Tr. 502.  Defense counsel objected, noting that the government has no evidence that Tor was used for any nefarious purpose and that introducing the fact that Mr. Johnson had Tor on his computer served no purpose other than character assassination.  *Id.* at 502-503; *see also* 4/10 Tr. 566-568.  The Court disagreed, ruling that "the government's evidence as to Tor is now both more probative than it was before and less prejudicial than it would have been because of the line of questioning yesterday."  4/10 Tr. 570.

Mr. Tucker's testimony then illustrated just how irrelevant this evidence was.  Mr. Tucker testified that Tor was installed on Mr. Johnson's computer when it was seized approximately a year after the charged conduct.  *Id.* at 611, 613.  But he admitted there was not so much as an *allegation* in the case that Mr. Johnson had used Tor to search for child pornography and that his

computer did not show any use of Tor whatsoever.  *Id.* at 705.  The absence of any evidence that Mr. Johnson had *used* Tor was corroborated by the defense expert Ms. Bush.  *See* 4/11 Tr. 969-971.  The mere presence of an unused browser on Mr. Johnson's computer, long after the charged conduct, does not make it any more or less likely that Mr. Johnson knowingly and intentionally possessed or transported child pornography as charged in this case.

Even if the presence of Tor on Mr. Johnson's computer had any relevance (and it did not), it should have been excluded under Rule 403 because any probative value was substantially outweighed by unfair prejudice.  The government was allowed to smear Mr. Johnson's character by informing the jury that Tor allows the user (*i.e.*, Mr. Johnson) to access the "dark web."  4/10 Tr. 611.  Notably, the government did not identify the Tor browser in its Rule 404(b) Notice, presumably because mere installing Tor is neither a crime nor a "bad act."  However, the government then proceeded to elicit testimony about Tor for precisely the purpose that Rule 404(b) forbids: to show that Mr. Johnson acted in accordance with the bad character of someone who searches for child pornography on the "dark web."

## VI.  The Court Should Grant Mr. Johnson's Motion Based on the Cumulative Effect of the Errors Listed Above.

Mr. Johnson respectfully submits that the errors grouped above in sections I, II, III, IV and V are each, standing alone, sufficient to provide him with a new trial.  To the extent the Court disagrees, however, the cumulative effect of those errors plainly warrants vacating Mr. Johnson's conviction.  *See, e.g., United States v. McGill*, 815 F.3d 846, 947 (D.C. Cir. 2016) ("the total effect of numerous small missteps may deprive a defendant of a fair trial[.]") (quoting United States v. Celis, 608 F.3d 818, 847 (D.C. Cir. 2010)); *United States v. Oberle*, 136 F.3d 1414, 1423 (10th Cir. 1998) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error.").  The

Court must both "analyze[] each ground for the defendant's motion separately," and "consider[] the cumulative effect of all the prosecution's missteps." *United States v. Khatallah*, 313 F. Supp. 3d 176, 196 (D.D.C. 2018) (citing *United States v. Holmes*, 413 F.3d 770, 774-775 (8th Cir. 2005)).  Even if the errors above did not individually warrant a new trial, which Mr. Johnson submits they do, their cumulative effect plainly necessitates it.

## **CONCLUSION**

For all the foregoing reasons, Mr. Johnson respectfully requests that the Court grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

<div style="text-align: right">

Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

</div>

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of July 2024, the foregoing was served electronically

on the counsel of record through the U.S. District Court for the District of Columbia Document

Filing System (ECF) and the document is available on the ECF system.

<div align="right"><em><u>/s/ Jonathan Jeffress</u></em><br>Jonathan Jeffress</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

**v.**                          **Case No. 22-cr-0176 (CJN)**

**STEPHEN JOHNSON**
                **Defendant.**

**[PROPOSED] ORDER**

Upon consideration of Defendant Stephen Johnson's Motion for a New Trial pursuant to

Federal Rule of Criminal Procedure 33, any opposition thereto, any reply in further support

thereof, and the entire record herein, in the interest of justice, it is hereby:

**ORDERED** that the motion is **GRANTED.**

**SO ORDERED.**

Date: _____

                          _____
                          CARL J. NICHOLS
                          United States District Court Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-176 (CJN)** |
| **STEPHEN JOHNSON,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT STEPHEN JOHNSON'S MOTION FOR A NEW TRIAL**

The United States of America, by and through undersigned counsel, files this response in opposition to the defendant's motion for a new trial under Federal Rule of Criminal Procedure 33.

Rule 33 allows the Court to vacate any judgment and grant a new trial "if the interest of justice so requires." *See* Fed. R. Crim. P. 33(a). "Granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2004) (cleaned up). As set forth below, the defendant has identified no such circumstances here.

The defendant argues that he should get a new trial because (1) the Court denied his motion to suppress evidence seized from the his digital devices, (2) the Court denied his motion to suppress evidence obtained from his Google account, (3) a court clerk provided redacted exhibit lists to the jury, (4) the jury resumed deliberating after a jury poll indicated a lack of unanimity, and (5) the Court improperly admitted certain Rule 404(b) and Tor browser evidence. None of these arguments entitles the defendant to a new trial.

Three of the issues—this Court's denial of his two suppression motions and admission of the Rule 404(b) evidence—have already been litigated extensively. The defendant seeks to

relitigate decided issues by rehashing old arguments this Court has already considered and rejected. His motion as to these issues—which do not warrant reconsideration—should be denied.

In addition, neither the jury's receipt of the exhibit lists nor the jury's continued deliberations after the first verdict warrant a new trial. As to the jury receiving the exhibit list— and consistent with the decision of many other courts facing this issue—no evidence of prejudice exists warranting a new trial. And Federal Rule of Criminal Procedure 31(d) expressly permitted the Court to "direct the jury to deliberate further" once the jury poll revealed a lack of unanimity.

Because none of the defendant's arguments warrant a new trial, his Rule 33 motion for a new trial should be denied.

## **BACKGROUND**

In September 2020, Google reported to the National Center for Missing and Exploited Children, or NCMEC, that a user had uploaded several hundred files containing child pornography to the Google Drive account stephenjohnson1197@gmail.com. *See* Gov't Exs. 100-1 to 100-19. NCMEC forwarded the information, called "CyberTips," to law enforcement. *See* 4/9/24 Tr. at 346:18-23.

After initially reviewing some of the files from NCMEC, law enforcement sought a search warrant to review the full contents of the CyberTips. *See* 4/1/24 Tr. at 18-24. The magistrate judge assigned to the search warrant held hearings *sua sponte* on whether a search warrant was even necessary. *See id.* at 24:25–25:14. The magistrate judge eventually found that the government had established probable cause but that the government did not need a search warrant to review the NCMEC CyberTips. *See Matter of Search of Encrypted Data Provided by National Center for Missing and Exploited Children for Nineteen Related Cyber Tipline Reports*, No. 20-SW-321, 2021 WL 2100997 (D.D.C. May 22, 2021) (Faruqui, M.J.).

Law enforcement then obtained a search warrant for the defendant's Google account.  *See* 4/1/24 Tr. at 26:5-9.  After searching the defendant's Google account, law enforcement obtained an arrest warrant for the defendant and a search warrant for the defendant's apartment.  *See* 4/9/24 Tr. at 379:20-23.  The Federal Bureau of Investigation arrested the defendant on October 7, 2021.  *Id.* at 379:24-25.

As relevant to this trial, a federal grand jury returned a second superseding indictment charging the defendant with 15 counts of 18 U.S.C. § 2252(a)(1), (b)(1) (transportation of child pornography) and one count of 18 U.S.C. § 2252(a)(4)(B), (b)(2) (possession of child pornography).  (*See* ECF 110).

Before trial, the defendant moved to suppress evidence obtained from his Google account (ECF 82), apartment (ECF 83), and electronic devices within his apartment (ECF 84).  This Court received extensive briefing on the search issues, held oral argument on March 21, 2024, and conducted an evidentiary hearing on April 1, 2024.  The Court ultimately denied the defendant's motions to suppress.  *See generally* 4/2/24 Tr. at 3-17.

Trial began on April 9, 2024.  The government's evidence showed that on September 21 and October 1, 2020, the defendant uploaded over two hundred files containing child pornography to his Google Drive account.  *See* Gov't Exs. 100-1 to 100-19.  Some of the uploaded files had been on the defendant's laptop for months before he uploaded them to Google Drive.  *See* Gov't Ex. 412; 412A.  Evidence also showed that the defendant viewed some of the files on his web browser, *see* Gov't Ex. 400A, and opened other child pornography files using the Microsoft Movies & TV application, *see* Gov't Ex. 412A.

The defense argued that the defendant did not knowingly possess or upload child pornography, and that he had inadvertently downloaded it while seeking out adult pornography. *See* 4/9/24 Tr. at 305:4-8; 306:3-4; 309:11-14; 311:5-12.

In response to this defense, the government introduced, and the Court admitted, additional evidence from the defendant's Google account and cellphone showing other times he had accessed websites and groups with names indicative of child pornography. For example, the defendant repeatedly visited a Dropbox folder called "Black teens and underage thots" less than three months before he uploaded child pornography to his Google Drive. *See* Gov't Ex. 400B. The defendant's cellphone also showed he was in multiple groups on both Telegram and Google Photos that advertised child pornography. *See* Gov't Exs. 401E; 401G; 402B; 402C. Some of the groups, like the Google Photos shared album "13-17 lesbian cp," were named in ways that clearly conveyed child pornography. *See* Gov't Ex. 401E. The cellphone also showed that three images containing child pornography had been downloaded from Telegram. *See* Gov't Ex. 401D.

The jury first indicated it had reached a verdict in the early afternoon of April 17, 2024. *See* 4/17/24 Tr. at 1358:24. As the foreperson read the verdict, the defendant's supporters in the gallery engaged in repeated, emotional outbursts, with one person shouting at the jury, "I hope you can sleep at night." *See id.* at 1368:11-14; 1386:3-4. Jury polling then revealed a lack of unanimity. *See id.* at 1363:16-17.

The defense moved for a mistrial. After taking a short recess and hearing from the parties, the Court denied the motion, finding that the record did not "demonstrate clearly, if at all that there had been coercion, rather than a change of mind or a reaction to the enormity of the moment or a reaction to the outburst in the crowd[.]" *See id.* at 1379:21–1380:5. The Court instructed the jury to continue deliberating. *Id.* at 1381:5-12.

A few hours later, the jury again indicated that it had reached a verdict. The jury convicted the defendant of five counts of transportation of child pornography and one count of possession of child pornography. *See id.* at 1397:4–1400:2. Jury polling confirmed that the verdict was unanimous. *See id.* at 1400:9–1401:9. At the defense's request, the Court conducted limited voir dire that removed any doubt as to the unanimity of the jury's verdict. *Id.* at 1404:19-20.

The defendant now moves for a new trial under Federal Rule of Criminal Procedure 33.

## ARGUMENT

**I.    The Defendant's Rehashed Suppression Arguments Do Not Support a New Trial.**

The defendant argues that the Court's failure to suppress evidence from his digital devices and his Google account warrant a new trial. *See* Def.'s Mot. at 19–31. These two arguments simply rehash the defendant's suppression arguments without providing any new legal or factual grounds to support his motions. *See, e.g., United States v. Williams*, No. 18-CR-149-1, 2022 WL 1136573, at *4 (N.D. Ill. Apr. 18, 2022) ("Because [defendant] adds nothing new to his previous arguments, he has not given the Court any reason to reconsider these earlier rulings. Put differently, [defendant's] arguments made in the present motion do not meet the burden placed on defendants to provide adequate grounds for relief under Rule 33."); *cf. Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (holding that bases for reconsideration include "when the Court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court" (alteration in original) (internal quotation marks and citation omitted)).

As it pertains to his rehashed suppression arguments, the defendant's motion should be denied.

### A. The Search of the Digital Devices

The defendant first asks this Court to reconsider its denial of his motion to suppress evidence from his digital devices. *See* Def.'s Mot. at 19–25. He primarily focuses on his belief that the search warrant for the defendant's apartment did not authorize the search of digital devices within the apartment. *Id.* The government has already responded on this issue, both in briefing (ECF 94) and at oral argument, and it incorporates its earlier arguments by reference. At bottom, though, the defendant ignores that Attachment B of the search warrant, which was incorporated by reference, expressly allows for seizure of evidence from the digital devices found in the apartment:

> 3. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Devices":
>
>> a. Information, correspondence, records, and documents constituting evidence of the possession, receipt, distribution, or production of child pornography including: [. . .]

(*See* ECF 94, Ex. E at 7).

The Court previously considered the parties' arguments and denied this motion, finding that the search warrant incorporated Attachment B by reference and ruling that the "most natural way to read these various authorizations is as allowing the government to enter Johnson's devices to look for and then to seize certain content." 4/2/2024 Tr. at 17:4-7. The defendant identifies no basis for the Court to reconsider its ruling. Instead, he rehashes the same points he made in his motion and at oral argument. His motion for a new trial as to this argument should be denied.

### B. The Search of the Google Account

The defendant next argues for reconsideration of this Court's denial of his motion to suppress evidence from his Google account. *See* Def.'s Mot. at 25–31. The defendant primarily argues that because law enforcement conducted a warrantless review of the CyberTip reports from

Google, that review of the CyberTip reports tainted the subsequent search warrant for the defendant's account. *See id.*

This issue was exhaustively litigated before trial. The Court received extensive briefing from the parties (ECF 94, 99, 121, 128, 133, 134, 136, 140, 142) and heard oral argument. It then held an evidentiary hearing at which it took testimony from Detective Thomas Sullivan. *See generally* 4/1/24 Tr. at 1-64. Once again, the government has already responded at length on this issue, both in briefing (ECF 94, 133, 136, 140) and at oral argument, and it incorporates its earlier arguments by reference.

The Court ultimately denied this motion to suppress. *See* 4/2/24 Tr. at 13:7-12. The Court noted that the question of whether a search warrant was needed under these circumstances was a "difficult one." *See* 4/2/24 Tr. at 5:1-2. But the Court did not decide the issue. *See id.* at 7:13-16. Rather, the Court found that the good faith exception to the exclusionary rule applied to both the detective's initial viewing of the files and the government's viewing and use of the files after the magistrate judge found no warrant was needed. *See id.* at 7–12; *see also Davis v. United States*, 564 U.S. 229 (2011); *Herring v. United States*, 555 U.S. 135, 137–138 (2009). Among other things, the Court found that the detective followed then-existing precedent from the Courts of Appeals and did not act "deliberately, recklessly or with gross negligence." *See* 4/2/24 Tr. at 10:10–11:5.

The defendant again makes no new arguments that change that analysis. The suppression issues were extensively litigated before trial, and the defendant rehashes the same arguments this Court has already considered and rejected. Because the defendant identifies no proper basis for this Court to reconsider its ruling, his motion for a new trial as to the suppression arguments should be denied.

## II.    The Court, Consistent with Rule 31(d), Instructed the Jury to Keep Deliberating After July Polling Revealed a Lack of Unanimity.

The defendant argues that the Court erred in instructing the jury to keep deliberating after jury polling revealed a lack of unanimity. This argument is meritless. Under Federal Rule of Criminal Procedure 31(d), the Court had to poll the jury at the defense's request. Fed. R. Crim. P. 31(d) ("[T]he court *must* on a party's request . . . poll the jurors individually."). And once the jury poll revealed a lack of unanimity, Rule 31(d) explicitly authorized the court to "direct the jury to deliberate further." *Id.*

### A.    Additional Facts

On April 17, 2024, the jury indicated it had reached a unanimous verdict. *See* 4/17/24 Tr. at 1358:24–1359:1. The jury foreperson read the verdict in open court, finding the defendant guilty of six counts of transportation of child pornography (Counts 1, 2, 3, 5, 7, and 8), one count of possession of child pornography (Count 16), and acquitting him of the rest. *Id.* at 1359–62. While the jury foreperson read the verdict, the defendant's supporters in the gallery engaged in repeated, emotional outburst, shouting "no" at the jury. This disruption was loud enough that the court reporter captured "no" repeatedly in the transcript. *See id.* at 1359:17; 1360:5; 1360:14; 1360:19; 1362:7; 1362:12. The government made a record as to what had unfolded, including that members of the audience were yelling "no" and also that a gallery member yelled "I hope you can sleep at night" while the foreperson read the verdict. *See id.* at 1368:6-14. The Court noted that while these events would likely not all be reflected in the transcript, the Court "personally observed" these events and called the government's description an "accurate recitation of what occurred." *See id.* at 1368:20-24. Multiple members of the Court's staff also heard a gallery member yell either "I hope you can sleep at night" or "tonight." *See id.* at 1386:3-4.

8

The defense asked to poll the jury. *Id.* at 1363:8-9. Juror 1 said that this was not his verdict and then leaned forward in his seat, sobbing. *Id.* at 1363:16-17. The Court finished polling the jury. *Id.* at 1363:18–1364:14. The defense then moved for a mistrial. *See id.* at 1365:7-11.

In evaluating the defense's motion for a mistrial, the Court found the record did not "demonstrate clearly, if at all that there had been coercion, rather than a change of mind or a reaction to the enormity of the moment or a reaction to the outburst in the crowd[.]" *See id.* at 1379:21–1380:5. The Court denied the motion. *Id.* at 1380:12-13.

Instead, consistent with Rule 31(d), the Court instructed the jury to continue deliberating. In doing so, the Court emphasized:

> The goal here is not to force you to reach a verdict or to suggest in any way what your verdict should be. Do not surrender your honest vocation as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

> But since you have not reached a unanimous verdict, please continue your deliberations.

*Id.* at 1381:5-12.

A few hours later,[1] the jury indicated again that it had reached a unanimous verdict. The jury convicted the defendant of five counts of transportation of child pornography (Counts 1, 2, 5, 7, 8), one count of possession of child pornography (Count 16), and acquitted him of the rest. *See id.* at 1397:4–1400:2. This time, the jury poll was unanimous. *See id.* at 1400:9-1401:9.

The defense then asked to poll Juror 1 outside the presence of the other jurors. *See id.* at 1402:16-17. The Court agreed to do so. *See id.* at 1403:9-15; 1404:2–1405:16. Juror 1,

---

[1] The jury sent a note indicating it had reached a unanimous verdict, signed at 11:35 a.m. on April 17, 2024. (ECF 164). The transcript on April 17, 2024, begins at approximately 12:06 p.m., and the Court took the first verdict shortly thereafter. The jury sent a second note, indicating it had again reached a unanimous verdict, signed at 3:20 p.m. (ECF 164). The second verdict was taken shortly after 4:05 p.m. *See* 4/17/24 Tr. at 1385:6.

9

unprompted, stated that his issues were that "it's a very serious charge" and "a bad situation for everybody." *Id.* at 1404:19-20.   Juror 1 confirmed that this was his verdict and that the evidence established the defendant's guilt.  *See id.* at 1404:2-1405:15.

### B.  Argument

The defendant argues that further deliberations were "coercive" because Juror 1 was revealed as the lone holdout.  Neither the facts nor case law support that argument.

First, the facts show that no coercion occurred here because the jury's further deliberations led the jury to acquit the defendant of an additional count. When the jury returned the second verdict, it acquitted the defendant of Count 3; during the first verdict, the foreperson read a "guilty" verdict as to that count.  *Compare* 4/17/24 Tr. at 1359:18-21 ("guilty") *with* 4/17/24 Tr. at 1397:12-15 ("Not guilty").  That fact alone shows that Juror 1 was not coerced into simply accepting a verdict reached by the other jurors.

Second, continuing the jury poll is not coercive unless the court coerced the jurors into prematurely rendering a decision.  *See United States v. Brooks*, 420 F.2d 1350, 1354 (D.C. Cir. 1969) (rejecting argument that jury polling that continued after one juror disagreed with verdict and one juror had reservations as to the verdict was coercive); *Williams v. United States*, 419 F.2d 740, 745–46 (D.C. Cir. 1969).  *Williams* involved the first juror—like Juror 1 here—indicating disagreement and confusion with the jury verdict.  *See id.* at 745.  The court finished polling the other jurors before directing the jury back to the jury room to determine what their unanimous verdict was.  *See id.*  The D.C. Circuit rejected the argument that this polling was coercive, finding that "the mere fact that the announcement by one juror seems to differ from the judgment of the other jurors" did not amount to "impermissible coerciveness."  *Id.* at 746.

10

Other circuits agree. In *United States v. Penniegraft*, for example, the Fourth Circuit rejected the same claim that the defendant makes here: that continuing polling after a juror disagreed with the verdict was coercive. *See* 641 F.3d 566, 580 (4th Cir. 2011). Rather, the *Penniegraft* court, citing *Brooks*, found no error with continued polling under Rule 31(d) absent the court coercing the jurors into "prematurely rending a decision." *Id.; accord United States v. Gambino*, 951 F.2d 498, 501 (2d Cir. 1991) (holding "reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rending a decision, and not merely because the judge continued to poll the jury"); *United States v. Fiorilla*, 850 F.2d 172, 176–77 (3d Cir. 1988) (same); *Amos v. United States*, 496 F.2d 1269, 1273 (8th Cir. 1974) (same); *United States v. Carraway*, 108 F.3d 745, 751 (7th Cir. 1997) (discerning "no error in the decision to complete the polling," "let alone any prejudice to" the defendant).

Nothing about how the Court continued polling here coerced the jury into "prematurely rendering a decision." The Court did not impose time pressures on the jury to reach a verdict or inquire into why any juror agreed or disagreed with the verdict. To the contrary, the Court emphasized that the goal was "not to force you to reach a verdict" or "suggest what your verdict should be." 4/17/24 Tr. at 1381:5-7. Indeed, the jury deliberated several more hours without any pressure from the Court, leading the jury to acquit the defendant of an additional count. Nor did the Court single out the dissenting juror in front of other jurors. *Compare with United States v. Spitz*, 696 F.2d 916, 917–18 (11th Cir. 1983) (finding coerciveness when the court, after a juror indicated disagreement with the verdict, finished polling the jury, had the dissenting juror stand, asked the juror to confirm again that this was not their verdict, then began giving an *Allen* charge while the juror was still standing). By continuing the polling here, the Court avoided singling out Juror 1's response under the circumstances.

11

The only potential coercion of the jury came not from the Court but from the defendant's supporters in the gallery.  During the reading of the first verdict, the defendant's supporters engaged in repeated, emotional outbursts.  Members in the gallery repeatedly yelled "no" almost every time the jury foreperson said "guilty."  And multiple people in the courtroom, including a member of the Court's staff, heard someone yell, "I hope you can sleep at night," as the foreperson read the verdict.

Third, the defense's failure to contemporarily object to the continued polling "demonstrates to some degree the absence of a coercive atmosphere."  *See Fiorilla*, 850 F.2d at 176; *Brooks*, 420 F.2d at 1354 (finding any additional coercion from continued polling was "relatively slight" in light of defense counsel's failure to object);  *Penniegraft*, 641 F.3d at 579, 579 n.5 (noting that there was "no objection to continued polling of the entire jury" and concluding that that "some degree" of deference to defense counsel's lack of objection is warranted because continued polling could be beneficial to the defendant); *Amos*, 496 F.2d at 1273 (finding the "lack of objection by counsel permits an inference that the procedures utilized did not appear coercive at the time").

To argue coerciveness, the defendant relies on cases finding error in polling jurors in deadlock situations.  *See Brasfield v. United* States, 272 U.S. 448 (1926); *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991).  But reliance on *Brasfield* is "largely misplaced" because a "jury poll, it is clear, stands on quite a different footing[.]"  *See Brooks*, 420 F.2d at 1354.  Unlike in deadlock situations, Rule 31(d) mandates polling on a party's request.  *See* Fed. R. Crim. P. 31(d).

Finally, the Court's colloquy with Juror 1 after the second verdict outside the presence of other jurors ensured that Juror 1's verdict was his own and based on the evidence at trial, not coercion from the Court or other jurors.  Juror 1 unequivocally stated that he agreed with the verdict and that the evidence established the defendant's guilt.  *See* 4/17/24 Tr. at 1404:2–1405:16.

12

The Court neither erred in polling the jury nor coerced Juror 1 into reaching any certain verdict (or a verdict at all). As to this argument, the defendant's motion should be denied.

III.    **The Jury's Receipt of Redacted Exhibit Lists Does Not Warrant a New Trial Because the Neutral Descriptions of Cumulative Evidence Were Not Prejudicial.**

The defendant next argues that the court clerk's delivery of the defense and prosecution exhibits lists to the jury was reversible error. The exhibit lists, however, could not have prejudiced the jury's verdict because they contained neutral and objective descriptions of evidence that were mostly cumulative of evidence already seen by the jury. Because the exhibit lists did not prejudice the jury's verdict, no new trial is warranted.

### A. Additional Facts

The jury began deliberating late on Friday, April 12, 2024. The following Tuesday, the Court alerted the parties that a courtroom deputy had given a copy of the government and defense exhibit lists to the jury. *See* 4/16/24 Tr. at 1338–39. The clerk had tried to redact the listed exhibits that were not admitted in evidence using a black marker. *See id.* Some, if not all, of the "blacked out" exhibit descriptions could be seen through the black marker. *Id.*

Unredacted versions of both the government's exhibit list (ECF 162) and the defense's exhibit list (ECF 163) were uploaded to the docket.

The government's exhibit list was 24 pages long. (ECF 161). Most of the exhibits on the government's list, 328 of the 349 listed, were admitted during the trial. *See id.* The defense later admitted two of the 21 unadmitted government exhibits on the list: government exhibit 413 was admitted as defense exhibit 18, and government exhibit 410 was admitted as defense exhibit 19. Other unadmitted government exhibits listed were cumulative of evidence introduced during the trial, including:

- Government Exhibit 4: A hard drive containing Exhibit 3, which was cumulative because Exhibit 3 was admitted;

<center>13</center>

- Government Exhibit 108: Google CyperTip Log, which was cumulative because all this information was included on Government Exhibits 100-1 to 100-19;

- Government Exhibits 321–324: Four photographs labeled as DSC_0093, DSC_0094, DSC_0097, and DSC_0098, which were additional photographs in a series of search warrant photographs admitted as Government Exhibits 300-320;

- Government Exhibits 401 and 402: A scoped extraction report for the defendant's Samsung cellphone. The pertinent parts of these two report were admitted as Government Exhibits 401A, 401B, 401D, 401E, 401G, 401I, 402B, and 402C;

- Government Exhibit 414: Samsung Galaxy Note 10 Plus Browser History, which was mostly duplicative of data admitted in Government Exhibit 400, the Google Chrome Browser history.

In arguing prejudice, the defense focused on two entries relating to the defendant's post-arrest statement as potentially prejudicial. *See* 4/16/24 Tr. at 1346:6-18. Those two entries, on page 20 of the government's exhibit list, read:

| 202 | October 7, 2021, Interview of Stephen Johnson | | | Calvillo | |
| 202A | Transcript of Exhibit 202 | | | Calvillo | |

Based on this purported prejudice, the defense requested a mistrial. *See id.* The Court denied the motion for a mistrial. *See id.* at 1349:2-3. For analytical purposes, the Court assumed that the jurors could see each entry, even if the clerk had tried to redact it. *See id.* at 1349:13-23. The Court found that the jury having seen the names was not prejudicial and "certainly not sufficiently prejudicial to warrant a mistrial." *Id.* at 1350:1-3. The Court reasoned, among other things, that jurors frequently hear of evidence that is not admitted, such as when attorneys try to lay a foundation but the evidence is not admitted, or when testimony or evidence is stricken from the record. *See id.* at 1350:4-17. The Court then gave the jury a curative instruction:

In particular, it's come to our attention that both sides' exhibit lists were provided to you on Friday, April 12. Those lists are not themselves evidence, and you should

14

not weigh anything in those documents, including their length, as evidence in the case.

Furthermore, the lightly redacted or the drawn-through entries concerned exhibits never entered into evidence, so you should disregard those entirely as well. You must not consider either of the exhibit lists in your deliberations.

*See* 4/16/24 Tr. at 1352:19–1353:3. The defense, without waiving its request for a mistrial, agreed to the language in the curative instruction. *See* 4/16/24 Tr. at 1347:2-3.

The jury deliberated into the next day before returning its guilty verdict.

### B. Argument

The court clerk's delivery of the exhibit lists to the jury room does not warrant a new trial. No one disputes that the court clerk should not have provided the exhibit lists to the jury without informing the parties and the Court. But without showing prejudice, no new trial is warranted. *See United States v. Treadwell*, 760 F.2d 327, 339 (D.C. Cir. 1985) (finding no reversible error even though jury received unadmitted substantive evidence without a showing of prejudice). Prejudicial error exists when the error could have swayed the jury verdict, *see id.*, and it depends on several factors, including "the force of the unfairly prejudicial evidence, whether that force was mitigated by curative instructions, and the weight of the admissible evidence that supports the verdict." *See United States v. Roy*, 473 F.3d 1232, 1238 (D.C. Cir. 2007) (quoting *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004)) (rejecting, on plain error review, that sending an indictment listing incorrect predicate felonies to the jury warranted a new trial).

The prejudice here—if any—was minimal. To start, the exhibit lists had "neutral or objective" descriptions that are unlikely to be prejudicial. *See United States v. Wiley*, 846 F.2d 150, 157–58 (2d Cir. 1988); *cf. Roy*, 473 F.3d at 1238 (finding insufficient showing of prejudice in felon in possession trial when the jury received indictment that *incorrectly* identified predicate crimes of "Assault with Intent to Kill" and "Use of a Handgun in the Commission of a Crime of

15

Violence"). In *Wiley*, much like what happened here, the exhibit list inadvertently made it into the jury room without the district court's knowledge. *Id.* at 157. The exhibit list contained "neutral or objective" descriptions of evidence, and the district court issued a prompt curative instruction. *Id.* at 158. Because the exhibit list was "so patently harmless" and the "trial judge is generally in the best position to evaluate the critical question of whether the jury's exposure to extra-record evidence prejudiced the defendant," the Second Circuit found that it was harmless error and the district court's prompt curative instruction cured any possible prejudice. *Id.* at 157–58.

Here, the exhibit lists provided to the jury contained "neutral" and "objective" descriptions of the unadmitted exhibits. The defendant's post-arrest interview, which the defense focuses on, is described neutrally and objectively as the "October 7, 2021, Interview of Stephen Johnson." Indeed, the jurors could glean little from the description of unadmitted Exhibits 202 and 202A.[2] While the defendant speculates that jurors might conclude the statement was inculpatory, he provides no evidence or case law supporting that conclusion. As a logical matter, this conclusion is not the most obvious: Why would the jury assume the defendant's statement is inculpatory if the government chose not to put it in evidence? And nothing in the description supports that conclusion. This description does not, for example, refer to the interview as a "confession." In fact, this description indicates nothing about what happened in the interview. Even though the defense calls it a "post-arrest statement," the exhibit list does not say that. This neutral description told the jury nothing that could have influenced the verdict.

Additionally, the exhibit lists described evidence that was cumulative and concerned matters already before the jury, thus minimizing or eliminating any prejudice. *See Treadwell*, 760 F.2d at 339–42 (finding no prejudice with jury receiving unadmitted summary of FBI testimony

---

[2] The same is true for the other unadmitted exhibits described in the government's exhibit list.

that the defense alleged "mapped out the government's theories of liability" on certain counts because it was mostly cumulative); *United States v. Bentley*, 489 F.3d 360, 362 (D.C. Cir. 2007) (finding no prejudice when unadmitted exhibits, including an envelope containing thousands in cash and handwritten labels on drug evidence, were sent to the jury because it was cumulative).

The Eleventh Circuit rejected an almost identical argument.  *See United States v. Guida*, 792 F.2d 1087, 1091 (11th Cir. 1986).  There, a jury received both a witness list and an unredacted exhibit list describing items never admitted in evidence.  *See id.*  By the time the Court gave a curative instruction, the jury had "in all probability . . . already reached their verdict[.]"  *Id.* at 1092.  The defense identified over 30 entries that referenced unadmitted prosecution exhibits, including additional unadmitted counterfeit notes.  *Id.*  But no prejudice existed because the exhibit list referenced cumulative evidence and concerned matters already before the jury.  *Id.*

Nothing on the exhibit lists here revealed anything the jury had not already heard.  The unadmitted exhibits were either admitted by the defense or duplicative of evidence the jury received in evidence.  Although the defense focuses on the references to the defendant's interview, it was not news to the jury that the defendant spoke to law enforcement.  The defense, in fact, asked the government's computer forensics expert, Dero Tucker, explicitly about information the defendant had provided to law enforcement *on the day of his arrest*:

> Mr. Jeffress:    Mr. [Tucker], you're aware that Mr. Johnson gave the passcode to the Lenovo computer the very day he was arrested, correct?
>
> Mr. Tucker:    I'm aware of a user account PIN, yes.

4/10/2024 Tr. at 675:11-14.  Based on the defense's own questions, it would have been unsurprising—and likely expected—that the defendant spoke to law enforcement on the day of his arrest.  Seeing a generic description for "October 7, 2021, Interview of Stephen Johnson" thus added nothing to the jury's knowledge of the case, and so it could not have been prejudicial.

<div align="center">17</div>

The defendant, ignoring the D.C. Circuit's later decisions in *Treadwell* and *Bentley*, relies on one 1969 case to argue that the exhibit list prejudiced the jury. *See Dallago v. United States*, 427 F.2d 546 (D.C. Cir. 1969). But *Dallago* does not support his argument. *Dallago* involved the jury receiving substantive evidence (an SEC suspension order containing unsubstantiated allegations), not an exhibit list, that the parties expressly agreed should not go to the jury room. *See id*. at 551–52. Indeed, the defense stipulated to admission of certain exhibits during the trial conditioned on the jury not receiving this SEC suspension order. *See id.* at 551. The Court found the prejudice "clear enough" because the parties had agreed to keep those documents out of evidence. *Id.* at 558. Here, on the other hand, the jury received no substantive evidence; rather, it received both sides' exhibit lists. *See Guida*, 792 F.2d at 1093 (noting that a jury receiving an exhibit list describing unadmitted exhibits is "clearly distinguishable from cases where the extrinsic evidence which comes before the jury constitutes a significant addition to the evidence already presented at trial"). And nothing on the exhibit list provided the jury with anything approaching the SEC suspension order in *Dallago*.

The defense also argues, without any legal or factual support, that the lists "telegraphed" to the jury that most of the defendant's evidence was deemed inadmissible or insignificant. *See* Def.'s Mot. at 35. That argument lacks any basis. Factually, no evidence supports that inference. Practically, the jury saw throughout the trial that the government had many more exhibits than the defense. Legally, juries often see evidentiary objections and are instructed to disregard and not speculate on evidence that was not admitted. (*See* ECF 169 (Final Jury Instructions) at 14); *see also* 4/16/24 Tr. at 1350 (explaining that juries often hear about inadmissible evidence through foundational questions, and we presume that jurors focus only on admitted evidence). The law presumes that jurors follow the Court's instructions. *See Samia v. United States*, 599 U.S. 635,

18

646 (2023). And jurors are instructed that the defense has no burden to produce any evidence. (*See* ECF 169 at 9). So the fact that the defense has fewer exhibits in evidence than the government does not prove prejudice.

In any event, the jury verdict itself undercuts this argument. *See United States v. Richards*, 659 F.3d 527, 546–47 (6th Cir. 2011) (finding no plain error affecting substantial rights when the jury received labels on disks that the court had excluded when the jury acquitted the defendant on three counts based on the labeled disks and convicted on six others). The jury here convicted the defendant of six counts and acquitted the defendant of ten other counts. This breakdown aligned with whether the government had additional evidence showing that the defendant had accessed the files named in the indictment.[3] Under these circumstances, the defendant's argument lacks any support that the exhibit list's inclusion of the defendant's post-arrest statement in any way prejudiced the jury.

Finally, the Court promptly instructed the jury that the exhibit lists were not evidence and to disregard anything not in evidence. *See* 4/16/24 Tr. at 1352:19–1353:3. This type of curative instruction can cure any minimal prejudice. *See, e.g., Treadwell*, 760 F.2d at 341 ("The court responded by immediately retrieving the document and instructing the jury that the document was not in evidence and should not be considered by them."); *Wiley*, 846 F.2d at 158 ("Any possible prejudice was cured by the district court's prompt inquiry and curative instruction.") (cleaned up).

---

[3] The jury convicted of transportation of child pornography counts 1, 2, 5, 7, and 8, and the sole count of possession of child pornography, count 16. Transportation counts 1, 2, 5, 7, and 8, are the only charged counts where the government had additional evidence showing that the defendant had accessed the files and initially saved them in a different location on his computer before moving them to Google Drive. *See* Gov't Ex. 412A ("Summary of Jump List Showing Charged Files on Lenovo Desktop").

The exhibit lists contained neutral descriptions of exhibits—most of which were admitted at trial—which could not have prejudiced the jury. If the list of unadmitted counterfeit notes in *Guida*, the unadmitted summary of FBI testimony in *Treadwell*, the envelopes of cash and handwritten drug labels in *Bentley*, and the incorrect list of predicate felonies in *Roy* are not prejudicial, then the neutral indication that the defendant had participated in an interview on the day of his arrest—a fact that the jury already knew about from testimony that the defendant elicited at trial—cannot be prejudicial. The Court's curative instruction was more than enough to resolve this issue. No evidence of any prejudice exists here that would warrant a new trial.

## IV. The Court Properly Admitted the Dropbox, Telegram, and Google Photos Evidence Under Rule 404(b).

The defendant contests the Court's admission of evidence involving Dropbox, Telegram, and Google Photos under Federal Rule of Evidence 404(b). Here, the evidence was highly probative in showing that the defendant knew he possessed child pornography and did not accidentally download it. This evidence was especially probative considering the defense's opening statement, in which it argued that the defendant did not seek out child pornography and had accidentally downloaded it while seeking out adult pornography.

### A. Additional Facts

Before trial, the government noticed certain evidence from the defendant's internet browser history and cellphone that it intended to offer at trial under Federal Rule of Evidence 404(b). (*See* ECF 81, 97, 126). This evidence included:

- Evidence that the defendant's Google Chrome browser had repeatedly visited a Dropbox folder called "Black teens and underage thots" in June and July 2020, a few months before the charged child pornography was uploaded to the Google Drive account.

- Evidence that the defendant's cellphone had downloaded three images containing child pornography from Telegram, months after the child pornography was uploaded to the defendant's Google Drive.

- Evidence from the defendant's cellphone showing he was a member of Telegram groups advertising child pornography, months after the child pornography was uploaded to the Google Drive.

- Evidence from the defendant's cellphone showing that he was a member of Google Photos shared albums focused on child pornography, including a group called "13-17 lesbian cp."

The defense objected.  (*See* ECF 93).  The Court reserved judgment until trial.

At trial, the defense opened by stating that the defendant "did not deliberately and intentionally possess child pornography and he did not deliberately and intentionally and knowingly transport child pornography[.]"  4/9/24 Tr. at 305:4-8.  The defense argued that the defendant "accidentally got a small amount, a relatively small amount, of illegal images."  *Id.* at 306:3-4.  They argued that "it is not difficult, if you are looking for adult pornography, to accidentally get a small amount of this material, which is exactly what happened here."  *Id.* at 309:11-14.  And they argued that the "government's evidence will also show you that Mr. Johnson used none of the techniques, the search terms, the other things that it well knows that people seeking child pornography on the Internet use."  *Id.* at 311:5-12.

The Court ultimately admitted the government's exhibits and testimony relating to the noticed 404(b) evidence.  *See* Gov't Ex. 400B (Summary of Google Chrome Browser History – Visits to Dropbox Folder "Black teens and underage thots"); Gov't Ex. 401D (containing three images of child pornography downloaded from Telegram and found on the defendant's cellphone); Gov't Ex. 401E, G (Google Photos groups); Gov't Ex. 402B–D (Telegram groups).

### B.  Argument

The Court appropriately allowed the government to introduce evidence under Rule 404(b).  The evidence was highly probative of the defendant's knowledge, intent, and the absence of

mistake in possessing and uploading child pornography. This evidence became even more probative after the defense opening, in which the defense told the jury that this was an accident and that the defendant was not seeking out child pornography.

Federal Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character but is admissible for any non-propensity purpose, including motive, intent, plan, knowledge, and absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000). This rule is one of "inclusion rather than exclusion." *Id.* at 929. While "the first sentence of the rule is framed restrictively, the rule itself is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance – for the purpose of proving that a person's actions conformed to his character." *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (internal quotations omitted). In short, "Rule 404(b) bars not evidence as such, but a theory of admissibility." *Id.; see also United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) ("[A]ny purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character." (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990))).

There is a two-pronged test for determining whether other bad acts evidence is admissible. First, the evidence must be "probative of a material issue other than character." *Miller*, 895 F.2d at 1435. Second, the evidence is subject to the balancing test of Rule 403, so that it is inadmissible only if the prejudicial effect of admitting the evidence "substantially outweighs" its probative value. *Id*. Furthermore, it is not enough that the evidence is simply prejudicial; the prejudice must be "unfair." *See, e.g., United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) ("The Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger substantially outweighs the evidence's probative value." (emphasis in original)

(cleaned up)); *Cassell*, 292 F.3d at 796 ("'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977))).

The Dropbox, Telegram, and Google Photos evidence was quintessential Rule 404(b) evidence as to the defendant's intent to possess child pornography and his knowledge that he was doing so.  In opening, the defense challenged each of these mental states, argued that the material was accidentally downloaded, and promised the jury that the government's evidence would show "none of the techniques, the search terms, the other things that it well knows that people seeking child pornography on the Internet use."  4/9/24 Tr. at 311:5-12.  The chosen defense made this Rule 404(b) evidence even more relevant and admissible.

The Dropbox evidence showed that the defendant was logged into his Google account— the same account to which the defendant later uploaded the child pornography—when he repeatedly visited a folder called "black teens and underage thots" and accessed movie files from that folder within the Google Chrome browser.  These visits occurred in June and July 2020, a period between when the evidence shows at least some child pornography files were first opened on the defendant's laptop and when the defendant uploaded the charged files to his Google Drive. This evidence was highly probative evidence that the defendant sought out child pornography, making it more likely that he knew he possessed child pornography and did not accidentally download it while looking for adult pornography.  *See United States v. Hite*, 916 F. Supp. 2d 110, 119–20 (D.D.C. 2013) (finding browser history indicative of accessing child pornography probative of defendant's intent, knowledge, and absence of mistake in attempted coercion of a minor trial), *aff'd*, 963 F.3d 122 (D.C. Cir. 2020).

The defendant argues that the Dropbox site had little probative value because there was no evidence that the defendant downloaded child pornography from this folder.  *See* Def.'s Mot. at 37–38.  But that argument misses the point.  *See, e.g.*, *United States v. Lieu*, 963 F.3d 122, 129 (D.C. Cir. 2020) (noting admissible bad acts need not be identical so long as they are probative).  The defendant intentionally and repeatedly accessed an online folder obviously named to convey the presence of child pornography, making it more likely that the defendant knew about the child pornography in his Google account and did not accidentally download it.  *See, e.g., United States v. Roberson*, 581 F. Supp. 3d 65, 77–78 (D.D.C. 2022) (admitting internet searches for written accounts, images, and videos that sexualized children, which were "relevant to motive, intent, knowledge, and absence of mistake in seeking out and distributing child pornography a few months earlier"), *appeal filed*, No. 23-3066 (D.C. Cir. May 11, 2023).  In *United States v. Tanguay*, the defendant made the same argument that the defense makes here: that the prosecution admitted evidence of bookmarked websites like "CumFilledBoys" on the defendant's computer without showing the sites contained child pornography.  982 F. Supp. 2d 119, 124–25 n.5 (D.N.H. 2013).  The district court rejected that argument, noting that having bookmarked sites with such name suggested that the defendant "was also aware of the presence of child pornography on his computer."  *Id.*  That logic applies here too.

Similarly, the Telegram evidence showed that the defendant accessed several Telegram groups advertising child pornography on his cellphone.  It also showed that the defendant had downloaded three images containing child pornography from Telegram.  This evidence was again highly probative.  The fact that the defendant accessed child pornography using Telegram on a device other than his laptop made it less likely that the child pornography downloaded from other

24

sources onto the laptop was accidental and more likely that the defendant knowingly possessed and transported the child pornography.

The defendant argues that his "passive presence" on Telegram "does not tend to show that he knowingly and intentionally possessed or transported the charged files." *See* Def.'s Mot. at 39. That logic defies common sense: "passive presence" is often the point when seeking out and viewing child pornography. What is more, the defendant argued in opening that he accidentally downloaded child pornography while seeking out adult pornography. But if that were the case, one would not expect to find him in multiple child pornography groups—even "passively."

The defendant's presence in shared Google Photos child pornography groups on his phone further undercuts his "passive presence" argument. *See United States v. Hardrick*, 766 F.3d 1051, 1057 (9th Cir. 2014) (noting that it was inconsistent with defense of accidental downloading to have numerous files with names "clearly indicating" child pornography on two computers that had been downloaded on different days). The defendant was in a Google Photos group called "13-17 lesbian cp." That group name leaves no doubt as to the purpose of that group. "Passive presence" in this group makes it more likely that the defendant knowingly possessed and transported child pornography and significantly less likely that he accidentally downloaded it. Those inferences become even stronger when one combines "passive presence" in the Google groups, "passive presence" in the Telegram groups, downloaded images in the Telegram group, and repeated visits to the Dropbox folder.

The defendant argues that both the Telegram and Google Photos evidence was too "remote in time" to be relevant. The case law does not support that argument. *See, e.g., United States v. Nance*, 767 F.3d 1037, 1042 (10th Cir. 2014) (upholding admission of evidence that the defendant had viewed child pornography on his computer two years before the charged offenses as "clearly

probative" given defense of lack of knowledge).  The defendant's presence in child pornography

groups months after he uploaded child pornography to his Google Drive is highly probative of

whether the defendant knew he possessed and transported child pornography.  *See Roberson*, 581

F. Supp. 3d at 77–78 (permitting searches made in 2016 that sexualized children as evidence of

child pornography distribution occurring months before in 2015).  The defendant claims that he

accidentally downloaded the charged child pornography files was an accident.  Yet months later

he was in child pornography groups and was downloading child pornography from Telegram onto

a different device.  This evidence significantly undercuts any argument of accidental possession.

At bottom, it becomes less believable that the defendant accidentally accessed child pornography

when he did so on different devices through different internet applications on different days in

different months.

Given its significant probative value, this evidence not "substantially outweighed" by

considerations of unfair prejudice.  *See* Fed. R. Evid. 403.  Nor was this evidence "especially

graphic in the context of the crimes" for which the defendant was charged.  *See Lieu*, 963 F.3d at

128.  "The prejudice that the court must assess is the prejudice that lies in the danger of jury misuse

of the evidence." *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995).  And given the split

jury verdict, the jury appears to have thoughtfully evaluated the evidence in this case as to each

count.   The Court properly admitted this evidence, and the defendant's motion should be denied.

**V.    The Court Properly Allowed the Tor Browser Evidence After the Defendant Opened the Door.**

Finally, the defendant argues evidence of the Tor browser on Mr. Johnson's computer

should have been excluded under Federal Rules of Evidence 402 and 403.  This argument is

surprising because it was the defendant—not the government—who brought Tor into this trial.

Because the defendant opened the door to this evidence, and the evidence became probative as to

26

issues that the defendant brought up in his opening and in its cross-examination of the government's lead FBI agent, the defendant's motion should be denied.

### A. Additional Facts

Before trial, the defense moved in limine to exclude evidence of the Tor browser. (*See* ECF 117 at 11–12). The government agreed that it did not intend to use this evidence at trial, so the Court denied the motion as moot. *See* 4/2/24 Tr. at 1–10.

Despite the government agreeing not use the Tor evidence, the defense brought up the dark web and Tor twice on the first day of trial. The defendant first brought up Tor in his opening statement: "The main website here is not from the dark web. *It is not from Tor or anything like that*." *See* 4/9/24 Tr. at 309:15-24 (emphasis added).

Then the defense led FBI Special Agent Laura Calvillo right into a discussion of the dark web on cross-examination:

| | |
|---|---|
| Mr. Jeffress: | And, just to be clear, there are websites out there that specifically cater to child pornography. Correct? |
| SA Calvillo: | Mostly on – nowadays, on the dark net. But in the past there have been, yes. |
| Mr. Jeffress: | That's right. Most of them are on the dark web. Correct? |
| SA Calvillo: | Correct. |
| Mr. Jeffress: | And they are specifically catered to child pornography. They are not, you know, public websites that may have child pornography in them. Correct? |
| SA Calvillo: | Correct. |
| Mr. Jeffress: | And if someone wants to find child pornography, all they need to do is go to the dark web, and they can go to a website that's exclusively all about this; isn't that right? |
| SA Calvillo: | They can. I don't see that much in our investigations, but they can. |

27

Mr. Jeffress:    You don't see any dark web investigations?

SA Calvillo:    In the users that I've seen, the majority of them are on chats or other ways of getting links.  On occasion, we see the Tor, as in the The Onion Router, but –

*Id.* at 467:3-24.

Based on the defense opening and cross-examination, the government asked the Court for permission to bring out the Tor evidence.  After reviewing the transcript, the Court agreed that the Tor evidence was now "both more probative than it was before and less prejudicial than it would have been because of the line of questioning yesterday."  *See* 4/10/24 Tr. at 570:15-22.

The government then brought out a limited amount of information about the Tor browser from the government's computer forensics expert, Dero Tucker.  Mr. Tucker stated that the Tor browser was found on the defendant's laptop.  *See id.* at 613:10-14.  Additionally, Mr. Tucker testified that the defendant's cellphone showed evidence of a Google search for a "private Tor search engine" shortly after Google disabled the defendant's account for uploading child pornography.  *See id.* at 664:20-25; *see also* Gov't Ex. 401I at 19.

## B. Argument

To start, because the defense opened the door on this issue and left the misleading impression that the government had no evidence of Tor, the Court properly allowed the government to introduce evidence of the Tor browser on the defendant's laptop.  *See United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 205 (D.C. Cir. 2013) (finding defense opened the door to admission of recorded phone call that the government had agreed not to use when the defense, "fully aware of the consequences of doing so," then argued the absence of the recording at trial).

In any event, the defendant's own argument shows why this evidence was relevant. The defendant now says that he "sought to establish that [he] only accessed CSAM through legitimate

28

internet sites, as opposed to the dark web." Def.'s Mot. at 42.  Implicit in that reasoning is that the defendant believes Tor (and the access or lack of access to it) is relevant in whether the defendant knowingly possessed and transported child pornography.  So his argument that Tor was not relevant is undercut by his own arguments about why he brought Tor up in the first place.

Even more, the defendant's Google searches show that the Tor browser was linked to the child pornography at issue in this case.  Just two days after learning Google had closed his account,[4] the defendant made a series of Google searches on his cellphone that ended with a search for "private tor search engine":

| Date | Time | Web Activity on Cellphone |
|---|---|---|
| October 5, 2020 | 12:34 PM | Google Search: "who can you legally tell secrets to" |
| October 5, 2020 | 12:35 PM | Google Search: "confess to a preacher" |
| October 5, 2020 | 12:49 PM | Google Search: "Is talking to a psychologist protected" [remainder of search term cannot be seen] |
| October 5, 2020 | 12:50 PM | Views a website with the heading: "When Does a Therapist Have to Break Confidentiality?" |
| **October 5, 2020** | **1:23 PM** | **Google Search: "Private tor search engine"** |

The defendant cannot have it both ways.  The defendant's opening statement and questioning left the misleading impression that he did not use Tor, despite knowing that the government had agreed not to introduce evidence that Tor was on his laptop and that he had searched for it shortly after Google detected child pornography.  The Court properly allowed the government to introduce this probative evidence after the defendant opened the door.

---

[4] The government also introduced Google search evidence showing that the defendant understood why his Google account had been suspended, including searches for "Google pornographic sweep" and a search about a child pornography offender caught by Google.  *See* Gov't Ex. 401I.

## **CONCLUSION**

The defendant's arguments do not amount to error.  The Court correctly denied the motions to suppress evidence, and the defendant identifies no proper basis for the Court to reconsider those rulings, instead rehashing the same arguments this Court has already considered and rejected.  The Court appropriately instructed the jury to keep deliberating after jury polling revealed a lack of unanimity, consistent with Federal Rule of Criminal Procedure 31(d).  The Court promptly gave a curative instruction when a court clerk gave the exhibit lists to the jury, and, in any event, the neutral and objective descriptions described cumulative evidence that was not prejudicial.  Finally, the Court properly admitted both the 404(b) evidence and the Tor browser evidence.

None of this was error, let alone cumulative error requiring a new trial.  The defendant's motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:        */s/ Ryan Lipes*
Ryan Lipes
Special Assistant United States Attorney
N.Y. Bar No. 5404843
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 514-4715 (Lipes)
(202) 252-1719 (Courtney)
Ryan.Lipes@usdoj.gov
Paul.Courtney@usdoj.gov

30

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-cr-0176 (CJN)** |
| **STEPHEN JOHNSON**<br>       **Defendant.** | |

<u>**STEPHEN JOHNSON'S REPLY IN SUPPORT OF HIS MOTION FOR A NEW TRIAL**</u>

Stephen Johnson, through undersigned counsel, respectfully submits this Reply in Support of His Motion for a New Trial ("Motion"). ECF 179 ("Mot."). For reasons that follow, pursuant to Fed. R. Crim. P. 33, the Court should grant the Motion and order a new trial.

<u>**DISCUSSION**</u>

As an initial matter, the government misstates the applicable legal standards. Rule 33, on its face, allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Courts have "wide discretion in determining whether to grant a new trial." *United States v. Williams*, 113 F.3d 243, 247 (D.C. Cir. 1997) (citing *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988)). This "broad discretion" standard also played a key role in the sole case cited by the government. *See United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014). Courts in the D.C. Circuit have held that extrinsic evidence improperly taken into the jury room need only have raised "the slightest possibility that harm could have resulted." *See* Mot. at 18 (collecting case law); *see also United States v. Vasquez*, 597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law throughout federal circuits). Additionally, while the government does not address this point, "the total effect of numerous small missteps may deprive a defendant of a fair trial[.]" *United States v. McGill*, 815 F.3d 846,

947 (D.C. Cir. 2016) (quoting *United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010)); *see also* Mot. at 19.

## I.    The Government Continues to Offer No Basis for Upholding the Warrant for Mr. Johnson's Digital Devices and the Substantial Prejudice From the Error is Clear.

Contrary to the government's Response, the warrant to search Mr. Johnson's apartment did not authorize a search of his electronic devices.  That fact is plain from the face of the warrant, which repeatedly and expressly limited the "property to be searched" to Mr. Johnson's apartment itself.  *See* ECF 84, Ex. 1 at 3, Ex. 2.  The Magistrate expressly found that Detective Sullivan's affidavit "establish[ed] probable cause to search and seize" Mr. Johnson's apartment, *id.,* Ex. 1 at 3, not his electronic devices.  The Court's ruling that the warrant nonetheless authorized a search of Mr. Johnson's phone, computer, and other digital devices was erroneous and led to the admission of prejudicial evidence that warrants a new trial.

In its Response, the government notes that it has already prevailed on this issue.  *See* ECF 182 ("Opp.") at 6.  It did so with nothing more than it offers here: the bald and unsupported assertion that, contrary to the English language and its own warrant, the words "search" and "seize" mean the same thing.  As before trial, the government does not cite a single case in support.  Instead, it relies solely on the warrant's incorporation of Attachment B, which the warrant expressly describes as listing "the property to be seized."  *See* ECF 84, Ex. 1 at 3, Ex. 3 at 2.  If the "property to be seized" were co-extensive with "the property to be searched," then there would be no reason to have two separate sections of the warrant and two separate attachments, describing different categories of property.  The government's reading of the warrant, which disregards the express purpose of each attachment, is not "natural" given the warrant's "words of reference," *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990)

2

(requiring that the warrant use "suitable words of reference"), which do not incorporate Attachment B as a list of items to be searched.

The result of the government's illogical reading of the warrant is to nullify Mr. Johnson's Fourth Amendment right under *Riley v. California*, 573 U.S. 373 (2014), to be protected from searches of one's electronic devices absent a warrant for those devices. The Supreme Court was clear on what is necessary for the government to search a person's digital devices: law enforcement must "get a warrant." *Riley*, 573 U.S. at 403 ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple— get a warrant."). The government did not do so here.[1]

The government knows what a warrant sufficient to search a person's electronic devices looks like. It drafted one, in this case, in 2023. The differences between the 2020 and 2023 warrants tell the Court what is obvious: that the 2020 warrant did not authorize a search of Mr. Johnson's devices. Whereas the 2020 warrant for Mr. Johnson's residence set out the "property to be searched" in Attachment A as only Mr. Johnson's apartment, *see* ECF 84, Ex. 2, the 2023 warrant's Attachment A delineates the "property to be searched" as follows:

> The property to be searched is two laptop computers and three cellphones, specifically: one HP laptop (Serial #5CD037BY27), one Lenovo laptop (Serial #PF1BH2S1), one Samsung Galaxy Note 10 Plus (IMEI: 356793100242338), one Apple iPhone 7 (IMEI: 356391102901108), and one Apple iPhone 6 (IMEI: 358372063450119), hereinafter the "Devices."

---

[1] At this stage of the proceedings, the extreme prejudice from admitting the evidence extracted from Mr. Johnson's electronic devices is clear: even the government has not taken the position that the erroneous admission of this evidence would have been harmless. Nor could it do so, given the evidence admitted from those devices and the jury's verdicts, which correspond to the "jump list" and other crucial, allegedly inculpatory evidence extracted from Mr. Johnson's laptop. *See generally* Mot. at 25 (collecting the evidence obtained from the devices).

ECF 135 at 4.[2]

The government relies on the Court's observation that Attachment B, which describes "property to be seized," states that law enforcement may seize biometric information from Mr. Johnson "for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant."  ECF 84, Ex. 3 at 5; *see also* 4/2 Tr. 16-17. Even if this one isolated statement from Attachment B was read to suggest confusion on the affiant's part, it is far too slender a reed to support a search of Mr. Johnsons' digital devices given the strength of the Fourth Amendment interest set forth in *Riley*.  *See generally Riley*, 573 U.S. at 398 ("the privacy interests here dwarf those in *Robinson* [414 U.S. 218].");  *see also United States v. Jones*, 565 U.S. 400, 413-414 (2012) (Sotomayor, J., concurring) ("The Government usurped Jones' property [to surveil him through digital tracking] … thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection.").  The motivating purpose of Attachment B was plain: to state with particularity what law enforcement was looking for, so it would only seize property relevant to the criminal conduct being investigated (i.e. child pornography), including only devices capable of storing evidence of child pornography.  The objectively reasonable interpretation of the warrant is that it authorized law enforcement to seize specified items so, *inter alia*, it could search the contents of them pursuant to a second warrant, such as the one it applied for in 2023.  The warrant does not

---

[2] Additionally, the captions on the 2020 warrant application and the 2020 warrant, which are identical, state as follows: "In the Matter of the Search of . . . 600 H STREET APARTMENT #749 NORTHEAST WASHINGTON, DC 20002 UNDER RULE 41."  ECF 84, Ex. 1 at 2.  The captions on the 2023 application and 2023 warrants, by contrast, identify the devices to be searched ("TWO LAPTOP COMPUTERS AND THREE CELLPHONES").  ECF 135 at 1.

4

provide authority to search items the Magistrate designated for seizure only.[3]

The Fourth Amendment did not permit the government to search Mr. Johnson's phone and computers based on the warrants to *search* Mr. Johnson's residence and *seize* Mr. Johnson's devices. The Court's pretrial decision was erroneous, and the substantial prejudice from the error is now clear, *see supra*, n.1, and the interests of justice warrant a new trial.

## II.     The Good Faith Exception Does Not Apply to the Warrantless and Reckless Review of the Images From Mr. Johnson's Google Account.

On the issue of whether law enforcement's warrantless review of the images from Mr. Johnson's Google Drive violated the Fourth Amendment, under either the private search doctrine and/or a *Jones* trespass theory, the government points to the Court's finding immediately before trial that, regardless of the violation, Detective Sullivan acted in good faith. *See* Opp. at 6-7; *see also* 4/2 Tr. 7-12. The government continues to ignore two factors undermining the Court's ruling: (1) that the good faith exception generally applies to reliance on a deficient warrant, but not to the absence of a warrant; and (2) that, even assuming the good faith exception applies here, Detective Sullivan acted recklessly. Faced with significant uncertainty regarding the legality of his conduct, the objectively reasonable path was for Detective Sullivan to seek guidance on whether he could legally search Mr. Johnson's images without a warrant, which would (and later did) lead to a decision to apply for a warrant. The failure to do so was reckless, placing Detective Sullivan's conduct outside the good faith exception.

---

[3] It is notable that neither during the pretrial proceedings nor in its Response has the government invoked the good-faith exception. That is because a reading of the warrant as encompassing authorization per *Riley* to search Mr. Johnson's digital devices is objectively unreasonable, so as to fall outside the boundaries of *United States v. Leon*, 468 U.S. 897, 922-23 (1984).

First, the government offers no response to the cases cited in Mr. Johnson's Motion emphasizing that the good faith doctrine generally applies to reliance on a deficient warrant, as opposed to a situation where the officer did not seek a warrant at all.  *See* Mot. at 26-27.

Second, even assuming the good faith doctrine applies in the absence of a warrant, Detective Sullivan acted recklessly.  He knew or should have known that the warrantless search of Mr. Johnson's property presented a Fourth Amendment issue.  Among other factors counseling caution, he had little knowledge of the process regarding, or the credibility of, Google's CyberTips.  He was aware that the definition for child pornography used by Google differed from the definition under federal law.  He also knew that, even though the Virginia Internet Crimes Against Children ("ICAC") Task Force had possessed the images for some time before sending them to him, there was no indication any law enforcement officer had previously searched the files.

Detective Sullivan had a plethora of authoritative resources from which he could have sought guidance on whether he should have obtained a warrant prior to reviewing the contents of Mr. Johnson's Google Drive.  Those included: (1) multiple prosecutors with the D.C. United States Attorney's Office; (2) the FBI, including the agents in ICAC; and (3) Google and NCMEC representatives, who could have explained the limitations of the prior search.  Choosing to plow forward in the face of such uncertainty was not based on an "objectively reasonable good-faith belief that [his] conduct [was] lawful," *Davis v. United States*, 564 U.S. 229, 238 (2011), but rather a heedless disregard of the obvious dangers in searching a person's property without a search warrant.  Mr. Johnson should therefore be granted a new trial without the unconstitutionally obtained evidence from his Google account.

III.    **The Resumption of Deliberations after Jury Polling Revealed a Lone Holdout Juror Led to Impermissible Juror Coercion.**

The government's arguments regarding the coercion of Juror No. 1 are flawed in several respects.  While the government devotes considerable energy to the continued polling of all jurors, Mr. Johnson is not seeking a new trial based on the Court's continued polling of jurors after Juror No. 1 revealed that he did not agree with the verdict.  Rather, Mr. Johnson argues the Court erred *after* jury polling was completed by sending the jury back to deliberate *after* the poll revealed that there was only one juror who did not agree with the announced verdicts.  Given the 11-to-1 split that was disclosed through polling, there was a substantial risk that Juror No. 1 would experience undue pressure and coercion to fall in line with the remaining jurors and return guilty verdicts the second time around.[4]  The appropriate remedy was a mistrial.

Contrary to the government's argument, the Court need not be the one coercing the jury, nor does coercion need to happen within the courtroom.  Potential coercion within the jury room, by fellow jurors, is a common and foreseeable issue under Rule 31(d).  *See, e.g., United States v. Ligon,* 781 F. Supp. 1, 5 (D.D.C. 1991) (upholding the decision to declare a mistrial rather than send a jury back to deliberate, due in part to "the risk that an unjust or coerced verdict will be rendered after protracted and exhausting deliberations by the jury")*; see also Williams v. United*

---

[4] The government's Opposition ignores the significance of the correlation between Juror No. 1 being the sole hold out and the coercion that Juror No. 1 reasonably could have endured.  At one point in the government's Opposition, when purportedly recounting the relevant facts, the government omits any discussion of the fact that Juror No. 1 was the only holdout, stating: "The defense asked to poll the jury.  Juror 1 said that this was not his verdict and then leaned forward in his seat, sobbing.  The Court finished polling the jury.  The defense then moved for a mistrial." Opp. at 9 (citations omitted).  This characterization of events ignores the 11-to-1 split and it fails to appreciate that defense counsel moved for a mistrial only after polling of all jurors revealed that Juror No. 1 was the only juror who did not agree.  It also ignores other relevant facts about Juror No. 1's behavior, including that his reaction was immediate, sharp and unequivocal (stating a strong "No!" not a calm "I do not agree," as implied by the government), and that his immediate sobbing was coupled with him covering his face with his hands.  It was unduly coercive to require Juror No. 1 to resume deliberations under these facts.

(Page 90 of Total)

*States,* 419 F.2d 740, 746 & n. 8 (D.C. Cir. 1969) (noting that a "case in which the announcements of the jurors make it clear that one juror differs with the others, and the return to the jury room is for the purpose of obtaining a unanimity that plainly did not exist … is also apparently contemplated by Rule 31(d), but there may well be a problem of coerciveness under the particular facts of the case."). As the Supreme Court acknowledged in *Brasfield*, the effect of publicly revealing the exact numerical division of a jury "cannot properly be known … but in general its tendency is coercive." *Brasfield v. United States,* 272 U.S. 448, 450 (1926). To hold otherwise would be to encroach upon the fundamental role of the jury, "from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded." *Id.* at 450. Indeed, the drafters of Rule 31 acknowledged the possibility that "an individual juror … has been forced to join the majority during deliberations" and therefore would not "voice dissent from a collective response." *See* Fed. R. Crim. P. 31 (Adv. Comm. Notes, 1998 Amend.). Put simply, the government's claim that a failed jury poll is not coercive "unless the court coerced the jurors," Opp. at 10, is unfounded both in law and fact.

The case law relied on by the government is nonbinding, misstated, irrelevant, and unpersuasive against the binding precedent Mr. Johnson has cited. The government misapplies *Williams*. *See* Opp. at 10. *Williams* involved the first juror "indicating … confusion with the jury verdict," *id.,* due to what turned out to be "merely a mistake in hearing, or understanding," *see Williams v. United States*, 419 F.2d 740*,* 746 (D.C. Cir. 1969); unlike Mr. Johnson's case, it did *not* involve a juror's genuine disagreement. This is a crucial distinction under this Circuit's case law. *Id.* at 745-46 ("There is a distinction in law and in fact between actions of the trial judge to obtain clarity in place of confusion, and actions that produce a likelihood that a juror has been coerced."); *see also United States v. Mathis*, 535 F.2d 1303, 1307 (D.C. Cir. 1976) ("jury

8

polls are a matter where the need for clarity is at its zenith."); and *United States v. McCoy*, 429 F.2d 739, 741-42 (D.C. Cir. 1970) (holding a conviction "must be reversed" where the case is like one with "no assurance that the jury freely and fairly arrived at a unanimous verdict" rather than one where the juror was "merely confused."); *but see* 4/17 Tr. 1363-70 (discussing the immediate and unequivocal negative response by Juror No. 1).  Therefore, precedent in this Circuit supports reversal, as jury polling revealed disagreement and a mistrial was not declared.[5]

The facts here belie the government's effort to minimize the potential for coercion of Juror No. 1.  The deliberative process was clearly very stressful and burdensome for Juror No. 1, even before he was revealed as the holdout.  When expressing his disagreement with the verdicts announced by the foreperson, Juror No. 1's refusal was "immediate" and "unequivocal."  *See* 4/17 Tr. 1363-70.  And after his quick and forceful "no," based on the government's own account, Juror No. 1 "slumped forward in his seat and began sobbing and crying."  *Id.* at 1368.  After polling of the remaining jurors showed that Juror No. 1 was the only juror who disagreed with the verdict, the Court told the jury to return to the jury room and that, "in light of what we just heard," the jury was not excused from service.  *Id.* at 1364.  When the jury later returned to the courtroom, it was told to continue deliberating and "keep an open mind about the

---

[5] Also, the government's out-of-circuit authority is distinguishable.  *See* Opp. at 11.  In *Penniegraft*, the government's keystone case, the Fourth Circuit held against the defendant because it reviewed on appeal for a higher standard, because of the failure of defense counsel to object and because of its own discretion in light of a circuit split, all decisive facts that do not apply to Mr. Johnson's case. *United States v. Penniegraft*, 641 F.3d 566, 575, 579 (4th Cir. 2011) ("each case involving continued polling of a jury after one juror dissents must be viewed on its own merits (or demerits), considering all the facts and circumstances.").  *Fiorilla*, *Gambino*, *Amos* and *Carraway* were faced with the same standard and similar facts.  *See, e.g., United States v. Fiorilla*, 850 F.2d 172, 175-76 (3d Cir. 1988) (analyzing the "exceptional circumstance limitation to the reversal requirement" and collecting case law that do "not require *per se* reversal once a jury poll reveals an internal division of the jurors.").

case with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision." *Id.* at 1380-81.

Given everything that occurred, Juror No. 1 was well aware he had been publicly exposed as the only person on the jury unwilling to agree with the verdict announced by the foreperson. The judge, prosecutors, fellow jurors, everyone present in the courtroom, and all other members of the public who were informed of the situation, knew that Juror No. 1 was the lone holdout preventing the case from concluding. These circumstances created a substantial risk that Juror No. 1 would be coerced into agreeing to a verdict that did not represent his position.

Contrary to the government's assertion, the authorities cited in Mr. Johnson's motion are not all cases "finding error in polling jurors in deadlock situations," Opp. at 12. *See, e.g., McCoy*, 429 F.2d at 741-42 (reversing a conviction because the juror's disagreement was not "attributable to any confusion[]" and the trial judge only met with the juror later, without any of the parties, to give the juror "an opportunity to state her question."). The cases cited in Mr. Johnson's Motion about juror coercion after the revelation of a deadlocked juror retain their importance, as they elucidate generally applicable principles on jury polling and coercion. *See, e.g., United States v. Ligon*, 781 F. Supp. 1, 7-8 (D.D.C. 1991) (collecting case law and analyzing the risks and purposes of jury polling).

The government's argument that defense counsel was required to object to the continued polling is meritless. Because the defense does not contend that the continued polling of the jurors alone warranted a mistrial, the lack of objection by Mr. Johnson's counsel does not show the absence of a coercive atmosphere. At the time Juror No. 1 expressed his disagreement with the verdict, neither party nor the Court knew how the remaining jurors would respond to the poll. And since Juror No. 1 responded in the negative, the parties immediately knew the verdict

10

was not unanimous, meaning *either* the government or the defense could have asked the court to discontinue polling immediately, and requested that the jurors resume deliberations without revealing the numerical division. This option would have significantly reduced any coercion concern and presented a circumstance under which requiring jurors to continue deliberating would have been proper under Fed. R. Crim. P. 31. An *equally* appropriate response for the parties would have been to wait until the entire jury was polled before determining the proper course of action and, if the dissenting vote was not alone, resuming deliberations because concerns about coercion would have been minimized. The latter approach would have been proper and in accordance with Rule 31 *if* polling showed that enough additional jurors disagreed. But, as here, when polling of the *entire* jury showed that there was *only one* dissenting juror, the risk of subsequent coercion in the jury room was too great and the Court should have ordered a mistrial.

The government's opposition concerning the jury coercion issue also relied on factual speculation that the Court should ignore. For example, the government argues that it is unlikely that Juror No. 1's verdict was coerced because the jury acquitted on one additional count in the second verdict. This argument is baseless. Juror No. 1's objection to the verdicts was to all of the verdicts; not just a single count. Moreover, there is no evidence to suggest that the additional not guilty verdict was the result of an atmosphere free of coercion. In fact, given the totality of circumstances, common sense suggests the opposite. A more plausible explanation for the changed verdict is that jurors compromised with Juror No. 1 by agreeing to acquit Mr. Johnson of one additional count in exchange for his guilty verdict on the remaining six counts. Indeed, Juror No. 1's conduct during announcement of the second verdict was consistent with having experienced coercion. When Juror No. 1 was polled about his second verdict, unlike all other

jurors, he answered with "his head down" and "was unable to look anyone in the eye or the Court in the eye." *See* 4/17 Tr. 1401. When stating that he agreed with the verdict, Juror No. 1 was "very soft-spoken" and his tone was apparently "reluctant." *Id*. The Court indicated its agreement about Juror No. 1's hesitancy and noted that a *second* juror also appeared hesitant, stating "I believed Juror 11 also reflected some small hesitation, perhaps less than Juror 1, in answering the verdict." *Id*. at 1402.

Questioning of Juror No. 1 about the second verdict, outside the presence of the other jurors, did not alleviate concerns regarding whether Juror No. 1 experienced coercion. He never discussed whether he experienced any undue pressure or coercion. And, once again, his conduct and demeanor during questioning suggested that he was coerced. At the very beginning of his *voir dire*, Juror No. 1 had "his hand on his head" with his "head down." *Id*. at 1405. When first asked if he agreed with the verdict, Juror No. 1 appeared "very reluctant." *Id*. There was a "long pause" and, when eventually answering "yes", Juror No. 1 did so in a "very soft spoken" voice. *Id*. at 1405-1406. When considering Juror No. 1's continued hesitancy and all prior events, there is a serious risk that the jury's second verdict was achieved by coercion.

The government also speculates about the impact some members of the gallery may have had on the jury's verdict. The government goes on at length regarding the reaction to the first verdict by Mr. Johnson's "supporters" in the gallery. *See* Opp. at 4, 8, 12. First, there is no evidence that any member of the jury heard anyone from the gallery say, "I hope you can sleep at night." Opp. at 8. There is no statement from any member of the jury indicating that any juror heard that comment. And, although the government claims this statement was "yelled" by someone from the gallery, neither counsel for the government nor defense counsel, both of

12

whom were closer to the gallery than the jury was, heard the remark.[6]  Second, regardless of what part of the gallery's reaction was heard by the jury, there is no evidence that any juror was impacted by that reaction.  At no time, including during Juror No. 1's *voir dire* after the second verdict, did any member of the jury say that the reaction from members of the gallery influenced the poll.  And third, even if the jury was influenced by the gallery's reaction to the first verdict,[7] a mistrial was still warranted if there was a substantial risk that Juror No. 1's guilty verdicts were coerced.  *See generally United States v. Dorsey*, 865 F.2d 1275, 1277 (D.C. Cir. 1989) ("Any criminal defendant … being tried by a jury is entitled to the uncoerced verdict of that body.") (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988)).

In sum, the Court *could* have stopped the polling when Juror No. 1's dissenting vote was revealed.  *United States v. Dorsey*, 865 F.2d 1275, 1276-1278 (D.C. Cir. 1989) (affirming the lower court's decision when it "immediately stopped the polling" upon reveal of a dissenting juror).  Had the Court done so, it could have sent the jury back to deliberate further, as set forth in Rule 31(d).  *Id.* at 1276 (explaining the jury instructions that the Court gave when the polling was aborted and jury returned to the jury room); *see also* Mot. at 32 & n. 14.  However, once the Court did *not* do so, and the exact numerical division of the jury had been revealed, especially when that number was 11-to-1, it would have been "proper for the trial judge to declare a mistrial

---

[6] When counsel for the government reported the alleged comment to the Court, government counsel acknowledged that he "did not personally hear" the statement.  *See* 4/17 Tr. 1368.  Mr. Johnson's counsel also reported that he "did not hear" any such statement.  *Id*. at 1369-1370.

[7] While there is no evidence of any such influence, it is also not clear that any influence the gallery could have had on the jury would have been favorable to Mr. Johnson.  The government speculates that jurors may have been more reluctant to convict Mr. Johnson after hearing the gallery's response.  But it is also plausible that the gallery's response could have offended members of the jury and that angry jurors who felt attacked by Mr. Johnson's "supporters" could have been more incentivized to pressure fellow jurors to reach unanimous guilty verdicts.  The secrecy of jury deliberations means either theory is equally valid and the government's attempts at theorizing on this point are unnecessary.

13

on this ground alone[.]" *Mullin v. United States*, 356 F.2d 368, 370 (D.C. Cir. 1966).  In Mr.

Johnson's case, by continuing the polling, revealing a numerical division of 11-to-1, and *then* not

declaring a mistrial – all of which led to a substantial risk of coercion in the jury room – the

interests of justice require a new trial.

IV.    **The Jury's Improper Receipt of the Exhibit Lists Does Not Need to Have Caused Prejudice, But It Would Also Meet That Standard.**

The government's Opposition misstates both the facts and law surrounding the exhibit list

issue.  Regarding the facts, the government claims that "[s]ome, if not all, of the 'blacked out'

exhibit descriptions could be seen through the black marker" and that the Court assumed the

highlighted exhibits were transparent merely for "analytical purposes."  Opp. at 13-14.  The

government's statements minimize the ease and extent to which jurors could see through the

lightly redacted exhibit list.  The jury was able to "see through the redaction and read what's

there" for each and every exhibit, "without much difficulty" and without holding the exhibit lists

"up to a light or [doing] anything extra to see through."  4/16 Tr. 1345.  Significantly, the

government never refuted this description of the poorly redacted exhibit lists.

Regarding the law, the government misstates the applicable standard for determining

whether a new trial is warranted.  The government claims that "without showing prejudice, no

new trial is warranted" and centers its argument on the lack of a prejudicial effect.  *See* Opp. at

15-20.  However, as explained in the Motion, a new trial is required whenever extrinsic evidence

is improperly taken into the jury room if there exists "the slightest possibility that harm could

have resulted."  *Dallago v. United States*, 427 F.2d 546, 560 & n. 58 (D.C. Cir. 1969) (citing

*United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967); *see also United States v. Vasquez*,

597 F.2d 192, 193 & n. 1 (9th Cir. 1979) (collecting case law throughout federal circuits).  The

correct standard is significantly lower than prejudice, requiring a new trial when there is a

"reasonable possibility that the extrinsic material could have affected the verdict." *Vasquez*, 597 F.2d at 193-194 & n. 1 (explaining the standard is lower because it is a "fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under circumstances assuring the accused all the safeguards of a fair trial."); *see also Turner v. State of La.*, 379 U.S. 466, 472-473 (1965) ("evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel").

The cases cited by the government for an actual prejudice standard do not apply here. Grappling with the complexities of appellate procedure and unclear records, *Treadwell, Roy* and *Wiley* all reviewed on appeal for harmless or plain error. *See generally United States v. Treadwell*, 760 F.2d 327, 339-40 (D.C. Cir. 1985) (harmless error); *see also United States v. Wiley*, 846 F.2d 150, 157-58 (2d Cir. 1988) (same); *see also United States v. Roy*, 473 F.3d 1232, 1237-38 (D.C. Cir. 2007) ("[B]ecause Roy did not object to the indictment before it was submitted to the jury-notwithstanding the court's invitation to counsel to inspect it-we review the denial for plain error."). This case is not an appeal and, therefore, the correct standard is *not* prejudice, reversible error, or harmless error. The correct standard is the risk of harm.

Notwithstanding the government's complaints about Mr. Johnson's "one 1969 case to argue that the exhibit list prejudiced the jury[,]" Opp. at 18, the (multiple) opinions cited in the Motion are more persuasive than those the government cites. As explained above, prejudice is *not* the correct standard, and the cases underlying the government's point apply this incorrect standard. Unlike the government's citations, *Dallago* is a D.C. Circuit opinion with numerous factual parallels to the instant case. *See generally Dallago v. United States*, 427 F.2d 546, 553-

15

560 & n. 23, 58 (D.C. Cir. 1969); *see also* Mot. at 34-36 & n. 15-16.  The government itself

identifies a parallel to *Dallago*, as the parties here also "agreed to keep [certain] documents out

of evidence."  *See* Opp. at 18 (citing *Dallago*, 427 F.2d at 558).  The government's attack on

*Dallago* also loses credibility due to its misplaced reliance on *Guida*, an out-of-circuit,

unpersuasive opinion from 1986, and *Bentley*, which also applied a heightened standard on

appeal because of a failure to object.  *Id.* at 17-18; *see generally United States v. Guida*, 792 F.2d

1087 (11th Cir. 1986); *see also United States v. Bentley*, 489 F.3d 360, 364 (D.C. Cir. 2007)

("when a defendant has failed to timely object to an error at trial, we apply plain error review").

As the Court is aware, defense counsel contemporaneously objected and moved for a mistrial.

*See* 4/16 Tr. 1345-47.

     Even if prejudice was the standard (which it is not), the cases upon which the government

relies state that the presumption is against the government, explaining "[n]onconstitutional error

*is prejudicial* if one cannot reasonably conclude that the judgment was *not substantially swayed*

by the error."  *Treadwell*, 760 F.2d at 339 (emphasis added); *see also Wiley*, 846 F.2d at 157

("Concededly, extra-record information that comes to the attention of a juror is presumptively

prejudicial." (internal citations omitted)).  The government has failed to show, or even attempt to

show, that this presumption of prejudice has been overcome by evidence that the jury was *not*

substantially swayed by the error.  Accordingly, even by the government's misstated standard, it

has not presented evidence counseling against a new trial.

     The record in this case convincingly shows that a new trial is warranted under both the

correct risk of harm standard and the government's inapplicable prejudice standard.  The exhibit

lists at issue in this case were undoubtedly harmful and prejudicial.  First, the Motion does *not*

only "focus[] on two entries relating to the defendant's post-arrest statement as potentially

<div align="center">16</div>

prejudicial." Opp. at 14. Rather, the Motion explicitly identifies multiple highly prejudicial facts the jury was made aware about: (1) the fact that Mr. Johnson gave an interview that must have been recorded in some fashion to constitute an individual exhibit; (2) that said interview was on the government's list, but not the defense's exhibit list, suggesting that Mr. Johnson's statement was favorable to the government's case and unfavorable to Mr. Johnson's; (3) the fact that the government's list of evidence was significantly longer than the defense list (349 against 18); and, finally, (4) the fact that most of the government's evidence was introduced and admitted, while only a fraction of Mr. Johnson's evidence was (328 out of 349 against 4 out of 18 not blacked out). *See* Mot. at 34-35 & n. 18. All of this information, combined, created a serious risk of harm that the jury could have considered in convicting Mr. Johnson.

Second, the government's claims about the poorly redacted, unadmitted evidence on the exhibit lists being "cumulative" are untrue. *See* Opp. at 16-17. The fact Mr. Johnson gave a recorded "Interview" to law enforcement that was significantly detailed enough to warrant transcribing the interview was significantly new information. And knowledge of the recorded and transcribed interview was not previously revealed to the jury by defense counsel's cross examination of Dero Tucker. Eliciting from Mr. Tucker that "Mr. Johnson gave the passcode to the Lenovo computer the very day he was arrested" is not nearly the same as informing jurors about the existence of a recorded interview that Mr. Johnson gave to the police on the day of his arrest. *Id.* at 17 (citing 4/10 Tr. 675). Evidence about Mr. Johnson giving a password during his arrest does *not* mean speaking to law enforcement about anything else and does *not* carry the same significance as a post-arrest recorded and transcribed interview. The fact Mr. Johnson gave a recorded "Interview" to law enforcement after his arrest, and the fact that the government was the only party that chose to include the recorded interview and a transcript of that interview as its

17

trial exhibits, were both completely new to the jury, not implicated by defense counsel's question, and highly prejudicial to Mr. Johnson's defense.

The exhibit lists, which disclosed Mr. Johnson's post-arrest interview and various other unintroduced or inadmissible pieces of evidence, deprived Mr. Johnson of the constitutional safeguards that are assured to all those criminally accused. As the Supreme Court has explained, "evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel[.]" *Turner v. State of La.*, 379 U.S. 466, 472-473 (1965); *see also United States v. Vasquez*, 597 F.2d 192, 193-194 & n. 1 (9th Cir. 1979) ("fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under circumstances assuring the accused all the safeguards of a fair trial."). Criminal defendants have a right to counsel, confrontation and due process, all served by the procedures for introduction and admissibility of evidence. This deprivation of Mr. Johnson's constitutional rights was harmful and prejudicial to the defense.

The closeness of the case contributed to the severe harm and prejudice that Mr. Johnson experienced. As the Motion explained, the jury deliberated for three days and ended up acquitting Mr. Johnson on ten out of the sixteen counts. *See* Mot. at 35-36; *see also Osborne v. United States*, 351 F.2d 111, 118 (8th Cir. 1965) (jury's deliberation for two full working days, requesting an additional exhibit and rereading of instructions, all "lends credence to the view that the case was a close and a difficult one … long deliberation by the jury and its conscientious effort reflected by its notes … makes it likely that the exhibit was examined."); *Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969) ("one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner."). Mr. Johnson was

(Page 101 of Total)

prejudiced by the disclosure of inadmissible evidence because it is more likely that the improper

information could have impacted the jury's verdict on close issues. The jury could have

concluded that Mr. Johnson's interview was on the government's exhibit list because it included

facts that proved Mr. Johnson's knowledge and intent with regard to the charged offenses.

     Under either a risk of harm standard or the incorrect prejudice standard, Mr. Johnson has

shown that the jury's exposure to harmful and unadmitted evidence warrants a new trial. Both

the risk of harm and prejudice are obvious from the novel information introduced by the post-

arrest statement and from the other parts of the exhibit lists, the harmfulness of the information,

the closeness of the case, and the importance of due process safeguards of a criminal trial.

     The government's arguments concerning the effectiveness of the court's curative

instruction are also unpersuasive. First, the government's arguments about the curative

instruction are based on the false premise that the lightly redacted exhibit lists caused only

"minimal prejudice."[8] As discussed above, the true harm caused by exposing jurors to the lightly

redacted exhibit lists was likely substantial. Second, no curative instruction, including the one

given by the Court, could possibly erase from the jury's memory information it learned about

unadmitted exhibits through the lightly redacted exhibit lists. *See generally Gray v. Maryland*,

523 U.S. 185, 190 (1998) ("[T]here are some contexts in which the risk that the jury will not, or

cannot, follow instructions is so great, and the consequences of failure so vital to the defendant,

that the practical and human limitations of the jury system cannot be ignored.") (citing *Bruton v.

United States*, 391 U.S. 123, 135 (1968)). Therefore, there was a substantial risk that jurors

---

[8] The government states that "[t]his type of curative instruction can cure any minimal prejudice." Opp. at 19.

improperly considered the unadmitted exhibits during their deliberations even though the court

instructed them to disregard that evidence, justifying a new trial.

**V.    Telegram and Google Photos Evidence Should Have Been Excluded Because There Was Insufficient Evidence That Mr. Johnson Committed Another Bad Act.**

The government argues that the Telegram and Google Photos evidence was probative of

Mr. Johnson's "intent to possess child pornography and his knowledge that he was doing so."

Opp. at 23.  However, in doing so, the government completely ignores the first prong of the test

for admissibility under Rule 404(b):  the evidence must be *relevant* to an issue other than

character.  *United States v. Mitchell*, 49 F.3d 769, 774-775 (D.C. Cir. 1995).

"In the Rule 404(b) context, similar act evidence is relevant only if the jury can

reasonably conclude that the act occurred and that the defendant was the actor."  *Huddleston v.

United States*, 485 U.S. 681, 689 (1988); *see also United States v. Bowie*, 232 F.3d 923, 930

(D.C. Cir. 2000).  "Evidence of similar acts must also be sufficient to support a jury finding that

the defendant committed the other crime or act."  *United States v. Long*, 328 F.3d 655, 660 (D.C.

Cir. 2003) (citing *Huddleston*, 485 U.S. at 689).  To make this determination, the court must

examine all the evidence and decide whether the jury could reasonably find that the defendant

committed the other act by a preponderance of the evidence.  *See Huddleston*, 485 U.S. at 689-

90.  Often, this means the court allows the government to introduce evidence concerning another

act, and then, after further trial proceedings, assesses whether the prosecution met its burden to

demonstrate that "the act occurred and that the defendant was the actor."  *Id.*  If the government

has not met that burden, the court must instruct the jury to disregard the evidence.  *Id.*

The government's opposition greatly overstates the evidence of Mr. Johnson's actual

conduct with respect to Telegram.  The government argues that Mr. Johnson "*accessed* several

Telegram groups advertising child pornography" and "the *defendant had downloaded* three

20

images containing child pornography from Telegram." Opp. at 24 (emphases added). However, this categorization of intentional, affirmative acts by Mr. Johnson is inconsistent both with the evidence at trial and with the government's proffer of the evidence in its pretrial 404(b) briefing. *See* Opp. at 21 (referencing evidence that Mr. Johnson's "*cellphone* had downloaded three images containing child pornography" and that he was a "*member* of Telegram groups advertising child pornography") (emphases added).

    The government's opposition wholly fails to address the insufficiency of the evidence that Mr. Johnson committed any relevant act with respect to Telegram or Google photos. *See* Mot. at 38-39, 41. The government provided no evidence that Mr. Johnson was aware that he had been added to the Telegram or Google Photos groups advertising child pornography; there was no evidence of him sending, reading, viewing, or reacting to any of the messages at issue or even knowing about the messages. *Id*. at 38, 41. Nor was there sufficient evidence upon which the jury could conclude that Mr. Johnson knowingly and intentionally downloaded the three images recovered from his phone. At best, the expert testimonies of Mr. Tucker and Ms. Bush stood in equipoise on this point, *see id.*, meaning that the government had not met its burden to show that Mr. Johnson had committed a bad act.

    The government argues that "'passive presence' is often the point when seeking out and viewing child pornography." Opp. at 25. This misconstrues Mr. Johnson's argument. Passive presence is not probative if a person is unwittingly added to a group and never interacts with it. In this case, the evidence showed that Mr. Johnson was unknowingly *admitted* to the groups. Without evidence that Mr. Johnson either (1) chose to join those Telegram groups or Google Photos albums or (2) realized that he had been added to them and chose to remain, there is simply no basis for the jury to "reasonably conclude that the [bad] act occurred and that [Mr.

<center>21</center>

Johnson] was the actor." *Huddleston*, 485 U.S. at 689.  Therefore, the Court erred when it did not exclude or instruct the jury to disregard this evidence.

## VI.    Unfair Prejudice of Dropbox Evidence Was Not Mitigated.

The government concedes that Mr. Johnson never downloaded child pornography from the Dropbox folder, *see* Opp. at 24, and it does not contest Mr. Johnson's point that any probative value of the Dropbox evidence was cumulative of other government evidence offered to show Mr. Johnson's knowledge, intent, or lack of mistake, *see* Mot. at 38.

The government also ignores Mr. Johnson's argument that the repeated use of the phrase "black teens and underage thots" presented a risk of unfair prejudice that outweighed the probative value of this cumulative evidence.  Significantly, unlike the vast majority of the cases cited by the government, it cannot point to any steps taken by either it or the Court to mitigate this risk of unfair prejudice.  *See, e.g., Hardrick*, 766 F.3d 1051, 1056 (9th Cir. 2014).  No such limits were placed on the government's presentation here.  Government witnesses and counsel repeated the inflammatory name of the Dropbox folder "black teens and underage thots" over and over.  The unqualified and unconditional admission of this evidence was error.

## VII.    The Defense Did Not "Open the Door" To Irrelevant and Prejudicial Testimony About Tor.

At trial, it was uncontested that Mr. Johnson only accessed child pornography through legitimate websites on the ordinary internet with which jurors would all be familiar, such as Mega and Dropbox.  The defense stressed, in both its opening and cross-examination of Special Agent Cavillo, that the government had no evidence that Mr. Johnson had visited websites on the "dark web" that specifically cater to people looking for child pornography.  *See* 4/9 Tr. 309, 466-467.  Crucially, the defense was making arguments and eliciting evidence about the *websites* Mr. Johnson visited, not the *internet browser* he used to access those sites.  Browsers do not contain

22

content; rather, they help users navigate to and find websites that contain content.  Tor can access

the "dark web," but it also allows users to access the "clear internet" that regular people use

every day.  4/10 Tr. 611.

Although defense counsel made a passing, ambiguous reference in his opening to the

"main website" at issue in this case not being "from Tor", his cross-examination of SA Cavillo

was eliciting information about *websites*, not *browsers*.   Defense counsel did not bring up Tor in

any of his questions, nor was he asking about browsers Mr. Johnson used to access child

pornography.  Rather, he was asking the witness to confirm that websites *exist* on the dark web

that are exclusively designed for child pornography.  *See* Opp. at 27-28 (quoting 4/9 Tr. 467).  It

was SA Cavillo who spontaneously mentioned Tor in a single response, and defense counsel

immediately interrupted her to move the testimony away from that topic:

Mr. Jeffress:    You don't see any dark web investigations?

SA Cavillo:     In the users that I've seen, the majority of them are on chats or other ways
of getting the links. On occasion, we see the Tor, as in The Onion Router, but ---

Mr. Jeffress:    You keep mentioning "chats." You didn't talk to Mr. Courtney about any
chats that Mr. Johnson had with anybody, did you?

4/9 Tr. at 467.

Defense counsel's questioning did not elicit any testimony about what Tor was or what it

was used for.  Nor did defense counsel follow up on SA Cavillo's response to establish that there

was no evidence that Mr. Johnson had ever used Tor.  Thus, defense counsel did not "open the

door" to Tor—if anything, he emphatically slammed it shut.

During the discussion of the defense's objections on this issue, the Court noted that the

defense had not "really open[ed] the door" to evidence about Tor.  *See* 4/10 Tr. 570.  As the

Court framed the issue, the thrust of the defense's cross-examination of SA Cavillo was that "it

is more likely that a mistake was made here or it's less likely that there is mens rea when the government only has evidence that Mr. Johnson was using traditional Internet sites to access CSAM … Leaving the impression, I think, that that is the only evidence in the case is that he uses only such sites." *Id.*

Even assuming the "opening the door" doctrine applies here, it was improper to allow the government to introduce evidence about Tor that did nothing to counter the "impression" that Mr. Johnson used only traditional Internet sites to access child pornography and instead introduced only unfair prejudice. The D.C. Circuit and other courts of appeals have cautioned that curative admissibility "is a shield, not a sword":

> Although the government may prevent a defendant from using rules of evidence to select and enter pieces of evidence wholly out of context, **the government may not shore up a prosecution by pushing through the open door evidence not "necessary to remove any unfair prejudice"** created by defense counsel's tactics. In sum, the range of otherwise-inadmissible evidence that may be squeezed through an "open door" is limited.

*United States v. Brown*, 921 F.2d 1304, 1308-09 (D.C. Cir. 1990) (emphasis added); *see also*

*United States v. Baird*, 29 F.3d 647, 653-54 (D.C. Cir. 1994) (quoting *Brown*, 921 F.2d at 1307).

When the opposing party has introduced evidence on an issue, the trial court has the discretion to permit the other party to introduce otherwise inadmissible evidence on the same issue "when it is needed to rebut a false impression that may have resulted from the opposing party's evidence."

*United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992) (citing *Brown*, 921 F.2d at 1307).[9]

Thus, as the Court formulated the issue, the only evidence that potentially should have been admitted based on the defense "opening the door" is evidence that Mr. Johnson *used* the

---

[9] The government cites *Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013), for the proposition that admission of the Tor evidence was proper because defense counsel opened the door. However, *Lopesierra-Gutierrez* addresses the admissibility of the recorded phone call in a single paragraph and contains no description or discussion of what in the defense's line of questioning "opened the door" to otherwise inadmissible evidence. *Id.* at 206.

Tor browser or *used* websites on the "dark web." But that is *not* what the government did—because such evidence does not exist. Instead, the government introduced testimony that, although Tor was installed on Mr. Johnson's computer, the evidence *did not show any use of Tor whatsoever*. 4/10 Tr. 705. The government then unfairly "squeezed through" character-smearing testimony from Mr. Tucker that Tor allows users to access the "dark web"—though the government well knew that Mr. Johnson *had not done so*.

The defense did not open the door to irrelevant and prejudicial Tor evidence. And even if the Court concludes that the cross-examination of SA Cavillo left a misleading impression that the government was entitled to rebut, the evidence it elicited far exceeded that limited scope and was unfairly prejudicial to Mr. Johnson.

## **CONCLUSION**

For all the foregoing reasons, in the interests of justice, Mr. Johnson respectfully requests that the Court grant the Motion and grant him a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

(Page 108 of Total)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

**v.**

**STEPHEN JOHNSON**
**Defendant.**

**Case No. 22-cr-0176 (CJN)**

---

**SUPPLEMENTAL NOTICE OF AUTHORITY**

Stephen Johnson, by and through undersigned counsel, respectfully submits this

Supplemental Notice of Authority.  The recent D.C. Circuit case *Asinor v. District of Columbia*,

No. 22-7129, 2024 WL 3733171 (D.C. Cir. Aug. 9, 2024) (attached)), provides further support

for Mr. Johnson's position on the two Fourth Amendment issues raised in his Motion for a New

Trial: (1) the warrantless and unconstitutional search of Mr. Johnson's electronic devices; and (2)

Detective Sullivan's warrantless review of the material from Mr. Johnson's Google account.  *See*

*generally* ECF 179 at 19-31; *see also* ECF 183 at 2-6.

In *Asinor*, the D.C. Circuit considered whether the District of Columbia's prolonged

retention of seized property taken from the plaintiffs incident to their arrests constituted an

ongoing seizure for Fourth Amendment purposes.  The court reviewed the historical connection

between the Fourth Amendment and the law of trespass:

> Fourth Amendment jurisprudence "reflects [the Amendment's] close connection
> to property."  *United States v. Jones*, 565 U.S. 400, 405 (2012).  The standards for
> identifying Fourth Amendment violations have been "tied to common-law
> trespass," and the Amendment has been "understood to embody a particular
> concern for government trespass upon the areas ('persons, houses, papers, and
> effects') it enumerates." *Id.* at 405–07. So, to determine whether a particular
> action violates the Fourth Amendment, we must consider "whether the action was
> regarded as an unlawful search or seizure under the common law when the

Amendment was framed." *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999); *see California v. Hodari D.*, 499 U.S. 621, 626 n.2 (1991).

*Id.* at *3.

Noting that the plain text of the Fourth Amendment does not answer the question of whether a seizure occurs only upon the initial taking (as opposed to including continued retention of the property), *id.* at *2, the court turned to the history of the word "seizure."

> Founding-era definitions of the word "seizure" are consistent with both readings. The 1773 edition of Johnson's Dictionary defined the word *seizure* to include both "the act of taking forcible possession" and "gripe; possession." 2 S. Johnson, "Seizure," *A Dictionary of the English Language* (1773). In turn, it defined "gripe" as a noun meaning "grasp" or "hold." 1 S. Johnson, "Gripe," *supra.* These definitions suggest that the word "seizure" encompassed both the act of taking possession and continuing possession over time. In other words, when the Fourth Amendment was proposed and ratified, a "seizure" referred to both the act of *taking* possession and the ongoing state of *having taken* possession.

*Id.* at *2 (emphasis in original).

Because the relevant history confirmed that a seizure included both taking and continued retention, the Court agreed with the plaintiffs that the District of Columbia's ongoing possession of their property must be reasonable to survive Fourth Amendment scrutiny. *Id.* at *3 ("the Fourth Amendment protects possessory interests against government infringement in the same way that Founding-era common law protected possessory interests against private infringement. And the common law authorized actions for damages and recovery of property that was lawfully taken, but then unlawfully possessed. History thus indicates that the government's continued possession of the plaintiffs' property must be reasonable.").

*Asinor* implicates Mr. Johnson's motions to suppress in at least two ways. First, with respect to the warrantless search of Mr. Johnson's electronic devices, *Asinor* makes clear that—

contrary to the government's argument[1]—the words "search" and "seize" are *not* interchangeable for Fourth Amendment purposes. To the contrary, *Asinor* supports Mr. Johnson's argument that "seizing" and "searching" are fundamentally different acts for Fourth Amendment purposes, and that a seizure involves taking (and retaining) possession of property only. The D.C. circuit expressly distinguished between "searches" and "seizures" under the Fourth Amendment: "A search requires 'an attempt to find something or to obtain information,' and a seizure requires 'some meaningful interference with an individual's possessory interests in …property.'" *Asinor*, 2024 WL 3733171 at *3; *see also id.* at *9 ("[The government] can also seek warrants to *search seized* cell phones or other personal property.") (emphasis added). Similarly, in describing the trespass in *Jones*, the court was clear to distinguish searches from seizures. *See id.* at *8 & n. 2 ("*Jones* dealt with a search, not a seizure, and it discussed only the common law of trespass, not other remedies for interference with property like replevin, detinue, and trover.") (citation omitted).

Here, a neutral magistrate reviewing Detective Sullivan's warrant application would have understood the words "search" and "seize" in the same manner as the D.C. Circuit in *Asinor*: as distinct words with distinct meanings. *See id.* at *3 ("A search requires 'an attempt to find something or to obtain information,' and a seizure requires 'some meaningful interference with an individual's possessory interests in …property.'"). While the warrant for Mr. Johnson's apartment authorized law enforcement to "seize" Mr. Johnson's devices—to interfere with Mr. Johnson's possessory interest in them—the warrant by its express terms did not authorize a

---

[1] *See, e.g.,* 3/21 Tr. 43 (the government agreeing with the Court that "even though Attachment B says 'property to be seized,' it really means 'property to be searched' because the words are functionally equivalent. It's describing the seizure of digital evidence from within the devices, which is tantamount to a search. I'm not sure that there's a huge distinction substantively[.]")

"search" of those items, i.e., to "find something or … obtain information," *id.*, from them. Because the warrant did not authorize a search of Mr. Johnson's electronic devices, all evidence extracted from them should have been suppressed, and Mr. Johnson is entitled to a new trial.

Second, with respect to Detective Sullivan's warrantless search of the material from Mr. Johnson's Google drive, *Asinor* underscores that the search was a common law trespass upon Mr. Johnson's property and therefore a violation of the Fourth Amendment, regardless of whether Google had previously committed the same trespass. Indeed, law enforcement's mere continued possession of Mr. Johnson's property was a seizure requiring a warrant. As the *Asinor* court stated:

> [W]hen [there is a search or seizure] *and* there is a violation of private property rights, the Fourth Amendment applies. For example, in *Jones*, the government's placement of a GPS tracker on a suspect's car was a Fourth Amendment search because (1) the government attempted to find information, and (2) the act of placing an object on someone else's property would have been a trespass under founding-era common law. *See id.* at 407–08, 408 n.5. By the same logic, there is a Fourth Amendment seizure if the government (1) meaningfully interferes with possessory interests in property in a way that (2) would have been understood to be an actionable property tort at common law.

*Id.* at *8.

A well-trained officer in Detective Sullivan's position would not have seized and searched the material from Mr. Johnson's Google account without first obtaining a warrant. The good faith exception accordingly does not apply, and the material from Mr. Johnson's Google Account should have been suppressed, entitling Mr. Johnson to a new trial on this basis as well.

Dated: August 20, 2024                         Respectfully Submitted,

                                               */s/ Jonathan Jeffress*
                                               Jonathan Jeffress (D.D.C. Bar No. 479074)
                                               Courtney R. Forrest (D.D.C. Bar No. 996740)
                                               Tony Miles (D.D.C. Bar No. 484450)
                                               Washington, D.C. 20005
                                               Phone: (202) 640-2850

4

Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

5

JA2294

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 21, 2023          Decided August 9, 2024

No. 22-7129

OYOMA ASINOR AND BRYAN DOZIER,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Consolidated with 22-7130

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-02158)
(No. 1:21-cv-02908)

———

*Michael Perloff* argued the cause for appellants. With him
on the briefs were *Kristin L. McGough*, *Scott Michelman*,
*Arthur B. Spitzer*, *Tara L. Reinhart*, and *Jeffrey L. Light*.

*Thomas K. Clancy* was on the brief for *amici curiae*
Morgan Cloud and Thomas K. Clancy in support of appellants.

2

*Zoé E. Friedland* and *Hanna Perry* were on the brief for *amicus curiae* The Public Defender Service for the District of Columbia in support of appellants.

*Amir H. Ali* was on the brief for *amici curiae* The Roderick and Solange MacArthur Justice Center, et al. in support of appellants.

*Marcella Coburn*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KATSAS, *Circuit Judge*: The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Under settled law, a seizure of personal effects incident to a lawful arrest is reasonable. This case presents the question whether the Fourth Amendment requires that any continued retention of such personal property—even after release of the arrested individuals—must also be reasonable. We hold that it does.

3

I

The appellants in these consolidated appeals allege that the District of Columbia, after arresting and releasing them without charges, for months or years refused to return their personal property seized incident to the arrests. On review of dismissal orders, we assume that these allegations are true. *City of Harper Woods Emps.' Ret. Sys. v. Oliver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

In *Cameron v. District of Columbia*, five plaintiffs allege that they were among some 40 individuals arrested in a protest on August 13, 2020. Upon arresting them, the Metropolitan Police Department seized their personal effects, including their cell phones. The plaintiffs were quickly released, and the MPD neither pressed charges nor sought warrants to search or continue to possess the phones. Despite many phone calls and emails to the MPD and the U.S. Attorney's Office, the plaintiffs were unable to get their phones back.

The plaintiffs then invoked D.C. Rule of Criminal Procedure 41(g), which allows a person aggrieved by "the deprivation of property" to "move for the property's return." At first, the plaintiffs filed a Rule 41(g) motion in criminal cases pending in the D.C. Superior Court against other individuals arrested on August 13. The Deputy Clerk of that court instructed the plaintiffs to refile their motion in a new, standalone case. After they did so, the District returned the phones of two plaintiffs—285 and 312 days after their arrests.

In November 2021, the five plaintiffs sued the District in federal court. They alleged claims under the Fourth and Fifth Amendments and common-law conversion, and they sought damages and an injunction ordering the return of their property still held by the MPD. They also sought to represent classes of

JA2297

4

August 13 arrestees whose property was not returned within a reasonable amount of time. The District eventually returned the other plaintiffs' phones, more than a year and two months after their arrests.

The district court dismissed the complaint. It reasoned that the plaintiffs had failed to state a Fourth Amendment claim because the initial seizure of their property was reasonable and because any challenge to its continued retention was governed exclusively by the Fifth Amendment. On the Fifth Amendment claim, the court held that Rule 41(g) gave the plaintiffs adequate process to recover their property. And having dismissed the constitutional claims, the court declined to exercise supplemental jurisdiction over the conversion claim and denied the motion for class certification as moot.

In *Asinor v. District of Columbia*, a journalist alleges that he was arrested while photographing an August 31, 2020 protest. When arresting him, the MPD seized his cell phone, camera, and other effects. The journalist was released the same day and informed that he would not face charges. Despite repeated requests, he was unable to retrieve his property for nearly a year. He sued and raised Fourth Amendment, Fifth Amendment, and D.C.-law claims.

The district court dismissed the constitutional claims based on its reasoning in *Cameron*. And it declined to exercise supplemental jurisdiction over the other claims.

The plaintiffs in both cases appealed.

## II

All agree that the MPD's arrest of the plaintiffs was reasonable under the Fourth Amendment. And it is blackletter

5

law that, during an arrest, police may seize personal property held by the arrestee without a warrant. *Riley v. California*, 573 U.S. 373, 384 (2014). So the District's initial seizure of the plaintiffs' effects did not violate the Fourth Amendment.

The question before us is whether the Fourth Amendment has anything to say about the many months in which the MPD allegedly continued to hold the plaintiffs' effects with no legitimate investigatory or protective purpose. The District answers no. It contends that the Fourth Amendment governs the government's taking of possession of an individual's personal property, but not the government's continued possession of the property.

We disagree. When the government seizes property incident to a lawful arrest, the Fourth Amendment requires that any continued possession of the property must be reasonable. We reach this conclusion based on the Fourth Amendment's text and history, as well as modern Supreme Court precedents regarding the constitutionally permissible duration of seizures, whether of property or persons.

A

The Fourth Amendment promises that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. If the right to be "secure" against "unreasonable … seizures" speaks only to the initial moment when the government takes possession of property—that is, the initial moment of seizure—then the District wins. But if this guarantee is instead concerned with the entire duration of the government's possession of the property—that is, the entire period during which the property has been seized—then the plaintiffs win.

6

The bare text of the Fourth Amendment does not answer this question definitively. Founding-era definitions of the word "seizure" are consistent with both readings. The 1773 edition of Johnson's Dictionary defined the word *seizure* to include both "the act of taking forcible possession" and "gripe; possession." 2 S. Johnson, "Seizure," *A Dictionary of the English Language* (1773). In turn, it defined "gripe" as a noun meaning "grasp" or "hold." 1 S. Johnson, "Gripe," *supra.* These definitions suggest that the word "seizure" encompassed both the act of taking possession and continuing possession over time. In other words, when the Fourth Amendment was proposed and ratified, a "seizure" referred to both the act of *taking* possession and the ongoing state of *having taken* possession. But a narrower understanding, limited to the moment of taking possession, was also definitionally possible. In this respect, the meaning of "seizure" was ambiguous in the late eighteenth century, as it is today.

History helps resolve this semantic ambiguity. Because the Fourth Amendment codified a "*pre-existing* right," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), it "must be read in light of" its history, *Chimel v. California*, 395 U.S. 752, 760–61 (1969). And history favors the plaintiffs. As explained below, the Fourth Amendment protects possessory interests against government infringement in the same way that Founding-era common law protected possessory interests against private infringement. And the common law authorized actions for damages and recovery of property that was lawfully taken, but then unlawfully possessed. History thus indicates that the government's continued possession of the plaintiffs' property must be reasonable.

The Fourth Amendment grew out of Antifederalist criticism of the original Constitution. Patrick Henry opposed

7

ratification in part because "any man may be seized, any property may be taken, in the most arbitrary manner, without any evidence or reason." 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 588 (Jonathan Elliott ed., 1891). This criticism was especially salient to the many who considered the Crown's seizures of personal property to be among the grievances justifying the Revolutionary War—with some colonists comparing British officers to "thieves" or lamenting that they would "take and carry away" their property without cause. *See* Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 Yale L. J. 946, 987–94, 991 & n.205 (2016) (cleaned up).

Consistent with this history, Fourth Amendment jurisprudence "reflects [the Amendment's] close connection to property." *United States v. Jones*, 565 U.S. 400, 405 (2012). The standards for identifying Fourth Amendment violations have been "tied to common-law trespass," and the Amendment has been "understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 405–07.[1] So, to determine whether a particular action violates the Fourth Amendment, we must consider "whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed." *Wyoming v. Houghton*, 526 U.S. 295, 299

---

[1] The Court later supplemented this "property-based approach" by holding that the Fourth Amendment also protects a person's "reasonable expectation of privacy." *Jones*, 565 U.S. at 405–06 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). But "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 409.

8

(1999); *see California v. Hodari D.*, 499 U.S. 621, 626 n.2 (1991). To be sure, not *every* government trespass upon the persons or effects protected by the Fourth Amendment is a "search" or "seizure." *Jones*, 565 U.S. at 408 n.5. A search requires "an attempt to find something or to obtain information," and a seizure requires "some meaningful interference with an individual's possessory interests in … property." *Id.* But when one of these elements exists *and* there is a violation of private property rights, the Fourth Amendment applies. For example, in *Jones*, the government's placement of a GPS tracker on a suspect's car was a Fourth Amendment search because (1) the government attempted to find information, and (2) the act of placing an object on someone else's property would have been a trespass under founding-era common law. *See id.* at 407–08, 408 n.5. By the same logic, there is a Fourth Amendment seizure if the government (1) meaningfully interferes with possessory interests in property in a way that (2) would have been understood to be an actionable property tort at common law.[2]

The plaintiffs' allegations satisfy both prongs of this test. The MPD meaningfully interfered with their possessory interests both by taking possession of their property and by keeping it. The ongoing meaningful interference is self-evident; for as long as the MPD had control of the property, the plaintiffs could not possess it at all. And prolonged, unauthorized possession of a person's property would have

---

[2] *Jones* dealt with a search, not a seizure, and it discussed only the common law of trespass, not other remedies for interference with property like replevin, detinue, and trover. *See generally* Ames, *History of Trover*, 11 Harv. L. Rev. 374 (1897–1898). But *Jones*'s reasoning was not about the specific connection between trespass law and a "search"—it is about the broader relationship between the Fourth Amendment's protections and common-law property rights.

9

been actionable at common law even if the initial taking had been lawful.  William Blackstone, "whose works constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), directly addressed this question.  He described "the amotion or deprivation of … possession" as an injury to the "rights of personal property in possession" that was "divisible into two branches; the unjust and unlawful *taking* them away; and the unjust *detaining* them, though the original taking might be lawful."  3 W. Blackstone, Commentaries on the Laws of England 145 (1768).  He further elaborated that "deprivation of possession may also be by an unjust *detainer* of another's goods, though the original *taking* was lawful"—providing as one example a person who refused to return a borrowed horse. *Id.* at 150–51 (cleaned up).  And he then set forth the different remedies available to recover the property and get damages for its wrongful detention, stating that the plaintiff "shall recover damages only for the *detention* and not for the *caption*, because the original taking was lawful."  *Id.* at 151–52.

In other words, the common law recognized that property interests are impaired not only at the instant when an owner loses possession, but also for as long as the owner cannot get the property back.  And it provided remedies for wrongful interference with possessory rights regardless of whether the interference became wrongful at the moment of the initial seizure or only later.  This history indicates that the Fourth Amendment governs the MPD's continued retention, as well as its taking possession, of the plaintiffs' property.

B

Modern caselaw confirms that the Fourth Amendment governs what happens after the government initially seizes

10

property. In *United States v. Jacobsen*, 466 U.S. 109 (1984), the government seized white powder, tested it, and determined that it was cocaine. *Id.* at 111. The Court had no trouble holding that the initial seizure was lawful because it was supported by probable cause. *Id.* at 120–22. But the Court was not finished; it also analyzed whether the field test was reasonable, because "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id.* at 124. The Court further explained that a seizure could become "unreasonable because its length unduly intruded upon constitutionally protected interests." *Id.* at 124 n.25.

These principles govern this case. The MPD's initial seizure of the plaintiffs' effects was lawful because it was incident to their arrests. Such seizures are reasonable to protect the safety of arresting officers and to prevent any destruction of evidence. *See Riley*, 573 U.S. at 381–85. But here, the plaintiffs allege that the government continued to possess their property for many months after it lacked any legitimate interest in protecting officers or investigating possible criminal behavior. And after the government's legitimate interests dissipated, harm to the plaintiffs continued to accrue: It is one thing not to have access to a cell phone while spending a night in jail. It is quite another not to have access to it for the following year. Some plaintiffs allege that they had to replace their phones, a significant financial harm. And some allege that they lost access to important information like passwords, photographs, and contact information for friends and family. So the plaintiffs have alleged that the seizures at issue, though lawful at their inception, later came to unreasonably interfere with their protected possessory interests in their own property.

11

The District contends that *Jacobsen* merely applied *United States v. Place*, 462 U.S. 696 (1983).  And it argues that *Place* dealt not with the question whether a seizure lawfully carried out can later become unlawful, but with the question whether probable cause or reasonable suspicion was the necessary standard for justifying a seizure that involved retaining a traveler's suspicious luggage for 90 minutes.  *See id.* at 707–10.  But regardless of *Place*, *Jacobsen* announced and applied the rule set forth above, in a case presenting no question about when an initial seizure could be justified based only on reasonable suspicion.  Moreover, a majority of Justices have reiterated that *Jacobsen* and *Place* set forth a general rule regarding the permissible duration of full-fledged seizures.  *See Segura v. United States*, 468 U.S. 796, 812 (1984) (plurality opinion) ("Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons."); *id.* at 823 (Stevens, J., dissenting) ("Even a seizure reasonable at its inception can become unreasonable because of its duration."). The District objects that this statement of law from *Segura* does not bind us because it was not joined by a majority of Justices who concurred in the judgment.  *See Marks v. United States*, 430 U.S. 188, 193 (1977).  But the fact that six of nine Justices expressed this view certainly suggests that *Jacobsen* is not somehow limited to *Place*'s facts.

The District further seeks to distinguish *Jacobsen* because the field test there, which destroyed a small portion of the seized cocaine, led to a *permanent* deprivation of the relevant property interests, while this case has no comparable intrusion. True enough, the plaintiffs do not allege that the MPD has destroyed or physically damaged their property.  But *Jacobsen* cannot fairly be limited to cases involving destruction of property.  The Court stated unequivocally that a seizure's

12

"length" and "manner of execution" can make an initially lawful seizure unlawful. *Jacobsen*, 466 U.S. at 124 & n.25. This suggests a concern not only with destruction of property, but with any change in circumstances that makes unreasonable the government's ongoing interference with possessory property interests.

C

The modern caselaw on the seizure of individuals further confirms our conclusion. When a person is seized, the Fourth Amendment requires reasonableness not only at the moment of arrest, but also for the seizure's entire duration. We see no textual, historical, or other reason to say that the Fourth Amendment protects against the government's prolonged seizure of persons but not its prolonged seizure of effects.

In *Manuel v. City of Joliet*, 580 U.S. 357 (2017), the Supreme Court held that after a person is arrested, the Fourth Amendment requires any pretrial detention to remain reasonable even after the commencement of formal legal process. *Id.* at 359–60. The Court explained that the continued detention of an individual is an ongoing "seizure": Manuel alleged that government officials "detained—which is to say, 'seized'—[him] for 48 days following his arrest. And that detention was 'unreasonable,' the complaint continued, because it was based solely on false evidence, rather than supported by probable cause." *Id.* at 364 (cleaned up). And the Fourth Amendment required continuing reasonableness over time, Manuel argued, even after the start of formal criminal process. *See id.* at 362. The Supreme Court agreed, holding that "Manuel's claim fits the Fourth Amendment, and the Fourth Amendment fits Manuel's claim, as hand in glove." *Id.* at 364.

JA2306

13

The same logic applies here. The plaintiffs allege that MPD retained—which is to say, "seized"—their property for over eight months after their arrests. And they allege that this continued seizure was unreasonable because it served no legitimate investigatory or protective purpose. By its terms, the Fourth Amendment prohibits unreasonable seizures of "persons, houses, papers, and effects," which suggests that the four listed terms receive analogous protection. Neither text, grammar, nor history suggest that seizures are ongoing events when directed at "persons" but mere snapshots when directed at "houses, papers, and effects."

Likewise, this Court has held that the Fourth Amendment requires officers to release an arrestee from custody—that is, to end their seizure of a person—if new facts dissipate the probable cause that justified a warrantless arrest. *Lin v. District of Columbia*, 47 F.4th 828, 841 (D.C. Cir. 2022). This principle also covers the claims here. If the rationales that justified the initial retention of the plaintiffs' effects dissipated, and if no new justification for retaining the effects arose, then the Fourth Amendment obliged the MPD to return the plaintiffs' effects.

The District counters that *Torres v. Madrid*, 592 U.S. 306 (2021), distinguishes seizures of persons and effects. True enough, *Torres* did hold that a person, but not an effect, is "seized" if shot by a government official. *Id.* at 309, 322–23. This distinction was based on the "unremarkable proposition that the nature of a seizure can depend on the nature of the object being seized." *Id.* at 324. The proposition mattered because the seizure of a person implicates the common law of arrest, while the seizure of an effect does not. *Id.* at 312–13. But while *Torres* thus explained *why* people and effects are different in the specific context of a shooting, the District offers

JA2307

14

no good reason why people and effects are different with respect to ongoing seizures in general. Moreover, even *Torres*'s limited and "unremarkable" conclusion was a contested departure from the ordinary presumption that "courts cannot give a single word different meanings depending on the happenstance of which object it is modifying." *Id.* at 332 (Gorsuch, J., dissenting) (cleaned up). So, *Torres* does not justify a categorical break between Fourth Amendment law governing persons and its law governing effects.

More narrowly, the District argues that governments must apply continuing force to seized persons, who would often wish to flee, which is why *Manuel* recognized the need for ongoing reasonableness of the detention. In contrast, the District argues, there is no continuing application of force against an inanimate object, and thus no need for its prolonged retention to be reasonable. This argument misses the point. Of course, the government does not use force against a cell phone, just as it does not infringe upon the property interests of a cell phone. But it infringes upon a *person*'s possessory property interests *in* a cell phone. And whether the government infringes upon a liberty or property interest, it hopes to avoid using force, but will do so if necessary. An arrested individual will be subjected to force if he tries to walk out of his jail cell. But so too will a cell phone owner who tries to walk into police headquarters to remove the phone from an evidence locker. In both instances, the government is prepared to use force to prolong an ongoing deprivation of liberty or property. If the Fourth Amendment addresses the former, we see no reason why it does not also address the latter.

15

III

The District makes several counterarguments based on caselaw, the Fifth Amendment, and assertedly dire consequences.  We find none of them convincing.

A

The District contends that *Hodari D.* and *Torres* resolve any semantic ambiguity in the word "seizure."  According to the District, those cases establish that "seizure" means "taking possession" and refers to a "single act" rather than a "continuous fact."  *Torres*, 592 U.S. at 312, 323; *Hodari D.*, 499 U.S. at 624, 625.  The District argues that these statements show that its "seizure" occurred only when the MPD took the plaintiffs' property into its possession—and that only that single act must be reasonable.

We disagree.  Viewed in isolation, these snippets sound good for the District.  But *Hodari D.* and *Torres* both address what must happen for the government to effect a seizure in the first place; neither case presents the question whether a seizure must remain reasonable over time.  Read in context, the highlighted statements do not support the District's position, which is inconsistent with many other cases.

In *Hodari D.*, the Supreme Court rejected an argument that a suspect had been "seized" when he saw a police officer running toward him; instead, the seizure occurred only when the officer tackled him.  499 U.S. at 622–23, 629.  The Court reasoned that, at common law, a "seizure" required "taking possession."  *Id.* at 624.  But although the suspect was not seized *until* the police took possession of him, that does not make prolonged detention *after* the initial arrest any less of a seizure.  Then—with a *cf.* citation to a 19th century case about

16

the seizure of a ship—the Court said that a "seizure is a single act, and not a continuous fact" to bolster its point that, had the suspect escaped custody, there would have been no "*continuing* arrest during the period of fugitivity." *Id.* at 625 (quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471 (1874)). But that does not mean there is no continuing seizure when the police continue to hold a person or property in custody.

*Torres* is similar. As discussed above, it held that the police had "seized" a fleeing suspect when they shot but failed to detain her. The Court acknowledged *Hodari D.*'s statement that "from the time of the founding to the present, the word 'seizure' has meant a 'taking possession'" immediately before explaining that "seizure" can also have a broader meaning that encompasses the common law of arrest. *See* 592 U.S. at 312–13 (cleaned up). And it reasoned—echoing the second portion of *Hodari D.* just discussed—that "a seizure is a single act, and not a continuous fact" to explain the line-drawing issues that would arise if shooting a suspect did not constitute a seizure. *See id.* at 323 (cleaned up). At no point did the Court suggest that the suspect *stopped* being seized after she was shot—only that she *had been* seized once shot. Like *Hodari D.*, *Torres* simply does not address the question whether the prohibition on "unreasonable seizures" applies only for a single moment or for the duration of the government's possession.

Other cases, however, do address this question. Blackletter Fourth Amendment law—including the caselaw that we have already discussed—establishes that a "seizure" has a duration. *Jacobsen* said that a lawful seizure may become "unreasonable because [of] its length." 466 U.S. at 124 n.25. And *Manuel* described a prisoner as having been "detained— which is to say, 'seized' … for 48 days." 580 U.S. at 364. Still other cases likewise have described "seizures" as reflecting an

17

ongoing state.  *See*, *e.g.*, *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (noting that the "tolerable duration" of a traffic stop depends on the "seizure's mission" (cleaned up)); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *Jacobsen* for the proposition that the "initial seizure" of a traffic stop that was "concededly lawful" could "become unlawful" if it were "prolonged beyond the time reasonably required"); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (holding that, even though warrantless arrests do not always run afoul of the Fourth Amendment, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest").

The two lines of cases can be reconciled.  *Hodari D.* and *Torres* show that the government "takes possession" of a person or object at a single moment in time.  The other cases show that, once the government has taken possession of a person or object, its conduct must remain reasonable over time. At both the moment of seizure and throughout its duration, the government's conduct must be reasonable—consistent with both founding-era meanings of the word "seizure."

## B

The District acknowledges a constitutional obligation to return the plaintiffs' property, but it locates the duty in the Fifth Amendment's guarantee that no person shall be "deprived of … property, without due process of law."  U.S. Const. Amend V.  In other words, because the Fifth Amendment protects the plaintiffs' ongoing possessory interests, the Fourth Amendment does not.

But constitutional provisions do not preempt one another like that.  Indeed, the Supreme Court has already rejected the argument that the Fourth Amendment does not apply to

18

interferences with property rights just because the Fifth Amendment does. *Soldal v. Cook County*, 506 U.S. 56, 70–71 (1992). The Court reasoned that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." *Id.* at 70. And if "multiple violations are alleged," we must "examine each constitutional provision in turn." *Id.* So, the question whether this case implicates procedural due process, substantive due process, or the Takings Clause is irrelevant to the question whether it also implicates the Fourth Amendment.

Even if we had to pick between constitutional provisions, we do not share the District's confidence that the Fifth Amendment fits the plaintiffs' claims better than the Fourth. The District argues that a hearing under D.C. Criminal Rule 41(g)—which allows a "person aggrieved" by a property deprivation to "move for the property's return"—affords constitutionally sufficient process for the adjudication of the plaintiffs' claims. But even if a hearing under Rule 41(g) provides adequate process, the question remains what substantive law would require the District to return property held without justification. We are reluctant to reduce this entirely to a question of D.C. law, which would eliminate substantive constitutional protection for the property rights at issue. As for other portions of the Fifth Amendment, it is unclear whether the government's continued retention of lawfully seized property would constitute an unconstitutional taking. *See Bennis v. Michigan*, 516 U.S. 442, 452 (1996). And we prefer guideposts from "an explicit textual source of constitutional protection against a particular sort of government behavior" to the more amorphous standards of "substantive due process." *Abdelfattah v. DHS*, 787 F.3d 524, 541 (D.C. Cir. 2015) (cleaned up). Here, the Fourth Amendment is just such a textual source; it "was tailored

19

explicitly for the criminal justice system" and strikes a "balance between individual and public interests" that has always "been thought to define the 'process that is due' for seizures of persons or property in criminal cases." *Gerstein*, 420 U.S. at 125 n.27.  An argument that we need not consider the Fourth Amendment because of substantive due process thus gets things backward; instead, we need not consider substantive due process because of the Fourth Amendment.

## C

The District points to two decisions that it says reject Fourth Amendment claims in analogous contexts: *Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010), and *City of West Covina v. Perkins*, 525 U.S. 234 (1999).  We find both cases distinguishable.

In *Tate*, we considered a Fourth Amendment challenge to the sale of an impounded vehicle to pay two outstanding parking tickets.  627 F.3d at 906–07.  Christina Tate argued that the sale was a disproportionate response to her tickets.  *Id.* at 912.  We rejected her Fourth Amendment claim, because the "sale itself was not a 'seizure' of Tate's vehicle which was already in the District's lawful possession and control."  *Id.*  We held that the sale was "properly subject to constitutional challenge, if at all, under the Fifth Amendment as an unlawful taking or a violation of due process."  *Id.*  But in that case, the District had assumed title to the vehicle under a "forfeiture regime" governing abandoned property.  *Id.* at 907–09, 912.  And once title was transferred, Tate lacked any ongoing property interest.  So, at that point, the District's conduct stopped being a "seizure" and became a permanent claim of title.  We held that a constitutional challenge to that claim fell under the Fifth Amendment, not the Fourth.  *Id.* at 908–09,

JA2313

20

911–12.  But here, the District never claimed title to the disputed property, so *Tate* sheds little light on this case.

*City of West Covina* is even farther afield.  There, the Court held that procedural due process does not require the government "to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution."  525 U.S. at 236.  No Fourth Amendment claim was raised or considered.  And because nobody "contest[ed] the right of the State to have seized the property in the first instance or its ultimate obligation to return it," the Court set aside any question about what rules may restrict "the substantive power of the State to take property."  *Id.* at 240.  This framing of the question, assuming a protected property interest and addressing what procedural protections must attach, simply does not address whether the Fourth Amendment requires the government's ongoing possession of seized property to be substantively reasonable.[3]

### D

Finally, the District warns of the consequences of holding that the Fourth Amendment requires ongoing retention of seized property to be reasonable.  The District frets that such a ruling would constitutionalize pedestrian, state-law rules about

---

[3]  The District also notes that some of our sister Circuits have held that the Fourth Amendment does not address the reasonableness of the government's continuing retention of lawfully seized effects. *See*, *e.g.*, *Lee v. City of Chicago*, 330 F.3d 456, 460–66 (7th Cir. 2003); *Fox v. Van Oosterum*, 176 F.3d 342, 349–52 (6th Cir. 1999). But the Ninth Circuit has adopted our approach.  *See Brewster v. Beck*, 859 F.3d 1194, 1196–98 (9th Cir. 2017).  And for reasons explained above, we find its conclusion more persuasive.

21

how to return arrestees' property. In *Soldal*, the government likewise objected that applying the Fourth Amendment would involve "federalizing areas of law traditionally the concern of the States." 506 U.S. at 71. But like the Court in *Soldal*, we "think the risk is exaggerated." *Id.*

The Fourth Amendment prohibits only unreasonable seizures—which only modestly restricts the government's ability to continue retaining lawfully seized property. Of course, it can reasonably retain contraband or evidence in an ongoing criminal investigation or trial. *See United States v. Farrell*, 606 F.2d 1341, 1347 (D.C. Cir. 1979). It can also seek warrants to search seized cell phones or other personal property. *See Riley*, 573 U.S. at 401. Nothing in our holding limits the government's ability to use seized effects for legitimate law-enforcement purposes.

Moreover, even when there the government no longer has a valid reason to retain lawfully seized property, we do not suggest that it must always return the property instantaneously. Matching a person with his effects can be difficult, as can the logistics of storage and inventory. And the retention of personal property is, of course, less burdensome than being held in custody. In other words, returning seized effects will often be more difficult for the government and less important to the affected individuals than releasing seized persons—which means that some delays that would be unreasonable as to persons may be reasonable as to effects.

At the same time, the Fourth Amendment does require continuing retention of seized property to be reasonable. And the plaintiffs' allegations raise serious questions about the reasonableness of the MPD's handling of their property for months or years after their release from custody without

JA2315

22

charges. The district court erred in concluding that these allegations do not implicate the Fourth Amendment.[4]

## IV

Having resolved the Fourth Amendment claims, we turn to the other issues in this appeal. The plaintiffs do not challenge the dismissal of their Fifth Amendment claims. But both sets of plaintiffs argue that the district court should reconsider its decision not to exercise supplemental jurisdiction over their D.C.-law claims, and the *Cameron* plaintiffs also argue that the district court should reevaluate its denial of class certification in their case.

We agree. The sole rationale that the district court offered for declining to exercise supplemental jurisdiction was that there were no federal claims left in the cases. And the sole rationale for denying class certification in *Cameron* was that the merits dismissals had mooted the certification issue. Because our decision has overtaken both rationales, the district court should reconsider whether supplemental jurisdiction and class certification are appropriate.

---

[4] The parties appear to agree, as do we, that the district court misread the complaints as alleging an alternative theory that the MPD unreasonably delayed a search of the plaintiffs' property. The Fourth Amendment claims here rest only on the MPD's prolonged retention of the property itself. Because the district court held that the complaints stated no Fourth Amendment violation, it did not reach the question whether the complaints adequately alleged a municipal custom or policy under *Monell v. Department of Social Services*, 436 U.S. 658 (1977). We decline to address that question in the first instance.

JA2316

23

V

For these reasons, we reverse the dismissal of the Fourth Amendment claims; vacate the dismissal of the D.C.-law claims and the denial of class certification in *Cameron*; and remand both cases for further proceedings consistent with this opinion.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I join the majority opinion in full. The Fourth Amendment's protections do not cease once the government takes possession of an individual's property. I write separately to explain why I believe we correctly part ways with many of our sister circuits.

Five circuits — the First, Second, Sixth, Seventh and Eleventh — have held in precedential opinions that the Fourth Amendment does not support a claim for the government's retention of legally seized property. *Denault v. Ahern*, 857 F.3d 76, 84 (1st Cir. 2017); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004); *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999); *Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003); *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009). Only the Ninth Circuit disagrees. *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017).[1] Granted, we should hesitate before rejecting a robust consensus from our sister circuits but here, I believe, their reasoning lacks the power to persuade because they fail to discuss the key Supreme Court precedent, *United States v. Jacobsen*, 466 U.S. 109 (1984).

To begin with, most of the contrary opinions have considered the issue only in passing. In *Denault*, the plaintiffs halfheartedly raised a continuing seizure claim but made "no effort" to "explain why the alleged violation of their constitutional rights sound[ed] in the Fourth Amendment." 857 F.3d at 83. The First Circuit rejected the theory without independent analysis because plaintiffs had "offered no reason to disagree" with the circuits that had already rejected such a theory. *Id.* at 84. The Second Circuit simply reasoned that "a seizure claim based on the unlawful retention [of property] was too 'novel' a theory to warrant Fourth Amendment protection." *Shaul*, 363 F.3d at 187 (quoting *United States v. Jakobetz*, 955

---

[1] The Fourth Circuit may also agree with us. *See Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (unpublished).

2

F.2d 786, 802 (2d Cir.1992)); *see also Denault*, 857 F.3d at 83 (noting that "the Second Circuit rejected the seizure-includes-retention theory out of hand"). The Eleventh Circuit gave the issue almost equally short shrift. *See Casey*, 555 F.3d at 1330–31. None of these opinions discussed relevant Supreme Court precedent or competing definitions of "seizure."

The Sixth Circuit's opinion in *Fox* and the Seventh Circuit's opinion in *Lee* are exceptions. *Fox* reasoned that the Supreme Court had found a seizure of property only in "cases where there is no debate that the challenged act is one of taking property away from an individual and the issue is whether that act of taking property away constitutes a meaningful interference with possessory interests." 176 F.3d at 351. Because it concentrated on the moment of taking, the *Fox* court concluded that "the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property." *Id. Lee* reached its conclusion differently. It relied on what it considered the "temporally limited" definition of "seizure" at the Founding, on in-circuit precedent rejecting the idea of continuing seizures in the context of persons and the "practical concerns" it foresaw in extending the Fourth Amendment. *See Lee*, 330 F.3d at 462–65.

But *Fox* and *Lee*, thorough as they are in many respects, focused on the wrong Supreme Court precedent. Both discussed *United States v. Place*, 462 U.S. 696 (1983), without recognizing that the Court's later *Jacobsen* decision extended *Place*. *See Lee*, 330 F.3d at 464; *Fox*, 176 F.3d at 351 n.6. In *Place*, law enforcement took a suspicious traveler's luggage and held it for ninety minutes before securing a narcotics dog to conduct a "sniff test" for drugs. *Id.* at 699. The Court held that law enforcement may, as a general matter, detain property "on the basis of less than probable cause, for the purpose of

3

pursuing a limited course of investigation," *id.* at 702, "provided that the investigative detention is properly limited in scope," *id.* at 706. But the Court went on to hold that the seizure at issue was unreasonable because of "[t]he length of the detention of respondent's luggage." *Id.* at 709. As *Fox* and *Lee* recognized, the reason that the length of the detention was crucial in *Place* was the fact that law enforcement lacked probable cause. *See Lee*, 330 F.3d at 464; *Fox*, 176 F.3d at 351 n.6. Although "some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests" that they can be justified on less than probable cause, *Place*, 462 U.S. at 706, the Court emphasized that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," *id.* at 709.

Standing alone, *Place* offers little rationale for finding that the Fourth Amendment applies to the government's retention of lawfully seized property. The fact that investigatory detentions made without probable cause must be of a reasonable duration does not dictate that the Fourth Amendment requires the same for all property seizures. But the Court added to *Place* in *Jacobsen*, which connection neither *Fox* nor *Lee* discussed.[2] There, the government seized white powder from a package and tested it to determine that it was cocaine. *Jacobsen*, 466 U.S. at 111. The Court held the powder's initial seizure was supported by probable cause. *Id.* at 120–22. But, critically for our purpose, the Court then turned to the reasonability of the government's actions *after* the initial lawful seizure: "whether the additional intrusion occasioned by the field test . . . was an unlawful 'search' or 'seizure' within

---

[2] *Jacobsen* is scarcely cited across the two opinions and never for the portion of it pertinent here.

4

the meaning of the Fourth Amendment." *Id.* at 122. The Court explained that, under *Place*, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id.* at 124. In a footnote, the Court described *Place* as holding that "while the initial seizure of luggage for the purpose of subjecting it to a 'dog sniff' test was reasonable, the seizure became unreasonable because its length unduly intruded upon constitutionally protected interests." *Id.* at 124 n.25. The Court ultimately found that the field test, which destroyed "a trace amount" of the powder, was reasonable. *Id.* at 125.

I respectfully submit that our two sister circuits have failed to recognize that *Jacobsen* broadened *Place*.[3] *Jacobsen* applied *Place* in a new context, extending it from its investigatory "initial seizure" had already occurred. *See id.* at 124 (internal quotation marks removed). Thus, when *Jacobsen* refers to "seizure[s] lawful at [their] inception," *id.*, it refers not just to the narrow class of seizures at issue in *Place* but to all lawful seizures of property. Those seizures "can nevertheless violate the Fourth Amendment" if their "manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment[]." *Id.*

Nor, in my view, can a seizure's "manner of execution" be read as somehow distinct from its duration. True, the only time *Jacobsen* refers to the "length" of a seizure is in the footnote describing *Place*'s holding. *See id.* at 124 n.25. But that footnote immediately follows the "manner of execution"

---

[3]    It is no coincidence that the only circuit to reach our conclusion cited *Jacobsen* in support. *See Beck*, 859 F.3d at 1196, 1197.

5

sentence; in context, then, the Court suggested that an unreasonable length is one way the execution of an initially lawful seizure can violate the Fourth Amendment. Indeed, in one sense, the respondent's challenge to the field test was a challenge to the duration of the seizure: the test "destroy[ed] a quantity of the powder" and therefore "converted what had been only a temporary deprivation of possessory interests into a permanent one." *Id.* at 124–25. When the government destroys property, the length of the seizure is necessarily "permanent." However one characterizes the field test challenge, the bottom line is that the Supreme Court unequivocally held that what the government does with seized property can sometimes violate the Fourth Amendment even though "the property ha[s] already been lawfully detained." *Id.* at 125. I believe the Fourth Amendment's continued applicability after the initial seizure cannot be squared with the notion that "[o]nce th[e] act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies." *Fox*, 176 F.3d at 351; *see also Lee*, 330 F.3d at 466 ("Once an individual has been meaningfully dispossessed, the seizure of the property is complete, and once justified by probable cause, that seizure is reasonable. The amendment then cannot be invoked by the dispossessed owner to regain his property.").[4]

---

[4]    As my colleagues note, *see* Maj. Op. 12–13, the Supreme Court's more recent decision in *Manuel v. City of Joliet*, 580 U.S. 357 (2017), lends further support to our conclusion. There, the Court held that the Fourth Amendment applies throughout the duration of a person's pretrial detention. *See id.* at 366 ("[T]hose objecting to a pretrial deprivation of liberty may invoke the Fourth Amendment when (as here) that deprivation occurs after legal process commences."). Under the most natural reading of the Fourth Amendment, we should give analogous protection against the seizure of "persons" and "effects," at least absent a well-defined historical

6

In sum, I agree with my colleagues that *Jacobsen* "govern[s] this case." Maj. Op. at 10. And, for the reasons I have given, I am untroubled that our holding puts us on the minority side of a circuit split.

_____

tradition to the contrary. *See Torres v. Madrid*, 592 U.S. 306, 324 (2021). To me, *Manuel* suggests as a corollary that Fourth Amendment protections for property endure over time, too.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-176 (CJN)** |
| **STEPHEN JOHNSON,** | |
| **Defendant.** | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S SUPPLEMENTAL NOTICE OF AUTHORITY**

Defendant Stephen Johnson filed a Supplemental Notice of Authority following the D.C. Circuit's decision in *Asinor v. District of Columbia*, 111 F.4th 1249 (D.C. Cir. 2024) (ECF No. 188). In the Supplemental Notice, the defendant relies on *Asinor* to rehash arguments that this Court has already considered and rejected. For reasons that follow, the defendant's reliance on *Asinor* is misplaced and does not support his motion for a new trial.

The issue addressed in *Asinor* is the Fourth Amendment's application to the government's continued retention of lawfully seized evidence. The case is not on point here, where this Court held that (i) the search warrant for the defendant's apartment permitted it to seize and examine his digital devices and (ii) Detective Sullivan's warrantless review of files associated with NCMEC CyberTips was in good faith and did not merit application of the exclusionary rule.

First, the defendant cites the *Asinor* Court's discussion of the distinct meanings of the terms "search" and "seizure" to relitigate his claim that the warrant for his apartment authorized the *seizure* of his digital devices but not a *search* of those items. In defining these terms, the *Asinor* Court quoted from the Supreme Court's opinion in *United States v. Jones*, 565 U.S. 400 (2012), so *Asinor* does not reflect a development in the law in this respect. In holding that the warrant authorized the search of the defendant's digital devices, this Court explained:

[T]he warrant's incorporation of Attachment B authorize[d] the government to seize and examine Mr. Johnson's digital devices and their contents.

Although it's true that the warrant and attachment do refer to Attachment B's contents as property to be seized, quote/unquote, the body of the attachment, read in context, indicates that the warrant allows the government to do what might be called a search in order to seize information contained within the devices found in the residence.

For example, Attachment B says that the items to be seized include "visual depictions of minors engaged in sexually explicit conduct" and "in whatever form and however stored." Attachment B similarly states the government can seize "correspondence and communications" in "any digital device which is capable of containing evidence."

And the warrant says that the government can obtain Johnson's fingerprint "for the purpose of attempting to unlock" devices "in order to search the contents as authorized by this warrant."

The most natural way to read these various authorizations is as allowing the government to enter Johnson's devices to look for and then to seize certain content.

Apr. 1, 2024, Hr'g Tr. 16:9–17:7.

The defendant elevates form over substance and rehashes the same argument that this Court has already rejected. By its incorporation of Attachment B, the warrant authorized the seizure of both digital devices and electronically stored information contained within those devices. As this Court recognized, the seizure of information contained within a digital device necessarily entails what might be called a search of those devices, and other portions of the warrant expressly contemplated that the devices would be searched. Although this Court cited specifically the authorizations in Attachment B, it could also have looked to the search warrant affidavit. *See United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990) ("This circuit has held, along with most others, that in some circumstances a search warrant may be construed with reference to the affidavit supporting it for purposes of satisfying the particularity requirement."). The affidavit

2

made clear that "[t]he property to be searched include[d] laptop computers, mobile phones, and tablets owned, used, or controlled by JOHNSON," (ECF No. 83-2 at 12), and it established probable cause to believe such devices would contain evidence of child pornography offenses. Indeed, most of the affidavit pertained to the search of digital devices, including a section entitled "METHODS TO BE USED TO SEARCH DIGITAL DEVICES." (ECF No. 83-2 at 12–36). As this Court has held, the warrant authorized a search of the defendant's devices, notwithstanding the fact that the devices are referenced on an attachment pertaining to the evidence to be seized. Nothing in *Asinor* compels a different outcome here.

Even if the Court were to reconsider its earlier decision, the defendant would not be entitled to suppression or a new trial. Law enforcement relied on the warrant in good faith, and it was consistent with similar warrants with which judges have found no constitutional defect. *See, e.g.*, *In re Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523, 526–527 (D.D.C. 2018) (holding that residential search warrant listing devices to be searched in Attachment B satisfied the Fourth Amendment's particularity requirement).

Second, the defendant argues that *Asinor* further supports his argument that Detective Sullivan's warrantless review of certain NCMEC CyberTip files culled from the defendant's Google account violated the Fourth Amendment under a common law trespass theory. Again, the defendant cites the *Asinor* Court's recitation of background legal principles articulated in *Jones*. The defendant has previously cited *Jones* for this proposition, so *Asinor*—which dealt not with searches but the police's prolonged retention of uncharged arrestees' cellphones—lends no additional support here.

In any event, this Court held that "this is a case where the exclusionary rule would not apply, even if a Fourth Amendment violation occurred" and that "the good faith exception clearly

3

applies to the government's ultimate viewing of all the files in 2021."  Apr. 2, 2024, Hr'g Tr.

7:14-16, 8:7-9.  The defendant's conclusory assertion that the good faith exception does not apply

does not merit reconsideration or a new trial.

For the foregoing reasons, *Asinor* is inapposite and lends no further support to the

defendant's arguments for a new trial.  The defendant's motion for a new trial should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

</div>

Dated: September 12, 2024          By:     */s/ Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
Ryan Lipes
N.Y. Bar No. 5404843
Special Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 252-1719 (Courtney)
(202) 514-4715 (Lipes)
Paul.Courtney@usdoj.gov
Ryan.Lipes@usdoj.gov

<div style="text-align: center;">4</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-cr-0176 (CJN)** |
| **STEPHEN JOHNSON**<br>**Defendant.** | |

**STEPHEN JOHNSON'S REPLY IN SUPPORT OF HIS**
**SUPPLEMENTAL NOTICE OF AUTHORITY**

Stephen Johnson, by and through undersigned counsel, respectfully submits this Reply in Support of His Supplemental Notice of Authority ("Supplemental Notice"). ECF 188. The D.C. Circuit's opinion in *Asinor v. District of Columbia*, 111 F.4th 1249 (D.C. Cir. 2024), supports Mr. Johnson's Motion for a New Trial ("Motion"). *See* ECF 179 at 19-31; *see also* ECF 183 at 2-6. In its Response to the Supplemental Notice, *see* ECF 192, the government continues to conflate the basic distinction between searches and seizures (as reiterated in *Asinor*), tries to incorporate Detective Sullivan's *affidavit* into the *warrant* without any basis for doing so, and attempts to add a good faith argument it has already waived at least twice over and is meritless in any event.

The D.C. Circuit's opinion in *Asinor* re-states what is obvious: that the terms "search" and "seize" have fundamentally different meanings under the Fourth Amendment and cannot be used interchangeably in a search warrant. Contrary to the government's position, the terms are distinct: "A search requires 'an attempt to find something or to obtain information,' and a seizure requires 'some meaningful interference with an individual's possessory interests in …property.'" *Asinor*, 111 F.4th at 1254 (quoting *United States v. Jones*, 565 U.S. 400, 408 n. 5

(2012)).  Here, Attachment B—the government's sole purported authority for authorization to search Mr. Johnson's electronic devices—is entitled "Property to be seized."  ECF 84, Exhibit 3 at 2.  The introductory statement to Attachment B states, "The items to be seized are …".  *Id*.  Neither in letter nor spirit did Attachment B authorize a search of the items listed therein.  No neutral magistrate would have read the warrant as authorizing a search of electronic devices that the warrant itself expressly stated could only be seized.

The government now urges the Court to rely upon Detective Sullivan's affidavit in construing the warrant, even though the warrant cited Attachment B alone.  *See* ECF 192 at 2 (citing *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990)).  Notwithstanding many prior opportunities to have done so, *see generally* ECF 94, ECF 133, 3/21 Tr. 41-44, this is the first time the government has made this argument—and for good reason.  Notably, the very next sentence to the portion of *Maxwell* the government quotes states that search warrants may be construed with reference to their affidavits "*only if* '(1) the affidavit accompanies the warrant,' and *in addition* '(2) the warrant uses suitable words of reference which incorporate the affidavit by reference.'"  *Maxwell*, 920 F.2d at 1031 (quoting *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987)) (emphases added).  Here, the warrant did not incorporate the affidavit by reference, as it did not use any language to that effect.[1]  The affidavit is irrelevant to the Fourth Amendment issue, and the cases the government cites only underscore why its search warrant for Mr. Johnson's apartment did not authorize a search of his electronic devices.

The government's view of Attachment B as authorizing a search of property the attachment plainly states may only be seized is incorrect.  Attachment B narrows the property

---

[1] Indeed, the Court ended up denying Mr. Johnson's motion not on the basis of the affidavit, but solely based on Attachment B, which for the reasons stated above was likewise incorrect.  *See generally* ECF 192 at 2-3 (citing, in part, 4/2 Tr. 16-17).

2

that law enforcement is allowed to seize from the residence to the devices that are "capable of storing or processing data in digital form" and "capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s)[.]"  ECF 84, Ex. 3 at 5-6.  This means, among other things, the government was not allowed to seize Mr. Johnson's toaster, microwave, or Tesla, as those items could not reasonably contain CSAM.  This is how the warrant attempted to satisfy the Fourth Amendment's particularity requirement for seizures, with Attachment B limiting the seizure, "to the specific areas and things for which there is probable cause[.]"  *Maxwell,* 920 F.2d at 1031; *see also Andresen v. Maryland*, 427 U.S. 463, 479-482 (1976) (holding that the "exhaustive list of particularly described documents" in the warrants was not unconstitutionally overbroad, as they were all limited by wording narrowing it down to items relevant to the offense conduct).  That the warrant should be read based on its plain language is not "elevat[ing] form over substance," ECF 192 at 2; it is focusing on the warrant's specific substance.  Even if "other portions of the warrant expressly contemplated that the devices would be searched," *id.*, this only serves to underscore that the proposed warrant itself—the operative document for Fourth Amendment purposes—*could have* contained authorization to search Mr. Johnson's phone and computers, and the Magistrate could then have made that required determination.  *See generally Riley v. California*, 573 U.S. 373, 381-386, 401 (2014); *see also Asinor*, 111 F. 4th at 1254, 1260 & n. 2 (courts can "deal[] with a search, not a seizure" and the government "can also seek warrants to search seized cell phones or other personal property.").  Because the Magistrate did not do so, the search of Mr. Johnson's devices violated the Fourth Amendment and the evidence should have been suppressed.

The government's argument is that a neutral Magistrate would have worked backwards from the seizure list to assume an authorization to search that the warrant did not contain.  In

3

other words, because law enforcement could seize pornography, it must have been allowed to search Mr. Johnson's devices for such pornography in the first place. *See, e.g.,* ECF 192 at 2 ("the seizure of information contained within a digital device necessarily entails what might be called a search of those devices"). But that approach is plainly insufficient under the Fourth Amendment. *See generally Groh v. Ramirez*, 540 U.S. 551, 557-558 (2004) (holding a warrant was "plainly invalid" as "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents … the presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant."); *see also Jones v. Kirchner*, 835 F.3d 74 (D.C. Cir. 2016) (explaining that the particularity requirement of the Fourth Amendment "operates to 'prevent[] the seizure of one thing under a warrant describing another.'" (quoting *Marron v. United States*, 275 U.S. 192, 195-196 (1927))). The Fourth Amendment operates based on particular descriptions of items covered by specific warrants issued by the courts, not general words leaving it up to the interpretations of executing officers. *See, e.g., Andresen*, 427 U.S. at 480-482 (interpreting the specific wording of the exhaustive list in the warrant, upholding it because the narrow language "did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime of false pretenses and Lot 13T."). The Fourth Amendment does not allow the Court to work backwards from the seizure list in Attachment B to interpret Attachment A, nor to leave it up to the discretion of law enforcement to do so.

Finally, the government's claim that law enforcement "relied on the warrant in good faith" was waived long ago by the government and should not be considered here, in what was supposed to be a government response to Mr. Johnson's Notice of Authority regarding *Asinor*. *See* ECF 192 at 3*;see generally United States v. Sheffield*, 832 F.3d 296, 303-305 (D.C. Cir.

2016) (holding that the government has forfeited its argument that the defendant did not have a Fourth Amendment expectation of privacy, when it did not raise that argument in district court, and collecting case law of the same); *see also United States v. Rhine*, 652 F. Supp. 3d 38, 76-77 (D.D.C. 2023) (citing a case where the court "first found that the government had 'forfeited' any argument that seeking geofence data did not amount to a 'search' for Fourth Amendment purposes[.]").  Notwithstanding multiple opportunities to have done so, the government never raised the good-faith exception in relation to the warrantless search of Mr. Johnson's devices.  Mr. Johnson was never given the opportunity to argue that the good-faith exception did *not* apply to the evidence from the devices, the Court was never asked (and did not) conduct an evidentiary hearing on this issue (despite holding a hearing on a separate good faith claim the government *did* make), and the Court only ever held that the evidence *from the Google Drive* was reviewed in good faith, not the evidence from the devices.  This argument is waived.

    Even were it not waived, the government's good faith argument is meritless.  When a warrant is as deficient as the one issued here in relation to the property that is searched, the government cannot reasonably presume it to cover its actions.  *See generally Groh,* 540 U.S. at 565 & n. 9 ("a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. … the Fourth Amendment's particularity requirement assures the subject of the search that a magistrate has duly authorized the officer to conduct a search of limited scope. This substantive right is not protected when the officer fails to take the time to glance at the authorizing document and detect a glaring defect that … is of constitutional magnitude[.]") (internal citations omitted).  As set forth above, the courts have held that facially invalid warrants cannot be relied upon in good faith, including where the warrant fails to specifically describe the

item to be seized or searched. The "property to be searched" attachment did not list the devices, while the "property to be seized" attachment did; there was simply no reason for a law enforcement officer reading both attachments and interpreting them in good faith to believe that the language from the one applied to the other.

Finally, *Asinor* also provides support for suppression of the CyberTip files. As a threshold matter, *Asinor* is not merely "recit[ing] background legal principles articulated in *Jones*." ECF 192 at 3. Even in the portions cited in the Supplemental Notice, the court in *Asinor* collects other Supreme Court cases, distinguishes from *Jones*, and analyzes and synthesizes law applicable to Mr. Johnson's case. *See, e.g.,* ECF 188 at 2-3. Second, the assertion that the good faith exception does not apply was not "conclusory," as the government claims, as it has been explained time and again in multiple filings. *See, e.g.,* ECF 83, 84 (explaining before the trial how the good-faith exception does not apply); *see also* ECF 179 at 25-31 (explaining in the Motion that the exception did not apply and evidence should have been suppressed). Third, through its sole focus on the good faith exception, the government fails to address Mr. Johnson's argument that *Asinor* means the "mere continued possession" of Mr. Johnson's property was an unlawful seizure. ECF 188 at 4. Through all the above, *Asinor* supports Mr. Johnson's argument that the Google account evidence should have been suppressed.

*Asinor* supports Mr. Johnson's arguments that the evidence from the devices, residence, and Google account should have been suppressed, as their search violated the Fourth Amendment. Mr. Johnson should therefore be granted a new trial.

6

Dated: September 17, 2024

Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. Bar No. 479074)
Courtney R. Forrest (D.D.C. Bar No. 996740)
Tony Miles (D.D.C. Bar No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

STEPHEN JOHNSON,

*Defendant.*

Criminal Action No. 1:22-cr-176 (CJN)

## ORDER

Following a five-day trial (and three days of deliberation), a jury convicted Stephen Johnson of five counts of transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). *See* ECF No. 166; 4/17/2024 Tr. at 1597-99. Johnson moves for a new trial, raising arguments that the Court previously rejected. *See* Johnson Mot. for New Tr. ("Johnson Br."), ECF No. 179. The Court denies that motion.

**A.**

Prior to trial, Johnson moved to suppress evidence from his digital devices and Google account. Following extensive briefing, *see* ECF Nos. 82, 84, 94, 99, 128, 133-34 & 136, a motions hearing, *see* 3/21/2024 Tr., and an evidentiary hearing, *see* 4/1/2024 Tr., the Court denied those motions and explained in detail its reasoning, *see* 4/2/2024 Tr. at 3-14, 16-17. The Court has reviewed Johnson's more recent filings on the topic and concludes that he has provided no new legal or factual bases that cause the Court to reconsider its prior decisions.

**B.**

Johnson also contends that certain evidence should not have been admitted at trial.

1

1.      Johnson first argues that the Court improperly admitted evidence that should have been excluded under Federal Rules of Evidence 404(b) and 403. Johnson Br. at 36. In particular, Johnson takes issue with the admission of evidence (1) that Johnson visited a Dropbox folder labeled "black teens and underage thots" ten times, (2) that Johnson belonged to Telegram groups advertising child pornography and that his phone contained child sexual abuse materials (CSAM) from those Telegram groups, and (3) that Johnson was a member of shared Google Photo albums titled "13-17 lesbian cp," "CINCITY PYT," and "pyt videos." *Id.* at 36-42.

All of that evidence was properly admitted. Generally, all relevant evidence is admissible. *See* Fed. R. Evid. 402. Rule 404(b) carves out an exception for evidence of "other crimes, wrongs, or acts" if introduced to prove a defendant's character, but such evidence is admissible if it is introduced for non-propensity purposes. And under Rule 403, evidence is inadmissible if the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" stemming from admission "substantially outweigh[s]" the evidence's probative value.

The Dropbox, Telegram, and Google Photos evidence were admitted for non-propensity purposes—to demonstrate Johnson's intent, knowledge, and absence of mistake in possessing and uploading the charged materials. *See* Fed. R. Evid. 404(b)(2) (listing permitted uses of evidence about other wrongs). This evidence went to an issue at the trial: Did Johnson accidentally download (and ultimately upload) the illegal child pornography while trying to access legal adult pornography? Or did he do so intentionally, with knowledge of what was in the files he downloaded and uploaded?

Johnson wanted to tell a narrow story, focused only on the conduct for which he was charged—that he had one or two accidental brushes with child pornography. The government

wanted to provide the jury with a fuller picture—that Johnson repeatedly found himself in contact with child pornography, and therefore acted with intention when it came to the charged conduct.

The government had a right to present that broader story to the jury, especially given Johnson's choice to put his accident theory front and center in the trial. *See Old Chief v. United States*, 519 U.S. 172, 187-89 (1997). A reasonable juror, when told that a defendant claims to have accidentally interacted with child pornography, might ask "has he done it before?" The government was entitled to proffer evidence suggesting that he had. Indeed, if it had failed to do so, the jury might "draw[] a negative inference against" the government and assume that there was no evidence that Johnson had other encounters with child pornography. *Id.* at 188.

No rule forces the government to live with such a result. Under Rule 404(b), this evidence was introduced for non-propensity purposes—to disprove Johnson's accident theory.[1] And the evidence had significant probative value, more than enough to survive 403 balancing. Regardless of whether Johnson accessed the Dropbox folder on different dates than he accessed the materials for which he was charged, the fact that, on more than one occasion, Johnson accessed a folder entitled "black teens and underage thots" was highly relevant to an assessment of his accident defense. Similarly, his presence in Telegram groups and Google Photos albums was relevant to whether his possession and uploading of the charged child pornography was accidental.[2]

---

[1] It is also "generally accepted in this Circuit and elsewhere that evidence of a defendant's sexual attraction to children (or teenagers) is probative of the specific intent element of criminal statutes involving sexual activity with minors," such that this type of evidence generally survives 404(b) challenges. *United States v. Lieu*, 298 F. Supp. 3d 32, 52 (D.D.C. 2018) (cleaned up).

[2] Evidence of other crimes or bad acts can be introduced only if "the evidence is sufficient to support a jury finding that the defendant committed the other crime or act." *United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). Johnson argues that the government did not provide sufficient evidence that he intentionally joined the Telegram groups and Google Photos albums. *See* Johnson Reply at 21, ECF No. 183. But that argument misses the point of that evidence. The government was not trying to prove that *every* interaction Johnson had with child pornography was intentional. Rather, it introduced the evidence to show that Johnson so frequently found himself in contact

3

Johnson's argument might have some force in a different case, such as one revolving around whether the pornographic materials depicted minors. But one of the central issues in this trial was Johnson's *mens rea*—that is, whether his possession and uploading of child pornography was accidental or intentional—and evidence rebutting the possibility that his conduct was unintentional was probative enough to outweigh any concerns about unfair prejudice or cumulative presentation of evidence.[3]

Also eliminating concerns about unfair prejudice is the Court's instruction reminding the jury that "Johnson is not on trial for any act or any conduct not specifically charged in the indictment." Final Jury Instructions at 22, ECF No. 169. Jurors are, of course, presumed to follow such an instruction. *See infra* p. 8–9.

2.      Johnson also contends that evidence of the presence of the Tor browser on his computer should have been excluded "as irrelevant and/or more prejudicial than probative." Johnson Br. at 42. But Johnson put the Tor issue on the table, making the government's evidence sufficiently probative to satisfy 403 balancing.

Before trial, the government stated that it did not intend to present evidence that the Tor browser (a browser which can be used to access the dark web) was on Johnson's computer. At

---

with child pornography as to make it less likely that that contact in general—and the charged conduct in particular—was accidental. Thus, the government's burden was to show that Johnson was in the groups and albums, not that he necessarily joined them on purpose. It easily met that burden.

[3] Johnson's concerns of unfair prejudice—that the jury might seek to punish Johnson for unindicted bad acts—are muted here, where the jury convicted Johnson of only those counts of transportation for which the government presented the best and clearest evidence. Government Exhibit 412A showed that five files had been saved and played on Johnson's computer prior to being uploaded to his Google Drive. Those were the only five files that the jury convicted Johnson of transporting. If the jury wanted to punish Johnson for his other bad acts, it might have convicted him across the board, or at least not been so discerning in acquitting him on the ten counts supported by less evidence.

trial, however, Johnson put the dark web, and Tor in particular, at issue.  In his opening, defense counsel stated to the jury that "[t]he main website here is not from the dark web.  It is not from Tor or anything like that."  4/9/24 Tr. at 309.  And defense counsel engaged in the following colloquy while cross examining FBI Special Agent Laura Calvillo:

> Mr. Jeffress:    And, just to be clear, there are websites out there that specifically cater to child pornography. Correct?
>
> SA Calvillo:    Mostly on – nowadays, on the dark net. But in the past there have been, yes.
>
> Mr. Jeffress:    That's right. Most of them are on the dark web. Correct?
>
> SA Calvillo:    Correct.
>
> Mr. Jeffress:    And they are specifically catered to child pornography. They are not, you know, public websites that may have child pornography in them. Correct?
>
> SA Calvillo:     Correct.
>
> Mr. Jeffress:    And if someone wants to find child pornography, all they need to do is go to the dark web, and they can go to a website that's exclusively all about this; isn't that right?
>
> SA Calvillo:    They can. I don't see that much in our investigations, but they can.
>
> Mr. Jeffress:    You don't see any dark web investigations?
>
> SA Calvillo:    In the users that I've seen, the majority of them are on chats or other ways of getting the links. On occasion, we see the Tor, as in the The Onion Router, but –

*Id.* at 467.

Johnson thus implied (both through his opening and his cross-examination) that a significant portion of child pornography is found on the dark web, using specific browsers, and that Johnson did not use the dark web or such browsers.  As the Court put it at the time, Johnson had essentially argued to the jury that "it is more likely that a mistake was made here or it's less

likely that there is *mens rea* when the government only has evidence that Mr. Johnson was using traditional Internet sites to access CSAM . . . . [l]eaving the impression, I think, that . . . he uses only such sites." 4/10/24 Tr. at 570:9-13. This created the risk that the jury would be left with a partial, and misleading, picture, believing that the government was unable to find evidence indicating that Johnson had the Tor browser or accessed the dark web. As a result, the Court explained, "the government's evidence as to Tor [had become] both more probative than it was before and less prejudicial than it would have been because of [defense counsel's] line of questioning." 4/10/24 Tr. at 570:15-22. The Court maintains that view: The evidence had significant probative value, particularly given the need to correct the implication that Johnson had (intentionally or not) created in his opening and cross-examination, and that probative value outweighed any 403 concerns.

## C.

Johnson also seeks a new trial based on alleged errors that occurred after the case was submitted to the jury.

1. Johnson first argues that a new trial is necessary because the jury had access to both sides' complete exhibit lists during its deliberations. In particular, during the middle of the jury's deliberation, the Court learned that (contrary to the Court's normal practice) the jury had been given a copy of each party's exhibit list. Those lists included a short description of each potential exhibit (whether admitted into evidence or not). The descriptions of the exhibits that had not been admitted were redacted with a black marker, but, as the Court found at the time, it was "possible that some of the redacted [descriptions] could be viewed, if someone wanted to" try to do so.

4/16/24 Tr. at 1340:15-21.[4]  Many of those redacted descriptions were of meaningless phrases (such as photographs labelled "DSC_0093," "DSC_0094," "DSC_0097," and "DSC_0098"); others described the material in wholly objective terms (such as "Lenovo Yoga laptop Shell Bags").  ECF No. 161.

Johnson focuses on one entry on the government's exhibit list in particular: "October 7, 2021, Interview of Stephen Johnson."  Even assuming that the jury could and did read this item, the Court concludes that a new trial is not warranted.  This description was, like others, objective; it did not say "October 7, 2021, *Confession* of Stephen Johnson."  Johnson argues that the exhibit was found on the government's list, so the jurors might have "conclude[d] that the contents of the statement were inculpatory."  Johnson Br. at 35.  The more natural inference, however, would have been that the interview did not contain anything inculpatory because otherwise the government would have attempted to use it.  It was also no secret that the government had talked with Johnson. Defense counsel elicited testimony at trial that "Johnson gave the passcode to [his] Lenovo computer [to law enforcement] the very day he was arrested."  4/10/2024 Tr. at 675:11-13.  Further, it seems unlikely that it would have been grounds for a new trial had the government attempted to introduce the video into evidence by asking a law-enforcement witness questions about the video in front of the jury.  The exhibit list's description of Johnson's custodial interview was more neutral than what a witness's testimony might have been in connection with an attempt to lay foundation.

Changing tack, Johnson argues that the mere fact that the jury could see that a higher proportion of entries on Johnson's exhibit list was crossed out than on the government's list would leave "jurors with the impression, even implicitly, that the government's case was stronger than it

---

[4] For admitted exhibits, the lists also contained the courtroom deputy's annotations about when each exhibit was admitted and through which witness the exhibit was introduced.

actually was, and/or that defense counsel had doubts about the strength of their proposed evidence." Johnson Br. at 35.  This is pure speculation.  To the extent jurors read into this at all, they may well have thought that defense counsel felt they didn't need to introduce further evidence because the government's case was weak and Johnson's presented evidence was strong.

In any event, the Court gave the jury a curative instruction that, together with the other instructions the Court gave throughout the trial, reduces the risk that jurors drew an improper inference from the exhibit lists.  With respect to the exhibit lists specifically, the Court instructed that the jury that the "*lists are not themselves evidence, and you should not weigh anything in those documents, including their length, as evidence in this case.  Furthermore, the lightly redacted or the drawn-through entries concerned exhibits never entered into evidence, so you should disregard those entirely as well.  You must not consider either of the exhibit lists in your deliberations*." 4/16/2024 Tr. at 1352-53 (emphasis added).   More generally, the Court instructed the jury that it "may consider only the evidence properly admitted in this trial," which consists of "the sworn testimony of the witnesses, the exhibits that were admitted into evidence and the facts and testimony stipulated to by the parties."  Final Jury Instructions at 6.  The Court similarly told the jury it "should determine the facts solely from a fair consideration of the evidence."  Final Jury Instructions at 4.  And it instructed that any "exhibits as to which I have sustained an objection or that I ordered stricken are not evidence, and you must not consider them in your deliberations." Final Jury Instructions at 14.

"Our legal system presumes" "that jurors can be relied upon to follow the trial judge's instructions." *Samia v. United States*, 599 U.S. 635, 646 (2023).  If jurors can be trusted to follow instructions when it comes to far more probative, far more potentially damaging, and far more difficult to compartmentalize evidence—such as an instruction to consider a defendant's

statements procured via a *Miranda* violation only for impeachment purposes and not as evidence of substantive guilt, *see Harris v. New York*, 401 U.S. 222, 223-26 (1971)—then the instruction to disregard the exhibit lists here suffices too.

2.      Johnson also argues that a new trial is warranted because the Court instructed the jury to continue deliberating after a post-verdict jury poll revealed a lack of unanimity.

a.      Here's what happened:  On April 17, 2024, the jury indicated that it had reached a unanimous verdict.  4/17/24 Tr. at 1558-59.  The foreperson read the verdict—which found Johnson guilty on the possession count as well as on six of the transportation counts, but not guilty as to the other counts—in open court.  *Id.* at 1559-62.  As the foreperson did so, members of the defendant's family (who were in the public seating area) loudly shouted "no" repeatedly, and one person yelled "I hope you can sleep at night" at the jury.  *Id.* at 1568, 1570.  Johnson then asked to poll the jurors.  *Id.* at 1563:8-9.  The courtroom deputy asked the jurors to individually indicate "if [his or her] individual verdict is the same as that just announced," starting with Juror 1.  *Id.* at 1563:12-16.  Juror 1 responded "No" and began sobbing.  *Id.* at 1563:16-17, 1568:15-17.  The polling continued and every other juror responded "Yes."  *Id.* at 1563-64.  Defense counsel initially stated that "in light of Juror No. 1's clear answer that that was not his verdict, this was not a unanimous verdict, and we would ask that they continue to deliberate," but then changed course and moved for a mistrial.  *Id.* at 1564-65.

The Court did not declare a mistrial, but instead directed the jury to continue deliberating and gave the following instruction:

> The goal here is not to force you to reach a verdict or to suggest in any way what your verdict should be.  Do not surrender honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.  But since you have not reached a unanimous verdict, please continue your deliberations.

*Id.* at 1581:5-12.

A couple of hours later, the jury again indicated that it had reached a unanimous verdict. This time, the Court cleared the courtroom to prevent further outburst; the foreperson announced the verdict, finding Johnson guilty on the possession count and five of the transportation counts, but not guilty as to all other counts; and the subsequent poll of the jury reflected that the jury was unanimous as to that verdict. *See id.* at 1596-1601.

Johnson requested that Juror 1 be questioned outside the presence of the remaining jurors to "be sure that that is truly his verdict; that it was without coercion." *Id.* at 1602:16-21. The Court agreed, in order "to ensure [], outside the presence of the jury" that the verdict "is, in fact, his verdict." *Id.* at 1603:9-15. In response to the Court's questions, Juror 1 agreed that the "verdict was [his] verdict," that he "agree[s] that the government proved the defendant guilty . . . [f]or the charges that [the jurors] all agreed upon," that the "verdict form . . . reflects [his] view of the proper verdict," and that "the evidence . . . establishes the defendant's guilt on every count the jury found him guilty of." *Id.* at 1604-05. The juror also volunteered that the case was difficult for him because "it's a very serious charge" and "a bad situation for everybody" and responded "yes" when the Court asked whether the "problem" he was having was because the case involved "a difficult subject and difficult charges." *Id.*

As the Court summed up contemporaneously, Juror 1 "agreed entirely with the verdict," "agreed with the slightly different statement that the government had proved beyond a reasonable doubt Mr. Johnson's guilt[] o[n] each of the counts reflected in the guilty verdict," and agreed "that the reason for his emotional response and the difficulty he was having with this case was the nature of the charges and the difficult situation everyone finds themselves in." *Id.* at 1606. Thus, the Court found, based on its observation of Juror 1's statements, that "the verdict has the

unanimous support of every juror and the polling response we saw earlier and his emotional reactions here are not because he believes the jury's verdict is incorrect or is not unanimous, but because he is suffering the emotional reaction to the difficulty of the topic, the videos and the like." *Id.* at 1607.

b.    Johnson argues that the "Court erred when it resumed deliberations" after Juror 1 "openly disagreed with the verdicts" because doing so "created a substantial risk of juror coercion." Johnson Br. at 31. The Court disagrees.

The record makes clear that the verdict was not the result of coercion. As noted above, the Court expressly instructed the jurors that they should not "surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors or for the mere purpose of returning a verdict." 4/17/24 Tr. at 1581:5-12. The jury deliberated for several hours before again returning a verdict. Then, outside the presence of the other jurors, Juror 1 stated expressly that he fully agreed with the verdict and that he believed the evidence demonstrated Johnson's guilt beyond a reasonable doubt on the counts for which he was convicted. And Juror 1 provided an explanation for his earlier hesitation and demeanor: They were a result of the emotional weight of the case—and understandably so, given the seriousness of the charges, the graphic and brutal nature of some of the evidence, and the emotional outbursts of Johnson's family as the verdict was being read. Based on Juror 1's statements and the Court's observation of his demeanor, the Court saw no indication that Juror 1 was coerced against his conscience into voting guilty on any count. *See United States v. Brooks*, 420 F.2d 1350, 1353 (D.C. Cir. 1969) (explaining that "the trial judge [has] a measure of discretion in assessing the impact of a dissenting vote during a jury poll," because "the trial judge is in a much better position . . . to determine whether a recalcitrant juror's eventual acquiescence in a verdict was in fact freely given").

11

Johnson argues (essentially) that there is coercion as a matter of law whenever there is a jury poll indicating an 11-1 split (as opposed to a situation where the court stops polling as soon as a lack of unanimity is revealed) based on one juror's "disagreement with the substance of the verdict." Johnson Br. at 32. He cites cases that, due to coercion concerns, disfavor a court inquiring into the numerical division among jurors when they may be deadlocked during deliberations. Johnson Br. at 31 (citing *Brasfield v. United States*, 272 U.S. 448, 450 (1926), and *United States v. Ligon*, 781 F. Supp. 1, 8 (D.D.C. 1991)). The question is whether that disfavor extends to polls to ensure juror unanimity after a verdict has been announced.

The Court of Appeals has held that it does not. As the Court of Appeals has put it, although "inqur[ing] what the numerical division among the jurors" mid-deliberation is "not to be sanctioned," "[a] jury poll, it is clear, stands on quite a different footing," even though it may exert "pressure toward conformity . . . because of its tendency to isolate the dissenting jurors." *United States v. Brooks*, 420 F.2d 1350, 1354 (D.C. Cir. 1969) (quoting *Brasfield*, 272 U.S. at 450). That distinction makes sense. There is little reason, other than imposing pressure on the jury, for a judge to ask about the numerical division of a jury during its deliberation. *See id.* at 1354. In contrast, there are legitimate reasons for polling the jury after it has reached its verdict: for one, such polls help ensure verdicts are truly unanimous, and for another, the judge must conduct one if requested under Federal Rule of Criminal Procedure 31(d).

Moreover, Rule 31(d) expressly authorizes continued deliberations after a post-verdict poll reveals the jury might not be unanimous: "If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury." Johnson argues that once one juror has indicated that the verdict is not unanimous, it is error to continue polling. But Rule 31(d) states that the court "must . . . poll the jurors individually," suggesting

that the rule at least contemplates that every juror is polled.[5] And if that poll reveals a lack of unanimity, the Court can *either* "declare a mistrial" *or* "direct the jury to deliberate further."

Of course, a court should not "direct the jury to deliberate further" when that would result in a coerced verdict. But as explained above, there was no coercion here. And given that the poll happened after the jury returned its first verdict, this is not a situation (unlike when there is a possible deadlock) where a poll might suggest that the judge is getting impatient with the pace of deliberations.[6]

\*      \*      \*

Accordingly, it is **ORDERED** that Defendant's Motion for a New Trial, ECF No. 179, is

**DENIED.**

**IT IS SO ORDERED.**

DATE: October 10, 2024

_____
CARL J. NICHOLS
United States District Judge

---

[5] Whether or not a Court poll every juror even though a lack of unanimity is revealed before reaching the last juror, it does not follow that a court *cannot* continue to poll as Johnson suggests. *See Brooks*, 420 F.2d at 1354; *see also, e.g.*, *United States v. Pennegraft*, 641 F.3d 566, 580 (4th Cir. 2011); *United States v. Gambino*, 951 F.2d 498, 501 (2d Cir. 1991). This is especially so in this case, where defense counsel requested the poll and did not object to continuing the poll after the lack of unanimity was revealed.

[6] Johnson raises one final argument. He argues that even if none of the issues he has raised individually warrants a new trial, their "cumulative effect" does. Johnson Br. at 43. The Court disagrees. The only arguable error identified by Johnson is providing the jury with the parties' exhibit lists, and that error was not prejudicial.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**STEPHEN JOHNSON**<br><br>**Defendant.** | **Case No. 1:22-cr-00176 (CJN)** |

### <u>STEPHEN JOHNSON'S MEMORANDUM IN AID OF SENTENCING</u>

Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ................................................................. 2

II.    PERSONAL AND PROFESSIONAL HISTORY ................................ 5

A.    Childhood, High School and College Years ......................................... 5

B.    Career and Volunteering ....................................................................... 8

C.    Circumstances Surrounding the Offense ............................................ 12

D.    Dr. Felix's Psycho-Sexual Evaluation ................................................ 14

III.    THE REQUESTED SENTENCE OF 60 MONTHS IS APPROPRIATE BASED ON THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) ............................... 16

A.    Nature and Circumstances of the Offense, and History and Characteristics of the Defendant, § 3553(a)(1) .................................................................... 16

B.    Purposes of Sentencing, § 3553(a)(2) ................................................ 19

1.    Seriousness of the Offense ................................................ 20

2.    Adequate Deterrence ......................................................... 21

3.    Protection of the Public .................................................... 22

4.    Educational or Vocational Training, Medical Care, or Other Treatment ................. 25

C.    Kinds of Sentences Available and the Guidelines Range, § 3553(a)(3), (4) ................... 26

1.    Kinds of Sentences ............................................................ 26

2.    Sentencing Guidelines ...................................................... 28

D.    Pertinent Policy Statements and the Flawed Sentencing Guidelines in Child Pornography Cases, § 3553(a)(5) ................................................................ 38

1.    The United States Sentencing Commission's Position ..................... 38

2.    The Department of Justice's Position ................................ 43

3.    Federal Court Sentences ................................................... 44

4.    Policy Based Variance is Warranted in Mr. Johnson's Case ............... 46

E.    Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6) ................... 48

1.    District of Columbia Cases That are Most Similar to Mr. Johnson's Case ............. 49

2.    District of Columbia Cases Involving More Serious Conduct Than Mr. Johnson's Case ................................................................... 50

3.    District of Columbia Cases Involving Substantially More Serious Conduct Than Mr. Johnson's Case ................................................. 51

(Page 168 of Total)

4.    Cases in Other Districts in Which the Conduct is Similar to, or More Serious Than, Mr. Johnson's Conduct ................................................................. 54

F.    Need to Provide Restitution, § 3553(a)(7) ........................................ 56

**IV.    FINANCIAL ABILITY TO PAY A FINE** .................................................. 59

**V.    CONCLUSION** ........................................................................................ 60

iii

This is a tragic case. Mr. Johnson is an impressive young person with significant promise. He comes from a good family with strong values—one that has always strived to help others. Mr. Johnson learned to do the same. His conviction and impending sentence on charges such as these are heartbreaking not only for his loved ones, but for anyone with an objective view of this case. While Mr. Johnson's strength of character and family support will in time help him overcome this experience, there is no question that his life and the lives of his loved ones will be forever changed by it.

If one accepts the jury's verdicts, the Court is presented with a young man who suffered from a pornography addiction that, during the worst parts of COVID, spiraled out of control to include the viewing of illegal images. Importantly, once Mr. Johnson realized Google had detected his conduct back in October 2020, he ceased all involvement with CSAM. This is the rare case where the defendant has already shown, even without the intervention of the judicial system, that viewing CSAM is not who he is or something beyond his control. This is also the rare case where the Court can have 100% confidence from Mr. Johnson's post-2020 conduct that he will not go down this path again.

While sufficiently serious to warrant a term of imprisonment, the conduct here did not involve personal interactions (or even any discussion of personal interactions) with children. It did not involve the distribution of child pornography to any other person. Notwithstanding the formal legal characterization, the conduct was simple possession only. And driven in part by Mr. Johnson's decision to exercise his right to a trial, the government has performed an exhaustive forensic investigation here. If there was evidence demonstrating anything beyond Mr. Johnson's simple possession of CSAM, law enforcement would surely have found it.

<div align="center">1</div>

When assessing the § 3553(a) factors in this case—and especially when compared against sentences imposed in similar cases in this Court, *or even against sentences for the actual distribution of CSAM to others*—the sentence here should be the mandatory minimum, sixty months. As the Court is aware, the number one predictor of recidivism in these cases is the strength of the defendant's familial and community support, and that support could not be stronger here. A sixty-month sentence is also consistent with—if not significantly longer than—the sentences imposed in cases with similar (or even worse) facts in this Court. Indeed, Mr. Johnson is facing a sixty-month mandatory minimum only because of his decision to exercise his constitutional right to go to trial. Had he not done so, there would be no mandatory minimum penalty and the appropriate sentence under the § 3553(a) factors would be significantly lower than 60 months.[1]

## I.    PROCEDURAL HISTORY

Mr. Johnson was arrested and his apartment searched on October 7, 2021. *See* ECF 5. During the search, law enforcement seized and forensically examined all five of Mr. Johnson's electronic devices, including three phones and two computers. Mr. Johnson gave law enforcement the passwords and his fingerprint biometrics to unlock his devices. Mr. Johnson made his initial appearance and was released on personal recognizance under the supervision of the Pretrial Services Agency and the third-party custody of his mother, Patricia R. Johnson. *See* ECF 211 ("PSR") at ¶ 8.

Mr. Johnson maintained a spotless record throughout years of pretrial release. For two and a half years under high-intensity supervision, Mr. Johnson remained at home with limited

---

[1] As the record reflects, the government made a possession plea offer to Mr. Johnson before trial that would have eliminated any mandatory minimum penalty and would have resulted in an agreed upon guideline range of 78-97 months. *See* ECF 106.

exceptions, with GPS and Internet monitoring, as well as constant supervision by his custodian. He was prohibited from using any Internet-enabled devices (a particularly severe restriction given his career and business in digital marketing) and reported weekly to his Pretrial Services officer. *See generally* ECF 7, 16, 25, 33, 39. Pretrial services submitted regular compliance reports during Mr. Johnson's supervision, with *all twenty-one* reports throughout the two and a half years of supervision noting that he was fully "compliant with the conditions of release imposed by the Court." ECF 144; *see also* ECF 11, 19, 24, 28, 33, 35, 40, 46, 49, 53, 56, 59, 62, 65, 66, 68, 71, 75, 105, 108. Mr. Johnson fully complied with informing his probation officer of his weekly permitted outings, charging his GPS monitoring device daily, refraining from accessing Internet-enabled devices, and abiding by all other conditions of his release. *See, e.g.,* ECF 144 at 2; *see also* ECF 144-1 at 1 (marking "YES" for compliance in the contact reports for *all* telephone check-ins in 2024); *see also* ECF 108-1 at 1-4 (marking "YES" for compliance in the contact reports for *all* telephonic and in-person check-ins from October 12, 2021 to January 23, 2024); PSR at ¶¶ 8-30 (listing Mr. Johnson's key pretrial release conditions and concluding he "was compliant with his pretrial release conditions while under supervision."). Put simply, Mr. Johnson was a model supervisee.

After several continuances, Mr. Johnson's trial began on April 8, 2024. After trial, Mr. Johnson was found guilty of five counts of transportation of child pornography and one count of possession of child pornography and acquitted of the remaining ten counts of transportation of child pornography. *Id*; *see also* ECF 166. Mr. Johnson was ordered to self-surrender two days later, even though, as the Court noted, "if [the Court] had the discretion to do so, [it] would [have] allow[ed] Mr. Johnson to continue on his conditions of pretrial release pending sentencing

3

… [b]ecause I do think he's conducted himself appropriately while on pretrial release, during the trial, et cetera." *Id.* at 1421.

Pursuant to the Court's order, Mr. Johnson self-surrendered on April 19, 2024. He has been at the Correctional Treatment Facility since then, in isolation for his own safety given the nature of his charges.

After self-surrendering, Mr. Johnson experienced significant financial difficulties as a result of his bank freezing his accounts. His accounts were frozen due to concerns about Mr. Johnson's activities regarding the liquidation of assets. Mr. Johnson liquidated some assets— and attempted to liquidate others—the day before he self-surrendered for the purpose of facilitating ongoing payment of bills and other debt during his incarceration and to provide his wife Adanna Johnson with access to funds for her living expenses.[2] On May 15, 2024, the government filed an Application for Prejudgment Writ of Garnishment ("Application"). *See* ECF 180. In the Application, which lists Mr. Johnson's bank as the "Garnishee," the government sought to garnish funds in Mr. Johnson's bank accounts for purposes of securing those assets for collection on any future court order regarding restitution or forfeiture in connection with the instant case. *Id.*[3] Mr. Johnson's bank responded to the government's Application by continuing to freeze *all* funds in Mr. Johnson's accounts indefinitely.

Because of the debilitating impact the freezing of all funds in the accounts had on Mr. and Mrs. Johnson's financial affairs, and because Mr. Johnson has always been agreeable to

---

[2] Mr. Johnson's conduct under the circumstances was understandable and the government has conceded that "there could be legitimate reasons for the defendant to prepare his finances before self-surrendering." *See* ECF 174-3 at 3.

[3] Two days before filing the Application, upon consideration of a separate motion filed by the government, this Court entered a restraining order that significantly restricted the way in which Mr. Johnson, his family members, or other agents could use his assets. *See* ECF 173.

4

making his funds available for payment of any court-ordered financial penalty, Mr. Johnson

worked out an agreement with the government concerning his assets.  First, the parties sought—

and eventually received—an amended restraining order from this Court that restricted Mr.

Johnson's use of his account by prohibiting him, his family members, and any agents from

reducing the value of money or property in the accounts to an amount below $250,000.  *See* ECF

177.  Second, on August 22, 2024, because the amended restraining order did not cause the bank

to unfreeze Mr. Johnson's assets, this Court entered an Interim Disposition Order as requested by

the government in a consent motion.  *See* ECF 189.  The Interim Disposition Order requires Mr.

Johnson's bank to "remove any additional hold on" funds exceeding $250,000, and to "not

further encumber any remaining accounts pursuant to the Writ of Garnishment."  *Id*.

## II.   PERSONAL AND PROFESSIONAL HISTORY

### A.   Childhood, High School and College Years

Mr. Johnson was born on September 2, 1987, in Washington, D.C., to Patricia Rattley

Johnson and Hugh Anderson Johnson.  His father worked as a USAID employee, an aide to

Congressman Mickey Leland, and an Assistant U.S. Attorney.  He died in a plane crash when

Mr. Johnson was just two years old, while on a humanitarian mission to Ethiopia.  *See, e.g.,* Ex.

A at 1 (Letter from Pastor Reginald Mazyck).  Mr. Johnson grew up in what was then a rough

area of D.C. in Northeast, across the street from a park named after his father.  He was raised by

his mother, a lawyer and professor at Wesleyan University, and his extended family, which

included his maternal grandparents, aunts, uncles, and cousins.  *See generally* PSR at ¶¶ 89-90.

People in his broader community, including his uncle and his pastor, served as strong male role

models, and his mother was a wonderful and loving parent.  *Id.* at ¶ 90; *see also* Ex. A (Letter

from Pastor Reginald Mazyck); Ex. B (Letter from Adrian Washington).  At the same time,

<div align="center">5</div>

however, a son misses not having his dad, and the young Mr. Johnson was no different; he felt his father's absence in his life.

The family moved to Maryland, and Mr. Johnson quickly began to fill his father's shoes. He was one of his sister's biggest supporters and became a "leader within every community that surrounds him." *See* Ex. C (Letter from Dara Johnson). Key among these were his neighborhood and his church, with both becoming places that supported and nurtured him, allowing him to flourish. *See* Ex. D (Letter from Patricia Johnson). Mr. Johnson's neighborhood snow shoveling business demonstrated his "leadership, compassion and entrepreneurial spirit" at a young age, and a missions trip to Jamaica at age 13 ignited "his passion for travel and service to others." *Id.* Multiple pastors or former pastors, including his mother and the Rev. Dr. Denise King-Miller, highlight the role of "Christian ethics and values … expressed throughout his life." Ex. E (Letter from Rev. Dr. Denise King-Miller); *see also* Ex. D ("I raised Stephen and his sister with the help of my family, and my faith in God.") (Letter from Patricia Johnson); *see also* Ex. F ("He sought to do justly, love mercy, and walk humbly with his God as noted in the Bible (Micah 6:8).") (Letter from Donna Mazyck). His family friend and pastor wrote how he "embraced these Godly principles of integrity and forthrightness and used them to mold [his] character." Ex. A (Letter from Pastor Reginald Mazyck). In the wake of his trial and incarceration, his wife writes how Mr. Johnson has only "grown closer to God." Ex. G (Letter from Adanna Johnson). Every Christmas, for instance, Mr. Johnson would get up early and travel into town to distribute winter hats, gloves and coffee to those living on the streets of D.C. *See* Ex. E (Letter from Rev. Dr. Denise King-Miller). He quickly grew to organize this event, and inspired others in his neighborhood to join him. *Id.*; *see also* Ex. H (Letter from Patric Holly). As summarized by his aunt, one of several people who provided character

6

testimony during Mr. Johnson's trial, his "father's death and legacy of caring for others profoundly impacted Stephen," as he and his family spent "hundreds of hours over the years volunteering" and Stephen remained a "rock and steady support for his mother" and community. *See* Ex. I (Letter from Donna Rattley).  In short, Mr. Johnson has been respectful, compassionate and altruistic from a young age, guided by his father's legacy, his community, his extended family, and his faith.

Mr. Johnson attended St. Albans High School, one of the most prestigious high schools in D.C.  As one of few black students there—and the only student from Mr. Johnson's neighborhood—Mr. Johnson felt out of place.  He struggled emotionally with the "balancing act" of growing up in a primarily black neighborhood while attending a predominantly white private high school.  PSR at ¶ 91.  His mother describes how his experiences at the time "helped to form a well-rounded young man, who appreciated people from all walks of life."  Ex. D (Letter from Patricia Johnson).

After graduating from St. Albans, Mr. Johnson went to study at Florida A&M University. *See* PSR at ¶ 107.  He found this change inspiring, as he was the first in his group of friends to go to college; his childhood friend from the neighborhood, Patric Holly, credits him with his decision attend university in Florida and begin his own career.  *See* Ex. H (Letter from Patric Holly).  Like he did for many others, Mr. Johnson welcomed Mr. Holly to his home in Florida for months, paying for his food and living expenses, so that he could get up on his feet.  *Id.*; *see also* Ex. J (Letter from Sarah Vaughn).  Unfortunately, Mr. Johnson's time in Florida was cut short when his family encountered financial difficulties and he suffered a foot injury.  *See* Ex. D (Letter from Patricia Johnson).  Never one to let challenges get in the way, after returning home,

7

Mr. Johnson transferred to the University of the District of Columbia and worked for a D.C. City Councilman to fund his own education.  *Id.*; *see also* Ex. K (Letter from Kimberly Dailey).

Mr. Johnson's time at UDC was transformative in multiple ways.  Not only did he earn his college diploma, but he also met his future wife, Adanna Quashie (now Adanna Johnson).  *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. G (Letter from Adanna Johnson).  He did so as the result of another impactful event, the study abroad program.  Even though UDC did not have an active study abroad program, Mr. Johnson took initiative with the business school and became the first UDC student to study abroad in Rome, Italy.  *See* Ex. D (Letter from Patricia Johnson).  For his initiative, he was recognized by the Dean of the business school, and the presentation he and his future wife gave to the university inspired other UDC students to study abroad.  *Id.*; *see also* Ex. G (Letter from Adanna Johnson).  Again, he played host to his friends, letting them stay for free in his apartment however long they wanted, and going out of his way to stay "thoughtful, intentional, and caring."  *See* Ex. J (Letter from Sarah Vaughn).  Mr. Johnson graduated from UDC in 2012 with a bachelor's degree in business administration.  *See* PSR at ¶ 107; *see also* Ex. R (Picture of Diploma from UDC).  He has gone on to utilize his leadership, compassion, courage, and global outlook in several ways as he has achieved greater success.

### B.    Career and Volunteering

Throughout his career, Mr. Johnson's entrepreneurial activities always had a "dual focus": build a profitable business, while simultaneously benefiting the community, be that local or global.  *See* Ex. D (Letter from Patricia Johnson).  After working for various marketing or sales companies for a few years after college, he formed his own business in 2018.  *See generally* PSR at ¶¶ 111-115.  First, he founded a travel business, aimed at enabling African American millennials, like himself, to live or travel abroad.  *See* Ex. D (Letter from Patricia Johnson).

8

Besides ensuring his customers' health and happiness, he was cognizant of the broader social impact of his business, ensuring "no harm came to anyone even tangentially affected by his business." *See* Ex. J (Letter from Sarah Vaughn). His ambitions to help others only grew, building multiple successful businesses and helping across the world. *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. B (Letter from Adrian Washington).

Mr. Johnson's interest in business began to grow, and so did his interest in the "good he could accomplish for people who lacked basic needs in life." *See* Ex. F (Letter from Donna Mazyck). Leaning on his own ability to rebound from mistakes, he was quick to use the lessons from his business trials and tribulations to teach members of his neighborhood, including those who had been in trouble with the law or otherwise facing hardship, how to apply for a job or even start their own businesses. *See* Ex. H (Letter from Patric Holly); *see also* Ex. J (Letter from Sarah Vaughn).

Following the success of his travel company, Mr. Johnson founded his digital marketing company, SRJ Digital, in 2018. *See* PSR at ¶ 111. The company was highly successful, providing employment to five individuals and grossing roughly 2 million dollars in 2022. *Id.*

Even as his wealth grew, Mr. Johnson never forgot to give back. He has demonstrated a passion for altruism, both local and global, direct and indirect. Within his neighborhood, he continued to bring people together, shoveling snow, raking leaves, volunteering to help low-income individuals, giving employment advice for those in need and even holding a free stock market seminar for women over the age of 60. *See* Ex. D (Letter from Patricia Johnson); *see also* Ex. H (Letter from Patric Holly). Within his family and friends, he continued sharing the lessons he learned in building his business, lending a listening ear and supportive shoulder whenever needed, and encouraging others to succeed and give back. *See, e.g.,* Ex. J (Letter from

<div align="center">9</div>

Sarah Vaughn); *see also* Ex. C (Letter from Dara Johnson); *see also* Ex. E (Rev. Dr. Denise

King-Miller); *see also* Ex. H (Letter from Patric Holly).  Members of both his extended family

write about the "calming, soft-spoken cousin Stephen" they could always rely on, through the

"unconditional and consistent encouragement from him."  *See* Ex. L (Letter from Sam

Washington); *see also* Ex. M (Letter from Jessica Washington) ("He's a major champion of my

career, and his influence has been a driving force in my life.").

But Mr. Johnson's altruism was not limited to his own community, or even his own city.

He would attend his aunt's classes at Pepperdine University in California to talk to

undergraduate students about his mission work and global travels, inspiring them to step out of

their comfort zones to help others.  *See* Ex. K (Letter from Kimberly Dailey).  He went with a

local church pastor to one of the poorest slums in Guatemala to provide clothes and materials to

children in need.  *See* Ex. D (Letter from Patricia Johnson).  He also accompanied his mother on

a volunteer trip to Uganda, where he conducted free all-day workshops for Ugandan

entrepreneurs, discussed marketing and outreach strategies with the founder of the Widow

Orphan Support Organization to expand its impact, and donated funds to sponsor members of the

organization.  *Id*.  Pictures of those volunteer trips are attached, showing the closeness he had to

those he helped, regardless of the distance from his home.  *See* Ex. N (Pictures of Volunteering

in Uganda and Guatemala).  Even when he was not there in person, he would continue his

support, donating regularly and in large sums, and encouraging others to do the same.  *See, e.g.,*

Ex. E (Letter from Rev. Dr. Denise King-Miller); *see also* Ex. F (Letter from Donna Mazyck);

Ex. I (Letter from Donna Rattley); Ex. G (Letter from Adanna Johnson); Ex. D (Letter from

Patricia Johnson).  Notably, his generosity has never faltered through his own hardships, with his

monthly donations to charity and church continuing even after his pre-trial home detention and

10

his post-trial incarceration.  *See, e.g.,* Ex. O (Water Project Receipts); *see also* Ex. P (Union

Church and Destiny Harvest Giving Statements).  The founder of the organization took to social

media to thank Mr. Johnson:



Mr. Johnson has always been a bedrock of his family, friends and community, a "mentor

and role model" at "the beating heart of" his family bond, and an "incredible son, husband,

nephew, and friend."  *See* Ex. M (Letter from Jessica Washington).  He has worked to help

others both here in D.C. and in remote corners of the world.  Even while on pre-trial release in

this case, he continued to support those he could in his church and in his family.  *See* Ex. F

(Letter from Donna Mazyck); *see also* Ex. I (Donna Rattley); *see also* Ex. L (Letter from Sam

Washington) ("In the years since his trial began, Stephen has remained a light to myself and all those around him … Despite all he is going through, his primary commitment is always to ensuring that those closest to him are okay, and his stoic strength has been a rock for all of us."). Those closest to him have watched Mr. Johnson "engage in very difficult conversations, that most people would avoid, with grace and courage" and remain steadfast in their conviction "beyond a shadow of a doubt that Stephen can make a tremendously positive impact on our society." Ex. Q (Letter from Andrew Dailey). In the footsteps of his late father, Mr. Johnson remains "committed to caring for others less fortunate than himself and solving global problems." Ex. E (Letter from Rev. Dr. Denise King-Miller). Church, faith, altruism, humility and a strong moral compass all were and continue to be integral for Mr. Johnson. Even after all his trials and tribulations, the Court can see his community wrote in droves to express their support, as well as their "sincerest hope that he will be allowed to join our family on the outside soon." Ex. M (Letter from Jessica Washington).

### C.    Circumstances Surrounding the Offense

Accepting the jury's verdicts, Mr. Johnson's illegal conduct was an outgrowth of his adult pornography addiction, which grew exponentially worse during COVID. During this time, an isolated Mr. Johnson began spending too much time on the internet and too much time watching pornography. Excessive pornography use inevitably leads to interest in different kinds of pornography, and what appears to have happened here is that Mr. Johnson at the time felt somewhat attracted to—or at least insufficiently disgusted by or afraid of—images featuring young girls. That is the extent of his crime, and he will pay a severe price for the remainder of his life for it, regardless of the sentence imposed.

<div align="center">12</div>

Compared to other possession cases, Mr. Johnson's offense conduct features a number of mitigating factors. First, Mr. Johnson's foray into this material was relatively brief. Based on the government's thorough investigation, it appears Mr. Johnson interacted with this material from only around April 2020 to October 2020, when he received the notice from Google suspending his account. While the government attempted to prolong the offense conduct to the jury beyond October 2020 by using Rule 404(b) evidence excavated from Mr. Johnson's phone involving Telegram and Google Photos, that evidence was not convincing in general, and especially not for the specific purpose of showing that Mr. Johnson's offense conduct extended beyond October 2020 when he received the email from Google. The facts are that Mr. Johnson received the Google alert; conducted the panicked Google searches for psychological help the Court has already seen from the trial evidence; immediately told his mother, Patricia Johnson, what had happened; and did not involve himself with illegal pornography again.[4] That is why law enforcement's search of the devices seized from in October 2021 did not reveal the ongoing possession of any illegal images.

Second, and relatedly, the Court has already seen that Mr. Johnson has both the desire and willpower to stop this conduct, as he has done *for over four years now.* Fortunately, even under the government's allegations and evidence, Mr. Johnson's involvement with CSAM was never so deep or prolonged that it became pervasive. Particularly when compared to other cases prosecuted in this Court, the conduct here was short-lived, and the number of images low (especially when compared to the amount of adult pornography). The material underlying the

---

[4] As the Probation Office notes, he searched, among others, for the terms "psychologist to help break bad habits," "sex addiction therapist in dc" and "is talking to a psychologist protected." PSR at ¶ 54. As explained during closing arguments, his search pattern was indicative of someone "looking for help and what could happen next." 4/12 Tr. at 1232-33.

offense conduct did not involve violent images or images of infants or toddlers, and did not

involve images of boys, a critical factor in how forensic psychologists such as Dr. Felix classify

offenders and determine the likelihood of recidivism. *See* Report of Dr. Tashna Felix

("Report"), ECF 213 (under seal) at 17-18 (receiving a 0 in Items 3-7 of the CPORT assessment

tool "designed to predict the sexual recidivism of men convicted of child pornography offenses,"

including scores of 0 on "Indication of pedophilic interests," "More boy than girl content in child

pornography" and "More boy than girl content in other child depictions").

### D.    Dr. Felix's Psycho-Sexual Evaluation

At the suggestion of the Probation Officer, the defense retained Dr. Tashna Felix to

conduct a forensic evaluation of Mr. Johnson. As her report reflects, Dr. Felix's work was

extensive and involved a battery of tests commonly used by forensic psychologists to assess

offenders and predict risk and recidivism, as well as a forensic interview. *See* Report at 2-3. The

tests Dr. Felix administered include: Mental Status Examination (MSE); Personality Assessment

Inventory (PAI); Beck Anxiety Inventory (BAI); Beck Depression Inventory (BDI); Substance

Abuse Subtle Screening Inventory (SASSI); Sexual History Questionnaire; Internet Sex

Screening Test (ISST); Sexual Adjustment Inventory (SAI); Levinson Victim Empathy Scale

(LVES); Bumby Cognitive Distortions Scale: The MOLEST Scale; Child Pornography Offender

Risk Tool: Version 2 (CPORT); and the STATIC-99R.

Dr. Felix's report first discusses the severe psychological toll this matter has taken on Mr.

Johnson over the past three years, a time during which Mr. Johnson has been severely depressed

and even on the brink of suicide. His depression has increased since his placement at CTF,

where he has been held in isolation due to the nature of his charges. *See* Report at 4 (noting that

Mr. Johnson "does report current suicidal ideation, which started in October 2021, following his

<div align="center">14</div>

arrest and has persisted to the present time"). This is unsurprising: it is difficult to imagine more psychologically stressful circumstances than those under which Mr. Johnson has lived for the last several years.

On any future risk posed by Mr. Johnson, Dr. Felix's report is clear: the risk is low. *See, e.g.*, Report at 19 ("Based on the structured clinical assessment, Mr. Johnson presents a low risk of sexual recidivism. He has no history of prior sexual offenses, maintains a stable and supportive relationship, and has shown compliance with treatment and legal expectations."). Indeed, on all of the critical scales and measures for validating risk assessment, Mr. Johnson's future risk scored as low to non-existent. *See id.* at 13-15 ("In summary, results from the sexual risk measures outlined above, Mr. Johnson's risk assessment indicates a low risk for sexual addiction and deviant behaviors[.]"). Among the many tests he took, he also demonstrated an "above average capacity for victims." *Id.* at 15. Notably, his Static-99R score, a widely used metric for sexual recidivism including by the Department of Justice, Mr. Johnson's score totaled "0," placing him in the "Below Average Risk" range. *Id.* at 16.[5] Looking at all the tests and all the protective factors presented by Mr. Johnson, Dr. Felix's assessment of low risk was supported by Mr. Johnson's "amenability to treatment and his willingness to learn healthier lifestyle skills and not fall back into maladaptive ways of coping" and the fact Mr. Johnson simply "does not meet the criteria for a sexual disorder at this time." *Id.* at 16-17. Another common metric, Mr. Johnson's CPORT score, was also a grand total of only two, with one of those points due to the instant offense and another due to his DUI conviction over twenty years ago. *Id.* at 17-18. By any measure, be that "sexual assessments" or "structure clinical assessment," Mr. Johnson presents "a low risk of sexual recidivism." *Id.* at 19.

---

[5] The Static-99R is the primary tool the Department of Justice relies upon in screening prisoners for involuntary civil commitment, for example.

15

### III.    THE REQUESTED SENTENCE OF 60 MONTHS IS APPROPRIATE BASED ON THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

The function of the sentencing court is, after consideration of various factors, to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a) ("[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)"]).[6]  In addition to the factors discussed in § 3553(a)(2), sentencing courts must consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" the United States Sentencing Guidelines; "any pertinent policy statement;" "the need to avoid unwarranted sentence disparities;" and "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

### A.    Nature and Circumstances of the Offense, and History and Characteristics of the Defendant, § 3553(a)(1)

Mr. Johnson's offense conduct was an aberrant and relatively brief episode in a life otherwise well-lived. Stephen Johnson is a fundamentally good man from a wonderful family. As the Court knows from both the trial and the letters submitted to it, Mr. Johnson has strong interpersonal relationships and knows how to love, value, and help others—and does so. He is "an incredible cousin, son, husband, nephew, and friend," *see* Ex. M (Letter from Jessica Washington), an entrepreneur, philanthropist, and a bedrock member of his community. Mr. Johnson's character and history support a sentence at the mandatory minimum.

---

[6] In accordance with 18 U.S.C. § 3553(a)(2), the imposed sentence needs:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

16

Mr. Johnson's criminal history is minimal. The only blemish on his record is a DUI conviction in March 2007, almost 20 years ago, pursuant to a guilty plea. *See* PSR at ¶ 82. He was 19 years old at the time, a sophomore student at Florida A&M University.[7] *Id.* at ¶¶ 82, 107. Even so and in spite of his youth, he accepted responsibility, pled guilty, and completed his sentence, which matched his offense. *Id.* His record has been spotless since.

Mr. Johnson is well educated. He attended and graduated from St. Albans High School, a prestigious private school, as one of its small handful of black students. *Id.* at ¶¶ 91, 107. He then moved down to Florida to pursue a college education at Florida A&M University, inviting and inspiring others from his neighborhood to do the same. *Id.* at ¶ 107; *see also* Ex. H (Letter from Patric Holly). Tragically, an injury to his foot and financial difficulties faced by his family resulted in him having to leave Florida A&M. *See* Ex. D (Letter from Patricia Johnson). But he did not give up – he persevered, enrolling in the University of the District of Columbia and working part-time to support himself and his mother, and finally earn his college diploma. *Id.*;

---

[7] Youth matters when considering this prior conviction. Several fields of the criminal justice system, including Supreme Court case law and D.C. statute, recognize that those under the age of 25 must be treated differently in their sentencing. *See, e.g., Roper v. Simmons*, 543 U.S. 551, 569-70 & n. 62 (2005) (banning the use of capital punishment on juveniles); *Graham v. Florida*, 560 U.S. 48, 68 & n. 64 (2010); *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *see also* D.C. Code § 24-403.03 (counselling against lengthy prison terms for those who committed an offense under the age of twenty-five). This follows the growing body of scientific research that recognizes that the prefrontal cortex portion of the frontal lobe, associated with the ability "to control impulses, suppress aggression, consider the impact of their behavior on others, consider the future consequences of their behavior, take personal responsibility for their actions, and resist the influence of peers" does not fully mature until age twenty-five. 5 Laurence Steinberg, et. al., *Psychosocial Maturity and Desistance From Crime in a Sample of Serious Juvenile Offenders*, JUVENILE JUSTICE BULLETIN (OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION) (March 2015) at 7; *see also* Elizabeth Sowell, et. al*., In Vivo Evidence for Post-Adolescent Brain Maturation in Frontal and Striatal Regions*, NATURE NEUROSCIENCE at 860 (Oct. 2019); 7 Mariam Arain, et. al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE AND TREATMENT 449, 453 (April 2, 2013). Essentially, science and law both recognize what parents often do: young people make mistakes.

17

*see also* Ex. K (Letter from Kimberly Dailey); Ex. R (Picture of Diploma from UDC); PSR at ¶¶

107, 108 (noting Mr. Johnson's education and "specialized skills").

Mr. Johnson can persevere, rebuild, and recover to have a successful life.  As a child

growing up without a father and with debilitating asthma, as a student living in a primarily black

neighborhood while studying at a predominantly white private school, and as a college student

transferring to UDC and working to fund the education himself, Mr. Johnson's adolescent years

were marked by significant challenges.  *See* Ex. D (Letter from Patricia Johnson); *see also* PSR

at ¶ 91; *see also* Ex. I (Letter from Donna Rattley); *see also* Ex. C (Letter from Dara Johnson).

Yet throughout these valleys, he remained a "rock and steady support" for all those around him

and "caring for others less fortunate than himself," maintaining his "faith in the good nature of

people."  *See* Ex. I (Letter from Donna Rattley); *see also* Ex. E (Letter from Rev. Dr. Denise

King-Miller); *see also* Ex. B (Letter from Adrian Washington).  Now, too, and in the years since

his arrest for the instant offense, Mr. Johnson "has remained a light to [his family] and all those

around him."  *See* Ex. L (Letter from Sam Washington).  As summarized by one of the many

family members who have watched Mr. Johnson grow up, sat through the trial, and wrote a letter

of support to the Court, "given the opportunity, Stephen can recover and will go on to lead a

meaningful, productive, and law-abiding life."  Ex. I (Letter from Donna Rattley).

And most importantly, Mr. Johnson has built and maintains strong ties to his family,

friends, and the broader community.  While significant and beneficial in itself, this is also the

most important issue when it comes to predicting recidivism.  Without rehashing all of the facts

described in the Personal Background section, the Court can observe the love Mr. Johnson has

for his family and the love his family has for him from the materials attached to this

memorandum, including the letters of support from five aunts and uncles, two cousins, his

mother, wife, and sister. The Court saw many of these people in the gallery throughout Johnson's trial, and the government saw them pray with him in the hallways of the corridor as they awaited the jury's verdict. They are "painfully aware of the charges on which he was convicted" and the details of the offense conduct, yet they all have stood with him throughout his house arrest, his trial, and his pre-sentencing detention; "his entire family stands with him and will be there to love and support him" for however many years to come. Ex. S (Letter from Brenda Donald); *see also* Ex. L (Letter from Sam Washington); *see also* Ex. Q (Letter from Andrew Dailey); *see also* Ex. I (Letter from Donna Rattley); *see also* Ex. D (Letter from Patricia Johnson). Childhood friends, family friends, neighbors and other members of the community all rally around him just the same. *See, e.g.,* Ex. H (Letter from Patric Holly); *see also* Ex. J (Letter from Sarah Vaughn). In the words of his wife, they have all seen Mr. Johnson "learn, grow and become a better man" and now all they ask for is "the opportunity to walk in the grace and freedom that we have come to believe in … the opportunity to use all of our experiences, the good and the bad, to make a positive impact in society." Ex. G (Letter from Adanna Johnson). His community eagerly awaits Mr. Johnson's return and will help ensure his future success.

### B.    Purposes of Sentencing, § 3553(a)(2)

Under § 3553(a), the purposes of sentencing include "the need for the sentence imposed": "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

19

### 1.    Seriousness of the Offense

While serious, Mr. Johnson's conviction—including all relevant conduct—is limited to the possession of child pornography and the transportation of that pornography via the internet on only two occasions and to his own Google Drive. Mr. Johnson's offense does not involve the production of child pornography, distribution of child pornography, advertising of child pornography, selling or buying of children, transporting children for purposes of prostitution, sexual contact with children, or any attempt to commit any of these child abuse offenses. In terms of child abuse cases prosecuted in federal court, the conduct here falls on the least egregious end of the spectrum.

When evaluating the content of the child pornography and the way in which it was stored and handled, Mr. Johnson's offense conduct is less concerning than even the typical *possession* of child pornography case. There is no indication Mr. Johnson had any preference for material depicting infants, toddlers, or even prepubescent children. Even according to the government's account, the total amount of child pornographic files involved in Mr. Johnson's offense does not exceed 250. The number of files is substantially fewer than the number of files associated with the typical child pornography offense in the Internet era.[8] The government's own evidence showed that Mr. Johnson did not spend much time viewing child pornography in particular[9] and

---

[8] Based on fiscal year 2019 data compiled by the Sentencing Commission, the median number of child pornography images and videos for all 2019 cases sentenced under §2G2.2 was 4,265. *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (2021) at 30, fig. 13. The median number for receipt cases that year was 4,672, and the median number in possession cases was 2,350.

[9] The government conducted a detailed and thorough forensic evaluation on Mr. Johnson's devices, and that evaluation only showed that Mr. Johnson played (or attempted to play) five files depicting child pornography. *See* Government Trial Exhibit 412A.

20

that he did not store the material in any organized manner.[10]  Finally, Mr. Johnson never

discussed, chatted, or texted anything with anyone about abusing children or about child

pornography.

Therefore, when considering the seriousness of the offense, a sentence at the five-year

mandatory minimum—along with decades of registration as a sex offender and all of the other

collateral consequences attaching to a conviction of this nature—is more than sufficient to

provide just punishment for the offense.

### 2.    Adequate Deterrence

A sentence at the five-year mandatory minimum is also more than sufficient to satisfy the

purposes of deterrence.  By their nature, mandatory minimum sentences send a strong deterrent

signal.  A five-year term of imprisonment is substantial and enough to adequately deter Mr.

Johnson and others from engaging in this type of conduct.

The shameful nature of the offense and the humiliating experience Mr. Johnson has

experienced since his arrest in 2021 and will continue to endure in the future all have a powerful

deterrent effect.  For the past three years, he has been forced to have nightmarishly difficult

conversations with his wife, mother, sister, and other close family members about the offense

and about other sensitive private matters.  As a result of his conviction, Mr. Johnson will be

required to register in the future as a sex offender for a substantial period of time.  As a

registered sex offender, Mr. Johnson will be required to register in each jurisdiction where he

resides, works, or even visits.  He will be required to remain active in the registration process

because periodic recertification is required in each jurisdiction.  Information concerning his

---

[10] The government's forensic examination determined that the child pornography was stored on
Mr. Johnson's devices and in his Google Drive account in the same file path structure that the
material was in when it was originally obtained.

registration will be publicly available and numerous websites will make this information easily

available to members of the community.  Mr. Johnson's friends, neighbors, co-workers, and

anyone else in the community will know about Mr. Johnson's conviction and will be aware of

his status as a "sex offender."  The widespread availability of this information will surely create

barriers for Mr. Johnson when seeking professional, housing, and educational

opportunities.  This intense level of shame and humiliation will certainly deter Mr. Johnson and

everyone else from viewing any pornography, much less illegal pornography.  Accordingly, a

sentence of five years of incarceration will satisfy the goal of specific and general deterrence.

### 3.    Protection of the Public

Because Mr. Johnson's presence in the community poses no current or future public

safety risk, a sentence exceeding five years will serve no community safety purpose.  The nature

of the offense, seriousness of the offense, and Mr. Johnson's background all indicate that the

public will be 100% safe with Mr. Johnson in the community, as it was during his years-long

term of pretrial supervision and even prior to that.  Since Mr. Johnson was alerted by Google in

the Fall of 2020 about misconduct concerning his Google Drive account, there is no evidence

that Mr. Johnson has engaged with illegal pornography.  In fact, when Mr. Johnson's devices

were searched by law enforcement in 2021, no child pornography was discovered on any of his

computers.

Mr. Johnson's unblemished record during the 2 1/2 years from October of 2021 to April

of 2024 when he was on pretrial release is compelling evidence that the public needs no

protection from Mr. Johnson.  He successfully complied with stringent release conditions,

including internet restrictions, avoiding direct contact with children, and wearing a GPS

monitoring device.  As the 21 Pretrial Services Agency "Status Reports" that have been filed in

22

his case demonstrate, Mr. Johnson did not suffer a single violation during his entire thirty-month period while on pretrial release.[11]

As discussed above, a recent psychosexual evaluation confirms that Mr. Johnson poses no danger to the community.  According to Dr. Felix, "Mr. Johnson presents a low risk of sexual recidivism.  He has no history of prior sexual offenses, maintains a stable and supportive relationship, and has shown compliance with treatment and legal expectations."  Report at 19. Dr. Felix determined that Mr. Johnson rightly falls in the "Below Average Risk" range of the Static-99R test, with his grand total of 0 on the test (and almost lower) and his "multiple protective factors that may decrease his risk level, including but not limited to an absence of pre-existing mental health diagnoses, his willingness to engage in treatment, his history of consistent employment/income, his charitable contributions and volunteer services, and the presence of social supports, as evidenced by his support letters." *Id.* at 16.

Dr. Felix's conclusion is backed by extensive recent research about the low rates of recidivism among sexual offenders in general.  The United States Sentencing Commission's research demonstrates that a history of stable employment, a college education, lack of criminal history, and family ties and responsibilities all predict reduced recidivism across offenses, *see Measuring Recidivism*, United States Sentencing Commission (May 2004) at 12-13.[12]

"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime."  Mary Helen McNeal & Patricia Warth,

---

[11] *See* ECF Nos. 11, 19, 24, 28, 33, 35, 40, 46, 49, 53, 56, 59, 62, 65, 66, 68, 71, 75, 105, 108, and 144.

[12] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

23

*Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 KAN. J.L. & PUB. POL. 317,

344-45 (Spring 2013).

Those rates are even lower for individuals like Mr. Johnson, who have no record of

contact behavior and no relevant prior offenses. *See* Written Statement of Michael C. Seto,

Ph.D., C. Psych. before the U.S. Sentencing Commission at 3 (Feb. 15, 2012),[13] (citing research

that shows that online (mostly child pornography) offenders had recidivism rates that were

"relatively low compared to the average recidivism rates found for contact offenders" and "[i]n

particular*, first-time child pornography possession only offenders appear to be very low risk of

sexual recidivism*, in contrast to those with any prior or concurrent criminal convictions or those

who engage in other sexual offending (e.g., attempted or actual contacts with a child, production

of child pornography).") (emphasis added); *see also* Written Statement of Richard Wollert, Ph.D.

before the U.S. Sentencing Commission, at 20 (Feb. 15, 2012) (drawing on his decade of

supervising child pornography offenders and concluding that the typical child pornography

offender "is mortified by his criminal internet behavior once he is confronted with its reality in

the wake of being arrested. This reaction is helpful for motivating him against relapse, which is

rarely encountered.").[14] Dr. Wollert explicitly recommends increasing "efforts to support the

reintegration of CPOs into the community sooner rather than later. *The more an ex-CPO is tied

to the community, and the greater his stake in it, the less likely he will be to reoffend.*" *Id*. at 22

(emphasis added).

---

[13] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Seto.pdf.
[14] *Available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-courts-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf.

24

In addition to Mr. Johnson's overall conduct, his background, his "low-risk" classification, and the vast amount of research showing that individuals like Mr. Johnson are unlikely to recidivate, the period of supervised release that Mr. Johnson must serve upon his release from custody will provide an addition layer of assurance that the public will be safe when Mr. Johnson returns to the community. Mr. Johnson's conditions of supervised release will surely be very restrictive, likely including strict travel conditions, restrictions on contact with children, and internet monitoring and restrictions. Mr. Johnson will also be required to report regularly to his probation officer, be subject to unannounced visits, and adhere to searches by his probation officer that are not based on probable cause.

For these reasons, a sentence exceeding the five-year mandatory minimum will *not* provide any greater protection for the community and is greater than necessary here.

### 4.    Educational or Vocational Training, Medical Care, or Other Treatment

Incarcerating Mr. Johnson for more than five years will not assist him with any needed educational or vocational training, medical care, or other correctional treatment. Considering that Mr. Johnson has a bachelor's degree, he is not in need of any educational or vocational training that can be offered at a penal institution. And, given Mr. Johnson's good physical health, he will not receive any beneficial medical care at a federal prison. Any mental health treatment, therapy, or other correctional treatment from which Mr. Johnson can benefit can be fully accomplished within the five-year period that Mr. Johnson must serve due to the mandatory minimum penalty.

Given Mr. Johnson's results as "Below Average Risk" for sexual recidivism, Dr. Felix specifically held that "sexual offender treatment is not warranted." Report at 19. Individual counseling and mental health treatment is recommended, in order to address "any underlying

<div align="center">25</div>

issues related to sexual behaviors" as well as Mr. Johnson's depression and anxiety, but not the SOTP. *Id.* at 19-20. Dr. Felix notes that Mr. Johnson's "overall compliance and support network further suggest a reduced likelihood of reoffending." *Id.* at 19. This support network, comprised of his family, friends and extended community, is the network that Mr. Johnson seeks to return to soon.

### C.    Kinds of Sentences Available and the Guidelines Range, § 3553(a)(3), (4)

#### 1.    Kinds of Sentences

18 U.S.C. § 3553(a)(3) requires courts to consider "the kinds of sentences available" when imposing a sentence. When considering the kinds of sentences available, "§ 3553(a) directs the judge to consider sentences other than imprisonment." *Gall v. United States*, 552 U.S. 38, 59 (2007). This directive is consistent with Congress' directive to the United States Sentencing Commission concerning the importance of "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Since Mr. Johnson has never been convicted of a crime of violence or any other serious offense, Congress encourages imposing sentencing alternatives to imprisonment for individuals like Mr. Johnson.

Since Mr. Johnson's offense of conviction requires that he serve a minimum of five years in custody, Congress' goal of sentences other than imprisonment for individuals like Mr. Johnson can best be met here by imposing a sentence at the mandatory minimum and offering Mr. Johnson through supervised release the opportunity to realize his significant potential in life. Sentencing Mr. Johnson to a five-year period of incarceration that is followed by a lengthy period of supervised release is clearly not letting him off easily. Especially for a person who has never been incarcerated before and has little experience with the criminal justice system, five

years in prison will be very debilitating for Mr. Johnson. Adding to this imprisonment a period

of supervised release, sex offender registration, and the lifelong problems and indignities he will

experience because of his felony sex conviction, Mr. Johnson will endure significant hassles and

limitations for the remainder of his life.[15] The United States Supreme Court recognized the

severity of federal post-offense supervision alone when observing that "[o]ffenders on probation

are nonetheless subject to several standard conditions that substantially restrict their

liberty." *Gall*, 552 U.S. at 48. Regarding some of the substantial restrictions supervision places

on one's liberty, the Supreme Court observed that:

> Probationers may not leave the judicial district, move, or change jobs without
> notifying, and in some cases receiving permission from, their probation officer
> or the court. They must report regularly to their probation officer, permit
> unannounced visits to their homes, refrain from associating with any person
> convicted of a felony, and refrain from excessive drinking. Most probationers
> are also subject to individual "special conditions" imposed by the court.

*Id*.

---

[15] Courts and commentators are increasingly recognizing how severe the collateral consequences of a felony conviction are. A federal district court noted that "federal law imposes nearly 1,200 collateral consequences" on people who have been convicted of a felony. *United States v. Nesbeth*, 188 F. Supp. 3d 179, 185 (E.D.N.Y. 2016), *appeal withdrawn* (Sept. 9, 2016) (sentencing a drug defendant to no jail time even though her sentencing guidelines range had been 33-41 months, because of the serious collateral consequences she would suffer by virtue of her status as a convicted felon). And state laws impose even more consequences; all told "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *Id.* at 184. Consequences for the conviction of a sex offense are even more severe. The *New York Times* has reported on the particularly harsh consequences that accompany sex offense convictions, suggesting that "our entire approach to dealing with sex offenders has gone tragically off the rails." Lisa Jackson and David Feige, *Sex Offender Village*, N.Y. Times, May 21, 2013. *Available at* http://www.nytimes.com/2013/05/22/opinion/sex-offender-village.html. "In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless." *Id.* The *Federal Probation Journal*, a publication of the United States Courts, issued a report with similar findings, including that "[c]ollateral harms include harassment or victimization, social isolation, difficulty finding employment, and difficulty finding housing." Sarah W. Craun and David M. Biere, *Are the Collateral Consequences of Bring a Registered Sex Offender as Bad as We Think? A Methodological Research Note*, 78 Fed. Probation J. 28 (2014). *Available at* https://www.uscourts.gov/sites/default/files/june2014_final_proof_6_11_2014.pdf.

2.    **Sentencing Guidelines**

As 18 U.S.C. § 3553(a) makes clear, the guideline range established by the United States Sentencing Guidelines ("Sentencing Guidelines," "Guidelines," or "U.S.S.G.") is merely one of many factors the court must consider when determining an appropriate sentence. *See also Gall v. United States*, 552 U.S. 38, 59 (2007) ("the Guidelines are only one of the factors to consider when imposing sentence"). Moreover, because "the Guidelines are not mandatory," the applicable sentencing guideline range is not binding on courts. *Gall v. United States*, 552 U.S. at 59. Rather, the Guidelines range is advisory and sentencing courts are free to impose sentences below the advisory Guidelines range. *Id.; see also Rita v. United States*, 551 U.S. 338, 351 (2007) (courts are free to impose sentences outside of the advisory Guidelines range for various reasons, including that, for example, "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply," the advisory Guidelines range "fails properly to reflect § 3553(a) considerations," or because "the case warrants a different sentence regardless").

In Mr. Johnson's case, there is disagreement concerning the proper application of the Sentencing Guidelines. Much of the disagreement centers on properly characterizing the offense conduct and ensuring that Mr. Johnson's guidelines range is not influenced by acquitted conduct, per the most recent Amendment to the Sentencing Guidelines. Regarding the nature of Mr. Johnson's offense conduct, the government alleges that Mr. Johnson acquired files containing child pornography from the internet, stored all or some of those files to his computer's hard drive, and then on September 21, 2020, and October 1, 2020, transferred those files to his personal secured private Google Drive account. There are no allegations that Mr. Johnson ever distributed the files to another person or knowingly made the files available to anyone else. Thus, the conduct in this case involves Mr. Johnson receiving child pornography and then

28

transporting that material via the internet to his personal and exclusive cloud-based storage

Google Drive account for no purpose other than his own personal use.  Mr. Johnson's conduct

does not involve the trafficking or distribution of child pornography.  *See United States v.*

*Chiaradio*, 684 F.3d 265 (1st Cir. 2012) (distribution of child pornography has occurred "[w]hen

an individual consciously makes files available for others to take and those files are in fact

taken").

In accordance with the 2024 United States Sentencing Guidelines (effective on

November 1, 2024), acquitted conduct shall not be considered when calculating a defendant's

sentencing guidelines range.  A new amendment to the 2024 Sentencing Guidelines adds an

"acquitted conduct" provision to the "Relevant Conduct" guideline at U.S.S.G. § 1B1.3.  The

new provision makes clear that "[r]elevant conduct does not include conduct for which the

defendant was criminally charged and acquitted in federal court, unless such conduct also

establishes, in whole or in part, the instant offense of conviction."  U.S.S.G. § 1B1.3(c).

Therefore, acquitted conduct "is not relevant conduct for purposes of determining the guideline

range."  U.S.S.G. § 6A1.3 commentary.

Mr. Johnson was acquitted on ten counts and found guilty of six counts.[16]  Five of the six

counts of conviction relate to transportation of child pornography and each of these five counts

involved only a single video file.  Since the video depicted in counts Five and Eight is the same

video, the five transportation offenses involve four unique and distinct files.  *See* Motion to

Dismiss Counts Five and Eight of Second Superseding Indictment, ECF 115 ("the contents of the

---

[16] Mr. Johnson was acquitted of Counts Three, Four, Six, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen.  He was convicted of Counts One, Two, Five, Seven, Eight, and Sixteen.

29

visual depiction charged in Counts Five and Eight, which is a video, are identical").[17]  The sixth

count of conviction involved a possession of child pornography offense that, unlike the

transportation counts, does not specifically identify the material encompassing that count.  The

jury was permitted to convict Mr. Johnson of the possession offense based only on a single file,

if it determined that the one file constituted child pornography.  Indeed, regarding the possession

count, the jury was instructed by the Court to decide only whether "*at least one* of the images

possessed by the defendant involved a prepubescent minor or a minor who had not obtained 12

years of age."  ECF 169 at 2 (emphasis added).  And, during closing argument, the government

took advantage of the fact that the jury could convict Mr. Johnson of the possession count based

on a single file when telling the jury that "[a]ll that we have to prove to you, beyond a reasonable

doubt, is that he possessed one file. One file is enough. If you all agree on one file, that's

sufficient for Count 16. Counts 1 through 15 focus on specific file names. Count 16, one file is

enough."  4/12 Tr. 1225.

      In determining the offense conduct, it is clear that the jury's guilty verdicts were based on

the five images—and that the jury acquitted him of everything else.  This interpretation of the

jury's verdict on the transportation allegations is supported by its note to the Court regarding

available metadata, *see* ECF 156, as well as this Court's observations in its Order regarding Mr.

Johnson's Motion for a New Trial ("Order").  *See* ECF 210.  In the Order, the Court noted that

the five files the government showed "had been saved and played on Johnson's computer prior to

being uploaded to his Google Drive . . . were the only five files that the jury convicted Johnson

---

[17] Significantly, in the government's opposition, the government does not deny that the video
depicted in Counts Five and Eight is the same.  *See* Government's Consolidated Memorandum in
Opposition to Defendant's Motions to Dismiss Certain Counts of Second Superseding
Indictment, ECF 123 at 5 (". . . the video files charged in Counts Five and Eight are the same
length and appear visually identical. . . .").

of transporting." *Id.* at 4, note 3.[18]  The Court further noted that the jury was "discerning" by

"acquitting [Mr. Johnson] on the ten counts supported by less evidence." *Id*.  It stands to reason

that the jury took a similar approach with the possession of child pornography offense,

convicting Mr. Johnson of only the five files for which the government's evidence was the

strongest and acquitting him of everything else.  Thus, the most reasonable interpretation of the

jury's verdicts is that it acquitted Mr. Johnson of all conduct except for the five files specifically

charged in Counts One, Two, Five, Seven, and Eight.

 In calculating Mr. Johnson's sentencing guidelines, the government has the burden of

proving any sentence enhancement.  *See United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir.

2016) ("[t]he Government must demonstrate that a sentencing enhancement is warranted by a

fair preponderance of the evidence"); *see also United States v. Hines*, 449 F.3d 808, 815 (7th Cir.

2006) ("[t]his court's case law clearly places upon the Government a burden to prove by a

preponderance of the evidence that a particular sentencing enhancement is warranted") (cleaned

up).  In satisfying this burden, the government "may not simply rely on assertions in a

presentence report if those assertions are contested by the defendant." *United States v. Price*,

409 F.3d 436, 444 (D.C. Cir. 2005).  Rather, "the Government must demonstrate that the

description in the report is based on a sufficiently reliable source to establish the accuracy of that

description." *Id*.  When sentencing guideline enhancement disputes arise, "the defendant need

not produce any evidence" because "the Government carries the burden to prove the truth of the

disputed assertion." *Id*.

---

[18] The parties disputed during trial whether the government's evidence showed that certain files
were clicked on or whether the evidence showed that these files were actually played.

> a.    *Mr. Johnson is entitled to a two-level decrease in his offense level because the conduct for which he was convicted was limited to the receipt of child pornography.*

When the applicable base offense level under U.S.S.G. § 2G2.2 is 22,[19] the defendant is entitled to a two-level decrease if "the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor" and "the defendant did not intend to traffic in, or distribute, such material." U.S.S.G. § 2G2.2(b)(1). As explained above, considering that the government's evidence shows nothing more than Mr. Johnson receiving child pornography from the internet and then receiving it again when he transported it solely to himself, Mr. Johnson's conduct in this case was limited to the receipt of child pornography. By not sending child pornography to another person or making it available to anyone else, Mr. Johnson did not intend to traffic in or distribute child pornography.

In *United States v. Chiccini*, 2022 WL 1024261 (3d Cir. 2022), where the defendant— like Mr. Johnson—possessed child pornography on his computer and transferred those files via the internet to his personal cloud storage account, it was held that it was plain error to deny the defendant a 2-level decrease under U.S.S.G. § 2G2.2(b)(1). The court in *Chiccini* determined that "the act of downloading images into a personal cloud account, without more, does not demonstrate an intent to distribute, and in fact, defines the act of receiving or possessing the images." *Id*. at 2. In holding that the 2-level decrease applied in cases involving only a transfer of child pornographic material into the defendant's personal cloud account, the *Chiccini* court found significant that "[defendant's] conduct was 'limited' to receiving the material, which he did by storing it in a private, password protected account." *Id*. at 3.

---

[19] There is no dispute that Mr. Johnson's base offense level is 22. *See* PSR at ¶ 67; *see also* U.S.S.G. § 2G2.2(a)(2).

Cases in which courts have denied application of the 2-level decrease are easily

distinguishable from *Chiccini*.  Those cases, unlike *Chiccini* and Mr. Johnson's case, either

involve conduct where the defendant transferred child pornography to at least one other person

or engaged in offense conduct greater than the receipt or even solicitation of child pornography.

Cases concerning the transfer of material to someone else involve defendants who affirmatively

provide child pornography to another person or store it in a location that makes the material

available for others to access.  *See, e.g., United States v. Bleau*, 930 F.3d 35 (2d Cir. 2019) (two-

level decrease for conduct limited to receipt or solicitation of child pornography unwarranted

where defendant's computer was equipped with peer-to-peer software that enabled other people

to access defendant's child pornography); *United States v. Miltier*, 993 F.3d 267 (4th Cir. 2021)

(decrease under § 2G2.2(b)(1) inapplicable when law enforcement used a peer-to-peer file

sharing network to download child pornography from an IP addresses associated with

defendant); *Haney v. United States*, 962 F.3d 370 (8th Cir. 2020) (decrease under § 2G2.2(b)(1)

did not apply where defendant distributed child pornography by making it available to others

through a file sharing program).  Other cases denying application of § 2G2.2(b)(1)'s two-level

decrease involve offense related criminal conduct that is greater than mere receipt or solicitation.

*See, e.g., United States v. Hodge*, 805 F.3d 675 (6th Cir. 2015) (section 2G2.2(b)(1) decrease did

not apply to defendant whose offense conduct also involved the attempted production of child

pornography); *United States v. Meek*, 32 F.4th 576 (6th Cir. 2022) (no error in denying two-level

§ 2G2.2(b)(1) decrease for conduct more extensive than mere receipt or solicitation where

defendant made child pornography available to others by downloading the material on a peer-to-

peer file sharing network and admitted that "he may have inadvertently shared or traded child

pornography").

33

Because each of the following are true, Mr. Johnson is entitled to a two-level reduction under § 2G2.2(b)(1): (1) Mr. Johnson's base offense level under U.S.S.G. § 2G2.2 is 22; (2) Mr. Johnson's offense conduct is limited to the receipt of child pornography; and (3) Mr. Johnson did not intend to traffic in, or distribute, child pornography.

> b.    The two-level increase in Mr. Johnson's offense level for "distribution" is inapplicable.

U.S.S.G. § 2G2.2(b)(3) provides for an offense level increase ranging from two to seven levels for various types of child pornography distribution. Because Mr. Johnson was clearly not involved in distributing child pornography for pecuniary gain or to a child, neither the government nor the probation office is seeking the more serious distribution enhancements. They do, however, argue that the least serious distribution enhancement, which provides for a two-level increase when "the defendant knowingly engages in distribution" that was not covered by the more serious distribution enhancements, applies in Mr. Johnson's case. *See* U.S.S.G. § 2G2.2(b)(3)(F). The position adopted by the Probation Office and government is incorrect.

Mr. Johnson's position that the distribution enhancement does not apply is supported by case law, while the position taken by Probation and the government has no such support. In a case identical to Mr. Johnson's, the distribution enhancement was found not to apply. In *United States v. Hyatt*, 28 F.4th 776 (7th Cir. 2022), it was held that application of § 2G2.2(b)(3)(F)'s distribution enhancement where defendant uploaded files containing child pornography to his cloud-based storage account was plain error. In denying application of the distribution enhancement where a person transports child pornography to his own cloud-based storage account, the Court held that "[d]istribution is not present unless and until there is something related to a transfer of material from the defendant *to another person*." *Id.* at 783 (emphasis added). By noting that "[a] person can 'transport' an item without distributing it to anyone," the

<div align="center">34</div>

Court held that inapplicability of the distribution enhancement can exist in cases where a defendant has "transported" child pornography.  *Id*. at 783-84.[20]  In order to apply the distribution enhancement in a transportation of child pornography offense, "[w]e must find transportation *related to* a transfer from [the defendant] to some other person."  *Id*. at 785 (emphasis in the original).

Various other courts have sensibly found the existence of "distribution" in child pornography cases only when there is a transfer of material to some other person.  *See In re United States v. Manzano*, 945 F.3d 616 (2d Cir. 2019) (defendant's uploading of a video containing child pornography to his personal Google Photos folder by using internet servers located outside of defendant's state was not distribution); *United States v. Budziak*, 697 F.3d 1105, 1109 (9th Cir. 2012) ("we hold that the evidence is sufficient to support a conviction for distribution under 18 U.S.C. § 2252(a)(2) when it shows that the defendant maintained child pornography in a shared folder, knew that doing so would allow others to download it, and another person actually downloaded it"); *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015) (same); *United States v. Husmann*, 765 F.3d 169, 174 (3rd Cir. 2014) ("[t]he statutory context confirms that 'distribute' in § 2252(a)(2) means to apportion, give out, or deliver and that distribution necessarily involves the transfer of materials to another person"); *United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020) (transportation of child pornography, unlike distribution, "does not require conveyance to another person"); *United States v. Clarke*, 979 F.3d 82, 95 (2nd Cir. 2020) ("'[d]istribution' and 'transportation' are different. . . as distribution can be accomplished by mere transfer of ownership without movement from one place to another").

---

[20] The defendant in *Hyatt* was charged with transportation, receipt, and possession of child pornography.

Accordingly, since Mr. Johnson did not distribute child pornography to another person, a two-level enhancement under §2G2.2(b)(3)(F) plainly does not apply.

> c.    Because the material for which Mr. Johnson was convicted did not involve sadistic or masochistic conduct, or depictions of violence, nor did the material involve sexual abuse or exploitation of an infant or toddler, a four-level enhancement does not apply.

Pursuant to U.S.S.G. § 2G2.2(b)(4), a four-level enhancement applies "[i]f the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler."  While some files amongst the approximate 220 files that the government alleges Mr. Johnson unlawfully possessed and transported *may* contain material that justifies an enhancement under §2G2.2(b)(4),[21] the conduct for which Mr. Johnson was convicted does not.  The five files constituting all conduct associated with the transportation counts of conviction (i.e. Counts One, Two, Five, Seven, and Eight) do not portray sadistic, masochistic, or other depictions of violence; and these five files also do not portray sexual abuse or exploitation of any infant or toddler.  And, as discussed above, the conduct for which Mr. Johnson was convicted in the possession count includes only the same files implicated in the five transportation counts of conviction.  Mr. Johnson was acquitted of everything else.  There is accordingly no basis for finding that the possession conviction includes any files in addition to those associated with the transportation convictions.

Because the new Sentencing Guideline precludes the use of acquitted conduct in calculating a defendant's sentencing guidelines range, any determination about whether an enhancement under § 2G2.2(b)(4) applies must be based only on the five files charged in Counts

---

[21] Unless the government can direct Mr. Johnson's counsel to a file that portrays sadism, masochism, depictions of violence, sexual abuse or exploitation of an infant or toddler, Mr. Johnson does not concede that this enhancement even applies to the broader approximate 220 files.

One, Two, Five, Seven, and Eight. *See* U.S.S.G. § 1B1.3(c) ("[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction"). Since these five files do not portray the type of conduct that justifies an enhancement, Mr. Johnson's offense level may not be increased under § 2G2.2(b)(4).

> d.    *The applicable offense level increase for number of images is limited to four levels.*

The Sentencing Guidelines includes an incremental increase in a child pornography offender's offense level based on the number of images involved in the offense. *See* U.S.S.G. § 2G2.2(b)(7).[22] In Mr. Johnson's case, the PSR writer determined that Mr. Johnson's offense involved more than 600 images and, therefore, applied a five-level increase in Mr. Johnson's offense level.[23] *See* PSR at ¶ 72. This calculation is incorrect.

As explained above, the most reasonable interpretation of the jury's verdicts is as based on five discrete files. And, because the videos depicted in Counts Five and Eight are the same, the number of video files involved for which Mr. Johnson was convicted is limited to four distinct videos. When counting each of the four distinct video files on which Mr. Johnson's conviction was based as 75 images, Mr. Johnson is accountable for a total of 300 images under U.S.S.G. § 2G2.2(b)(7). In accordance with § 2G2.2(b)(7)(C), a four-level offense level increase applies when there are "at least 300 images, but fewer than 600." Therefore, since the correct number of images involved in Mr. Johnson's case for purposes of calculating his sentencing

---

[22] In determining the number of images involved, "[e]ach photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image" and "[e]ach video, video-clip, movie, or similar visual depiction shall be considered to have 75 images." U.S.S.G. § 2G2.2, Application Note 6(i) & (ii).

[23] This five-level increase is the maximum increase permitted by the Sentencing Guidelines based on the number of images. *See* U.S.S.G. § 2G2.2(b)(7)(D).

(Page 206 of Total)

guidelines is 300, his offense level is increased by four levels—not five levels—based on the number of images.

<div align="center">*    *    *</div>

Based on the above, and given a Criminal History Category of I, the correct Guidelines range in this case is 78-97 months.

### D.    Pertinent Policy Statements and the Flawed Sentencing Guidelines in Child Pornography Cases, § 3553(a)(5)

It is widely accepted that the sentencing guidelines in child pornography cases produce absurdly high guideline ranges, primarily due to various enhancements that are not based on the United States Sentencing Commission exercising its institutional role and basing those guidelines on empirical data and national experience.  And even under the correct Guidelines range of 78-97 months, that is plainly the case here.  The Sentencing Commission has publicly expressed criticism about the child pornography guidelines for over a decade.  A large number of federal courts share the concerns of the Sentencing Commission, and the Department of Justice has agreed with much of the criticism, as well.

### 1.    The United States Sentencing Commission's Position

In its 2012 report, the Sentencing Commission found that the current sentencing scheme in U.S.S.G. § 2G2.2 does not accurately measure the severity of non-production child pornography offenses.  U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES at 207, 321 ("2012 Report").[24]  According to the Commission at that time, this is due in part to the fact that "the sentencing scheme … has not been updated for nearly a decade"

---

[24]*Available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

<div align="center">38</div>

and fails to "account for significant changes in offense conduct, particularly in technology, that have occurred in recent years." *Id*. at 207. Conduct that is now typical of almost every child pornography offense "triggers multiple guideline enhancements and exposes the vast majority of defendants today to substantial penalty ranges." *Id*.

More specifically, the Commission found that before advances in computers, the internet, and digital cameras, "child pornography was difficult to find, risky to produce, expensive to duplicate, and required a secure and private storage area," as offenders typically received and distributed it in printed form using the U.S. mail. *Id*. at 42, 312. Now, most offenders rely on internet or internet-enabled technology to access and distribute child pornography. *Id*. at 42. These changes in technology have made it significantly easier to access child pornography. "All of these technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id*. at 6. An "entry-level offender," like Mr. Johnson, can now easily access large amounts of child pornography for little or no financial cost and often in an anonymous, indiscriminate manner. *Id*. at 312.

Yet, as the Sentencing Commission stated in its 2012 Report, "the sentencing scheme for non-production offenses has not been updated for nearly a decade. It thus does not account for significant changes in offense conduct, particularly in technology, that have occurred in recent years—such as the widespread use of peer-to-peer ("P2P") file sharing, which typical offenders now use to receive and distribute large quantities of graphically violent child pornography." *Id*. at 207. The sentencing scheme has not been updated since the 2012 Report. Thus, a relatively less serious offender can now be saddled with an excessive guidelines range.

<center>39</center>

The Commission identified five § 2G2.2(b) enhancements that are at odds with the above-described changes in technology: (1) images involving a pre-pubescent minor; (2) offenses involving distribution; (3) sado-masochistic images; (4) use of a computer; and (5) enhancements based on the quantity of images possessed.  2012 Report at 313 (citing U.S.S.G. § 2G2.2(b)(2)-(4), (6)-(7)).  According to the Commission, these enhancements were established "in an earlier technological era" when child pornography was typically received and distributed in printed form.  *Id*.  But now, enhancements that were intended to apply to the very worst offenders "are now being applied routinely to most offenders." *Id.*  For example, in 2010, the "typical non-production offender" was subject to the enhancements for images of pre-pubescent minors, use of a computer, and quantity of images in more than 96 percent of cases,[25] and the enhancement for sado-masochistic images in nearly 80 percent of cases. *Id.* at 316; *see also* U.S.S.G. § 2G2.2(b)(2), (4), (6)-(7); U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2004-2011).  Together, these five "typical" enhancements, which apply to "the vast majority of offenders," account for 15 offense levels.  2012 Report at 316.

Because the above enhancements are now so common in child pornography offenses, the Commission determined that they often overstate the seriousness of individual offenses.  Federal Id. at 321 ("The current sentencing scheme . . . places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections[.]") (citing § 2G2.2(b)(3)(B), the five-level enhancement for possession of 600 or more images, as an example of an "outmoded measure[] of culpability").

---

[25] Further, of the offenders who received an enhancement based on the number of images, almost 70 percent received the maximum five-level enhancement based on possession of 600 or more images.  *See* 2012 Report at 141.

In 2021, the Sentencing Commission issued another report reaffirming similar criticisms about the child pornography guidelines that the Sentencing Commission expressed a decade earlier. United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* ("2021 Report").[26] For example, the 2021 Report noted that Guideline offense level enhancements for age of victim, distribution, type of images,[27] and use of computer "continued to apply in the vast majority of non-production child pornography cases." 2021 Report at 19.[28] Additionally, the five-level enhancement for more than 600 images, an enhancement that the probation office claims applies in Mr. Johnson's case, applied in 77.2% of non-production cases in fiscal year 2019. *Id*. The frequency with which these enhancements apply to all types of non-production child pornography offenses shows that §2G2.2 of the Sentencing Guidelines "fails to distinguish adequately between more and less severe offenders." *Id.*

According to the 2021 Report, offense conduct involving files depicting prepubescent minors is also not a distinguishing factor in non-production child pornography cases because—with significant advances in technology—nearly all non-production cases involve prepubescent minors. In fiscal year 2019, 99.4% of all non-production offenders "had images or videos depicting victims who were prepubescent or under the age of 13." 2021 Report at 31.

---

[26] This report updates and expands upon the Sentencing Commission's 2012 Report to Congress by evaluating "data from the Commission's fiscal years 2005-2019 Offender Datafiles." 2021 Report at 8. The 2021 Report is based on a particularly detailed evaluation of fiscal year 2019 data as the Commission "undertook an extensive special coding project to collect and analyze data on non-production child pornography offenses and offender characteristics beyond the information regularly collected." *Id.* at 9.

[27] The "type of images" enhancement includes the four-level increase the probation office applies to Mr. Johnson's case for material portraying sadistic or masochistic conduct.

[28] Three enhancements – use of computer, number of images, and age of victims – applied in more than 95% of non-production cases.

41

Additionally, the report reveals, most non-production offenders "had images or videos of infants or toddlers." *Id.*

The 2021 Report, like the Sentencing Commission's 2012 Report to Congress, identifies offenders who participate in child pornography communities as a factor that deserves considerable attention when making sentencing determinations. In 2012, the "Commission found that online communities provided a forum to discuss sexual interest in children without fear of condemnation and helped offenders to develop positive feelings about their online deviant sexual identities." 2012 Report at 37. The 2012 Report warns that child pornography communities contribute to the child pornography market and some members of these communities "produced new child pornography to gain access to other images." *Id*. at 36. In 2021, the Sentencing Commission reports that nearly half (43.7%) of all "non-production child pornography offenders sentenced in fiscal year 2019 belonged to a child pornography community." 2021 Report at 38. The 2021 Report further noted that "even 36.4 percent of possession offenders, the least serious type of non-production offender under §2G2.2, participated in a child pornography community." *Id.*

The 2021 Report also identified the manner in which offenders stored child pornography and whether there were any sophisticated methods of concealing the offense as relevant sentencing factors. The Sentencing Commission observed that "some offenders possess child pornography collections numbering in the hundreds of thousands or even millions of images and videos." 2021 Report at 34. "The typical non-production offender," the Sentencing Commission reports, "stored child pornography in more than one place, with 57.6 percent of offenders storing their collections on two or more devices." *Id.* With regard to the use of sophisticated means to conceal child pornography collections, "16.0 percent of non-production child pornography

42

offenders engaged in sophisticated concealment efforts" in fiscal year 2019.  *Id.* at 35.  A slightly

higher rate (18.8 %) of possession offenders employed sophisticated means of concealment.  *Id.*

Tactics used by those engaging in sophisticated concealment include "using the Dark Web,

software that wipes files, encryption, or using cryptocurrency to facilitate the transfer of child

pornography."  *Id.*

### 2.    The Department of Justice's Position

After the Commission released its 2012 Report, the Department of Justice expressed

agreement with the Commission's position in several respects.  *See* Ltr. from Anne Gannon,

Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy

Attorney Gen., U.S. Dep't of Justice, to Patti B. Saris, Judge, U.S. Sentencing Comm'n (Mar. 5,

2013).[29]

Significantly, the Department of Justice agreed "with the Commission's conclusion that

advancements in technology and the evolution of the child pornography 'market' have led to a

significantly changed landscape – one that is no longer adequately represented by the existing

sentencing guidelines."  *Id.* at 1.  For these reasons, the Department, like the Sentencing

Commission, recommended targeted revisions to § 2G2.2 "to account for new technology and

the dramatic evolution in how offenders obtain, store, organize, trade, and protect child

pornography collections."  *Id.* at 2.

Specifically, the Department of Justice proposed the elimination of the increase for the

use of a computer.  *Id.* at 4; U.S.S.G. § 2G2.2(b)(6) (providing for a two-level increase "[i]f the

offense involved the use of a computer or an interactive computer service").  The Department of

---

[29]*Available at* http://sentencing.typepad.com/files/dojletter-to-ussc-on-cp-report.pdf.

43

Justice also suggests a revision to the specific offender characteristic governing the quantity of images. *Id.* at 4. Although the Department supports the continued tying of the guideline range to the quantity of images collected, it argues that "the numeric thresholds should be substantially increased for each offense level," which will "better distinguish between occasional and habitual collectors." *Id.* The Department bases this recommendation on its assessment that the "technology-facilitated ease of obtaining larger child pornography collections" warrants such a substantial revision. *Id.*

### 3. Federal Court Sentences

For very similar reasons to those articulated by the Sentencing Commission and the Department of Justice, federal courts have been rejecting the child pornography sentencing guidelines for years.

The majority of federal circuits have voiced criticism about the child pornography guidelines in U.S.S.G. § 2G2.2—or at least recognized its *sui generis* nature as a creature not of Commission action but primarily Congressional manipulation. *See, e.g.*, *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) ("we wish to express our view that the sentencing guidelines at [U.S.S.G. § 2G2.2] are in our judgment harsher than necessary"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (observing that U.S.S.G. § 2G2.2 is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results"); *United States v. Grober*, 624 F.3d 592, 609-10 (3d Cir. 2010) (affirming downward variance from a 235-293-month advisory guideline range to the mandatory minimum of 60 months based on criticism of § 2G2.2); *United States v. McNerney*, 636 F.3d 772, 777 (6th Cir. 2011) (recognizing that "some courts and commentators have questioned the wisdom of the congressionally-directed Child Pornography Sentencing Guideline because they were the product of Congressional mandate rather than the Commission's preferred systematic, empirical

<div align="center">44</div>

approach") (cleaned up); *United States v. Halliday*, 672 F.3d 462, 473 (7th Cir. 2012) (acknowledging that not giving a downward variance in a child pornography case actually "may be in tension" with section 3553(a)(6)'s requirement for sentencing courts to avoid unwarranted disparity); *United States v. Henderson*, 649 F.3d 955, 965 (9th Cir. 2011) ("an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the maximum statutory term"); *United States v. Regan*, 627 F.3d 1348, 1354 (10th Cir. 2011) (noting that arguments that U.S.S.G. § 2G2.2 should be accorded less deference because it lacks empirical support are "quite forceful").  Furthermore, some of these circuits have approved a district court's categorical refusal to sentence under the guidelines based on a policy disagreement.  *See, e.g.*, *Henderson*, 649 F.3d at 960; *Grober*, 624 F.3d at 609; *Dorvee*, 616 F.3d at 188.

Sentencing courts throughout the country are increasingly recognizing the failures of the child pornography guidelines and are routinely imposing below guidelines sentences in non-production child pornography cases.  In 67.9% of all non-production cases in fiscal year 2019, defendants received a below guidelines sentence.  2021 Report at 24.[30]  While the vast majority of non-production child pornography sentences are below the guidelines range, there is significant variation with regard to the extent to which courts are sentencing below the guideline range.  Sentences in child pornography cases for fiscal year 2019 ranged from probation to 228 months.  *Id.* at 55.

---

[30] This includes both downward departures and downward variances.

45

Courts are relying on factors such as participation in a child pornography community[31] and aggravating conduct[32] in determining the appropriate length of sentence. According to the 2021 Report, in fiscal year 2019, "[o]ffenders who did not participate in a child pornography community or engage in aggravating conduct received the lowest average and median sentences." 2021 Report at 45. This pattern is consistent with the recommendations made by the Sentencing Commission in 2012. In 2012, the Sentencing Commission "identified participation in online child pornography communities and aggravated sexual conduct as factors that should be accounted for in the guidelines and in the sentences imposed on non-production child pornography offenders." 2012 Report at 44.

### 4.    Policy Based Variance is Warranted in Mr. Johnson's Case

Like with the crack cocaine Guidelines the Supreme Court addressed in *United States v. Kimbrough*, Congressional action heavily influenced the sentencing outcomes suggested by the Guidelines in Mr. Johnson's case. For example, the two-level use of a computer enhancement was added to the Guidelines in 1996 after Congress explicitly directed the Commission to increase child-pornography punishments whenever "a computer was used" to facilitate the

---

[31] The Sentencing Commission "identified an offender as part of a child pornography community if he or she engaged in any of the following: (1) participating in an online group whose members interact with each other primarily via the internet through posts, discussions, and one-on-one chatting in a forum devoted to child pornography; (2) having conversations with at least one other individual about child pornography or the sexual abuse of a minor; (3) distributing or receiving child pornography via personal means (*e.g*., text, email, or instant message); or (4) working with another individual to produce child pornography." 2021 Report at 38.

[32] "Aggravating conduct" is defined by the Sentencing Commission as "(1) contact sex offenses (any illegal sexually abusive conduct involving actual or attempted physical contact with a victim, before or concurrent with the non-production child pornography offense); (2) non-contact sex offenses (any illegal sexually abusive conduct not involving actual or attempted physical contact with a victim, such as soliciting a minor online, before or concurrently with the non-production child pornography offense); or (3) prior non-production child pornography offenses." 2021 Report at 39.

offense.[33]  In the years leading up to this directive, the Commission considered a series of specific offense characteristics designed to differentiate between more and less culpable offenders, but none involved an offense-level increase based on the use of a computer.[34]  Also, soon after Congress issued the mandate, the Commission noted that the suggested enhancement failed to adequately differentiate between different types of computer uses, not all of which corresponded to the congressional concerns underlying the directive, namely the potential for widespread dissemination of child pornography over the internet.[35]  Moreover, the enhancement's ability to meaningfully differentiate between more and less culpable defendants has waned as computer use has become increasingly ubiquitous.  The enhancement initially applied to roughly a quarter of child-pornography defendants,[36] but by 2010, it applied in over ninety-five percent of possession-of-child-pornography cases.[37]  Any worth this enhancement once had as a basis for differentiating between more and less culpable defendants is largely gone, and the Commission recognized as much in a recent report to Congress.[38]

The four-level (or five-level according to probation and the government) number-of-images enhancement provides another example.  This enhancement was added to the Guidelines

---

[33] *See* U.S.S.G. App. C, amend. 537, at 470, 472 (Supp. 2003) (citing the Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, § 3 (1995)).

[34] United States Sentencing Commission, History of the Child Pornography Guidelines, 14-15, 18 (2009).

[35] United States Sentencing Commission, Sex Offense Against Children: Findings and Recommendations Regarding Federal Penalties, 27, 30 (1996) (citing H.R. REP. NO. 104-90 at 3-4 (1995)).

[36] *Id*. at 30.

[37] FEDERAL CHILD PORNOGRAPHY OFFENSES at 209.

[38] *See id*. at xi ("[S]entencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.").

in 2003 following an explicit congressional directive,[39] but aside from a general fear that child-pornography defendants were receiving exceedingly lenient sentences,[40] the available legislative history does little to explain Congress' motivation or the process by which it matched the various numbers of images to the prescribed offense-level increases.  Also, the ability of this enhancement to meaningfully differentiate between defendants on the basis of culpability is suspect, as roughly seventy percent of child-pornography offenders sentenced in 2010 received the maximum five-level enhancement.[41]

Given that the child pornography guidelines, like the crack cocaine guidelines, are not based on the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, this Court should reject the guideline range applicable in Mr. Johnson's case.  Because the advisory range recommends a sentence that is far greater than necessary to serve the statutory purposes of federal sentencing, a substantial downward variance is warranted in Mr. Johnson's case.

### E.   Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6)

Because the sentencing guidelines are uniquely problematic with regard to fashioning an appropriate sentence in child pornography cases, comparisons with other similar cases can be particularly useful.  When making such comparisons between Mr. Johnson's case and other cases in this District and elsewhere in the country, a sentence at the five-year mandatory minimum is warranted.

---

[39] *See* U.S.S.G. App. C, amend. 649, at 299, 303 (Supp. 2003) (citing the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub. L. 108-21, § 401(i) (2003)).

[40] *See* H.R. Conf. Rep. No. 108-66, at 58-59 (2003); *see also* 149 Cong. Rec. H.3069-709 (statement of Rep. Sensenbrenner) (noting with disappointment that a defendant who possessed 1,300 images of child pornography received a downward departure).

[41] FEDERAL CHILD PORNOGRAPHY OFFENSES at 141.

1. **District of Columbia Cases That are Most Similar to Mr. Johnson's Case**

Comparing Mr. Johnson's case with other cases in the United States District Court for the District of Columbia is difficult because the prosecution of cases in this District where the conduct only involves possession of child pornography or transportation to oneself is rare. Cases in this District that are most similar to Mr. Johnson's case are as follows:

• *United States v. Brian Kampel*, **1:20-cr-0084 (DLF) (D.D.C. August 5, 2021)**

The defendant in this case was sentenced to thirty-three months imprisonment after being convicted of access with intent to view child pornography, based on his downloading of child pornography from a web site which required credit card payment to access. Mr. Kampel downloaded and viewed child pornography over the course of *ten years*. He possessed over a thousand files depicting child pornography, including files showing prepubescent girls engaging in oral sex with adult men, being vaginally penetrated by adult men, and at least one file of an adult male penetrating a child's anus with his penis. Mr. Kampel's sentencing guideline range included enhancements for material involving a prepubescent minor, material portraying sadistic or masochistic conduct, use of a computer, and a five-level enhancement based on the number of images.

• *United States v. Jason Wright*, **1:09-cr-00311 (ESH) (D.D.C. Apr. 15, 2010)**

In this case, the Court sentenced Mr. Wright to no prison time and to 5 years of probation. Mr. Wright was charged with possession of child pornography and he had nearly 300 images on his computer. After complying with all conditions of his probation for three and a half years, the Court agreed to the early termination of his probation.

49

• *United States v. David Malakoff*, **1:09-cr-00051 (ESH) (D.D.C. July 17, 2009)**

In *Malakoff*, the Court sentenced Mr. Malakoff to no prison time and to 5 years of

probation.  Mr. Malakoff was charged with possession of child pornography and he received

sentencing guidelines enhancements for sado-masochistic content, prepubescent content, use of a

computer, and for having more than 600 images.

### 2.   District of Columbia Cases Involving More Serious Conduct Than Mr. Johnson's Case

Probationary, or near probationary, sentences have been imposed in some cases in this

District where the conduct was more serious than the conduct with which Mr. Johnson was

involved.  Examples are:

• *United States v. Pasha Pakdel*, **1:17-cr-00165 (RJL) (D.D.C. June 11, 2019)**

Judge Leon imposed a sentence of one day imprisonment, credit for time served, to be

followed by 120 months of supervised release.  Though the charge was possession of child

pornography, over a two-year period, the defendant made multiple child pornography files

available for download on a peer-to-peer network—and many of those files were downloaded by

other users.  The defendant had approximately 215 videos and 212 images of child pornography

on his computer, including videos and images depicting prepubescent children being vaginally

penetrated by adult penises.

• *United States v. John Moreira*, **1:10-cr-00002 (ESH) (D.D.C. May 21, 2010)**

In this case, where the defendant shared and distributed files from his computer,

including providing files to an undercover officer on three different occasions, the Court imposed

a sentence of probation for 5 years.  After complying with all the conditions of his probation, the

Court agreed to the early termination of his probation after three years.

50

### 3. District of Columbia Cases Involving Substantially More Serious Conduct Than Mr. Johnson's Case

In many other cases in this district where the conduct was considerably more serious than Mr. Johnson's conduct, defendants received significant downward variances, including variances to the applicable mandatory minimum and to one year and a day or less. Some examples are as follows:

- ***United States v. Ryan Cooper***, **19-cr-382 (KBJ) (D.D.C. April 30, 2021)**

Defendant who distributed dozens of files of child pornography on Tumblr sentenced at the five-year mandatory minimum. In this case, Mr. Cooper distributed nineteen images of child pornography using one of his Tumblr accounts and, after that Tumblr account was shut down for the distribution of child pornography, he distributed an additional twenty-six files depicting pre-pubescent children on another one of his Tumblr accounts. Three of the images he distributed depicted children sucking on erect penises. Searches of Mr. Cooper's electronic devices and Tumblr account uncovered hundreds of videos and images of child pornography, triggering the five-level Guidelines enhancement for more than 600 images. Mr. Cooper's guideline range was also enhanced for depictions of prepubescent children and sadomasochistic images. His collection contained videos of prepubescent children having oral sex with adult men and a prepubescent boy being penetrated anally and orally by another child's penis.

- ***United States v. Patterson***, **19-cr-355 (PLF) (D.D.C. January 28, 2020)**

Defendant sentenced at the five-year mandatory minimum for distributing child pornography within a messenger group that was established for trading child pornography. Defendant played a leadership role in the messenger group when he was assigned as the "owner" of the messenger group. As the owner, defendant encouraged others to distribute child

pornography to the group by removing anyone from the group who failed to quickly share child pornography with the group.

• *United States v. Solorzano*, **19-cr-282 (TJK) (D.D.C. December 3, 2019)**

Judge Kelly sentenced defendant at the five-year mandatory minimum for distributing child pornography.  In addition to sending an undercover officer child pornography via a mobile messaging application, Mr. Solorzano sent the officer images of a minor stepdaughter with whom Mr. Solorzano claimed to have engaged in sexual activity.  While chatting with the undercover officer through the mobile messaging application, Mr. Soloranzo discussed traveling to Washington, D.C., to have sex with the undercover's purported 8-year-old child.

• *United States v. Anthony Gardea*, **19-cr-00022 (EGS) (D.D.C. Aug. 5, 2019)**

In this case, a sentence of time served (7 months and 10 days) was imposed, followed by 120 months of supervised release.  The defendant was found by an undercover agent in an interactive online meeting room where he publicly masturbated through his Webcam while viewing child pornography.

• *United States v. Ryan Young*, **16-cr-00082 (CRC) (D.D.C. Aug. 17, 2016)**

Judge Cooper imposed a sentence of one year and one day imprisonment, to be followed by 60 months of supervised release.  Though the defendant was charged with possession, the defendant sent multiple images of child pornography to an undercover agent, solicited images of the agent's purported 9-year-old daughter, and discussed engaging in sex acts with the purported daughter.  The guidelines range in that case was 108 to 135 months.

52

• *United States v. Mark Misiano*, **16-cr-00048 (RDM) (D.D.C. July 26, 2016)**

A sentence of nine months' imprisonment was imposed, to be followed by 120 months of supervised release. Though the defendant was charged with possession, the defendant distributed multiple pornographic images of prepubescent children to an undercover agent.

• *United States v. Marc Singleton*, **14-cr-206 (RMC) (D.D.C. April 8, 2015)**

Judge Collyer imposed a sentence of one year and a day where Mr. Singleton traveled from Maryland to Washington, D.C., with the intent to engage in illicit sexual conduct with a child who Mr. Singleton believed was eight years old. After a 3-level reduction for acceptance of responsibility, Mr. Singleton's guideline range was 108-135 months.

• *United States v. Thomas DeGrange*, **13-cr-297 (BAH) (D.D.C. February 25, 2014)**

Judge Howell sentenced Mr. DeGrange to 57 months in relation to his convictions for traveling with intent to have sex with a minor and possessing child pornography. In this case, Mr. DeGrange traveled to Washington, D.C., to have sex with a purported 12-year-old girl. Condoms, lubricant, and prolonging gel were recovered from Mr. DeGrange's vehicle. When his residence was searched, child pornography depicting prepubescent children and other depictions of violence were found.

• *United States v. Wesley Hawkins*, **13-cr-00244 (KBJ) (D.D.C. Nov. 22, 2013)**

Mr. Hawkins was charged with possession, but also communicated with and sent child pornography to an undercover officer. Mr. Hawkins sent the officer a video of child pornography, uploaded to a website controlled by YouTube videos depicting child pornography, and uploaded images depicting child pornography to Microsoft's file share site, Skydrive. Mr. Hawkins's guidelines range was 97 to 121 months. Judge Jackson sentenced Mr. Hawkins to 3 months' incarceration, and 73 months of supervised release.

53

• *United States v. Peter Zagorski*, 11-cr-351 (BAH) (D.D.C. October 9, 2012)

Defendant sentenced to 99 months in distribution of child pornography and attempted coercion and enticement of a minor case where Guidelines range, after adjusting downward for acceptance of responsibility, was 262-327 months. Defendant's relevant conduct included distribution for a thing of value, prepubescent minors/minors under 12, sadistic, masochistic and/or violent material, and more than 600 images. In this case, defendant distributed multiple videos of child pornography to an undercover police officer. Several of the video files depicted nude prepubescent children being vaginally or anally penetrated by an adult male penis or finger, including at least one of these files showing the child bound in restraints. After an undercover officer claimed that he was sexually active with his girlfriend's purported 12-year-old daughter, Mr. Zagorski asked if he could speak with the purported 12-year-old by telephone and suggested having a web camera session to see the girl nude. Mr. Zagorski also expressed an interest in traveling from Pennsylvania to Washington, D.C., to engage in sex acts with the purported 12-year-old child.

**4.    Cases in Other Districts in Which the Conduct is Similar to, or More Serious Than, Mr. Johnson's Conduct**

• *United States v. Sprecher,* 19-cr-749 (JPO) (S.D.N.Y. March 18, 2021)

In this possession of child pornography case, the Court imposed a sentence of probation despite the government's request for a sentence within the applicable guideline range.

• *United States v. Liddy*, 19-cr-1685 (CAB) (S.D.C.A. September 2, 2020)

Mr. Liddy was convicted of possession of child pornography after a bench trial and he was sentenced to a five-year probationary sentence.

54

• *United States v. Benton*, 16-cr-287 (RAL) (M.D. Fla. December 8, 2017)

In this case, where the defendant admitted to visiting websites dedicated to child pornography for more than fifteen years, the Court imposed a sentence of probation.

• *United States v. Maliza*, 13-cr-628 (FB) (E.D.N.Y June 19, 2015)

In this case, Mr. Maliza was sentenced to a term of probation for three years where the conduct included possession and distribution of child pornography.

• *United States v. Teves*, 11-cr-10351 (JLT) (D. Mass. July 26, 2012)

Mr. Teves pled guilty to possession of child pornography, but his conduct included distribution. Mr. Teves was sentenced to probation.

•*United States v. Campbell*, 09-cr-3023 (RGK) (D. Neb. September 14, 2010)

In this possession of child pornography case, the applicable guideline range was 51-63 months. Mr. Campbell was sentenced to a period of probation.

• *United States v. Pustis*, 10-cr-60038 (HO) (D.OR August 24, 2010)

Although Mr. Pustis pled guilty to possession of child pornography, his conduct included distribution of child pornography. He also had a prior misdemeanor conviction. The government sought a sentence of 87 months, but the Court sentenced Mr. Pustis to probation.

• *United States v. Flores*, 09-cr-60100 (AA) (D.OR July 22, 2010)

Mr. Flores was sentenced to five years of probation in a case involving both the distribution and possession of child pornography.

• *United States v. Applequist*, 09-cr-120 (JWS) (D. Alaska June 11, 2010)

Mr. Applequist pled guilty to possession of child pornography. His conduct involved multiple purchases relating to child pornographic material, including five purchases totaling

55

$484.00 within a two-month period.  Mr. Applequist was sentenced to a period of probation for five years.

> • *United States v. Victor*, 08-cr-5821 (RJB) (W.D. Wash. January 29, 2010)

In this case, the court imposed a one-day time-served sentence in a possession of child pornography case where the guideline range was 121-151 months.  The government agreed to a downward variance of 14 levels, 8 levels of which were due to the following factors: 1) Mr. Victor's participation in a psychosexual evaluation; 2) the evaluator's assessment that there is a "low risk" that Mr. Victor will reoffend; and 3) Mr. Victor's weekly participation in treatment prior to sentencing.

> • *United States v. Gonzalez*, 07-cr-328 (JCC) (W.D. Wash. March 27, 2009)

The Court imposed a one-day time-served sentence where defendant possessed thousands of images and was involved in trading images.

> • *United States v. Connelly*, 17-cr-830 (JHR) (D.N.J. December 17, 2008)

Mr. Connelly pled guilty to possession of child pornography and he stipulated to various sentencing enhancements, including images of minors under the age of 12, sado-masochistic images, use of computer, and more than 600 images.  The court imposed a sentence of probation.

### F.    Need to Provide Restitution, § 3553(a)(7)

The PSR states that restitution in this case is mandatory.  *See* PSR at ¶ 157.  Mr. Johnson disagrees.  The statutes cited in the PSR as authority for the position that restitution is mandatory—*i.e.*, 18 U.S.C. §§ 2259(b)(2) and 3663A—do not support the PSR writer's position in Mr. Johnson's case.  18 U.S.C. § 2259 requires defendants "convicted of trafficking in child pornography" to pay restitution "in an amount to be determined by the court."  18 U.S.C. §

(Page 225 of Total)

2259(b)(2).  Because, as discussed in detail above, Mr. Johnson was not convicted of

"trafficking" child pornography, this statute does not apply to his case.  The PSR further cites to

18 U.S.C. § 2259(c)(3), which states that "'trafficking in child pornography' means conduct

proscribed by section . . . 2252" as well as other specifically referenced sections in Chapter 110

of Title 18 of the United States Code.  Because § 2252 criminalizes a wide range of child

pornography-related conduct, including merely the possession and receipt of child pornography,

"trafficking child pornography" cannot possibly include all offenses proscribed by section 2252.

*See* 18 U.S.C. § 2252.  While some conduct covered by section 2252, such as distribution and

selling child pornography, is the type of "trafficking child pornography" conduct for which

mandatory restitution applies, other section 2252 conduct, such as possession, receipt, and the

type of transportation that Mr. Johnson was convicted for, does not mandate restitution.  *Id*.

Mr. Johnson is also not required to pay restitution under 18 U.S.C. § 3663A.  Restitution

is mandatory under § 3663A only for convictions for "a crime of violence," "an offense against

property," offenses "relating to tampering with consumer products," and offenses "relating to

theft of medical products."  18 U.S.C. § 3663A(c).  Because Mr. Johnson was not convicted of

any of the type of offenses described in § 3663A(c), section 3663A's mandatory restitution

provision does not apply in Mr. Johnson's case.

Although Mr. Johnson is not required to pay restitution, this Court has discretionary

authority to order restitution in this case based upon the offenses of conviction.  *See* 18 U.S.C. §

3663(a)(1)(A) ("[t]he court, when sentencing a defendant convicted of an offense under [Title 18

and other specifically identified sections of other titles in the United States Code] *may* order . . .

that the defendant make restitution to any victim of such offense") (emphasis added).

(Page 226 of Total)

If the Court enters an order of restitution, that order must be based on the four images Mr. Johnson was convicted of transporting and possessing. *See generally United States v. Pole*, 741 F.3d 120, 127-129 (D.C. Cir. 2013) (holding that the restitution order "suffers from a more fundamental defect" because "nothing in the record supports the government's assertion that the jury [through its verdict] or district judge actually found a scheme of such duration."); *see also United States v. Udo*, 795 F.3d 24, 33-34 (D.C. Cir. 2015) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990) (holding that Congress "authorize[d] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction")). And, in determining the proper amount of any restitution Mr. Johnson should pay, restitution "shall be based on the amount of public harm caused by the offense." 18 U.S.C. § 3663(c)(2)(A).[42]

Whether evaluating the amount of public harm caused by the instant offense or Mr. Johnson's relative role in the causal process that underlies any identifiable victim's losses, a relatively low amount of restitution is warranted. The burden of demonstrating any amount of loss sustained by a victim, to be met by a preponderance of the evidence, is on the government. *See* 18 U.S.C. § 3664(e); *see also United States v. Bryson*, 485 F.3d 1205, 1208 (D.C. Cir. 2007) ("The Government must prove at sentencing that its proposed restitution figure is supported by a preponderance of the evidence."). Mr. Johnson's relative role in the causal process was also minimal, even according to the government. Mr. Johnson's offense conduct is limited to possessing child pornography on his computer and uploading it to his own Google Drive folder. He did not produce any child pornography; he did not advertise any child pornography; he did not distribute child pornography; and he did make his Google Drive folder available to anyone

---

[42] If restitution is ordered under section 2259's mandatory restitution provision, "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B).

58

else.  Under the government's allegations he was a passive consumer of five files containing illicit material, two of which depicted the same video.  *See* ECF 115, 116, 138, and 166.

For these reasons, any restitution order should not exceed $3,000 per identifiable victim. Because there are at most four separate identifiable victims in this case, the final order should not exceed $12,000.

## IV.   FINANCIAL ABILITY TO PAY A FINE

Mr. Johnson's financial condition has changed drastically since he self-surrendered in April of 2024.  The profitable business that he ran since 2018 was forced to abruptly shut down due to his incarceration.  PSR at ¶¶ 110, 111.  Thus, as noted by the Probation Office, his "business presently has no value."  *Id.* at ¶ 122.  His only other sources of income are interest on his bank accounts, dividends from his stock holdings, and rent from a rental property.  *Id.* at ¶ 123.

Without his business income, Mr. Johnson's expenses now vastly outpace his income, and he will also likely pay restitution here.  The PSR writer noted that Mr. Johnson's most recent tax return shows that expenses associated with his rental property were more than $30,000 higher than the income he earned from his rental properties.  *Id.*  Those expenses, including utilities, occasional repairs and other payments have only increased since.  He also incurs regular legal fees, has two mortgages with a total balance of nearly two million dollars, as well as an auto loan with a balance of $46,254.  *Id.* at ¶¶ 124, 125.  His credit card debt has also increased.  *Id.*  As explained to the Probation Office in his Objections to the Draft Presentencing Report, Mr. Johnson's negative cash flow every month is more than five thousand dollars and, at this rate, he will eventually run out of his savings.  Put simply, he is unable to pay a fine.

59

**V.    CONCLUSION**

For the above-mentioned reasons, and any others the Court finds just and proper, the

Court should impose a sentence of sixty months, to be followed by five years of supervised

release.

Dated: October 24, 2024                    Respectfully Submitted,

*/s/ Jonathan Jeffress*
Jonathan Jeffress (D.D.C. No. 479074)
Courtney R. Forrest (D.D.C. No. 996740)
Tony Miles (D.D.C. No. 484450)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
jjeffress@kaiserlaw.com
cforrest@kaiserlaw.com
tmiles@kaiserlaw.com

*Counsel for Stephen Johnson*

60

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October 2024, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the District of

Columbia Document Filing System (ECF) and the document is available on the ECF system.

<div align="right">

*/s/ Jonathan Jeffress*
Jonathan Jeffress

</div>

61

# EXHIBIT A

Pastor Reginald Mazyck



June 6, 2024

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Nichols,

I am submitting this letter attesting to the character of Stephen Johnson for your consideration as you make your decision regarding sentencing.

I have known Stephen for over 30 years. His mother and I served as Associate Pastors at Hope Christian Church in Beltsville, MD.

Our families first met during a Christian small group meeting. Stephen is a couple of years younger than my son, Marques. The families bonded and I became a mentor for Stephen, whose father Hugh Johnson, an aide to Congressman Mickey Leland, died a few years earlier in the tragic plane crash that took the life of the congressman and others as they traveled to Ethiopia on a humanitarian mission.

Stephen has always been very respectful and has openly received direction. He has always demonstrated care and concern for others, even to the extent of giving away his possessions to other children who had less than him.

My time with Stephen increased during his teenage years, as he and Marques attended the Saint Albans School for middle school and high school, including a few months during which he lived with our family. It was during that time that our relationship strengthened. A couple of highlights of our time together during those years were trips we took to Myrtle Beach and Williamsburg.

The Williamsburg trip provided an opportunity for the Stephen and Marques to visit the College of William and Mary, prior to Marques submitting his application for acceptance. This trip is worth mentioning because my car's transmission failed twelve miles outside of Williamsburg. In the midst of this adversity, I observed Stephen's strength of character, as he endured the hardship without complaint. Instead, he offered to assist in any way he could, including offering to push the car to the nearest exit. It sounds like a small thing but it demonstrated to me that willingness to help and having a concern for others are strong characteristics Stephen possesses.

The Myrtle Beach trip was a rites of passage event, where another mentor and I shared Christian principles of manhood with Stephen and Marques while also enjoying a little golf. They both embraced these Godly principles of integrity and forthrightness and used them to mold their character.

I ask that you consider Stephen's character, including the respectful demeanor you observed in the courtroom, and forthrightness, as well as the time spent under house arrest as he awaited trial, when considering Stephen's sentence.

Respectfully,

*Reginald Mazyck*

Reginald Mazyck
Associate Pastor
Hope Christian Church

JA2414

# EXHIBIT B

The Honorable Carl J Nichols

Ref:  Stephen Johnson Case


Dear Judge Nichols:


I am writing to you to provide a character reference for Stephen Johnson.  I am Stephen's uncle by marriage, have known him for over 30 years, and have watched him grow from a small boy to a caring an admirable adult.  I have interacted with him countless times, at large family gatherings, smaller family meals, and one on one on multiple occasions.  He also worked for me as a summer intern at my real estate / construction business.  In sum, I know him quite well.


I met Stephen shortly after the tragic death of his father, which obviously affected him greatly.  Growing up, Stephen was unfailingly polite, soft spoken, kind and curious.  Although I never tried to "replace" his father, I strove to provide him with an older male role model, and we grew close over the years.  Stephen also became close with my three children, who saw him as an "older brother" type figure.  Even though he was several years older than them he would always take the time to play with them and otherwise let them know that they were important to him.  Two of my children were girls, and he often spent time unsupervised with them.  I never felt uncomfortable with that arrangement, and they never reported anything out of the ordinary.  Also, Stephen took particular care to respect his grandparents – I would often see him patiently listening to their stories, which I know he had heard dozens of times in the past.

Stephen's great passion was travel, and I always admired his bravery in picking up and moving to the far corners of the globe for months at a time with only a rudimentary plan of where he would stay and how he would live.  He explained to me that part of his confidence in undertaking these adventures was his faith in the good nature of people and his ability to forge friendships across diverse cultures.  He told me many stories of his arriving in a country without knowing a soul, and then rapidly establishing new connections that he would nourish over time.  Stephen always saw the good in other people, and I found it heartwarming to hear his stories about the connections he made in his travels.

Stephen is well-read and extremely intelligent, and shared my interest in business and entrepreneurship, and I enjoyed our many discussions on these topics. But even more so

than his technical knowledge, I was proud of the way that Stephen used his respect for and empathy with other business owners to make his own business a success.

Thank you for allowing me to submit these impressions of Stephen, and I hope that you will take these into account in your sentencing decisions.

Sincerely,

Adrian G. Washington

# EXHIBIT C

Dear Judge Nichols,

I would like to start by thanking you for allowing our family time together before my brother, Stephen Johnson, turned himself in after the verdict in his case this past April. This space gave us the chance to come together at my brother's home with his wife, to try to bottle up the feeling of his presence before watching the holding facility gate seal behind him the next morning. This last family gathering can only be described as a short breath of air while being pulled through the interminable undertow of this process.

Throughout my professional work within the justice system over the past decade, which includes my current role as the Legal Advocacy Coordinator with the American Civil Liberties Union of Maryland, I have supported many similarly situated families who are often not shown such needed care during an adversarial process that is generally impervious to their grief. While I have worked alongside many other sisters, mothers, wives, and extended family members as they offered letters of support on behalf of their loved ones, doing the same now for my brother feels like an impossible task.

Apart from the general difficulty of describing all my brother's admirable qualities, there is simply no way to adequately articulate the immeasurable value of his presence in my life. As many of our loved ones have shared, my brother stands apart as a leader within every community that surrounds him. While we certainly had our fair share of sibling squabbles growing up, I was always eager to tagalong with him and his friends because of how much I look up to him.

In addition to being the coolest big brother, he has been one of the primary people I have relied on to help fill the void left by our father's death during a humanitarian mission when my brother was two and I was six months old. When a stranger with bad intentions came into my mother's house while I was there alone several years ago, I called my brother and he came immediately; without his protection and help calling law enforcement, this incident could have been much worse. He was also the one I called when I felt alone during a later period of emotional distress, and he again immediately came to support and comfort me through that difficult time.

As a survivor of sexual trauma, my heart has been repeatedly torn by every aspect of this case. The only saving grace has been the hope that you will show mercy in making the difficult decisions before you, and allow my brother to come home as soon as possible.

Sincerely,

Dara Johnson

# EXHIBIT D

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW, Washington, DC 20001

June 7, 2024

Re: Character Reference for Stephen Johnson

To The Honorable Carl J. Nichols,

My name is Patricia Johnson. I am writing this character letter on behalf of my son, Stephen Johnson, the eldest of my two children. His sister, Dara, is 17 months his junior. In order to provide my perspective about his character, I would like to provide a few very brief details about Stephen's upbringing. In 1989, my late husband, Hugh Johnson, Jr., was killed in a plane crash in Ethiopia. He was on a humanitarian mission with the late Congressman Mickey Leland. Hugh was an attorney, and a professional staff member of the Select Committee on Hunger in the U.S. House of Representatives. I raised Stephen and his sister with the help of my family, and my faith in God.

As a young man Stephen displayed leadership, compassion and an entrepreneurial spirit. He could be found constructing  a skateboard ramp out of recycled materials and organizing a neighborhood snow shoveling business in the winter, and leave raking in the fall.

As a teenager, some of Stephen's peers began to fall victim to the pressures of violence and crime. As a pastor at the time, my church community was a place that provided support to me as a single mother raising two children. At age 13, Stephen and I raised funds  to allow him to  participate in a missions trip to Jamaica. To this day, he credits this experience as igniting his passion for travel and service to others.

Stephen attended St. Albans High School in Washington, DC from grades 6 to 12. We lived in Mitchellville, Maryland during that time. This meant that Stephen's circle of friends included people from St. Albans and from our neighborhood in Mitchellville, Maryland. In terms of Stephen's character, his experiences at school and at home helped to form a well-rounded young man, who appreciated people from all walks of life. After graduating from St. Albans, he enrolled as a  business major at Florida A&M University. However, an injury to his foot and family financial constraints  resulted in the need for Stephen to return to DC, where he completed his degree at the University of the District of Columbia (UDC). Stephen wanted to study abroad, but at the time UDC did not have an active study abroad program. He submitted a proposal and  became the first student from UDC to study abroad through the Cultural Experiences Abroad (CEA) program in Rome, Italy. He was recognized for his leadership on this initiative by the Dean of the business school, and his effort paved the way for greater participation in study abroad programs for UDC students. In fact, Stephen met the woman who would become his wife, Adanna through this program.

After earning a Bachelor of Science degree in Business Administration, Stephen  worked for traditional marketing firms for a couple of years. However, he wanted to be an entrepreneur. He moved back home and I personally observed his journey in becoming a successful entrepreneur. Taking advantage of the growing interest of African American millennials in travel, Stephen built a successful travel business

JA2421

aimed primarily at this market. During this season of time, Stephen invited me and my daughter to events that highlighted the lives of young African American men and women, just like my son, who desired to live or travel abroad.

Stephen's business ideas always included a way to incorporate helping others. This dual focus was aided by the examples of service from his late father, my emphasis on service and what I believe is inherently a part of his nature. Stephen responded to my request for sponsors for orphans I met in Uganda while teaching in Uganda on a Fulbright Scholarship in 2012-13. In 2018 I returned to Uganda to visit an organization called Northern Uganda, Widow and Orphan Support Organization (WOSO). Stephen went with me and did the following while there:

1) Met with the founder of WOSO about he could help him increase the organization's impact through better marketing and outreach, and to donate funds to help expand the organization's work in helping widows and orphans, and,

2) To conduct a free all-day works workshop for Ugandan entrepreneurs, some who were former students of mine and some who were not. Stephen paid his way to Uganda and for the set up and materials to conduct the workshop in a rented space.

I can personally attest to Stephen's generosity of spirit from emails I have received from individuals who have benefited from his help in some way. A few additional examples include at the request of a local church pastor, he participated in a missions trip to provide clothes and materials to children in one of the poorest slums in Guatemala, he volunteered to speak with students from Pepperdine University about inter-cultural competence based on his global travel experience, organized a large block party in our very diverse DC neighborhood to bring people together (i.e., wealthy, low-income, blacks, whites, Latinos, young and old), and conducted a free stock market seminar in 2020 for several women over the age of 60, in which I also participated.

Your honor, as you know Stephen was under house incarceration for over two years and now is incarcerated as he awaits sentencing. As his mother, I humbly ask that if possible, this time and this letter be taken into consideration as you decide his sentence.

Thank you in advance for your consideration.

Sincerely,

Patricia R. Johnson, PhD

JA2422

# EXHIBIT E

(Page 242 of Total)

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

June 4, 2024

To The Honorable Carl J. Nichols,

This letter is my personal character reference for Stephen Johnson. I have been a close family friend of the Johnson's for 11 years and I have come to know Stephen through the friendship I have with his mother. I am an ordained minister and a former professor at Howard University. I am writing this letter to offer a fuller picture of Stephen Johnson, as a person.

Stephen grew up with Christian ethics and values has shown himself to be a spiritual young man. This is evidenced in many ways including his regular participation in his church, and in the way he and his wife Adanna communicate to others about their faith. It is also demonstrated in the compassionate way his faith has been expressed throughout his life.

Like his late father, he is committed to caring for others less fortunate than himself and solving global problems. One such example is from approximately 6 years ago. Stephen invited a few family members and friends to gather together at his apartment on Christmas morning to distribute hats, gloves and coffee to individuals living on the streets of Washington, DC. I was very impressed that Stephen would organize such an event and was impressed with his leadership as well as the strong character and compassion for others exhibited by this act.

Another example of Stephen's character was when he accompanied his mother on a trip to Uganda to assist her in providing professional training to Ugandan entrepreneurs. Stephen understood that the entrepreneurs present at the workshop had limited resources. He paid for his expenses to Uganda and agreed to provide free digital marketing training to the workshop participants at an all-day workshop. Stephen later highlighted the entrepreneurs on his travel blog and encouraged family and friends including me to financially donate to needy individuals (children and adults) in Uganda.

I am confident in Stephen's core values which he has consistently demonstrated in the examples discussed above and in many other ways. Your honor, I am not overstating it, when I say that I have not met many young men like Stephen in my 73 years of age. Thank you for taking my thoughts about Stephen into your sentencing considerations. If you have any further questions, please do not hesitate to contact me.

Sincerely,

*Dr. Denise King-Miller*

Reverend Dr. Denise King-Miller

# EXHIBIT F

Donna Mazyck



June 7, 2024

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Nichols,

For two decades, I have been a licensed clinical professional counselor in Maryland; I recently retired as executive director of the National Association of School Nurses. I have known Stephen Johnson for 30 years. We met while our families attended the same faith community. At the time I met Stephen, he was six years old, and he, his mother, and sister had been living through the impact of bereavement for four years after his father, Hugh Johnson, died in an airplane crash while on a humanitarian mission in Ethiopia. Our families became close friends.

Stephen and my son were peers and attended the same middle and high school. For a few months, my husband and I welcomed Stephen to stay in our home during the school week in order to assist with the long commute to school. Stephen and I regularly conversed throughout his secondary school years. His speech and actions were always respectful, transparent, and polite. He spoke to me about what he liked about school and what he enjoyed recreationally. Stephen lives with an attitude of thanksgiving. I found out he was interested in drums. My son had a set of drums he no longer used, so my family made the drum set a gift to Stephen. As usual, Stephen expressed his gratitude for the gift and also his appreciation for our awareness of his interests.

As Stephen matured and started his university education, we chatted about his growing interest in business when he was home during breaks from school. In his conversations, he discussed the good he could accomplish for people who lacked basic needs in life. This mindset was similar to that of his parents in their careers. He sought to do justly, love mercy, and walk humbly with his God as noted in the Bible (Micah 6:8). Through the years, I had opportunities to keep up with Stephen's adult and early career years. He remained connected to family and friends, as well as engaging and sharing his career dreams to positively influence the well-being and circumstances of people in underserved communities. For example, he provided financial support for orphans in Uganda and also financially supported the orphanage director for a year. More recently, my husband and I spent time with Stephen and his wife at their church service and noted that he continues to live out his values to give his time and talent to others, as well as to grow in times of difficulty.

Your Honor, I ask that you consider these aspects of Stephen Johnson's character when making your sentencing decision. Thank you.

Sincerely,

*Donna Mazyck*

Donna Mazyck

# EXHIBIT G

**Adanna Johnson**



31st May 2024

**The Honorable Carl J. Nichols**

U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Nichols,

The purpose of this letter is to provide a clearer depiction of who Stephen Johnson is and how he actively makes the life of those that have met him and know him better.

I first met Stephen at University of the District of Columbia in 2011. We were both marketing students with a curiosity to expand our world through education and experiencing more of the world. We met after having completed study abroad experiences through the university. As a part of that experience we did a presentation on campus to support the university's goal of having more students utilize the study abroad opportunities that were available to them.

I know Stephen in a different way today because I married him about 10 years after we first met. We were married by his mother in 2022. Stephen is still the vibrant man that I first met over a decade ago. He is curious to learn and affect change in our local community and communities abroad. I see this come to life through his generosity. He is generous whenever he sees an opportunity to be generous. Most people are probably more like myself in that they have a few causes that they give to, and they aren't so generous with their time. My husband is the opposite, he is generous with his time, taking time to make even strangers feel heard. It's not uncommon for him to talk to older neighbors about everything, and nothing at all. I have seen him on numerous occasions taking time out of a busy workday to be a thought partner with friends looking for career advice, business advice and life advice. Stephen is generous in sharing his ideas; what he says to me is that he can share his best ideas with anyone because most people won't put in the work. It's what makes Stephen so different. He's willing to work to accomplish his hopes and dreams.

My husband is also generous with his financial resources. He gives generously to our church, to multiple charities in Africa, and the unlimited fundraising seen throughout the streets of the city. Through seeing my husband's generosity and us growing in our faith, I have been personally impacted to go beyond the causes I support and seek to be generous on every occasion.

My husband has been personally generous to me. Since our marriage in 2022, my husband has embodied the role of provider in our household. This has personally impacted not only my life but the life of women with whom I am connected to; it provides a fresh example of traditional roles within a marriage.

I love my husband and want the opportunity for us to learn and grow together. We want to accomplish plans and dreams that benefit generations to come. There was no plan for the extreme circumstance that we find ourselves in today. But here we are. During the past three years that were spent seeking freedom for my husband, I have seen him learn, grow and become a better man. He has grown closer to God and has reflected on how worldliness leads only to destruction. We want the opportunity to walk in the grace and freedom that we have come to believe in. We want the opportunity to use all of our experiences, the good and the bad, to make a positive impact in society.

Sincerely,

Adanna Johnson

# EXHIBIT H

(Page 249 of Total)

The Honorable Carl J. Nichols
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW, Washington, DC 20001

June 5, 2024

Re: Character Reference for Stephen Johnson

To The Honorable Carl J. Nichols,


I Patric Holly am writing this character reference letter about Stephen Johnson who has been my friend for over 30 years. I am 35 years old, married and have a one-year-old daughter. Stephen and I grew up together in Mitchellville, Maryland. Our houses were near each other and he and a couple of other guys in the neighborhood became close friends. Our neighborhood was a very close-knit neighborhood where our friends had sleepovers at each other's houses, our parents organized block parties, and took turns taking us to places like Six Flags during the summer. It was the kind of neighborhood where our parents knew each other and knew each of our friends very well.

Stephen and I have remained close friends for all of the years we have known one another up to the present day. He was the first person to go to college from our group of friends. He went to Florida A & M University in Tallahassee, Florida.

I graduated from high school a year after Stephen and wasn't sure whether I wanted to go college or not. I asked Stephen if I could stay with him awhile in Florida to think about what I wanted to do. Stephen let me stay with him for a few months without paying rent or paying for food until I got a job and could contribute. As one of my closest friends, I have learned more from him about character, business and leadership than anyone I know. I give Stephen the credit for helping me decide to go to Florida State University and helping me begin my career as a Health IT consultant, where I am now a EHR Integrations & Automation Lead at Aledade, Inc.

In fact, Stephen has been a prime example of someone who goes out of his way to help people in need. For several years when we were young, Stephen's family would get up early on Christmas morning and drive to DC to give food and gifts to homeless people on the street in DC. One year Stephen asked if I wanted to go with them. He told me that he didn't want to go the first year his mother asked him and his sister to get up early and go to DC before opening their presents. But after doing it for a couple of years, he looked forward to it. I told Stephen no at the time.  To be young and not mind getting up early on Christmas morning to give food to homeless people before you opened your own Christmas gifts is just one example of the kind of person Stephen is. Other examples of his character are the times that I saw Stephen talking with guys in our neighborhood who had been in trouble with the law or were headed that way. He gave them advice about how to apply for a job or start a business like he had done. As a close friend, I have been with him in all kinds of situations.

Stephen's exceptional kindness, compassion and integrity have made him a role model for many people that I know, including me, and he has so much more to give. Your honor, I ask that you please take all of this into consideration in your deliberation about Stephen.

Thank you.

Sincerely,

Patric Holly

# EXHIBIT I

(Page 252 of Total)

Honorable Carl J. Nichols,

Dear Judge Nichols,

I am writing to provide a character reference for my nephew, Stephen Johnson, the son of my sister Patricia. I have known Stephen his entire life, first as a nephew, son, grandson, and then as a cousin to my three children.

As for my background, I am an attorney and have been a member of the District of Columbia bar since 1991. I have three children, aged 29, 26, and 20, and I have been married to Adrian Washington for approximately 30 years.

Stephen's father died tragically in a plane crash while on a humanitarian mission to deliver supplies to an Ethiopian refugee camp. His father's death and legacy of caring for others profoundly impacted Stephen. Guided by his mother, Stephen and his sister have dedicated hundreds of hours over the years volunteering for various organizations and causes.

Stephen is unfailingly kind and considerate. He has a deep sense of responsibility and duty to care for those around him. He has consistently demonstrated this caring nature, starting from his role as a supportive son to his mother. Stephen has been a rock and steady support for his mother as she navigated widowhood and the challenges of raising two young children on her own. Stephen had a severe, life-threatening asthma condition growing up. We thought we would lose him several times. He endured a lot. But, through his health challenges he was undoubtedly the one comforting us, the adults in his life, and letting us know that he was going to be alright.

Stephen has been an exceptional brother to his sister Dara. He is a wonderful grandson and nephew. He never forgets a birthday, Mother's Day, or holiday, always showing his family how much he values and cares for them. Despite the challenges he has faced in recent years, Stephen has remained a positive influence on my children, encouraging them in their educational and career pursuits and supporting my son through high school during the pandemic.

One notable example of Stephen's dedication is his support for a school in Uganda initiated by his mother. Stephen was the first to offer full financial support for this cause and has continued to do so for years.

The recent events in Stephen's life have had a profound impact on him and our entire family. However, I firmly believe that given the opportunity, Stephen can recover and will go on to lead a meaningful, productive, and law-abiding life.

I am grateful for the opportunity to provide this letter on behalf of Stephen as you consider his sentence.

Thank you.

Respectfully submitted,

Donna Rattley

JA2434

# EXHIBIT J

Dear Judge Nichols,

My name is Sarah Vaughn, and I write to express my support for Stephen Johnson as you consider his case. I am a graduate of Vanderbilt University and currently work as a high school health teacher.

I met Stephen when his sister, Dara, and I attended National Cathedral School (NCS), while he was across the street at St. Albans (STA). Dara and I have been friends for decades, and when my mother went on business trips, I would stay with Dara and Stephen. Over the years, we developed a close bond.

In the fall of 2011, while I was studying abroad in France, I knew Stephen was in Italy. When I had the opportunity to visit Rome, Stephen offered to let me stay at his place while he and his flatmates went to Oktoberfest. He lived with five other guys, and although the apartment had the typical bachelor smell, Stephen's side of the room was neat and orderly. It was clear he had done his best to make the apartment more comfortable for my week-long stay.

Stephen welcomed me and treated me like family, not asking for any payment. He was thoughtful, intentional, and caring in his efforts to look out for me.

In 2016, Dara and I both found ourselves in Washington, D.C. Both Dara and Stephen were living in their mother's house, and Stephen often hosted gatherings in the backyard, inviting friends and family. These gatherings became reunions of sorts for graduates of NCS and STA.

We would sit and talk, and I learned about Stephen's business endeavors at the time, which were focused on travel. He had built his business from the ground up, establishing a strong media presence with a large following. I saw how he inspired people to travel to the locales he visited through the comments on his posts. His goal was to share his love of travel with his audience, and he did so very successfully.

Stephen's various business endeavors have always aimed at bringing happiness or peace to his clients in one form or another. He was meticulous about ensuring the safety of those impacted by his business, offering advice on how to travel safely. Again, he was intentional about making sure no harm came to anyone even tangentially affected by his business.

Also in 2016, I had my son, and Dara became his godmother. My son and I attended not only Stephen's gatherings but also many of their family events over the years. Stephen was wonderful with my son, who naturally gravitated toward him as a solid male figure. Even as a young boy, my son was impressed by Stephen's tall stature and strong presence at friend, family, and community gatherings.

I deeply appreciate Stephen's influence in building a sense of community and pursuing entrepreneurial endeavors. As evident in the daily business schedule he kept on a whiteboard visible to anyone who stopped by, he has always been intentional in fostering community through his work. He has also been transparent about his trials and tribulations while building his brand and business. Stephen openly shared that he might not always make the right move the first time, but knew how to rebound from mistakes and become a more grounded businessman.

With this in mind, I ask for grace as you make difficult decisions concerning Stephen's case, and allow him to move forward to continue providing the safe spaces for community that I have enjoyed during the lifetime I have known him.

Sincerely,

Sarah J. Vaughn

Sarah Vaughn

# EXHIBIT K

(Page 257 of Total)

Kimberly Dailey

████████████

████████████

Honorable Judge Carl Nichols

Dear Judge Nichols:

I am writing this letter on behalf of my nephew, Stephen Johnson. I have had the privilege of knowing Stephen all his life, and throughout every stage, I have seen him face life's challenges with compassion, transparency, and dignity. As a clinical social worker and a consultant for the Department of Justice on professional development, I do not take these qualities lightly.

One instance that stands out is when Stephen's mother faced financial difficulties, jeopardizing his college education. At that time, his mother worked as a secretary at our church and could not qualify for another financial loan. Instead of using this setback as an excuse or doing anything less than upright, Stephen courageously took on the challenge. He found a way to fund his own education by working for a DC City Councilman on issues of homelessness.

Stephen's commitment to building a healthy family is another testament to his character. Having lost his father as a child, Stephen often expressed his desire to be the father he never had. Over the years, I have watched him intentionally develop these skills by babysitting his younger cousins and mentoring children at our church. He is always someone you can rely on to show up and lend an extra hand.

Stephen's support extends beyond young children. I will never forget watching him inspire my undergraduate class at Pepperdine University by sharing his recent mission work. Although only a few years older than the students, he motivated them to consider the positive impact they could make by stepping out of their comfort zones to help those in need. Additionally, his patience and kindness are evident in how he listens to his 86-year-old grandmother with dementia recount her favorite childhood memories. Stephen always smiles, nods, and responds as if it's the first time he has heard her story.

In all these endeavors, Stephen demonstrates remarkable resilience, responsibility, and a strong sense of community. His actions reflect a deep-seated commitment to bettering himself and those around him.

I respectfully ask that you consider these qualities and the positive impact Stephen has had on our family and community as you make your decision.

Warmly,

*Kimberly Dailey*
Kimberly Dailey

# EXHIBIT L

(Page 259 of Total)

Dear Honorable Carl J. Nichols,

I have the privilege of having Stephen as my older cousin, and it is from that experience that I can speak to his enormously generous spirit, consideration, and the care that he brings to all those around him. Stephen is 10 years older than me, and we grew up never more than a car ride away. As a result, my older sister, younger brother, and I all spent a lot of time with Stephen. I know without a doubt that we were all better for it. Whether formally babysitting us, or just hanging out at a family function, my parents could always count on our calming, soft-spoken cousin Stephen to look out for us. From a young age, Stephen has been one of the members of our family whom I have felt most comfortable around, and who I knew would be there for me.

Even when I got older, and we were no longer living in the same place, he never missed a happy birthday text or congratulations on a life transition, always cheering me on and letting me know he was supporting me. I know I'm one of many people in our family who received that sort of unconditional and consistent encouragement from him. From his teenage years into adulthood, I have watched Stephen become the respectable family man I always knew he would be. Watching him tend the garden at home he shares with his wife, or mentor my younger brother through his high school years, it's clear how caring of a person he is. I have watched him build a successful life, where family and faith are at the core.

In the years since his trial began, Stephen has remained a light to myself and all those around him. Through letters and visits he's encouraged my doctoral studies and we've bonded over his own intellectual interests, with him suggesting history books and documentaries for me and taking an interest in my research. Despite all he is going through, his primary commitment is always to ensuring that those closest to him are okay, and his stoic strength has been a rock for all of us. He remains extremely committed to his family, and because of this and all of his other wonderful qualities, we remain extremely committed to him.

Sincerely,

Sam Washington

# EXHIBIT M

Dear Honorable Carl J. Nichols,

Your honor, I am writing to you ahead of the sentencing of my cousin Stephen Johnson to give you a better sense of his character. As you can probably already tell from the influx of letters you've received, we're an incredibly close family. And Stephen is at the beating heart of that bond.

I've known Stephen for my entire life. When I was much younger, my mother and I lived with his family and moved out before I can remember. However, we stayed incredibly close. For most of my life, Stephen has been only a short drive away. He's not just a family member but a mentor and role model, particularly as I've pursued a career as a reporter. His unwavering support and encouragement, especially when I land a big story or do a television appearance for work, have been instrumental in my success. He's a major champion of my career, and his influence has been a driving force in my life.

Stephen is undoubtedly one of the kindest and most genuine human beings I've ever met. Regardless of anything else that's going on, he always remembers to ask how I'm doing or check in about significant events. Stephen is the kind of person who dotes on his wife, always calls his mother, and cherishes his family. He's an incredible cousin, son, husband, nephew, and friend, and I am so proud to call him my family. It is my sincerest hope that he will be allowed to join our family on the outside soon.

I earnestly hope that you will consider my words and the words of all of Stephen's loved ones as you make your decision. I am deeply grateful for the time you have taken to read my letter.


Sincerely,

Jessica Washington

# EXHIBIT N

(Page 263 of Total)

USCA Case #24-3162    Document #2102481    Filed: 02/24/2025    Page 264 of 551





JA2446



JA2447



JA2448

USCA Case #24-3162    Document #2102481    Filed: 02/24/2025    Page 268 of 551



JA2449

USCA Case #24-3162    Document #2102481    Filed: 02/24/2025    Page 269 of 551



JA2450

# EXHIBIT O

(Page 270 of Total)

On Thu, Dec 28, 2023 at 5:24 PM The Water Project <noreply@fundraiseup.com> wrote:





## Welcome to The Water Promise Circle!

Hi Stephen,

Welcome to our fantastic community of passionate world-changers! As you likely know, The Water Promise is our commitment to keeping water flowing for every community we serve, and your support as a member of The Water Promise Circle makes that possible.

You'll receive exclusive content from our field experts and direct access to our real-time status reports and project updates.

For those who previously lacked reliable access to safe and clean water, installing a water point unlocks a new future. With time and restored health, opportunities for development, education, entrepreneurship, and even some much-deserved playtime are made possible. That's the power of The Water Promise. That's the power of water you can rely on day after day.

With gratitude,

Peter Chasse
President & Founder
Along with all of us at The Water Project

**The Water Project**
17 Depot Street
2nd Floor
Concord, NH 03301
info@thewaterproject.org
603-369-3858
Tax ID 26-1455510



---

# Official donation receipt

**For income tax purposes**

---

| | |
|---|---|
| **Name** | **Stephen Johnson** |
| | ▇▇▇▇▇▇▇▇ |
| | WASHINGTON, DC 20018-2629 |
| | United States |
| **Donation amount** | **$785.00 USD** |
| **Designation** | Share in a Water Point Renewal and Protection |
| **Donation date** | May 28, 2022, 12:20 AM EDT |
| **Receipt number** | DBTFQXYU |
| **Date issued** | May 28, 2022, 12:20 AM EDT |
| **Location issued** | 17 Depot Street |
| | 2nd Floor |
| | Concord, NH 03301 |
| **Authorized signature** | *R Peter Chasse* |
| | R Peter Chasse - President & Founder |

---

Please print this receipt for tax purposes. As required by the IRS regulations, we provide the following information: The Water Project, Inc. is a 501(c)(3) non-profit organization. (EIN#: 26-1455510) Your donation is tax-deductible to the extent permitted by law. No goods or services were received in exchange for this donation.

**The Water Project**
17 Depot Street
2nd Floor
Concord, NH 03301
info@thewaterproject.org
603-369-3858
Tax ID 26-1455510



# Official donation receipt

**For income tax purposes**

| | |
|---|---|
| **Name** | Stephen Johnson |
| **Donation amount** | $31.70 USD |
| **Donation date** | Jun 28, 2024, 5:24 PM EDT |
| **Receipt number** | DMHTGNQA |
| **Date issued** | Jun 28, 2024, 5:24 PM EDT |
| **Location issued** | 17 Depot Street<br>2nd Floor<br>Concord, NH 03301 |
| **Authorized signature** | |

R Peter Chasse - President & Founder

Please print this receipt for tax purposes. As required by the IRS regulations, we provide the following information: The Water Project, Inc. is a 501(c)(3) non-profit organization. (EIN#: 26-1455510) Your donation is tax-deductible to the extent permitted by law. No goods or services were received in exchange for this donation.

**The Water Project**
17 Depot Street
2nd Floor
Concord, NH 03301
info@thewaterproject.org
603-369-3858
Tax ID 26-1455510



---

# Official donation receipt

**For income tax purposes**

---

| | |
|---|---|
| **Name** | Stephen Johnson |
| **Donation amount** | $31.70 USD |
| **Donation date** | Jul 28, 2024, 5:24 PM EDT |
| **Receipt number** | DSSSRWGK |
| **Date issued** | Jul 28, 2024, 5:24 PM EDT |
| **Location issued** | 17 Depot Street<br>2nd Floor<br>Concord, NH 03301 |
| **Authorized signature** | *R Peter Chasse* |

R Peter Chasse - President & Founder

---

Please print this receipt for tax purposes. As required by the IRS regulations, we provide the following information:
The Water Project, Inc. is a 501(c)(3) non-profit organization. (EIN#: 26-1455510) Your donation is tax-deductible
to the extent permitted by law. No goods or services were received in exchange for this donation.

**The Water Project**
17 Depot Street
2nd Floor
Concord, NH 03301
info@thewaterproject.org
603-369-3858
Tax ID 26-1455510



---

# Official donation receipt

**For income tax purposes**

---

| | |
|---|---|
| **Name** | Stephen Johnson |
| **Donation amount** | $31.70 USD |
| **Donation date** | Aug 28, 2024, 5:24 PM EDT |
| **Receipt number** | DWJASJPF |
| **Date issued** | Aug 28, 2024, 5:24 PM EDT |
| **Location issued** | 17 Depot Street<br>2nd Floor<br>Concord, NH 03301 |

**Authorized signature**

*R Peter Chasse*

R Peter Chasse - President & Founder

---

Please print this receipt for tax purposes. As required by the IRS regulations, we provide the following information:
The Water Project, Inc. is a 501(c)(3) non-profit organization. (EIN#: 26-1455510) Your donation is tax-deductible
to the extent permitted by law. No goods or services were received in exchange for this donation.

# EXHIBIT P

# 2021 Annual Giving Statement

Period: **Jan 1 - Dec 31, 2021**
Issued: **Jan 25, 2022 2:57PM**



**STEPHEN JOHNSON**

**Destiny Harvest Church
DBA Union Church**

**EIN No. 27-4312968**
7195 Oakland Mills Rd, Columbia Maryland 21046
Phone: 4106724260
antoinette.a@theunionchurch.com

### Total tax-deductible

$ **20,000**.00

No goods or services were given in exchange for the listed
contributions other than intangible religious benefits.

### Tax-deductible funds

| FUND | AMOUNT |
|------|--------|
| Tithes | **$20,000.00** |

## Tax-deductible contributions for Jan 1 - Dec 31, 2021

| DATE | METHOD | FUND | AMOUNT |
|------|--------|------|--------|
| Oct 27, 2021 | ACH | Tithes | **$10,000.00** |
| Nov 28, 2021 | ACH | Tithes | **$5,000.00** |
| Dec 29, 2021 | ACH | Tithes | **$5,000.00** |
|  |  |  | **Total tax-deductible: $20,000.00** |

# 2022 Annual Giving Statement

Period:  **Jan 1 - Dec 31, 2022**
Issued:  **Jan 29, 2023 12:31PM**

**union**

**Union Church**

---

**EIN No. 27-4312968**
681 Hollins Ferry Rd S, Glen
Burnie Maryland 21061
Phone: (410) 672-4260
stewardship@theunionchurch.com

**STEPHEN JOHNSON**
600 H ST NE
749
WASHINGTON, DC 20002

## Total tax-deductible

$ **88,000**.00

No goods or services were given in exchange for the listed
contributions other than intangible religious benefits.

## Tax-deductible funds

| FUND | AMOUNT |
|------|-------:|
| Limitless | $33,000.00 |
| Tithes | $55,000.00 |

## Tax-deductible contributions for Jan 1 - Dec 31, 2022

| DATE | METHOD | FUND | AMOUNT |
|------|--------|------|-------:|
| Jan 29, 2022 | ACH | Tithes | $5,000.00 |
| Mar 02, 2022 | ACH | Tithes | $3,500.00 |
| Mar 26, 2022 | ACH | Tithes | $5,000.00 |
| Apr 29, 2022 | ACH | Tithes | $5,000.00 |
| May 28, 2022 | ACH | Tithes | $5,000.00 |
| Jun 29, 2022 | ACH | Tithes | $3,500.00 |
| Jul 20, 2022 | ACH | Limitless | $10,000.00 |
| Aug 02, 2022 | ACH | Tithes | $3,000.00 |
| Aug 28, 2022 | ACH | Tithes | $5,000.00 |

| DATE | METHOD | FUND | AMOUNT |
|---|---|---|---|
| Sep 28, 2022 | ACH | Tithes | $5,000.00 |
| Oct 25, 2022 | ACH | Tithes | $5,000.00 |
| Nov 29, 2022 | Card | Tithes | $5,000.00 |
| Dec 11, 2022 | Card | Limitless | $23,000.00 |
| Dec 26, 2022 | Card | Tithes | $5,000.00 |
| | | **Total tax-deductible: $88,000.00** | |

# 2023 Annual Giving Statement

Period: **Jan 1 - Dec 31, 2023**
Issued: **Jan 31, 2024 9:43AM**



**Union Church**

**STEPHEN JOHNSON**
600 H ST NE
749
WASHINGTON, DC 20002

**EIN No. 27-4312968**
681 Hollins Ferry Rd S, Glen
Burnie, Maryland, 21061
Phone: (410) 672-4260
stewardship@theunionchurch.com

## Total tax-deductible

$ **46,300**.00

No goods or services were given in exchange for the listed
contributions other than intangible religious benefits.

## Tax-deductible funds

| FUND | AMOUNT |
| --- | --- |
| Tithes | **$46,300.00** |

## Tax-deductible contributions for Jan 1 - Dec 31, 2023

| DATE | METHOD | FUND | AMOUNT |
| --- | --- | --- | --- |
| Jan 28, 2023 | Card | Tithes | **$5,000.00** |
| Feb 28, 2023 | Card | Tithes | **$2,500.00** |
| Mar 24, 2023 | Card | Tithes | **$3,000.00** |
| Apr 27, 2023 | Card | Tithes | **$3,000.00** |
| May 26, 2023 | Card | Tithes | **$5,000.00** |
| Jun 26, 2023 | Card | Tithes | **$5,000.00** |
| Jul 26, 2023 | Card | Tithes | **$5,000.00** |
| Aug 28, 2023 | Card | Tithes | **$5,000.00** |
| Sep 25, 2023 | Card | Tithes | **$3,800.00** |

| DATE | METHOD | FUND | AMOUNT |
|---|---|---|---|
| Oct 30, 2023 | Card | Tithes | $4,500.00 |
| Nov 27, 2023 | Card | Tithes | $3,000.00 |
| Dec 27, 2023 | Card | Tithes | $1,500.00 |
| | | | Total tax-deductible: $46,300.00 |

# EXHIBIT Q

Andrew T. Dailey

████████████████████

June 18, 2024

The Honorable Carl J. Nichols
United States District Court
District of Columbia

Dear Judge Nichols:

Thank you for the opportunity to write this letter in support of Stephen Johnson, my nephew in marriage. I met Stephen in 2017 at a family gathering and was immediately impressed with his maturity and deportment.

Since I am one of the newest family members, and because of my professional background, I believe I can write about Stephen from a unique perspective. My undergraduate major was Decision Sciences. I have a Master of Divinity degree in Pastoral Psychology which included extended training in a state hospital. I also completed all coursework and advanced to candidacy for a Ph.D. in Clinical Psychology. I was ordained as a minister in 1989 and have established counseling ministries in various churches across the country. I was also a senior director at the American Psychological Association where I supported, trained, and mentored graduate students and early career psychologists from all over the United States.

Having worked as a leader, minister, counselor, mentor, teacher, and trainer, I had the opportunity to assess the character of many young adults. I can assuredly state that Stephen stands out as very intelligent, responsible, and respectful. I've had the opportunity to minister to him and found him to be quite sensitive, open, and genuine. I've watched him decide to engage in very difficult conversations, that most people would avoid, with grace and courage. He and I have talked about helping those in society who struggle to thrive. I know beyond a shadow of a doubt that Stephen can make a tremendously positive impact on our society.

Thank you for your consideration.

Sincerely,

*Andrew T. Dailey*

Andrew T. Dailey, MDiv, MS, CAE

████████████████

# EXHIBIT R

(Page 284 of Total)

# University of the District of Columbia

Be it known that

By virtue of the authority vested in the Board of Trustees and
upon recommendation of the faculty in recognition of the successful

completion of the requisite course of study
the Board of Trustees confers upon

### Stephen Johnson

the degree of

## Bachelor of Business Administration

### Marketing

In testimony whereof, we have affixed our signatures
this 10th day of August, two thousand twelve

*Christopher D. Bell*
Chairperson of the Board of Trustees



*Maurice Edington*
President

1A-2466

# EXHIBIT S

(Page 286 of Total)

Brenda Donald



June 12, 2024

The Honorable Carl J. Nichols

Dear Judge Nichols:

I am writing this letter on behalf of Stephen Johnson, who is my nephew by marriage.  I am writing this letter from the perspective of someone who has known Stephen for over 25 years, during which time I have watched him grown into a fine and upstanding young man.

I am also writing from the perspective of someone with extensive knowledge and experience on issues pertaining to vulnerable children and youth, having served as director of child welfare, Deputy Mayor for Health and Human Services, and now as a consultant advising child welfare leaders across the country.  I provide this background because I am fully aware of the atrocities that happen to children and the characteristics of people who commit them.  I can state unequivocally that Stephen has reflected the characteristics of the highest moral character for as long as I have known him.  I have seen Stephen interact with children over the years in numerous family gatherings, and I have never once seen a hint of any improper behavior or proclivities in this area.

Having sat through Stephen's trial, I am painfully aware of the charges on which he was convicted. He has lived an  honorable life, and I implore Your Honor to grant him a lenient sentence so that he can rebuild his life.  His entire family stands with him and will be there to love and support him.

Thank you for your consideration,

*Brenda Donald*
Brenda Donald

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-176 (CJN)** |
| **STEPHEN JOHNSON,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Following a five-day trial in April 2024, a jury convicted Defendant Stephen Johnson of five counts of transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1), (b)(1), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2). The charges arose out of reports to the National Center for Missing and Exploited Children that the defendant had uploaded hundreds of illegal child pornography files to his Google Drive account in the fall of 2020. The files largely depict the rape and sadistic sexual abuse of prepubescent girls. At trial, the defendant argued that he had accidentally obtained illegal child pornography while seeking out legal adult pornography. The evidence refuted his excuse. The evidence showed, among other things, that the defendant had accessed, downloaded, and viewed child pornography as early as April 2020; repeatedly visited a Dropbox folder called "Black teens and underage thots"; uploaded child pornography files to Google Drive; and—after he knew that Google had caught him—was a member of Telegram and Google Photos groups in which child pornography was being trafficked.

For reasons that follow, this Court should sentence the defendant to a guidelines term of **180 months' (15 years') imprisonment**, to be followed by ten years of supervised release. In support of its recommendation, the government respectfully submits this Memorandum.

## **BACKGROUND**

In September 2020, Google reported to the National Center for Missing and Exploited Children, or NCMEC, that a user had uploaded over two hundred files containing child pornography to the Google Drive account stephenjohnson1197@gmail.com. *See* Gov't Exs. 100-1 to 100-19. NCMEC forwarded the reports, called "CyberTips," to law enforcement. *See* 4/9/24 Tr. 346:18-23. After searching the defendant's Google account pursuant to a lawfully issued warrant, law enforcement obtained an arrest warrant for the defendant and a search warrant for the defendant's apartment. *See* 4/9/24 Tr. 379:20-23. The Federal Bureau of Investigation arrested the defendant and searched his apartment on October 7, 2021. *See* 4/9/24 Tr. 379:24-25.

As relevant to this trial, a federal grand jury returned a second superseding indictment charging the defendant with 15 counts of 18 U.S.C. § 2252(a)(1), (b)(1) (transportation of child pornography) and one count of 18 U.S.C. § 2252(a)(4)(B), (b)(2) (possession of child pornography). (ECF No. 110).

Trial began on April 9, 2024. The government's evidence showed that on September 21, 2020, and October 1, 2020, the defendant uploaded over two hundred child pornography files to Google drive. *See* Gov't Exs. 6, 100-1 to 100-19, 200-1 to 200-220. Some filenames were plainly indicative of child pornography, including:

- "lil black girl fucked by BBC.mp4" (Gov't Ex. 200-12);

- "Pthc Goldberg 10Y 2 Kleine Fotzen - Sonya (22.24).avi" (Gov't Ex. 200-135);

- "Pthc Goldberg 10Y Kleine Fotze - Unk (07.14).avi" (Gov't Ex. 200-136);

- (Children-sf-model) Pthc - 11Yo Black Girl Showing Off Her Pussy Aka - [!!! New !!!][USA][00.07.14] (2).avi (Gov't Ex. 200-173); and

- "[pthc] Goldberg - The Visitors (HiRes, 20m36s) ~ 2014 opva 9y 10y 11y 12y black preteen pedo lolitabay pussy.avi" (Gov't Ex. 200-174).

2

The evidence showed that the defendant had accessed child pornography using his Leonovo laptop as early as five months before the first reported uploads to Google Drive. It showed that he had viewed certain files using his web browser on April 27, 2020. *See* Gov't Ex. 400A. And it further showed that showed that he had opened a number of child pornography files using using the Microsoft Movies & TV application between April 27, 2020, and August 4, 2020, including the five files he was convicted of transporting in Counts One, Two, Five, Seven, and Eight of the second superseding indictment. *See* Gov't Ex. 412A.

| Summary of Jump List Showing Charged Files on Lenovo Desktop | | | |
|---|---|---|---|
| **Potential App Name** | **Linked Path** | **Last Access Date/Time (Eastern Time)** | **Target File Created Date/Time (Eastern Time)** |
| Microsoft Movies & TV | C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\black Shayla BACK IT UP 2.mp4 | 4/27/2020 2:37:48 PM | 4/27/2020 2:31:05 PM |
| Microsoft Movies & TV | C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\Pthc Goldberg 10Y Kleine Fotze - Unk (07.14).avi | 4/27/2020 2:39:01 PM | 4/27/2020 2:23:31 PM |
| Microsoft Movies & TV | C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\(Children-sf-model) Pthc - 11Yo Black Girl Showing Off Her Pussy Aka - [!!! New !!!][USA][00.07.14] (2).avi | 8/4/2020 12:26:54 PM | 4/27/2020 2:16:28 PM |
| Microsoft Movies & TV | C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\[pthc] Goldberg - The Visitors (HiRes, 20m36s) ~ 2014 opva 9y 10y 11y 12y black preteen pedo lolitabay pussy.avi | 8/4/2020 12:27:23 PM | 4/27/2020 4:19:35 PM |
| Microsoft Movies & TV | C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\1_4947301621999599675.mp4 | 8/4/2020 12:27:56 PM | 4/27/2020 4:18:58 PM |

Gov't Ex. 412A.

The defense argued that the defendant did not knowingly possess or upload child pornography, and that he had inadvertently downloaded it while seeking out legal adult pornography. *See* 4/9/24 Tr. 305:4-8, 306:3-4, 309:11-14, 311:5-12.

In response to this defense, the government introduced, and the Court admitted, additional evidence from the defendant's Google account and cellphone showing other times he had accessed

3

websites and groups with names indicative of child pornography.  For example, on three separate days between June 26, 2020, and July 2, 2020, the defendant accessed a Dropbox folder called "Black teens and underage thots" ten times.  *See* Gov't Ex. 400B.  This was approximately three months before the defendant uploaded child pornography to his Google Drive.  The defendant's cellphone also showed he was in multiple groups on both Telegram and Google Photos that advertised child pornography in 2021, well after Google had closed his account.  *See* Gov't Exs. 401E; 401G; 402B; 402C.  Some of the groups, like the Google Photos shared album "13-17 lesbian cp," were named in ways that clearly conveyed child pornography.  *See* Gov't Ex. 401E. The cellphone also showed that three images containing child pornography had been downloaded from Telegram.  *See* Gov't Ex. 401D.

The government also introduced evidence that, in the hours and days after Google notified the defendant it had closed his account, he conducted a number of Google searches that showed he knew why the account had been closed and that progressively demonstrated his consciousness of guilt.  The defendant began by searching for general information about Google accounts being disabled and then turned to searching for information about specific cases in which Google had reported its users for possessing child pornography.  The searches then progressed to more serious inquiries for information about when therapists are required to break confidentiality and confessing to a preacher.  In the midst of these searches, the defendant also Googled "private Tor search engine," indicating that he was looking for a dark web search engine that would conceal his online activity.  *See* Gov't Exs. 401B, 401I; 4/10/24 Tr. 653:9–667:6.

On April 17, 2024, the jury convicted the defendant of five counts of transportation of child pornography (Counts One, Two, Five, Seven, and Eight) and one count of possession of child pornography (Count Sixteen).  *See id.* at 1397:4–1400:2.  The transportation counts pertained to

five files that the government's evidence showed the defendant had (i) saved to his desktop and (ii) played on his computer prior to uploading them to his Google Drive. *See* Gov't Ex. 412A.

A sentencing hearing is scheduled for November 1, 2024. The government now respectfully submits this Memorandum in Aid of Sentencing.

## **LEGAL STANDARD**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The Section 3553(a) factors include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –

5

> (A) the applicable category of offense committed by
> the applicable category of defendant as set forth
> in the guidelines –
>> (i) issued by the Sentencing Commission . . .;
>> and
>> (ii) that, . . . are in effect on the date
>> the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission . . . and
>> (B) that, . . . is in effect on the date the defendant is
>> sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among
> defendants with similar records who have been found guilty of
> similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In addition to the Section 3553 factors, in child pornography cases the court should also consider the reports prepared by the U.S. Sentencing Commission specifically addressing sentencing in such cases. In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even
> without the presence of any aggravating factors from the other two categories,
> warrants enhanced punishment depending on the degree that aggravating factors
> from that category are present in a particular case. The presence of aggravating
> factors from multiple categories generally would warrant a more severe penalty
> than the presence of aggravating factors from a single category.

U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES at 321 (Dec. 2012)

(hereinafter, the "2012 Report").

6

### Content

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." *Id.* at 320.

### Community

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313–14, 324.

### Conduct

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at 325.

<p align="center">*    *    *</p>

The Court must impose a sentence of not less than 5 years' imprisonment. *See* 18 U.S.C. § 2252(b)(1). The Court must also impose a term of supervised release of not less than 5 years up to life. *See* 18 U.S.C. § 3583(k).

<p align="center">7</p>

## SENTENCING GUIDELINES CALCULATION

While the Sentencing Guidelines are only advisory, the Court "shall consider" them before imposing sentence. 18 U.S.C. § 3553(a)(4). A sentencing court must therefore "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Turner*, 21 F.4th 862, 864 (D.C. Cir. 2022) (quoting *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018) (per curiam)). "[T]he government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but the defendant bears the burden in seeking sentencing reductions." *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009). Facts relevant to sentencing must generally be proven by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam); Commentary to USSG §6A1.3.

The defendant has raised several objections to Probation's calculation of the guidelines. He submits that his total offense level is 28, yielding a guidelines range of 78 to 97 months' imprisonment. The defendant asserts that he is entitled to two-level reduction in his offense level because his conduct was limited to receipt, *see* USSG §2G2.2(b)(1), and that the specific offense characteristics for distribution, *see* USSG §2G2(b)(3), and for material portraying sadistic masochistic conduct or sexual abuse or exploitation of an infant or toddler, *see* USSG §2G2(b)(4), do not apply. The defendant also disputes the number of images for which he is responsible under USSG §2G2.2(b)(7).

The government previously took the position that the two-level enhancement for distribution under USSG §2G2.2(b)(3)(F) applied. Upon further consideration, the government agrees that there is an insufficient basis for application of that enhancement here. The defendant's objections are otherwise meritless and should be overruled.

8

**A. The Defendant Is Not Entitled to a Two-Level Reduction Under USSG §2G2.2(b)(1) Because, Having Been Convicted of Five Counts of Transportation of Child Pornography, His Conduct Plainly Was Not Limited to Receipt or Solicitation.**

The plain text of USSG §2G2.2(b)(1) makes clear that it has no application here. Where, as here, the base offense level is 22 under USSG §2G2.2(a)(2), a defendant is entitled to a two-level reduction if he can satisfy a two-pronged inquiry. First, the defendant's conduct must have been "limited to the receipt or solicitation of material involving the sexual exploitation of a minor." USSG §2G2.2(b)(1)(B). Second, the defendant must not have "intend[ed] to traffic in, or distribute, such material." USSG §2G2.2(b)(1)(C). The defendant cannot meet his burden.

Because the defendant was convicted of five counts of transportation of child pornography, his conduct went beyond—and thus was not limited to—receipt or solicitation, and he fails to qualify for the reduction at the first step of the inquiry. *See, e.g.*, *United States v. Fore*, 507 F.3d 412, 415 (6th Cir. 2007) (rejecting application of USSG §2G2.2(b)(1) where the defendant's "criminal conduct was not *limited* to the receipt or solicitation of pornographic materials, but also encompassed the transportation of materials involving the sexual exploitation of a minor in interstate commerce in violation of 18 U.S.C. § 2252(a)(1), an offense that is separate and distinct from, and goes beyond, the mere receipt or solicitation of pornography" and "further not[ing] that U.S.S.G. § 2G2.2(b)(1) is devoid of any language suggesting that the offense of transporting child pornography in interstate commerce otherwise qualifies for the two-level decrease in a defendant's offense level"); *accord United States v. Burgess*, 576 F.3d 1078, 1102 (10th Cir. 2009) (affirming district court's determination that "because Burgess' conduct included transportation of child pornography, not only receipt, he did not qualify for the reduction even though Burgess did not intend to distribute the material").

The defendant's reliance on *United States v. Chiccini*, No. 21-1036, 2022 WL 1024261, at

(Page 296 of Total)

*1 (3d Cir. Apr. 6, 2022) (not precedential),[1] is misplaced. (*See* ECF No. 214 at 32). The Third Circuit panel's reasoning is not analytically sound. That case involved a defendant who uploaded child pornography to his Adobe Cloud account and pleaded guilty to only receipt and possession offenses, not transportation offenses. The panel acknowledged that defendants convicted of transportation of child pornography do not qualify for the reduction, *see id.* at *2 (citing *Fore*, 507 F.3d at 415–16), but held that, in Chiccini's case, "the facts of record d[id] not amount to transportation" because he did not share the material with others, *see id.* at *3. In reaching this erroneous conclusion, the panel appears to have conflated transportation with distribution. *See, e.g.*, *United States v. Fall*, 955 F.3d 363, 374 (4th Cir. 2020) ("Fall improperly conflates the offense of transportation with the offense of distribution. Transportation . . . does not require conveyance to another person."). Had the panel concluded that Chiccini did not *distribute* child pornography, that would have satisfied only the second prong of the inquiry, *see* USSG §2G2.2(b)(1)(C), but Chiccini would have failed to satisfy the first prong because offenses involving *transportation* of child pornography go beyond, and thus are not limited to, receipt or solicitation, *see* USSG §2G2.2(b)(1)(B); *accord Fore*, 507 F.3d at 415; *Burgess*, 576 F.3d at 1102. The panel found both prongs of the inquiry satisfied based on its flawed conclusion that Chiccini did not transport child pornography. *See id.* at *3. Where, as here, a defendant is convicted of transportation offenses, the Third Circuit panel's reasoning in *Chiccini* makes no sense.

Because the defendant's conduct was not limited to receipt or solicitation of child pornography, the reduction under USSG §2G2.2(b)(1) does not apply.

---

[1] In the Third Circuit, not precedential opinions do not constitute binding precedent because they are decided by the panel and do not circulate to the full court before they are issued. *See* 3d Cir. I.O.P. 5.7 (2023).

**B. The Four-Level Enhancement for Images Depicting Sadistic Conduct and Sexual Abuse or Exploitation of an Infant or Toddler Under USSG §2G2.2(b)(4) Applies Because the Defendant's Offenses Involved Such Images.**

The offenses involved depictions of both sadistic conduct and sexual abuse or exploitation of an infant or toddler, so the four-level enhancement under USSG §2G2.2(b)(4) applies.

The defendant's claim that the files pertaining to the counts of conviction do not involve such material is incorrect. The file that the defendant was convicted of transporting in Count Two— "black Shayla BACK IT UP 2.mp4," *see* Gov't Ex. 200-7—alone justifies the application of this enhancement. Special Agent Calvillo testified that this video depicts "a nude African American prepubescent female who is holding a toothbrush and is using the toothbrush as a vibrator on her vagina, and then later in the video a male hand also uses that same vibrator – or that same toothbrush on the child's vagina." 4/9/2024 Tr. 406:20–407:11. Courts have held that the penetration of prepubescent minors—including with foreign objects—is inherently violent and warrants application of the sadistic and masochistic conduct enhancement. *See, e.g.*, *United States v. Sanchez*, 30 F.4th 1063, 1075 (11th Cir. 2022) (affirming application of sadistic and masochistic conduct enhancement where defendant filmed child penetrating herself with a toothbrush because "[a]n objective viewer could reasonably find that it was painful and humiliating"); *United States v. Starr*, 533 F.3d 985, 1001–1002 (8th Cir. 2008) ("[G]iven the plain meaning of 'violence,' it is difficult to imagine that the sexual penetration with a foreign object of a minor female would not qualify as 'violence' even if self-inflicted." (quoting *United States v. Parker*, 267 F.3d 839, 849 (8th Cir. 2001))); *United States v. Hall*, 312 F.3d 1250, 1261–63 (11th Cir. 2002) (holding that images showing vaginal or anal penetration of a prepubescent minor by either an adult male or a foreign object is sadistic within the meaning of § 2G2.2(b)(3)); *United States v. Turchen*, 187 F.3d 735, 739 (7th Cir. 1999) (explaining that "sadistic and masochistic conduct includes sexual

11

gratification which is purposefully degrading and humiliating"). The file associated with Count Two plainly merits this enhancement.

In any event, the Court's determination of the applicable guidelines is not limited to the specific files that are associated with the counts of conviction. In calculating the sentencing guidelines, the "'[o]ffense' means the offense of conviction and all relevant conduct under §1B1.3." Application Note 1(I) to USSG §1B1.1. Relevant conduct includes "all acts or omissions committed . . . by the defendant . . . during the commission of the offense of conviction," USSG §1B1.3(a)(1)(A), and is not limited to the conduct charged in the indictment, *see, e.g.*, *United States v. Ignancio Munio*, 909 F.2d 436, 439 (11th Cir. 1990) ("[C]onduct not contained in the indictment may be considered at sentencing."). At trial, the government introduced evidence of hundreds of files the defendant possessed in his Google Drive account, including files that Google did not report to NCMEC and excise from the account. Some of these visual depictions portrayed the penetration of prepubescent girls and the sexual abuse and exploitation of infants and toddlers. *See, e.g.*, Gov't Ex. 200-197; 4/9/24 Tr. 419:22-23 (Special Agent Calivllo: "This is a video of a Caucasian infant or baby whose anus is being penetrated by an adult male penis.").

Because the case involves numerous visual depictions portraying both sadistic conduct and sexual abuse or exploitation of an infant or toddler, the four-level enhancement under USSG §2G2.2(b)(4) applies.

### C. The Number of Images Involved Far Exceeds 600, so the Five-Level Enhancement Under USSG §2G2.2(b)(7)(D) Applies.

The evidence at trial established that the defendant possessed hundreds of child pornography files in his Google Drive account. Because the guidelines count each video as 75 images, *see* Application Note 6(B)(ii) of the Commentary to USSG §2G2.2, the number of total images far exceeds 600, and the five-level enhancement under USSG §2G2.2(b)(7)(D) applies.

<div align="center">12</div>

The defendant takes the position that the Court may consider only the files associated with the transportation counts of conviction and that the number of images is therefore 300,[2] resulting in a four-level enhancement under USSG §2G2.2(b)(7)(C). But at trial, the government introduced evidence that the defendant possessed a much larger number of videos. Although the jury also convicted the defendant of possession of child pornography in Count Sixteen, the defendant argues that the jury may have based the possession conviction only on the files associated with the transportation counts of conviction. That is something we will likely never know, but it is also immaterial here. The Court can consider all the files as relevant conduct under USSG §1B1.3.[3]

---

[2] The jury convicted the defendant of five counts of transportation of child pornography (Counts One, Two, Five, Seven, and Eight). Counts Five and Eight charged the upload of distinct digital files that appear to contain identical visual depictions. The Court previously denied the defendant's motion to dismiss one of these counts on multiplicity grounds. *See* 4/2/24 Tr. 22:12-17. The defendant now contends, without citation to any authority, that the two video files associated with Counts Five and Eight are to be counted only once, as one video file that equates to 75 images. The files associated with Counts Five and Eight are distinct files with different filenames. But even if the files were identical duplicates, courts have held that duplicate digital images are to be counted separately in determining the number of images. *See, e.g.*, *United States v. Price*, 711 F.3d 455, 459 (4th Cir. 2013) ("We reject any uniqueness requirement that Price tries to read into Section 2G2.2(b)(7) and hold that any image without regard to its originality should be counted when applying this enhancement so long as that image depicts child pornography and is relevant to the underlying conviction."); *United States v. McNerney*, 636 F.3d 772, 780 (6th Cir. 2011) (holding that "duplicate digital images, like duplicate hard copy images, should be counted separately for purposes of calculating a sentence enhancement pursuant to § 2G2.2(b)(7)"); *United States v. Sampson*, 606 F.3d 505, 510 (8th Cir. 2010) (holding that each video counts "regardless of whether or not it is a duplicate").

[3] This is true even considering new USSG §1B1.3(c), which is scheduled to take effect on the day of sentencing. Although the defendant was acquitted of certain transportation counts, the Court can consider all the child pornography evidence presented at trial—including those files associated with acquitted transportation counts—because the defendant was also convicted of possession of child pornography in Count Sixteen. *See* USSG §1B1.3(c) ("Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, *unless such conduct also establishes, in whole or in part, the instant offense of conviction*." (emphasis added)). New Application Note 10 of the Commentary to USSG §1B1.3 explains that "[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct

Because the transportation counts of conviction involve five video files, for the five-level enhancement under USSG §2G2.2(b)(7)(D) to apply, the Court need only find, by a preponderance of the evidence, that the offense involved at least three other video files.

The Court can easily make this finding based on the trial evidence. The government introduced evidence that the defendant uploaded 220 child pornography files (218 videos and two still images) to his Google Drive, *see* Gov't Exs. 6, 200-1–200-220, and that he possessed additional child pornography video files that Google did not report to NCMEC and left in his account, *see* Gov't Exs. 5B, 201-1–201-4. The evidence at trial showed that the defendant had viewed numerous of these files and had accessed others that were not ultimately recovered.

For example, the government presented evidence at trial establishing that on April 27, 2020, the defendant used the Chrome web browser to access files entitled "2019-01-26 11.23.22.mp4," "2017-06-22 22.28.29.mp4,"[4] and "deleted porn hub vid 13 yo.mp4." *See* Gov't Ex. 401; 4/9/24 Tr. 436:5–445:9. Google reported "2017-06-22 22.28.29.mp4" to NCMEC and excised it from the defendant's Google Drive, *see* Gov't Exs. 6, 200-5, and it failed to report "2019-01-26 11.23.22.mp4" or "deleted porn hub vid 13 yo.mp4," leaving them in the account, *see* Gov't Exs. 5B, 201-2. Special Agent Calvillo testified that "2017-06-22 22.28.29.mp4" depicted "an African American prepubescent female performing oral sex on an adult male's penis,

---

establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."

[4] This defendant was charged with transportation of this file in Count Three. Given the evidence that the defendant had previously accessed the file, the jury's acquittal appears to have been based on insufficient evidence of transportation. The government was unable to present evidence that this file had been saved on the defendant's laptop before he uploaded it to Google Drive. For the five transportation counts of conviction, the government presented evidence that the files had been saved on the defendant's desktop in a folder entitled "Courses," and so were necessarily moved from that location onto Google Drive. *See* Gov't Ex. 412A.

14

and at a certain point in the video the male's hand also grabs her head and motions her head up and down on his penis as well," 4/9/24 Tr. 409:1-6, and that "2019-01-26 11.23.22.mp4" depicted a prepubescent African American female who was "rubbing on her vagina" with her vagina and anus exposed to the camera, 4/9/24 Tr. 440:16-23.

The government also introduced evidence that the defendant had saved "Goldberg" series[5] videos on his Lenovo laptop on April 27, 2020, and accessed them between April 27, 2020, and August 4, 2020. *See* Gov't Exs. 412, 412A, 412B; 4/10/24 Tr. 623:12-22, 625:12–626:22, 638:18–639:2. All of the files were saved in the same file path: C:\Users\steph\Desktop\Courses\pyt trade\trade \2020 black pyt\. *See* Gov't Exs. 412, 412B. Only two of these files were specifically identified in the indictment, in Counts Five and Eight, *see* Gov't Exs. 200-136, 200-173, 412A, and the jury convicted the defendant of transporting those files. The defendant appears to have deleted the other nine files, as Google produced only metadata associated with them. *See* Gov't Ex. 5B (file path: Haute Gurls\pyt trade\trade_\2020 black pyt). Based on the content of the Goldberg videos introduced into evidence, the testimony about who "Goldberg" was, the filenames (which all reference prepubescent ages and include terms like "pthc" and "preteen"), and the fact that the files were in the same file path and opened close in time to one another, the Court can find by a preponderance of the evidence that the nine deleted Goldberg video files were similarly child pornography videos.[6]

---

[5] Special Agent Calvillo explained that "Goldberg" was a known defendant who had digitized child pornography files, *see* 4/9/24 Tr. 412:9-11, and Dero Tucker testified that Goldberg "was a well-known, pretty prolific producer of child sexual abuse material," *see* 4/10/24 Tr. 626:13-14.

[6] The Court can count deleted files in assessing the number of images. *See, e.g.*, *United States v. Nissen*, 666 F.3d 486, 491 (8th Cir. 2012) (holding, in case where forensic evidence showed defendant had edited or played since-deleted child pornography videos, "the court could have drawn the inference that Nissen knowingly possessed the videos because he viewed them or edited them at some point" and that "a court is permitted to rely on circumstantial evidence that

15

The hundreds of videos entered into evidence at trial and all the other evidence demonstrating the defendant's repeated contacts with child pornography—through multiple channels—establishes by a preponderance of the evidence that the offense involved well more than the eight videos required to apply the five-level enhancement under USSG §2G2.2(b)(7)(D).

*   *   *

In sum, the total offense level is **35**. With a criminal history category of **I**, the defendant's guidelines range is **168 to 210 months' imprisonment**.

### THE GOVERNMENT'S RECOMMENDATION

The government respectfully recommends that the Court sentence the defendant to a guidelines erm of **180 months' imprisonment**, to be followed by ten years of supervised release. For reasons set forth below, the government's recommended sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

#### A.  Nature and Circumstances of the Offense

The evidence at trial showed that the defendant repeatedly sought out, viewed, and downloaded child pornography. And the quantity of child pornography that law enforcement recovered in this case—hundreds of video files—was substantial: Special Agent Calvillo testified that while it was "not the most" and "not the least," it was "in the upper two-thirds" of the over 80 child pornography cases she has investigated. 4/10/24 Tr. 581:10-17. The defendant was caught only because he uploaded child pornography files to Google's servers in September and October of 2020. But getting caught by Google was not enough to make him stop. When his cellphone was seized in October 2021, it contained evidence that, well after Google caught him, he was

---

demonstrates knowing possession of a certain number of images when deciding whether USSG § 2G2.2(b)(7)(D) applies").

present in Telegram and Google Photos groups in which child pornography was being trafficked, such as the Google Photos groups "13-17 lesbian cp," "CINCITY PYT," and "Pytvideos." *See* Gov't Ex. 401E.

Transportation and possession of child pornography are incalculably serious crimes that demand a significant punishment. As a threshold matter, the defendant appears to believe that uploading child pornography to a cloud storage account amounts to nothing more than possession. Congress disagrees. Its decision to punish transportation offenses more severely than possession offenses reflects the greater harm caused by the movement of child pornography through modalities of interstate commerce. In this case, the defendant essentially duplicated files he possessed on his laptop by creating copies on Google's servers. That meant that the files were not isolated to a single device but accessible to him on any device that could connect to the Internet. It caused significant harm to Google—which does not want child pornography on its servers—and to any of its employees who might have encountered the content. And while the evidence did not show that the defendant intended to distribute child pornography, uploading child pornography to one's cloud storage account is a step on the path to distribution. Once uploaded to Google Drive, child pornography can be shared with others through only a few clicks. Given Congress's intention to eradicate the market for child pornography, the duplication and movement of such material in interstate commerce poses a substantially greater harm than mere possession.

Trafficking in child pornography inherently involves the sexual abuse of children, and the harms cannot be overstated. "The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by [its] circulation.'" *Paroline v.*

17

*United States*, 572 U.S. 434, 439–440 (2014) (quoting *New York v. Ferber*, 458 U.S. 747, 759

(1982)); *United States v. Galarza*, No. 18-MJ-146, 2019 WL 2028710, at *6 (D.D.C. May 8, 2019)

(Howell, J.) (noting that "'the perpetual nature of child pornography distribution on the Internet

causes significant additional harm to victims,' [who] 'live with persistent concern over who has

seen images of their sexual abuse' and how those images are being used to cause additional harm.'"

(quoting 2012 Report at vii)).

Courts across the country have similarly described the grave harm caused by child

pornography offenders, as they drive demand for the creation of child pornography and thus further

incentivize the rape and sexual abuse of children. As one court has explained:

> [W]e have numerous victims in a case like this, not one victim. Every image
> of a child, every image of a nonadult engaged in any type of sexual activity or any
> type of pose without clothing or any type of exploitation constitutes an additional
> case of victimizing a child. Without a demand for that type of information and that
> type of viewing from persons like this defendant, we don't know how many child
> abuse cases we could prevent. And as long as there is a demand to purchase images
> of child pornography, there is going to be an unending stream of child abuse of
> people—children who are forced into these roles.
>
> So although I do not take issue with the writing about what has happened to
> the guidelines, I think it begs the question of what is at stake here in the statutory
> sentencing scheme and the fact that this conduct is illegal and the concern that the
> Congress of the United States and the courts of this nation and the public of this
> nation place on it, and that is, every image has a child who has been exploited and
> abused, and that is the concern I have. It is the concern that I have when people are
> engaged in serially doing this, the effect it has on children throughout the world and
> the effect it has on their future lives.

*United States v. Miller*, 665 F.3d 114, 121–22 (6th Cir. 2011) (quoting the district court) (affirming

sentence and rejecting attack on the child pornography sentencing guidelines).

This case involved hundreds of video files depicting the rape and sadistic sexual abuse of

the most vulnerable members of our community—very young girls. These children were subjected

to unimaginable sexual abuse and cruelty. NCMEC was able to identify approximately 50 video

18

files and 12 image files as containing known victims; those files are associated with 40 different "series." Of those 40 identified series, there are victim impact statements for only six children. (*See* ECF No. 215). These children have been identified and rescued, and they and their loved ones are able to tell the Court about their pain and trauma. Most of the victims have been less fortunate and will be voiceless at sentencing.

The extremely serious nature of these offenses warrants a guidelines sentence.

**B. The History and Characteristics of the Defendant**

The defendant is 37 years old. While he has undoubtedly faced some challenges in life, he stands before the Court having enjoyed advantages that many others have not. Despite all this, the defendant accessed, downloaded, possessed, viewed, and transported child pornography videos. The evidence at trial made clear that this was no accident, and that the defendant purposefully and repeatedly accessed child pornography over a significant period of time.

The government acknowledges that the defendant has no prior criminal record. However, the defendant's lack of criminal history is accounted for in the guidelines range. Moreover, the Sentencing Commission recently enacted an adjustment to lower the guidelines range for certain offenders without criminal history, *see* USSG §4C1.1, but explicitly provided that the adjustment is not to be extended to defendants convicted of sex offenses, *see* USSG §4C1.1(a)(5).

The defendant's lack of criminal history is also unsurprising given that crimes involving the online sexual exploitation of children are committed in secret. This secrecy, combined with the overwhelming presence of digital devices and the near universal access to the Internet, makes detection of child pornography crimes difficult. It also speaks to the level of deception in which the defendant has engaged, which the Court should consider in evaluating his history and characteristics. Indeed, evidence that the defendant introduced at trial proved just how deceptive

19

he can be.  The defendant called his wife and other family members as character witness to demonstrate his law abidingness and sexual interest in adults.  *See* 4/11/24 Tr. 806:17–824:12, 980:1–1007:17.  Each character witness expressed total disbelief that the defendant could have engaged in the charged conduct.[7]  The defendant projected an image of being a law-abiding businessman, but when nobody was watching, he sought out and viewed depictions of prepubescent girls being sexually abused.  He was caught only because he uploaded child pornography files to Google's servers, and the evidence showed that even that was not enough to end his engagement with child pornography.

The deception inherent in the commission of child pornography offenses—coupled with trial evidence that the defendant had in fact deceived those around him—undermines the value of the psychosexual evaluation submitted by the defendant.  Dr. Felix premised her evaluation entirely on the defendant's self-reporting—none of which was verified using a polygraph—and at no point addressed any of the evidence presented at trial.  For example, Dr. Felix appears to have taken at face value the defendant's self-serving denial of any interest in child pornography.  *See* Evaluation at 12.  And in conducting the CPORT assessment, for the fifth item ("pedophilic interests"), Dr. Felix concluded that "[t]here is no evidence (i.e. records, self-report, or results from formal testing) to indicate that Mr. Johnson has pedophilic or hebephilic interests" and gave him a score of 0 on this item.  Evaluation at 17.  This conclusion is completely at odds with the trial evidence, which showed that the defendant had (i) repeatedly accessed child pornography depicting the abuse of prepubescent girls and (ii) deceived others regarding his sexual interest in children.  Had Dr. Felix assigned a point to this factor, the CPORT would have indicated a

---

[7] As defense expert Sara Boyd testified during the *Daubert* hearing, this is not at all uncommon in child pornography cases.  *See* 4/11/24 Tr. 1031:2-4 ("**Q.** And when you deal with offenders in CSAM cases, are [their] families often surprised by the conduct?  **A.** Almost always.").

considerably higher risk of recidivism, with only 16% of individuals having a higher risk score.
Evaluation at 18.  The fact that Dr. Felix awarded a score of 0 for pedophilic interests shows that
the risk assessment was skewed and should be disregarded.

Sex offenders generally have a high rate of recidivism.  *See, e.g.*, *Lombard v. United States*,
44 F. Supp. 3d 14, 26 (D.D.C. 2014) (rejecting post-conviction challenge to defendant's sentence
in child exploitation case because court's comments at sentencing on recidivism were "supported
by substantial authority") (collecting cases).  The information that the defendant has put forth
concerning his risk of recidivism is not helpful to the Court for the reasons discussed above.
Moreover, "[s]tatistical analysis of sex crimes has shown that the best predictor of recidivism is
not deportment at an interview but sexual interest in children." *United States v. Garthus*, 652 F.3d
715, 720 (7th Cir. 2011).  The child pornography videos that the defendant downloaded, watched,
and uploaded to Google's servers are evidence of his sexual interest in prepubescent children.  At
trial, the defendant intended to offer expert testimony from Dr. Sara Boyd.  Dr. Boyd had not
interviewed the defendant and had no opinion about him as individual.  But during a *Daubert*
hearing, Dr. Boyd testified that, in her experience, having adult sexual relationships and an interest
in adult pornography is "not at all" incompatible with possession of child pornography.  4/11/24
Tr. 1030:19–1031:1.  And when asked if someone could knowingly possess child pornography
and not be a pedophile, Dr. Boyd responded:  "Yes.  However, it is an extremely strong indicator
if its prepubescent children and the person is engaging with it, it is actually a stronger clinical
indicator of pedophilia than a history of actual hands-on offenses against children."  4/11/24 Tr.
1031:5-11.  Unsurprisingly, the defendant did not call Dr. Boyd as a witness at trial or employ her
to conduct the psychosexual evaluation.

Although the government is not seeking an obstruction enhancement under USSG §3C1.1,

the Court should consider that the defendant engaged in repeated conduct that, at a minimum, gives rise to the appearance he was attempting to conceal assets from the Court.   The defendant attempted to liquidate his assets, including his retirement account, before self-surrendering, which would have made them unavailable for a fine, mandatory restitution, and mandatory assessments at sentencing.   The conduct made little financial sense and was so alarming to the defendant's financial advisor that he reported it.   (*See* ECF No. 174-4).   The government brought this matter to the Court's attention, and the Court ultimately restrained $250,000 of the defendant's assets. (ECF Nos. 173, 177, 189).

Against this background—and despite being aware of the government's and the Court's extensive efforts to prevent him from dissipating his assets—the defendant failed to make a complete and truthful accounting of his assets to the Probation Office.   In the Draft Presentence Investigation Report, Probation wrote:  "The defendant also indicated having stocks with Chase Bank, but noted they are not actual holdings, just cash.   He was unsure of the fair market values and did not provide documentation for these accounts."   (ECF No. 184 ¶ 118).   Probation accordingly concluded that the defendant's total net worth was only $172,572.   (ECF No. 184 ¶ 116).   It is hard to understand how the defendant could have been unsure of the value of his accounts with JPMorganChase, given that it represents the substantial majority of his net worth and he had recently attempted to liquidate the accounts.   After the government objected, the defendant then provided Probation with additional information about his JPMorganChase assets. In the Final Presentence Investigation Report, Probation has now concluded that the defendant's total net worth is $1,060,508.00.   (ECF No. 211 ¶ 116).   The defendant would have the Court believe that he somehow forgot about nearly $1,000,000 in cash.

The history and characteristics of the defendant counsel in favor of a guidelines sentence.

### C. The Need for the Sentence Imposed

The sentence imposed must reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public from further crimes of the defendant.  The government's recommendation of 180 months' imprisonment serves these goals.

As discussed above, the sexual exploitation of children—including the viewing, possession, and transportation of child pornography—has devastating consequences for the children depicted in these images and videos.  Once they find their way onto the Internet, depictions of the sexual abuse of a child will circulate in perpetuity because individuals make the repetitive and purposeful decision to collect, save, and trade them for sexual gratification.

Furthermore, as noted above, consumers of child pornography, like the defendant, create a market and demand for the production of these images and videos, which depict the sexual abuse and exploitation of real children.  These consumers therefore contribute to the cycle of abuse and are in part responsible for the harm suffered by children used to produce the images and videos in their collections.  *See United States v. Goff*, 501 F.3d 250, 259–60 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography").  Thus, even if consumers of child pornography do not themselves molest children, their actions necessarily contribute to the abuse of children.  The defendant's conduct and the harm that it perpetuates demands a sentence that will reflect the nature and circumstances of the offense, serve as a just punishment, and promote respect for the law.  The government's recommended sentence would serve those goals.

Courts have also recognized the importance of deterrence in fashioning an appropriate sentence in child pornography cases.  *See Osbourne v. Ohio*, 495 U.S. 103, 109–10 (1990) ("It is

also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."); *United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (affirming a within-guidelines sentence where the sentencing court focused on the serious nature of the criminal conduct and the importance of deterring the defendant and "others who may be inclined in doing similar kinds of things"); *Goff*, 501 F.3d at 261 ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand.  The greater concern under the Guidelines is for the welfare of these exploited children.  The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").  The government's recommended sentence would deter the defendant and others from reoffending.

For all the foregoing reasons, the government's recommendation of a sentence of 180 months' imprisonment is appropriate in this case.

**D.  The Need to Avoid Unwarranted Sentencing Disparities**

Congress has directed the court to consider avoiding *unwarranted* disparities among similarly situated offenders.  But Section 3553(a)(6) "does not require the district court to avoid sentencing disparities between defendants who might not be similarly situated."  *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).  When an offense is uniquely serious, courts will consider the need to impose "stiffer sentences" that "justif[y] the risk of potential disparities."  *United States v. Jones*, 846 F.3d 366, 372 (D.C. Cir. 2017); *see also United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (concluding that a within-guidelines sentence did not produce an unwarranted disparity

when the child pornography images distributed by the defendant "were much more aggressive and troubling than the images distributed by other offenders" who received lesser sentences). The D.C. Circuit has held that "even if a district court retains discretion to vary from the child-pornography Guidelines based on a policy disagreement with them, a district court does not necessarily abuse its discretion by agreeing with (and applying) those Guidelines." *Fry*, 851 F.3d at 1334.

The defendant cites a litany of cases from this Court that he believes are "similar" to the defendant's case here. (*See* ECF No. 214 at 48–54.) But several key differences exist.

To start, each case he cites from the District of Columbia involved a plea and acceptance of responsibility. Indeed, 14 of the 15 cases cited by the defendant involved the defendant pleading to an information, meaning that the defendant accepted responsibility before the government had even sought an indictment before a grand jury. Here, however, one of the most concerning factors is the defendant's continuing reluctance to accept any responsibility, despite voluminous evidence that he accessed, downloaded, possessed, viewed, and transported child pornography files—and that he kept seeking out child pornography even after Google disabled his account by, for example, accessing illicit Telegram and Google Photos groups.

In addition, the guidelines range in the plea agreement for each of these former defendants was significantly lower than the defendant's range here. The cases that the defendant cites as "most similar" involved defendants with guidelines ranges of 78 to 97 months (Kampel and Malakoff) and 33 to 41 months (Wright). For the cases that the defendant cites as "more serious," the guidelines ranges were 78 to 97 months (Pakdel) and 51 to 63 months (Moreira). For the cases involving "substantially more serious conduct," almost all the guidelines ranges were lower: 151 to 188 months (Cooper); 108 to 135 months (Singleton); 97 to 121 months (Hawkins and Young); 87 to 108 months (DeGrange); 70 to 87 months (Misiano); 57 to 71 months (Patterson and

<div align="center">25</div>

Solorzano); and 46 to 57 months (Gardea).  Only one guidelines range was higher at 262 to 327 months (Zagorski).[8]  The guidelines range here is two to four times the guidelines range in most of the cited cases.  In other words, most of the cases do not present similarly situated defendants.

Accordingly, the government's recommendation of a term of 180 months' imprisonment fairly accounts for the defendant's egregious criminal conduct and would not create an unwarranted disparity.

### E.  The Need to Provide Restitution to Any Victims of the Offenses

The government has submitted restitution requests on behalf of four identified victims. (*See* ECF No. 216).  Contrary to the defendant's argument, restitution is mandatory here.

### i.    Restitution is mandatory.

The defendant argues that restitution is not mandatory here, but he misreads the statute: those who transport and possess child pornography in violation of 18 U.S.C. § 2252 owe mandatory restitution.

First, restitution is mandatory for all offenses in chapter 110, which includes the transportation and possession of child pornography counts of conviction here.  *See* 18 U.S.C. § 2259(a) ("[T]he court *shall* order restitution for any offense under this chapter [chapter 110]." (emphasis added)), 2259(b)(4) ("The issuance of a restitution order under this section is *mandatory*." (emphasis added)).

Despite this statutory language, the defendant argues that only distribution, not transportation and possession offenses, are covered under this mandatory restitution scheme. (*See* ECF No. 214 at 57).  But "[b]oth distribution and possession of child pornography offenses fall

---

[8] While Zagorski received a 99 month sentence, his case presented a significant, unmentioned factor: Zagorski faced deportation to Poland—a country he had not lived in since he was 15 years old.

under Section 2259's mandatory restitution scheme." *United States v. Monzel*, 930 F.3d 470, 476 (D.C. Circuit 2019); *see also Paroline v. United States*, 572 U.S. 434, 443 (2014) (noting that Section 2259(a) requires restitution for convictions for knowingly possessing child pornography).

Second, these offenses qualify for the specific restitution provisions for "trafficking in child pornography." *See* 18 U.S.C. § 2259(b)(2). This provision requires that the Court order restitution that reflects the defendant's "relative role in the causal process that underlies the victim's losses," and mandates at least $3,000 in restitution. 18 U.S.C. § 2259(b)(2)(B). The definition of "trafficking in child pornography" includes "conduct proscribed by section . . . 2252." 18 U.S.C. § 2259(c)(3). All the counts of conviction here—the five transportation counts and the possession count—are offenses proscribed by Section 2252.

The defendant argues, without any legal support and with disregard for the statutory text, that this provision "cannot possibly include" all offenses under Section 2252. (ECF 214 at 57). Yet that is exactly what the statute says: all offenses under Section 2252 are "trafficking in child pornography" offenses. So all the counts of conviction involve "trafficking in child pornography" for restitution purposes. *See id.; see also United States v. Hoffman*, No. 22-CR-18, 2022 WL 4017890, at *2 (W.D. Wash. Sept. 2, 2022) ("Trafficking in child pornography, for purposes of restitution, includes the receipt or possession of child pornography."); *United States v. Sotelo*, No. 21-CR-60016, 2022 WL 344588, at *1-2 (S.D. Fla. Feb. 4, 2022) (applying Section 2259(b)(2) to defendant convicted of one count of receipt of child pornography).

Restitution is mandatory here, as is the mandatory minimum restitution of $3,000 for "trafficking in child pornography" offenses.

27

>        ii.    **The defendant must pay restitution to all the victims whose materials he**
>               **possessed, even if the jury did not convict him of transporting a depiction**
>               **of that victim's abuse.**

The defendant next argues that he should be responsible only for restitution to victims in the materials the jury convicted him of transporting.  That argument fails.  The defendant must pay restitution for any victims of the transportation counts, plus any victims of the possession count.  *See* 18 U.S.C. § 2259(a) (mandating restitution for possession of child pornography).  A victim is an "individual harmed as a result of the commission of a crime under [chapter 110]."  18 U.S.C. § 2259(c)(4).

The jury heard evidence that the defendant possessed over 220 video and image files containing child pornography on his Google Drive account.  *See* Gov't Exs. 6, 200-1 through 200-220; 4/9/24 Tr. 391:4-7 (when asked what is depicted on Government Exhibit's 200-1 through 200-220, Special Agent Calvillo responded: "These are files of child pornography").  As the defendant himself admits, his "offense conduct is limited to possessing child pornography on his computer and uploading it to his own Google Drive folder."  (ECF No. 214 at 58).  Each of these files that the defendant possessed depicts the sexual abuse of a minor victim, although not all victims are seeking restitution here.  And so the defendant must pay restitution to any of the victims for the child pornography he possessed on his Google Drive.  Each of the restitution requests that the government has made relates to victims depicted in child pornography files that the defendant possessed on his Google Drive.

The defendant relies on two cases to support his argument that he should only pay restitution for the files associated with the transportation counts of conviction.  *See United States v. Udo*, 795 F.3d 24, 33–34 (D.C. Cir. 2015); *United States v. Pole*, 741 F.3d 120, 127–29 (D.C. Cir. 2013).  Neither case supports his argument.  In fact, neither case concerns restitution in child

<center>28</center>

pornography cases or even Section 2259. *Pole* concerns a defendant who embezzled money from a Senate office. *See* 741 F.3d at 182. The D.C. Circuit rejected a restitution order that required him to pay restitution for money taken before the charged conduct, when the jury had not convicted him of any offense committed during that time period and the district court made no further factual findings to support the restitution order. *See id.* at 186–87. *Udo* presented the same issue: the restitution order included restitution for uncharged crimes. *See* 795 F.3d at 34. Here, though, the jury convicted the defendant of the sole count of possession, and the possession evidence at trial centered on the 220 files in the defendant's Google Drive. Unlike in *Pole* and *Udo*, the restitution requests here fit directly into the offense of conviction.

As discussed above with respect to the application of certain guidelines enhancements, even if the jury decided to convict the defendant of the possession count based solely on the child pornography files underlying the transportation counts of conviction, the trial evidence provides ample basis for the Court to find by a preponderance standard that all the child pornography evidence—including those files depicting the abuse of the victims seeking restitution—falls within the scope of the "offense" as relevant conduct. *See* Application Note 1(I) to USSG §1B1.1; USSG §1B1.3(a)(1)(A).

Each victim on whose behalf the government submitted a request is entitled to restitution.

### **MANDATORY ASSESSMENTS IN CHILD PORNOGRPAHY CASES**

Because the defendant is not indigent, he must pay an assessment of $5,000 under 18 U.S.C. § 3014(a). This mandatory assessment funds the Domestic Trafficking Victims' Fund. *See* 18 U.S.C. § 3014(c). The weight of Circuit authority holds that this assessment applies per count of conviction. *See United States v. Warrington*, 78 F.4th 1158, 1168–70 (10th Cir. 2023) (affirming imposition of Section 3014 assessments per count of conviction on plain error review);

29

*United States v. Randall*, 34 F.4th 867, 874–78 (9th Cir. 2022) (same on *de novo* review); *United States v. Johnman*, 948 F.3d 612, 616–21 (3d Cir. 2020) (same on plain error review). *But see United States v. Haverkamp*, 958 F.3d 145 (2d Cir. 2020) (holding the Section 3014 assessment applies per offender, not per count of conviction). Because the defendant was convicted of six counts, the Court should impose $30,000 in Section 3014 assessments.

In addition, the Court "shall assess . . . not more than $17,000 on any person convicted of an offense under section 2252(a)(4)" and "not more than $35,000 on any person convicted of any other offense for trafficking n child pornography." 18 U.S.C. § 2259A(a)(1)-(2). These mandatory assessments fund the Child Pornography Victims Reserve, which was created to provide defined monetary assistance to victims of child pornography offenses. *See* 18 U.S.C. §§ 2559(d), 2259B. Because the text of Section 2259A tracks that of Section 3014, this assessment too applies per count of conviction. *Compare* 18 U.S.C. § 2259A(a) (imposing mandatory assessments on "any person convicted of" a child pornography offense), *with* 18 U.S.C. § 3014 (imposing mandatory assessments "on any non-indigent person or entity convicted of an offense"). Accordingly, the Court can assess the defendant up to a total of $192,000.

\*   \*   \*

Congress has provided that the defendant's financial obligations be paid in this order:

(A) A special assessment under Section 3013;
(B) Restitution to victims of any child pornography production or trafficking offense that the defendant committed;
(C) An assessment under Section 2259A;
(D) Other orders under any other section of Title 18; and
(E) All other fines, penalties, costs, and other payments required under the sentence.

*See* 18 U.S.C. § 2259A(d)(2).

30

## **CONCLUSION**

For the foregoing reasons, the government respectfully recommends that the Court sentence the defendant to at term of **180 months' (15 years') imprisonment** to be followed by ten years of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

Dated: October 28, 2024            By:      */s/ Paul V. Courtney*
Paul V. Courtney
D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
Assistant United States Attorney
Ryan Lipes
Special Assistant United States Attorney
N.Y. Bar No. 5404843
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 252-1719 (Courtney)
(202) 514-4715 (Lipes)
Paul.Courtney@usdoj.gov
Ryan.Lipes@usdoj.gov

31

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:22-cr-00176 (CJN)** |
| **STEPHEN JOHNSON** | |
| **Defendant.** | |

## STEPHEN JOHNSON'S RESPONSE TO THE
## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

      Mr. Johnson and the government each filed a sentencing memorandum on October 24 and October 28, 2024, respectively, to assist the Court with matters relating to Mr. Johnson's upcoming sentencing hearing. The government's sentencing memorandum focuses almost exclusively on Mr. Johnson's offense conduct and recommends a grossly disproportionate sentence. The government ignores critical information that is essential to determining an appropriate sentence, including Mr. Johnson's background, extensive and extraordinary community support, and post-offense (and post-Google alert) rehabilitation.[1] Moreover, it fails to candidly address the sentences in comparable cases, as those sentences do not support any sentence beyond 60 months' here, and do not come remotely close to supporting the government's truly excessive request for fifteen years.

---

[1] The government's Memorandum falsely suggests Mr. Johnson joined certain Telegram and Google Photos groups after receiving the Google Alert in October 2020. As the government well knows, there is zero evidence—forensic or otherwise—to support this claim. *See generally* 4/10 Tr. 646-649 (Dero Tucker testifying as to when messages were received, but not when Mr. Johnson would have been added to a group); *see also* 4/10 Tr. 725-727 (Mr. Tucker agreeing that he had not "looked at the rules or … the permission structure on Telegram for getting added to a channel" and he did "not recall any instances where there were sent messages from the Samsung Note+ device.")

The Court should impose a fair sentence in line with what other judges of this District Court have done:  a 60-month sentence.  In support of this request, Mr. Johnson  responds to the government on (1) sentences in comparable cases; (2) the trial penalty, which in the government's view is over a decade of prison time; (3) the government's distortions of Dr. Felix's psycho-sexual report; and (4) the United States Sentencing Guidelines.

## I.    Comparable Cases Militate Against a Guidelines Sentence, to a Sentencing at the Mandatory Minimum

The government acknowledges, as it must, that sentences within the guideline range in child pornography possession cases are rare.  The overwhelming majority of child pornography possession and transportation defendants, including defendants in the District of Columbia, receive below guidelines sentences, and most are significantly below.  *See* U.S.S.C Nat'l and Dist. Sentencing Data (see *United States v. Kampel*, 1:20-cr-00084-DLF, ECF 27).  According to sentencing information concerning defendants sentenced in fiscal years 2015-2019 under U.S.S.G. § 2G2.2 with similar guideline adjustments, only 18.4% nationally received sentences within the guideline range.  In the District of Columbia, 0% received guideline sentences during this same period.  *Id.*  Nationally, the overwhelming majority of this category of defendants received below guidelines sentences (i.e. 81.3%) and 5.5% of defendants received a probationary sentence.[2]  As discussed *supra* and in Mr. Johnson's sentencing memorandum, *see generally* ECF 214, because Mr. Johnson's total offense conduct and his personal history is less troubling than many offenders who have similar guideline ranges, Mr. Johnson should be punished less severely.

---

[2] 3.7% received probation only sentences and 1.8% received a sentence of probation with alternatives.

An analysis of child pornography cases in this District yields 16 similar cases: David Malakoff (probation), Jason Wright (probation), Pasha Pakdel (time served), Wesley Hawkins (3 months), Mark Misiano (9 months), Ryan Young (12 months and 1 day), Michael Rowan (24 months), Pamela Wilson (30 months), Brian Kampel (33 months), Jason Dejournett (33 months), Thomas Meekins, Jr. (37 months), Marc Gange (46 months), Ryan Cooper (mandatory minimum 60 months), Aron Patterson (mandatory minimum 60 months), Christopher Solorzano (mandatory minimum 60 months), and John Moreira (mandatory minimum 60 months). *See* Ex. A (statements of facts). Not one of these cases featured conduct *less* disturbing than Mr. Johnson's, and some featured conduct considerably worse, including distribution to other persons. *See id.* (e.g., *Misiano*, *Young, Gange*, *Cooper*, *Patterson*, *Solorzano*, *Moreira*). All of the below cases occurred in this District, involved worse or conduct to Mr. Johnson's, then resulted in the government requesting significantly lower terms of imprisonment, and/or the court imposing significantly lower terms. The only independent variable that differs from those cases with the lowest sentences, including the probationary ones, is Mr. Johnson's exercise of his constitutional right to a trial.

- ***United States v. Brian Kampel***, **1:20-cr-0084 (DLF) (D.D.C. August 5, 2021)**

Mr. Kampel had downloaded and possessed CSAM for ten years, sourced among others from websites which required credit card payment. This resulted in over a thousand files of child pornography depicting sadistic, penetrative conduct explained in more detail in Mr. Johnson's original sentencing memorandum. *See* ECF 214 at 52. The government requested 78-97 months' incarceration, and the court imposed 33 months.

• ***United States v. Jason Dejournett***, **1:20-cr-00094 (DLF) (D.D.C. July 30, 2021)**[3]

The defendant here had used Tor browser (a browser familiar to the Court from Mr. Johnson's hearing) and Bitcoin to pay for and download child pornography multiple times, over the course of one and a half years. The government requested a sentence at the lower end of the 51–63-month Guidelines range. The court imposed a sentence of 33 months' incarceration, followed by lifetime supervised release.

• ***United States v. Ryan Cooper***, **19-cr-382 (KBJ) (D.D.C. April 30, 2021)**

Mr. Cooper distributed nineteen images depicting child pornography through a Tumblr page, then twenty-six more images through a second Tumblr account. The distributed material included three videos depicting oral, anal or penetrative sex of pre-pubescent males. A search warrant for Mr. Cooper's electronic devices revealed hundreds more of such content. The government only requested 72 months, and he received the five-year mandatory minimum, followed by 10 years supervised release.

• ***United States v. Aron Patterson***, **19-cr-355 (PLF) (D.D.C. January 28, 2020)**

The defendant in this case acted as the "owner" of a social media messenger group established for trading and distributing child pornography. He invited, added and removed users as he saw fit, and actively traded in and encouraged others to trade in illicit material, incentivizing active participation in the distribution scheme by removing anyone who did not quickly share child pornography with the group and promoting those to "admin" who shared sufficient material. The government sought 60 months' incarceration, and he received the five-

---

[3] This case, alongside the comparable sentences in *United States v. Thomas Meekins, Jr.*, 1:17-cr-103 (ABJ) (D.D.C. May 14, 2018), *United States v. Pamela Wilson*, 1:17-cr-00011 (RDM) (D.D.C. Apr. 12, 2017) and *United States v. Marc Gange*, 1:13-cr-00038 (JEB) (D.D.C. June 11, 2013), explained below, only came to the undersigned counsel's attention recently and were not included in the original sentencing memorandum.

4

year mandatory minimum, followed by five years' supervised release.  Notably, the period of incarceration was further reduced through credit for time served since his arrest 15 months prior.

• *United States v. Christopher Solorzano*, 19-cr-282 (TJK) (D.D.C. December 3, 2019)

The defendant in this case distributed images of child pornography through an instant messaging app.  He also claimed to have engaged in sexual activity with his minor stepdaughter and sent an undercover officer images he purportedly snuck of her, alongside other child pornography.  During the course of his conversation with the officer, the defendant also discussed travelling to the District of Columbia to engage in sexual acts with the officer's 8-year-old child.  The government recommended, and the court imposed, the five-year mandatory minimum of incarceration, followed by five years' supervised release.

• *United States v. Pasha Pakdel*, 1:17-cr-00165 (RJL) (D.D.C. June 11, 2019)

Over the course of two years, Mr. Pakdel downloaded, uploaded and shared multiple child pornography files to a peer-to-peer network, many of which were subsequently downloaded by other users.  The government sought 37-46 months' incarceration, and he was sentenced to time served, followed by 120 months of supervised release.

• *United States v. Thomas Meekins, Jr.*, 1:17-cr-103 (ABJ) (D.D.C. May 14, 2018)

Mr. Meekins used a peer-to-peer file-sharing network to share child pornography, including graphic images downloaded by law enforcement from Mr. Meekins's computer.  He also possessed approximately 66 videos and 16 partially-downloaded videos.  The government recommended 37 months' incarceration and the Court imposed a s sentence of 24 months, to be followed by 48 months of supervised release.

• *United States v. Pamela Wilson*, **1:17-cr-00011 (RDM) (D.D.C. Apr. 12, 2017)**

Ms. Wilson had distributed to the government agent a collection of more than 500 graphic videos and images of child pornography and traveled to meet the agent and the agent's purported nine-year-old daughter to engage in sexual conduct with the daughter. At the time she did all this, Ms. Wilson was aware that she was separately being investigated for distributing images child pornography to online chat rooms. She also admitted to the agent that she had "touched" children as young as seven years old for whom she had babysat. Among the thousands of images and videos in defendant's possession were graphic images of prepubescent children experiencing anal and oral sodomy and vaginal intercourse with adults. Despite all of the above, the government only sought a sentence at the bottom of the 97-121 months Guidelines range, and the court only imposed 30 months' incarceration, followed by 120 months of supervised release.

• *United States v. Ryan Young*, **16-cr-00082 (CRC) (D.D.C. Aug. 17, 2016)**

The defendant sent multiple images of child pornography to an undercover agent, solicited images of the agent's purported 9-year-old daughter, and discussed engaging in sex acts with the purported daughter. A search of the defendant's cell phone revealed 22 further unique videos and 44 unique images, including two clips depicting bestiality against prepubescent female children and one video depicting multiple prepubescent and toddler female children forcibly penetrated vaginally and orally. Still, the government sought a sentence at the low end of the 108-135 months Guidelines range. The court imposed one year and one day incarceration, followed by 60 months of supervised release.

6

• *United States v. Mark Misiano*, 16-cr-00048 (RDM) (D.D.C. July 26, 2016)

    Mr. Misiano distributed multiple pornographic images of prepubescent and toddler children to an undercover officer, including some he described as depicting rape. In part relying on Mr. Misiano's post-offense rehabilitation, the government recommended 36 months' imprisonment. The Court sentenced him to 9 months, followed by 120 months of supervised release.

• *United States v. Wesley Hawkins*, 13-cr-00244 (KBJ) (D.D.C. Nov. 22, 2013)

    Mr. Hawkins uploaded fives videos depicting child pornography to YouTube and sent multiple child pornography videos to an undercover agent, both through email and cloud file-sharing services. The government recommended 24 months of incarceration. Mr. Hawkins was sentenced to 3 months, followed by 73 months of supervised release.

• *United States v. Marc Gange*, 1:13-cr-00038 (JEB) (D.D.C. June 11, 2013)

    In this case, the defendant distributed approximately 79 images of child pornography depicting 9-12-year-old female children, many being vaginally, orally and anally penetrated by adult males. He also sent pictures of young women he worked with, claiming to have masturbated into their underwear, pictures of prepubescent females with semen on them, and pictures of himself masturbating. A search of his USB drive revealed 3 videos and 911 further images of child pornography, with the videos depicting oral, anal or vaginal penetration. The government requested 97 months and the court imposed 46 months' incarceration, followed by 120 months of supervised release.

• *United States v. John Moreira*, 1:10-cr-00002 (ESH) (D.D.C. May 21, 2010)

    Mr. Moreira used peer-to-peer software to share files with an undercover law enforcement agent. When the defendant was arrested, law enforcement found over 800 images

and 5 videos of child pornography, including images of prepubescent children, in the defendant's possession. The government requested the mandatory minimum of 5 years, which the court imposed, followed by 5 years of supervised release. Notably, probation was terminated after 3 years based on flawless compliance with its terms.

• *United States v. Jason Wright*, **1:09-cr-00311 (ESH) (D.D.C. Apr. 15, 2010)**

In this case, the defendant had used a peer-to-peer file-sharing website to download 284 images of child pornography, depicting girls as young as 11 years old. The government sought 33-41 months incarceration. The court sentenced Mr. Wright to 5 years' probation.

• *United States v. Michael Rowan*, **09-cr-225 (RMU) (D.D.C. Jan. 5, 2010)**

Mr. Rowan distributed 16 images to an undercover officer through peer-to-peer computer software. Upon investigation, 826 images of child pornography were found in the defendant's possession, including images of infants and toddlers being penetrated. The government requested 97 months' incarceration. The Court imposed 24 months, followed by a supervised release of 180 months.

• *United States v. David Malakoff*, **1:09-cr-00051 (ESH) (D.D.C. July 17, 2009)**

Mr. Malakoff downloaded over 150 images of child pornography onto his computer, including images depicting sexual acts of violence against children and video clips of prepubescent children engaging in oral and vaginal sex. Individuals reviewing the files found references to child pornography in their titles, even though Mr. Malakoff claimed his computer was just infected with a virus. The government recommended 78-97 months incarceration. The court sentenced him to 5 years of probation, from which he was successfully terminated early.

\* \* \*

8

The government attempts to distinguish Mr. Johnson's case from the above cases by arguing that his Guidelines range is higher. That argument turns a blind eye to a basic fact of federal criminal sentencing: that prosecutors manipulate the Guidelines ranges depending not on the actual offense conduct, but on a desire to achieve a plea and reward a defendant who pleads early, and punish those who do not. While the Guidelines were not meant to be used this way, the reality is that in the hands of the government the rewards and penalties of a plea go far beyond the three-level "acceptance of responsibility" already provided for in the Guidelines. While this practice of adding years to its sentencing requests for going to trial—or even a decade, as the government is doing here—runs directly contrary to the "real offense" sentencing system the Guidelines were meant to create, it is a central fact of plea bargaining and federal sentencing. Most importantly for present purposes, it undermines the basis for the comparisons the government presents the Court with here.

## II.     The Government's Efforts to Discredit Dr. Felix's Evaluation are Meritless

Because Dr. Tashna Felix's professional findings are at odds with the government's flawed view of Mr. Johnson's recidivism risk, the government engages in baseless attacks on Dr. Felix's thoroughly investigated and well-reasoned psychological evaluation and report. The government begins by claiming that Dr. Felix's report is undermined by Mr. Johnson's alleged deception. The government's basis for accusing Mr. Johnson of deception is rooted in its opinion that deception is "inherent in the commission of child pornography offenses" and that Mr. Johnson called character witnesses to testify at trial about his law abidingness and sexual interest in adults. *See* Government's Memo at 19-20. If one were to accept the government's reasoning, psychosexual evaluations in child pornography cases would be meaningless because all evaluations would be undermined by this alleged inherent deceptive nature of child

pornography offenders. Accusing Mr. Johnson of deception based on the testimony of his character witnesses is also absurd. Unrefuted testimony from honest law-abiding and well-respected members of the community is not evidence of Mr. Johnson's deception—especially when their testimony is consistent with the government's evidence which shows that the vast majority of pornography involved in this case was adult pornography.

The government next complains that Dr. Felix relies solely on Mr. Johnson's self-reporting. *See* Government's Memo at 20. This allegation is also not true. Dr. Felix's report discusses Mr. Johnson's instant convictions of five counts of transportation of child pornography and one count of possession of child pornography, and these convictions are considered in her evaluation. *See* Felix Report at 5. Dr. Felix also noted instances where Mr. Johnson exhibited "defensiveness" and, despite this defensiveness, she determined that she was able to make a valid diagnosis of Mr. Johnson's psychological condition. *Id*. at 9. And, rather than base her conclusions on Mr. Johnson's reporting without any questioning, Dr. Felix evaluated Mr. Johnson's veracity on a Sex Item Truthfulness scale. *Id*. at 13. Dr. Felix determined that, after running the Sex Item Truthfulness scale, the scores she reported about Mr. Johnson are valid. *Id*.

The government also attempts to discredit Dr. Felix's assessment of Mr. Johnson's performance on the CPORT tool. While the government accuses Dr. Felix of not considering the instant case in her assessment, the government fails to recognize that the tool is only used on individuals who have already been convicted of a child pornography offense. *See* Dr. Felix's report at 17 ("The CPORT is a risk assessment tool designed to predict the sexual recidivism of men convicted of child pornography offenses"). The fact that Dr. Felix administered the CPORT tool on Mr. Johnson is evidence that she did consider his conduct in the instant offense and that she is treating him as a child pornography offender. Contrary to the government's uninformed

10

opinion about this matter, scoring on the CPORT tool is based on factors such as "any *prior*

criminal history" and "any *prior* sexual offense history."  Dr. Felix's report at 17 (emphasis

added).

Finally, the government seeks to undermine Dr. Felix's conclusion that Mr. Johnson "is

classified as a 'low-risk' for sexually deviant behavior"[4] and that he "presents a low risk of

sexual recidivism"[5] by arguing that "[s]ex offenders generally have a high rate of recidivism."

Government's Memo at 21.  First, the government's position about recidivism, unlike Dr. Felix's

report, are based on the government's claims about "general" recidivism rates rather than on Mr.

Johnson's risk of recidivism.  Second, the government's claims about high recidivism rates are

contradicted by the numerous studies cited in Mr. Johnson's sentencing memorandum and the

examples of cases offered in Mr. Johnson's sentencing memorandum about the repeated success

convicted child pornography offenders have while in the community.  *See, e.g.,* Mary Helen

McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22

KAN. J.L. & PUB. POL. 317, 344-45 (Spring 2013) ("research consistently demonstrates that

recidivism rates for people who have been convicted of a sex offense are substantially lower than

most people believe, and in fact, are among the lowest of all people convicted of a crime") and

*Measuring Recidivism*, United States Sentencing Commission (May 2004) at 12-13 (research by

the United States Sentencing Commission demonstrates that a history of stable employment, a

college education, lack of criminal history, and family ties and responsibilities all predict

reduced recidivism across offenses); *see also United States v. Jason Wright*, 1:09-cr-00311

(D.D.C.) (due to defendant's successful adjustment in the community, his supervision was

---

[4] Dr. Felix's Report at 19.
[5] *Id*.

terminated early) and *United States v. John Moreira*, 1:10-cr-00002 (D.D.C) (after complying

with all the conditions of his probation, the Court agreed to the early termination of defendant's

probation after three years).

### III.    Mr. Johnson Should Not Be Excessively Punished for Exercising his Constitutional Right to Trial

Mr. Johnson elected to proceed to trial and a jury has found him guilty of certain counts,

while acquitting him of more.  He should not be unfairly penalized at his sentencing hearing for

exercising his Sixth Amendment right to trial.  Particularly when compared to other sentences for

similar (and worse) conduct, the only credible basis for a sentence above the mandatory

minimum of 60 months is a heavy trial tax imposed on Mr. Johnson for exercising his

constitutional right to trial.

To be fair and reasonable, "post-trial sentences should not increase by more than . . .

denial of acceptance of responsibility (if appropriate); obstruction of justice (if proved); and the

development of facts unknown before trial."[6]  In Mr. Johnson's case, there is no proof that he

obstructed justice, and no facts unknown before trial that would warrant an increased sentence

ever developed.  Therefore, there is no basis for increasing Mr. Johnson's sentence beyond what

other defendants have received—some with significantly worse facts—in this category of cases.

Indeed, the government candidly admits that the central factor driving its 15-year

sentencing recommendation is that most of the other cases involved a guilty plea.  *See* ECF 217

at 25 ("To start, each case he cites from the District of Columbia involved a plea and acceptance

---

[6] *See* NACDL, *The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It* (2018) at 13, available from https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penaltythe-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf (last accessed Oct. 28, 2024).

12

of responsibility.  Indeed, 14 of the 15 cases cited by the defendant involved the defendant

pleading to an information[.]").  But notwithstanding Mr. Johnson decision to go to trial, the

§ 3553 factors—no prior criminal history, voluntary cessation of illegal conduct *prior to his*

*arrest*, and the need to avoid unwarranted sentencing disparities—still apply equally to Mr.

Johnson.  These mitigating factors should not be ignored merely because someone exercises a

constitutional right.  Because Mr. Johnson is similarly situated to those defendants receiving far

less than 60 months of imprisonment, he should receive no more than that.

### IV.    The Government Miscalculates the Applicable Guidelines Range and its Recommended Term of Imprisonment, Based in Part on Ambiguities The Government Created Through Its Requested Jury Instructions

#### A.   Because Mr. Johnson's conduct was limited to the receipt of child pornography, he is entitled to a two-level reduction pursuant to U.S.S.G. § 2G2.2(b)(1).

When a defendant's base offense level is 22, his conduct is limited to the receipt or

solicitation of child pornography, and he did not intend to traffic or distribute child pornography,

the defendant is entitled to the two-level reduction.  *See* U.S.S.G. § 2G2.2(b)(1).  Contrary to the

government's contention, Mr. Johnson meets all three requirements under §2G2.2(b)(1).

The government's argument that Mr. Johnson's conduct was not limited to the receipt or

solicitation of child pornography is meritless.  First, as discussed in Mr. Johnson's sentencing

memorandum, despite the title of Mr. Johnson's offense of conviction, his offense conduct

involved nothing more than receiving child pornography when illicit material was uploaded to

his Google Drive account.  His conduct did not involve distribution, trafficking, or transportation

to another person.  His conduct also did not involve the physical transportation of child

pornography by Mr. Johnson across state lines.  Therefore, because his conduct was truly limited

to only receipt, the two-level decrease applies.

Second, the government fails entirely to distinguish Mr. Johnson's case from

<div align="center">13</div>

*United States v. Chiccini*, 2022 WL 1024261 (3d Cir. 2022), a case where the decrease was held

to apply under factual circumstances similar to the facts in Mr. Johnson's case.  Significantly, in

*Chiccini*—like in Mr. Johnson's case—the defendant possessed child pornography on his

computer and transferred those files via the internet to his personal cloud storage account.

Rather than identify any distinction between *Chiccini* and Mr. Johnson's case, or cite alternative

authority with a similar factual scenario, the government resorts to nothing more than attacking

*Chiccini* by arguing that the decision "is not analytically sound."  Government's Memo at 10.

Because *Chiccini* was correctly decided and well-reasoned, it provides convincing authority for

applying § 2G2.2(b)(1)'s two-level decrease in Mr. Johnson's case.

Third, the facts involved in the cases cited by the government to support its position are

materially dissimilar to Mr. Johnson's case and to *Chiccini*.  Both *United States v. Fore*, 507

F.3d 412 (6th Cir. 2007) and *United States v. Burgess*, 576 F.3d 1078 (10th Cir. 2009), involve

defendants who physically transferred photographs depicting child pornography from one state

to another by transporting those photographs across state lines in their vehicles.  Unlike Mr.

Johnson and Mr. Chiccini, the conduct in *Fore* and *Burgess* was not limited to the defendants

receiving child pornography.

**B.  Because the file charged in Count Two does not involve penetration, an enhancement for sadistic, masochistic, or depictions of violence, is inapplicable.**

In arguing that U.S.S.G. § 2G2.2(b)(4)'s four-level enhancement for material depicting

sadism, masochism, or violence applies, the government focuses on one file for which Mr.

Johnson was convicted.  Government's Memo at 11 ("The file that the defendant was convicted

of transporting in Count Two—'black Shayla BACK IT UP 2.mp4,' [] alone justifies the

application of this enhancement").  Even when adopting the government's position that the

"penetration of prepubescent minors" alone justifies an enhancement under U.S.S.G. §

14

2G2.2(b)(4), the four-level enhancement does not apply to the file charged in Count Two. According to the government's account, the file in Count Two depicts a child using a toothbrush "*on* her vagina" and a male hand also using the same toothbrush "*on* the child's vagina." Government's Memo at 11 (emphasis added). Since the toothbrush in this file is *on* the child's vagina and *not in* her vagina, penetration is not depicted in that file. Accordingly, a four-level enhancement is inapplicable.

**C. Even when counting both files charged in Counts Five and Eight, the applicable offense level increase for number of images is four levels.**

The government asks this Court to apply a five-level enhancement for conduct involving 600 or more images based on images for which Mr. Johnson was acquitted. Despite the new acquitted conduct guideline that prohibits use of acquitted conduct in calculating the applicable guideline range,[7] the government claims that files for which Mr. Johnson was acquitted should be considered because they establish "that the offense involved well more than the eight videos required to apply the five-level enhancement under USSG §2G2.2(b)(7)(D)." Government's Memo at 16. The government argues that the acquitted material underlies both an acquitted charge and the offenses of conviction; therefore permitting the Court to exercise its discretion to include the acquitted conduct in calculating the Guidelines range. *See* U.S.S.G. 1B1.3(c), Application Note 10 ("[t]here may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction" and, in those situations, the court may decide whether such "overlapping conduct" is relevant conduct). Because each of the fifteen transportation counts in the indictment charged a separate individual file, conduct for one of the

---

[7] In accordance with the 2024 Sentencing Guidelines manual, relevant conduct does not include acquitted conduct and acquitted conduct, therefore, "is not relevant conduct for purposes of determining the guideline range." U.S.S.G. 1B1.3(c) & U.S.S.G. 6A1.3 commentary.

transportation counts cannot possibly underlie conduct for another transportation count and there is no issue of "overlapping conduct." And, because there is no evidence that the jury's conviction on the possession count involved any files other than those charged in the five convicted transportation counts, Mr. Johnson's conviction is based on only five files. Regardless of whether the duplicative files charged in Counts Five and Eight are counted once or twice, the number of images involved in Mr. Johnson's case is at least 300 and fewer than 600. Therefore, only a four-level enhancement applies due to the number of images.

## CONCLUSION

Based on the information provided by Mr. Johnson regarding sentencing data, other child exploitation cases in the District of Columbia and nationally, Mr. Johnson's background, his extraordinary post-offense rehabilitation, and the fact that he poses a low risk for reoffending, the Court should sentence him to sixty months, to be followed by five years of supervised release.

Dated: October 30, 2024                    Respectfully Submitted,

                                           */s/ Jonathan Jeffress*
                                           Jonathan Jeffress (D.D.C. No. 479074)
                                           Courtney R. Forrest (D.D.C. No. 996740)
                                           Tony Miles (D.D.C. No. 484450)
                                           Washington, D.C. 20005
                                           Phone: (202) 640-2850
                                           Fax: (202) 280-1034
                                           jjeffress@kaiserlaw.com
                                           cforrest@kaiserlaw.com
                                           tmiles@kaiserlaw.com

                                           *Counsel for Stephen Johnson*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October 2024, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the District of

Columbia Document Filing System (ECF) and the document is available on the ECF system.

<u>*/s/ Jonathan Jeffress*</u>
Jonathan Jeffress

# Exhibit A

(Page 336 of Total)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 20-cr-084 |
| | : | |
| v. | : | |
| | : | |
| BRIAN KAMPEL, | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Brian Kampel ("KAMPEL"), stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty: Access With Intent to View Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2).

## Statement of Facts

1.     On or about September 10, 2019, a federal search and seizure warrant issued by the United States District Court in the District of Columbia was executed at 709 Rock Creek Church Road NW, Unit 2, Washington, DC 20010, KAMPEL's residence.  The warrant authorized the search and seizure of evidence of violations of Title 18, United States Code, Sections 2252(a)(2) and (a)(4)(B), which make it a crime to distribute, receive, possess, and access with intent to view child pornography.

2.     During the execution of the search warrant, law enforcement explained to KAMPEL and his wife that they worked for HSI's Cyber Division.  Electronic devices were located and seized from the residence pursuant to this search warrant, including a Compaq Presario Laptop (Serial Number L2605989).  This Compaq Presario laptop was found by law

1

enforcement officers inside of a room that contained KAMPEL's personal effects.

3.    KAMPEL was read his *Miranda* warnings and, after waiving the same, he agreed to speak with law enforcement officers.  KAMPEL stated he had been living at 709 Rock Creek Church Road NW, Unit 2, Washington, DC 20010 for approximately 3 ½ years.  KAMPEL admitted that he knew what child pornography was, and to viewing and downloading files that depicted child pornography via the Internet.  KAMPEL stated that some of the files that depicted child pornography would be located on the hard drive of his computer in a "temp file".

4.    KAMPEL's Compaq Presario Laptop was forensically analyzed.  According to information provided by the HSI Computer Forensic Agent, a total of 1,060 files depicting child pornography were located in allocated space on KAMPEL's Compaq Presario laptop.  The below described files were forensically located within the file path:  "\Users\Brian Kampel\AppData\Local\temp"

a.  Yngirl04.avi: This is a video file that is approximately 2.15 minutes in length and appears to have been produced using a webcam.  The video depicts a prepubescent female child.  The child removes her pajama pants and exposes her vagina.  The prepubescent female child uses her fingers to spread apart her vagina.

b.  D9f632e32142bc45.jpg: This is an image file.  The image depicts a prepubescent female child engaging in oral sex with an adult male.

c.  $RYT8KZJ.mp4: This is a video file that is approximately 46 seconds in length.  This video depicts a prepubescent female child being penetrated vaginally by an adult male.  The adult male also performs oral sex on the prepubescent female child and the child performs oral sex on the adult male.

d. Mellony 10 y/o sucking dick.avi: This file is approximately 29 seconds in length. This file appears to have been written to the computer in or about November 2016. This file depicts a prepubescent female child performing oral sex on an adult male.

5. Also found on KAMPEL's Compaq Presario laptop are cached images of suspected child pornography. These cached images indicate that they were viewed on the internet using the Mozilla Firefox browser by the user on this computer. Cache files are saved when the user visits a webpage and are stored under each user's Mozilla Firefox profile directory. The below described images were saved by Mozilla Firefox when the user of the computer viewed the file. This information was found within the file path: \Users\BrianKampel\AppData\local\mozilla\firefox\profiles\xtyalbb9.default\ AppData cache 2\Entries. Examples of the images that were saved under the above profile are:

a. HTTPS://youplay.online/2441202187/video/watch/5.jpg which was viewed on or about September 8, 2019. This file depicts a prepubescent female child, fully nude. An adult male penetrates the child's anus with his penis.

6. KAMPEL's Compaq Presario laptop had VLC media player installed on it. This software can be downloaded for free on the Internet and can be used to view/play video files. Found within the VLC media player in the "recently opened media" folder was a video. The file path for this video is "Users\Brian Kampel\AppData\Local\temp." The file name is !!! New Pthc

3

– 11yo Evelyn 2010 – part 3!!!.avi.  This video file is approximately 1.31 minutes in length and depicts a prepubescent female performing oral sex on an adult male.

Respectfully,

TIMOTHY SHEA
UNITED STATES ATTORNEY

*Amy E. Larson*

Amy E. Larson
Assistant United States Attorney

4

## DEFENDANT'S ACKNOWLEDGMENT

I, Brian Kampel, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 5/10/2020

Brian Kampel
Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 5/11/2020

/s/ Sarah Fink

Sarah Fink, Esq.
Attorney for Defendant

5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** 19-382 (KBJ) |
| | : | |
| **v.** | : | |
| | : | |
| **RYAN COOPER,** | : | |
| **Defendant.** | : | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Ryan Cooper, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offenses to which he is pleading guilty: one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).

## Statement of Facts

Between the dates of June 16, 2018 and July 22, 2018, the defendant, Ryan Cooper, using the screen/user name of "finestrawfucking," posted on his Tumblr[1] blog, which had a URL of "finestrawfucking.tumblr.com," nineteen images depicting child pornography. The images were focused on the children's genitals, buttocks, or anal areas. The defendant accessed Tumblr from an IP address of 73.87.241.90, which resolved to his home address.

---

1. Tumblr is a microblogging platform and social networking website. The service allows users to post multimedia – photos, videos, texts, quotes, links, music – and other content to a short-form blog. Users can "follow" other users' blogs. Many Tumblr blogs are public, but users can make their blogs private. User blogs and their content are maintained on servers owned and/or operated by Tumblr.

1

On July 23, 2018, Tumblr alerted the National Center for Missing and Exploited Children ("NCMEC") to the posts made by the defendant, and NCMEC alerted law enforcement. A member of the Metropolitan Police Department/Federal Bureau of Investigation Child Exploitation and Human Trafficking Task Force ("CEHTTF") viewed the defendant's blog post, as well as comments from other users who had viewed or commented on the post.

Between September 16, 2018 and October 25, 2018, the defendant used a second Tumblr account bearing screen name "ANNYOINGUNADULTERATEDADULTDREAMLAND" to again post images of child pornography on his assigned website/blog, which had a URL of "annoyinglyunadulteratedreamland.tumblr.com." The defendant did so from his same home IP address of 73.87.241.90. During this time period, the defendant posted a total of twenty-six files depicting pre-pubescent male children who were in some state of undress or completely nude. The boys depicted in the images all had light hair, and the majority of the images were focused on the boys' genitals, buttocks, or anal areas. Three of the images depicted minor male children sucking on erect penises.

On October 17, 2018, Tumblr alerted the NCMEC that the user of the Tumbler account "annoyinglyunadulterateddreamland.tumblr.com," later identified by the CEHTTF as the defendant, had posted the above-described child pornography. NCMEC alerted law enforcement.

Once the CEHTTF identified the defendant as the owner of the Tumblr accounst "finestrawfucking" and "annoyinglyunadulterateddreamland.tumblr.com," the CEHTTF obtained a search warrant from the United States District Court for the District of Columbia for the defendant's residence at 1332 Belmont Street, Northwest, #301, in Washington, D.C., where the

2

IP address used by the defendant to post the images of child pornography to Tumblr was registered.

Members of the CEHTTF executed the search warrant on February 19, 2019. The defendant was residing in the home at the time of execution of the search warrant. During the execution of the search warrant, members of the CEHTTF conducted a voluntary, non-custodial interview of the defendant. The defendant stated that he had resided at the home for several years, and that he had only stayed outside of the home from late 2017 until February 2018 due to work. The defendant provided his phone number and other identifying information tied to the above Tumblr accounts, though he claimed he did not remember using Tumblr or the last time he used Tumblr.

Several electronic devices were located in the defendant's bedroom and seized as evidence to be searched. Among these devices were a black Apple iPhone X and a silver Apple MacBook Pro. Once these devices were taken into evidence, a Special Agent at the United States Attorney's Office conducted preliminary forensic examinations of the contents of each of the above devices. The black Apple iPhone X recovered from the defendant's bedroom had a phone number of (978) 210-9996, which had been associated with the defendant's Tumblr account. Forensic examination revealed that the defendant had used that to access the Tumblr account "finestrawfucking" described above.

The Silver Apple Macbook Pro recovered from the defendant's bedroom was also used to visit the Tumblr website, including the Tumblr URL "finestrawfucking.tumblr.com." A search of the device's web history also led to the identification of numerous images of child pornography that had been viewed by accessing user accounts on Tumblr. These images of child

pornography were accessed on, among other user accounts, the defendant's account of finestrawfucking.Tumblr.com.

The defendant maintained a folder on the desktop of his device named "Untitled Folder." This folder contained hundreds of images and videos of child pornography, totaling over 600 images under the United States Sentencing Guidelines. The images and videos depicted primarily male children, ranging in age from pre-pubescent to teenaged, engaged in sexually explicit acts. Among the images and videos of child pornography were depictions of sadomasochism, including sexually explicit images depicting bondage of young children. The following videos are examples of those in the "Untitled Folder":

- A video depicting a fully nude, pre-pubescent male squatting over top of a plastic water bottle; the child squats down and forces the top of into his anus.

- A video depicting a pre-pubescent male laying on a couch with an adult male. The child and adult remove their clothes, and then penetrate each other's mouths with their penises at the same time.

- A video depicting two fully nude minors, one of which is pre-pubescent, engaged in oral and anal sex with each other. The pre-pubescent boy is observed being penetrated anally and orally by the older boy's penis.

Also included among the images located on the defendant's computer were the same images that had been posted to Tumblr via the URLs identified by Tumblr, "finestrawfucking' and "annoyingunadulterateddreamland."

On June 5, 2019, the CEHTTF received a return on a search warrant for the contents of the defendant's Tumblr accounts. Contained therein were hundreds of images and videos

4

depicting child pornography, including images depicting prepubescent minors engaged in

sexually explicit conduct.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

_____
Nicholas G Miranda
Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 3/8/21

_____
Ryan Cooper
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 3/8/21

_____
Jonathan Jeffress, Esq.
Attorney for Defendant

6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA : CASE NO. 19 CR 355 (PLF)

  :

v. :

  :

ARON PATTERSON, :
**Defendant.** :

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Aron Patterson, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty, Distribution of Child Pornography, in violation of Title 18 U.S.C. § 2252(a)(2).

## Statement of Facts

Leading up to Friday July 13, 2018, a detective with the Metropolitan Police Department ("UC") was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force operating out of a local office in Washington, D.C.

The UC was portraying itself as a pedophile on certain websites, and On Friday, July 13, 2018, the UC was invited to a private group on KIK messenger,[1] (herein "KIK group") by KIK

---

[1] KIK messenger, or "KIK" is a free mobile application that permits users to send text messages and other content, including videos and images.

user "dnick1982," who has been identified by the FBI as Daniel Nickelson Jr. ("Nickelson"). Nickelson had established the KIK group for the purpose of trading images and videos of child pornography, controlled membership, and required members to post child pornography to remain in the group.[2]

Between the dates of July 13, 2018 and July 18, 2018, there were approximately 9 total participants in the KIK group observed by the UC.  During those dates, the following KIK users had participated in the KIK group:

- Display Name: Dandy 333; Username:  lddng

- Display Name: teddybear; Username: dnick1982 (identified as Nickelson)

- Display Name: Bob Phillips; Username: drbob29

- Display Name: rock lee; Username: xxxxXDxxxxz

- Display Name: Nightt Pell; Username: Allnight224

- Display Name: joser Man; Username: fire463

- Display Name: Robot Ron; Username: RobotRon517 (identified as Aron PATTERSON as set forth below)

- Display Name: Jack B Nible; Username: BigBossMan8383 (identified by the FBI as Joe D. Buttry)

Once he entered the group, the UC observed multiple users engaging in the posting of child pornography to the KIK group. The UC also observed multiple users discussing the sexual abuse of children.

On Friday July 13, 2018, KIK user "RobotRon517," whose display name was "Robot

---

[2] The UC did not post child pornography and was ultimately removed from the group.

Ron," and who was later identified by the FBI as defendant PATTERSON, was promoted to an owner of the group. A KIK group owner has the power to invite users into the group, delete users from the group, and screen content posted within the group. An owner also has the power to appoint administrators to assist in performing these functions.

Later that day, a new KIK user with screen name "Kelsey K" joined the KIK group upon being invited in by PATTERSON. Approximately 12 minutes later, PATTERSON removed "Kelsey K" from the KIK group. "Kelsey K" had not posted material depicting child pornography in the interim.

On Sunday July 15, 2018, while the UC was observing the activity of the KIK group, Nickelson asked PATTERSON if he (Nickelson) could be an "admin"[3] of the KIK group. The following chat within the KIK group ensued:

Nickelson: Hi Robert

Allnight224: [Posts a file depicting what appears to be a minor female on a bed reaching for the recording device]

Nickelson: [Posts a file depicting a prepubescent male child and an adult female; the adult female is on top of the prepubescent male, who is laying down on his back on a bed. Both are nude in the file and the focus of the file is of the genitalia of both the male child and the adult female]

---

[3] "Admin" refers to an administrator of the group. A KIK group administrator has the power to invite users into the group, delete users from the group, and screen content posted within the group.

Allnight224: i Love this one

Nickelson: Any vids like the one i just posted?

Allnight224: [Posts a file depicting an adult female and what appears to be a minor female. The adult female is pulling up the minor female's dress up to expose her naked buttocks]

Allnight224: [Posts one Dropbox[4] link containing numerous images and videos depicting apparent minors engaged in sexual acts with other minors as well as with adults, to include the anal penetration of prepubescent females by adult males]

PATTERSON: [Posts a file depicting a female grabbing her breast.  The focus of the file is of the female's breasts]

PATTERSON: [Posts a file depicting what appears to be a prepubescent female's face]

Nickelson: Hi

PATTERSON: [Posts a file depicting what appears to be a minor with an open mouth and an adult male holding his penis toward the open mouth]

PATTERSON: [Posts a file depicting an apparently prepubescent female child using what appears to be a vibrator to masturbate on her bare vagina, which is the focus of the file]

Nickelson: Can i be an admin?

---

[4] Dropbox is a file hosting service that allows users to store files and data in the cloud. Users can then share those files via links to the content stored in the Dropbox account.

KIK Notification: [Robot Ron [PATTERSON] has promoted teddybear [Nickelson] to administrator of the KIK group]

Nickelson: Thanks

FBI used administrative subpoena returns, law enforcement and open source databases to confirm the identity of "RobotRon517" as the defendant, Aron PATTERSON.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

/s/_____

Nicholas Miranda
Andrea Lynn Hertzfeld
Assistant United States Attorneys

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 11-18-19

Aron Patterson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 1-18-19

Carmen Hernandez
Attorney for Defendant



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

SEP 1 2 2019

Clerk, U.S District and
Bankruptcy Courts

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. |
| | : | 19-CR-282-1 (TJK) |
| v. | : | |
| | : | |
| CHRISTOPHER SOLORZANO, | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Christopher Solorzano, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty, Distribution of Child Pornography, in violation of Title 18 U.S.C. § 2252(a)(2).

### Statement of Facts

On December 31, 2018, a member of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force (referred to herein as "UC") was operating out of a satellite office in Washington, D.C. in an undercover capacity online. In that capacity, the UC posted an advertisement on a website known to law enforcement as a platform used by individuals who have a sexual interest in children, among other sexual fetishes. The website is an anonymous social networking application on which users post "confessions," either fact or fiction, by super imposing text on a picture and sharing it with other users. The website is unique in that it is completely anonymous, and, accordingly, users are issued a random nickname

upon joining the site. The website has its own gallery of photos and fonts users may choose to help protect the anonymity of users.

The UC posted his message on the above-described platform on December 31, 2018 in a group hosted within the application called "Nudist Family Life." The message read, "Any other dads chilling at home with daughter?" That afternoon, a user using the screen name "Hotcheetoeater" contacted the UC in response to the UC's posting and began a private chat communication. The following is a transcription of that communication:

"Hotcheetoeater": Hey man I got a stepdaughter

UC: Nice Age

"Hotcheetoeater": Teens you?

UC: 8

"Hotcheetoeater": Nice. Mine is XX

"Hotcheetoeater": You a single dad?

UC: Nice

"Hotcheetoeater": Or married

UC: Yes U

"Hotcheetoeater": Awesome you got KIK[1]

UC: Yes whats yours ill give u a hit

"Hotcheetoeater": Comagain27

UC: Ok

---

[1] "KIK" refers to KIK messenger, which is a free mobile messaging application that allows users to exchange messages and content, either privately with another user or in groups. Users can also share content, including images and videos.

Immediately thereafter, "Hotcheetoeater," later identified as the defendant, Christopher Solorzano (referred to herein as "SOLORANZO"), communicated with the UC via KIK instant messenger using the KIK name, "Comagain27." During the course of the chat, SOLORANZO identified himself as a married stepfather of a young teenage daughter and claimed to have engaged in sexual activity with her.

SOLORANZO stated that he also sneaks pictures of his daughter and offered to send them to the UC. SOLORANZO then sent the UC images purportedly of his stepdaughter depicting the following:

1. An image depicting an adult male touching the buttocks of an apparent minor female that appears to be asleep and who is wearing only panties on her lower half.

2. An image depicting what appears to be a minor female wearing dark colored pants, lying on her stomach on a couch.

3. An image depicting what appears to be a minor female lying on the floor wearing a bathing suit bottom. The picture focuses on the girl's buttocks.

4. An image depicting what appears to be a minor female sitting on a couch wearing only a bra and panties and looking at her phone.

5. An image depicting what appears to be a minor female wearing bra and panties.

6. An image depicting what appears to be a minor female sitting in a bathtub. The girl's bare breasts are exposed above the water line. She does not appear to be aware of the photographer's presence.

During the course of the chat on KIK, in order to verify that the above-images were of a child to whom he had access as opposed to internet images, SOLORANZO sent the UC a contemporaneously taken image of a couch cushion, stating that the cushion was the one described

JA2537

above.  The cushion depicted appeared to be the same cushion as depicted in images 2, 4 and 5 described above.

In addition to the images of his step-daughter described above, SOLORANZO also sent the UC via KIK messenger other images he had collected from the internet that depicted child pornography.  Those images are described as follows:

1. An image depicting a prepubescent female child masturbating her bare vagina;

2. A second image depicting what appears to be the same prepubescent female child masturbating her bare vagina, but focusing more closely on the vagina;

3. An image depicting a prepubescent female child sitting on the stomach of an adult male. The adult male's erect penis appears to be rubbing against the child's buttocks, and he is spreading her legs exposing her bare vagina;

4. An image depicting two preteen female children who are naked and positioned on their hands and knees and exposing their vaginas.

During the course of the chat, SOLORANZO discussed traveling to the District of Columbia to engage in sexual acts with the UC's 8 year-old child.  However, SOLORANZO later informed the UC that he resided too far from D.C., and stated that he likely could not make the trip, as the travel would be difficult since it was an hour away.

FBI used administrative subpoena returns, law enforcement and open source databases to confirm the identity of "Hotcheetoeater" and ""Comagain27" as the defendant, Christopher SOLORZANO.

Respectfully submitted,


JESSIE K. LIU
UNITED STATES ATTORNEY


/s/ _____

Nicholas Miranda
Assistant United States Attorney

DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney.  I fully understand this Statement of the Offense.  I agree and acknowledge by my signature that this Statement of the Offense is true and accurate.  I do this voluntarily and of my own free will.  No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: _8/16/2019_

Christopher Solorzano
Defendant

ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully.  I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: _8-16-19_

Mark J. Carroll
Attorney for Defendant

**FILED**

**JUN 19 2019**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**                **CRIMINAL NO. 17-CR-165 (RJL)**

      v.

**PASHA SONNY PAKDEL**
   **Defendant.**

## STATEMENT OF FACTS IN SUPPORT OF A GUILTY PLEA

On various dates between February and November 2015, I shared images of child pornography via the peer-to-peer ("P2P") file sharing networks "eMule" and "BitTorrent" using the IP addresses 98.233.29.43, 73.200.47.123, 50.190.186.210, and 73.200.72.112 from my laptop computer at my home in the District of Columbia.

On March 26, 2015, I used a P2P network to download child pornography, and to make available for download and sharing with others on the P2P network, both partially and completely downloaded files containing child pornography that I had on my computer. Among the files of child pornography that I had on my computer available for download by other users were a file called "Yogirl-Man-Scargirl-Compliationy-Cute-8Yo-10Yo-B1onde-Girl-Jerks-Sucks-Daddy-Shower-Masturb-Sound-08m06s.avi," which depicted a clothed prepubescent female child masturbating an adult male penis who is sitting in a chair in front of the child on the floor.

On May 27, 2015, I used my a P2P network to download child pornography, and to make available for download and sharing with others on the P2P network, both partially or completely downloaded files of child pornography that I had on my computer, including a partial file called, "Little Girls 9Yo Sucking.avi," which depicts a clothed prepubescent female child performing oral sex on an adult male penis.

1

On July 2, 2015, I used a P2P network to download child pornography, and to make available for download and sharing with other users on the P2P network, both partially or completely downloaded files containing child pornography that I had on my computer, including a partial file identified as "Lizeth 7yo Fuck Ass.avi," which depicts a naked, prepubescent female child masturbating an adult male penis.

At the time, I was using the IP Addresses described above, my internet provider was Comcast, and I used an email address of son.pak@comcast.net to subscribe to the account. I was using the internet and a P2P file sharing program to download and view child pornography for approximately two years. I knew this was wrong, so I periodically deleted the child pornography, but would subsequently return to the P2P programs to download and view more child pornography. At the time the Federal Bureau of Investigation seized my laptop computer on December 15, 2015, I had approximately 215 videos and 212 images of child pornography on my computer, including videos and images depicting prepubescent children being vaginally penetrated by adult penises.

Date: _May 13, 2019_    _____
                                         Sonny Pasha Pakdel, Defendant

### ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting the government's proffer of evidence related to my client's guilty plea. I have reviewed the entire proffer with my client and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: _May 13, 2019_    _____
                                         G. Allen Dale, Esq.
                                         Counsel for Defendant

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 17-CR-103 (ABJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS MEEKINS, JR.,** | : | **FILED** |
| **Defendant.** | : | JUL 1 2 2017 |

**STATEMENT OF OFFENSE**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

The parties in this case, the United States of America and the defendant, Thomas Meekins, Jr., stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty: one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

**Essential Elements**

The essential elements of the offense of Possession of Child Pornography, in violation of 18 U.S.C. 2252A(a)(5)(B) are:

(1) Defendant knowingly possessed materials that the defendant knew contained visual depictions of a minor engaged in sexually explicit conduct;

(2) Defendant knew each visual depiction contained in the materials showed minors engaged in sexually explicit conduct;

(3) Defendant knew that the visual depiction involved the use of a minor engaging in sexually explicit conduct; and

(4) Each visual depiction had been either (a) mailed, or shipped or transported using any

means or facility of interstate and foreign commerce or in and affecting interstate and foreign commerce, by any means, including by computer, or (b) produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

## Penalties

The statutory maximum sentence that the Court can impose for a violation of Title 18 U.S.C. Section 2252A(a)(5)(B) where an image involved in the offense involves a prepubescent minor or a minor who had not attained 12 years of age is 20 years imprisonment; a lifetime period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

## Statement of Facts

On various dates between July 2014 and August 2015, an Online Covert Employee ("OCE") used a law enforcement tool to review a list of Internet Protocol ("IP") addresses that (1) had been recorded as sharing suspected child pornography images or videos, identified by their unique SHA1 hash values,[1] on a peer-to-peer ("P2P") file sharing network; and (2) were believed to resolve back to physical addresses located in the District of Columbia based on a commercial geolocation program utilized by the law enforcement tool. An IP address is unique to a particular

---

[1] "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that file. It is computationally infeasible for two files with different content to have the same SHA 1 hash value. By comparing the hash values of files, it can be concluded that two files that share the same hash value are identical with a precision that exceeds 99.9999 percent certainty. There is no known instance of two different child pornographic images or videos having the same SHA1 hash value.

computer during an online session and makes it possible for data to be transferred directly between computers.

The law enforcement tool indicated that the IP address 76.111.64.213 ("Subject IP Address") was used to share known child pornography images and/or videos and that the computer using that IP address was physically located in the District of Columbia.

On several days between July 2014, and August 2015, the OCE logged onto the Internet in an undercover capacity and accessed a P2P network. The OCE used a P2P software client program to connect to the Subject IP Address and attempted to download files that had names that were indicative of child pornography.

The OCE initiated single source downloads from the Subject IP Address and obtained several files. Additionally, several other video/image files were attempted to be downloaded on various days as listed above, however no parts could be obtained.

For example, the following single source downloads from the Subject IP Address were obtained during the above time frame, along with the file descriptions:

- A file identified as "pthc hussyfan youngirl make handjob.mpg," containing a video file of a nude, prepubescent female child on a bed with a nude, prepubescent male child. The video shows the girl masturbating the boy, who ejaculates.

- A file identified as "toddler want know about where the cock go inside(2).avi," containing a video of a nude, prepubescent female child sitting on the lap of a nude adult male. The adult male digitally penetrates the girl as the hands of another adult are seen holding the girl's legs open.

- A file identified as "(((pthc))) {boylove} ssukm boy sucking mancock.mpg," containing a video of a nude, prepubescent male child performing oral sex on what appears to be an adult male.



According to an open source Internet research tool, the Subject IP Address was owned by Comcast. The research tool also indicated that the IP Addresses were assigned in the Washington, DC area. Administrative subpoena returns provided by Comcast, dated November 13, 2014, February 10, 2015, and August 13, 2015, revealed that during the time of the above-referenced downloads, the Subject IP Address, was assigned to Wyonia Brown, and the internet service was provided to 232 Cromwell Terrace, NE, Washington, DC (herein after, "Subject Premises").

On or about February 26, 2015, agents with the FBI conducted physical surveillance of the Subject Premises. A man matching the description of the defendant, Thomas Linwood Meekins, was observed leaving the Subject Premises and entering a vehicle which was registered to Arnita Meekins at the Subject Premises. Open source law enforcement sensitive databases indicated that in addition to Wyonia Brown, several members of the Meekins family, including Thomas and Arnita Meekins, resided at the Subject Premises.

On August 27, 2015, a search warrant issued by a magistrate judge from the United States District Court for the District of Columbia was executed at the Subject Premises. The defendant was determined to be residing at the Subject Premises at the time, along with several family members who were also present when the search was executed. As a result of the search warrant, three laptop computers were seized.

Agents with the FBI interviewed the defendant during the execution of the search warrant. Meekins stated he began utilizing the "Ares" peer-to-peer program and "stumbled" across child pornography videos. "Ares" is a P2P file-sharing program used to exchange files between users' computers. The "Ares" network uses file hashing to uniquely identify files on the network and users typically locate files in which they are interested with keyword searches. Before being

granted access to "Ares," the network requires users to agree to file-sharing; specifically, the user must click a box agreeing to share the files that he or she possesses.

Meekins further stated that he had viewed child pornography "off and on" for about a year, and had done so as recently as a week prior to the execution of the search warrant. Meekins used various search terms, including ages of children, to find the child pornography videos, and mainly viewed videos of girls under the age of fourteen. Meekins stated that after viewing the videos, he would feel guilty about watching them, and would delete them after viewing. Meekins estimated that during the time he had used Ares, he had downloaded and deleted "a couple hundred" videos of child pornography.

The three laptops seized pursuant to the search warrant were forensically examined by a computer forensic examiner at the FBI. One of the laptops contained child pornography, including approximately 66 videos depicting child pornography, and 16 partially-downloaded videos that have names consistent with child pornography or that depict known victims of child pornography.

The following files are examples of the video files recovered during the course of the forensic examination:

- A file identified as "11YO Vicky Childlover Little Collection Video 0039 String Bikini Pthc.mpg" depicting a naked prepubescent female child who is tied to a bench with an adult male standing over her and inserting his penis into her mouth.

- A file identified as "(KINGPASS) NEW! 022 Asian – pthc (tied 8yo Cambodian boom-boom girl fucked + raped by sex-tourist) hussyfan.mpeg" depicting a naked prepubescent female child with her ankles and wrists bound together with duct tape. An adult male then engages in sexual intercourse with the girl.

- A file identified as "GOOD! 2yo girl getting raped during diaper change – Babyshivid-Pussy Pounded Pthc Pedo Child Fuck (kiddy ddoggpm naked b3ddogg little girl young kiddyporn realkiddy child sex.mpg" depicting a naked prepubescent female child lying



on a bed. An adult male is above her and attempts to insert his penis into her vagina. The adult male eventually ejaculates on the girl.

Although the files downloaded by the OCE described above were not located during the forensic review of defendant's laptop, the same file names were recovered in the "Ares Downloads" file of that laptop, indicating the files with the same name had been previously downloaded to the computer using the Ares peer-to-peer software.

Respectfully submitted,
CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

Andrea L. Hertzfeld
Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 07/12/17

Thomas Meekins, Jr.
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 7-12-17

Thomas Key
Attorney for Defendant



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. | 17-CR-11 (RDM) |
| | : | | |
| v. | : | | |
| | : | | |
| PAMELA WILSON, | : | | |
| Defendant. | : | | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Pamela Wilson, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty: one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

## Essential Elements

The essential elements of the offense of Possession of Child Pornography, in violation of 18 U.S.C. 2252A(a)(5)(B) are:

(1) Defendant knowingly possessed materials that the defendant knew contained visual depictions of a minor engaged in sexually explicit conduct;

(2) Defendant knew each visual depiction contained in the materials showed minors engaged in sexually explicit conduct;

(3) Defendant knew that the visual depiction involved the use of a minor engaging in sexually explicit conduct; and

(4) Each visual depiction had been either (a) mailed, or shipped or transported using any

1

means or facility of interstate and foreign commerce or in and affecting interstate and foreign commerce, by any means, including by computer, or (b) produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

## Penalties

The statutory maximum sentence that the Court can impose for a violation of Title 18 U.S.C. Section 2252A(a)(5)(B) where an image involved in the offense involves a prepubescent minor or a minor who had not attained 12 years of age is 20 years imprisonment; a lifetime period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

## Statement of Facts

Leading up to Monday August 29, 2016, District of Columbia Metropolitan Police Department Detective Timothy Palchak had been acting in an undercover capacity as part of a multi-jurisdictional FBI-MPD Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, Detective Palchak ("UC") posted an advertisement in a predicated area of an online website for classified advertisements which, based on the UC's experience and information gathered from other sources, is an area of the site frequented by individuals who have a sexual interest in children and incest, among other fetishes. The advertisement was intended to attract individuals with a sexual interest in children.

On Monday August 29, 2016, at 4:48pm an individual later identified as the defendant, Pamela Wilson, responded to the UC's advertisement via email stating, "Not a dad or a mom, just a normal 20 year old female, but I think we're on the same page with our thinking and enjoy the same exact things." The UC responded, "sweet 30 dad here with daughter. Do you have kik?

2

easier to talk". Wilson replied, "How old is she? I actually don't. Honestly probably not the safest place to chat. I know a guy its talking to who said it wasn't." The UC responded, "she is very yng so not sure if that is your thing what is your limit?" Wilson replied, "I prefer younger. The younger the better actually. My cut off limit is between 7. So anything under that is great."

The UC informed Wilson that he was sexually active with his purported 9-year-old daughter, and had been since "she was in diapers." Wilson responded, "9 is fine. I was thinking you were talking younger. 9 is nothing. That's the best! Your lucky to have been with her that young. That's one of my big things I want to try tasting at a really young age. Is her mom involved?" Wilson continued, "Like I said I'm not a mom but would love to join. Would really like to lick her."

Wilson then suggested that the UC and she switch to communicating via cellular phone text messaging. The UC agreed, and provided a cellular phone number. Wilson provided the defendant her cellular phone number and the two then resumed their communications via text message.

During the course of the text messaging exchange, which began on August, 29, 2016, Wilson identified herself as a 20-year-old, mixed race female residing in the Lorton, Virginia area. The UC asked Wilson to take a photograph of herself holding up 4 fingers and send it to the UC to validate Wilson's identity. Wilson sent the UC an image depicting a female holding up four fingers above her chest. Wilson later sent an image depicting her face. This image matched a DMV photo for Pamela K Wilson that was obtained by agents with the Federal Bureau of Investigation ("FBI").

Wilson informed the UC that she has an interest in meeting the UC for the purpose of performing sexual acts on his purported 9-year old-daughter. Wilson also inquired of the UC

3

whether he had "established rules with your daughter about talking about these things" to which the UC indicated he had. Wilson then continued to discuss with the UC the logistics of a meeting with him.

The following day the UC and Wilson resumed their texting communications. Wilson continued to express her desire to engage in sexual acts with the UC's purported daughter, stating, I'm excited to taste her when I do." The UC and Wilson continued to chat over the next several days. The two continued discussing the logistics of a meeting between the two of them.

On September 13, 2016, Wilson continued chatting with the UC, stating:

> Wilson: Definitely interested in both her licking me and me on her. I think I'll be a ball of nerves so we'll let you start out.

> UC: Yes I think that is best, I'm thinking may I'll lay her down on the couch and start licking and playing with her pussy to make everyone comfortable

> UC: Can't wait to see her lick your pussy

> Wilson: Yeah, that sounds good. I can't wait to taste her and can't wait for her to lick me either

> UC: After the first time it will be easier with the nerve thing lol

> Wilson: It might not be her thing though.

> Wilson: I hope so lol

> UC: It is we talked about it she really wants to try I have shown her a lot of vids

> Wilson: Awesome!

> Wilson: Speaking of vids, if you do see her this week do you mind sending me a video of maybe you licking her or something?

4

UC: Well I'm nervous sending that out until I really know a person. But would I can do is meet u before we play with her and FaceTime her and have her spread her pussy so u feel more comfortable

Wilson: Yeah, I'm okay with that. Totally understand. We can do that.

Wilson: Wanted to play to her lol but I have enough videos to do that too

Wilson: To*

UC: Perfect that way we all feel better and you will know for sure we are legit. I live near the Verizon center so we can meet in public first

UC: You have a lot of good vids lol

UC: What's the youngest u have

Wilson: They're decent, but you tend to want more and longer ones.

Wilson: Probably 1 maybe a little younger

UC: I know the feeling, mmmmmm I miss that age so much can I see the ones u have . Live the puffy pussy at that age

Wilson: Yes, I know!!! I love how puffy they are too. Wish your daughter was younger lol.

Wilson: It's in a Dropbox don't fell comfortable sending videos but I don't mind giving you access to the Dropbox

Wilson sent the UC an email account, butterfly69@gmail.com with her password that accesses her Dropbox account. The undersigned entered her Dropbox account and had the following dialogue with Wilson:

UC: Got in

UC: Mmmm

Wilson. Lol you're very welcome

UC: Which one is best

Wilson: Me personally I'm into oral and seeing more of their pussy

Wilson: If you go to almighty collection I like the first one

5

UC: Let me look

Wilson: Mom and daughter it's pretty long which I love

Wilson: You have to go to files

UC: Mmmm I love when there are voices

UC: She is licking her good

Wilson: And then if you go to files again I also like pretty much everything in videos except for a few. My favorite is the fifth one down I love watching the dad like her

Wilson: She is!

UC: Ok let me look now

Wilson. Also a video in hey I love watching the dad trying to force his cock in her

The affiant (UC) viewed the video described by Wilson. The video depicted an adult female performing oral sex on a prepubescent girl and other sexual acts. On September 13, 2016, the Dropbox account was accessed and was found to contain 11 folders, each of which contained child pornography totaling 1.4GB of data. The folders within the Dropbox account were labeled as follows:

- b (8 videos depicting child pornography)
- beast (24 videos depicting child pornography)
- G (5 videos depicting child pornography and 10 images of child pornography)
- Hey (3 videos depicting child pornography)
- ninas (1 video depicting child pornography)
- the all mighty collection (11 videos depicting child pornography and images of child pornography)
- Vattie's cp blowjobs (6 videos depicting child pornography)
- videos (11 videos depicting child pornography)
- xxx (1 video depicting child pornography and 98 images of child pornography)
- young (30 videos depicting child pornography and 5 images of child pornography)
- young(1) (29 videos depicting child pornography)

6

The UC and Wilson maintained sporadic contact via text message, including discussing plans to get together in the future.

On one occasion, on October 9, 2016, Wilson indicated she had accessed her own Dropbox account and saw that someone had accessed it.  On October 17, 2016, Wilson informed the UC that she had uploaded some new material to the Dropbox account since their last discussion about it.  She provided again the same Dropbox username and password.

On October 18, 2016, the Dropbox account was accessed and was found to contain 13 folders, each of which contained CP totaling 2.4GB of data.  The folders within the Dropbox account were:

- b (8 videos depicting child pornography)
- beast (24 videos depicting child pornography)
- daddy (110 videos depicting child pornography and 75 images of child pornography)
- G (5 videos depicting child pornography and 10 images of child pornography)
- Hey (3 videos depicting child pornography)
- MomPthc (16 videos depicting child pornography)
- alias (1 video depicting child pornography)
- the all mighty collection (11 videos depicting child pornography and 6 images of child pornography)
- Mattie's cp blowjobs (6 videos depicting child pornography)
- videos (11 videos depicting child pornography)
- xxx (1 video depicting child pornography and 101 images of child pornography)
- young (39 videos depicting child pornography and 51 images of child pornography)
- young(1) (29 videos depicting child pornography)

Over the course of the next several days, the UC and Wilson resumed discussions of their planned meeting, including discussing whether Wilson preferred meeting the UC's purported daughter or a younger female niece, with which Wilson was more comfortable because of concerns around the purported daughter's age and possibility of her disclosure.

7

On Friday October 21, 2016, the UC contacted Wilson and suggested that they meet for lunch the following week to gain a level of comfort with each other. Wilson informed the UC that she was available to meet him on Wednesday October 26, 2016. Wilson suggested eating lunch at the Springfield, Virginia Town Center. Wilson stated that she would need a ride and instructed the UC to pick her up in front of her boyfriend's house in Virginia. Wilson was arrested when she met the UC as arranged and her iPhone 7 was seized. The cellular phone was forensically examined and identified as the device from which the defendant uploaded to her Dropbox account and sent the UC images of child pornography.

During the course of their investigation, agents with the FBI learned that the defendant had, as she informed the UC previously been investigated by federal authorities for engaging in chats on KiK messenger in 2015 in which she had uploaded images of child pornography to the application. Specifically, from approximately May to approximately June of 2015, the defendant uploaded photographs to KiK messenger chat rooms of adults engaging in sexually explicit conduct with infants, including oral, anal, and vaginal penetration, or posing the infant in a sexually suggestive manner to expose the genitals or public area of the infant.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

Andrea L. Hertzfeld
Assistant United States Attorney

8

JA2557

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 01/26/2017

Pamela Wilson
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 1-26-17

Mary Petras
Attorney for Defendant

9

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 16-CR-00082 (CRC) |
| | : | |
| v. | : | |
| | : | |
| RYAN YOUNG, | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Ryan Young, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty, Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4).

## Statement of Facts

Leading up to June 10, 2015, Detective Timothy Palchak was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force. Acting as an undercover task force officer ("UC"), Detective Palchak posted numerous online bulletin messages on specific social media forums, which, based on the UC's experience and information gathered from other sources, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children through the use of adjectives such as "taboo" and "perv." Included in these bulletin messages was the UC's KIK messenger username. KIK is a free texting application for mobile devices.

On June 10, 2015, an individual with KIK username "ryguy8989," who was subsequently

1

identified as Ryan Young ("defendant"), contacted the UC through KIK messenger. KIK also allows members to use a profile picture that appears next to each text on the other member's mobile device, so the UC was able to view the photograph associated with username "ryguy8989," which was subsequently confirmed to be a photograph of the defendant.

The defendant texted the UC "Hello there….You're into taboo and incest?" In response, the UC engaged the defendant in a conversation over KIK messenger. The UC informed the defendant that the UC was "30 here with a 9yo daughter. You?" The defendant replied back, "26…How cute is your daughter?!" In response, the UC texted the defendant an image of a clothed female child, and the defendant quickly replied back, "Omg she is amazing." The defendant continued, "Oh man how I would love to meet her lol…Any photos or anything?! And omg I bet she is so amazing. Ever consider sharing?!" The UC explained that it's "hard finding trusted people it would turn me on like crazy to see her with another cock," and the defendant quickly replied back, "I'd love to work towards that."

To prove to the UC that he was not a "cop," the defendant texted the UC a photograph of himself, which matched the photograph associated with the defendant's KIK username profile picture. Thereafter, the defendant sent several images to the UC of females, approximately 14-16 years of age, who were self-posing nude in bathroom mirrors. The UC asked the defendant if the UC's 9-years-old daughter was too young for him, and YOUNG replied back, "No. She looks amazing. I'm getting hard thinking about hopefully one day we'll hang out and she'll be touching my cock."

The defendant specifically asked the UC to send him sexually explicit images of the UC's purported 9-year-old daughter. In response, the UC texted images of the purported 9-year-old girl (the images were not of a real child). As the UC texted these images, the defendant

2

responded, "Mmm please keep going." The defendant then texted a video to the UC. In this video, a female child, approximately 10-12 years of age, is lying on a bed as a penis ejaculates in her face. The girl's eyes are tightly shut closed, and only the girl's face and bare shoulders are visible in the video.

The defendant continued to ask the UC what the UC's purported 9-year-old daughter "say[s]/think[s] about all this?!" and began to question the UC about "[h]ow much can she fit inside her mouth and pussy," "[d]oes she say things while doing it," and "[w]hat are your limits?!" The defendant repeated that he was "serious I absolutely want to play with her…I'm so hard right now…Grrr lol I wish you had more I could see of her. She is driving me crazy." Throughout this exchange, the defendant persistently asked for more sexually explicit images of the UC's purported 9-year-old daughter, and in response to each image that the UC sent (of which, none of the images were of a real child), the defendant replied, "Mmm omg yes!!!" and "…just looking at her while I stroke."

The defendant then texted another image to the UC. In this image, a girl, approximately 14 years of age, is positioned nude with her legs spread open and apart. The focal point of the photograph is on her vagina. She is sitting upright on her elbows so that her breasts are also visible in the image.

On June 11, 2015, the UC texted the defendant but did not get a response. On June 23, 2015, the UC again texted the defendant but received an automated message indicating that he had turned off or disconnected his cell phone and was thus unable to receive or send messages.

On July 4, 2015, the UC texted the defendant to see if he "still wanted to chat," and on July 7, 2015, the defendant replied "[y]ea."

3

On July 8, 2015, the defendant texted that he was "[h]orny at the moment lol," and inquired about the UC's purported 9-year-old daughter. The defendant texted, "God I wish I could see her sucking or playing." The UC told the defendant that the UC had new images to send to the defendant, but asked the defendant if he had anything new to send too. In response, the defendant sent the UC a video of a female child, approximately 10-12 years of age. The video begins with the female child explaining that she is going to get "undressed for you guys," that she was "super excited," and that her "pussy is really horny right now." The child then takes off her pajama pants and begins to masturbate herself by touching her vagina and making moaning noises for the video. The video focuses in on the child's vagina as the child continues to touch herself. The video lasts one minute and thirty seconds.

On July 9, 2015, the defendant asked the UC to send him additional sexually explicit images of the UC's purported 9-year-old daughter. In response, the UC texted one image (note that the image was not of a real child). The defendant replied, "That all" with a frown-face emoticon. This was the last text exchange the UC had with the defendant, which took place on July 9, 2015 at 2:16 p.m.

On August 3, 2015, a search warrant was executed at the defendant's residence in Oakton, Virginia, and the following items were seized: (1) Western Digital 160 GB hard drive, serial number WXK1A10L6091, (2) black Dell Inspiron 15 laptop computer with express service code 16604547698, and (3) silver Dell laptop computer with service tag BHJ6GH1.

Law enforcement reviewed the contents of the seized electronic devices pursuant to the search warrant. The Western Digital hard drive was dead and could not be reviewed. The black Dell laptop contained two unique images depicting child pornography. The silver Dell laptop

4

contained several additional images and videos depicting child pornography, which appeared to be part of a back-up to the defendant's cell phone.

On August 3, 2015, the defendant was arrested in Arlington, Virginia, and the following evidence was seized from his person: silver iPhone with IMEI 352005065A37769.

In a meeting with law enforcement on August 26, 2015, the defendant consented to the search of his cell phone. On the defendant's cell phone, law enforcement located approximately 22 unique videos depicting child pornography and approximately 44 unique images depicting child pornography. The files depicting child pornography on the defendant's cell phone include the following:

- File name: 012a072b-0c17-49ef-89ea-dcad5fa381e0.mp4. This is a 1:00 minute mp4 video which depicts a prepubescent female child sitting on a bed wearing a rainbow colored tie-dye shirt naked from the waist down. The child is involved in bestiality, specifically having a brown and white dog repeatedly lick her vagina and anus throughout the length of the video.

- File name: 14b5722a-25a4-459c-8964-ef01687d0f2c.mp4. This is a 2:00 mp4 video made up of multiple clips of prepubescent and toddler female children being sexual assaulted. Specifically, individual prepubescent children are seen being penetrated vaginally and subjected to forcible fellacio and cunnilingus. In one clip a toddler is penetrated vaginally.

- File name: 81314b23-7f87-422d-a1c5-5a2cba237bd9.mp4. This is a 1:32 minute mp4 video which depicts a prepubescent female child sitting on the floor wearing a leopard print colored shirt naked from the waist down. The child is involved in bestiality, specifically having a brown dog repeatedly lick her vagina. The child

5

also stimulates the dog's penis with her hand.

- File name: a227f1ca-cb54-4f84-8e37-9013231551f0.mp4. This is a 0:37 minute
  mp4 video which depicts a prepubescent female child naked. The child is
  repeatedly penetrated vaginally and anally with a hair brush.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

Lindsay Suttehberg
Assistant United States Attorney

6

## DEFENDANT'S ACKNOWLEDGMENT

I have read every page of this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 5/12/16

Ryan Young
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 5/13/16

Stuart Sears, Esq.
Defense Counsel

7

**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

APR 2 0 2016

Clerk, U.S. District and
Bankruptcy Courts

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 16 cr 48-01 (RDM) |
| | : | |
| v. | : | |
| | : | |
| MARK MISIANO, | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, Mark Misiano, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty: one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

### Essential Elements

The essential elements of the offense of Possession of Child Pornography, in violation of 18 U.S.C. 2252A(a)(5)(B) are:

(1) Defendant knowingly possessed materials that the defendant knew contained visual depictions of a minor engaged in sexually explicit conduct;

(2) Defendant knew each visual depiction contained in the materials showed minors engaged in sexually explicit conduct;

(3) Defendant knew that the visual depiction involved the use of a minor engaging in sexually explicit conduct; and

(4) Each visual depiction had been either (a) mailed, or shipped or transported using any

means or facility of interstate and foreign commerce or in and affecting interstate and foreign commerce, by any means, including by computer, or (b) produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer.

## Penalties

The statutory maximum sentence that the Court can impose for a violation of Title 18 U.S.C. Section 2252A(a)(5)(B) where an image involved in the offense involves a prepubescent minor or a minor who had not attained 12 years of age is 20 years imprisonment; a lifetime period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

## Statement of Facts

Leading up to September 4, 2015, District of Columbia Metropolitan Police Department Detective Timothy Palchak had been acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, Detective Palchak ("UC") posted an advertisement in a predicated area of an online website for classified advertisements which, based on the UC's experience and information gathered from other sources, is an area of the site frequented by individuals that have a sexual interest in children and incest. The UC's advertisement indicated the UC was seeking other "no limit perv dads into the more taboo things in life."

On September 4, 2015 at approximately 11:42 am, an individual later identified as the defendant, Mark Daniel Misiano, using a screen name of "Gay Perv," responded to the advertisement by sending the UC an email on the online forum. The defendant stated, "I don't have kids but I'm a HUGE perv. I live on Cap Hill. I'm 26, white, slim, good looking and I

have a 7.5-8 inch cock. I'm totally normal and no one has any idea the kinds of twisted things that happen in my head. Let me know if you're interested in perving together!"

The UC responded via the online forum email that he was into young children and incest, to which the defendant responded that the two should "hang out" and asked "got any pics?" The UC purported to have a nine-year-old daughter and to be an uncle to a two-year-old nephew. The defendant then provided a screen name of "patrickmills" on which the UC could contact the defendant on the mobile messaging application KiK.

On September 4, 2015, the defendant and the UC began communicating via the KiK messaging application. The UC stated that it was "Nice to meet another perv so close." The UC, who purported to be sexually active with the young children described above, then began communicating with the defendant about the "experience" he had engaging in sexual acts with children. The defendant responded, "Fun!" and asked the UC, "Got pics of them?" The defendant also stated that he had his own "special pics" and stated, "I'm more into boys…So that's mainly what I have." The defendant asked the UC, "That cool?" When the UC responded that it was, the defendant sent the UC an image of a prepubescent male lying on a bed with his legs spread and his erect penis exposed.

The defendant then asked the UC, "So are you into consensual or do you wanna hurt/rape?" The UC responded about his purported daughter and nephew, "Consensual with her have to force cock on him but not really rough. Although love c yng rape. You?" The defendant stated, "Love rape." The defendant told the UC regarding child rape videos, "They're my favorite."

Upon the defendant's request, the UC sent the defendant images of his purported daughter. None of the images depicted a real child. The first image depicted a female child

whose abdomen and underwear were exposed, with the UC's hand in front of the purported child's abdomen and his finger pointed towards the child. The second image depicted a portion of the UC's face near the stomach region of the purported child.

The defendant then sent the UC an image of a naked prepubescent boy with his legs spread back towards his head and his ankles and wrists tied together with black rope. The child's mouth is also bound by a black rope, and his anus and penis are exposed. The defendant also sent the UC an image of a male child, approximately twelve to fifteen years of age, naked in a bathtub exposing his erect penis.

The defendant then requested that the UC send a "face pic," and the two exchanged images of their faces, each sending a photograph of himself with certain fingers held up as specified by the other as a confirmation that the images were taken contemporaneously. Subsequent to the exchange of these "confirmation images," the defendant sent the UC an image depicting a prepubescent male toddler being anally penetrated by an adult male.

The defendant asked the UC if he had any "pics" of himself "playing with the kids." The UC sent the defendant an image of his purported female child's pink underwear. The UC informed the defendant, "I can take live ones when I have her again and him too just let me know what u want to see." The defendant continued to request additional images, including 'pics or videos of boys." The UC asked the defendant if he had a big "collection" that included "vids," to which the defendant responded "Yup." The defendant and the UC then discussed their schedules regarding when they might meet.

During the course of the chat, the defendant also sent the UC an image of a prepubescent male child sucking on an adult male's penis with what appears to be semen on the child's mouth.

The UC asked the defendant where he obtains his "rape" videos, to which the defendant responded, "I get them on here mostly." The UC then described to the defendant the various sex acts he had performed on his purported daughter and how he had convinced her not to tell anyone.

During the course of the chats, the defendant revealed to the UC that he had moved to the District of Columbia from Virginia the previous weekend and that he had moved for work-related reasons.

On September 4, 2015, agents at the FBI issued an administrative subpoena to Kik requesting subscriber information and IP logs associated with the username "patrickmills." On September 8, 2015, KiK responded to the subpoena and provided information that username "patrickmills" was linked to email address finglynchburg@yahoo.com. KiK also provided IP access logs associated with this account between August 16, 2015, and September 7, 2015. Examination of the IP logs indicated that the target KiK account was accessed primarily from an AT&T Wireless telephone. Also used were two Comcast Communication IP addresses and two Verizon Internet IP addresses. Both of the Verizon Internet IP addresses (108.18.78.107 and 108.18.72.105) and one of the Comcast IP addresses (73.172.242.240) resolved to a service address in Washington, D.C. at which the defendant was residing. The other Comcast IP address (70.90.93.126) resolved to The Crew Club Sauna and Bathhouse at service address 1321 14th Street NW, Washington, D.C., 20005.

Upon receipt of this information, agents with FBI used available open source, law enforcement sensitive and FBINET internal databases to fully identify the user of KiK account "patrickmills" as Mark Daniel Misiano. In addition, a social networking profile of (www.facebook.com/mark.misiano) was identified as belonging to the defendant.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

Andrea L. Hertzfeld
Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/13/16

Mark Misiano
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/15/16

Jonathan Jeffress
Attorney for Defendant

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 13-244 (KBJ) |
| | : | |
| v. | : | |
| | : | **FILED** |
| WESLEY HAWKINS, | : | |
| Defendant. | : | SEP 0 5 2013 |

U.S. DISTRICT COURT

### STATEMENT OF OFFENSE

The parties in this case, the United States of America and the defendant, WESLEY HAWKINS, stipulate and agree that the following facts are true and accurate.   These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty, Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

### Essential Elements

**Possession of Child Pornography**

The elements of the offense of Possession of Child Pornography, in violation of 18 U.S.C. 2252A(a)(5)(B), are:

(1)    The defendant knowingly possessed or accessed with intent to view material that contained an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A);

(2)    That such child pornography:

(a)    had been mailed; and/or

1

(b)    had been shipped or transported using any means or facility of interstate or foreign commerce; and/or

(c)    had been shipped or transported in or affecting interstate or foreign commerce; and/or

(d)    has been produced using materials that have been mailed, shipped or transported in or affecting interstate or foreign commerce, including by computer; and

(3)    The defendant knew that such items contained child pornography.

## Penalties

Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5) carries a maximum sentence of 20 years of imprisonment pursuant to 18 U.S.C. § 2252A(b)(2), if any image involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age; a fine of $250,000, pursuant to 18 U.S.C. § 357(d); a term of supervised release – after any period of incarceration – of not less than 5 years or life pursuant to 18 U.S.C. § 3583(k); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

## Statement of Facts

Between on or about December 25, 2012, and on or about June 10, 2013, the defendant, WESLEY HAWKINS, possessed child pornography on his personal computer at his residence in Washington, D.C.  On various dates during that time frame, the defendant downloaded and/or received from one or more individuals over the Internet images and videos depicting child pornography.

2

On or about December 25, 2012, the defendant uploaded five video files from his computer to an identified web address controlled by You Tube, Inc.  The videos include:  (1) two prepubescent boys masturbating each other; (2) two prepubescent boys without any clothes, with one boy using his penis to anally penetrate the other boy; (3) three prepubescent boys engaged in sexual activity with each other, including oral and anal penetration; (4) three prepubescent boys engaged in oral and anal sex with each other; (5) two prepubescent boys engaged in oral and anal sex with each other.  Law enforcement learned about this upload through a Cybertipline Report ("cybertip") from You Tube, Inc., to the National Center for Missing and Exploited Children ("NCMEC").

On February 4, 2013, your Affiant, working in an undercover capacity ("UC"), sent an email to the defendant, at one of the email addresses identified in the first cybertip (js760151@gmail.com), stating, "Cant remember where i found you but i think we are into the same, yng, lil, boy etc."  The UC provided an online ID if the individual wanted to chat.  The individual replied, "who is this."  The UC provided a name and said, "saw your email somewhere i think on image share or youtube, thought we may have similar interest, if not no worries."  The individual asked, "do u have vids to share."  During the course of the email exchange, the individual said he was 18, that he likes children ages 11 to 17, and that he has videos to share.  At approximately 6:22 p.m. on February 4, 2013, the individual sent via email to the UC a video of a prepubescent male masturbating.  At approximately 8:00 p.m. on February 4, 2013, the individual sent via email to the UC a video of a prepubescent male masturbating.  The UC also exchanged emails with the defendant at the email address wesleyhawkins2013@hotmail.com.

On or about January 19, 2013, the defendant uploaded approximately 21 images depicting

3

child pornography and/or child erotica to a Skydrive account.   Skydrive is a file hosting service owned by Microsoft.   Skydrive allows users to upload files to cloud storage in which the uploaded files can be accessed by the user through logging into the service, but the files are stored in a data center owned by a third party.   The 21 images include the following:   (1) a prepubescent female child and a prepubescent male child standing next to each other without any clothes on where the female child is holding the male child's penis; (2) a male prepubescent child lying on his back with his legs in the air with an erect penis; and (3) a prepubescent male child lying on his back with his eyes closed and with his underwear pulled down to make the child's penis visible.   Law enforcement learned about this activity through a cybertip from Microsoft to NCMEC.

On or about March 4, 2013, the defendant uploaded approximately 15 images depicting child pornography and/or child erotica to a Skydrive account.   These files include a video of two prepubescent males engaging in sexual conduct, including what appears to be anal penetration of one male child by the other male child.   Law enforcement learned about this activity through a cybertip from Microsoft to NCMEC.

On or about March 25, 2013, the defendant uploaded approximately 1 file depicting child pornography to his email account.   The file contains an image of two male children, one of whom appears to be prepubescent.   The prepubescent child is lying on his stomach on a bed.   The other male child is on his knees straddling the prepubescent child with his penis appearing to penetrate the anus of the prepubescent child.   Law enforcement learned about this activity through a cybertip from Google to NCMEC.

On or about June 10, 2013, law enforcement executed a search warrant at the defendant's house in Northwest Washington, D.C., and seized a cellular telephone iPhone IMEI #

4

990002833685140, and Toshiba Laptop S/N 8A119833A, with hard drive S/N 70QIF1YNS.    A preliminary forensic analysis of the laptop led to the identification of at least 17 videos and 16 images depicting child pornography.    These videos and images include:

- 24:06 minute video depicting an approximately 12 year-old male masturbating before a web camera;

- 1:57 minute video depicting an approximately 8 year-old male masturbating before a web camera;

- 11:47 minute video depicting an approximately 11 year-old male masturbating and being anally penetrated by an adult male;

- 15:19 minute video depicting two approximately 11 year-old males masturbating and performing sexual acts on each other;

- 7:51 minute video depicting an approximately 12 year-old male masturbating before a web camera.

Law enforcement officers interviewed the defendant at the time of the search.    The defendant admitted that he possessed child pornography.    The defendant was subsequently arrested.

Respectfully submitted,
RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

Cassidy Kesler Pinegar
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7765
Cassidy.Pinegar@usdoj.gov

5

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 09/05/13

Wesley Hawkins
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 9/5/13

Lara Quint, Esq.
Attorney for Defendant

6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    :     CRIMINAL NO. 13Cr038-01 (JEB)

    v.      :

MARC GANGE     :
     Defendant.    :

**FILED**

FEB 1 4 2013

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## STATEMENT OF THE OFFENSE

The parties in this case, the United States of America and the defendant, Marc Gange, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

1.    Leading up to November 15, 2012, Metropolitan Police Department Detective Timothy Palchak ("UC") had been acting in an undercover capacity and previously registered as a member and created an online profile on a website that is frequented by individuals that have a sexual interest in children, and incest.

2.    On November 15, 2012, at approximately 6:47 p.m., the UC posted a message in the public forum of the incest chat room soliciting, "DC Virginia Maryland ??? no limits." An individual with the screen name "eagledevil24" with the IP address 92-198-48-242, later identified as Marc Edward Gange ("defendant") responded to the message, "hey im from silvery spring . . you?"

1

3.     On November 15, 2012, at approximately 6:48 p.m., the UC initiated a private instant message chat with the defendant within the predicated site.   The UC wrote, "Hey im in DC 42 perv male."   The UC explained that he was divorced and shared custody of a purported 12-year-old daughter.   The defendant responded, "13 yo niece in law though . . . I like 10-13 yo, just budding. . . you ever share pics of your daughter . . . would love to see her . . . especially if she lives in D.C. . . . I work in N.W.

4.     On November 15, 2012, after some back and forth, at approximately 6:54 p.m., the UC and the defendant switched to Yahoo Instant Messenger.   During the course of the instant messaging, the UC explained that he was "active" with his purported 12-year-old daughter, and the defendant responded that he was not active but was just a "voyeur and perv" and "have a big panty fetish too love panty peeks."   The defendant then sent the UC a photo of his 13-year-old niece taken when she was 12 years-old.   During the course of the November 15, 2012 messaging, the UC asked, "Sniff her panties," and the defendant answered, "You bet," and sent a photo of the child's purported underwear.

5.     During the course of their extensive messaging over approximately 6-days the defendant sent the UC numerous photos of his niece as well as various inappropriate photographs of young girls and young women.   The defendant also sent numerous images of child pornography set forth in more detail below.

6.     The defendant and the UC messaged again on November 19, 20, 24 and 27th During the messaging on November 27, 2012, the defendant stated that he worked for an NGO located in the Dupont Circle area and that there are interns in his workplace.   On November 27,

2

2012, the defendant wrote, "my intern left her panties in a drawer . . . they were for working out I guess . . . so I went to the bathroom with them and jacked off . . . in them left a lil . . . yeah she's hot." The defendant sent the UC a photo of the intern as well as her panties with his semen on them. The defendant again asked for photos of the UC's purported daughter and her panties.

7.     In total, the defendant distributed approximately 84 images of pre and post pubescent female children posing nude and in lascivious positions. Of those images, approximately 79 rise to the level of child pornography. In addition, the defendant sent numerous pictures of the young women that he purportedly works with, images of underwear covered in semen, images of photos of prepubescent females with semen on them, a photograph of a prepubescent child with semen in her mouth and on her face, and various pictures of himself masturbating.

8.     Many of the images of child pornography depict prepubescent females between 9 and 12 years of age being vaginally, orally and anally penetrated by adult males. The rest depict naked prepubescent females exposing their vaginas. For example, numerous images depict a prepubescent female sucking on an adult male penis. There is an image of two prepubescent girls masturbating a male penis, an image of an adult male vaginally penetrating a prepubescent female, an image of a prepubescent female with her legs spread inserting a dildo into her vagina, an adult male licking the vagina of a prepubescent female, and an image of a prepubescent female lying on a bed bound with a rope and her legs spread exposing her vagina.

9.     A Yahoo search of the defendant's Yahoo Messenger screen name resolves to a website and blog which shows various photographs of the defendant's niece and states, "Love yng

<center>3</center>

girls 9-12 yo.  Prefer amateurs, not models.  Have gigs of pics to share.  Love to share pics of my neice [name]."

10.     On or about December 5, 2012, the defendant was arrested at his place of business, the World Wildlife Fund, in Northwest, Washington, D.C. and charged with distribution of child pornography.  Upon his arrest, personal items were seized from the defendant's work space (a cubicle) including a jacket, a lunch bag, a backpack and two cell phones.  Pursuant to a search warrant, officers found a USB drive in the defendant's backpack.  That USB drive contained approximately 3 videos and 911 images of child pornography.  The following are the videos recovered from the USB drive:

> a) San Disk 8GB USB\C\Vids\Cat Godess Frontal Anal.AVI
> Approximately 10:34 min video depicting 8 yo female sucking adult male penis to ejaculation, adult male vaginally penetrating female
>
> b) San Disk 8GB USB\C\Vids\(Pthc) HC 8yo bj and cummed.avi
> Approximately 1:06 min video depicting 7 yo female sucking adult male penis to ejaculation
>
> c) San Disk 8GB USB\C\Vids\Pthc (Hussyfan) (Pthc) (R@Ygold) (Babyshivid) Tender Suck Mg7 Bj.avi
> Approximately 3:05 min video depicting adult male vaginally and anally penetrating 11yo female.

11.     The still images of child pornography are comprised of images of mostly prepubescent females naked with exposed genetalia and/or being orally, vaginally or anally penetrated by adult male penises.  There are also images of prepubescent females with their legs and arms bound exposing their genetalia.  In addition to the videos and images of child pornography, investigators found numerous photos of the defendant's niece including images that had been manipulated to put the child's face on the body of a naked prepubescent female.  This

4

process, known as "morphing" or "faking," resulted in five images of child erotica and one image of child pornography.   In the example of child pornography, the niece's face had been superimposed on the body of a naked prepubescent female who is sitting on the beach with her legs spread open exposing her genetalia.   The defendant maintains that these images were created by other people who took the clothed photos distributed by the defendant and "morphed" them into child pornography.   The government does not have any evidence to suggest the defendant himself "morphed" the photos.

12.    Finally, investigators found numerous images of photos of young girls where the photos had been ejaculated on, or manipulated to show a male penis on the photo with the child or children.   Pursuant to a search warrant on the defendant's home in Maryland, officers also recovered numerous videos and images of child pornography.

<u>DEFENDANT'S ACKNOWLEDGMENT</u>

I have read this Statement of the Offense and have discussed it with my attorney, Matthew Kaiser, Esquire.   I fully understand this Statement of the Offense.   I agree and acknowledge by my signature that this Statement of the Offense is true and accurate.   I do this voluntarily and of my own free will.   No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 2/4/2013

_____
Marc Gange
Defendant

ATTORNEY'S ACKNOWLEDGMENT

5

I have read this Statement of the Offense, and have reviewed it with my client fully.
I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 2/4/13

Matthew Kaiser, Esq.
Attorney for Marc Gange

6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,    :
    :
    v.    :    **CASE NO. 10-CR-00002 (ESH)**
    :
JOHN MOREIRA,    :    **FILED**
    **Defendant.**    :
    FEB    

**STATEMENT OF THE OFFENSE**    Clerk, u.u. District and
Bankruptcy Courts

    The parties in this case, the United States and the defendant, John Moreira, stipulate and

agree that the following facts are true and accurate. These facts do not constitute all of the facts

known to the parties concerning the charged offenses; they are being submitted to demonstrate

that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

    1. On or about July 21, 2008, defendant, John Moreira, connected to the internet using

GigaTribe, a Peer-to-Peer file sharing program. Peer-to-Peer (P2P) file sharing is a method of

communication available to internet users through the use of a special software which allows the

sharing of digital files between users on the network. Gigatribe is a private, peer-to-peer

program that allows users to share files and folders that they specifically designate for sharing

over the internet. These files and folders may include images and videos. The sharing is done by

the user designating and permitting specific individuals access to the files and folders designated

for sharing so that the designated individual can receive and download files from the user. A

peer-to-peer file transfer is assisted by a unique Internet Protocal (IP) address, which is unique to

a particular computer during an online session.

    2. On or about July 21, 2008, when John Moreira accessed the internet and the peer-to-

-1-

peer file sharing program Gigatribe he used the user ID Dante2707 and the IP address 216.15.62.158. During that session, he permitted Special Agent Eric Campbell of the Federal Bureau of Investigation, who was operating in an undercover capacity, access to files in his possession that were images of child pornography. One image was of a naked prepubescent female with her legs spread laying in the grass and another one was of a naked prepubescent male laying next to a naked adult female while the female fondles the male's genitalia.

3. Again on or about August 1, 2008, defendant, John Moreira was again on the peer-to-peer file sharing program Gigatribe under the user ID Dante2707. At that time, he shared with Special Agent Campbell approximately 44 files, files different than those on July 21, 2008, that appeared to contain images of child pornography. Seven of those images were images of the same prepubescent female, wearing only a tank top and posing in various positions exposing her genitalia. Another image was of a completely naked prepubescent female with her hands and legs bound so that her legs were spread and her genitalia exposed.

4. Again on or about August 22, 2008, defendant, John Moreira, under the user ID Dante2707 and utilizing the IP address 216.15.62.158, the same IP address that was used on July 21, 2008, logged into the GigaTribe peer-to-peer file sharing program and made available to and shared with Special Agent Campbell, inter alia, three files. Two of those files contained images of prepubescent males with their genitalia exposed. The third was an image of a prepubescent female with her legs spread, exposing her genitalia.

5. The IP address 216.15.62.158, was the IP address for defendant's computer at his residence at ·                                                                On or about November 26, 2008, law enforcement agents executed a search warrant at that address.   Seized during the

-2-

search warrant were a Dell Latitude Laptop Computer, Tag Number 9QGHBGl, a Western

Digital External Harddrive with Serial Number WXC907600439 and accompanying scandisk

2-gig Thumbdrive and a Maxtor Externa Harddrive, 80 gig, Serial Number Y239NWC.

Defendant, John Moreira owned this property, and these items were within defendant's exclusive

possession and control.  In the memory of the computer and hard drives defendant had over 800

images of child pornography, including five videos containing child pornography.  The  images

defendant had included images of child pornography with prepubescent children.

     6.  Defendant was home at the time the search warrant was executed.   In an interview at

that time, defendant admitted that the above items were his.  He also admitted that he had used

the file sharing program GigaTribe for approximately six to twelve months prior to the warrant.

He used it to download and share files containing pornography.  Moreira admitted that in

accessing the internet and Gigatribe he used the user name Dante2707.  He admitted he had seen

images of child pornography among the images he had downloaded.

DARIA J. ZANE
Assistant United States Attorney

G. ALLEN DALE, ESQ.
Attorney for Defendant

JOHN MOREIRA
Defendant

DATE: _12/10/05_

DATE: _12/10/09_

-3-

**FILED**

**JAN 0 7 2010**

**U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: 09-311 (ESH) |
| | : | |
| v. | : | |
| | : | |
| JASON WRIGHT, | : | 18 U.S.C. § 2252A(a)(5)(B), (b)(2) |
| Defendant. | : | (Possession of Child Pornography) |
| | : | |

## STATEMENT OF FACTS
## IN SUPPORT OF GUILTY PLEA

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this statement of facts which the United States would have presented if this matter had gone to trial. The facts presented below show, beyond a reasonable doubt, that between on or about November 12, 2007 and January 14, 2008, defendant Jason Wright (hereinafter, "Wright" or "defendant") violated 18 U.S.C. § 2252A(a)(5)(B), (b)(2), Possession of Child Pornography.

In 2007, the defendant was employed as a construction project manager by PN Hoffman, a real estate development company in Washington, D.C. Wright's employer assigned to him a company-owned laptop computer to be used for work-related purposes. When Wright logged onto his laptop and his company account, all of the files stored on his laptop would download to, and be stored on, the company's central computer network server. During the time period at issue, various company employees complained that the company's computer network was too slow and that gaining access to the internet was difficult. In response to the complaints, the company's Information Technology Manager ("IT Manager") began monitoring the network and how the

(Page 407 of Total)

employees were using it. The IT Manager determined that Wright was using about 90% of the company's network resources because Wright was using "Bitorrent,"a peer-to-peer software program, to download pornographic materials.

On January 11, 2008, the IT Manager reviewed some of the images that Wright had been downloading from the internet onto his laptop, and consequently onto the company's network server. The IT Manager viewed numerous images of what he considered to be images of child pornography, and reported his findings to company officials, who fired the defendant on January 14, 2008.

The company informed the Federal Bureau of Investigation about the images on Wright's laptop computer and their network server. The server was located in the District of Columbia and Wright often used his laptop to obtain and view images of child pornography while he was in the District of Columbia. The FBI seized the laptop and server and an analysis was conducted on the items. FBI Special Agent Michael French was assigned to investigate the matter. Agent French has reviewed the images on the defendant's laptop computer and determined that there are 284 images of child pornography, that is, images showing female children under the age of 18 posing in a lascivious manner by exhibiting their genitals and pubic area for the sexual gratification of the viewer.

On June 4, 2009, Agent French conducted a non-custodial interview with Wright at Wright's home in Maryland. During the interview, Wright admitted that when he worked for PN Hoffman he used his company laptop to access the internet and download images of child pornography, including images of girls as young as eleven to sixteen years old who were posing naked, and

(Page 408 of Total)

engaging in sexually explicit conduct. Wright also admitted that he knew he was breaking the law by possessing and viewing the images of child pornography.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney

By:

FREDERICK W. YETTE
Assistant United States Attorney
555 4th Street, N.W., 4th Floor
Washington, D.C. 20530
(202) 353-0814
Frederick.Yette@usdoj.gov

## Defendant's Acceptance of Factual Proffer

I have read this Statement of Facts in Support of Guilty Plea and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Statement of Facts and all matters relating to it. I fully understand this Statement of Facts and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully. No agreements, promises, understandings, or representations have been made with, to, or for me other than those set forth above.

1-07-10
Date

Jason Wright

## Defense Counsel's Acknowledgment

I am Jason Wright's attorney. I have reviewed every part of this Statement of Facts in Support of Guilty Plea with him. It accurately and completely sets forth the Statement of Facts agreed to by the defendant and the Office of the United States Attorney for the District of Columbia.

1/7/2010
Date

Timothy F. Maloney, Esq..

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  09-CR-225-RMU |
| | : | |
| v. | : | |
| | : | **FILED** |
| MICHAEL ROWAN, JR, | : | |
| | : | OCT 7 – 2009 |
| Defendant. | : | |
| | : | NANCY MAYER WHITTINGTON, CLERK |
| | | U.S. DISTRICT COURT |

### STATEMENT OF OFFENSE

1.      On March 12, 2009, a Special Agent with the Federal Bureau of Investigation ("FBI"),

using an internet connected computer, conducted a search for child pornography using

Limewire.  Limewire is a peer to peer file sharing program whereby one user can link to

another user to transfer information over the internet.  Computers linked together through the

Internet using Limewire form a network that allows for the sharing of digital files between

users on the network.  A user obtains files through Limewire by opening the software on the

user's computer and conducting a search for files that are currently being shared on the

network.  The files being shared are stored directly on a user's computer and then transferred

over the network.

2.      The FBI Agent's review of the March 12, 2009 search results revealed a file being

hosted by a user whose IP address was 208.59.114.45.   The FBI agent was able to view the list

of files being offered for download by 208.59.114.45 and found 127 files consisting of

approximately 122 image files and 5 video files.  The Agent then downloaded from

208.59.114.45 twenty image files.  Sixteen of the downloaded images appeared to contain

child pornography including:

      a.      An image with filename lsm-pthc-lsp-154.jpg, which is a pictures of a 9-year-
old girl sitting in a chair holding a male sex toy near her mouth while spreading

JA2591

her legs and exposing her naked genitals.

b.    an image with filename "lolita Child kids childporn collection pussy illegal preteen underage yo is kiddy incest port bd-company ptsc teen inzest boy fuck pedo kiddie sexy yr girl youn hussyfan 34(1).jpg," which is a picture of a 12-year-old girl completely naked sitting on top of an adult male who is naked lying on a bed.

c.    an image with filename "lolita child kids childporn collection pussy illegal preteen undersage yo ls kiddy incest porn bd-company ptsc teen inzest boy fuck ped kiddie sexy yr girl young husseyfan 44.jpg", which is a picture of a 13-year-old female performing oral sex on a 16-year-old female.

d.    an image with filename "hornytoad's best cp ptn lsm pthc(254).jpg," which is picture of an adult male penis vaginally penetrating a pre-pubescent female.

e.    an image with filename "hornytoad's best cp ptn lsm pthc (205).jpg," which is a picture of a 6-year-old girl pulling her legs up as a finger is inserted into her anus by another person.

3.    The FBI learned through an administrative subpoena that the subscriber to IP address 208.59.114.45 was located at 3206 Wisconsin Avenue, NW, Apartment 7, Washington, D.C. A search warrant was obtained and executed on July 7, 2009. The FBI recovered from the apartment a Gateway desktop computer, Model 310X, Serial number 1097614445. At the time of execution of the search warrant, the defendant, Michael Rowan Jr, was inside the apartment. The defendant stated that he owned the desktop computer. He acknowledged that he had Limewire on his computer and that he had used it to download child pornography. He stated that he had been using Limewire for three to four years to obtain child pornography. He described the pornographic images on his computer as images of pre-pubescent children, including infants and toddlers, engaged in sexual acts with adult males.

4.    The defendant's computer, a Gateway desktop, Model 310X, Serial number 1097614445, seized from his home, was forensically examined. A preliminary forensic examination of the hard drive revealed the presence of approximately 826 images of child

pornography. These images were stored in Lime Wire Shared, Saved, and Incomplete folders, as well as in DriveFreeSpace, which would indicate that the files were previously deleted by a user of the computer. Most of the files were thumbnail files. Thumbnail files are created when a user views the contents of a folder in thumbnail view. A thumbnail file is an exact replication of the original file, only in a smaller format requiring less disk space. Examples of child pornography images found on the defendant's computer include:

a. An image with filename "4 yo Girl MafiaSex.Ru_Children_Kids_Hard_000303 _ChildPorn_ Family_4yo_Jackoff_Dad_Illegal_Preteen_Under.jpg" is an image of a naked prepubescent female who appears to be approximately four years old with her hands on a male penis preparing to give oral sex.

b. An image with filename "I Stole these pics off my daughters computer! Kira Overberg Moorehead MN..nobull1968@yahoo.com(1).jpg," is an image of a naked prepubescent female with a sex toy inserted into her anus.

c. An image with filename "hornytoad's best cp ptn lsm pthc (124).jpg" is an image of a naked prepubescent female with her legs spread, her mouth duct-taped, rope tied around her crotch, and her hands duct-taped to her legs.

d. An image with filename "MafiaSex.Ru_Children_kids_Hard 003ChildPorn_Collection_7_Suck_2_Illegal_Preteen_Underage_Lolita_Kiddy_Child_I ncest_Xxx_Porno_Gay_Fuck_Young_Naked_Nude_Little_Girl.jpg" is an image of a naked female performing oral sex on a naked prepubescent male approximately two years old.

<div style="text-align:right">

Respectfully submitted,
CHANNING D. PHILLIPS
Acting United States Attorney

BY: *Michelle Zamarin*

Michelle A. Zamarin
Bar No. 424740
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
202-305-2195  Fax: 202-514-6010
Michelle.Zamarin@usdoj.gov

</div>

## DEFENDANT'S ACCEPTANCE

I have read this Statement of Offense setting forth the facts as to my participation in violation of 18 U.S.C. Section 2252A. I have discussed this Statement of Offense with my attorney, Michele Peterson. I fully understand this Statement of Offense and I acknowledge its truthfulness, agree to it and accept it without reservation. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: 10/8/2009

Michael Rowan
Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

MAR 0 6 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Cr. No.** *09-0051* |
| | : | |
| **DAVID MALAKOFF** | : | |
| **Defendant.** | : | |

---

## STATEMENT OF FACTS

The parties in this case, the United States of America, and the defendant, David Malakoff, stipulate and agree that the following facts are true. This statement of facts does not include all of the facts known to the parties in this case. The statement sets forth facts sufficient to prove that the defendant committed the offenses to which he is pleading guilty, as well as certain facts that are relevant to sentencing in this matter.

The defendant, David Malakoff, was an employee of National Public Radio (NPR) which is located at 900 7th Street, N.W., Washington, D.C. As an employee of NPR, the defendant had been issued a company laptop computer.

On June 3, 2008, the defendant contacted NPR's Information Technology (IT) department to report that he was having problems with his computer. The defendant reported that he believed that a virus may have been affecting the computer. A member of the IT staff inspected the computer and found that Limewire, a peer to peer file sharing program which allows users to share files with each other over the internet, had been downloaded on to the defendant's computer. Upon further inspection the employee found a Limewire folder that contained files with sexually explicit titles referencing sexual acts with minors. The employee then contacted the Director of IT Operations, the Director, to report his findings.

The Director also reviewed the file names which he described to authorities as "obvious" references to child pornography.  Based on his review of the filenames, ████████contacted NPR's legal department to discuss the matter.  Counsel for the defendant notified law enforcement of NPR's finding and an investigation was conducted.

A forensic examination of defendant's computer was conducted by the company Stroz Frideberg.  The FBI and the Government reached an agreement with counsel for NPR to establish protocols that were consistent with FBI protocols for conducting the examination.  This agreement was reached in order to protect confidential NPR data that was located on the defendant's computer.  The examination revealed that images were downloaded by the defendant on April 6, 2008.  The computer was in the defendant's possession at the time the images were downloaded.  The defendant knowingly downloaded the child pornography images onto his computer.  The images were located in the following directory: C\DocumentsandSettings\dmalakoff\MyDocuments\limwire\incomplete.  There were at least 150 images of child pornography found on the defendant's computer.

The images contained depictions of prepubescent children, as well as images of sexual acts of violence against children.  For example, there were video clips of prepubescent children engaging in fellatio, vaginal intercourse and masturbation.

The defendant admits to knowingly possessing materials depicting child pornography that had been shipped or transported in interstate commerce or foreign commerce by means of a computer.

DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed the Statement of Offense with my attorney, Danny Onorato,

Esquire.  I agree, and acknowledge by my signature that this Statement of Offense is true and

correct.

Date: __3/6/09__

**David Malakoff**
Defendant

Date: __3/6/09__

**Danny Onorato, Esquire**
Attorney for David Malakoff

JA2597

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.

STEPHEN JOHNSON,

                 Defendant.
_____/

Criminal Action
No. 1:22-176

Washington,
October 31, 2024

10:09 a.m

TRANSCRIPT OF SENTENCING
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**     **Paul Courtney**
                         **Ryan Lipes**
                         U.S. Attorneys Office
                         United States Attorney's Office
                         601 D Street NW
                         Washington, DC 20530
                         Email: paul.courtney@usdoj.gov
                         Email: ryan.lipes@usdoj.gov

**For the Defendant:**    **Jonathan Jeffress**
                         KAISER DILLON, PLLC
                         1099 14th Street, Suite 800 West
                         Washington, DC 20005
                         Email: jjeffress@kaiserdillon.com
                       **Tony Miles**
                         MILES LAW PLLC
                         1717 K Street, NW, Suite 900
                         Washington, DC 20006
                         Email: tonymiles@mileslawpllc.com

**Reported By:**          **LORRAINE T. HERMAN, RPR, CRC**
                         Official Court Reporter
                         U.S. District & Bankruptcy Courts
                         333 Constitution Avenue NW
                         Washington, DC 20001
                         lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1      **DEPUTY CLERK:** Good morning, Your Honor, this is
criminal case year 2022-176, *United States of America versus
Steven Johnson.*

      Probation Officer is Kelli Willett.

      Counsel, please come forward to introduce
yourselves for the record, beginning with the government.

      **MR. COURTNEY:** Good morning, Your Honor.
Paul Courtney for the United States.  I am joined at counsel
table by my colleague Ryan Lipes.

      **THE COURT:** Mr. Courtney and Mr. Lipes.

      **MR. JEFFRESS:** Good morning, Your Honor.
Jon Jeffress and Tony Miles on behalf of Mr. Johnson, who is
present.

      **THE COURT:** Mr. Jeffress, Mr. Miles and
Mr. Johnson.

      We are here to sentence the defendant on the five
counts of transportation of child pornography and one count
of possession of child pornography, as to which he was found
guilty by the jury.

      Before we get into the specifics, I'm just going
to state for the record that obviously this hearing was
going to have been tomorrow.  I had it moved earlier for my
own schedule.  But even though it's October 31st, I am going
to apply, for purposes of the sentencing today, the new

1    sentencing guidelines, which are set to take effect

2    tomorrow.

3        I believe that, for purposes of this matter, the

4    only relevant change is the addition of Section 1B1.3(c)

5    regarding the relevance of the acquitted conduct.  The

6    parties disagree about the effect of that change on the

7    sentencing, and we'll get to that in due course.  But for

8    present purposes, I intend to apply the new guidelines,

9    including that new provision.

10        Are there any other changes to the guidelines that

11    the parties believe are relevant, other than the one I've

12    identified?

13        **MR. JEFFRESS:**  Not that we are aware of,

14    Your Honor.

15        **MR. COURTNEY:**  No, Your Honor.

16        **THE COURT:**  Thank you.  Okay.

17        So just to state for the record what I've done to

18    prepare for today, of course I presided over the trial, so I

19    have a pretty high level of familiarity with the facts.

20        In addition to my pre-existing knowledge, I've

21    reviewed the Presentence Investigation Report and

22    recommendation -- thank you for that -- the sentencing

23    briefs submitted by both parties, together with the

24    supplemental brief submitted by the defendant or the

25    response, really -- I suppose we'll call it -- to the

1    government's brief from the defendant; the various victim

2    impact statements and restitution requests proffered by the

3    government; and the numerous statements, letters and the

4    like submitted in support of Mr. Johnson.

5             Are there any other written materials I should be

6    aware of from the government's perspective?

7        **MR. COURTNEY:**  No, Your Honor.

8        **THE COURT:**  And I should note, I'm kind of

9    including it within my having reviewed the brief from the

10   defendant, because it refers to it, but I've reviewed the

11   psychosexual evaluation that was done as to the defendant as

12   well.

13            Any other written materials I should know about

14   from the defense perspective?

15       **MR. MILES:**  No, Your Honor.

16       **THE COURT:**  Okay.  Here's how I plan to proceed.

17   I'll first consider any objections to the facts and

18   circumstances described within the Presentence Investigation

19   Report and make my factual findings regarding it.

20            I'll then hear from the parties regarding their

21   differing views on the applicability of various guidelines

22   questions.  And after that, we'll go through the guidelines

23   calculation, as I see it, and resolve those disputed

24   questions.

25            After having done that, I'll hear from counsel for

1    both parties, from anyone who wishes to speak on behalf of

2    Mr. Johnson and Mr. Johnson, if he wishes to address the

3    Court.  I never require it.  It's always the defendant's

4    option to speak if he would like.

5            And at that point, Mr. Johnson, if you would like

6    to speak, you're welcome to but you're under no obligation

7    to.  And then, assuming everything else is in order, I will

8    pronounce the sentence.

9            So referring first to the facts and circumstances

10   contained or described within the PSR.  Obviously, there are

11   a number of objections from both parties contained at the

12   back of the PSR, but most, if not all of those, seem to be

13   objections to the PSR's guidelines calculations rather than,

14   really, a dispute about whether certain facts or

15   circumstances are true as described in the PSR.

16           But let me just make sure that's correct.  From

17   the government's perspective — and I realize that there's

18   often not a bright line between these two questions.  But

19   does the government object to any of the facts and

20   circumstances described in the PSR?

21           **MR. COURTNEY:**  No, Your Honor.

22           **THE COURT:**  Mr. Jeffress, obviously you're going

23   to have an opportunity to argue about the applicability of

24   guidelines enhancements and the like in light of the record

25   here, but are there any objections, from the defense

1    perspective, to the facts and circumstances described in the

2    PSR?

3            **MR. JEFFRESS:**  No, Your Honor.

4            **THE COURT:**  Okay.  Thank you.

5            So, Mr. Johnson, I'm referring to the PSR in this

6    matter, the Presentence Investigation Report prepared by

7    Probation.  Have you had enough time to review this report

8    and to discuss it with Mr. Jeffress and Mr. Miles?

9            **THE DEFENDANT:**  Yes, Your Honor.

10           **THE COURT:**  Are you satisfied with their services?

11           **THE DEFENDANT:**  Yes, Your Honor.

12           **THE COURT:**  Thank you.

13           Pursuant to Rule 32, I accept the factual findings

14    contained in the PSR regarding the circumstances of the

15    offenses, and I adopt those facts for the purposes of

16    imposing a sentence.

17           Turning to the next step, which are the various

18    guidelines questions, Mr. Courtney, are you going to take

19    the lead on that?  Mr. Lipes?

20           **MR. COURTNEY:**  Yes, Your Honor.

21           **THE COURT:**  Why don't you come on up and walk me

22    through the government's views on at least the most

23    important disputed questions.  And I recognize that the

24    government's brief acknowledged that, upon reflection, you

25    thought that one enhancement is no longer applicable.  So I

1    don't think we need to talk about that one.

2              **MR. COURTNEY:**  Correct.  So just to make the

3    record clear, as a preliminary matter, the government had

4    objected to the PSR with respect to the two-level

5    enhancement for Obstruction of Justice under 3C1.1 based on

6    the facts of what happened with Mr. Johnson's finances, both

7    during the self-surrender period and then in the presentence

8    investigation interview.

9              The government is withdrawing that objection, as

10   noted in the memorandum, and we're instead asking the Court

11   to consider that conduct in its analysis of the 3553(A)

12   factor.

13             **THE COURT:**  Okay.

14             **MR. COURTNEY:**  As the Court noted, the government

15   also, upon further reflection, is conceding that, on our

16   facts, the distribution enhancement under

17   Section 2G2.2(b)(3) does not properly apply.  So the

18   contested issues are, first, whether the defendant is

19   entitled to a two-level reduction under 2G2.2(b)(1) for

20   conduct that's limited to receipt or solicitation.  It's the

21   defendant's burden to show that that reduction is merited

22   here.  It is not.

23             The defendant was plainly convicted of

24   transportation of child pornography.  That is conduct that

25   is beyond receipt or solicitation.

1      The defendant primarily relies on a not

2  precedential Third Circuit opinion called *United States*

3  *versus Chiccini*.  I have to correct one aspect of our brief.

4  I think I said in a footnote it wouldn't have circulated to

5  the full Third Circuit.  I believe that it would have

6  because I overlooked that it contained a dissent, but it is

7  still not considered an opinion of the Court in Third

8  Circuit.

9      *Chiccini* is distinguishable, as the government

10  noted, because, one, the defendant was convicted of receipt,

11  not transportation.  And the majority of the panel appears

12  to have conflated distribution and transportation, that he

13  didn't transport it.  Plainly he transported it.  He didn't

14  distribute it.

15      And that's pointed out in the dissent by

16  Judge Matey that even someone not convicted of

17  transportation under a relevant conduct analysis in

18  *Chiccini*'s case, his conduct amounted to transportation.

19  For those reasons, the government submits that the defendant

20  did not show his burden of showing the conduct applies.

21      The next enhancement, and this one is the

22  government's burden, is the four-level enhancement for

23  images that depict sadistic conduct or sexual abuse or

24  exploitation of an infant or toddler.  There are various

25  video files that were admitted into evidence that easily

1    meet this enhancement.

2         The government identified one, in specific, that

3    underlie a count of conviction, Count 2, 'cause that would

4    present the fewest issues for the Court in terms of

5    arguments about relevant conduct and acquitted conduct.

6         That depicted a prepubescent girl holding an

7    electric toothbrush on her vagina and then having a man

8    apply it to her vagina.  The government cited numerous cases

9    from the Courts of Appeals where courts have found

10   penetration involving a foreign object or conduct that is

11   degrading, painful, humiliating, to be sadistic, inherently

12   sadistic, within the meaning of that guideline.

13        The defendant, in response, argues that, while

14   it's not penetration because it's just on her vagina.  I

15   don't think that's material under the case law.  I don't

16   think it's material under definition of penetration

17   elsewhere in the United States Code.

18        And Chapter 109(a), in dealing with sex abuse,

19   penetration is referred to as "penetration, however slight."

20   I think that's, kind of, a classic definition that a lot of

21   state statutes and courts have applied when considering

22   penetration.

23        I don't think we need to get into a dispute about

24   the degree of penetration here, because it's clearly conduct

25   that would be painful and is humiliating and is degrading

1    and falls within the spirit of what makes that conduct

2    inherently sadistic.

3              There are certainly other — the government cites

4    another file that was uploaded that depicts a much easier

5    example that depicts the rape of an infant.  If the Court

6    doesn't find that the file underlying Count 2 with the

7    toothbrush is inherently sadistic, it can certainly consider

8    other files that the defendant uploaded as relevant conduct.

9        **THE COURT:**  If I decided I wanted -- let's assume,

10    hypothetically, I thought that the toothbrush example was

11    questionably satisfying the enhancement and I said, just to

12    be really clean about it all, I'm not going to consider any

13    of the videos as to which the transportation counts resulted

14    in acquittals, but I was willing to consider other files

15    that may or may not, obviously, have supported the

16    possession count.

17              What's the file that would be — I guess it would

18    be a file not within the 10 transportation counts but was,

19    at least allegedly possessed by the defendant that would

20    satisfy this standard in your view?

21        **MR. COURTNEY:**  I don't know that I have that

22    example top of mind.  I know that such files have been

23    introduced into evidence.  I think the other example that we

24    cite was one of the transportation files, because those are

25    the files on which we elicited testimony in order to, kind

1    of, reduce and be judicious about the amount of child

2    pornography that we were showing to the jury, we played only

3    transportation files and select others.

4              **THE COURT:**  Fair enough.

5              **MR. COURTNEY:**  But we'd have to go back and

6    respond to the Court on that.

7              **THE COURT:**  Okay.

8              And can you just walk me through, just to go back

9    to the question whether this enhancement applies, obviously

10   we are under 2G2.2(b)(4).  So does the material portray

11   sadistic or masochistic conduct or other depictions of

12   violence.  Is that a defined term or terms within the

13   guidelines?

14             **MR. COURTNEY:**  I don't believe so.  It's been

15   interpreted through case law.

16             **THE COURT:**  To be?  So, has the D.C. Circuit

17   defined that phrase?

18             **MR. COURTNEY:**  Not to my knowledge.  We've cited

19   cases from other circuits that have, and the consensus of

20   the Courts of Appeals that have considered the issue is

21   generally that penetration, any penetration of a

22   prepubescent minor is inherently violent and sadistic

23   because it necessarily is something that would be painful.

24             Pain is not the only idea that the courts

25   discussed.  They also discussed conduct that is degrading

1    and that is humiliating.

2          And so I'll just refer the Court to *United States*

3    *against Turchen*, 187 F.3d 735, which is a Seventh Circuit

4    case, in which the Seventh Circuit explained that sadistic

5    and masochistic conduct includes sexual gratification, which

6    is purposefully degrading and humiliating.

7          Certainly, having a very young girl hold an

8    electric toothbrush on her vagina to stimulate masturbation

9    and then to have a man hold it there is humiliating and

10   degrading and I would imagine painful.

11         So our view is that that video, under the case law

12   of other circuits who have considered the term, would check

13   all of those boxes and would be inherently sadistic.

14         **THE COURT:** Thank you. Okay.

15         **MR. COURTNEY:** I believe the only other issue is

16   the number of images, and this falls into whether the Court

17   considers files other than the transportation files. The

18   defendant was convicted of possession in Count 16. There

19   was evidence introduced of in excess of 218 child

20   pornography videos that the defendant uploaded to his Google

21   Drive and possessed in the Google Drive.

22         **THE COURT:** I take it the government's view is,

23   imagine hypothetically this was a possession-only case.

24         **MR. COURTNEY:** Right.

25         **THE COURT:** And the defendant was charged with

1  possession of child pornography.  Full stop.  And was

2  convicted of possession of child pornography.  Full stop.

3  And the jury was shown some, but perhaps not every file that

4  was in evidence.

5       That once that is true, it is up to me to decide

6  by a preponderance — again, I'm talking about just a

7  possession count.

8       **MR. COURTNEY:**  Right.

9       **THE COURT:**  By a preponderance what the number of

10  videos was and, therefore, what the number of images would

11  be calculated to be.

12       **MR. COURTNEY:**  Correct.  And I don't -- I think

13  the Court doesn't really need to get into the acquitted

14  conduct amendment on this at all, because the Court can just

15  assume, without deciding, that the transportation files, the

16  files underlying the transportation counts for which there

17  was an acquittal, don't count.  There's still over 200 --

18       **THE COURT:**  Which is sort of the question I was

19  asking before.

20       **MR. COURTNEY:**  Right.

21       **THE COURT:**  If I assumed away the acquitted

22  conduct transportation counts for the sadistic or

23  masochistic conduct, what the rest of the files might have

24  in them.

25       **MR. COURTNEY:**  Right.  I mean, back to that

14

1    question, I can't, standing here, identify a specific file.

2    I know that there are additional videos that were not

3    charged for transportation that depict the penetrative rape

4    of very young girls.

5            And even if the Court, for the image count, sets

6    aside the acquitted files, there are still over 200 video

7    files that were introduced into the evidence and about which

8    there was uncontested testimony that they were child

9    pornography.

10           **THE COURT:**  Do you happen to know — sorry to go

11   back to the question we were talking about before.  But that

12   provision of 2G2.2(b)(4) actually has two prongs.  So you

13   get a four-level increase if it's either sadistic or

14   masochistic conduct -- da, da, da -- or sexual abuse or

15   exploitation of an infant or toddler.

16           Do you happen to know whether -- again, if we're

17   talking about the non-transportation files, whether there

18   are files within that corpus that reflect the sexual abuse

19   or exploitation of an infant or toddler?

20           **MR. COURTNEY:**  I believe so but I am more certain

21   that there are files that depict penetrative rape of

22   prepubescent girls.

23           **THE COURT:**  Okay.

24           **MR. COURTNEY:**  But in any event, the defendant has

25   argued well, because he could have been convicted on the

15

1    possession count by virtue of one file, that the jury has

2    acquitted him of everything else; and that's just not so.

3    There's been no acquittal on possession.

4           And the fact that the jury might have found the

5    burden satisfied beyond a reasonable doubt by one file, does

6    not mean that they reached any agreement as to any other

7    file.

8           An acquittal requires a unanimous finding that the

9    defendant is not guilty.  And at best, under the defendant's

10   view of the jury's verdict, there is no finding as to the

11   additional files.  And the Court can make that finding under

12   a preponderance standard.

13          **THE COURT:**  This is an analytical question about

14   the guidelines and grouping which may be, it seems to me,

15   the parties agree on, but I just want to make sure I

16   understand it.

17          Here we have — of course, we have five

18   transportation counts, each of which involved an individual

19   file as to which there was a finding of conviction.  We then

20   have five transportation counts as to which there was a

21   finding of acquittal and then the possession count.

22          The PSR and the parties, I think, all group those

23   six counts of conviction together at the beginning of the

24   analysis and then essentially say, for example, on, you

25   know, the first count of transportation guilt, right,

1    there's a base offense level.

2        And then, in thinking about enhancements, we're

3    not limited to the qua transportation count.  We can go look

4    at other conduct, related conduct.  Is that true whether

5    there's grouping or not?

6        In other words, imagine, hypothetically, that the

7    jury convicted Mr. Johnson of only one transportation count

8    but the evidence was otherwise — the hypothetical gets a

9    little bit complicated because I'm trying not to introduce

10   the possibility of acquittal on possession.

11       But imagine that the evidence was introduced as it

12   was introduced.  The jury convicted Mr. Johnson of only

13   one transportation count and there was no possession count.

14       In thinking about enhancements on a single

15   transportation count — so now you're not grouping with any

16   other, with anything else, just that one transportation

17   count.  Is it crystal clear that, when I think about whether

18   all of the enhancements that apply, I can look at all of the

19   evidence related to what happened on the relevant days, the

20   files that were stored together and the like?

21       **MR. COURTNEY:**  Yes, and that's because of the

22   relevant conduct provision.  The offense is not limited to

23   the offense of conviction.  It's what the evidence shows.

24   And so the Court, under a relevant conduct analysis, could

25   look at this evidence, even if it was a single count of

17

 1    transportation and say it clearly establishes possession.

 2          **THE COURT:**  What I think that means then — and I'm

 3    not disagreeing.  I just want to make sure that we're clear

 4    about it is, as to the five counts of transportation, even

 5    if you did the offense level analysis independently for each

 6    of the five, you'd start at the same base offense level.

 7    And then for purposes of enhancement questions, you'd be

 8    looking at all relevant conduct.

 9          And from the government's perspective, each of the

10    enhancements or — well, really, any of the adjustments to

11    the base offense level would be the same as to each

12    transportation count, even if you haven't grouped them.

13          And then, I think it's also true then that, if we

14    were doing the possession count alone and not grouping it,

15    just saying possession count, the base offense would start

16    lower, at 18.  But then each of the adjustments would be the

17    same as the adjustments in each of the transportation count

18    because it's the same relevant conduct.

19          Do you agree with all of that?

20          **MR. COURTNEY:**  I do.

21          **THE COURT:**  And if you did it that way, as I have

22    found the need to do in other circumstances where there was

23    a more difficult grouping question -- but just stick with me

24    for a second -- you would get an offense level for each of

25    the six counts of conviction here that would be different.

1          It would be, like, from the government's
2    perspective, you know, it would be, hypothetically, 35, 35,
3    35, 35, 35, 31.  And then you would just ask whether those
4    group or not.  And here, I think the parties are in
5    agreement that the grouping is appropriate, and then you
6    just look to the highest offense level.

7          **MR. COURTNEY:**  Yes.

8          **THE COURT:**  And so the enhancement analysis isn't
9    really dependent on grouping or not at the front end.  It's
10   a result of the relevant conduct provisions in the
11   guidelines.

12         **MR. COURTNEY:**  I think that's right.

13         **THE COURT:**  Okay.

14         **MR. COURTNEY:**  So in that respect, I think our
15   reliance on the possession count may have been misplaced
16   because, even without it, the evidence would be in evidence
17   and could be considered as relevant conduct.

18         **THE COURT:**  Well, except that I'm just going to
19   preview something for everyone.  I mean, I think there is
20   some strength to the defendant's argument that, yes, I was
21   convicted of transportation.  And transportation, it does
22   have elements different than possession, but I wasn't
23   sending them to other people.  I surely wasn't distributing
24   these files, and, you know, this is really like a possession
25   case.

1          And there's a way of thinking about this case.

2     I'm not just saying it's correct from a guidelines-strict

3     perspective but you think about this case as a possession

4     case.  And you say, okay, possession different base offense

5     level.

6          Now let's work through the possession count

7     guidelines analysis.  And I think, from the government's

8     perspective, realizing that you probably don't agree with

9     that as an argumentative proposition.

10         **MR. COURTNEY:**  Sure.

11         **THE COURT:**  But that if you do the possession

12    count guidelines analysis, it almost certainly results in an

13    offense level that's four levels below any of the individual

14    transportation counts for the reasons we were talking about

15    before.

16         **MR. COURTNEY:**  That's correct.  I think the only

17    distinction under the approach that we've been discussing

18    would be in the base offense level.

19         **THE COURT:**  Yeah.  Right.

20         Are there any other guidelines questions you'd

21    like to raise?

22         **MR. COURTNEY:**  Not from the government.  Thank

23    you, Your Honor.

24         **THE COURT:**  Okay.  Thank you.

25         It looks like Mr. Miles is up on the guidelines

1   today.

2          **MR. MILES:**  I am.

3          **THE COURT:**  Good morning.  Welcome back.

4          **MR. MILES:**  Good morning, Your Honor.  Thank you.

5          Just so the record is clear, I want to add to this

6   whole issue about considering relevant, the new amendment to

7   the guidelines regarding acquitted conduct today.

8          It's also my understanding that the government

9   agrees that we do so.  I know the Court indicated it was

10  going to do that, but I just want the record to be clear,

11  unless the government corrects me, that the government also

12  agrees that we should --

13         **THE COURT:**  I think everyone is in agreement.

14  You're right.  I meant my lead-in in the beginning to

15  include that.  But it seems to me that all parties and I

16  agree that, for purposes of the sentencing today, I am

17  applying the guidelines as they will be effective tomorrow.

18         **MR. COURTNEY:**  Okay.

19         **MR. MILES:**  Okay.  Thank you, Your Honor.

20         Since the distribution issue has been handled, I

21  won't deal with that.  I understand the Court's not going to

22  add two levels for distribution.

23         **THE COURT:**  Correct.

24         **MR. MILES:**  I'll move on to whether there should

25  be a two-level decrease under 2G2.2(b)(1).  And everyone

1    agrees that there are three prongs you have to satisfy.

2         Everybody agrees he starts at 22.  This does not

3    involve trafficking or distribution.  I think the only issue

4    here is whether the conduct is limited to receipt or

5    solicitation.  We believe and argue, Your Honor, that this

6    conduct here is limited to just receipt.  That's what

7    happened here.

8         This case is nothing more than Mr. Johnson

9    receiving these images, this material, to his Google, his

10   own personal Google Cloud account.  It belongs to nobody

11   else.  It's his account only.  And so that's why, you know,

12   we argue that it's receipt only.

13        The *Chiccini* case is the only case cited by

14   anybody that is square-on factually.  That case involves

15   somebody who, like Mr. Johnson, files were uploaded to that

16   person's personal Google Drive account.  And as the Court

17   was talking about earlier, the purpose of the guidelines,

18   it's about the conduct, the relevant conduct.

19        I think the government's focusing too much on

20   *Chiccini* got a plea offer to some other plea.  Mr. Johnson

21   didn't.  But the conduct is the same.  And so there really

22   is no distinction between our case and *Chiccini*.

23        The government cites two cases where there is a

24   material distinction.  And that distinction is that, in

25   those cases, those individuals physically had photographs,

1    child pornography, put them in their car, drove their car

2    across state lines and transported them in that way.  So

3    there is a factual distinction between our case.  And the

4    *Chiccini* case is the only --

5        **THE COURT:**  Why isn't uploading images to a Google

6    Drive to facilitate or at least potentially facilitate their

7    being viewed from anywhere in the world, the Internet

8    version of those two cases?

9        **MR. MILES:**  Well, it's — and I would say, I think

10   the government focuses on this interstate commerce nexus

11   issue.  And when looking at the statute for what one would

12   have to do to be found guilty of receipt of child

13   pornography, it too involves an interstate commerce nexus.

14       Looking at the statute that criminalizes receipt,

15   somebody would have to receive it, but it has to be a visual

16   depiction that — you know, they received it.  They receive

17   the visual depiction by using any means or facility of

18   interstate commerce or it has to have been shipped or

19   transported in or affecting interstate or foreign commerce

20   or it had to have contained material which had been mailed

21   or shipped or transported.

22       So even the receipt statute, which we all agree

23   would require the Court to apply the two-level decrease,

24   does require some element of interstate commerce.

25       And so here, we have Mr. Johnson receiving the

1    images through a means of interstate commerce, just like the

2    receipt statute criminalizes.

3           **THE COURT:** Right.  The jury then convicts him of

4    transporting.

5           **MR. MILES:** Right.

6           **THE COURT:** Which involves the upload to the

7    drive.

8           **MR. MILES:** Uh-huh.

9           **THE COURT:** And why isn't that extra step more

10   than receipt?  It's beyond receipt because it's an extra

11   step.  And why isn't that the Internet version of driving

12   across state lines with the picture in your car?

13          **MR. MILES:** The difference, Your Honor, is that,

14   in this case, Mr. Johnson didn't — he didn't travel across

15   state lines with the images.  The images just, you know,

16   went through the Internet to a server in California.

17   Whereas, the cases cited by the government, which are also

18   out of circuit and not --

19          **THE COURT:** So the images traveled in interstate

20   commerce and he didn't?

21          **MR. MILES:** Yes.  In the cases cited by the

22   government, the person traveled.

23          **THE COURT:** And that's a distinction with a

24   difference why?

25          **MR. MILES:** The difference is that, as I

1    indicated, our case, Mr. Johnson didn't travel or traffic --

2         **THE COURT:**  He didn't travel.

3         **MR. MILES:**  Uh-huh.

4         **THE COURT:**  The images did, at least in sort of

5    the Internet sense --

6         **MR. MILES:**  Right.

7         **THE COURT:**   --Because the jury found they were

8    transported to the drive.

9         So why does whether Mr. Johnson traveled as those

10   other individuals in those other cases did, I guess by

11   driving their cars across a state line.  If he didn't do

12   that, why is that a distinction that matters for purposes of

13   considering whether this provision is applicable?

14        **MR. MILES:**  I believe driving is more akin to a

15   trafficking type of thing because with trafficking you're

16   going across state lines, whereas this isn't.

17        And the bottom line here, I think, I'm trying to

18   point out, though, is that trying to find a case factually

19   similar to ours, it is the *Chiccini* case which holds that

20   the two-level decrease does apply.

21        Whereas, the cases the government cited, is on

22   different facts.  And yeah, I think that's, you know, the

23   key point.  And then I indicated that most cases, I think,

24   are more akin to trafficking than in our case or *Chiccini*.

25        **THE COURT:**  Okay.  Thank you.

1      **MR. MILES:**  Now, and I do want to note, just

2   adding, that the receipt crime also was penalized by a

3   mandatory minimum of five years, just indicating the

4   similarity to the offense with which Mr. Johnson was

5   convicted.  Whereas, a possession charge has no mandatory

6   minimum.

7      Moving on to the four-level enhancement for the

8   masochistic and other depiction to violence or sadism.

9      **THE COURT:**  Yes.

10      **MR. MILES:**  The key here is the acquitted conduct

11   provision.  And I think the bottom line with this issue, and

12   the other number of images issue, is the most, I think,

13   reasonable way to interpret the jury's verdict is they found

14   Mr. Johnson guilty of five counts where there was evidence,

15   forensic evidence from the government, that he can dispute

16   whether it shows he clicked on or viewed, whatever that is.

17      But there was forensic evidence from the

18   government that showed that Mr. Johnson actually either

19   clicked on or viewed these images.  When they found that

20   evidence, they convicted Mr. Johnson.

21      And we have the other 10 transportation counts,

22   where there was not such evidence, and the jury

23   affirmatively acquitted him of those counts.  When the jury

24   was not presented with evidence, forensic evidence, to

25   indicate that Mr. Johnson either clicked on or viewed, the

1    jury acquitted him.

2         And I think, taking that reasoning, is the way we

3    should look at the possession charge; that he was convicted.

4    The best way to understand the jury's verdict is he was

5    convicted only of the files for which they had forensic

6    evidence showing he clicked on or viewed.  And he was

7    acquitted of everything else.

8         And we, you know, should add, we talk about in our

9    pleadings that the government made that very clear during

10   its closing argument, that that's all the jury had to do.

11   They only had to find one.  It was very clear to the jury.

12   The jury instructions indicated that.

13        And I wanted also to mention that we asked for a

14   special verdict form that would have provided more clarity

15   on this, so that the jurors had to be clear about what they

16   agreed to on which specific files and the government

17   objected to that.  So we don't have that special verdict

18   form.

19        And I will also add there is a rule of lenity.  If

20   the Court finds this is ambiguous, then the rule of lenity

21   would indicate that any ambiguity should be found in favor

22   of the defendant.

23        **THE COURT:**  All right.  I don't think there is any

24   question, applying the new guidelines, I can't consider the

25   expressly acquitted transportation counts.  No doubt.  We

1    have the five transportation counts where there's a guilty

2    verdict.  And those are four or five files, in your view?

3         **MR. MILES:**  Yeah, four, exactly.  Do you want me

4    to argue that now?

5         **THE COURT:**  Well, we'll take that up in a second.

6         **MR. MILES:**  Yeah.

7         **THE COURT:**  So it's four or five.

8         **MR. MILES:**  Correct.

9         **THE COURT:**  In your view, whether it's four or

10   five, the possession count should be viewed as not the

11   finding by the jury that he possessed at least one, but that

12   he possessed four or five.

13        **MR. MILES:**  We think trying to understand the

14   jury's verdict is, because they convicted him of the four or

15   five counts that were transported, it reasons that, with

16   regard to possession, they convicted him of those as well.

17             But in applying that same reasoning, it also

18   indicates that they acquitted him, not just didn't decide or

19   didn't get to it is unresolved, but they actually acquitted

20   him of the remaining counts, the counts — well, we know they

21   acquitted him of the other transportation of all the other

22   images.  And I think that's the --

23        **THE COURT:**  Is it your view that perhaps the

24   government should have charged him with like 200 possession

25   counts?

1    **MR. MILES:**  Well, of course, we'd prefer not that

2    he have that many counts, but I think that that's why we

3    asked for the specific verdict form.  I think we'd prefer

4    that they charge him as they did, but we have a special

5    verdict form so we're very clear on what --

6         **THE COURT:**  Can you remind me what that special

7    verdict form would have required the jury to say on the

8    possession count?

9         **MR. MILES:**  That if they convict him of a

10   possession count, they had to decide which files they

11   unanimously agreed --

12        **THE COURT:**  So, what?  The jury was going to have

13   to like write down the files or was there a 200-list file

14   thing at the bottom, and they would have had to say, yes/no,

15   yes/no, yes/no?

16        **MR. MILES:**  We didn't do that.  I remember it

17   wasn't that long of a form.  But it was a form that we

18   wanted to make clear.  And if the Court would agree, perhaps

19   it would have turned out that way.  But from our

20   perspective, that there needs to be some indication and the

21   jurors need to make a decision as to what specific files

22   they unanimously agree on.

23             And if we would have gone down that road, it's

24   possible that we could have had -- they would have had to

25   decide it.

```
 1              THE COURT:  I don't remember myself rejecting that
 2    as a proposition, but maybe I'm just not remembering the
 3    record here.  But in any event, I understand your view.
 4              Let's just go back to the four versus five
 5    question because, even under this view, I have to figure out
 6    if we're talking about four or five videos.  So walk me
 7    through your view on the one or two --
 8              MR. MILES:  Are we dealing with like for the
 9    number of images at issue for that?  I think that's the
10    reason the Court would have to decide.
11              THE COURT:  Yeah.
12              MR. MILES:  And, frankly, it's the same guideline
13    enhancement, whether it's four or whether it's five.
14              THE COURT:  Okay.
15              MR. MILES:  I mean, we believe it's five but it
16    really doesn't matter.
17              THE COURT:  Okay.  Fair enough.
18              MR. MILES:  We're still at a four-level
19    enhancement away.
20              THE COURT:  All right.  Depending on what happens
21    with the acquitted conduct question, that resolves.  Okay.
22    Fair enough.
23              MR. MILES:  So, yeah.  So this acquitted conduct
24    issue is key to whether the four-level enhancement applies
25    for the sadism and masochism issues or a number of images.
```

1          And so I just want to be clear for the record

2     that, from our perspective, it really is only the four or

3     five of which he was convicted, and that he was acquitted of

4     the rest.  It just makes sense with the jury's verdict.

5          The jury note, they had a note that indicated they

6     wanted to see forensic evidence and they listed certain

7     counts where there was no forensic evidence or there was

8     some type — they were looking for something with the counts

9     and they acquitted on all of those counts.

10          But I want to be clear about the possession.  I

11     think that is the fair and reasonable way to read the jury's

12     verdict with regard to the possession, is that they

13     acquitted him of everything for which there was no forensic

14     evidence that he clicked on or viewed, as opposed to just

15     they didn't decide them and then the Court can decide by a

16     preponderance of the evidence whether, you know, those

17     images should be counted as relevant conduct.  That's our

18     view that that was everything but those five were acquitted

19     for those counts.

20          **THE COURT:**  All right.  I totally get it.  Let me

21     just ask this question.

22          **MR. MILES:**  Yes.

23          **THE COURT:**  Which is the flip of what I was asking

24     the government, which is, if I'm thinking about the corpus

25     of files that — I guess the easiest way to think about it

1    is, at a minimum, not the expressly acquitted transportation

2    conduct files, but essentially everything that's other than

3    the transportation counts.

4            **MR. MILES:**  Uh-huh.

5            **THE COURT:**  Do you concede that, within that

6    universe of files, there were files portraying either

7    sadistic or masochistic conduct or other depictions of

8    violence or sexual abuse or exploitation of an infant or a

9    toddler?

10           **MR. MILES:**  Let me confer with co-counsel, just

11   because we both viewed the files and I just want to confer.

12           **THE COURT:**  Please.

13       (Brief pause.)

14           **MR. MILES:**  As Your Honor may know, counsel had an

15   opportunity on a few occasions to view the evidence in this

16   case and, based on our review, we concede that.

17           **THE COURT:**  Okay.  I think it's two questions,

18   actually, in light of that.  It's, one, did the jury

19   effectively acquit on the possession count as to all these

20   other files?  And, two, even if not, did the government

21   prove by a preponderance for purposes of sentencing or does

22   the evidence establish by a preponderance for purposes of

23   sentencing that this enhancement applies?  That is a

24   different question.

25           **MR. MILES:**  Yes.

1          You know what, to throw an extra wrinkle in this,

2     I'll note that I noticed, looking at the counts the jury

3     convicted of, they all were on the earlier date, the

4     September date.  I don't remember the exact day.  And they

5     acquitted everything in the October 1st.

6          So although we made the concession we made, I

7     can't tell you whether the ones that fit that description

8     were October 1st files versus the other one.  So I just want

9     to add that for the record.

10          I think that makes it more challenging, I think,

11     for this Court to find by a preponderance of the evidence

12     that those images should be counted, if the Court, you know,

13     were to go down that road.

14          Again, I think our position is clear.  Everything

15     but the five we argue was acquitted.

16          **THE COURT:**  Understood.

17          **MR. MILES:**  And the Court shouldn't consider that.

18          **THE COURT:**  Yes.

19          **MR. MILES:**  Any other questions?  Otherwise, I

20     have — okay.  Thank you.  Court's indulgence.

21          **THE COURT:**  Please.

22          **MR. MILES:**  I do want to add, again, the rule of

23     lenity.  I want to remind the Court about the rule of

24     lenity, as we are citing these issues.

25          Now, the number of images, Your Honor, I think,

1    again, it boils down to that issue.  And I think, if the

2    Court does base it just on the counts of conviction, either

3    four or five, either way it's a four-level increase and not

4    a five-level increase.

5          And so does the Court have any other questions on

6    that?

7          **THE COURT:**  No.  Thank you, Counsel.

8          **MR. MILES:**  Thank you.

9          **THE COURT:**  Do you want to respond briefly?

10         **MR. COURTNEY:**  Very briefly.

11         On the issue that was raised about the defendant

12   not traveling, I don't think that that is really material.

13   I don't think there's a basis in the case law to slice

14   transportation that thin and say it's only cases in which

15   there's been interstate transportation.

16         However, the Court can find that there was travel

17   based on the trial evidence by a preponderance.  There was

18   forensic evidence that some files underlying the counts of

19   transportation conviction were downloaded and viewed on the

20   laptop on April 27th of 2020.

21         There was also testimony through the defense's

22   expert that IP addresses on that day showed that the

23   defendant was in Africa, and also testimony from the

24   defendant's wife that he had traveled to Africa in 2020.

25   And so the Court can find, based on the evidence by a

1    preponderance if it needed to reach this issue, that

2    Mr. Johnson initially possessed those files in Africa and

3    brought them back to the United States.

4         As to reading into why the jury acquitted on the

5    transportation counts it did and convicted on the

6    transportation counts it did, I don't think we can know.  I

7    don't think we can be certain that it was limited to

8    evidence that he viewed the files.

9         And I say that because of Count 4; and that's the

10   count on which the jury wobbled, where there was a guilty on

11   the first verdict and then a not guilty on the second.

12   There was evidence that the defendant viewed that file in

13   the browser back in April of 2020, but there was no evidence

14   that it was saved in the PYT trade subfolder, on the

15   computer's desktop.

16        And so it's also a plausible explanation of the

17   jury's verdict, they acquitted on counts where the

18   government could not show the location of the file on the

19   computer, and thus proved that it was transported from

20   one location to the other.

21        I have no further argument unless the Court has

22   questions.

23        **THE COURT:**  Thank you.

24        **MR. MILES:**  May I?

25        **THE COURT:**  You may.

1          **MR. JEFFRESS:**  I'm responding to the government's

2   argument --

3          **THE COURT:**  Please.

4          **MR. MILES:**  -- about the possession in Africa.

5   The government's attorney is raising this for the first

6   time.  There is just no evidence that anything was viewed or

7   whatever happened in Africa that Mr. Johnson physically had

8   those images and brought them back to the United States.

9          And I did want to say something about particularly

10  that the government, on the penetration issue, on whether

11  Count 2 meets that definition.  We disagree with the

12  government's definition, however slight.  There was not even

13  slight penetration.  There was simply no penetration and

14  therefore it doesn't meet the definition of violence.

15         And then finally, we didn't address it here

16  orally, but the government did talk about it in their prior

17  pleading about the commentary on the newly acquitted conduct

18  guideline.  There's -- maybe I don't know if I want to call

19  it -- an exception but it does allow the Court to — you

20  know, unless such conduct also establishes in whole or in

21  part the instances of conviction, the Court can consider

22  that.

23         And there is a commentary that indicates that

24  there may be cases in which certain conduct underlies both

25  an acquitted charge in the instant offense of conviction.

1    In those cases the Court is in the best position to

2    determine whether such overlapping conduct establishes, in

3    whole or in part, the instant offense of conviction and

4    therefore qualifies as relevant conduct.

5           I just wanted to be clear.  I think that would

6    apply in a situation where, let's say, Mr. Johnson was

7    convicted of Count 5 and acquitted of Count 8.  Those are

8    the two counts with the video that's the same.

9           And we come in and we say, No, no, no.  He was

10   acquitted on Count 8.  And that depicted a minor under 12.

11   You can't add the two levels for that because he was

12   acquitted of Count 8.  The Court can say, well, no, that

13   same video was Count 5.  It depicts a minor.  It gets a

14   two-level enhancement.  That's where that would apply, not

15   in a case like this where each count, at least certainly

16   with the transportation charge, is different.

17          **THE COURT:**  Thank you, Mr. Miles.

18          I want to take hopefully a pretty quick recess.  I

19   just want to make sure that, when I walk through my

20   guidelines calculation, that I've done it exactly how I

21   intend to and am responsive to what the parties have said.

22          So my plan is to just take perhaps just till 11,

23   come back.  I'll walk through my guidelines analysis, which

24   really shouldn't be long.  I'll do that orally and then

25   we'll get to the allocution component of this.  And

1      depending on how long that goes, I may or may not take a

2      break before I pronounce the sentence.

3              But this is at least a slight deviation from what

4      I said before, which is to break right now.  Because there

5      are enough guidelines questions here, I just want to have a

6      minute to take it under advisement and get it right.  Okay?

7              So we'll be back at, let's assume, 11.  Okay?

8          (Recess was taken from 10:53 a.m. to 11:06 a.m.)

9          **DEPUTY CLERK:**  Your Honor, we are now back on the

10     record.

11         **THE COURT:**  Thank you, Ms. Moore.

12             Obviously, although the sentencing guidelines are

13     merely advisory, I must calculate them correctly and then

14     consider them in announcing the verdict and deciding on the

15     correct sentence today.  So I'm going to walk through what I

16     believe to be the correct guidelines calculation here.

17             I'm going to begin with the question of acquitted

18     conduct.  This dispute arises in part in connection with

19     Paragraph 53 of the PSR, but it also, as we discussed

20     earlier, has an effect on many of the arguments presented in

21     connection with the various enhancements.

22             The new guidelines, which again, I am applying say

23     that "relevant conduct does not include conduct for which

24     the defendant was criminally charged and acquitted in

25     federal court unless such conduct also establishes, in whole

1    or in part, the instant offense of conviction."

2            As we were discussing earlier and as we all know,

3    the jury convicted Mr. Johnson of five counts of

4    transportation but acquitted him on the other ten counts but

5    also convicted him of the one possession count with which he

6    was charged.

7            Mr. Johnson is correct that the jury could have

8    convicted him of possession based on even just one file or

9    based only on the files it convicted him of transporting.

10    But that does not mean that the jury actually acquitted him

11    of possessing all of those specific files.

12            The jury's guilty verdict as to the possession

13    count could be based on one file or it could be based on

14    every single file that the government accused Mr. Johnson of

15    possessing.  In fact, the jury's verdict, as to the

16    possession counts, could rest even on the files that the

17    jury found Mr. Johnson not guilty of transporting.  After

18    all, the transportation counts had additional elements that

19    the possession count did not.

20            It is possible that the jury found Mr. Johnson not

21    guilty on those ten transportation counts because it did not

22    believe that Mr. Johnson possessed the videos charged in

23    those counts.  But it's also possible that the jury believed

24    and concluded that Mr. Johnson possessed those files but

25    that he did not knowingly transport them.

1           And obviously, as everyone who sat through this

2     trial knows, the significant focus of this case was on the

3     question of and issues relating to transportation rather

4     than really about possession.

5           Having said all of that, to avoid not giving

6     enough weight to the jury's verdict, I will assume for

7     purposes of the sentence today that the jury found that

8     Mr. Johnson not only did not transport but also did not

9     possess the files that he was acquitted of transporting.

10          But those acquittals relate only to those 10

11    specific files.  Those acquittals do not relate to the many

12    other files that the government accused Mr. Johnson of

13    possessing.

14          Mr. Johnson's approach of interpreting the jury's

15    verdict as an acquittal as to all but five of the files or

16    four, as we were talking about before, would flip that

17    verdict around.  It would read the jury's finding of guilt

18    on the possession count as an acquittal for most of the

19    files that Mr. Johnson was charged with possession.

20          We have no reason to believe that that happened

21    here.  There's no clear reason for sure.  The only thing we

22    can be sure of is that the jury convicted him on one count

23    of possession.  There is no evidence that the jury acquitted

24    him as to possessing any individual file.

25          Just to be clear, the standard for convicting

1    Mr. Johnson of possession of child pornography was proved

2    beyond a reasonable doubt.  The jury found that the

3    government met that standard as to at least one child

4    pornography file.

5            Now, at sentencing I can consider as relevant any

6    child pornography file that I determine the government

7    proved possession of by a preponderance of the evidence,

8    except, as I've said, just to be clean here, the videos that

9    Mr. Johnson was acquitted of transporting.  I'm eliminating

10   those.

11           So therefore, in determining which enhancements

12   apply or do not apply, I will reference specific photos or

13   videos of child pornography that I conclude the government

14   proved by a preponderance that Mr. Johnson possessed.

15           Just to put a fine point on it, I am concluding

16   that I am not considering any of the conduct for any purpose

17   as to which Mr. Johnson was acquitted.  That is to say the

18   10 transportation counts and, in particular, those 10 files.

19           But I am concluding that the government proved by

20   a preponderance that Mr. Johnson possessed all of the other

21   files of child pornography that were introduced into

22   evidence, including the five counts on which he was found

23   guilty of transportation.

24           With that in mind, I'm going to walk through my

25   guidelines analysis.  Under 2G2.2, the base offense level

1    for the possession count, as we discussed before, is 18 and

2    the base offense level for each of the five transportation

3    counts is 22.  No one disagrees with that.

4         Everyone also agrees that, under 3D1.2(d), the

5    offenses are grouped.  Whether we do that at the beginning

6    or at the end because the offense behavior was continuous in

7    nature, and the guidelines for these offenses was written to

8    consider that continuous behavior.

9         We can think about the group offense base level as

10    22.  But then we have to talk about enhancements.  Now the

11    parties appear to agree and I do as well that the two-point

12    enhancement in 2G2.2(b)(2) applies because at least some of

13    the material involved a prepubescent minor.

14         The parties agree and I do as well that

15    Mr. Johnson used a computer in committing his offenses and,

16    therefore, a two-point enhancement is warranted under

17    (b)(6).  The government has conceded that (b)(3)(F), the

18    two-point enhancement for distribution of child pornography,

19    does not apply.  I agree with that as well.  And the

20    government agrees that an enhancement for obstruction of

21    justice does not apply.

22         Those are the agreed upon enhancements or

23    essentially withdrawn arguments about enhancements.

24         Turning to the disputed enhancements, the first

25    question relates to how many images are triggered under the

1    provisions of (b)(7) of 2G2.2.  Mr. Johnson argues that the

2    offense involves fewer than 600 images.

3        As I said earlier and I conclude specifically

4    here, the government demonstrated by a preponderance of the

5    evidence, that Mr. Johnson possessed hundreds of video files

6    of child pornography, really hundreds of files, almost all

7    of which were videos.

8        Again, as we've been discussing, the commentary to

9    2G2.2 states that each video counts as 75 images.  And I

10   therefore conclude by a preponderance of the evidence that

11   Mr. Johnson possessed at least 600 images for purposes of

12   that enhancement, and I will therefore apply the five-level

13   enhancement under (b)(7).

14       I also conclude that the four-level enhancement

15   under (b)(4) applies, because I find by a preponderance,

16   again, that Mr. Johnson possessed material portraying

17   sadistic conduct or sexual abuse of an infant or toddler.

18       It is not clear to me that the videos that

19   Mr. Johnson was convicted of transporting on the five

20   transportation counts would trigger this enhancement.  But

21   as we have been discussing, all parties — or it appears the

22   parties agree, but even if not, I conclude by a

23   preponderance of the evidence that a number of the videos

24   that the government demonstrated he possessed by a

25   preponderance of the evidence meet one or both of the

1    requirements of subsection (b)(4).  That enhancement

2    therefore applies.

3              Finally, Mr. Johnson argues that the two-point or

4    two-level decrease in 2G2.2(b)(1) applies.  As we've been

5    discussing, that reduction applies when a defendant's base

6    offense level is 22.  That's true here.  Second, the

7    defendant's conduct was limited to the receipt or

8    solicitation of child pornography.  And, third, the

9    defendant did not intend to traffic in or distribute child

10   pornography.

11             I don't think there's any question that

12   Mr. Johnson satisfies 1 and 3, and so the question here is

13   whether the defendant's conduct was limited to the receipt

14   or solicitation of child pornography.

15             In my view, he cannot satisfy this showing.  After

16   all, as to the five counts of conviction, the jury convicted

17   Mr. Johnson of transportation, a crime which has elements

18   and therefore carries higher penalties compared to more

19   passive crimes, certainly than possession.  And the

20   distinction between possessing or receiving child

21   pornography on the other hand and transporting it into a

22   Google Drive is not just theoretical.

23             Once Mr. Johnson had, as the jury concluded,

24   uploaded the files to his Google Drive, he could make them

25   public in seconds simply by sharing the drive with someone

1    else.  He could also access those materials from other

2    states or other locations.

3          Uploading files to a shareable folder, even

4    one that has not been shared, is more dangerous than keeping

5    them on a local hard drive.  It makes more sense to think

6    about uploading the files as deserving somewhat more serious

7    punishment than saving the files locally.  In my view that

8    conclusion is supported by decisions from the 10th Circuit

9    in *Burgess* and Sixth Circuit in *Fore*.

10         As we discussed with Mr. Miles, Mr. Johnson argues

11   that those cases unlike his involve physically transporting

12   child pornography across state lines.  That strikes me as,

13   as my questions indicated, a distinction without a

14   meaningful difference.

15         If anything, compared to physically moving files

16   across state lines, uploading files to a Google Drive runs

17   the risk of and is a bigger step toward transporting or even

18   distributing those files to others.

19         As a result, because I conclude that Mr. Johnson's

20   conduct was not limited to the receipt or solicitation of

21   child pornography, I will not apply the reduction that we've

22   been discussing.

23         All of that means, adding up the

24   22-point — 22-level offense level, the various enhancements

25   I've already discussed and not, of course, the ones that

1     I've rejected, including the reduction I've rejected, I

2     conclude that Mr. Johnson's total offense level is 35 for

3     the grouped offenses.

4             I also — well, turning now to criminal history,

5     and that is the, if I recall correctly — well, in any event,

6     that is, in my view, the relevant offense level, 35.

7             Everyone agrees that Mr. Johnson has zero criminal

8     history points and is therefore in Criminal History

9     Category I.  The rest is simple looking at the table.

10            Based on a offense level of 35 and Criminal

11    History Category of I, Mr. Johnson's guidelines range,

12    which, again, I must calculate correctly but is then merely

13    advisory is 168 to 210 months of incarceration.  His

14    supervised release range is five years to life, and his fine

15    range is $40,000 to $400,000.  He must also pay a $100

16    special assessment per felony or $600 in total.

17            Recognizing that the parties have briefed these

18    issues, we've argued about them today and the like, but of

19    course I want to make sure everyone has an opportunity to

20    have a crystal clear record, does either party have an

21    objection to my guidelines calculation that they would like

22    to state at this time?

23            Mr. Courtney?

24            **MR. COURTNEY:**  No, Your Honor.

25            **THE COURT:**  Mr. Miles?

1          **MR. MILES:**  Nothing.  Nothing that wasn't already

2     argued.

3          **THE COURT:**  You said, "Nothing that wasn't already

4     argued," argued very well I should say, both in the papers

5     and here.  I think the record reflects Mr. Johnson's various

6     objections to my guidelines calculation.

7          So let's now turn to the allocution.

8          Mr. Courtney, obviously we can talk about the

9     government's recommended period of incarceration, but I'd

10    also like to address restitution at some point.

11         **MR. COURTNEY:**  Okay.

12         **THE COURT:**  And the other monetary penalties.

13         **MR. COURTNEY:**  Yes.

14         **THE COURT:**  We can do that at the end.  I just

15    don't want to not talk about it.

16         **MR. COURTNEY:**  Yes.  And Mr. Lipes and I have

17    divided those issues.  So I'll be addressing 3553(a) factors

18    and the monetary penalty as well.

19         **THE COURT:**  Very well.

20         **MR. COURTNEY:**  And, Your Honor, the government is

21    respectfully recommending a guidelines term of 180 months

22    imprisonment to be followed by 10 years supervised release.

23         The nature and circumstances of this offense in

24    incalculably serious.  The videos at issue in this case

25    depicted the rape and sexual abuse of prepubescent girls,

1    demoralized for posterity on the Internet where it can't be

2    erased.  The defendant transported at least five of those

3    videos, respecting the jury's verdict, and possessed

4    hundreds more.

5           And as we've noted in our papers, NCMEC has

6    identified videos from 40 different series.  Most of those

7    victims will be voiceless in this proceeding.  We've

8    submitted to the Court victim impact statements from six

9    victims and their families.

10           **THE COURT:**  And as I said before, I'll just say it

11   again, I've reviewed all of them so.

12           **MR. COURTNEY:**  Yes, and I won't belabor it other

13   than to say they all reflect the lifelong trauma that these

14   young girls are dealing with and will deal with for the rest

15   of their life.

16           They're all individuals who expressed their own

17   individual experiences, but the common things that were in

18   the letter were suicidal ideation, being ashamed of their

19   bodies, their inability to trust or ever be sexually

20   intimate with men.

21           They have wounds that will never heal and that

22   reopen every time they get a notification about a

23   restitution request or a victim impact statement or that

24   their video has been viewed by someone else and spread on

25   the Internet.

1          I just briefly want to address, the Court

2     mentioned earlier there's an argument that this is just a

3     possession case and the government respectfully disagrees

4     and Congress disagrees.  Congress made transportation

5     subject to enhanced penalties for a reason.  And it's

6     because the spread of this material has to be completely

7     eradicated.

8          This is really, as the Court noted, in some

9     measures worse than a traditional transportation case.  In a

10    traditional transportation case, you might be charged with

11    transportation or flying across the country or driving

12    across the country with videos that never leave the local

13    hard drive of your laptop.

14         This involved videos that were uploaded to the

15    Internet that made them more accessible to defendant

16    anywhere he might want to access them.  There is no evidence

17    that this happened but they could have with a few clicks of

18    a button to be made accessible to anyone else.

19         And there's also an injury to Google who owned the

20    servers that this material was placed on, certainly didn't

21    want to own the material.  There was a risk that people

22    would have to come in contact with it and review it.

23         **THE COURT:**  Do you know when Congress made

24    transportation illegal?

25         **MR. COURTNEY:**  I don't know the precise year.  I'd

1    imagine that it was prior to cloud storage becoming widely

2    commercially available.

3            **THE COURT:**  You mean — I don't think it would be

4    any surprise to think that, in some ways, when we judges

5    confront child pornography cases, we're dealing, to some

6    extent, with statutes that were written before the advent of

7    at least certain manner in which child pornography can be

8    obtained, stored, accessed, distributed.

9            And as I've concluded, the jury's verdict on

10   transportation need not be overturned.  But it just seems to

11   me that there aren't really that many cases where

12   possession, for lack of a better word, becomes

13   transportation but not distribution in a way that's, like,

14   meaningful.

15           **MR. COURTNEY:**  Right.

16           **THE COURT:**  I mean, usually the culpable child

17   pornography people not only possess but they then

18   distribute.

19           **MR. COURTNEY:**  Right.

20           **THE COURT:**  And that's worse than transportation.

21   And I just — this case caused me to think about, like,

22   what's the purpose of the transportation statute to start

23   with.

24           **MR. COURTNEY:**  Right.  I mean, it is certainly —

25   distribution is certainly worse.  But it's interesting that

1    Congress has chosen essentially to punish them equally with

2    the guidelines enhancing distribution.  And then certainly

3    transportation is a meaningful step on the road of

4    distribution.  The risk of distribution is much greater once

5    those files are in a shared folder online as opposed to on a

6    thumb drive or a laptop hard drive.

7         The defendant has asked this Court to take an

8    exceedingly narrow view of his conduct.  The Court has in

9    some measure rejected that in counting all of the files

10   other than the transportation files of acquittal in

11   considering relevant conduct.

12        And the closest the defendant has come to

13   accepting responsibility for his conduct is to suggest that,

14   during a period of isolation in COVID, he went down a rabbit

15   hole and this was an anomaly.  I think the evidence tells a

16   different story.

17        Over the course of approximately six months in

18   2020, as the Court knows from sitting through the trial, the

19   defendant repeatedly accessed, downloaded, watched and then

20   uploaded child pornography to Google Drive.

21        The evidence at trial showed that he — and this is

22   just what the evidence showed -- that he first visited child

23   pornography in his chrome browser on April 27th of 2020,

24   with some evidence that he was in Africa at that time; and

25   that he downloaded those files to his computer necessarily

1    because they were on his desktop and there was evidence that

2    he watched them.  And there was evidence from the forensic

3    artifacts on the laptop that he watched them not only on

4    April 27th but at least through August 4th of 2020.

5          It also showed that the defendant routinely, in a

6    period in late June and early July 2020, visited a folder

7    called "Black Teens and Underaged Thots" — clearly named to

8    show it's child pornography — 10 times in that approximately

9    week-long period.  And of course that he uploaded child

10   pornography to Google on two occasions in September and

11   October of 2020.

12          It's important, in considering the defendant's

13   conduct, to acknowledge what the limits of the government's

14   evidence are and what conclusions can be drawn from that.

15   The FBI only obtained the defendant's electronic devices

16   over one year after the defendant was notified by Google

17   that his account had been closed.  The evidence showed the

18   defendant knew full well why his account was closed from a

19   number of Google searches that showed his knowledge of that

20   fact.

21          And by the time that electronic devices --

22          **THE COURT:**  A delay that had me scratching my head

23   when we were litigating the Fourth Amendment issues but,

24   yes.

25          **MR. COURTNEY:**  I mean, certainly more of a delay

1    than I would expect to see.  I think some of it is

2    attributable to the pandemic, unfortunately.  It's also

3    attributable, I think, as the Court knows, whether the

4    government could even look at the Cybertip files was

5    litigated in the court --

6              **THE COURT:**  I know.

7              **MR. COURTNEY:**   -- For months.

8              **THE COURT:**  I know.

9              **MR. COURTNEY:**  But in that period, Mr. Johnson had

10   the opportunity to and did, in fact, wipe the laptop clean.

11   The evidence that the government presented was the forensic

12   artifacts that it was able to recover.

13             The defendant would have the Court believe that

14   what the government showed in terms of the forensic

15   artifacts is the extent of what he ever did.  Maybe but

16   maybe not.  We don't know.  We know what the evidence shows.

17   We don't know what we don't have evidence of.

18             What we do know is that, when his laptop was

19   recovered, it had Tor installed, which is a dark web, web

20   browser.  And if he had access to child pornography on that,

21   it would have left no trace.

22             What we also know is that, after he was caught and

23   experienced that moment of crisis when he was searching

24   about other people who had been caught by Google, he found

25   himself, in 2021, in proximity to child pornography in

1    groups on his Samsung phone on Telegram and in Google photos

2    in which child pornography was being trafficked.

3         I think there's been some dispute in the papers

4    about whether that could have been residual.  Certainly not

5    with respect to the Google photos groups.  My recollection

6    of the evidence is that it's a different Google account,

7    which makes sense because his Google account had been closed

8    in 2020.

9         And, again, the defendant suggests, you know, that

10    this was a one-time event and that he hasn't viewed child

11    pornography again.  And I certainly hope that's true, but we

12    just don't know.  Pretrial services does not do home visits.

13    They don't install monitoring services on devices.

14         So we're really kind of left to whether violations

15    are reported by a third-party custodian.  And I don't doubt

16    the sincerity and honesty of any of the defendant's

17    third-party custodians.  And I'd also note that there are

18    family members who have expressed a strong desire to see him

19    not incarcerated.

20         And I finally just want to address defense's kind

21    of accusation that the government is trying to impose some

22    kind of severe trial penalty here; that's just not so.  The

23    best way to consider -- to be consistent and fair and to

24    avoid unwarranted sentencing disparities from the

25    government's perspective is to recommend and impose

1    guideline sentences.

2           All of the comparison cases that were cited

3    involved guilty pleas.  And the vast majority of them

4    involved very early guilty pleas before indictment, usually

5    in the year in which the person was charged.

6           It's not unreasonable for the government to give

7    and for courts to give defendants in that significantly

8    different posture a big benefit.  And there's a number of

9    reasons for that, most importantly.

10           An acknowledgment and acceptance of guilt and

11    responsibility at an early juncture in the case is the best

12    indicator that there is some hope of rehabilitation; that

13    the person acknowledges that there's an issue with the

14    material that they want to address that the conduct is not

15    going to repeat.

16           And the defendant has — the government doesn't

17    question the defendant has an absolute right to go to trial

18    but, when a defendant goes to plead guilty early, especially

19    in a case like this, it's reasonable to give him a

20    substantial benefit because the Court and the government can

21    avoid the time and the expense of a trial and spend those

22    resources on other matters.

23           But it also, in a case like this, ensures that

24    other members of the community, the jury, Court staff,

25    government staff, are not needlessly exposed to very graphic

1   descriptions and depictions of child sex abuse.

2          I'm not saying the Court should punish the

3   defendant for going to trial at all.  I'm just noting that

4   12 people had to sit through a five-day trial and hear and

5   watch depictions of children being raped.  And it's going to

6   forever alter those people's lives.

7          And when defendants choose to accept

8   responsibility early and don't subject members of the

9   community to that trauma unnecessarily, I think they deserve

10  a great substantial benefit that's just not present here.

11         Unless the Court has questions --

12  **THE COURT:**  Obviously, there is the cohort of

13  guilty plea cases and then those that go to trial.  In an

14  ideal world, I would be asking only in the first instance

15  only about the latter, but I'm going to pose the question

16  more generally.

17         Isn't it the case that in all or perhaps almost

18  all child pornography cases in this district, judges — and

19  the government may advocate for an in-guideline sentence,

20  but judges vary below guidelines for whatever reason and

21  would my not doing so here not create an unwarranted

22  sentencing disparity?

23  **MR. COURTNEY:**  I don't think that it would create

24  an unwarranted sentencing disparity because the other — as

25  far as I'm aware, the other cases are individuals who are

1    not similarly situated.  I haven't identified a comparable

2    case that's gone to trial in this district where the conduct

3    has been comparable.  So I don't have --

4        **THE COURT:**  Are you aware of any child pornography

5    case in, say, the last five years where the defendant got an

6    in-guideline sentence?

7        **MR. COURTNEY:**  Not off the top of my head.

8        **THE COURT:**  So --

9        **MR. COURTNEY:**  I'm not saying that there isn't.

10    I'm just not aware.

11        **THE COURT:**  Right.  You're just not aware.  And

12    that's whether we're talking about guilty plea or jury

13    verdict.

14        **MR. COURTNEY:**  Correct.

15        **THE COURT:**  Right?

16        **MR. COURTNEY:**  [Nodded]

17        **THE COURT:**  And am I right that, if one looks at

18    most Sentencing Commission data around child pornography

19    offenses — and obviously, there are lots of levers for

20    purposes of creating comparisons but, usually across the

21    country, the mean and median sentences in child pornography

22    cases.

23        And I'm using that term broadly to include

24    possession and transportation and distribution.  But the

25    mean and median sentences are below guidelines.

 1                    MR. COURTNEY:  That's likely correct.

 2                    THE COURT:  Yeah.

 3                    MR. COURTNEY:  But I also think it's likely the

 4       case that --

 5                    THE COURT:  It doesn't mean every single one is.

 6       I understand that.

 7                    MR. COURTNEY:  I think it's likely the case that

 8       the vast majority of those cases resolve by plea and don't

 9       involve a refusal of acceptance of responsibility.

10                    THE COURT:  So I get that.  But that means, very

11       likely, that the guidelines range is lower to start with.

12                    MR. COURTNEY:  Yes, that's correct.

13                    THE COURT:  So the fact of a guilty plea is

14       already usually incorporated into the range.

15                    MR. COURTNEY:  Right.

16                    THE COURT:  And so it's at least possible, of

17       course, that judges are saying, Well, there's a guilty plea

18       so the range is lower and the fact of the plea is a reason

19       to vary below the range and probably is part of it.

20                    It seems to me that it would be doing a lot of

21       work if it was all of it.

22                    MR. COURTNEY:  Right.

23                    THE COURT:  Okay.  Thank you, Counsel.

24                    MR. COURTNEY:  Thank you.

25                    THE COURT:  Mr. Lipes.

 1              If that's okay, we might as well cover the

 2      financial stuff, so to speak, first and then hear from

 3      defense counsel.

 4              **MR. LIPES:**  Thank you, Your Honor.

 5              My plan is to address restitution and then the

 6      assessments and then the fines.

 7              **THE COURT:**  Perfect.

 8              **MR. LIPES:**  I'm going to do that because, if the

 9      Court is inclined to impose any of these things, that's the

10      order that we would ask the Court to consider doing it in.

11              As to restitution, there seems to be a debate in

12      the papers about whether it is mandatory under

13      18 U.S.C. 2259.  I do think a plain reading of

14      18 U.S.C. 2259, subsection (a) incorporates all Chapter 110

15      offenses, which is why I think every pre-sentence

16      investigation I've seen in a child pornography case indicate

17      that it's mandatory and I can hardly even find case law

18      because I think everyone has assumed that that is the case

19      from the plain language --

20              **THE COURT:**  It seems to have been assumed in all

21      prior cases I've had.

22              **MR. LIPES:**  The second part is whether the

23      trafficking and child pornography, which is subsection (b)

24      of 2259, applies.  Again, we're in a situation where

25      trafficking and child pornography, just for the purposes of

1    this section, is defined to include all Section 2252

2    offenses, which is both the transportation and the

3    possession of child pornography accounts.

4    And, again, we cite a couple of cases where

5    district courts around the country have noted that this

6    applies in a possession of child pornography case.  And the

7    plain language of the statute indicates that this case would

8    fall within the trafficking and child pornography provisions

9    as well.

10    The significance of that, of course, Your Honor,

11    is that, if it is a subsection (b) trafficking and child

12    pornography case, then the Court is mandated to impose at

13    least $3,000 in restitution per victim seeking restitution,

14    if the Court finds that that person is a victim under the

15    statute.

16    Here, Your Honor, and we've submitted under seal

17    and I won't get into the details, but we submitted details

18    about four individuals that are victims of this offense.

19    And they're victims of this offense, Your Honor, because

20    they were harmed in the course of — as a result of this

21    offense; and that's the definition of "victim" in the

22    statute.

23    And I think the Court's already ruled on the

24    relevant conduct issue here but, you know, I'll just

25    emphasize.  The Indictment in Count 16 charged possession of

```
 1      child pornography in the defendant's Google Drive account.
 2      That's the language that was in the Indictment.  That's what
 3      the defendant was convicted of.
 4             And each of the individuals that we submitted
 5      restitution for were for files on the Google Drive.  I'll
 6      note that there were — I believe there were more victim
 7      impact statements than there were restitution requests.
 8             THE COURT:  I think it's six statements and
 9      perhaps four requests.
10             MR. LIPES:  That's correct.  And the reason for
11      that was some of the victims that were identified by the FBI
12      were for files that were found on other devices that this
13      Court, you know, heard some evidence about at trial.
14             But under the definition of 2259, we've narrowed
15      the restitution requests to who we believe is actually a
16      victim of the offense of conviction, which are the four
17      victims that we are seeking restitution for.
18             THE COURT:  So if that's right, I'm required to
19      impose $3,000 in restitution to each of those four?
20             MR. LIPES:  That is our view.  That is correct,
21      Your Honor.
22             THE COURT:  Okay.
23             MR. LIPES:  I will note that some of the victims
24      are seeking additional restitution.  Again, I think the
25      rationale is under seal, but we filed that and the factors
```

1    are difficult to apply in practice.  But we do think that

2    the restitution requests of those victims were quite

3    reasonable given the severity of the harm identified.

4         Second, Your Honor, as to assessments, there's, of

5    course, the what's called the standard assessment of $100.

6    There's two other assessments that apply here.  One is

7    18 U.S.C. 3014; that's the Justice for Victims of

8    Trafficking Act.  That act mandates a $5,000 assessment per

9    account, and we believe that that applies here and that the

10   Court should assess that assessment.

11        The second is the Amy, Vicky, and Andy Child

12   Pornography Victim Assistant Act of 2018.  That,

13   Your Honor -- it says, "The Court shall assess," but then

14   doesn't give a specific amount.  It says, Not more than, as

15   relevant here, $35,000 per count.

16        One of the things I started with, Your Honor, I

17   was going to start with restitution and then assessments.

18   And the reason I want to talk about the Amy, Vicky, and Andy

19   statute for just a minute is because, if the Court is

20   inclined to impose a monetary penalty, I think it makes

21   sense to do it through the special assessments of the Amy,

22   Vicky, and Andy special assessment before the Court goes to

23   imposing a fine.

24        And the reason for that, really, Your Honor, is

25   the money from that assessment goes into a fund that helps

1    support victims of child pornography offenses.  And so in

2    this case, given that that option is available, I think it

3    makes sense, if the Court is going to impose a fine, to do

4    it through the assessments of Amy, Vicky, and Andy statute.

5          Finally, Your Honor, as to a fine or an

6    assessment, as I just mentioned, through the Amy, Vicky, and

7    Andy statute, we do think some monetary penalty is

8    appropriate here and for a couple of reasons.  First, just

9    given the nature of the offense and obviously there is a

10    significant mandatory custodial sentence, the government is

11    seeking a significant custodial sentence, and we're aware of

12    that.

13          But we do think, in this particular circumstance,

14    a monetary penalty is appropriate.  And the Court has seen

15    some of the filings back and forth on this since the day of

16    the verdict.  But from the government's view, the Court

17    allowed about 48 hours for the defendant to remain on home

18    confinement before turning himself in.

19          And during that time, the government was alerted

20    that — actually, it was actually after this time, but the

21    government was alerted that, during that time, the defendant

22    had attempted to liquidate a variety of bank accounts.

23    There was some information, I think, from the defense — they

24    don't have necessarily all of the information we do.

25          So I don't think it was them intentionally saying

1    this, but we did not learn it first from them.  And we

2    immediately sent our agent with the FBI out to interview the

3    defendant's wealth advisor, who was, frankly — and the Court

4    has this filing — shocked about the defendant's choice of

5    actions and then Googled it and saw some headlines that made

6    him realize something was amiss here.

7        And the government was, frankly, very concerned

8    about this course of action because there was really no

9    financial logic to liquidating all of the accounts.  We

10   fully understand the defendant's wife would need to have

11   access to the money.

12       But when our agent spoke with the bank, they had

13   explained to the defendant that he can just add her to the

14   account and she would have access to the money.  Instead,

15   what the defendant was attempting to do was entirely

16   liquidate all of the accounts.

17       On top of that, he was liquidating retirement

18   accounts that came with taxes and fees and things like that.

19   Now, obviously, bad financial decisions are not a crime, but

20   we do think, under the --

21       **THE COURT:**  Thankfully.  I've made my share.

22       **MR. COURTNEY:**  Under the circumstances here, the

23   government believes that the evidence shows that the

24   defendant was attempting to hide a significant amount of

25   assets from the government and from the Court.  And I think

1    that's even shown more so by the initial draft PSR.

2              **THE COURT:**  Right.  I recall.

3              **MR. LIPES:**  And the fact that the defendant

4    remembered all of his liabilities but forgot about a million

5    dollars in assets is, in the government's view, quite

6    telling.

7              And so we do believe that, under the circumstances

8    and under 3553 and given the significant amount of money

9    that the defendant does have in his accounts, some monetary

10   penalty is appropriate.  We would ask the Court to impose

11   one.  And if the Court is inclined to do so, we do think

12   doing it through the Amy, Vicky, and Andy statute would be

13   appropriate.

14             **THE COURT:**  So let me just go back to the top just

15   to have the numbers from the government's perspective.

16   There are four, in your view, qualifying victims, for lack

17   of a better word, for restitution purposes.  And there, I'd

18   be required, from the government's perspective, to impose

19   $3,000 in restitution as to each of them but could, in

20   theory, impose more up to the claimed amounts?

21             **MR. LIPES:**  That's correct, Your Honor.

22             **THE COURT:**  Okay.  Then, as to assessments, of

23   course we have the $100 per felony.

24             There is the Amy, Vicky, Andy statute that would

25   permit a special assessment of up to $35,000 per count of

1    conviction, which here is six?

2            **MR. LIPES:**  That is correct with one caveat,

3    Your Honor.  It's 35,000 for each of the transportation

4    counts.

5            **THE COURT:**  Okay.  That was going to be my next

6    question.

7            **MR. LIPES:**  Up to the first five counts are going

8    to be $35,000 maximum.  The possession, and I apologize I

9    didn't say this at the beginning, has a $17,000 limit.

10           **THE COURT:**  Okay.  So those are the max

11   assessments under that provision.

12           And then I just forgot — I know it's in the papers

13   I just wanted to have it all in one place.  Under the

14   Justice for Victims of Trafficking Act, that assessment is,

15   just in terms of the monetary amounts --

16           **MR. LIPES:**  Is 5,000 per count.

17           **THE COURT:**  And is that per each of the six

18   counts?

19           **MR. LIPES:**  That's correct.

20           **THE COURT:**  Okay.

21           And those are maximums like — are those — the

22   hundred dollars per felony count of conviction, that's a

23   required assessment.  The Amy, Vicky, Andy assessment sounds

24   like that's a permitted but capped assessment.

25           **MR. LIPES:**  Right.

 1          **THE COURT:**  What about the Justice for Victims of

 2     Trafficking Act one?

 3          **MR. LIPES:**  The Justice for Victims of Trafficking

 4     Act one is a mandatory assessment in child pornography

 5     cases, and it says that the Court shall assess an amount of

 6     5,000 per count.

 7          **THE COURT:**  So the government's view is then I am

 8     required to impose $30,600 of assessments:  $100 per felony

 9     conviction, $5,000 for each of the six counts of child

10     pornography convictions.

11          **MR. LIPES:**  That's correct.

12          **THE COURT:**  And then there's the Amy, Vicky, Andy

13     assessment.

14          **MR. LIPES:**  That is correct.

15          **THE COURT:**  Thank you.

16          **MR. LIPES:**  Thank you, Your Honor.

17          **THE COURT:**  Mr. Courtney.

18          **MR. COURTNEY:**  If I could briefly respond to

19     one question that the Court had asked because I remembered

20     it after I sat down.  We cited at least one case in our

21     brief, *United States against Frye*, which is a 2017 case from

22     the D.C. Circuit, where the district judge was very focused

23     on deterrence and chose to impose a within-guideline

24     sentence.

25          And the D.C. Circuit essentially said that, while

1    judges are free to have policy disagreements with the

2    guidelines and to vary if they sufficiently explain their

3    reasons for agreeing with the guidelines, they are free to

4    do that as well.

5            THE COURT:  Do you know what judge that was?

6            MR. COURTNEY:  Not off the top of my head.

7            THE COURT:  Very well.

8            Mr. Jeffress.

9            MR. JEFFRESS:  Thank you, Your Honor.  Do you want

10   to address the financial piece first just because they just

11   did it?

12           THE COURT:  I'm happy to have you take it in

13   whatever order you would like.

14           MR. JEFFRESS:  Let me just, while it's fresh in my

15   mind.  First, a couple things that were mentioned.  One is,

16   is that, although we're learning for the first time today

17   that they did not learn of this from us, what happened was

18   Mr. Johnson contacted us and said, You know, my wife is

19   trying to withdraw money.  Our accounts are frozen now.  Why

20   is this?

21           So we went to them and said, You know, the

22   accounts are frozen.  Obviously, Mr. Johnson would never

23   have asked that of us and we would never have asked that of

24   him if we thought he was doing anything inappropriate.  Then

25   we worked it all out.  And they said, You know, this would

 1    be — there could be a logical explanation for this and

 2    everything like that.  So that is what happened there.

 3            On the — also, Judge, on the special assessment of

 4    5,000, the statute actually says -- does not say per count.

 5    And there's a circuit split, it's noted in the government's

 6    papers here, about whether it's per case, per defendant or

 7    whether it's per count.  There's a Second Circuit case that

 8    says it's per case.

 9            So we would say that that 5,000 should be imposed

10    but should be imposed one time.

11            **THE COURT:**  Very well.

12            **MR. JEFFRESS:**  Not per count.

13            Your Honor, and I think that's all I have unless

14    the Court has questions on the financial piece.

15            **THE COURT:**  I suppose it goes to the overall set

16    of sentencing factors but it was mentioned.  And that was

17    about the initial disclosure of assets to the probation and

18    PSR author.

19            **MR. JEFFRESS:**  I'm glad the Court asked that.  I

20    was sitting right there during this.  This was taken from

21    the Presentence Report interview.  And, you know, the

22    presentence report officer started asking -- it wasn't

23    Ms. Willet; it was someone else doing it -- asked him how

24    much money do you have, everything like that.

25            Mr. Johnson went through what he recalled from his

1   assets:  Obviously, he had been incarcerated at this point.

2   He didn't have any bank records or anything else.  I told

3   him not to speculate about what he had and that we'll

4   provide the bank records to the Probation Office.

5            They're making a mountain out of a mole hill.  Out

6   of that, there was absolutely no intent to misrepresent how

7   much he had.

8            And of course, we knew -- as I've been doing this

9   for 20 years, you have to give financial records to the

10  Probation Office.  They're going to see how much is in the

11  accounts.  You know, he was just spit-balling based on being

12  there during this presentence report interview.

13           **THE COURT:**  Okay.

14           **MR. JEFFRESS:**  There was nothing deceptive.

15           **THE COURT:**  Thank you.

16           **MR. JEFFRESS:**  Now, Judge, so turning to the

17  allocution.  You know, before turning to the statutory

18  factors, I just want to step back and look at what has

19  happened in this case with Mr. Johnson and Mr. Johnson's

20  family on a human level.

21           I know the Court is aware from the letters from

22  the support that it saw during the trial, from the

23  Presentence Report and from seeing all of the people that

24  are here today that Mr. Johnson is from a very close and

25  close-knit family.  He has had that benefit.

1          At the time all of this began, in 2020, you know,

2     he was enjoying a successful career that was really just

3     beginning to take off.  He was planning to get married and

4     to start a family of his own.

5          In the last four years, he has gone from that to

6     three years of home confinement under very stringent

7     conditions, which he performed flawlessly on, living up to

8     every promise he made to this Court, to being held in

9     isolation at CTF and with extremely uncertain future and

10    carrying just, you know, unfathomable shame and emotional

11    baggage.

12         It has been an enormously punishing experience.

13    And in one view of life, it has been quite enough.  And if

14    you add four years, five years, which is the least — the

15    sentence that we are requesting and the sentence that is

16    consistent with other sentences in this district, the only

17    sentence consistent with other sentences in this district,

18    it is enough.  And it is what is anything beyond that would

19    be more than what is necessary.

20         The 3553 factors lead to that same conclusion.

21    Mr. Johnson's history and characteristics could hardly be

22    more positive.  Despite a number of challenges in his life,

23    including losing his father when he was two years old, to a

24    plane crash, to, you know, for me, the experience that he

25    went through at St. Albans where he's -- you know, he's been

1    coming from across town as a Black kid to attend what's

2    basically an all-White school, going through that experience

3    and being successful at it.

4          This is a person who was raised in a loving family

5    and who learned to give that love back and that's the

6    important thing.  The lessons that we want our children to

7    learn, like, looking after one another and giving back to

8    the community are lessons that Mr. Johnson has shown

9    throughout his entire life that he learned well.

10         I know the Court already knows this from the

11   letters and the support that it's seen, but if there is

12   something in Mr. Johnson's history and characteristics that

13   would support a sentence anything beyond a comparable

14   sentence in this district, which is 60 months and below for

15   this conduct, the government has not mentioned it, and I

16   have not heard it anywhere else but just exactly the

17   opposite.

18         On the offense conduct, you know, accepting the

19   jury's verdicts, Mr. Johnson possessed images of child

20   pornography and uploaded them to a Google Drive.  The

21   government's own best evidence, which is the jump list,

22   which is very clear that the jury relied upon in rendering

23   its verdicts, shows that he watched only a small number of

24   these images and was only involved in this material for

25   several months in 2020.

1          Even under the government's interpretation, he was

2     only involved in this material for several months in 2020,

3     right during the worst part of COVID.

4          The evidence shows, despite what the government

5     said in its allocution, which invited the Court, basically,

6     to speculate about evidence it does not have and could not

7     locate, despite an exhaustive investigation of this case, it

8     shows that Mr. Johnson voluntarily and on his own ceased

9     this conduct after receiving the Google alert in October of

10    2020.

11         And that is why law enforcement's search of the

12    devices from October 2021 did not reveal the ongoing

13    possession of any illegal images.  It's also why Mr. Johnson

14    successfully completed three years of intense pretrial

15    supervision, again, living up to everything he promised the

16    Court that he would do.

17         And I think that really underscores the big 3553

18    factor in all cases, but I think especially in cases like

19    this one, which is whether there is a need for the specific

20    deterrence of this defendant, of Mr. Johnson.

21         That is what's separate.  You know, we have cited

22    16 cases with sentences at the mandatory minimum or below

23    for conduct that is arguably worse here, the same or worse.

24    I can't think of anything that was less serious than what,

25    you know, we have here, not to say it's not serious.  But

1  I'm talking about in the comparable causes for these same

2  charges.

3      The government has cited none.  We heard one for

4  the first time today about an appeal from an unknown judge

5  with unknown facts that they didn't give us notice of, and I

6  haven't had a chance to look at it.  But they've cited no

7  cases with comparable facts justifying a sentence anywhere

8  close to what they are saying.

9      And they haven't cited cases with comparable

10  conduct because they know that the sentences in those cases

11  were at the mandatory minimum of 60 months or below.

12      The question, I think — and what, you know, you

13  look at those 16 cases and you look at where defendants do

14  get hammered in child pornography cases, and they often

15  involve other conduct, such as trying to meet a child, being

16  on the Internet trying to solicit a child or trying to talk

17  to an adult about having sex with a child, things like that

18  that have nothing to do with it.

19      The government has absolutely no evidence that

20  ever took place here, and I think we all know did not.  And

21  you look at those 16 cases and you say, a big factor here is

22  whether this defendant needs to be incarcerated because he

23  cannot control himself.  And he is so tied up in an

24  attraction to this material that he will reoffend.

25      Nothing could be further from the truth here and

1    you do not have to take our word for it.  The government's

2    own evidence shows you this.  And the Court knows and as

3    everyone knows, very few of these cases go to trial.

4            When they do go to trial, like the government

5    puts -- has an exhaustive, an especially exhaustive

6    investigation of every device, they scour everything to make

7    sure that their case is as strong as possible.

8            If there was any evidence going beyond what the

9    Court was presented with here and at the trial, then the

10    government would have it.  The Court can have full

11    confidence of it.  There is no such evidence.

12            The government could not show, did not show and it

13    can't show, because it doesn't exist, that there is any

14    evidence that Mr. Johnson has accessed this any time after

15    the Google alert in 2020.  That's four years of a track

16    record of showing this Court that he is not going to

17    reoffend and he is not a danger to reoffend.

18        **THE COURT:**  It would be insane for someone to do

19    that before sentencing.

20        **MR. JEFFRESS:**  It would be insane for someone to

21    do it at any time.  It would be insane for someone to do it

22    after sentencing and especially given the penalties for

23    recidivism here.

24            Right.  Four years is not a track record that you

25    can look at and say, you know, this person was able to get

1    the message for these four years and then slip back into it.

2    And this is just not this kind of case.

3          The government's only marginally credible argument

4    for a higher sentence here is the trial penalty.  Just a

5    couple facts on the trial.  It did not involve victim

6    testimony.  It did not involve what can be a very searing

7    experience for anyone like that.  Thank God.

8          It did not involve Mr. Johnson testifying to this

9    Court.  It involved several — most, all law enforcement

10   coming and testifying about their forensic review of

11   Mr. Johnson.  So in terms of a trial penalty, whether there

12   is anything in particular about this trial, you know, I

13   think that those factors suggest that there's none.

14         And if you look at the average sentence, the trial

15   penalty here is already for possession cases in this

16   district.  The trial penalty here is already built in.  You

17   know, there are a number of probationary sentences for

18   possession of child pornography, which is the sort of

19   real-life conduct that this case features.  And there's

20   sentences, about 24 or 33 months in possession cases that

21   are much more serious than this.

22         If you take just two from Judge Friedrich, the

23   *Kampel* and *Dejournett* sentences, which were just a couple

24   years ago, these were two gentlemen who were using a child

25   pornography website that had a paid membership.  That

1    website was subject to a search warrant.

2         They got all the credit card records and they

3    showed that these two gentlemen had been looking at child

4    pornography from this website for about 10 years, so a much

5    longer track record of doing it.  And they had also been

6    paying for it.  That's how they got to them were credit card

7    records.

8         And her sentences were 33 months for the two

9    cases.  They are both out.  They are both doing well.  Like

10   almost all of the defendants in the cases that we cited,

11   there is no issues of recidivism.

12        And if you combine that 33-month sentence that

13   Judge Friedrich imposed for substantially the same conduct

14   but even worse, and you add the three levels for lack of

15   acceptance of responsibility, you get to probably less

16   than — I haven't done the exact math but you probably get to

17   less than the 60-month sentence.

18        So there is already a trial penalty built in here

19   when you compare it to cases involving substantially the

20   same conduct.  It should just not be that, because you test

21   the government's proof at trial and exercise your rights

22   under the Sixth Amendment, you get a decade longer sentence,

23   which is essentially what the government is suggesting here.

24   It is a constitutional right.

25        And you know, what the guidelines say is to look

17

1    at the conduct.  And the government says, Look at

2    guidelines, guidelines, guidelines.  But what they don't

3    like about the guidelines is going to trial is a three-level

4    difference.  It's a three-level difference in your offense

5    level.  You know, it's not a 10-year difference.

6           Acceptance of responsibility, you know, has

7    several meanings in this system.  The first is what

8    Mr. Courtney talked about, which is putting the government

9    through a lot of more work, additional work, putting the

10   Court through additional work, taking up the Court's time

11   and stuff like that.

12          People get a three-level reduction from the

13   guidelines for accepting responsibility, which really just

14   means pleading guilty, essentially.  But there's another

15   acceptance of responsibility and that is, does this person

16   get it?  Does this person get that message?

17          Mr. Johnson is going to come up here and talk in a

18   few minutes and Mr. Johnson gets it.  He has shown that

19   through his conduct.  He has shown that through his conduct

20   before law enforcement was ever even involved here in 2020,

21   from October of 2020.  In the year that they took to act on

22   the information that they got from Google, Mr. Johnson —

23   there is no good evidence that Mr. Johnson went back to this

24   conduct during that time.

25          So he showed it even before law enforcement was

1    involved and he's certainly shown it during the three years

2    under supervision here.

3        And when you add a five-year sentence on top of

4    three years of stringent home confinement that he's not

5    getting any credit for towards his sentence, and then you

6    add sex offender registration for the next 20 years,

7    supervised release under very stringent conditions,

8    including sex offense education, you know, monitoring, all

9    of those kind of things, you get to a place where 60 months

10   is too long a sentence but it's the least sentence that this

11   Court can impose.

12       I have known Mr. Johnson and I have known his

13   family for four years now.  If there is any question about

14   whether Mr. Johnson gets this, I know that that answer is

15   that he does.  I know that Mr. Johnson — I've done a lot of

16   these cases.  I know that Mr. Johnson will not be in front

17   of this Court ever again, not for anything like this.

18       Your Honor, so the only sentence that is really

19   consistent with what the sentences imposed in this district

20   is the mandatory minimum, and we respectfully ask the Court

21   to impose that.

22       Now, Mr. Johnson also wants to address the Court,

23   Your Honor.

24       **THE COURT:**  I would welcome him.  Thank you,

25   Mr. Jeffress.

```
 1              Mr. Johnson, come on up.
 2         THE DEFENDANT:  Thank you, Your Honor.
 3         THE COURT:  Good afternoon.
 4         THE DEFENDANT:  Good afternoon.
 5              Yeah, I've had a lot of time to think obviously
 6    these past four years.  And it's been one of the hardest
 7    things I've ever dealt with in my whole life.  I want to
 8    first apologize to you, to the government, and to my family
 9    for the pain they've endured.
10              But first and foremost, I want to apologize to the
11    victims and the girls that appeared in these videos.  What
12    happened to them was truly horrific.  It's very, very
13    heartbreaking to kind of learn these stories.
14              I've learned a lot about the trauma of sexual
15    abuse, dangers of online pornography, and it really breaks
16    my heart to see everything that's gone into this case and
17    what has come out of it, just heartbreak all of the way
18    around.
19              These past three years, like I said, have been the
20    hardest thing I've ever dealt with.  But to be honest, there
21    is a silver lining.  The Lord has done great work in me.  I
22    am a changed man, much wiser, better man for myself, for my
23    family, for society.  And I look forward to being able to
24    prove that to you, to my family, to the government all the
25    way around.  And to just be a positive contribution to
```

1   society going forward.

2                   That's all I want to say.

3               **THE COURT:**  Thank you very much, Mr. Johnson.

4               **THE DEFENDANT:**  Thank you.

5               **THE COURT:**  Mr. Jeffress, anything else on your

6   end?

7               **MR. JEFFRESS:**  Not right now, Your Honor.

8               **THE COURT:**  Okay.

9                   I'm going to take a 15-minute recess and come back

10  and pronounce the sentence.  Okay?

11          (Recess from 12:06 p.m. to 12:26 p.m.)

12              **DEPUTY CLERK:**  Your Honor, we are now back on the

13  record.

14              **THE COURT:**  Thank you, Ms. Moore.

15                  Before I walk through my analysis of the 3553(a)

16  factors and then pronounce the sentence, I'll just briefly

17  reiterate the parties' respective positions.

18                  The government, which agrees with my guidelines

19  calculation of 168 to 210 months proposes a within-guideline

20  sentence of 180 months of incarceration, obviously 15 years

21  to be followed by 120 months of supervised release.  And the

22  government proposes various financial consequences under the

23  various provisions that I discussed with counsel.

24                  Mr. Johnson, of course, argues that my guidelines

25  range is wrong and believes that there is a lower guidelines

 1    range.  But whether it's my calculated range or his proposed

 2    range, Mr. Johnson asks for a variance to a below-guideline

 3    sentence of 60 months, which, of course, is the mandatory

 4    minimum.

 5          Mr. Johnson opposes certain of the financial

 6    penalties or payments, and I think it's fair to say

 7    acknowledges that there will be a significant term of

 8    supervised release.

 9          Probation, for its part, calculated a somewhat

10    higher guidelines range than I have, but that was also

11    before the government withdrew one of its arguments about

12    enhancement.  In any event and even with that higher range,

13    Probation recommended a below-guideline sentence of 144

14    months of incarceration, 12 years obviously, followed by 120

15    months of supervised release and some financial penalties.

16          As everyone knows, in imposing a sentence, I am

17    required to and, for the record, I have, in fact, considered

18    each of the 3553(a) factors looking at each of them through

19    the entire record in this case both discussed today and as

20    reflected in the trial evidence in record.

21          I think just to start with, regarding the nature

22    and seriousness of the offense, this factor, of course, cuts

23    against Mr. Johnson.  He is surely not among the worst

24    defendants convicted of crimes related to child pornography.

25    He didn't create child pornography.  He didn't distribute it

1   to others.  He didn't, after accessing it, he didn't go

2   looking for in-person events, didn't communicate with

3   others, at least as far as we know, about such things.

4            So certainly compared to many, many, many others,

5   Mr. Johnson's conduct was substantially less serious,

6   including many people that I've sentenced.  But, as the

7   government's victim impact statements show, even the least

8   serious child pornography offenses, for example, "mere

9   possession" or "mere transportation," are still incredibly

10  serious.

11           Victims of these offenses suffer their whole

12  lives.  Reading the victim impact statements is one of the

13  worst things I do in this job.  It is "heartbreaking," as

14  Mr. Johnson said, to read about not just the initial trauma

15  that these, in this case, young girls went through, but the

16  trauma that they continue to live through in all the ways

17  described by the government.

18           They have and suffer serious and continuing harm

19  caused by knowing that their worst experience and their most

20  painful memories will be watched by people like Mr. Johnson

21  years after the abuse has ended.  I don't think it can be

22  overstated how saddening and truly chilling it is to review

23  those victim impact statements.

24           Mr. Johnson, of course, did not have a direct role

25  in creating those materials, and certainly that's why he's

1    not nearly as serious an offender as some I've seen.  But as

2    a general proposition, people who consume child pornography

3    are a part of the market for it, drive up demand, and that's

4    a market that leads to the further sexual exploitation of

5    children.  So this factor cuts significantly against

6    Mr. Johnson.

7          But his history and characteristics, which are the

8    second factor cuts in his favor.  Mr. Johnson has much more

9    support, both at trial today and in the record, than many of

10   the defendants who have appeared before me.  He grew up with

11   an accomplished and loving mother, a very supportive

12   extended family, strong role models and access to a good

13   education.

14         To some extent, it is more troubling and

15   inexplicable that he risked so much to commit the crimes at

16   issue here, but he does have that very strong background.

17         In addition, few defendants that appear before me

18   are as active in their community as Mr. Johnson has been.

19   As we heard, he lost his father when he was two years old.

20   And he, nevertheless, managed to overcome that early tragedy

21   in many ways.  As early as his early teen years, he began

22   emulating his father's role as a leader in the community.

23         He joined a religious mission to Jamaica and

24   organized community events.  He created a successful

25   business and has used some of the money generated by that

1    business for philanthropy.

2         As I've noted, I received very many letters of

3    support from Mr. Johnson's family, his friends, and members

4    of the community, including people who expressed

5    appreciation for his generosity.  I also received

6    documentation of Mr. Johnson's charitable activities and

7    donations.

8         Those documents show that, as a general matter,

9    although of course the offenses that we're here discussing

10   are exceptionally serious and should not be minimized,

11   Mr. Johnson has otherwise been an upstanding member of his

12   community.  He also has a very short criminal history

13   consisting of a single conviction for driving under the

14   influence, which, while no doubt also is a serious crime, is

15   now pretty stale.

16        The next factor I have to consider is protecting

17   the public respect for the law and deterrence.  The parties

18   have presented evidence both for and against or for and

19   against findings of high recidivism rates among sex

20   offenders in general.

21        As to Mr. Johnson, I'm not sure how much to read

22   into the fact that he appears to not have continued to

23   access child pornography because, as I said earlier, once he

24   was under investigation and perhaps even once the Google

25   freeze occurred, it would make perfectly rational sense to

1    stop and be exceptionally careful about further consumption

2    of child pornography.

3          But beyond that, he strictly complied with all

4    conditions of release during the 30 months he's out on

5    supervised release.  He's essentially been a model

6    pretrial — was a model pretrial defendant and with respect

7    to things that really aren't about the charges here but just

8    about complying with the orders from this Court.

9          Also, I realize that the psychosexual evaluation

10   of Mr. Johnson indicates a low risk of recidivism.  I have

11   my quibbles with psychosexual evaluations, as the government

12   does here, that rely almost entirely on self-reporting

13   statements by defendants and don't really seem to account

14   for the conduct reflected at trial and the evidence as

15   reflected at trial and the counts of conviction.

16        So I note that that evaluation indicates a low

17   risk of recidivism, but I have my doubts about how truly

18   reliable it is.  But I also note that Mr. Johnson points out

19   that it turns out that many sex offenders don't recidivate.

20        And as to the more general specific deterrence

21   question, I think it's fair to say, quite clearly, the

22   offenses with which Mr. Johnson was charged, they've already

23   had a very significant negative impact on his life,

24   including, of course, a major interference with his business

25   and his personal relationships.

1          Having said all that, a sentence that is too light

2     could still provide insufficient deterrence to Mr. Johnson.

3     But given the mandatory minimum is five years, even that

4     sentence, the five-year mandatory minimum, would still send

5     a strong deterrent message to Mr. Johnson.

6          But specific deterrence isn't the only deterrence

7     that I have to take into account.  I have to consider the

8     need for general deterrence.  I don't want to harp, yet

9     again, on the victim impact statements.

10         But child pornography and the creation of child

11    pornography, the distribution of child pornography, the

12    creation of markets and the trading of child pornography is

13    a horrible, horrible, crime and a crime that both harms,

14    over and over again, the past victims but also creates the

15    risk of future victims in the future.

16         And I need to ensure that what I do today does

17    what it can, perhaps not a lot, but at least something to

18    act as a general deterrent on people who would access child

19    pornography in the future.

20         I have to consider the need to avoid unwarranted

21    sentencing disparities.  We've discussed a lot today about,

22    like or not like child pornography cases, Mr. Johnson

23    presented me in his most recent filing with many child

24    pornography cases that resulted in sentences at or below his

25    suggested sentence of 60 months.

```
 1              Every case is different, and I'm not sure that any

 2      individual case is a perfect comparator.  I do think there

 3      are a couple of general statements that I've already made

 4      clear through my questions perhaps what my views are.

 5              First, there's a risk that I would create

 6      unwarranted sentencing disparities here or disparity by

 7      sentencing Mr. Johnson within guidelines because, in this

 8      district, it's almost always the case that, in child

 9      pornography cases, at least cases that are sort of like this

10      one, that judges vary downward.

11              We also have the general data available about

12      sentencings, all of which reflect that often the median and

13      mean sentences in cases somewhat like this one are below

14      guidelines.

15              And I do think that there's an anomaly here, which

16      I alluded to earlier, which is that, if this were a

17      possession-only count, the — and all of the other

18      enhancements were otherwise applicable and the like, then

19      the offense level would be four points lower.

20              And what that would mean is, at least if all

21      one did was think about this as a possession rather than a

22      transportation case, the sentencing guidelines range at 31,

23      the offense level would be 108 to 135.

24              And if this were a possession-only case, perhaps

25      the two-level reduction that Mr. Johnson advocated for that
```

1    I have said is inapplicable under the correct reading of the

2    guidelines, would bring us down to an offense level of 29,

3    which would have us thinking about a guidelines range of 87

4    to 108.

5            I understand the theory behind the guidelines

6    about why transportation — or the guidelines and statutes as

7    to why transportation is worse than possession.  But it

8    seems a little odd to me that the difference between a

9    possession and transportation case here is a 60-month

10   difference.

11           Without any other differences, that four-level

12   difference is the difference between a bottom range of

13   108 months versus a bottom range of 168.  And so this is

14   one of those circumstances where, in my view, the sentencing

15   guidelines can be viewed as overly penal when it comes to

16   the conduct we have in this particular case.

17           I've also said in a lot of other cases that the

18   way that the gathering, review, distribution, and the like,

19   of child pornography in the Internet age happens, that the

20   use of a computer enhancement feels like it doesn't do much

21   to distinguish between bad and worse conduct.

22           I haven't yet had a child pornography case that

23   didn't involve the use of a computer and so unclear to me

24   why we would be always enhancing based on an offense

25   characteristics that applies in every case.  Perhaps it

1    should be in the base offense level, but I've always

2    wondered about the computer enhancement.

3         So that's not to say that I think the guidelines

4    range I've calculated is incorrect.  But it is to say that,

5    in some ways, the guidelines calculation, in my view, tends

6    to overstate the severity of the conduct in this case, and

7    then that has the collateral consequence of tending to

8    create the possibility of unnecessary sentencing disparities

9    when you look at conduct by Mr. Johnson compared to others'

10   conduct.

11        And of course, as I've said in many cases,

12   including in the January 6th context, I care deeply about

13   not creating myself unwarranted sentencing disparities.

14        Where does that all leave us?  I'm going to walk

15   through the financial penalties I'm going to impose first,

16   because they're a little bit technical.  And then I'm going

17   to impose the other provisions or other material parts of

18   the sentence.

19        As to financial consequences, I'm going to — I'm

20   required to impose the $600 reflecting a $100 per count of

21   conviction special assessment.

22        I'm going to impose $12,000 in restitution, which

23   is $3,000 to each of the victims that are entitled to

24   restitution.

25        I apologize, I should have started at the top.

1    The total financial consequences I am imposing on

2    Mr. Johnson are $52,600.  I think there are two different

3    ways to think of the next two components, each of which gets

4    to the same number.

5         If Mr. Johnson is correct that, under the Justice

6    for Victims of Trafficking Act, I can only impose an

7    assessment of $5,000, then I would impose $5,000 under that

8    Act.  And I would impose a $35,000 under the Amy, Vicky,

9    Andy Act and an assessment of $35,000 there.

10        If, alternatively, the government is right that I

11   can impose $5,000 per count for the Justice for Victims of

12   Trafficking Act, I would do that and impose $30,000 there.

13   And I would impose only a $10,000 assessment under the Amy,

14   Vicky, Andy assessment.

15        What I'm trying to do is I'm cognizant that there

16   are arguments about caps and amounts, but there is no

17   argument that the $52,000 amount that I am imposing, which I

18   think is an appropriate amount to impose both to the

19   victims, who are identified here, and also because the money

20   that would be paid would be used for the prevention or other

21   sexual abuse or sex trafficking-like aid, are appropriate

22   and that an overall amount of $52,600 would, in no respect,

23   exceed any statutory maximum.

24        And also, because I've concluded that that's an

25   appropriate amount to impose on Mr. Johnson on the specific

1    circumstances of this case.

2          It may be — and we can discuss this later whether

3    I have to pick one or two of the ways of getting to that

4    amount, but importantly, I think, everyone should know

5    that's the amount I'm imposing.  The $600 special assessment

6    per count, the $12,000 in restitution are locked in.  And I

7    think there are two different ways to get to the total

8    amount that I have articulated.

9          Where does that leave us as to the period of

10   incarceration?  I think a very significant variance is

11   warranted here.  I think not varying here and not varying

12   significantly would create an unwarranted sentencing

13   disparity.

14         I think it also wouldn't account for Mr. Johnson's

15   strong personal support, which was both before, during and

16   after trial, and the like.  But I think that, going as far

17   down as the mandatory minimum would not adequately reflect

18   the need for specific and general deterrence and would not

19   otherwise take account of all the other 3553(a) factors.

20         And for those specific sort of conclusory reasons

21   but based on the entire record and my analysis of all of the

22   relevant evidence here and my specific conclusions around

23   the 3553(a) factors, I'm sentencing you, Mr. Steven Johnson,

24   to the custody of the Bureau of Prisons for a term of

25   imprisonment of 90 months for five counts of transportation

1    and the one count of possession of child pornography, all to

2    run concurrently.

3            You are also sentenced to serve a term of

4    120 months of supervised release.  While on supervision,

5    you're required to abide by several mandatory conditions,

6    which were imposed to establish the basic expectations for

7    your conduct.

8            You must not commit another federal, state or

9    local crime.  You must not unlawfully possess a controlled

10   substance.  You must refrain from any unlawful use of a

11   controlled substance.  I'm going to waive the requirement to

12   submit to drug testing.  You must cooperate in the

13   collection of DNA as directed by the probation officer.

14           You must register as a sex offender and refrain

15   from unsupervised contact with minors.  You must cooperate

16   with Probation's computer monitoring procedures, and you

17   must provide financial disclosures until your financial

18   obligations are satisfied.

19           I am waiving the accrual of interest on payment of

20   the amounts as I've identified until the period of your

21   incarceration ends.

22           Let me ask Probation if there are issues I've

23   omitted that I should be raising or identifying we are

24   talking about.

25           **PROBATION:**  Thank you, Your Honor.  Kelli Willett

1    on behalf of the Probation Office.

2           **THE COURT:**  Yes.

3           **PROBATION:**  The Probation Office did ask for a sex

4    offender assessment and treatment.  I did not hear the Court

5    order that.

6           **THE COURT:**  I will order that, yes.

7           **PROBATION:**  Thank you, Your Honor.

8           Also, the Probation Office requested computer

9    searches.  I believe you --

10          **THE COURT:**  I did, yes.  What I said was, You must

11   cooperate with computer monitoring procedures as identified

12   by the Probation Office.  Is that enough?

13          **PROBATION:**  Yes.  That's correct, Your Honor.

14          **THE COURT:**  Okay.

15          **PROBATION:**  Also we would request polygraphs as

16   part of treatment, the standard part of treatment.

17          **THE COURT:**  So ordered.

18          **PROBATION:**  Thank you, Your Honor.  We also ask

19   for a mental health statement that was recommended by the

20   defense counsel's providers.

21          **THE COURT:**  So ordered.

22          **PROBATION:**  I believe that is all we have,

23   Your Honor.

24          **THE COURT:**  Okay.  Thank you, Ms. Willett.

25          Does the government have any objections or

 1   questions or things it would like to note?

 2             **MR. COURTNEY:**  No, Your Honor.

 3             **THE COURT:**  Thank you, Mr. Courtney.

 4             Mr. Jeffress, any further objections?  Questions?

 5   Requests for recommendations?

 6             **MR. JEFFRESS:**  Yes, Your Honor, the latter.  Can

 7   we please get FCI Elkton?

 8             **THE COURT:**  Yes, I will make that recommendation.

 9             **MR. JEFFRESS:**  And then also, you know, I think

10   there is plenty of support for this in the presentence

11   report, but could we get the Court to recommend the 500-hour

12   drug program for Mr. Johnson?

13             **THE COURT:**  Yes.  Order that.

14             **MR. JEFFRESS:**  Thank you.

15             **THE COURT:**  Thank you.  Anything else you'd like

16   to note for the record?

17             **MR. JEFFRESS:**  No.

18             **THE COURT:**  Okay.  Thank you, all.

19             **MR. COURTNEY:**  All right.  I almost forgot, and

20   Ms. Moore reminded me at the beginning of the proceeding,

21   that I need to move to the dismiss the original Indictment

22   and then first superseding Indictment --

23             **THE COURT:**  The old superseded by now indictments,

24   but I assume there is no objection from the defendant to

25   dismissing those?

1        **MR. JEFFRESS:** No, Your Honor.

2        **THE COURT:** Okay. They are dismissed.

3        Okay. Thank you, all.

4     (Proceedings concluded at 12:55 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA2692

1                    **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4     certify that the foregoing is a true and correct transcript

5     of the record of proceedings in the above-entitled matter.

6

7

          December 4, 2024              /s/ Lorraine T. Herman
8              **DATE**                      **Lorraine T. Herman**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USCA Case #24-3162    Document #2092481    Filed: 02/24/2025    Page 513 of 551

**DEPUTY CLERK: [3]**
2/2 37/9 80/12
**MR. COURTNEY: [59]**
2/8 3/15 4/7 5/21 6/20
7/2 7/14 10/21 11/5
11/14 11/18 12/15
12/24 13/8 13/12 13/20
13/25 14/20 14/24
16/21 17/20 18/7 18/12
18/14 19/10 19/16
19/22 20/18 33/10
45/24 46/11 46/13
46/16 46/20 47/12
48/25 49/15 49/19
49/24 51/25 52/7 52/9
55/23 56/7 56/9 56/14
56/16 57/1 57/3 57/7
57/12 57/15 57/22
57/24 63/22 66/18 67/6
94/2 94/19
**MR. JEFFRESS: [17]**
2/12 3/13 6/3 35/1 67/9
67/14 68/12 68/19
69/14 69/16 74/20 80/7
94/6 94/9 94/14 94/17
95/1
**MR. LIPES: [17]** 58/4
58/8 58/22 60/10 60/20
60/23 64/3 64/21 65/2
65/7 65/16 65/19 65/25
66/3 66/11 66/14 66/16
**MR. MILES: [40]** 4/15
20/2 20/4 20/19 20/24
22/9 23/5 23/8 23/13
23/21 23/25 24/3 24/6
24/14 25/1 25/10 27/3
27/6 27/8 27/13 28/1
28/9 28/16 29/8 29/12
29/15 29/18 29/23
30/22 31/4 31/10 31/14
31/25 32/17 32/19
32/22 33/8 34/24 35/4
46/1
**PROBATION: [7]**
92/25 93/3 93/7 93/13
93/15 93/18 93/22
**THE COURT: [145]**
**THE DEFENDANT: [5]**
6/9 6/11 79/2 79/4 80/4

**$**

**$10,000 [1]** 90/13
**$100 [5]** 45/15 61/5

64/23 66/8 89/20
89/22 89/25 91/6
**$12,000 [2]** 89/2 91/1
**$17,000 [1]** 65/9
**$3,000 [4]** 59/13 60/19
64/19 89/23
**$30,000 [1]** 90/12
**$30,600 [1]** 66/8
**$35,000 [5]** 61/15
64/25 65/8 90/8 90/9
**$40,000 [1]** 45/15
**$400,000 [1]** 45/15
**$5,000 [5]** 61/8 66/9
90/7 90/7 90/11
**$52,000 [1]** 90/17
**$52,600 [2]** 90/2 90/22
**$600 [3]** 45/16 89/20
91/5

**'**

**'cause [1]** 9/3

**-**

**--Because [1]** 24/7

**/**

**/s [1]** 96/7

**1**

**10 [8]** 10/18 25/21
39/10 40/18 40/18
46/22 51/8 76/4
**10-year [1]** 77/5
**108 [2]** 87/23 88/4
**108 months [1]** 88/13
**109 [1]** 9/18
**1099 [1]** 1/17
**10:09 [1]** 1/7
**10:53 a.m [1]** 37/8
**10th [1]** 44/8
**11 [2]** 36/22 37/7
**110 [1]** 58/14
**11:06 a.m [1]** 37/8
**12 [3]** 36/10 55/4 81/14
**120 [2]** 80/21 81/14
**120 months [1]** 92/4
**12:06 p.m [1]** 80/11
**12:26 p.m [1]** 80/11
**12:55 p.m [1]** 95/4
**135 [1]** 87/23
**144 [1]** 81/13
**14th [1]** 1/17
**15 [1]** 80/20
**15-minute [1]** 80/9
**16 [5]** 12/18 59/25
72/22 73/13 73/21

**168 [3]** 45/13 80/19
88/13
**1717 [1]** 1/19
**176 [2]** 1/4 2/3
**18 [2]** 17/16 41/1
**18 U.S.C. 2259 [2]**
58/13 58/14
**18 U.S.C. 3014 [1]**
61/7
**180 [1]** 80/20
**180 months [1]** 46/21
**187 [1]** 12/3
**1:22-176 [1]** 1/4
**1B1.3 [1]** 3/4
**1st [2]** 32/5 32/8

**2**

**20 [2]** 69/9 78/6
**200 [3]** 13/17 14/6
27/24
**200-list [1]** 28/13
**20001 [1]** 1/23
**20005 [1]** 1/17
**20006 [1]** 1/20
**2017 [1]** 66/21
**2018 [1]** 61/12
**2020 [16]** 33/20 33/24
34/13 50/18 50/23 51/4
51/6 51/11 53/8 70/1
71/25 72/2 72/10 74/15
77/20 77/21
**2021 [2]** 52/25 72/12
**2022-176 [1]** 2/3
**2024 [2]** 1/5 96/7
**20530 [1]** 1/14
**210 [2]** 45/13 80/19
**218 [1]** 12/19
**22 [4]** 21/2 41/3 41/10
43/6
**22-level [1]** 44/24
**22-point [1]** 44/24
**2252 [1]** 59/1
**2259 [4]** 58/13 58/14
58/24 60/14
**24 [1]** 75/20
**27th [3]** 33/20 50/23
51/4
**29 [1]** 88/2
**2G2.2 [10]** 7/17 7/19
11/10 14/12 20/25
40/25 41/12 42/1 42/9
43/4

**3**

**30 [1]** 85/4

**3014 [1]** 61/7
**31 [3]** 15/18 87/22
**31st [1]** 2/24
**32 [1]** 6/13
**33 [2]** 75/20 76/8
**33-month [1]** 76/12
**333 [1]** 1/23
**35 [8]** 18/2 18/2 18/3
18/3 18/3 45/2 45/6
45/10
**35,000 [1]** 65/3
**3553 [9]** 7/11 46/17
64/8 70/20 72/17 80/15
81/18 91/19 91/23
**3C1.1 [1]** 7/5
**3D1.2 [1]** 41/4

**4**

**40 [1]** 47/6
**48 [1]** 62/17
**4th [1]** 51/4

**5**

**5,000 [4]** 65/16 66/6
68/4 68/9
**500-hour [1]** 94/11
**53 [1]** 37/19

**6**

**60 [5]** 71/14 73/11 78/9
81/3 86/25
**60-month [2]** 76/17
88/9
**600 [2]** 42/2 42/11
**601 [1]** 1/13
**6th [1]** 89/12

**7**

**735 [1]** 12/3
**75 [1]** 42/9

**8**

**800 [1]** 1/17
**87 [1]** 88/3

**9**

**90 [1]** 91/25
**900 [1]** 1/19

**A**

**a.m [3]** 1/7 37/8 37/8
**abide [1]** 92/5
**able [3]** 52/12 74/25
79/23
**about [91]** 3/6 4/13
5/14 5/23 7/1 9/5 9/23

USCA Case #24-3162     Document #2101481     Filed: 12/26/2025     Page 514 of 551

**A**

**about... [84]** 10/12 11/1 13/6 14/7 14/11 14/17 15/13 16/2 16/14 16/17 17/4 19/1 19/3 19/14 20/6 21/17 21/18 26/8 26/15 29/6 30/10 30/24 30/25 32/23 33/11 35/4 35/9 35/16 35/17 39/4 39/16 41/9 41/10 41/23 44/6 45/18 46/8 46/15 47/22 49/21 52/24 53/4 55/15 56/12 58/12 59/18 60/13 61/18 62/17 63/4 63/8 64/4 66/1 68/6 68/17 69/3 72/6 73/1 73/4 73/17 75/10 75/12 75/20 76/4 77/3 77/8 78/13 79/14 81/11 82/3 82/14 85/1 85/7 85/8 85/17 86/21 87/11 87/21 88/3 88/6 89/2 89/12 90/16 92/24

**above [1]** 96/5

**above-entitled [1]** 96/5

**absolute [1]** 54/17

**absolutely [2]** 69/6 73/19

**abuse [11]** 8/23 9/18 14/14 14/18 31/8 42/17 46/25 55/1 79/15 82/21 90/21

**accept [2]** 6/13 55/7

**acceptance [5]** 54/10 57/9 76/15 77/6 77/15

**accepting [3]** 50/13 71/18 77/13

**access [8]** 44/1 48/16 52/20 63/11 63/14 83/12 84/23 86/18

**accessed [3]** 49/8 50/19 74/14

**accessible [2]** 48/15 48/18

**accessing [1]** 82/1

**accomplished [1]** 83/11

**account [14]** 21/10 21/11 21/16 51/17 51/18 53/6 53/7 60/1 61/9 63/14 85/13 86/7 91/14 91/19

**accounts [9]** 59/3 62/22 63/9 63/16 64/18 64/9 67/19 67/22 69/11

**accrual [1]** 92/19

**accusation [1]** 53/21

**accused [2]** 38/14 39/12

**acknowledge [1]** 51/13

**acknowledged [1]** 6/24

**acknowledges [1]** 54/13 81/7

**acknowledgment [1]** 54/10

**acquit [1]** 31/19

**acquittal [8]** 13/17 15/3 15/8 15/21 16/10 39/15 39/18 50/10

**acquittals [3]** 10/14 39/10 39/11

**acquitted [39]** 3/5 9/5 13/13 13/21 14/6 15/2 20/7 25/10 25/23 26/1 26/7 26/25 27/18 27/19 27/21 29/21 29/23 30/3 30/9 30/13 30/18 31/1 32/5 32/15 34/4 34/17 35/17 35/25 36/7 36/10 36/12 37/17 37/24 38/4 38/10 39/9 39/23 40/9 40/17

**across [11]** 22/2 23/12 23/14 24/11 24/16 44/12 44/16 48/11 48/12 56/20 71/1

**act [12]** 61/8 61/8 61/12 65/14 66/2 66/4 77/21 86/18 90/6 90/8 90/9 90/12

**action [2]** 1/3 63/8

**actions [1]** 63/5

**active [1]** 83/18

**activities [1]** 84/6

**actually [9]** 14/12 25/18 27/19 31/18 38/10 60/15 62/20 62/20 68/4

**add [12]** 20/5 20/22 26/8 26/19 32/9 32/22 36/11 63/13 70/14 76/14 78/3 78/6

**adding [2]** 25/2 44/23

**addition [3]** 3/4 3/20 83/17

**additional [6]** 14/2 15/11 30/18 60/24 77/9 77/10

**address [9]** 5/2 35/15 46/10 48/1 53/20 54/14 58/5 67/10 78/22

**addresses [1]** 33/22

**addressing [1]** 46/17

**adequately [1]** 91/17

**adjustments [3]** 17/10 17/16 17/17

**admitted [1]** 8/25

**adopt [1]** 6/15

**adult [1]** 73/17

**advent [1]** 49/6

**advisement [1]** 37/6

**advisor [1]** 63/3

**advisory [2]** 37/13 45/13

**advocate [1]** 55/19

**advocated [1]** 87/25

**affecting [1]** 22/19

**affirmatively [1]** 25/23

**Africa [6]** 33/23 33/24 34/2 35/4 35/7 50/24

**after [15]** 4/22 4/25 38/17 43/15 51/16 52/22 62/20 66/20 71/7 72/9 74/14 74/22 82/1 82/21 91/16

**afternoon [2]** 79/3 79/4

**again [19]** 13/6 14/16 32/14 32/22 33/1 37/22 42/8 42/16 45/12 47/11 53/9 53/11 58/24 59/4 60/24 72/15 78/17 86/9 86/14

**against [6]** 12/3 66/21 81/23 83/5 84/18 84/19

**age [1]** 88/19

**agent [2]** 63/2 63/12

**ago [1]** 75/24

**agree [11]** 15/15 17/19 19/8 20/16 22/22 28/18 28/22 41/11 41/14 41/19 42/22

**agreed [3]** 26/16 28/11 41/22

**agreeing [1]** 67/3

**agreement [3]** 15/6 18/5 20/13

**agrees [2]** 20/9 20/12 21/1 21/2 41/4 41/20 45/7 80/18

**aid [1]** 90/21

**aided [1]** 1/25

**akin [2]** 24/14 24/24

**Albans [1]** 70/25

**alert [2]** 72/9 74/15

**alerted [2]** 62/19 62/21

**all [74]** 5/12 10/12 12/13 13/14 15/22 16/18 16/18 17/8 17/19 20/15 22/22 26/10 26/23 27/21 29/20 30/9 30/20 31/19 32/3 38/2 38/11 38/18 39/5 39/15 40/20 42/6 42/21 43/16 44/23 47/11 47/13 47/16 50/9 54/2 55/3 55/17 55/18 57/21 58/14 58/20 59/1 62/24 63/9 63/16 64/4 65/13 67/25 68/13 69/23 70/1 71/2 72/18 73/20 75/9 76/2 76/10 78/8 79/17 79/24 80/2 82/16 85/3 86/1 87/12 87/17 87/20 89/14 91/19 91/21 92/1 93/22 94/18 94/19 95/3

**all-White [1]** 71/2

**allegedly [1]** 10/19

**allocution [4]** 36/25 46/7 69/17 72/5

**allow [1]** 35/19

**allowed [1]** 62/17

**alluded [1]** 87/16

**almost [7]** 19/12 42/6 55/17 76/10 85/12 87/8 94/19

**alone [1]** 17/14

**already [11]** 44/25 46/1 46/3 57/14 59/23 71/10 75/15 75/16 76/18 85/22 87/3

**also [53]** 7/15 11/25 17/13 20/8 20/11 23/17 25/2 26/13 26/19 27/17 33/21 33/23 34/16 35/20 37/19 37/25 38/5 38/23 39/8 41/4 42/14 44/1 45/4 45/15 46/10 48/19 51/5 52/2 52/22 53/17 54/23 57/3 68/3 72/13 76/5 78/22 81/10 84/5 84/12 84/14 85/9 85/18 86/14 87/11 88/17 90/19 90/24 91/14 92/3 93/8 93/15

USCA Case #24-3162    Document #2104281    Filed: 03/24/2025    Page 581 of 551

**A**

**also... [2]** 93/18 94/9
**alter [1]** 55/6
**alternatively [1]** 90/10
**although [4]** 32/6 37/12 67/16 84/9
**always [4]** 5/3 87/8 88/24 89/1
**am [17]** 2/9 2/24 14/20 20/2 20/16 36/21 37/22 40/15 40/16 40/19 56/17 66/7 79/22 81/16 90/1 90/17 92/19
**ambiguity [1]** 26/21
**ambiguous [1]** 26/20
**amendment [4]** 13/14 20/6 51/23 76/22
**AMERICA [2]** 1/3 2/3
**amiss [1]** 63/6
**among [2]** 81/23 84/19
**amount [12]** 11/1 61/14 63/24 64/8 66/5 90/17 90/18 90/22 90/25 91/4 91/5 91/8
**amounted [1]** 8/18
**amounts [4]** 64/20 65/15 90/16 92/20
**Amy [11]** 61/11 61/18 61/21 62/4 62/6 64/12 64/24 65/23 66/12 90/8 90/13
**analysis [12]** 7/11 8/17 15/24 16/24 17/5 18/8 19/7 19/12 36/23 40/25 80/15 91/21
**analytical [1]** 15/13
**Andy [11]** 61/11 61/18 61/22 62/4 62/7 64/12 64/24 65/23 66/12 90/9 90/14
**announcing [1]** 37/14
**anomaly [2]** 50/15 87/15
**another [4]** 10/4 71/7 77/14 92/8
**answer [1]** 78/14
**any [46]** 3/10 4/5 4/13 4/17 5/19 5/25 10/12 11/21 14/24 15/6 15/6 16/15 17/10 19/13 19/20 22/17 26/21 26/23 29/3 32/19 33/5 39/24 40/5 40/16 40/16 43/11 45/5 49/4 53/16

56/4 58/9 69/2 72/13
74/8 74/13 74/14 74/21
78/5 78/13 81/12 87/1
88/11 90/23 92/10
93/25 94/4
**anybody [1]** 21/14
**anyone [3]** 5/1 48/18 75/7
**anything [12]** 16/16 35/6 44/15 67/24 69/2 70/18 71/13 72/24 75/12 78/17 80/5 94/15
**anywhere [4]** 22/7 48/16 71/16 73/7
**apologize [4]** 65/8 71/6 79/10 89/25
**appeal [1]** 73/4
**Appeals [2]** 9/9 11/20
**appear [2]** 41/11 83/17
**APPEARANCES [1]** 1/10
**appeared [2]** 79/11 83/10
**appears [3]** 8/11 42/21 84/22
**applicability [2]** 4/21 5/23
**applicable [3]** 6/25 24/13 87/18
**applied [1]** 9/21
**applies [13]** 8/20 11/9 29/24 31/23 41/12 42/15 43/2 43/4 43/5 58/24 59/6 61/9 88/25
**apply [17]** 2/25 3/8 7/17 9/8 16/18 22/23 24/20 36/6 36/14 40/12 40/12 41/19 41/21 42/12 44/21 61/1 61/6
**applying [4]** 20/17 26/24 27/17 37/22
**appreciation [1]** 84/5
**approach [2]** 19/17 39/14
**appropriate [8]** 18/5 62/8 62/14 64/10 64/13 90/18 90/21 90/25
**approximately [2]** 50/17 51/8
**April [4]** 33/20 34/13 50/23 51/4
**April 27th [3]** 33/20 50/23 51/4
**are [94]** 2/17 3/1 3/10 3/11 3/13 4/5 5/10 5/15

5/25 6/10 6/17 6/18
7/18 8/24 9/3 10/24
11/10 14/2 14/6 14/18
14/21 18/4 19/20 21/1
23/17 24/24 27/2 29/8
32/24 36/7 37/5 37/9
37/12 41/5 41/22 41/25
47/14 50/5 51/14 53/15
53/17 54/25 55/25
55/25 56/4 56/19 56/25
57/17 59/18 60/16
64/16 65/7 65/10 65/21
65/21 67/1 67/3 67/19
67/22 69/24 70/15 71/8
73/8 75/17 75/21 76/9
76/9 80/12 82/9 83/3
83/7 83/18 84/10 87/3
87/4 87/9 87/13 89/23
90/2 90/2 90/16 90/19
90/21 91/6 91/7 92/3
92/18 92/22 92/23 95/2
**aren't [2]** 49/11 85/7
**arguably [1]** 72/23
**argue [5]** 5/23 21/5 21/12 27/4 32/15
**argued [5]** 14/25 45/18 46/2 46/4 46/4
**argues [5]** 9/13 42/1 43/3 44/10 80/24
**argument [7]** 18/20 26/10 34/21 35/2 48/2 75/3 90/17
**argumentative [1]** 19/9
**arguments [5]** 9/5 37/20 41/23 81/11 90/16
**arises [1]** 37/18
**around [6]** 39/17 56/18 59/5 79/18 79/25 91/22
**articulated [1]** 91/8
**artifacts [3]** 51/3 52/12 52/15
**as [135]**
**ashamed [1]** 47/18
**aside [1]** 14/6
**ask [8]** 18/3 30/21 58/10 64/10 78/20 92/22 93/13 93/18
**asked [8]** 26/13 28/3 50/7 66/19 67/23 67/23 68/19 68/23
**asking [5]** 7/10 13/19

30/23 55/14 68/22
**asks [1]** 81/2
**aspect [1]** 8/3
**assess [3]** 61/10 61/13 66/5
**assessment [22]** 45/16 61/5 61/8 61/10 61/22 61/25 62/6 64/25 65/14 65/23 65/23 65/24 66/4 66/13 68/3 89/21 90/7 90/9 90/13 90/14 91/5 93/4
**assessments [9]** 58/6 61/4 61/6 61/17 61/21 62/4 64/22 65/11 66/8
**assets [4]** 63/25 64/5 68/17 69/1
**Assistant [1]** 61/12
**assume [5]** 10/9 13/15 37/7 39/6 94/24
**assumed [4]** 13/21 58/18 58/20
**assuming [1]** 5/7
**attempted [1]** 62/22
**attempting [2]** 63/15 63/24
**attend [1]** 71/1
**attorney [1]** 35/5
**Attorney's [1]** 1/13
**Attorneys [1]** 1/12
**attraction [1]** 73/24
**attributable [2]** 52/2 52/3
**August [1]** 51/4
**August 4th [1]** 51/4
**author [1]** 68/18
**available [3]** 49/2 62/2 87/11
**Avenue [1]** 1/23
**average [1]** 75/14
**avoid [4]** 39/5 53/24 54/21 86/20
**aware [8]** 3/13 4/6 55/25 56/4 56/10 56/11 62/11 69/21
**away [2]** 13/21 29/19

**B**

**back [22]** 5/12 11/5 11/8 13/25 14/11 20/3 29/4 34/3 34/13 35/8 36/23 37/7 37/9 62/15 64/14 69/18 71/5 71/7 75/1 77/23 80/9 80/12
**background [1]** 83/16

USCA Case #24-3162    Document #2110581    Filed: 05/15/2025    Page 516 of 551

**B**

**bad [2]** 63/19 88/21
**baggage [1]** 70/11
**balling [1]** 69/11
**bank [4]** 62/22 63/12 69/2 69/4
**Bankruptcy [1]** 1/22
**base [12]** 16/1 17/6 17/11 17/15 19/4 19/18 33/2 40/25 41/2 41/9 43/5 89/1
**based [12]** 7/5 31/16 33/17 33/25 38/8 38/9 38/13 38/13 45/10 69/11 88/24 91/21
**basic [1]** 92/6
**basically [2]** 71/2 72/5
**basis [1]** 33/13
**be [98]**
**because [48]** 4/10 8/6 8/10 9/14 9/24 10/24 11/23 13/14 14/25 16/9 16/21 17/18 18/16 23/10 24/7 24/15 27/14 29/5 31/11 34/9 36/11 37/4 38/21 41/6 41/12 42/15 44/19 48/6 51/1 53/7 54/20 55/24 58/8 58/18 59/19 61/19 63/8 66/19 67/10 73/10 73/22 74/13 76/20 84/23 87/7 89/16 90/19 90/24
**becomes [1]** 49/12
**becoming [1]** 49/1
**been [36]** 2/23 10/22 11/14 14/25 15/3 18/15 19/17 20/20 22/18 22/20 33/15 42/8 42/21 43/4 44/4 44/22 47/24 51/17 52/24 53/3 53/4 53/7 56/3 58/20 69/1 69/8 70/12 70/13 70/25 76/3 76/5 79/6 79/19 83/18 84/11 85/5
**before [23]** 1/9 2/21 13/19 14/11 19/15 37/2 37/4 39/16 41/1 47/10 49/6 54/4 61/22 62/18 69/17 74/19 77/20 77/25 80/15 81/11 83/10 83/17 91/15
**began [2]** 70/1 83/21
**begin [1]** 37/17

**beginning [7]** 2/7 15/23 20/14 41/5 65/9 70/3 94/20
**behalf [3]** 2/13 5/1 93/1
**behavior [2]** 41/6 41/8
**behind [1]** 88/5
**being [9]** 22/7 47/18 53/2 55/5 69/11 70/8 71/3 73/15 79/23
**belabor [1]** 47/12
**believe [19]** 3/3 3/11 8/5 11/14 12/15 14/20 21/5 24/14 29/15 37/16 38/22 39/20 52/13 60/6 60/15 61/9 64/7 93/9 93/22
**believed [1]** 38/23
**believes [2]** 63/23 80/25
**belongs [1]** 21/10
**below [11]** 19/13 55/20 56/25 57/19 71/14 72/22 73/11 81/2 81/13 86/24 87/13
**below-guideline [2]** 81/2 81/13
**benefit [4]** 54/8 54/20 55/10 69/25
**best [6]** 15/9 26/4 36/1 53/23 54/11 71/21
**better [3]** 49/12 64/17 79/22
**between [7]** 5/18 21/22 22/3 43/20 88/8 88/12 88/21
**beyond [8]** 7/25 15/5 23/10 40/2 70/18 71/13 74/8 85/3
**big [3]** 54/8 72/17 73/21
**bigger [1]** 44/17
**bit [2]** 16/9 89/16
**Black [2]** 51/7 71/1
**bodies [1]** 47/19
**boils [1]** 33/1
**both [17]** 3/23 5/1 5/11 7/6 31/11 35/24 42/25 46/4 59/2 76/9 76/9 81/19 83/9 84/18 86/13 90/18 91/15
**bottom [5]** 24/17 25/11 28/14 88/12 88/13
**boxes [1]** 12/13

**break [2]** 37/2 37/4
**breaks [1]** 67/25
**brief [7]** 3/24 4/1 4/9 6/24 8/3 31/13 66/21
**briefed [1]** 45/17
**briefly [5]** 33/9 33/10 48/1 66/18 80/16
**briefs [1]** 3/23
**bright [1]** 5/18
**bring [1]** 88/2
**broadly [1]** 56/23
**brought [2]** 34/3 35/8
**browser [3]** 34/13 50/23 52/20
**built [2]** 75/16 76/18
**burden [4]** 7/21 8/20 8/22 15/5
**Bureau [1]** 91/24
**Burgess [1]** 44/9
**business [3]** 83/25 84/1 85/24
**button [1]** 48/18

**C**

**calculate [2]** 37/13 45/12
**calculated [4]** 13/11 81/1 81/9 89/4
**calculation [7]** 4/23 36/20 37/16 45/21 46/6 80/19 89/5
**calculations [1]** 5/13
**California [1]** 23/16
**call [2]** 3/25 35/18
**called [3]** 8/2 51/7 61/5
**came [1]** 63/18
**can [36]** 10/7 11/8 13/14 15/11 16/3 16/18 25/15 28/6 30/15 33/16 33/25 34/6 34/7 35/21 36/12 39/22 40/5 41/9 46/8 46/14 49/7 51/14 54/20 58/17 63/13 74/10 74/25 75/6 78/11 82/21 86/17 88/15 90/6 90/11 91/2 94/6
**can't [7]** 14/1 26/24 32/7 36/11 47/1 72/24 74/13
**cannot [2]** 43/15 73/23
**capped [1]** 65/24
**caps [1]** 90/16
**car [3]** 22/1 22/1 23/12
**card [2]** 76/2 76/6

**care [1]** 89/12
**career [1]** 70/2
**careful [1]** 85/1
**CARL [1]** 1/9
**carries [1]** 43/18
**carrying [1]** 70/10
**cars [1]** 24/11
**case [71]** 2/3 8/18 9/15 11/15 12/4 12/11 12/23 18/25 19/1 19/3 19/4 21/8 21/13 21/13 21/14 21/22 22/3 22/4 23/14 24/1 24/18 24/19 24/24 31/16 33/13 36/15 39/2 46/24 48/3 48/9 48/10 49/21 54/11 54/19 54/23 55/17 56/2 56/5 57/4 57/7 58/16 58/17 58/18 59/6 59/7 59/12 62/2 66/20 66/21 68/6 68/7 68/8 69/19 72/7 74/7 75/2 75/19 79/16 81/19 82/15 87/1 87/2 87/8 87/22 87/24 88/9 88/16 88/22 88/25 89/6 91/1
**cases [48]** 9/8 11/19 21/23 21/25 22/8 23/17 23/21 24/10 24/21 24/23 33/14 35/24 36/1 44/11 49/5 49/11 54/2 55/13 55/18 55/25 56/22 57/8 58/21 59/4 66/5 72/18 72/18 72/22 73/7 73/9 73/10 73/13 73/14 73/21 74/3 75/15 75/20 76/9 76/10 76/19 78/16 86/22 86/24 87/9 87/9 87/13 88/17 89/11
**Category [2]** 45/9 45/11
**Category I [1]** 45/9
**caught [2]** 52/22 52/24
**caused [2]** 49/21 82/19
**causes [1]** 73/1
**caveat [1]** 65/2
**ceased [1]** 72/8
**certain [7]** 5/14 14/20 30/6 34/7 35/24 49/7 81/5
**certainly [16]** 10/3 10/7 12/7 19/12 36/15 43/19 48/20 49/24 49/25 50/2 51/25 53/4

USCA Case #24-3162    Document #2092481    Filed: 06/26/2025    Page 517 of 551

# C

**certainly... [4]** 53/11 78/1 82/4 82/25
**certify [1]** 96/4
**challenges [1]** 70/22
**challenging [1]** 32/10
**chance [1]** 73/6
**change [2]** 3/4 3/6
**changed [1]** 79/22
**changes [1]** 3/10
**Chapter [2]** 9/18 58/14
**Chapter 110 [1]** 58/14
**characteristics [4]** 70/21 71/12 83/7 88/25
**charge [5]** 25/5 26/3 28/4 35/25 36/16
**charged [11]** 12/25 14/3 27/24 37/24 38/6 38/22 39/19 48/10 54/5 59/25 85/22
**charges [2]** 73/2 85/7
**charitable [1]** 84/6
**check [1]** 12/12
**Chiccini [8]** 8/3 8/9 21/13 21/20 21/22 22/4 24/19 24/24
**Chiccini's [1]** 8/18
**child [76]** 2/18 2/19 7/24 11/1 12/19 13/1 13/2 14/8 22/1 22/12 40/1 40/3 40/6 40/13 40/21 41/18 42/6 43/8 43/9 43/14 43/20 44/12 44/21 49/5 49/7 49/16 50/20 50/22 51/8 51/9 52/20 52/25 53/2 53/10 55/1 55/18 56/4 56/18 56/21 58/16 58/23 58/25 59/3 59/6 59/8 59/11 60/1 61/11 62/1 66/4 66/9 71/19 73/14 73/15 73/16 73/17 75/18 75/24 76/3 81/24 81/25 82/8 83/2 84/23 85/2 86/10 86/10 86/11 86/12 86/18 86/22 86/23 87/8 88/19 88/22 92/1
**children [3]** 55/5 71/6 83/5
**chilling [1]** 82/22
**choice [1]** 63/4
**choose [1]** 55/7
**chose [1]** 66/23

**chosen [1]** 50/1
**chrome [1]** 50/23
**circuit [13]** 8/2 8/5 8/8 11/16 12/3 12/4 23/18 44/8 44/9 66/22 66/25 68/5 68/7
**circuits [2]** 11/19 12/12
**circulated [1]** 8/4
**circumstance [1]** 62/13
**circumstances [12]** 4/18 5/9 5/15 5/20 6/1 6/14 17/22 46/23 63/22 64/7 88/14 91/1
**cite [2]** 10/24 59/4
**cited [13]** 9/8 11/18 21/13 23/17 23/21 24/21 54/2 66/20 72/21 73/3 73/6 73/9 76/10
**cites [2]** 10/3 21/23
**citing [1]** 32/24
**claimed [1]** 64/20
**clarity [1]** 26/14
**classic [1]** 9/20
**clean [3]** 10/12 40/8 52/10
**clear [20]** 7/3 16/17 17/3 20/5 20/10 26/9 26/11 26/15 28/5 28/18 30/1 30/10 32/14 36/5 39/21 39/25 42/18 45/20 71/22 87/4
**clearly [4]** 9/24 17/1 51/7 85/21
**clicked [5]** 25/16 25/19 25/25 26/6 30/14
**clicks [1]** 48/17
**close [3]** 69/24 69/25 73/8
**close-knit [1]** 69/25
**closed [3]** 51/17 51/18 53/7
**closest [1]** 50/12
**closing [1]** 26/10
**cloud [2]** 21/10 49/1
**co [1]** 31/10
**co-counsel [1]** 31/10
**Code [1]** 9/17
**cognizant [1]** 90/15
**cohort [1]** 55/12
**collateral [1]** 89/7
**colleague [1]** 2/10
**collection [1]** 92/13
**COLUMBIA [1]** 1/1

**combine [1]** 76/12
**come [10]** 6/20 17/16 36/9 36/23 48/22 50/12 77/17 79/1 79/17 80/9
**comes [1]** 88/15
**coming [2]** 71/1 75/10
**commentary [3]** 35/17 35/23 42/8
**commerce [7]** 22/10 22/13 22/18 22/19 22/24 23/1 23/20
**commercially [1]** 49/2
**Commission [1]** 56/18
**commit [2]** 83/15 92/8
**committing [1]** 41/15
**common [1]** 47/17
**communicate [1]** 82/2
**community [8]** 54/24 55/9 71/8 83/18 83/22 83/24 84/4 84/12
**comparable [6]** 56/1 56/3 71/13 73/1 73/7 73/9
**comparator [1]** 87/2
**compare [1]** 76/19
**compared [4]** 43/18 44/15 82/4 89/9
**comparison [1]** 54/2
**comparisons [1]** 56/20
**completed [1]** 72/14
**completely [1]** 48/6
**complicated [1]** 16/9
**complied [1]** 85/3
**complying [1]** 85/8
**component [1]** 36/25
**components [1]** 90/3
**computer [10]** 1/25 34/19 41/15 50/25 88/20 88/23 89/2 92/16 93/8 93/11
**computer's [1]** 34/15
**computer-aided [1]** 1/25
**concede [2]** 31/5 31/16
**conceded [1]** 41/17
**conceding [1]** 7/15
**concerned [1]** 63/7
**concession [1]** 32/6
**conclude [7]** 40/13 42/3 42/10 42/14 42/22 44/19 45/2
**concluded [5]** 38/24 43/23 49/9 90/24 95/4

**concluding [2]** 40/15 40/19
**conclusion [2]** 44/8 70/20
**conclusions [2]** 51/14 91/22
**conclusory [1]** 91/20
**concurrently [1]** 92/2
**conditions [4]** 70/7 78/7 85/4 92/5
**conduct [83]** 3/5 7/11 7/20 7/24 8/17 8/18 8/20 8/23 9/5 9/5 9/10 9/24 10/1 10/8 11/11 11/25 12/5 13/14 13/22 12/23 14/14 16/4 16/4 16/22 16/24 17/8 17/18 18/10 18/17 20/7 21/4 21/6 21/18 21/18 21/21 25/10 29/21 29/23 30/17 31/2 31/7 35/17 35/20 35/24 36/2 36/4 37/18 37/23 37/23 37/25 40/16 42/17 43/7 43/13 44/20 50/8 50/11 50/13 51/13 54/14 56/2 59/24 71/15 71/18 72/9 72/23 73/10 73/15 75/19 76/13 76/20 77/1 77/19 77/19 77/24 82/5 85/14 88/16 88/21 89/6 89/9 89/10 92/7
**confer [2]** 31/10 31/11
**confidence [1]** 74/11
**confinement [3]** 62/18 70/6 78/4
**conflated [1]** 8/12
**confront [1]** 49/5
**Congress [4]** 48/4 48/4 48/23 50/1
**connection [2]** 37/18 37/21
**consensus [1]** 11/19
**consequence [1]** 89/7
**consequences [3]** 80/22 89/19 90/1
**consider [16]** 4/17 7/11 10/7 10/12 10/14 26/24 32/17 35/21 37/14 40/5 41/8 53/23 58/10 84/16 86/7 86/20
**consider -- to [1]** 53/23
**considered [5]** 8/7 11/20 12/12 18/17

USCA Case #24-3162    Document #2104848    Filed: 03/13/2025    Page 518 of 551

# C

**considered... [1]** 81/17
**considering [6]** 9/21
20/6 24/13 40/16 50/11
51/12
**considers [1]** 12/17
**consistent [4]** 53/23
70/16 70/17 78/19
**consisting [1]** 84/13
**Constitution [1]** 1/23
**constitutional [1]**
76/24
**consume [1]** 83/2
**consumption [1]** 85/1
**contact [2]** 48/22
92/15
**contacted [1]** 67/18
**contained [5]** 5/10
5/11 6/14 8/6 22/20
**contested [1]** 7/18
**context [1]** 89/12
**continue [1]** 82/16
**continued [1]** 84/22
**continuing [1]** 82/18
**continuous [2]** 41/6
41/8
**contribution [1]** 79/25
**control [1]** 73/23
**controlled [2]** 92/9
92/11
**convict [1]** 28/9
**convicted [28]** 7/23
8/10 8/16 12/18 13/2
14/25 16/7 16/12 18/21
25/5 25/20 26/3 26/5
27/14 27/16 30/3 32/3
34/5 36/7 38/3 38/5
38/8 38/9 39/22 42/19
43/16 60/3 81/24
**convicting [1]** 39/25
**conviction [19]** 9/3
15/19 15/23 16/23
17/25 33/2 33/19 35/21
35/25 36/3 38/1 43/16
60/16 65/1 65/22 66/9
84/13 85/15 89/21
**convictions [1]** 66/10
**convicts [1]** 23/3
**cooperate [3]** 92/12
92/15 93/11
**corpus [2]** 14/18 30/24
**correct [25]** 5/16 7/2
8/3 13/12 19/2 19/16
20/23 27/8 37/15 37/16

38/7 56/14 57/1 57/12
60/10 60/20 64/21 65/2
65/19 66/11 66/14 88/1
90/5 93/19 96/4
**correctly [2]** 37/13
45/5 45/12
**corrects [1]** 20/11
**could [23]** 14/25 16/24
18/17 28/24 34/18 38/7
38/13 38/13 38/16
43/24 44/1 48/17 52/4
53/4 64/19 66/18 68/1
70/21 72/6 73/25 74/12
86/2 94/11
**counsel [9]** 2/6 2/9
4/25 31/10 31/14 33/7
57/23 58/3 80/23
**counsel's [1]** 93/20
**count [59]** 2/18 9/3 9/3
10/6 10/16 12/18 13/7
13/17 14/5 15/1 15/21
15/25 16/3 16/7 16/13
16/13 16/15 16/17
16/25 17/12 17/14
17/15 17/17 18/15 19/6
19/12 27/10 28/8 28/10
31/19 34/9 34/10 35/11
36/7 36/7 36/10 36/12
36/13 36/15 38/5 38/13
38/19 39/19 39/22 41/1
59/25 61/15 64/25
65/16 65/22 66/6 68/4
68/7 68/12 87/17 89/20
90/11 91/6 92/1
**Count 16 [2]** 12/18
59/25
**Count 2 [3]** 9/3 10/6
35/11
**Count 4 [1]** 34/9
**Count 5 [2]** 36/7 36/13
**Count 8 [3]** 36/7 36/10
36/12
**counted [2]** 30/17
32/12
**counting [1]** 50/9
**country [4]** 48/11
48/12 56/21 59/5
**counts [51]** 2/18 10/13
10/18 13/16 13/22
15/18 15/20 15/23 17/4
17/25 19/14 25/14
25/21 25/23 26/25 27/1
27/15 27/20 27/20
27/25 28/2 30/7 30/8
30/9 30/19 31/3 32/2

33/2 33/18 34/5 34/6
34/17 36/8 36/18 37/8
38/16 38/18 38/21
38/23 40/18 40/22 41/3
42/9 42/20 43/16 65/4
65/7 65/18 66/9 85/15
91/25
**couple [6]** 59/4 62/8
67/15 75/5 75/23 87/3
**course [22]** 3/7 3/18
15/17 28/1 44/25 45/19
50/17 51/9 57/17 59/10
59/20 61/5 63/8 64/23
69/8 80/24 81/3 81/22
82/24 84/9 85/24 89/11
**court [89]** 1/1 1/22 5/3
7/10 7/14 8/7 9/4 10/5
11/6 12/2 12/16 13/13
13/14 14/5 15/11 16/24
20/9 21/16 22/23 26/20
28/18 29/10 30/15
32/11 32/12 32/17
32/23 33/2 33/5 33/16
33/25 34/21 35/19
35/21 36/1 36/12 37/25
47/8 48/1 48/8 50/7
50/8 50/18 52/3 52/5
52/13 54/20 54/24 55/2
55/11 58/9 58/10 59/12
59/14 60/13 61/10
61/13 61/19 61/22 62/3
62/14 62/16 63/3 63/25
64/10 64/11 66/5 66/19
68/14 68/19 69/21 70/8
71/10 72/5 72/16 74/2
74/9 74/10 74/16 75/9
77/10 78/11 78/17
78/20 78/22 85/8 93/4
94/11 96/3
**Court's [4]** 20/21
32/20 59/23 77/10
**Courtney [9]** 1/11 2/9
2/11 6/18 45/23 46/8
66/17 77/8 94/3
**courts [8]** 1/22 9/9 9/9
9/21 11/20 11/24 54/7
59/5
**cover [1]** 58/1
**COVID [1]** 50/14 72/3
**crash [1]** 70/24
**CRC [1]** 1/21
**create [6]** 55/21 55/23
81/25 87/5 89/8 91/12
**created [1]** 83/24
**creates [1]** 86/14

**creating [3]** 56/20
82/25 89/13
**creation [2]** 86/10
86/12
**credible [1]** 75/3
**credit [3]** 76/2 76/6
78/5
**crime [7]** 25/2 43/17
63/19 84/14 86/13
86/13 92/9
**crimes [3]** 43/19 81/24
83/15
**criminal [7]** 1/3 2/3
45/4 45/7 45/8 45/10
84/12
**criminalizes [2]** 22/14
23/2
**criminally [1]** 37/24
**crisis [1]** 52/23
**crystal [2]** 16/17 45/20
**CTF [1]** 70/9
**culpable [1]** 49/16
**custodial [2]** 62/10
62/11
**custodian [1]** 53/15
**custodians [1]** 53/17
**custody [1]** 91/24
**cuts [3]** 81/22 83/5
83/8
**Cybertip [1]** 52/4

# D

**D.C [3]** 11/16 66/22
66/25
**da [3]** 14/14 14/14
14/14
**danger [1]** 74/17
**dangerous [1]** 44/4
**dangers [1]** 79/15
**dark [1]** 52/19
**data [2]** 56/18 87/11
**date [2]** 32/3 32/4 96/8
**day [4]** 32/4 33/22 55/4
62/15
**days [1]** 16/19
**DC [4]** 1/14 1/17 1/20
1/23
**dcd.uscourts.gov [1]**
1/24
**deal [2]** 20/21 47/14
**dealing [4]** 9/18 29/8
47/14 49/5
**dealt [2]** 79/7 79/20
**debate [1]** 58/11
**decade [1]** 76/22

USCA Case #24-3162    Document #2102491    Filed: 02/28/2025    Page 519 of 551

**D**

December [1] 96/7
deceptive [1] 69/14
decide [7] 13/5 27/18
28/10 28/25 29/10
30/15 30/15
decided [1] 10/9
deciding [2] 13/15
37/14
decision [1] 28/21
decisions [2] 44/8
63/19
decrease [4] 20/25
22/23 24/20 43/4
deeply [1] 89/12
defendant [54] 1/7
1/16 2/17 3/24 4/1 4/10
4/11 7/18 7/23 8/1 8/10
8/19 9/13 10/8 10/19
12/18 12/20 12/25
14/24 15/9 26/22 33/11
33/23 34/12 37/24 43/9
47/2 48/15 50/7 50/12
50/19 51/5 51/16 51/18
52/13 53/9 54/16 54/17
54/18 55/5 56/5 60/3
62/17 62/21 63/13
63/15 63/24 64/3 64/9
68/6 72/20 73/22 85/6
94/24
defendant's [15] 5/3
7/21 15/9 18/20 33/24
43/5 43/7 43/13 51/12
51/15 53/16 60/1 63/3
63/4 63/10
defendants [8] 54/7
55/7 73/13 76/10 81/24
83/10 83/17 85/13
defense [5] 4/14 5/25
58/3 62/23 93/20
defense's [2] 33/21
53/20
defined [3] 11/12
11/17 59/1
definition [7] 9/16 9/20
35/11 35/12 35/14
59/21 60/14
degrading [5] 9/11
9/25 11/25 12/6 12/10
degree [1] 9/24
Dejournett [1] 75/23
delay [2] 51/22 51/25
demand [1] 83/3
demonstrated [2] 42/4
42/24
demoralized [1] 47/1
dependent [1] 18/9
depending [2] 29/20
37/1
depict [3] 8/23 14/3
14/21
depicted [3] 9/6 36/10
46/25
depiction [3] 22/16
22/17 25/8
depictions [4] 11/11
31/7 55/1 55/5
depicts [3] 10/4 10/5
36/13
described [6] 4/18
5/10 5/15 5/20 6/1
82/17
description [1] 32/7
descriptions [1] 55/1
deserve [1] 55/9
deserving [1] 44/6
desire [1] 53/18
desktop [2] 34/15 51/1
despite [3] 70/22 72/4
72/7
details [2] 59/17 59/17
determine [2] 36/2
40/6
determining [1] 40/11
deterrence [9] 66/23
72/20 84/17 85/20 86/2
86/6 86/6 86/8 91/18
deterrent [2] 86/5
86/18
deviation [1] 37/3
device [1] 74/6
devices [5] 51/15
51/21 53/13 60/12
72/12
did [34] 8/20 17/5
17/21 24/4 24/10 28/4
31/18 31/20 34/5 34/6
35/9 35/16 38/19 38/21
38/25 39/8 39/8 43/9
52/10 52/15 63/1 67/11
67/17 72/12 73/20
74/12 75/5 75/6 75/8
82/24 87/21 93/3 93/4
93/10
didn't [24] 8/13 8/13
21/21 23/14 23/14
23/20 24/1 24/2 24/11
27/18 27/19 28/16
30/15 35/15 48/20 65/9
69/2 73/5 81/25 81/25
82/1 82/21 82/2 86/25
difference [11] 23/13
23/24 23/25 44/14 77/4
77/4 77/5 88/8 88/10
88/12 88/12
differences [1] 88/11
different [13] 17/25
18/22 19/4 24/22 31/24
36/16 47/6 50/16 53/6
54/8 87/1 90/2 91/7
differing [1] 4/21
difficult [2] 17/23 61/1
DILLON [1] 1/16
direct [1] 82/24
directed [1] 92/13
disagree [2] 3/6 35/11
disagreeing [1] 17/3
disagreements [1]
67/1
disagrees [3] 41/3
48/3 48/4
disclosure [1] 68/17
disclosures [1] 92/17
discuss [2] 6/8 91/2
discussed [9] 11/25
11/25 37/19 41/1 44/10
44/25 80/23 81/19
86/21
discussing [7] 19/17
38/2 42/8 42/21 43/5
44/22 84/9
dismiss [1] 94/21
dismissed [1] 95/2
dismissing [1] 94/25
disparities [5] 53/24
86/21 87/6 89/8 89/13
disparity [4] 55/22
55/24 87/6 91/13
dispute [5] 5/14 9/23
25/15 37/18 53/3
disputed [3] 4/23 6/23
41/24
dissent [2] 8/6 8/15
distinction [9] 19/17
21/22 21/24 21/24 22/3
23/23 24/12 43/20
44/13
distinguish [1] 88/21
distinguishable [1]
8/9
distribute [4] 8/14
43/9 49/18 81/25
distributed [1] 49/8
distributing [2] 18/23
69/2 73/5 81/25 81/25
82/1 82/21 82/2 86/25
difference [11] 23/13
44/18
(State 518 of 551)
distribution [14] 7/16
8/12 20/20 20/22 21/3
41/18 49/13 49/25 50/2
50/4 50/4 56/24 86/11
88/18
district [14] 1/1 1/1 1/9
1/22 55/18 56/2 59/5
66/22 70/16 70/17
71/14 75/16 78/19 87/8
divided [1] 46/17
DNA [1] 92/13
do [59] 14/10 14/16
17/19 17/20 17/22
19/11 20/9 20/10 22/12
24/11 25/1 26/10 27/3
28/16 31/5 32/22 33/9
36/24 39/11 40/12 41/5
41/11 41/14 46/14
48/23 52/18 53/12 58/8
58/13 61/1 61/21 62/3
62/7 62/13 62/24 63/15
63/20 64/7 64/11 64/11
67/4 67/5 67/9 68/24
72/16 73/13 73/18 74/1
74/4 74/18 74/21 74/21
82/13 86/16 87/2 87/15
88/20 90/12 90/15
documentation [1]
84/6
documents [1] 84/8
does [31] 5/19 7/17
11/10 15/5 18/21 21/2
22/24 24/9 24/20 31/21
33/2 33/5 35/19 37/23
38/10 41/19 41/21
45/20 53/12 64/9 68/4
72/6 77/15 77/16 78/15
83/16 85/12 86/16
89/14 91/9 93/25
doesn't [9] 10/6 13/13
29/16 35/14 54/16 57/5
61/14 74/13 88/20
doing [10] 17/14 55/21
57/20 58/10 64/12
67/24 68/23 69/8 76/5
76/9
dollars [2] 64/5 65/22
don't [40] 6/21 7/1
9/15 9/15 9/23 10/21
11/14 13/12 13/17 19/8
26/17 26/23 29/1 32/4
33/12 33/13 34/6 34/7
35/18 43/11 46/15
48/25 49/3 52/16 52/17

USCA Case #24-3162    Document #2108481    Filed: 03/14/2025    Page 520 of 551

## D

**don't...** **[15]** 52/17 53/12 53/13 53/15 55/8 55/23 56/3 57/8 62/24 62/25 77/2 82/21 85/13 85/19 86/8
**donations [1]** 84/7
**done [7]** 3/17 4/11 4/25 36/20 76/16 78/15 79/21
**doubt [5]** 15/5 26/25 40/2 53/15 84/14
**doubts [1]** 85/17
**down [8]** 28/13 28/23 32/13 33/1 50/14 66/20 88/2 91/17
**downloaded [3]** 33/19 50/19 50/25
**downward [1]** 87/10
**draft [1]** 64/1
**drawn [1]** 51/14
**drive [19]** 12/21 12/21 21/16 22/6 23/7 24/8 43/22 43/24 43/25 44/5 44/16 48/13 50/6 50/6 50/20 60/1 60/5 71/20 83/3
**driving [5]** 23/11 24/11 24/14 48/11 84/13
**drove [1]** 22/1
**drug [2]** 92/12 94/12
**due [1]** 3/7
**during [13]** 7/7 26/9 50/14 62/19 62/21 68/20 69/12 69/22 72/3 77/24 78/1 85/4 91/15

## E

**each [20]** 15/18 17/5 17/9 17/11 17/16 17/17 17/24 36/15 41/2 42/9 60/4 60/19 64/19 65/3 65/17 66/9 81/18 81/18 89/23 90/3
**earlier [9]** 2/23 21/17 32/3 37/20 38/2 42/3 48/2 84/23 87/16
**early [8]** 51/6 54/4 54/11 54/18 55/8 83/20 83/21 83/21
**easier [1]** 10/4
**easiest [1]** 30/25
**easily [1]** 8/25
**education [2]** 78/8

83/13
**effect [3]** 3/1 3/6 37/20
**effective [1]** 20/17
**effectively [1]** 31/19
**either [7]** 14/13 25/18 25/25 31/6 33/2 33/3 45/20
**electric [2]** 9/7 12/8
**electronic [2]** 51/15 51/21
**element [1]** 22/24
**elements [3]** 18/22 38/18 43/17
**elicited [1]** 10/25
**eliminating [1]** 40/9
**Elkton [1]** 94/7
**else [13]** 5/7 15/2 16/16 21/11 26/7 44/1 47/24 48/18 68/23 69/2 71/16 80/5 94/15
**elsewhere [1]** 9/17
**Email [4]** 1/14 1/15 1/18 1/20
**emotional [1]** 70/10
**emphasize [1]** 59/25
**emulating [1]** 83/22
**end [4]** 18/9 41/6 46/14 80/6
**ended [1]** 82/21
**ends [1]** 92/21
**endured [1]** 79/9
**enforcement [3]** 75/9 77/20 77/25
**enforcement's [1]** 72/11
**enhanced [1]** 48/5
**enhancement [28]** 6/25 7/5 7/16 8/21 8/22 9/1 10/11 11/9 17/7 18/8 25/7 29/13 29/19 29/24 31/23 36/14 41/12 41/16 41/18 41/20 42/12 42/13 42/14 42/20 43/1 81/12 88/20 89/2
**enhancements [13]** 5/24 16/2 16/14 16/18 17/10 37/21 40/11 41/10 41/22 41/23 41/24 44/24 87/18
**enhancing [2]** 50/2 88/24
**enjoying [1]** 70/2
**enormously [1]** 70/14
**enough [9]** 6/7 11/4

29/17 29/22 37/5 39/6 70/15 70/18 93/14
**ensure [1]** 86/16
**ensures [1]** 54/23
**entire [3]** 71/9 81/19 91/21
**entirely [2]** 63/15 85/12
**entitled [3]** 7/19 89/23 96/5
**equally [1]** 50/1
**eradicated [1]** 48/7
**erased [1]** 47/2
**especially [4]** 54/18 72/18 74/5 74/22
**essentially [8]** 15/24 31/2 41/23 50/1 66/25 76/23 77/14 85/5
**establish [2]** 31/22 92/6
**establishes [4]** 17/1 35/20 36/2 37/25
**evaluation [3]** 4/11 85/9 85/16
**evaluations [1]** 85/11
**even [27]** 2/24 8/16 14/5 16/25 17/4 17/12 18/16 22/22 29/5 31/20 35/12 38/8 38/16 42/22 44/3 44/17 52/4 58/17 64/1 72/1 76/14 77/20 77/25 81/12 82/7 84/24 86/3
**event [5]** 14/24 29/3 45/5 53/10 81/12
**events [2]** 82/2 83/24
**ever [7]** 47/19 52/15 73/20 77/20 78/17 79/7 79/20
**every [9]** 13/3 38/14 47/22 57/5 58/15 70/8 74/6 87/1 88/25
**Everybody [1]** 21/2
**everyone [11]** 18/19 20/13 20/25 39/1 41/4 45/7 45/19 58/18 74/3 81/16 91/4
**everything [13]** 5/7 15/2 26/7 30/13 30/18 31/2 32/5 32/14 68/2 68/24 72/15 74/6 79/16
**evidence [69]** 8/25 10/23 12/19 13/4 14/7 16/8 16/11 16/19 16/23 16/25 18/16 18/16

25/14 25/15 25/17 25/20 25/22 25/24 25/24 26/6 30/6 30/7 30/14 30/16 31/15 31/22 32/11 33/17 33/18 33/25 34/8 34/12 34/13 35/6 39/23 40/7 40/22 42/5 42/10 42/23 42/25 48/16 50/15 50/21 50/22 50/24 51/1 51/2 51/14 51/17 52/11 52/16 52/17 53/6 60/13 63/23 71/21 72/4 72/6 73/19 74/2 74/8 74/11 74/14 77/23 81/20 84/18 85/14 91/22
**exact [2]** 32/4 76/16
**exactly [3]** 27/3 36/20 71/16
**example [6]** 10/5 10/10 10/22 10/23 15/24 82/8
**exceed [1]** 90/23
**exceedingly [1]** 50/8
**except [2]** 18/18 40/8
**exception [1]** 35/19
**exceptionally [2]** 84/10 85/1
**excess [1]** 12/19
**exercise [1]** 76/21
**exhaustive [3]** 72/7 74/5 74/5
**exist [1]** 74/13
**existing [1]** 3/20
**expect [1]** 52/1
**expectations [1]** 92/6
**expense [1]** 54/21
**experience [5]** 70/12 70/24 71/2 75/7 82/19
**experienced [1]** 52/23
**experiences [1]** 47/17
**expert [1]** 33/22
**explain [1]** 67/2
**explained [2]** 12/4 63/13
**explanation [2]** 34/16 68/1
**exploitation [5]** 8/24 14/15 14/19 31/8 83/4
**exposed [1]** 54/25
**expressed [3]** 47/16 53/18 84/4
**expressly [2]** 26/25 31/1
**extended [1]** 83/12

USCA Case #24-3162    Document #2078481    Filed: 07/10/2025    Page 521 of 551

**E**

**extent [3]** 49/6 52/15 83/14

**extra [3]** 23/9 23/10 32/1

**extremely [1]** 70/9

**F**

**F.3d [1]** 12/3

**facilitate [2]** 22/6 22/6

**facility [1]** 22/17

**fact [9]** 15/4 38/15 51/20 52/10 57/13 57/18 64/3 81/17 84/22

**factor [7]** 7/12 72/18 73/21 81/22 83/5 83/8 84/16

**factors [10]** 46/17 60/25 68/16 69/18 70/20 75/13 80/16 81/18 91/19 91/23

**facts [13]** 3/19 4/17 5/9 5/14 5/19 6/1 6/15 7/6 7/16 24/22 73/5 73/7 75/5

**factual [3]** 4/19 6/13 22/3

**factually [2]** 21/14 24/18

**fair [7]** 11/4 29/17 29/22 30/11 53/23 81/6 85/21

**fall [1]** 59/8

**falls [2]** 10/1 12/16

**familiarity [1]** 3/19

**families [1]** 47/9

**family [11]** 53/18 69/20 69/25 70/4 71/4 78/13 79/8 79/23 79/24 83/12 84/3

**far [3]** 55/25 82/3 91/16

**father [2]** 70/23 83/19

**father's [1]** 83/22

**favor [2]** 26/21 83/8

**FBI [3]** 51/15 60/11 63/2

**FCI [1]** 94/7

**features [1]** 75/19

**federal [2]** 37/25 92/8

**feels [1]** 88/20

**fees [1]** 63/18

**felony [4]** 45/16 64/2 65/22 66/8

**few [5]** 31/15 48/17 74/3 77/18 83/17

**few clicks [1]** 48/17

**fewer [1]** 42/2

**fewest [1]** 9/4

**figure [1]** 29/5

**file [19]** 10/4 10/6 10/17 10/18 13/3 14/1 15/1 15/5 15/7 15/19 28/13 34/12 34/18 38/8 38/13 38/14 39/24 40/4 40/6

**filed [1]** 60/25

**files [64]** 8/25 10/8 10/14 10/22 10/24 10/25 11/3 12/17 12/17 13/15 13/16 13/23 14/6 14/7 14/17 14/18 14/21 15/11 16/20 18/24 21/15 26/5 26/16 27/2 28/10 28/13 28/21 30/25 31/2 31/6 31/6 31/11 31/20 32/8 33/18 34/2 34/8 38/9 38/11 38/16 38/24 39/9 39/11 39/12 39/15 39/19 40/18 40/21 42/5 42/6 43/24 44/3 44/6 44/7 44/15 44/16 44/18 50/5 50/9 50/10 50/25 52/4 60/5 60/12

**filing [2]** 63/4 86/23

**filings [1]** 62/15

**finally [4]** 35/15 43/3 53/20 62/5

**finances [1]** 7/6

**financial [14]** 58/2 63/9 63/19 67/10 68/14 69/9 80/22 81/5 81/15 89/15 89/19 90/1 92/17 92/17

**find [8]** 10/6 24/18 26/11 32/11 33/16 33/25 42/15 58/17

**finding [7]** 15/8 15/10 15/11 15/19 15/21 27/11 39/17

**findings [3]** 4/19 6/13 84/19

**finds [2]** 26/20 59/14

**fine [5]** 40/15 45/14 61/23 62/3 62/5

**fines [1]** 58/6

**first [23]** 4/17 5/9 7/18 15/25 34/11 35/5 41/24

**50/22 55/14 58/2 62/8 63/1 65/22 67/10 67/25 67/16 73/4 77/7 79/8 79/10 87/5 89/15 94/22**

**fit [1]** 32/7

**five [39]** 2/17 15/17 15/20 17/4 17/6 25/3 25/14 27/1 27/2 27/7 27/10 27/12 27/15 29/4 29/6 29/13 29/15 30/3 30/18 32/15 33/3 33/4 38/3 39/15 40/22 41/2 42/12 42/19 43/16 45/14 47/2 55/4 56/5 65/7 70/14 78/3 86/3 86/4 91/25

**five-day [1]** 55/4

**five-level [2]** 33/4 42/12

**five-year [2]** 78/3 86/4

**flawlessly [1]** 70/7

**flip [2]** 30/23 39/16

**flying [1]** 48/11

**focus [1]** 39/2

**focused [1]** 66/22

**focuses [1]** 22/10

**focusing [1]** 21/19

**folder [3]** 44/3 50/5 51/6

**followed [3]** 46/22 80/21 81/14

**footnote [1]** 8/4

**Fore [1]** 44/9

**foregoing [1]** 96/4

**foreign [2]** 9/10 22/19

**foremost [1]** 79/10

**forensic [12]** 25/15 25/17 25/24 26/5 30/6 30/7 30/13 33/18 51/2 52/11 52/14 75/10

**forever [1]** 55/6

**forgot [3]** 64/4 65/12 94/19

**form [7]** 26/14 26/18 28/3 28/5 28/7 28/17 28/17

**forth [1]** 62/15

**forward [3]** 2/6 79/23 80/1

**found [16]** 2/19 9/9 15/4 17/22 22/12 24/7 25/13 25/19 26/21 38/17 38/20 39/7 40/2 40/22 52/24 60/12

**four [34]** 8/22 14/13

**19/13 25/7 27/2 27/3 27/15 27/18 27/21 27/14 29/4 29/6 29/13 29/18 29/24 30/2 33/3 33/3 39/16 42/14 59/18 60/9 60/16 60/19 64/16 70/5 70/14 74/15 74/24 75/1 78/13 79/6 87/19 88/11**

**four-level [8]** 8/22 14/13 25/7 29/18 29/24 33/3 42/14 88/11

**Fourth [1]** 51/23

**frankly [3]** 29/12 63/3 63/7

**free [2]** 67/1 67/3

**freeze [1]** 84/25

**fresh [1]** 67/14

**Friedrich [2]** 75/22 76/13

**friends [1]** 84/3

**front [2]** 18/9 78/16

**frozen [2]** 67/19 67/22

**Frye [1]** 66/21

**full [5]** 8/5 13/1 13/2 51/18 74/10

**fully [1]** 63/10

**fund [1]** 61/25

**further [6]** 7/15 34/21 73/25 83/4 85/1 94/4

**future [4]** 70/9 86/15 86/15 86/19

**G**

**gathering [1]** 88/18

**general [9]** 83/2 84/8 84/20 85/20 86/8 86/18 87/3 87/11 91/18

**generally [2]** 11/21 55/16

**generated [1]** 83/25

**generosity [1]** 84/5

**gentlemen [2]** 75/24 76/3

**get [26]** 2/21 3/7 9/23 13/13 14/13 17/24 27/19 30/20 36/25 37/6 47/22 57/10 59/17 70/3 73/14 74/25 76/15 76/16 76/22 77/12 77/16 77/16 78/9 91/7 94/7 94/11

**gets [5]** 16/8 36/13 77/18 78/14 90/3

**getting [2]** 78/5 91/3

**girl [2]** 9/6 12/7

USCA Case #24-3162    Document #2102804    Filed: 03/24/2025

**G**

**girls [6]** 14/4 14/22 46/25 47/14 79/11 82/15

**give [7]** 54/6 54/7 54/19 61/14 69/9 71/5 73/5

**given [6]** 61/3 62/2 62/9 64/8 74/22 86/3

**giving [2]** 39/5 71/7

**glad [1]** 68/19

**go [13]** 4/22 11/5 11/8 14/10 16/3 29/4 32/13 54/17 55/13 64/14 74/3 74/4 82/1

**God [1]** 75/7

**goes [5]** 37/1 54/18 61/22 61/25 68/15

**going [38]** 2/21 2/23 2/24 5/22 6/18 10/12 18/18 20/10 20/21 24/16 28/12 37/15 37/17 40/24 54/15 55/3 55/5 55/15 58/8 61/17 62/3 65/5 65/7 69/10 71/2 74/8 74/16 77/3 77/17 80/1 80/9 89/14 89/15 89/16 89/19 89/22 91/16 92/11

**gone [4]** 28/23 56/2 70/5 79/16

**good [9]** 2/2 2/8 2/12 20/3 20/4 77/23 79/3 79/4 83/12

**Google [26]** 12/20 12/21 21/9 21/10 21/16 22/5 43/22 43/24 44/16 48/19 50/20 51/10 51/16 51/19 52/24 53/1 53/5 53/6 53/7 60/1 60/5 71/20 72/9 74/15 77/22 84/24

**Googled [1]** 63/5

**got [5]** 21/20 56/5 76/2 76/6 77/22

**government [76]** 2/7 4/3 5/19 7/3 7/9 7/14 8/9 8/19 9/2 9/8 10/3 19/22 20/8 20/11 20/11 21/23 22/10 23/17 23/22 24/21 25/15 25/18 26/9 26/16 27/24 30/24 31/20 34/18 35/10 35/16 38/14

39/12 40/3 40/6 40/13 40/19 41/1 41/26 42/4 42/24 46/20 48/3 52/4 52/11 52/14 53/21 54/6 54/16 54/20 54/25 55/19 62/10 62/19 62/21 63/7 63/23 63/25 71/15 72/4 73/3 73/19 74/4 74/10 74/12 76/23 77/1 77/8 79/8 79/24 80/18 80/22 81/11 82/17 85/11 90/10 93/25

**government's [29]** 4/1 4/6 5/17 6/22 6/24 8/22 12/22 17/9 18/1 19/7 21/19 35/1 35/5 35/12 46/9 51/13 53/25 62/16 64/5 64/15 64/18 66/7 68/5 71/21 72/1 74/1 75/3 76/21 82/7

**graphic [1]** 54/25

**gratification [1]** 12/5

**great [2]** 55/10 79/21

**greater [1]** 50/4

**grew [1]** 83/10

**group [3]** 15/22 18/4 41/9

**grouped [3]** 17/12 41/5 45/3

**grouping [7]** 15/14 16/5 16/15 17/14 17/23 18/5 18/9

**groups [2]** 53/1 53/5

**guess [3]** 10/17 24/10 30/25

**guideline [10]** 9/12 29/12 35/18 54/1 55/19 56/6 66/23 80/19 81/2 81/13

**guidelines [58]** 3/1 3/8 3/10 4/21 4/22 5/13 5/24 6/18 11/13 15/14 18/11 19/2 19/7 19/12 19/20 19/25 20/7 20/17 21/17 26/24 36/20 36/23 37/5 37/12 37/16 37/22 40/25 41/7 45/11 45/21 46/6 46/21 50/2 55/20 56/25 57/11 67/2 67/3 76/25 77/2 77/2 77/2 77/3 77/13 80/18 80/24 80/25 81/10 87/7 87/14 87/22 88/2 88/3 88/5 88/6 88/15 89/3

89/5

**guidelines-strict [1]** 19/2

**guilt [3]** 15/25 39/17 54/10

**guilty [19]** 2/20 15/9 22/12 25/14 27/1 34/10 34/11 38/12 38/17 38/21 40/23 54/3 54/4 54/18 55/13 56/12 57/13 57/17 77/14

**H**

**had [43]** 2/23 6/7 7/3 21/25 22/20 22/20 26/5 26/10 26/11 26/15 28/10 28/14 28/24 28/24 30/5 31/14 33/24 35/7 38/18 43/23 51/17 51/22 52/9 52/19 52/20 52/24 53/7 55/4 58/21 62/22 63/12 66/19 69/1 69/3 69/7 69/25 73/6 75/25 76/3 76/5 79/5 85/23 88/22

**hammered [1]** 73/14

**hand [1]** 43/21

**handled [1]** 20/20

**happen [2]** 14/10 14/16

**happened [10]** 7/6 16/19 21/7 35/7 39/20 48/17 67/17 68/2 69/19 79/12

**happens [2]** 29/20 88/19

**happy [1]** 67/12

**hard [3]** 44/5 48/13 50/6

**hardest [2]** 79/6 79/20

**hardly [2]** 58/17 70/21

**harm [2]** 61/3 82/18

**harmed [1]** 59/20

**harms [1]** 86/13

**harp [1]** 86/8

**has [54]** 11/16 14/12 14/24 15/1 20/20 22/15 22/18 25/5 34/21 37/20 41/17 43/17 44/4 45/7 45/19 47/5 47/24 48/6 50/1 50/7 50/8 50/12 54/16 54/17 55/11 56/3 58/18 62/14 63/4 65/9 68/14 69/18 69/25 70/5 70/12 70/13 71/8 71/15

73/3 73/19 74/5 74/14 77/6 77/18 79/17 79/17 79/21 82/21 83/8 83/18 83/25 84/11 84/12 89/7

**hasn't [1]** 53/10

**have [122]**

**haven't [6]** 17/12 56/1 73/6 73/9 76/16 88/22

**having [7]** 4/9 4/25 9/7 12/7 39/5 73/17 86/1

**he [101]**

**he's [7]** 70/25 70/25 78/1 78/4 82/25 85/4 85/5

**head [3]** 51/22 56/7 67/6

**headlines [1]** 63/5

**heal [1]** 47/21

**health [1]** 93/19

**hear [5]** 4/20 4/25 55/4 58/2 93/4

**heard [4]** 60/13 71/16 73/3 83/19

**hearing [1]** 2/22

**heart [1]** 79/16

**heartbreak [1]** 79/17

**heartbreaking [2]** 79/13 82/13

**held [1]** 70/8

**helps [1]** 61/25

**her [6]** 9/7 9/8 9/14 12/8 63/13 76/8

**here [64]** 2/17 5/25 7/22 9/24 14/1 15/17 17/25 18/4 21/4 21/6 21/7 22/25 24/17 25/10 29/3 35/15 37/5 37/16 39/21 40/8 42/4 43/6 43/12 46/5 53/22 55/10 55/21 59/16 59/24 61/6 61/9 61/15 62/8 63/6 63/22 65/1 68/6 69/24 72/23 72/25 73/20 73/21 73/25 74/9 74/23 75/4 75/15 75/16 76/18 76/23 77/17 77/20 78/2 83/16 84/9 85/7 85/12 87/6 87/15 88/9 90/19 91/11 91/11 91/22

**Here's [1]** 4/16

**herman [5]** 1/21 1/24 96/3 96/7 96/8

**hide [1]** 63/24

**high [2]** 3/19 84/19

**higher [4]** 43/18 75/4

USCA Case #24-3162    Document #2104281    Filed: 03/11/2025    Page 523 of 551

**H**

**higher... [2]** 81/10 81/12

**highest [1]** 18/6

**hill [1]** 69/5

**him [27]** 15/2 23/3 25/23 26/1 27/14 27/16 27/18 27/20 27/21 27/24 28/4 28/9 30/13 38/4 38/5 38/8 38/9 38/10 39/22 39/24 53/18 54/19 63/6 67/24 68/23 69/3 78/24

**himself [3]** 52/25 62/18 73/23

**his [48]** 8/18 8/20 12/20 21/9 21/9 21/11 41/15 43/24 44/11 45/13 45/14 50/8 50/13 50/23 50/25 51/1 51/17 51/18 51/19 52/18 53/1 53/7 64/4 64/9 68/25 70/4 70/22 70/23 71/9 72/8 77/19 77/19 78/5 78/12 81/1 83/7 83/8 83/19 83/21 83/22 84/3 84/5 84/11 85/23 85/24 85/25 86/23 86/24

**history [8]** 45/4 45/8 45/8 45/11 70/21 71/12 83/7 84/12

**hold [2]** 12/7 12/9

**holding [1]** 9/6

**holds [1]** 24/19

**hole [1]** 50/15

**home [4]** 53/12 62/17 70/6 78/4

**honest [1]** 79/20

**honesty [1]** 53/16

**Honor [50]** 2/2 2/8 2/12 3/14 3/15 4/7 4/15 5/21 6/3 6/9 6/11 6/20 19/23 20/4 20/19 21/5 23/13 31/14 32/25 37/9 45/24 46/20 58/4 59/10 59/16 59/19 60/21 61/4 61/13 61/16 61/24 62/5 64/21 65/3 66/16 67/9 68/13 78/18 78/23 79/2 80/7 80/12 92/25 93/7 93/13 93/18 93/23 94/2 94/6 95/1

**HONORABLE [1]** 1/9

**hope [2]** 53/11 54/12

**hopefully [1]** 36/18

**horrible [2]** 86/13 86/13

**horrific [1]** 79/12

**hour [1]** 94/11

**hours [1]** 62/17

**how [11]** 4/16 36/20 37/1 41/25 68/23 69/6 69/10 76/6 82/22 84/21 85/17

**however [3]** 9/19 33/16 35/12

**huh [1]** 23/8 24/3 31/4

**human [1]** 69/20

**humiliating [5]** 9/11 9/25 12/1 12/6 12/9

**hundred [1]** 65/22

**hundreds [3]** 42/5 42/6 47/4

**hypothetical [1]** 16/8

**hypothetically [4]** 10/10 12/23 16/6 18/2

**I**

**I'd [4]** 46/9 48/25 53/17 64/17

**I'll [13]** 4/17 4/20 4/25 12/2 20/24 32/2 36/23 36/24 46/17 47/10 59/24 60/5 80/16

**I'm [43]** 2/21 4/8 6/5 10/12 13/6 16/9 17/2 18/18 19/2 24/17 29/2 30/24 35/1 37/15 37/17 40/9 40/24 55/2 55/3 55/15 55/25 56/9 56/10 56/23 58/8 60/18 67/12 68/19 73/1 80/9 84/21 87/1 89/14 89/15 89/16 89/19 89/19 89/22 90/15 90/15 91/5 91/23 92/11

**I've [31]** 3/11 3/17 3/20 4/10 36/20 40/8 44/25 45/1 45/1 47/11 49/9 58/16 58/21 63/21 69/8 78/15 79/5 79/7 79/14 79/20 82/6 83/1 84/2 87/3 88/17 89/1 89/4 89/11 90/24 92/20 92/22

**idea [1]** 11/24

**ideal [1]** 55/14

**ideation [1]** 47/18

**identified [9]** 3/12 9/2

**47/6 56/1 60/11 61/3 90/19 92/20 93/4 93/18**

**identify [1]** 14/1

**identifying [1]** 92/23

**illegal [2]** 48/24 72/13

**image [1]** 14/5

**images [26]** 8/23 12/16 13/10 21/9 22/5 23/1 23/15 23/15 23/19 24/4 25/12 25/19 27/22 29/9 29/25 30/17 32/12 32/25 35/8 41/25 42/2 42/9 42/11 71/19 71/24 72/13

**imagine [5]** 12/10 12/23 16/6 16/11 49/1

**immediately [1]** 63/2

**impact [9]** 4/2 47/8 47/23 60/7 82/7 82/12 82/23 85/23 86/9

**important [3]** 6/23 51/12 71/6

**importantly [2]** 54/9 91/4

**impose [26]** 53/21 53/25 58/9 59/12 60/19 61/20 62/3 64/10 64/18 64/20 66/8 66/23 78/11 78/21 89/15 89/17 89/20 89/22 90/6 90/7 90/8 90/11 90/12 90/13 90/18 90/25

**imposed [5]** 68/9 68/10 76/13 78/19 92/6

**imposing [6]** 6/16 61/23 81/16 90/1 90/17 91/5

**imprisonment [2]** 46/22 91/25

**inability [1]** 47/19

**inapplicable [1]** 88/1

**inappropriate [1]** 67/24

**incalculably [1]** 46/24

**incarcerated [3]** 53/19 69/1 73/22

**incarceration [6]** 45/13 46/9 80/20 81/14 91/10 92/21

**inclined [3]** 58/9 61/20 64/11

**include [4]** 20/15 37/23 56/23 59/1

**includes [1]** 12/5

**including [10]** 3/9 4/9

**40/22 45/1 70/23 78/8 82/6 84/4 85/2 88/3 90/12**

**incorporated [1]** 57/14

**incorporates [1]** 58/14

**incorrect [1]** 89/4

**increase [3]** 14/13 33/3 33/4

**incredibly [1]** 82/9

**independently [1]** 17/5

**indicate [3]** 25/25 26/21 58/16

**indicated [6]** 20/9 24/1 24/23 26/12 30/5 44/13

**indicates [5]** 27/18 35/23 59/7 85/10 85/16

**indicating [1]** 25/3

**indication [1]** 28/20

**indicator [1]** 54/12

**indictment [5]** 54/4 59/25 60/2 94/21 94/22

**indictments [1]** 94/23

**individual [5]** 15/18 19/13 39/24 47/17 87/2

**individuals [6]** 21/25 24/10 47/16 55/25 59/18 60/4

**indulgence [1]** 32/20

**inexplicable [1]** 83/15

**infant [6]** 8/24 10/5 14/15 14/19 31/8 42/17

**influence [1]** 84/14

**information [3]** 62/23 62/24 77/22

**inherently [5]** 9/11 10/2 10/7 11/22 12/13

**initial [3]** 64/1 68/17 82/14

**initially [1]** 34/2

**injury [1]** 48/19

**insane [3]** 74/18 74/20 74/21

**install [1]** 53/13

**installed [1]** 52/19

**instance [1]** 55/14

**instances [1]** 35/21

**instant [3]** 35/25 36/3 38/1

**instead [2]** 7/10 63/14

**instructions [1]** 26/12

**insufficient [1]** 86/2

**intend [3]** 3/8 36/21 43/9

**intense [1]** 72/14

**intent [1]** 69/6

USCA Case #24-3162          Document #2102481          Filed: 03/24/2025          Page 524 of 551

**I**

**intentionally [1]** 62/25

**interest [1]** 92/19

**interesting [1]** 49/25

**interference [1]** 85/24

**Internet [9]** 22/7 23/11 23/16 24/5 47/1 47/25 48/15 73/16 88/19

**interpret [1]** 25/13

**interpretation [1]** 72/1

**interpreted [1]** 11/15

**interpreting [1]** 39/14

**interstate [8]** 22/10 22/13 22/18 22/19 22/24 23/1 23/19 33/15

**interview [4]** 7/8 63/2 68/21 69/12

**intimate [1]** 47/20

**introduce [2]** 2/6 16/9

**introduced [6]** 10/23 12/19 14/7 16/11 16/12 40/21

**investigation [8]** 3/21 4/18 6/6 7/8 58/16 72/7 74/6 84/24

**invited [1]** 72/5

**involve [8]** 21/3 44/11 57/9 73/15 75/5 75/6 75/8 88/23

**involved [10]** 15/18 41/13 48/14 54/3 54/4 71/24 72/2 75/9 77/20 78/1

**involves [4]** 21/14 22/19 23/6 42/2

**involving [2]** 9/10 76/19

**IP [1]** 33/22

**is [289]**

**isn't [8]** 18/8 22/5 23/9 23/11 24/16 55/17 56/9 86/6

**isolation [2]** 50/14 70/9

**issue [18]** 11/20 12/15 20/6 20/20 21/3 22/11 25/11 25/12 29/9 29/24 33/1 33/11 34/1 35/10 46/24 54/13 59/24 83/16

**issues [10]** 7/18 9/4 29/25 32/24 39/3 45/18 46/17 51/23 76/11 92/22

**it [202]**

**it's [67]** 2/24 5/3 7/20 9/14 9/14 9/16 9/24 11/14 14/13 16/23 17/13 17/18 18/9 19/2 20/8 21/11 21/12 21/18 22/9 23/10 23/10 27/7 27/9 28/23 29/12 29/13 29/13 29/15 31/17 31/18 33/3 33/14 34/16 38/23 48/5 49/25 51/8 51/12 52/2 53/6 54/6 54/19 55/5 57/3 57/7 57/16 58/17 60/8 65/3 65/12 67/14 68/5 68/6 68/7 68/8 71/11 72/13 72/25 77/4 77/5 78/10 79/6 79/12 81/1 81/6 85/21 87/8

**its [6]** 7/11 26/10 71/23 72/5 81/9 81/11

**J**

**Jamaica [1]** 83/23

**January [1]** 89/12

**January 6th [1]** 89/12

**Jeffress [9]** 1/16 2/13 2/15 5/22 6/8 67/8 78/25 80/5 94/4

**jjeffress [1]** 1/18

**job [1]** 82/13

**JOHNSON [104]**

**Johnson's [13]** 7/6 39/14 44/19 45/2 45/11 46/5 69/19 70/21 71/12 82/5 84/3 84/6 91/14

**joined [2]** 2/9 83/23

**Jon [1]** 2/13

**Jon Jeffress [1]** 2/13

**Jonathan [1]** 1/16

**judge [9]** 1/9 8/16 66/22 67/5 68/3 69/16 73/4 75/22 76/13

**Judge Friedrich [2]** 75/22 76/13

**Judge Matey [1]** 8/16

**judges [6]** 49/4 55/18 55/20 57/17 67/1 87/10

**judicious [1]** 11/1

**July [1]** 51/6

**jump [1]** 71/21

**juncture [1]** 54/11

**June [1]** 51/6

**jurors [2]** 26/15 28/21

**jury [38]** 2/20 11/2

**13/3 15/1 15/4 16/7 16/17 23/3 24/7 25/23 25/23 26/1 26/10 26/11 26/12 27/11 28/7 28/12 30/5 31/18 32/2 34/4 34/10 38/3 38/7 38/10 38/17 38/20 38/23 39/7 39/22 39/23 40/2 43/16 43/23 54/24 56/12 71/22

**jury's [15]** 15/10 25/13 26/4 27/14 30/4 30/11 34/17 38/12 38/15 39/6 39/14 39/17 47/3 49/9 71/19

**just [95]** 2/21 3/17 5/16 7/2 9/14 10/11 11/8 11/8 12/2 13/6 13/14 15/2 15/15 16/16 17/3 17/15 17/23 18/3 18/6 18/18 19/2 20/5 20/10 21/6 23/1 23/15 25/1 25/3 27/18 29/2 29/4 30/1 30/4 30/14 30/21 31/10 31/11 32/8 33/2 35/6 36/5 36/19 36/22 36/22 37/5 38/8 39/25 40/8 40/15 43/22 46/14 47/10 48/1 48/2 49/10 49/21 50/22 53/12 53/20 53/22 55/3 55/10 56/10 56/11 58/25 59/24 61/19 62/6 62/8 63/13 64/14 64/14 65/12 65/13 65/15 67/10 67/10 67/14 69/11 69/18 70/2 70/10 70/15 70/2 75/4 75/22 75/23 76/20 77/13 79/17 79/25 80/16 81/21 82/14 85/7

**justice [8]** 7/5 41/21 61/7 65/14 66/1 66/3 90/5 90/11

**justifying [1]** 73/7

**K**

**KAISER [1]** 1/16

**kaiserdillon.com [1]** 1/18

**Kampel [1]** 75/23

**keeping [1]** 44/4

**Kelli [2]** 2/5 92/25

**key [3]** 24/23 25/10 29/24

**kid [1]** 71/1

**kind [10]** 4/8 9/20 10/25 53/14 53/20 53/22 75/2 78/9 79/13

**knew [2]** 51/18 69/8

**knit [1]** 69/25

**know [70]** 4/13 10/21 10/22 14/2 14/10 14/16 15/25 18/2 18/24 20/9 21/11 22/16 23/15 24/22 26/8 27/20 30/16 31/14 32/1 32/12 34/6 35/18 35/20 38/2 48/23 48/25 52/6 52/8 52/16 52/16 52/17 52/18 52/22 53/9 53/12 59/24 60/13 65/12 67/5 67/18 67/21 67/25 68/21 69/11 69/17 69/21 70/1 70/10 70/24 70/25 71/10 71/18 72/21 72/25 73/10 73/12 73/20 74/25 75/12 75/17 76/25 77/5 77/6 78/8 78/14 78/15 78/16 82/3 91/4 94/9

**knowing [1]** 82/19

**knowingly [1]** 38/25

**knowledge [3]** 3/20 11/18 51/19

**known [2]** 78/12 78/12

**knows [7]** 39/2 50/18 52/3 71/10 74/2 74/3 81/16

**L**

**lack [3]** 49/12 64/16 76/14

**language [3]** 58/19 59/7 60/2

**laptop [6]** 33/20 48/13 50/6 51/3 52/10 52/18

**last [2]** 56/5 70/5

**late [1]** 51/6

**later [1]** 91/2

**latter [2]** 55/15 94/6

**law [11]** 1/19 9/15 11/15 12/11 33/13 58/17 72/11 75/9 77/20 77/25 84/17

**lead [3]** 6/19 20/14 70/20

**lead-in [1]** 20/14

**leader [1]** 83/22

**leads [1]** 83/4

USCA Case #24-3162    Document #2146681    Filed: 02/24/2025    Page 525 of 551

**L**

**learn [4]** 63/1 67/17 71/7 79/13
**learned [3]** 71/5 71/9 79/14
**learning [1]** 67/16
**least [23]** 6/22 10/19 22/6 24/4 27/11 36/15 37/3 40/3 41/12 42/11 47/2 49/7 51/4 57/16 59/13 66/20 70/14 78/10 82/3 82/7 86/17 87/9 87/20
**leave [3]** 48/12 89/14 91/9
**left [2]** 52/21 53/14
**lenity [4]** 26/19 26/20 32/23 32/24
**less [4]** 72/24 76/15 76/17 82/5
**lessons [2]** 71/6 71/8
**let [6]** 5/16 30/20 31/10 64/14 67/14 92/22
**let's [6]** 10/9 19/6 29/4 36/6 37/7 46/7
**letter [1]** 47/18
**letters [4]** 4/3 69/21 71/11 84/2
**level [46]** 3/19 7/4 7/19 8/22 14/13 16/1 17/5 17/6 17/11 17/24 18/6 19/5 19/13 19/18 20/25 22/23 24/20 25/7 29/18 29/24 33/3 33/4 36/14 40/25 41/2 41/9 42/12 42/14 43/4 43/6 44/24 44/24 45/2 45/6 45/10 69/20 77/3 77/4 77/5 77/12 87/19 87/23 87/25 88/2 88/11 89/1
**levels [4]** 19/13 20/22 36/11 76/14
**levers [1]** 56/19
**liabilities [1]** 64/4
**life [8]** 45/14 47/15 70/13 70/22 71/9 75/19 79/7 85/23
**lifelong [1]** 47/13
**light [3]** 5/24 31/18 86/1
**like [50]** 4/4 5/4 5/5 5/24 16/20 18/1 18/24 19/21 19/25 21/15 23/1

27/24 28/13 29/8 36/15 45/18 45/2 146/2181 49/13 49/21 54/19 54/23 63/18 65/21 65/24 67/13 68/2 68/24 71/7 72/18 73/17 74/4 75/7 76/9 77/3 77/11 78/17 79/19 82/20 86/22 86/22 87/9 87/13 87/18 88/18 88/20 90/21 91/16 94/1 94/15
**likely [4]** 57/1 57/3 57/7 57/11
**limit [1]** 65/9
**limited [9]** 7/20 16/3 16/22 21/4 21/6 34/7 43/7 43/13 44/20
**limits [1]** 51/13
**line [4]** 5/18 24/11 24/17 25/11
**lines [6]** 22/2 23/12 23/15 24/16 44/12 44/16
**lining [1]** 79/21
**Lipes [6]** 1/12 2/10 2/11 6/19 46/16 57/25
**liquidate [2]** 62/22 63/16
**liquidating [2]** 63/9 63/17
**list [2]** 28/13 71/21
**listed [1]** 30/6
**litigated [1]** 52/5
**litigating [1]** 51/23
**little [3]** 16/9 88/8 89/16
**live [1]** 82/16
**lives [2]** 55/6 82/12
**living [2]** 70/7 72/15
**local [3]** 44/5 48/12 92/9
**locally [1]** 44/7
**locate [1]** 72/7
**location [2]** 34/18 34/20
**locations [1]** 44/2
**locked [1]** 91/6
**logic [1]** 63/9
**logical [1]** 68/1
**long [5]** 28/17 36/24 37/1 51/9 78/10
**longer [3]** 6/25 76/5 76/22
**look [17]** 16/3 16/18 16/25 18/6 26/3 52/4

69/18 73/6 73/13 73/13 73/2 74/5 75/23 76/17 76/25 77/1 79/23 89/9
**looking [10]** 17/8 22/11 22/14 30/8 32/2 45/9 71/7 76/3 81/18 82/2
**looks [2]** 19/25 56/17
**Lord [1]** 79/21
**lorraine [5]** 1/21 1/24 96/3 96/7 96/8
**losing [1]** 70/23
**lost [1]** 83/19
**lot [9]** 9/20 57/20 77/9 78/15 79/5 79/14 86/17 86/21 88/17
**lots [1]** 56/19
**love [1]** 71/5
**loving [2]** 71/4 83/11
**low [2]** 85/10 85/16
**lower [5]** 17/16 57/11 57/18 80/25 87/19

**M**

**made [11]** 26/9 32/6 32/6 48/4 48/15 48/18 48/23 63/5 63/21 70/8 87/3
**mailed [1]** 22/20
**major [1]** 85/24
**majority [3]** 8/11 54/3 57/8
**make [14]** 4/19 5/16 7/2 15/11 15/15 17/3 28/18 28/21 36/19 43/24 45/19 74/6 84/25 94/8
**makes [7]** 10/1 30/4 32/10 44/5 53/7 61/20 62/3
**making [1]** 69/5
**man [4]** 9/7 12/9 79/22 79/22
**managed [1]** 83/20
**mandated [1]** 59/12
**mandates [1]** 61/8
**mandatory [14]** 25/3 25/5 58/12 58/17 62/10 66/4 72/22 73/11 78/20 81/3 86/3 86/4 91/17 92/5
**manner [1]** 49/7
**many [15]** 28/2 37/20 39/11 41/25 49/11 82/4 82/4 82/4 82/6 83/9

83/21 84/2 85/19 86/23 89/11
**marginally [1]** 75/3
**market [2]** 83/3 83/4
**markets [1]** 86/12
**married [1]** 70/3
**masochism [1]** 29/25
**masochistic [6]** 11/11 12/5 13/23 14/14 25/8 31/7
**masturbation [1]** 12/8
**material [17]** 9/15 9/16 11/10 21/9 21/24 22/20 33/12 41/13 42/16 48/6 48/20 48/21 54/14 71/24 72/2 73/24 89/17
**materials [4]** 4/5 4/13 44/1 82/25
**Matey [1]** 8/16
**math [1]** 76/16
**matter [6]** 3/3 6/6 7/3 29/16 84/8 96/5
**matters [2]** 24/12 54/22
**max [1]** 65/10
**maximum [2]** 65/8 90/23
**maximums [1]** 65/21
**may [12]** 10/15 10/15 15/14 18/15 31/14 34/24 34/25 35/24 37/1 37/1 55/19 91/2
**maybe [4]** 29/2 35/18 52/15 52/16
**me [30]** 5/16 6/21 11/8 13/5 15/14 17/23 20/11 20/15 27/3 28/6 29/6 30/20 31/10 42/18 44/12 49/11 49/21 51/22 57/20 64/14 67/14 70/24 79/21 83/10 83/17 86/23 88/8 88/23 92/22 94/20
**mean [14]** 13/25 15/6 18/19 29/15 38/10 49/3 49/16 49/24 51/25 56/21 56/25 57/5 87/13 87/20
**meaning [1]** 9/12
**meaningful [3]** 44/14 49/14 50/3
**meanings [1]** 77/7
**means [6]** 17/2 22/17 23/1 44/23 57/10 77/14
**meant [1]** 20/14

USCA Case #24-3162    Document #2102481    Page 526 of 551

## M

**measure [1]** 50/9
**measures [1]** 48/9
**median [3]** 56/21 56/25 87/12
**meet [4]** 9/1 35/14 42/25 73/15
**meets [1]** 35/11
**member [1]** 84/11
**members [4]** 53/18 54/24 55/8 84/3
**membership [1]** 75/25
**memorandum [1]** 7/10
**memories [1]** 82/20
**men [1]** 47/20
**mental [1]** 93/19
**mention [1]** 26/13
**mentioned [5]** 48/2 62/6 67/15 68/16 71/15
**mere [2]** 82/8 82/9
**merely [2]** 37/13 45/12
**merited [1]** 7/21
**message [3]** 75/1 77/16 86/5
**met [1]** 40/3
**might [5]** 13/23 15/4 48/10 48/16 58/1
**Miles [9]** 1/18 1/19 2/13 2/15 6/8 19/25 36/17 44/10 45/25
**mileslawpllc.com [1]** 1/20
**million [1]** 64/4
**mind [3]** 10/22 40/24 67/15
**minimized [1]** 84/10
**minimum [10]** 25/3 25/6 31/1 72/22 73/11 78/20 81/4 86/3 86/4 91/17
**minor [4]** 11/22 36/10 36/13 41/13
**minors [1]** 92/15
**minute [3]** 37/6 61/19 80/9
**minutes [1]** 77/18
**misplaced [1]** 18/15
**misrepresent [1]** 69/6
**mission [1]** 83/23
**model [2]** 85/5 85/6
**models [1]** 83/12
**mole [1]** 69/5
**moment [1]** 52/23
**monetary [7]** 46/12

46/18 61/20 62/7 62/14 64/9 65/15
**money [8]** 61/25 63/11 63/14 64/8 67/19 68/24 83/25 90/19
**monitoring [4]** 53/13 78/8 92/16 93/11
**month [3]** 76/12 76/17 88/9
**months [22]** 45/13 46/21 50/17 52/7 71/14 71/25 72/2 73/11 75/20 76/8 78/9 80/19 80/20 80/21 81/3 81/14 81/15 85/4 86/25 88/13 91/25 92/4
**Moore [3]** 37/11 80/14 94/20
**more [27]** 14/20 17/23 21/8 23/9 24/14 24/24 26/14 32/10 43/18 44/4 44/5 44/6 47/4 48/15 51/25 55/16 60/6 61/14 64/1 64/20 70/19 70/22 75/21 77/9 83/8 83/14 85/20
**morning [5]** 2/2 2/8 2/12 20/3 20/4
**most [11]** 5/12 6/22 24/23 25/12 39/18 47/6 54/9 56/18 75/9 82/19 86/23
**mother [1]** 83/11
**mountain [1]** 69/5
**move [2]** 20/24 94/21
**moved [1]** 2/23
**moving [2]** 25/7 44/15
**Mr [1]** 2/15
**Mr. [138]**
**Mr. Courtney [7]** 2/11 6/18 45/23 46/8 66/17 77/8 94/3
**Mr. Jeffress [7]** 2/15 5/22 6/8 67/8 78/25 80/5 94/4
**Mr. Johnson [101]**
**Mr. Johnson's [13]** 7/6 39/14 44/19 45/2 45/11 46/5 69/19 70/21 71/12 82/5 84/3 84/6 91/14
**Mr. Lipes [4]** 2/11 6/19 46/16 57/25
**Mr. Miles [5]** 6/8 19/25 36/17 44/10 45/25

**Mr. Steven [1]** 91/23
**Ms. [5]** 37/11 68/23 80/14 93/24 94/20
**Ms. Moore [3]** 37/11 80/14 94/20
**Ms. Willet [1]** 68/23
**Ms. Willett [1]** 93/24
**much [14]** 10/4 21/19 50/4 68/24 69/7 69/10 75/21 76/4 79/22 80/3 83/8 83/15 84/21 88/20
**must [11]** 37/13 45/12 45/15 92/8 92/9 92/10 92/12 92/14 92/15 92/17 93/10
**my [45]** 2/10 2/23 3/20 4/9 4/19 11/18 20/8 20/14 36/19 36/22 36/23 40/24 43/15 44/7 44/13 45/6 45/21 46/6 51/22 53/5 55/21 56/7 58/5 63/21 65/5 67/6 67/14 67/18 79/7 79/8 79/16 79/22 79/24 80/15 80/18 80/24 81/1 85/11 85/17 87/4 87/4 88/14 89/5 91/21 91/22
**myself [3]** 29/1 79/22 89/13

## N

**named [1]** 51/7
**narrow [1]** 50/8
**narrowed [1]** 60/14
**nature [4]** 41/7 46/23 62/9 81/21
**NCMEC [1]** 47/5
**nearly [1]** 83/1
**necessarily [3]** 11/23 50/25 62/24
**necessary [1]** 70/19
**need [13]** 7/1 9/23 13/13 17/22 28/21 49/10 63/10 72/19 86/8 86/16 86/20 91/18 94/21
**needed [1]** 34/1
**needlessly [1]** 54/25
**needs [2]** 28/20 73/22
**negative [1]** 85/23
**never [5]** 5/3 47/21 48/12 67/22 67/23
**nevertheless [1]** 83/20
**new [6]** 2/25 3/8 3/9 20/6 26/24 37/22

**newly [1]** 35/17
**next [6]** 58/17 62/1 65/5 78/6 84/16 90/3
**nexus [2]** 22/10 22/13
**NICHOLS [1]** 1/9
**no [49]** 1/4 3/15 4/7 4/15 5/6 5/21 6/3 6/25 15/3 15/10 16/13 21/22 25/5 26/25 28/14 28/15 28/15 30/7 30/13 33/7 34/13 34/21 35/6 35/13 36/9 36/9 36/9 36/12 39/20 39/21 39/23 41/3 45/24 48/16 52/21 63/8 69/6 73/6 73/19 74/11 76/11 77/23 84/14 90/16 90/22 94/2 94/17 94/24 95/1
**nobody [1]** 21/10
**Nodded [1]** 56/16
**non [1]** 14/17
**non-transportation [1]** 14/17
**none [2]** 73/3 75/13
**not [147]**
**note [12]** 4/8 25/1 30/5 30/5 32/2 53/17 60/6 60/23 85/16 85/18 94/1 94/16
**noted [8]** 7/10 7/14 8/10 47/5 48/8 59/5 68/5 84/2
**nothing [7]** 21/8 46/1 46/1 46/3 69/14 73/18 73/25
**notice [1]** 73/5
**noticed [1]** 32/2
**notification [1]** 47/22
**notified [1]** 51/16
**noting [1]** 55/3
**now [20]** 16/15 19/6 25/1 27/4 32/25 37/4 37/9 40/5 41/10 45/4 46/7 63/19 67/19 69/16 78/13 78/22 80/7 80/12 84/15 94/23
**number [15]** 5/11 12/16 13/9 13/10 25/12 29/9 29/25 32/25 42/23 51/19 54/8 70/22 71/23 75/17 90/4
**numbers [1]** 64/15
**numerous [2]** 4/3 9/8
**NW [3]** 1/13 1/19 1/23

USCA Case #24-3162      Document #2103481      Filed: 02/25/2025      Page 527 of 551

**O**

**objected [2]** 7/4 26/17

**objection [3]** 7/9 45/21 94/24

**objections [7]** 4/17 5/11 5/13 5/25 46/6 93/25 94/4

**obligation [1]** 5/6

**obligations [1]** 92/18

**obstruction [2]** 7/5 41/20

**obtained [2]** 49/8 51/15

**obviously [17]** 2/22 5/10 5/22 10/15 11/9 37/12 39/1 46/8 55/12 56/19 62/9 63/19 67/22 69/1 79/5 80/20 81/14

**occasions [2]** 31/15 51/10

**occurred [1]** 84/25

**October [8]** 1/5 2/24 32/5 32/8 51/11 72/9 72/12 77/21

**October 1st [2]** 32/5 32/8

**odd [1]** 88/8

**off [3]** 56/7 67/6 70/3

**offender [4]** 78/6 83/1 92/14 93/4

**offenders [2]** 84/20 85/19

**offense [41]** 16/1 16/22 16/23 17/5 17/6 17/11 17/15 17/24 18/6 19/4 19/13 19/18 25/4 35/25 36/3 38/1 40/25 41/2 41/6 41/9 42/2 43/6 44/24 45/2 45/6 45/10 46/23 59/18 59/19 59/21 60/16 62/9 71/18 77/4 78/8 81/22 87/19 87/23 88/2 88/24 89/1

**offenses [13]** 6/15 41/5 41/7 41/15 45/3 56/19 58/15 59/2 62/1 82/8 82/11 84/9 85/22

**offer [1]** 21/20

**Office [8]** 1/12 1/13 69/4 69/10 93/1 93/3 93/8 93/12

**officer [3]** 2/5 68/22 92/13

**Official [2]** 1/22 96/3

**often [3]** 5/13 73/14 87/12

**okay [36]** 3/16 4/16 6/4 7/13 11/7 12/14 14/23 18/13 19/4 19/24 20/18 20/19 24/25 29/14 29/17 29/21 31/17 32/20 37/6 37/7 46/11 57/23 58/1 60/22 64/22 65/5 65/10 65/20 69/13 80/8 80/10 93/14 93/24 94/18 95/2 95/3

**old [3]** 70/23 83/19 94/23

**omitted [1]** 92/23

**once [5]** 13/5 43/23 50/4 84/23 84/24

**one [57]** 2/18 3/11 6/25 7/1 8/3 8/10 8/21 9/2 10/24 15/1 15/5 16/7 16/13 16/16 22/11 26/11 27/11 29/7 31/18 32/8 34/20 38/5 38/8 38/13 39/22 40/3 41/3 42/25 44/4 51/16 53/10 56/17 57/5 61/6 61/16 64/11 65/2 65/13 66/2 66/4 66/19 66/20 67/15 68/10 70/13 71/7 72/19 73/3 79/6 81/11 82/12 87/10 87/13 87/21 88/14 91/3 92/1

**one another [1]** 71/7

**one are [1]** 87/13

**one case [1]** 66/20

**one caveat [1]** 65/2

**one child [1]** 40/3

**one count [3]** 2/18 39/22 92/1

**one did [1]** 87/21

**one disagrees [1]** 41/3

**one enhancement [1]** 6/25

**one file [4]** 15/1 15/5 38/8 38/13

**one for [1]** 73/3

**one I've [1]** 3/11

**one is [4]** 8/21 57/5 61/6 67/15

**one location [1]** 34/20

**one looks [1]** 56/17

**one of [6]** 10/24 61/16 79/6 81/11 82/12 88/14

**one or [3]** 29/7 42/25

91/3

**one [1]** 65/13

**one place [1]** 93/13

**one possession [1]** 38/5

**one question [1]** 66/19

**one that [1]** 44/4

**one time [1]** 68/10

**one transportation [3]** 16/7 16/13 16/16

**one view [1]** 70/13

**one would [1]** 22/11

**one year [1]** 51/16

**one-time [1]** 53/10

**ones [2]** 32/7 44/25

**ongoing [1]** 72/12

**online [2]** 50/5 79/15

**only [37]** 3/4 11/2 11/24 12/15 12/23 16/7 16/12 19/16 21/3 21/11 21/12 21/13 22/4 26/5 26/11 30/2 33/14 38/9 39/8 39/10 39/21 49/17 51/3 51/15 55/14 55/15 70/16 71/23 71/24 72/2 75/3 78/18 86/6 87/17 87/24 90/6 90/13

**opinion [2]** 8/2 8/7

**opportunity [4]** 5/23 31/15 45/19 52/10

**opposed [2]** 30/14 50/5

**opposes [1]** 81/5

**opposite [1]** 71/17

**option [2]** 5/4 62/2

**orally [2]** 35/16 36/24

**order [7]** 5/7 10/25 58/10 67/13 93/5 93/6 94/13

**ordered [2]** 93/17 93/21

**orders [1]** 85/8

**organized [1]** 83/24

**original [1]** 94/21

**other [61]** 3/10 3/11 4/5 4/13 10/3 10/8 10/14 10/23 11/11 11/19 12/12 12/15 12/17 15/6 16/4 16/6 16/16 17/22 18/23 19/20 21/20 24/10 24/10 25/8 25/12 25/21 27/21 27/21 31/2 31/7 31/20 32/8 32/19 33/5 34/20 38/4 39/12 40/20

43/21 44/1 44/2 46/12 47/12 50/10 52/21 54/22 54/24 55/24 55/25 60/12 61/6 70/16 70/17 73/15 87/17 88/11 88/17 89/17 89/17 90/20 91/19

**others [5]** 11/3 44/18 82/1 82/3 82/4

**others' [1]** 89/9

**otherwise [5]** 16/8 32/19 84/11 87/18 91/19

**our [22]** 7/15 8/3 12/11 18/14 21/22 22/3 24/1 24/24 26/8 28/19 30/2 30/17 31/16 32/14 47/5 60/20 63/2 63/12 66/20 67/19 71/6 74/1

**ours [1]** 24/19

**out [14]** 8/15 23/18 24/18 28/19 29/5 63/2 67/25 69/5 69/5 76/9 79/17 85/4 85/18 85/19

**over [7]** 3/18 13/17 14/6 50/17 51/16 86/14 86/14

**overall [2]** 68/15 90/22

**overcome [1]** 83/20

**overlapping [1]** 36/2

**overlooked [1]** 8/6

**overly [1]** 88/15

**overstate [1]** 89/6

**overstated [1]** 82/22

**overturned [1]** 49/10

**own [8]** 2/24 21/10 47/16 48/21 70/4 71/21 72/8 74/2

**owned [1]** 48/19

**P**

**p.m [3]** 80/11 80/11 95/4

**paid [2]** 75/25 90/20

**pain [2]** 11/24 79/9

**painful [5]** 9/11 9/25 11/23 12/10 82/20

**pandemic [1]** 52/2

**panel [1]** 8/11

**papers [6]** 46/4 47/5 53/3 58/12 65/12 68/6

**Paragraph [1]** 37/19

**Paragraph 53 [1]** 37/19

**part [11]** 35/21 36/3

USCA Case #24-3162   Document #2082131   Filed: 04/24/2025   Page 528 of 551

**P**

**part... [9]** 37/18 38/1 57/19 58/22 72/3 81/9 83/3 93/16 93/16
**particular [4]** 40/18 62/13 75/12 88/16
**particularly [1]** 35/9
**parties [17]** 3/6 3/11 3/23 4/20 5/1 5/11 15/15 15/22 18/4 20/15 36/21 41/11 41/14 42/21 42/22 45/17 84/17
**parties' [1]** 80/17
**parts [1]** 89/17
**party [3]** 45/20 53/15 53/17
**passive [1]** 43/19
**past [3]** 79/6 79/19 86/14
**Paul [2]** 1/11 2/9
**Paul Courtney [1]** 2/9
**paul.courtney [1]** 1/14
**pause [1]** 31/13
**pay [1]** 45/15
**paying [1]** 76/6
**payment [1]** 92/19
**payments [1]** 81/6
**penal [1]** 88/15
**penalized [1]** 25/2
**penalties [7]** 43/18 46/12 48/5 74/22 81/6 81/15 89/15
**penalty [11]** 46/18 53/22 61/20 62/7 62/14 64/10 75/4 75/11 75/15 75/16 76/18
**penetration [12]** 9/10 9/14 9/16 9/19 9/19 9/22 9/24 11/21 11/21 35/10 35/13 35/13
**penetrative [2]** 14/3 14/21
**people [12]** 18/23 48/21 49/17 52/24 55/4 69/23 77/12 82/6 82/20 83/2 84/4 86/18
**people's [1]** 55/6
**per [20]** 45/16 59/13 61/8 61/15 64/23 64/25 65/16 65/17 65/22 66/6 66/8 68/4 68/6 68/6 68/7 68/8 68/12 89/20 90/11 91/6

**perfect [2]** 58/7 87/2
**perfectly [1]** 84/25
**performed [1]** 70/7
**perhaps [11]** 13/3 27/23 28/18 36/22 55/17 60/9 84/24 86/17 87/4 87/24 88/25
**period [8]** 7/7 46/9 50/14 51/6 51/9 52/9 91/9 92/20
**permit [1]** 64/25
**permitted [1]** 65/24
**person [9]** 23/22 54/5 54/13 59/14 71/4 74/25 77/15 77/16 82/2
**person's [1]** 21/16
**personal [4]** 21/10 21/16 85/25 91/15
**perspective [13]** 4/6 4/14 5/17 6/1 17/9 18/2 19/3 19/8 28/20 30/2 53/25 64/15 64/18
**philanthropy [1]** 84/1
**phone [1]** 53/1
**photographs [1]** 21/25
**photos [3]** 40/12 53/1 53/5
**phrase [1]** 11/17
**physically [4]** 21/25 35/7 44/11 44/15
**pick [1]** 91/3
**picture [1]** 23/12
**piece [2]** 67/10 68/14
**place [3]** 65/13 73/20 78/9
**placed [1]** 48/20
**plain [3]** 58/13 58/19 59/7
**plainly [2]** 7/23 8/13
**Plaintiff [2]** 1/4 1/11
**plan [3]** 4/16 36/22 58/5
**plane [1]** 70/24
**planning [1]** 70/3
**plausible [1]** 34/16
**played [1]** 11/2
**plea [8]** 21/20 21/20 55/13 56/12 57/8 57/13 57/17 57/18
**plead [1]** 54/18
**pleading [2]** 35/17 77/14
**pleadings [1]** 26/9
**pleas [2]** 54/3 54/4
**please [5]** 2/6 31/12

32/21 35/3 94/7
**plenty [1]** 94/10
**PLLC [2]** 1/16 1/19
**point [11]** 5/5 24/18 24/23 40/15 41/11 41/16 41/18 43/3 44/24 46/10 69/1
**pointed [1]** 8/15
**points [3]** 45/8 85/18 87/19
**policy [1]** 67/1
**polygraphs [1]** 93/15
**pornography [73]** 2/18 2/19 7/24 11/2 12/20 13/1 13/2 14/9 22/1 22/13 40/1 40/4 40/6 40/13 40/21 41/18 42/6 43/8 43/10 43/14 43/21 44/12 44/21 49/5 49/7 49/17 50/20 50/23 51/8 51/10 52/20 52/25 53/2 53/11 55/18 56/4 56/18 56/21 58/16 58/23 58/25 59/3 59/6 59/8 59/12 60/1 61/12 62/1 66/4 66/10 71/20 73/14 75/18 75/25 76/4 79/15 81/24 81/25 82/8 83/2 84/23 85/2 86/10 86/11 86/11 86/12 86/19 86/22 86/24 87/9 88/19 88/22 92/1
**portray [1]** 11/10
**portraying [2]** 31/6 42/16
**pose [1]** 55/15
**position [2]** 32/14 36/1
**positions [1]** 80/17
**positive [2]** 70/22 79/25
**possess [3]** 39/9 49/17 92/9
**possessed [15]** 10/19 12/21 27/11 27/12 34/2 38/22 38/24 40/14 40/20 42/5 42/11 42/16 42/24 47/3 71/19
**possessing [5]** 38/11 38/15 39/13 39/24 43/20
**possession [64]** 2/19 10/16 12/18 12/23 13/1 13/2 13/7 15/1 15/3 15/21 16/10 16/13 17/1 17/14 17/15 18/15

18/22 18/24 19/3 19/4 19/8 19/25 25/6 26/3 27/10 27/16 27/24 28/8 28/10 30/10 30/12 31/19 35/4 38/5 38/8 38/12 38/16 38/19 39/4 39/18 39/19 39/23 40/1 40/7 41/1 43/19 48/3 49/12 56/24 59/3 59/6 59/25 65/8 72/13 75/15 75/18 75/20 82/9 87/17 87/21 87/24 88/7 88/9 92/1
**possession-only [3]** 12/23 87/17 87/24
**possibility [2]** 16/10 89/8
**possible [5]** 28/24 38/20 38/23 57/16 74/7
**posterity [1]** 47/1
**posture [1]** 54/8
**potentially [1]** 22/6
**practice [1]** 61/1
**pre [2]** 3/20 58/15
**pre-existing [1]** 3/20
**pre-sentence [1]** 58/15
**precedential [1]** 8/2
**precise [1]** 48/25
**prefer [2]** 28/1 28/3
**preliminary [1]** 7/3
**prepare [1]** 3/18
**prepared [1]** 6/6
**preponderance [17]** 13/6 13/9 15/12 30/16 31/21 31/22 32/11 33/17 34/1 40/7 40/14 40/20 42/4 42/10 42/15 42/23 42/25
**prepubescent [5]** 9/6 11/22 14/22 41/13 46/25
**present [4]** 2/14 3/8 9/4 55/10
**presented [6]** 25/24 37/20 52/11 74/9 84/18 86/23
**presentence [9]** 3/21 4/18 6/6 7/7 68/21 68/22 69/12 69/23 94/10
**presided [1]** 3/18
**pretrial [4]** 53/12 72/14 85/6 85/6
**pretty [3]** 3/19 36/18

USCA Case #24-3162    Document #2102481    Filed: 02/24/2025    Page 529 of 552

# P

**pretty... [1]** 84/15
**prevention [1]** 90/20
**preview [1]** 18/19
**primarily [1]** 8/1
**prior [3]** 35/16 49/1 58/21
**Prisons [1]** 91/24
**probably [4]** 19/8 57/19 76/15 76/16
**probation [13]** 2/5 6/7 68/17 69/4 69/10 81/9 81/13 92/13 92/22 93/1 93/3 93/8 93/12
**Probation's [1]** 92/16
**probationary [1]** 75/17
**procedures [2]** 92/16 93/11
**proceed [1]** 4/16
**proceeding [2]** 47/7 94/20
**proceedings [3]** 1/25 95/4 96/5
**produced [1]** 1/25
**proffered [1]** 4/2
**program [1]** 94/12
**promise [1]** 70/8
**promised [1]** 72/15
**prongs [2]** 14/12 21/1
**pronounce [4]** 5/8 37/2 80/10 80/16
**proof [1]** 76/21
**properly [1]** 7/17
**proposed [1]** 81/1
**proposes [2]** 80/19 80/22
**proposition [3]** 19/9 29/2 83/2
**protecting [1]** 84/16
**prove [2]** 31/21 79/24
**proved [5]** 34/19 40/1 40/7 40/14 40/19
**provide [3]** 69/4 86/2 92/17
**provided [1]** 26/14
**providers [1]** 93/20
**provision [6]** 3/9 14/12 16/22 24/13 25/11 65/11
**provisions [5]** 18/10 42/1 59/8 80/23 89/17
**proximity [1]** 52/25
**PSR [12]** 5/10 5/12 5/15 5/20 6/2 6/5 6/14

7/4 15/22 37/19 64/1 68/18
**PSR's [1]** 5/13
**psychosexual [3]** 4/11 85/9 85/11
**public [2]** 43/25 84/17
**punish [2]** 50/1 55/2
**punishing [1]** 70/12
**punishment [1]** 44/7
**purpose [3]** 21/17 40/16 49/22
**purposefully [1]** 12/6
**purposes [14]** 2/25 3/3 3/8 6/15 17/7 20/16 24/12 31/21 31/22 39/7 42/11 56/20 58/25 64/17
**Pursuant [1]** 6/13
**put [2]** 22/1 40/15
**puts [1]** 74/5
**putting [2]** 77/8 77/9
**PYT [1]** 34/14

# Q

**qua [1]** 16/3
**qualifies [1]** 36/4
**qualifying [1]** 64/16
**question [23]** 11/9 13/18 14/1 14/11 15/13 17/23 26/24 29/5 29/21 30/21 31/24 37/17 39/3 41/25 43/11 43/12 54/17 55/15 65/6 66/19 73/12 78/13 85/21
**questionably [1]** 10/11
**questions [18]** 4/22 4/24 5/18 6/18 6/23 17/7 19/20 31/17 32/19 33/5 34/22 37/5 44/13 55/11 68/14 87/4 94/1 94/4
**quibbles [1]** 85/11
**quick [1]** 36/18
**quite [4]** 61/2 64/5 70/13 85/21

# R

**rabbit [1]** 50/14
**raise [1]** 19/21
**raised [2]** 33/11 71/4
**raising [2]** 35/5 92/23
**range [18]** 45/11 45/14 45/15 57/11 57/14 57/18 57/19 80/25 81/1 81/1 81/2 81/10 81/12

87/22 88/3 88/12 88/13 89/4
**rape [4]** 10/5 14/3 14/21 46/25
**raped [1]** 55/5
**rates [1]** 84/19
**rather [3]** 5/13 39/3 87/21
**rational [1]** 84/25
**rationale [1]** 60/25
**reach [1]** 34/1
**reached [1]** 15/6
**read [4]** 30/11 39/17 82/14 84/21
**reading [4]** 34/4 58/13 82/12 88/1
**real [1]** 75/19
**real-life [1]** 75/19
**realize [3]** 5/17 63/6 85/9
**realizing [1]** 19/8
**really [26]** 3/25 5/14 10/12 13/13 17/10 18/9 18/24 21/21 29/16 30/2 33/12 36/24 39/4 42/6 48/8 49/11 53/14 61/24 63/8 70/2 72/17 77/13 78/18 79/15 85/7 85/13
**reason [9]** 29/10 39/20 39/21 48/5 55/20 57/18 60/10 61/18 61/24
**reasonable [6]** 15/5 25/13 30/11 40/2 54/19 61/3
**reasoning [2]** 26/2 27/17
**reasons [7]** 8/19 19/14 27/15 54/9 62/8 67/3 91/20
**recall [2]** 45/5 64/2
**recalled [1]** 68/25
**receipt [16]** 7/20 7/25 8/10 21/4 21/6 21/12 22/12 22/14 22/22 23/2 23/10 23/10 25/2 43/7 43/13 44/20
**receive [2]** 22/15 22/16
**received [3]** 22/16 84/2 84/5
**receiving [4]** 21/9 22/25 43/20 72/9
**recent [1]** 86/23
**recess [4]** 36/18 37/8 80/9 80/11

**recidivate [1]** 85/19
**recidivism [5]** 74/23 76/11 84/19 85/10 85/17
**recognize [1]** 6/23
**Recognizing [1]** 45/17
**recollection [1]** 53/5
**recommend [2]** 53/25 94/11
**recommendation [2]** 3/22 94/8
**recommendations [1]** 94/5
**recommended [3]** 46/9 81/13 93/19
**recommending [1]** 46/21
**record [24]** 2/7 2/22 3/17 5/24 7/3 20/5 20/10 29/3 30/1 32/9 37/10 45/20 46/5 74/16 74/24 76/5 80/13 81/17 81/19 81/20 83/9 91/21 94/16 96/5
**recorded [1]** 1/25
**records [5]** 69/2 69/4 69/9 76/2 76/7
**recover [1]** 52/12
**recovered [1]** 52/19
**reduce [1]** 11/1
**reduction [7]** 7/19 7/21 43/5 44/21 45/1 77/12 87/25
**refer [1]** 12/2
**reference [1]** 40/12
**referred [1]** 9/19
**referring [2]** 5/9 6/5
**refers [1]** 4/10
**reflect [4]** 14/18 47/13 87/12 91/17
**reflected [3]** 81/20 85/14 85/15
**reflecting [1]** 89/20
**reflection [2]** 6/24 7/15
**reflects [1]** 46/5
**refrain [2]** 92/10 92/14
**refusal [1]** 57/9
**regard [2]** 27/16 30/12
**regarding [6]** 3/5 4/19 4/20 6/14 20/7 81/21
**register [1]** 92/14
**registration [1]** 78/6
**rehabilitation [1]** 54/12

USCA Case #24-3162     Document #2102667     Filed: 02/26/2025     Page 530 of 551

# R

**reiterate [1]** 80/17
**rejected [3]** 45/1 45/1 50/9
**rejecting [1]** 29/1
**relate [2]** 39/10 39/11
**related [3]** 16/4 16/19 81/24
**relates [1]** 41/25
**relating [1]** 39/3
**relationships [1]** 85/25
**release [9]** 45/14 46/22 78/7 80/21 81/8 81/15 85/4 85/5 92/4
**relevance [1]** 3/5
**relevant [23]** 3/4 3/11 8/17 9/5 10/8 16/19 16/22 16/24 17/8 17/18 18/10 18/17 20/6 21/18 30/17 36/4 37/23 40/5 45/6 50/11 59/24 61/15 91/22
**reliable [1]** 85/18
**reliance [1]** 18/15
**relied [1]** 71/22
**relies [1]** 8/1
**religious [1]** 83/23
**rely [1]** 85/12
**remain [1]** 62/17
**remaining [1]** 27/20
**remember [3]** 28/16 29/1 32/4
**remembered [2]** 64/4 66/19
**remembering [1]** 29/2
**remind [2]** 28/6 32/23
**reminded [1]** 94/20
**rendering [1]** 71/22
**reoffend [3]** 73/24 74/17 74/17
**reopen [1]** 47/22
**repeat [1]** 54/15
**repeatedly [1]** 50/19
**report [9]** 3/21 4/19 6/6 6/7 68/21 68/22 69/12 69/23 94/11
**reported [2]** 1/21 53/15
**Reporter [2]** 1/22 96/3
**reporting [1]** 85/12
**request [2]** 47/23 93/15
**requested [1]** 93/8

**requesting [1]** 70/15
**requests [6]** 4/2 60/7 60/9 60/15 61/2 94/5
**require [3]** 5/3 22/23 22/24
**required [8]** 28/7 60/18 64/18 65/23 66/8 81/17 89/20 92/5
**requirement [1]** 92/11
**requirements [1]** 43/1
**requires [1]** 15/8
**residual [1]** 53/4
**resolve [2]** 4/23 57/8
**resolves [1]** 29/21
**resources [1]** 54/22
**respect [6]** 7/4 18/14 53/5 84/17 85/6 90/22
**respectfully [3]** 46/21 48/3 78/20
**respecting [1]** 47/3
**respective [1]** 80/17
**respond [3]** 11/6 33/9 66/18
**responding [1]** 35/1
**response [2]** 3/25 9/13
**responsibility [8]** 50/13 54/11 55/8 57/9 76/15 77/6 77/13 77/15
**responsive [1]** 36/21
**rest [5]** 13/23 30/4 38/16 45/9 47/14
**restitution [20]** 4/2 46/10 47/23 58/5 58/11 59/13 59/13 60/5 60/7 60/15 60/17 60/19 60/24 61/2 61/17 64/17 64/19 89/22 89/24 91/6
**result [3]** 18/10 44/19 59/20
**resulted [2]** 10/13 86/24
**results [1]** 19/12
**retirement [1]** 63/17
**reveal [1]** 72/12
**review [6]** 6/7 31/16 48/22 75/10 82/22 88/18
**reviewed [4]** 3/21 4/9 4/10 47/11
**right [35]** 12/24 13/8 13/20 13/25 15/25 18/12 19/19 20/14 23/3 23/5 24/6 26/23 29/20 30/20 37/4 37/6 49/15 49/19 49/24 54/17

56/11 56/15 56/17 57/11 57/22 60/18 64/2 65/25 68/20 72/3 74/24 76/24 80/7 90/10 94/19
**rights [1]** 76/21
**risk [7]** 44/17 48/21 50/4 85/10 85/17 86/15 87/5
**risked [1]** 83/15
**road [3]** 28/23 32/13 50/3
**role [3]** 82/24 83/12 83/22
**routinely [1]** 51/5
**RPR [1]** 1/21
**rule [5]** 6/13 26/19 26/20 32/22 32/23
**Rule 32 [1]** 6/13
**ruled [1]** 59/23
**run [1]** 92/2
**runs [1]** 44/16
**Ryan [2]** 1/12 2/10
**Ryan Lipes [1]** 2/10
**ryan.lipes [1]** 1/15

# S

**saddening [1]** 82/22
**sadism [2]** 25/8 29/25
**sadistic [13]** 8/23 9/11 9/12 10/12 10/7 11/11 11/22 12/4 12/13 13/22 14/13 31/7 42/17
**said [22]** 8/4 10/11 36/21 37/4 39/5 40/8 42/3 46/3 47/10 66/25 67/18 67/21 67/25 72/5 79/19 82/14 84/23 86/1 88/1 88/17 89/11 93/10
**same [15]** 17/6 17/11 17/17 17/18 21/21 27/17 29/12 36/8 36/13 70/20 72/23 73/1 76/13 76/20 90/4
**Samsung [1]** 53/1
**sat [2]** 39/1 66/20
**satisfied [3]** 6/10 15/5 92/18
**satisfies [1]** 43/12
**satisfy [3]** 10/20 21/1 43/15
**satisfying [1]** 10/11
**saved [1]** 34/14
**saving [1]** 44/7
**saw [2]** 63/5 69/22
**say [30]** 15/24 17/1

19/4 22/9 28/7 28/14 33/14 34/9 35/9 36/6 36/9 36/12 37/22 40/17 46/4 47/10 47/13 56/5 65/9 68/4 68/9 72/25 73/21 74/25 76/25 80/2 81/6 85/21 89/3 89/4
**saying [7]** 17/15 19/2 55/2 56/9 57/17 62/25 73/8
**says [6]** 61/13 61/14 66/5 68/4 68/8 77/1
**schedule [1]** 2/24
**school [1]** 71/2
**scour [1]** 74/6
**scratching [1]** 51/22
**seal [2]** 59/16 60/25
**search [2]** 72/11 76/1
**searches [2]** 51/19 93/9
**searching [1]** 52/23
**searing [1]** 75/6
**second [9]** 17/24 27/5 34/11 43/6 58/22 61/4 61/11 68/7 83/8
**seconds [1]** 43/25
**section [4]** 3/4 7/17 59/1 59/1
**Section 1B1.3 [1]** 3/4
**Section 2G2.2 [1]** 7/17
**see [6]** 4/23 30/6 52/1 53/18 69/10 79/16
**seeing [1]** 69/23
**seeking [4]** 59/13 60/17 60/24 62/11
**seem [2]** 5/12 85/13
**seems [7]** 15/14 20/15 49/10 57/20 58/11 58/20 88/8
**seen [4]** 58/16 62/14 71/11 83/1
**select [1]** 11/3
**self [2]** 7/7 85/12
**self-reporting [1]** 85/12
**self-surrender [1]** 7/7
**send [1]** 86/4
**sending [1]** 18/23
**sense [2]** 24/5 30/4 44/5 53/7 61/21 62/3 84/25
**sent [1]** 63/2
**sentence [38]** 2/17 5/8 6/16 37/2 37/15 39/7 55/19 56/6 58/18 62/10

USCA Case #24-3162        Document #2106481        Filed: 02/24/2025        Page 531 of 551

# S

**sentence... [28]** 62/11 66/24 70/15 70/15 70/17 71/13 71/14 73/7 75/4 75/14 76/12 76/17 76/22 78/3 78/5 78/10 78/10 78/18 80/10 80/16 80/20 81/3 81/13 81/16 86/1 86/4 86/25 89/18

**sentenced [2]** 82/6 92/3

**sentences [14]** 54/1 56/21 56/25 70/16 70/17 72/22 73/10 75/17 75/20 75/23 76/8 78/19 86/24 87/13

**sentencing [26]** 1/8 2/25 3/1 3/7 3/22 20/16 31/21 31/23 37/12 40/5 53/24 55/22 55/24 56/18 68/16 74/19 74/22 86/21 87/6 87/7 87/22 88/14 89/8 89/13 91/12 91/23

**sentencings [1]** 87/12

**separate [1]** 72/21

**September [2]** 32/4 51/10

**series [1]** 47/6

**serious [12]** 44/6 46/24 72/24 72/25 75/21 82/5 82/8 82/10 82/18 83/1 84/10 84/14

**seriousness [1]** 81/22

**serve [1]** 92/3

**server [1]** 23/16

**servers [1]** 48/20

**services [3]** 6/10 53/12 53/13

**set [2]** 3/1 68/15

**sets [1]** 14/5

**Seventh [2]** 12/3 12/4

**several [5]** 71/25 72/2 75/9 77/7 92/5

**severe [1]** 53/22

**severity [2]** 61/3 89/6

**sex [10]** 9/18 55/1 73/17 78/6 78/8 84/19 85/19 90/21 92/14 93/3

**sexual [10]** 8/23 12/5 14/14 14/18 31/8 42/17 46/25 79/14 83/4 90/21

**sexually [1]** 47/19

**shall [2]** 61/13 66/5

**shame [1]** 70/10

**share [1]** 63/21

**shareable [1]** 44/3

**shared [2]** 44/4 50/5

**sharing [1]** 43/25

**she [1]** 63/14

**shipped [2]** 22/18 22/21

**shocked [1]** 63/4

**short [1]** 84/12

**shorthand [1]** 1/25

**should [23]** 4/5 4/8 4/13 20/12 20/24 26/3 26/8 26/21 27/10 27/24 30/17 32/12 46/4 55/2 61/10 68/9 68/10 76/20 84/10 89/1 89/25 91/4 92/23

**shouldn't [2]** 32/17 36/24

**show [9]** 7/21 8/20 34/18 51/8 74/12 74/12 74/13 82/7 84/8

**showed [10]** 25/18 33/22 50/21 50/22 51/5 51/17 51/19 52/14 76/3 77/25

**showing [5]** 8/20 11/2 26/6 43/15 74/16

**shown [6]** 13/3 64/1 71/8 77/18 77/19 78/1

**shows [8]** 16/23 25/16 52/16 63/23 71/23 72/4 72/8 74/2

**significance [1]** 59/10

**significant [8]** 39/2 62/10 62/11 63/24 64/8 81/7 85/23 91/10

**significantly [3]** 54/7 83/5 91/12

**silver [1]** 79/21

**similar [1]** 24/19

**similarity [1]** 25/4

**similarly [1]** 56/1

**simple [1]** 45/9

**simply [2]** 35/13 43/25

**since [2]** 20/20 62/15

**sincerity [1]** 53/16

**single [5]** 16/14 16/25 38/14 57/5 84/13

**sit [1]** 55/4

**sitting [2]** 50/18 68/20

**situated [1]** 56/1

**situation [2]** 36/6

58/24

**six [8]** 15/23 17/25 47/8 50/17 60/8 65/1 65/17 66/9

**Sixth [2]** 44/9 76/22

**slice [1]** 33/13

**slight [4]** 9/19 35/12 35/13 37/3

**slip [1]** 75/1

**small [1]** 71/23

**so [88]** 3/17 3/18 5/9 6/5 6/25 7/2 7/17 11/10 11/14 11/16 12/2 12/11 14/12 14/20 15/2 16/15 16/24 18/8 18/14 20/5 20/9 21/11 21/21 22/2 22/22 22/25 23/19 24/9 26/15 26/17 27/7 28/5 28/12 29/6 29/23 29/23 30/1 32/6 32/8 33/5 33/25 34/16 36/22 37/7 37/15 40/11 43/12 46/7 46/17 47/11 53/14 53/22 55/21 56/3 56/8 57/10 57/13 57/16 57/18 58/2 60/18 62/1 62/6 64/1 64/7 64/11 64/14 65/10 66/7 67/21 68/2 68/9 69/16 73/23 75/11 76/4 76/18 77/25 78/18 82/4 83/5 83/15 85/16 88/13 88/23 89/3 93/17 93/21

**society [2]** 79/23 80/1

**solicit [1]** 73/16

**solicitation [6]** 7/20 7/25 21/5 43/8 43/14 44/20

**some [31]** 13/3 18/20 21/20 22/24 28/20 30/8 33/18 41/12 46/10 48/8 49/4 49/5 50/9 50/24 52/1 53/3 53/21 54/12 60/11 60/13 60/23 62/7 62/15 62/23 63/5 64/9 81/15 83/1 83/14 83/25 89/5

**somebody [2]** 21/15 22/15

**someone [7]** 8/16 43/25 47/24 68/23 74/18 74/20 74/21

**something [7]** 11/23 18/19 30/8 35/9 63/6 71/12 86/17

**somewhat [3]** 44/6 81/9 87/3

**sorry [1]** 14/10

**sort [5]** 13/18 24/4 75/18 87/9 91/20

**sounds [1]** 65/23

**speak [4]** 5/1 5/4 5/6 58/2

**special [11]** 26/14 26/17 28/4 28/6 45/16 61/21 61/22 64/25 68/3 89/21 91/5

**specific [16]** 9/2 14/1 26/16 28/3 28/21 38/11 39/11 40/12 61/14 72/19 85/20 86/6 90/25 91/18 91/20 91/22

**specifically [1]** 42/3

**specifics [1]** 2/21

**speculate [2]** 69/3 72/6

**spend [1]** 54/21

**spirit [1]** 10/1

**spit [1]** 69/11

**spit-balling [1]** 69/11

**split [1]** 68/5

**spoke [1]** 63/12

**spread [2]** 47/24 48/6

**square [1]** 21/14

**square-on [1]** 21/14

**St. [1]** 70/25

**St. Albans [1]** 70/25

**staff [2]** 54/24 54/25

**stale [1]** 84/15

**standard [6]** 10/20 15/12 39/25 40/3 61/5 93/16

**standing [1]** 14/1

**start [7]** 17/6 17/15 49/22 57/11 61/17 70/4 81/21

**started [3]** 61/16 68/22 89/25

**starts [1]** 21/2

**state [12]** 2/22 3/17 9/21 22/2 23/12 23/15 24/11 24/16 44/12 44/16 45/22 92/8

**statement [2]** 47/23 93/19

**statements [11]** 4/2 4/3 47/8 60/7 60/8 82/7 82/12 82/23 85/13 86/9 87/3

**states [14]** 1/1 1/3 1/9

USCA Case #24-3162        Document #2102481        Filed: 03/24/2025        Page 532 of 551

**S**

**states... [11]** 1/13 2/3 2/9 8/2 9/17 12/2 34/3 35/8 42/9 44/2 66/21

**statute [14]** 22/11 22/14 22/22 23/3 42/2 49/22 59/7 59/15 59/22 61/19 62/4 62/7 64/12 64/24 68/4

**statutes [3]** 9/21 49/6 88/6

**statutory [2]** 69/17 90/23

**stenotype [1]** 1/25

**step [6]** 6/17 23/9 23/11 44/17 50/3 69/18

**STEPHEN [1]** 1/6

**Steven [2]** 2/4 91/23

**stick [1]** 17/23

**still [7]** 8/7 13/17 14/6 29/18 82/9 86/2 86/4

**stimulate [1]** 12/8

**stop [3]** 13/1 13/2 85/1

**storage [1]** 49/1

**stored [2]** 16/20 49/8

**stories [1]** 79/13

**story [1]** 50/16

**Street [3]** 1/13 1/17 1/19

**strength [1]** 18/20

**strict [1]** 19/2

**strictly [1]** 85/3

**strikes [1]** 44/12

**stringent [3]** 70/6 78/4 78/7

**strong [6]** 53/18 74/7 83/12 83/16 86/5 91/15

**stuff [2]** 58/2 77/11

**subfolder [1]** 34/14

**subject [3]** 48/5 55/8 76/1

**submit [1]** 92/12

**submits [1]** 8/19

**submitted [7]** 3/23 3/24 4/4 47/8 59/16 59/17 60/4

**subsection [4]** 43/1 58/14 58/23 59/11

**substance [2]** 92/10 92/11

**substantial [2]** 54/20 55/10

**substantially [3]** 76/13 76/19 82/5

**successful [3]** 70/2 71/3 83/21

**successfully [1]** 72/14

**such [8]** 10/22 25/22 35/20 36/2 37/25 73/15 74/11 82/3

**suffer [2]** 82/11 82/18

**sufficiently [1]** 67/2

**suggest [2]** 50/13 75/13

**suggested [1]** 86/25

**suggesting [1]** 76/23

**suggests [1]** 53/9

**suicidal [1]** 47/18

**Suite [2]** 1/17 1/19

**superseded [1]** 94/23

**superseding [1]** 94/22

**supervised [8]** 45/14 46/22 78/7 80/21 81/8 81/15 85/5 92/4

**supervision [3]** 72/15 78/2 92/4

**supplemental [1]** 3/24

**support [9]** 4/4 62/1 69/22 71/11 71/13 83/9 84/3 91/15 94/10

**supported [2]** 10/15 44/8

**supportive [1]** 83/11

**suppose [2]** 3/25 68/15

**sure [11]** 5/16 15/15 17/3 19/10 36/19 39/21 39/22 45/19 74/7 84/21 87/1

**surely [2]** 18/23 81/23

**surprise [1]** 49/4

**surrender [1]** 7/7

**system [1]** 77/7

**T**

**table [2]** 2/10 45/9

**take [16]** 3/1 6/18 12/22 27/5 36/18 36/22 37/1 37/6 50/7 67/12 70/3 74/1 75/22 80/9 86/7 91/19

**taken [2]** 37/8 68/20

**taking [2]** 26/2 77/10

**talk [9]** 7/1 26/8 35/16 41/10 46/8 46/15 61/18 73/16 77/17

**talked [1]** 77/8

**talking [10]** 13/6 14/11 14/17 19/14 21/17 29/6

39/16 56/12 73/1 92/24

**taxes [1]** 63/14

**technical [1]** 89/16

**teen [1]** 83/21

**Teens [1]** 51/7

**Telegram [1]** 53/1

**tell [1]** 32/7

**telling [1]** 64/6

**tells [1]** 50/15

**ten [2]** 38/4 38/21

**tending [1]** 89/7

**tends [1]** 77/5

**term [7]** 11/12 12/12 46/21 56/23 81/7 91/24 92/3

**terms [5]** 9/4 11/12 52/14 65/15 75/11

**test [1]** 76/20

**testifying [2]** 75/8 75/10

**testimony [5]** 10/25 14/8 33/21 33/23 75/6

**testing [1]** 92/12

**than [29]** 3/11 5/13 12/17 18/22 21/8 23/10 24/24 31/2 39/4 42/2 43/19 44/4 44/7 47/13 48/9 49/20 50/10 52/1 60/7 61/14 70/19 72/24 75/21 76/16 76/17 81/10 83/9 87/21 88/7

**thank [38]** 3/16 3/22 6/4 6/12 12/14 19/22 19/24 20/4 20/19 24/25 32/20 33/7 33/8 34/23 36/17 37/11 57/23 57/24 58/4 66/15 66/16 67/9 69/15 75/7 78/24 79/2 80/3 80/4 80/14 92/25 93/7 93/18 93/24 94/3 94/14 94/15 94/18 95/3

**Thankfully [1]** 63/21

**that [628]**

**that's [59]** 5/16 7/20 8/15 9/15 9/20 15/2 16/21 18/12 19/13 19/16 21/6 21/11 23/23 24/22 26/10 27/22 28/2 29/9 30/17 31/2 34/9 36/8 36/14 43/6 49/13 49/20 53/11 53/22 55/10 56/2 56/12 57/1 57/12 58/1 58/9 59/21 60/2 60/2 60/10 60/18

61/7 64/1 64/21 65/19 65/22 65/24 66/11 68/13 71/5 74/15 76/6 79/16 80/2 82/25 83/3 89/3 90/24 91/5 93/13

**their [20]** 4/20 6/10 22/1 22/1 22/6 24/11 35/16 47/9 47/15 47/16 47/18 47/19 47/24 67/2 74/7 75/10 82/11 82/19 82/19 83/18

**them [29]** 13/24 17/12 18/23 22/1 22/2 30/15 34/3 35/8 37/13 37/14 38/25 43/24 44/5 45/18 47/11 48/15 48/16 50/1 51/2 51/3 54/3 62/25 63/1 64/19 67/21 71/20 76/6 79/12 81/18

**then [52]** 4/20 5/7 7/7 9/7 12/9 15/19 15/21 15/24 16/2 17/2 17/7 17/13 17/13 17/16 18/3 18/5 23/3 24/23 26/20 30/15 34/11 35/15 36/24 37/13 41/10 45/12 49/17 50/2 50/19 55/13 58/2 58/5 58/6 59/12 61/13 61/17 63/5 64/22 65/12 66/7 66/12 67/24 74/9 75/1 78/5 80/16 87/18 89/7 89/16 90/7 94/9 94/22

**theoretical [1]** 43/22

**theory [2]** 64/20 88/5

**there [100]**

**there's [28]** 5/17 13/17 15/3 16/1 16/5 19/1 27/1 33/13 33/15 35/18 39/21 43/11 48/2 48/19 53/3 54/8 54/13 57/17 61/4 61/6 66/12 68/5 68/7 75/13 75/19 77/14 87/5 87/15

**therefore [10]** 13/10 35/14 36/4 40/11 41/16 42/10 42/12 43/2 43/18 45/8

**these [23]** 5/18 18/24 29/25 31/19 32/24 41/7 45/17 47/13 58/9 71/24 73/1 74/3 75/1 75/24 76/3 78/16 79/6 79/11 79/13 79/19 82/11 82/15

USCA Case #24-3162    Document #2123481    Filed 12/20/2025    Page 533 of 551

**they [73]**  11/25 14/8
15/6 20/17 22/16 22/16
24/7 25/13 25/19 25/20
26/5 26/11 26/15 27/14
27/16 27/18 27/19
27/20 28/4 28/4 28/9
28/10 28/10 28/14
28/22 28/24 30/5 30/5
30/6 30/8 30/9 30/12
30/15 32/3 32/4 34/17
45/21 47/13 47/21
47/22 48/17 49/17 51/1
53/13 54/14 55/9 59/20
62/23 63/12 67/2 67/3
67/10 67/17 67/25 73/5
73/8 73/9 73/10 73/14
74/4 74/6 76/2 76/2
76/5 76/6 76/9 76/9
77/2 77/21 77/22 82/16
82/18 95/2

**they're [5]**  47/16 59/19
69/5 69/10 89/16

**they've [3]**  73/6 79/9
85/22

**thin [1]**  33/14

**thing [5]**  24/15 28/14
39/21 71/6 79/20

**things [12]**  47/17 58/9
61/16 63/18 67/15
73/17 78/9 79/7 82/3
82/13 85/7 94/1

**think [105]**

**thinking [5]**  16/2 16/14
19/1 30/24 88/3

**third [6]**  8/2 8/5 8/7
43/8 53/15 53/17

**third-party [2]**  53/15
53/17

**this [146]**

**those [63]**  4/23 5/12
6/15 8/19 10/24 12/13
15/22 18/3 21/25 21/25
22/8 24/9 24/10 25/23
27/2 27/16 30/9 30/16
30/18 30/19 32/12 34/2
35/8 36/1 36/7 38/11
38/21 38/23 38/24
39/10 39/10 39/11
40/10 40/18 42/12 44/1
44/11 44/18 46/17 47/2
47/6 50/5 50/25 54/21
55/6 55/13 57/8 60/19
61/2 65/10 65/21 65/21

73/10 73/13 73/21
75/13 78/6 82/23 82/25
84/8 88/14 91/20 94/25

**Thots [1]**  51/7

**though [2]**  2/24 24/18

**thought [3]**  6/25 10/10
67/24

**three [10]**  21/1 70/6
72/14 76/14 77/3 77/4
77/12 78/1 78/4 79/19

**three-level [3]**  77/3
77/4 77/12

**through [34]**  4/22 6/22
11/8 11/15 19/6 23/1
23/16 29/7 33/21 36/19
36/23 37/15 39/1 40/24
50/18 51/4 55/4 61/21
62/4 62/6 64/12 68/25
70/25 71/2 77/9 77/10
77/19 77/19 80/15
81/18 82/15 82/16 87/4
89/15

**throughout [1]**  71/9

**throw [1]**  32/1

**thumb [1]**  50/6

**thus [1]**  34/19

**tied [1]**  73/23

**till [1]**  36/22

**time [20]**  6/7 35/6
45/22 47/22 50/24
51/21 53/10 54/21
62/19 62/20 62/21
67/16 68/10 70/1 73/4
74/14 74/21 77/10
77/24 79/5

**times [1]**  51/8

**today [15]**  2/25 3/18
20/1 20/7 20/16 37/15
39/7 45/18 67/16 69/24
73/4 81/19 83/9 86/16
86/21

**toddler [5]**  8/24 14/15
14/19 31/9 42/17

**together [3]**  3/23
15/23 16/20

**told [1]**  69/2

**tomorrow [3]**  2/23 3/2
20/17

**Tony [2]**  1/18 2/13

**tonymiles [1]**  1/20

**too [4]**  21/19 22/13
78/10 86/1

**took [2]**  73/20 77/21

**toothbrush [4]**  9/7
10/7 10/10 12/8

**top [7]**  10/22 56/7
63/17 64/14 67/6 78/3
89/25

**Tor [1]**  52/19

**total [4]**  45/2 45/16
90/1 91/7

**totally [1]**  30/20

**toward [1]**  44/17

**towards [1]**  78/5

**town [1]**  71/1

**trace [1]**  52/21

**track [3]**  74/15 74/24
76/5

**trade [1]**  34/14

**trading [1]**  86/12

**traditional [2]**  48/9
48/10

**traffic [2]**  24/1 43/9

**trafficked [1]**  53/2

**trafficking [15]**  21/3
24/15 24/15 24/24
58/23 58/25 59/8 59/11
61/8 65/14 66/2 66/3
90/6 90/12 90/21

**trafficking-like [1]**
90/21

**tragedy [1]**  83/20

**transcript [3]**  1/8 1/25
96/4

**transcription [1]**  1/25

**transport [3]**  8/13
38/25 39/8

**transportation [72]**
2/18 7/24 8/11 8/12
8/17 8/18 10/13 10/18
10/24 11/3 12/17 13/15
13/16 13/22 14/3 14/17
15/18 15/20 15/25 16/3
16/7 16/13 16/15 16/16
17/1 17/4 17/12 17/17
18/21 18/21 19/14
25/21 26/25 27/1 27/21
31/1 31/3 33/14 33/15
33/19 34/5 34/6 36/16
38/4 38/18 38/21 39/3
40/18 40/23 41/2 42/20
43/17 48/4 48/9 48/10
48/11 48/24 49/10
49/13 49/20 49/22 50/3
50/10 56/24 59/2 65/3
82/9 87/22 88/6 88/7
88/9 91/25

**transported [8]**  8/13
22/22 22/19 22/21 24/8
27/15 34/19 47/2

**transporting [9]**  23/4
38/9 38/17 39/9 40/9
42/19 43/21 44/11
44/17

**trauma [5]**  47/13 55/9
79/14 82/14 82/16

**travel [4]**  23/14 24/1
24/2 33/16

**traveled [4]**  23/19
23/22 24/9 33/24

**traveling [1]**  33/12

**treatment [3]**  93/4
93/16 93/16

**trial [31]**  3/18 33/17
39/2 50/18 50/21 53/22
54/17 54/21 55/3 55/4
55/13 56/2 60/13 69/22
74/3 74/4 74/9 75/4
75/5 75/11 75/12 75/14
75/16 76/18 76/21 77/3
81/20 83/9 85/14 85/15
91/16

**trigger [1]**  42/20

**triggered [1]**  41/25

**troubling [1]**  83/14

**true [7]**  5/15 13/5 16/4
17/13 43/6 53/11 96/4

**truly [3]**  79/12 82/22
85/17

**trust [1]**  47/19

**truth [1]**  73/25

**trying [10]**  16/9 24/17
24/18 27/13 53/21
67/19 73/15 73/16
73/16 90/15

**Turchen [1]**  12/3

**turn [1]**  46/7

**turned [1]**  28/19

**turning [6]**  6/17 41/24
45/4 62/18 69/16 69/17

**turns [1]**  85/19

**two [34]**  5/18 7/4 7/19
14/12 20/22 20/25
21/23 22/8 22/23 24/20
29/7 31/17 31/20 36/8
36/11 36/14 41/11
41/16 41/18 43/3 43/4
51/10 61/6 70/23 75/22
75/24 76/3 76/8 83/19
87/25 90/2 90/3 91/3
91/7

**two-level [8]**  7/4 7/19
20/25 22/23 24/20
36/14 43/4 87/25

**two-point [4]**  41/11

USCA Case #24-3162      Document #2101891      Filed: 02/24/2025      Page 534 of 551

**T**

**two-point... [3]** 41/16 41/18 43/3
**type [2]** 24/15 30/8

**U**

**U.S [2]** 1/12 1/22
**U.S.C. [3]** 58/13 58/14 61/7
**Uh [3]** 23/8 24/3 31/4
**Uh-huh [3]** 23/8 24/3 31/4
**unanimous [1]** 15/8
**unanimously [2]** 28/11 28/22
**uncertain [1]** 70/9
**unclear [1]** 88/23
**uncontested [1]** 14/8
**under [47]** 5/6 7/5 7/16 7/19 8/17 9/15 9/16 11/10 12/11 15/9 15/11 16/24 19/17 20/25 29/5 36/10 37/6 40/25 41/4 41/16 41/25 42/13 42/15 58/12 59/14 59/16 60/14 60/25 63/20 63/22 64/7 64/8 65/11 65/13 70/6 72/1 76/22 78/2 78/7 80/22 84/13 84/24 88/1 90/5 90/7 90/8 90/13
**Underaged [1]** 51/7
**underlie [1]** 9/3
**underlies [1]** 35/24
**underlying [3]** 10/6 13/16 33/18
**underscores [1]** 72/17
**understand [8]** 15/16 20/21 26/4 27/13 29/3 57/6 63/10 88/5
**understanding [1]** 20/8
**Understood [1]** 32/16
**unfathomable [1]** 70/10
**unfortunately [1]** 52/2
**UNITED [12]** 1/1 1/3 1/9 1/13 2/3 2/9 8/2 9/17 12/2 34/3 35/8 66/21
**United States [5]** 8/2 9/17 12/2 34/3 35/8
**universe [1]** 31/6
**unknown [2]** 73/4 73/5

**unlawful [1]** 92/10
**unlawfully [1]** 92/9
**unless [6]** 20/11 34/21 35/20 37/25 55/11 68/13
**unlike [1]** 44/11
**unnecessarily [1]** 55/9
**unnecessary [1]** 89/8
**unreasonable [1]** 54/6
**unresolved [1]** 27/19
**unsupervised [1]** 92/15
**until [2]** 92/17 92/20
**unwarranted [7]** 53/24 55/21 55/24 86/20 87/6 89/13 91/12
**up [16]** 6/21 13/5 19/25 27/5 44/23 64/20 64/25 65/7 70/7 72/15 73/23 77/10 77/17 79/1 83/3 83/10
**upload [1]** 23/6
**uploaded [9]** 10/4 10/8 12/20 21/15 43/24 48/14 50/20 51/9 71/20
**uploading [4]** 22/5 44/3 44/6 44/16
**upon [4]** 6/24 7/15 41/22 71/22
**upstanding [1]** 84/11
**us [8]** 67/17 67/18 67/23 73/5 88/2 88/3 89/14 91/9
**usdoj.gov [2]** 1/14 1/15
**use [3]** 88/20 88/23 92/10
**used [3]** 41/15 83/25 90/20
**using [3]** 22/17 56/23 75/24
**usually [4]** 49/16 54/4 56/20 57/14

**V**

**vagina [4]** 9/7 9/8 9/14 12/8
**variance [2]** 81/2 91/10
**variety [1]** 62/22
**various [9]** 4/1 4/21 6/17 8/24 37/21 44/24 46/5 80/22 80/23
**vary [4]** 55/20 57/19 67/2 87/10

**varying [2]** 91/11 91/11
**vast [2]** 54/3 57/8
**verdict [24]** 15/10 25/13 26/4 26/14 26/17 27/2 27/14 28/3 28/5 28/7 30/4 30/12 34/11 34/17 37/14 38/12 38/15 39/6 39/15 39/17 47/3 49/9 56/13 62/16
**verdicts [2]** 71/19 71/23
**version [2]** 22/8 23/11
**versus [5]** 2/3 8/3 29/4 32/8 88/13
**very [30]** 12/7 14/4 26/9 26/11 28/5 33/10 46/4 46/19 54/4 54/25 57/10 63/7 66/22 67/7 68/11 69/24 70/6 71/22 74/3 75/6 78/7 79/12 79/12 80/3 83/11 83/16 84/2 84/12 85/23 91/10
**Vicky [11]** 61/11 61/18 61/22 62/4 62/6 64/12 64/24 65/23 66/12 90/8 90/14
**victim [14]** 4/1 47/8 47/23 59/13 59/14 59/21 60/6 60/16 61/12 75/5 82/7 82/12 82/23 86/9
**victims [22]** 47/7 47/9 59/18 59/19 60/11 60/17 60/23 61/2 61/7 62/1 64/16 65/14 66/1 66/3 79/11 82/11 86/14 86/15 89/23 90/6 90/11 90/19
**video [8]** 8/25 12/11 14/6 36/8 36/13 42/5 42/9 47/24
**videos [17]** 10/13 12/20 13/10 14/2 29/6 38/22 40/8 40/13 42/7 42/18 42/23 46/24 47/3 47/6 48/12 48/14 79/11
**view [24]** 10/20 12/11 12/22 15/10 27/2 27/9 27/23 29/3 29/5 29/7 30/18 31/15 43/15 44/7 45/6 50/8 60/20 62/16 64/5 64/16 66/7 70/13 88/14 89/5
**viewed [15]** 22/7 25/16

25/19 25/25 26/6 27/10 30/14 33/4 33/5 34/8 34/12 35/6 47/24 53/10 88/15
**views [3]** 4/21 6/22 87/4
**violations [1]** 53/14
**violence [4]** 11/12 25/8 31/8 35/14
**violent [1]** 11/22
**virtue [1]** 15/1
**visited [3]** 50/22 51/6
**visits [1]** 53/12
**visual [2]** 22/15 22/17
**voiceless [1]** 47/7
**voluntarily [1]** 72/8
**vs [1]** 1/5

**W**

**waive [1]** 92/11
**waiving [1]** 92/19
**walk [9]** 6/21 11/8 29/6 36/19 36/23 37/15 40/24 80/15 89/14
**want [33]** 15/15 17/3 20/5 20/10 25/1 27/3 30/1 30/10 31/11 32/8 32/22 32/23 33/9 35/9 35/18 36/18 36/19 37/5 45/19 46/15 48/1 48/16 48/21 53/20 54/14 61/18 67/9 69/18 71/6 79/7 79/10 80/2 86/8
**wanted [6]** 10/9 26/13 28/18 30/6 36/5 65/13
**wants [1]** 78/22
**warrant [1]** 76/1
**warranted [2]** 41/16 91/11
**was [161]**
**Washington [5]** 1/5 1/14 1/17 1/20 1/23
**wasn't [6]** 18/22 18/23 28/17 46/1 46/3 68/22
**watch [1]** 55/5
**watched [5]** 50/19 51/2 51/3 71/23 82/20
**way [15]** 17/21 19/1 22/2 25/13 26/2 26/4 28/19 30/11 30/25 33/3 49/13 53/23 79/17 79/25 88/18
**ways [7]** 49/4 82/16 83/21 85/9 90/3 91/3 91/7

USCA Case #24-3162    Document #2102581    Filed: 02/14/2025    Page 539 of 551

**W**

**we [125]**

**we'd [3]** 11/5 28/1 28/3

**we'll [7]** 3/7 3/25 4/22 27/5 36/25 37/7 69/3

**we're [14]** 7/10 14/16 16/2 17/3 28/5 29/6 29/18 49/5 53/14 56/12 58/24 62/11 67/16 84/9

**we've [11]** 11/18 19/17 42/8 43/4 44/21 45/18 47/5 47/7 59/16 60/14 86/21

**wealth [1]** 63/3

**web [2]** 52/19 52/19

**website [3]** 75/25 76/1 76/4

**week [1]** 51/9

**week-long [1]** 51/9

**weight [1]** 39/6

**welcome [3]** 5/6 20/3 78/24

**well [27]** 4/12 14/25 17/10 18/18 22/9 27/5 27/16 27/20 28/1 36/12 41/11 41/14 41/19 45/4 45/5 46/4 46/18 46/19 51/18 57/17 58/1 59/9 67/4 67/7 68/11 71/9 76/9

**went [7]** 23/16 50/14 67/21 68/25 70/25 77/23 82/15

**were [50]** 8/25 11/2 14/2 14/7 14/8 14/11 16/20 17/14 19/14 21/15 24/7 27/15 30/8 30/18 31/6 32/3 32/8 32/13 33/19 38/2 39/16 40/21 42/7 47/17 47/18 48/14 49/6 51/1 51/23 54/2 59/20 60/5 60/6 60/6 60/7 60/11 60/12 60/12 61/2 67/15 73/11 75/23 75/24 75/24 76/6 76/8 87/16 87/18 87/24 92/6

**West [1]** 1/17

**what [61]** 3/17 7/6 10/1 13/9 13/10 13/23 16/19 16/23 17/2 21/6 22/11 26/15 28/5 28/6 28/12 28/21 29/20 30/23 32/1 36/21 37/3

37/15 50/22 51/13 52/14 52/15 52/15 52/16 52/17 52/18 52/22 60/2 63/15 66/1 67/5 67/17 68/2 68/25 69/3 69/18 70/18 70/19 72/4 72/24 73/8 73/12 74/8 75/6 76/23 76/25 77/2 77/7 78/19 79/11 79/17 86/16 86/17 87/4 87/20 90/15 93/10

**what's [5]** 10/17 49/22 61/5 71/1 72/21

**whatever [4]** 25/16 35/7 55/20 67/13

**when [22]** 9/21 16/17 22/11 25/19 25/23 36/19 43/5 48/23 49/4 51/23 52/18 52/23 54/18 55/7 63/12 70/23 74/4 76/19 78/3 83/19 88/15 89/9

**where [25]** 9/9 17/22 21/23 25/14 25/22 27/1 30/7 34/10 34/17 36/6 36/14 36/15 47/1 49/11 56/2 56/5 58/24 59/4 66/22 70/25 73/13 78/9 88/14 89/14 91/9

**whereas [4]** 23/17 24/16 24/21 25/5

**whether [38]** 5/14 7/18 11/9 12/16 14/16 14/17 16/4 16/17 18/3 20/24 21/4 24/9 24/13 25/16 27/9 29/13 29/13 29/24 30/16 32/7 35/10 36/2 41/5 43/13 52/3 53/4 53/14 56/12 58/12 58/22 68/6 68/7 72/19 73/22 75/11 78/14 81/1 91/2

**which [79]** 2/19 3/1 6/17 10/13 10/25 12/3 12/4 12/5 13/16 13/18 14/7 15/14 15/18 15/19 15/20 22/20 22/22 23/6 23/17 24/19 25/4 26/5 26/16 28/10 30/3 30/13 30/23 30/24 33/14 34/10 35/24 36/23 37/4 37/22 37/23 38/5 40/11 40/17 40/22 42/7 43/17 45/12 49/7 52/19 53/2 53/7 54/5 58/15 58/23

59/2 60/16 65/1 66/21 70/7 70/14 71/21 71/22 72/5 72/19 75/18 75/23 76/23 77/8 77/13 80/18 81/3 83/7 84/14 85/22 87/12 87/15 87/16 88/3 89/22 90/3 90/17 91/15 92/6

**while [5]** 9/13 66/25 67/14 84/14 92/4

**White [1]** 71/2

**who [20]** 2/13 5/1 12/12 21/15 39/1 47/16 48/19 52/24 53/18 55/25 60/15 63/3 71/4 71/5 75/24 83/2 83/10 84/4 86/18 90/19

**whole [6]** 20/6 35/20 36/3 37/25 79/7 82/11

**why [19]** 6/21 21/11 22/5 23/9 23/11 23/24 24/9 24/12 28/2 34/4 51/18 58/15 70/5 72/11 72/13 82/25 88/6 88/7 88/24

**widely [1]** 49/1

**wife [3]** 33/24 63/10 67/18

**will [17]** 5/7 20/17 26/19 39/6 40/12 42/12 44/21 47/7 47/14 47/21 60/23 73/24 78/16 81/7 82/20 93/6 94/8

**Willet [1]** 68/23

**Willett [3]** 2/5 92/25 93/24

**willing [1]** 10/14

**wipe [1]** 52/10

**wiser [1]** 79/22

**wishes [2]** 5/1 5/2

**withdraw [1]** 67/19

**withdrawing [1]** 7/9

**withdrawn [1]** 41/23

**withdrew [1]** 81/11

**within [13]** 4/9 4/18 5/10 9/12 10/1 10/18 11/12 14/18 31/5 59/8 66/23 80/19 87/7

**within-guideline [2]** 59/23 80/19

**without [4]** 13/15 18/16 44/13 88/11

**wobbled [1]** 34/10

**won't [3]** 20/21 47/12 59/17

**wondered [1]** 89/2

**word [3]** 49/12 64/17 74/1

**words [1]** 16/6

**work [6]** 19/6 57/21 77/9 77/9 77/10 79/21

**worked [1]** 67/25

**world [2]** 22/7 55/14

**worse [8]** 48/9 49/20 49/25 72/23 72/23 76/14 88/7 88/21

**worst [4]** 72/3 81/23 82/13 82/19

**would [93]** 5/4 5/5 8/5 9/3 9/25 10/17 10/17 10/19 11/23 12/10 12/12 12/13 13/10 17/11 17/15 17/16 17/24 17/25 18/1 18/2 18/3 18/16 19/18 22/9 22/11 22/15 22/23 26/14 26/21 28/7 28/14 28/18 28/19 28/23 28/24 29/10 36/5 36/14 39/16 39/17 42/20 45/21 48/22 49/3 52/1 52/13 52/21 55/14 55/21 55/23 57/20 58/10 59/7 63/10 63/14 64/10 64/12 64/24 67/13 67/22 67/23 67/25 68/9 70/18 71/13 72/16 74/10 74/18 74/20 74/21 78/24 84/25 86/4 86/18 87/5 87/19 87/20 87/23 88/2 88/3 88/24 90/7 90/8 90/12 90/13 90/20 90/20 90/22 91/12 91/17 91/18 93/15 94/1

**wouldn't [2]** 8/4 91/14

**wounds [1]** 47/21

**wrinkle [1]** 32/1

**write [1]** 28/13

**written [4]** 4/5 4/13 41/7 49/6

**wrong [1]** 80/25

---

**Y**

**yeah [8]** 19/19 24/22 27/3 27/6 29/11 29/23 57/2 79/5

**year [8]** 2/3 48/25 51/16 54/5 77/5 77/21 78/3 86/4

USCA Case #24-3162      Document #2102481      Filed: 02/24/2025      Page 536 of 551

**Y**

**years [28]**  25/3 45/14 46/22 56/5 69/9 70/5 70/6 70/14 70/14 70/23 72/14 74/15 74/24 75/1 75/24 76/4 78/1 78/4 78/6 78/13 79/6 79/19 80/20 81/14 82/21 83/19 83/21 86/3

**yes [26]**  6/9 6/11 6/20 16/21 18/7 18/20 23/21 25/9 28/14 28/15 28/15 30/22 31/25 32/18 46/13 46/16 47/12 51/24 57/12 93/2 93/6 93/10 93/13 94/6 94/8 94/13

**yes/no [3]**  28/14 28/15 28/15

**yet [2]**  86/8 88/22

**you [148]**

**you'd [4]**  17/6 17/7 19/20 94/15

**you're [8]**  5/6 5/6 5/22 16/15 20/14 24/15 56/11 92/5

**young [4]**  12/7 14/4 47/14 82/15

**your [65]**  2/2 2/8 2/12 3/14 3/15 4/7 4/15 5/21 6/3 6/9 6/11 6/20 10/20 19/23 20/4 20/19 21/5 23/12 23/13 27/2 27/9 27/23 29/3 29/7 31/14 32/25 37/9 45/24 46/20 48/13 58/4 59/10 59/16 59/19 60/21 61/4 61/13 61/16 61/24 62/5 64/16 64/21 65/3 66/16 67/9 68/13 76/21 77/4 78/18 78/23 79/2 80/5 80/7 80/12 92/7 92/17 92/20 92/25 93/7 93/13 93/18 93/23 94/2 94/6 95/1

**Your Honor [46]**  2/2 2/8 2/12 3/14 3/15 4/7 4/15 5/21 6/3 6/9 6/11 6/20 19/23 20/4 20/19 21/5 23/13 31/14 37/9 45/24 46/20 58/4 59/10 59/16 59/19 60/21 61/4 61/16 61/24 62/5 64/21 65/3 66/16 67/9 78/18 78/23 79/2 80/7 80/12

92/25 93/7 93/18 93/23 94/2 94/6 95/1

**Your Honor -- it [1]**  61/13

**yourselves [1]**  2/7

**Z**

**zero [1]**  45/7

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                Sheet 1

# UNITED STATES DISTRICT COURT

### District of Columbia ▾

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Stephen Johnson | Case Number: CR 22-176 (CJN) |
| | USM Number: 68598-509 |
| | Jonathan Jeffress, Tony Miles, and Courtney Forrest |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)   1ss-2ss, 5ss, 7ss-8ss, and 16ss
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 § 2252(a)(1), (b)(1) | ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO; Transportation of Child Pornography | 10/5/2020 | 1ss - 2ss |
| 18 § 2252(a)(1), (b)(1) | ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING | 10/5/2020 | 5ss |

    The defendant is sentenced as provided in pages 2 through   **9**   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   3ss-4ss, 6ss, and 9ss-15ss

☑ Count(s)   1, 1s-15s, 16s   ☐ is ☑ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

                                      10/31/2024
Date of Imposition of Judgment

*[signature: Carl J. Nichols]*

Signature of Judge

Carl J. Nichols    U. S. District Judge
Name and Title of Judge

                                11/4/2024
Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

DEFENDANT:  Stephen Johnson
CASE NUMBER:  CR 22-176 (CJN)

Judgment—Page  2  of  9

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| | CHILD PORNO; Transportation of Child Pornography | | |
| 18 § 2252(a)(1), (b)(1) | ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINI | 10/5/2020 | 7ss – 8ss |
| | CHILD PORNO; Transportation of Child Pornography | | |
| 18 § 2252(a)(4)(B), (b)(2) | ACTIVITIES RE MATERIAL CONSTITUTING/ CONTAINING CHILD PORNO; Possession of Child Pornography | 10/5/2020 | 16ss |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page __3__ of __9__ |
|---|---|

DEFENDANT:   Stephen Johnson
CASE NUMBER:   CR 22-176 (CJN)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Ninety (90) Months as to each count to run concurrently

☑ The court makes the following recommendations to the Bureau of Prisons:
FCI Elkton
8730 Scroggs Road
Lisbon, OH 44432
**RDAP

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

| | | Judgment—Page | 4 | of | 9 |

DEFENDANT:  Stephen Johnson
CASE NUMBER:  CR 22-176 (CJN)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

One Hundred Twenty (120) Months as to each count, to run concurrently

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
       ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☑ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

JA2721

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  |  |  |  |
|---|---|---|---|
| | Judgment—Page | 5 | of | 9 |

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

JA2722

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 9 |

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)

## SPECIAL CONDITIONS OF SUPERVISION

Sex Offense Assessment – You must participate in a sex offense-specific assessment. You must pay a percentage of the costs of the assessment, as determined by the Probation Office.

Sex Offender Treatment - You must participate in a sex offense-specific treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay a percentage of the costs of the program, as determined by the Probation Office.

Sex Offense Testing [Polygraph] - You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are in compliance with the requirements of your supervision or treatment program.

Location Restriction [Sex Offender] - You must not go to, or remain at, any place where you know children under the age of 18 are likely to be, including parks, schools, playgrounds, and childcare facilities.

Contact Restriction [Sex Offender] - You must not have direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

Computer Search - You must submit your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search. You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner.

Computer Monitoring - You must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use.

Computer Monitoring/Search - To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted to determine whether the computer contains any prohibited data prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation, and whether there have been attempts to circumvent the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

Mental Health Treatment - You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.).

Financial Information Disclosure - You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the United States Attorney's Office.

THE COURT ALSO imposes a $30,000 assessment pursuant to the Justice for Victims of Trafficking Act of 2015 and a $10,000 assessment pursuant to the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
            Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 7 | of | 9 |
|---|---|---|---|---|

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ 12,000.00 | $ | $ 10,000.00 | $ 30,000.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| <u>Name of Payee</u> | <u>Total Loss\*\*\*</u> | <u>Restitution Ordered</u> | <u>Priority or Percentage</u> |
|---|---|---|---|
| Utah Crime Victims Legal Clinic | | $3,000.00 | |
| Attn: Taylor | | | |
| 404 East 4500 South Ste B24 | | | |
| Salt Lake City, Utah 84107 | | | |
| | | | |
| Deborah A. Bianco, in trust for Pia | | $3,000.00 | |
| P.O. Box 6503 | | | |
| Bellevue, WA 98008 | | | |

| **TOTALS** | $ 0.00 | $ 12,000.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☑ the interest requirement for the    ☐ fine    ☑ restitution is modified as follows:  waived until term of incarceration ends.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5B — Criminal Monetary Penalties

| | | | Judgment—Page 8 of 9 |

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)

## ADDITIONAL RESTITUTION PAYEES

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Carol F. Hepburn, in trust for Sloane | | $3,000.00 | |
| P.O. Box 17718 | | | |
| Seattle, WA 98127 | | | |
| | | | |
| Carol F. Hepburn, in trust for Lily | | $3,000.00 | |
| P.O. Box 17718 | | | |
| Seattle, WA 98127 | | | |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page    9    of    9

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ☑    Lump sum payment of $    52,600.00    due immediately, balance due

☐    not later than _____ , or
☐    in accordance with    ☐ C,    ☐ D,    ☐ E, or    ☑ F below; or

B    ☐    Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☑    Special instructions regarding the payment of criminal monetary penalties:

The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
    Attachment (Page 1) — Statement of Reasons                                          Not for Public Disclosure

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)
DISTRICT:            District of Columbia

## STATEMENT OF REASONS
### (Not for Public Disclosure)
*Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony and Class A misdemeanor cases.*

**I.    COURT FINDINGS ON PRESENCE INVESTIGATION REPORT**

  A. ☐  **The court adopts the presentence investigation report without change.**

  B. ☑  **The court adopts the presentence investigation report with the following changes.** *(Use Section VIII if necessary)*
         *(Check all that apply and specify court determination, findings, or comments, referencing paragraph numbers in the presentence report.)*

   1. ☐  **Chapter Two of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to base offense level, or specific offense characteristics)*

   2. ☑  **Chapter Three of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to victim-related adjustments, role in the offense, obstruction of justice, multiple counts, or acceptance of responsibility)*
          The government conceded that the two-level enhancement in section 2G2.2(b)(3)(F) does not apply.
          The Court agreed and did not apply that enhancement.

   3. ☐  **Chapter Four of the United States Sentencing Commission Guidelines Manual** determinations by court: *(briefly summarize the changes, including changes to criminal history category or scores, career offender status, or criminal livelihood determinations)*

   4. ☐  **Additional Comments or Findings**: *(include comments or factual findings concerning any information in the presentence report, including information that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation, or programming decisions; any other rulings on disputed portions of the presentence investigation report; identification of those portions of the report in dispute but for which a court determination is unnecessary because the matter will not affect sentencing or the court will not consider it)*

  C. ☐  **The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.**
         Applicable Sentencing Guideline: *(if more than one guideline applies, list the guideline producing the highest offense level)* _____

**II.   COURT FINDING ON MANDATORY MINIMUM SENTENCE** *(Check all that apply)*

  A. ☑  One or more counts of conviction carry a mandatory minimum term of imprisonment and the sentence imposed is at or above the applicable mandatory minimum term.

  B. ☐  One or more counts of conviction carry a mandatory minimum term of imprisonment, but the sentence imposed is below a mandatory minimum term because the court has determined that the mandatory minimum term does not apply based on:

         ☐  findings of fact in this case: *(Specify)*

         ☐  substantial assistance (18 U.S.C. § 3553(e))
         ☐  the statutory safety valve (18 U.S.C. § 3553(f))

  C. ☐  No count of conviction carries a mandatory minimum sentence.

**III.  COURT DETERMINATION OF GUIDELINE RANGE: *(BEFORE DEPARTURES OR VARIANCES)***

Total Offense Level: __35__
Criminal History Category: __1__
Guideline Range: *(after application of §5G1.1 and §5G1.2)* __168__ to __210__ months
Supervised Release Range: __5__ to __life__ years
Fine Range: $ __40,000__ to $ __400,000__

   ☐  Fine waived or below the guideline range because of inability to pay.

JA2727

AO 245B (Rev. 09/19) Judgment in a Criminal Case
          Attachment (Page 2) — Statement of Reasons                                         Not for Public Disclosure

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)
DISTRICT:      District of Columbia

# STATEMENT OF REASONS

**IV.  GUIDELINE SENTENCING DETERMINATION** *(Check all that apply)*

    A.  ☐  The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range does not exceed 24 months.

    B.  ☐  The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range exceeds 24 months, and the specific sentence is imposed for these reasons: *(Use Section VIII if necessary)*

    C.  ☐  The court departs from the guideline range for one or more reasons provided in the <u>Guidelines Manual.</u> *(Also complete Section V.)*

    D.  ☑  The court imposed a sentence otherwise outside the sentencing guideline system (i.e., a variance). *(Also complete Section VI)*

**V.  DEPARTURES PURSUANT TO THE GUIDELINES MANUAL** *(If applicable)*

    A.  **The sentence imposed departs:** *(Check only one)*
        ☐  above the guideline range
        ☐  below the guideline range

    B.  **Motion for departure before the court pursuant to:** *(Check all that apply and specify reason(s) in sections C and D)*
        1.  **Plea Agreement**
            ☐  binding plea agreement for departure accepted by the court
            ☐  plea agreement for departure, which the court finds to be reasonable
            ☐  plea agreement that states that the government will not oppose a defense departure motion.
        2.  **Motion Not Addressed in a Plea Agreement**
            ☐  government motion for departure
            ☐  defense motion for departure to which the government did not object
            ☐  defense motion for departure to which the government objected
            ☐  joint motion by both parties
        3.  **Other**
            ☐  Other than a plea agreement or motion by the parties for departure

    C.  **Reasons for departure:** *(Check all that apply)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 4A1.3 | Criminal History Inadequacy | ☐ | 5K2.1 | Death | ☐ | 5K2.12 Coercion and Duress |
| ☐ | 5H1.1 | Age | ☐ | 5K2.2 | Physical Injury | ☐ | 5K2.13 Diminished Capacity |
| ☐ | 5H1.2 | Education and Vocational Skills | ☐ | 5K2.3 | Extreme Psychological Injury | ☐ | 5K2.14 Public Welfare |
| ☐ | 5H1.3 | Mental and Emotional Condition | ☐ | 5K2.4 | Abduction or Unlawful Restraint | ☐ | 5K2.16 Voluntary Disclosure of Offense |
| ☐ | 5H1.4 | Physical Condition | ☐ | 5K2.5 | Property Damage or Loss | ☐ | 5K2.17 High-Capacity, Semiautomatic Weapon |
| ☐ | 5H1.5 | Employment Record | ☐ | 5K2.6 | Weapon | ☐ | 5K2.18 Violent Street Gang |
| ☐ | 5H1.6 | Family Ties and Responsibilities | ☐ | 5K2.7 | Disruption of Government Function | ☐ | 5K2.20 Aberrant Behavior |
| ☐ | 5H1.11 | Military Service | ☐ | 5K2.8 | Extreme Conduct | ☐ | 5K2.21 Dismissed and Uncharged Conduct |
| ☐ | 5H1.11 | Charitable Service/Good Works | ☐ | 5K2.9 | Criminal Purpose | ☐ | 5K2.22 Sex Offender Characteristics |
| ☐ | 5K1.1 | Substantial Assistance | ☐ | 5K2.10 | Victim's Conduct | ☐ | 5K2.23 Discharged Terms of Imprisonment |
| ☐ | 5K2.0 | Aggravating/Mitigating Circumstances | ☐ | 5K2.11 | Lesser Harm | ☐ | 5K2.24 Unauthorized Insignia |
| | | | | | | ☐ | 5K3.1 Early Disposition Program (EDP) |

    ☐  Other Guideline Reason(s) for Departure, to include departures pursuant to the commentary in the <u>Guidelines Manual:</u> *(see "List of Departure Provisions" following the Index in the Guidelines Manual.) (Please specify)*

    D.  **State the basis for the departure.** *(Use Section VIII if necessary)*

JA2728

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Attachment (Page 3) — Statement of Reasons

Not for Public Disclosure

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)
DISTRICT:        District of Columbia

# STATEMENT OF REASONS

**VI.    COURT DETERMINATION FOR A VARIANCE** *(If applicable)*

    **A.    The sentence imposed is:** *(Check only one)*
      ☐ above the guideline range
      ☑ below the guideline range

    **B.    Motion for a variance before the court pursuant to:** *(Check all that apply and specify reason(s) in sections C and D)*
      **1.    Plea Agreement**
        ☐    binding plea agreement for a variance accepted by the court
        ☐    plea agreement for a variance, which the court finds to be reasonable
        ☐    plea agreement that states that the government will not oppose a defense motion for a variance
      **2.    Motion Not Addressed in a Plea Agreement**
        ☐    government motion for a variance
        ☐    defense motion for a variance to which the government did not object
        ☑    defense motion for a variance to which the government objected
        ☐    joint motion by both parties
      **3.    Other**
        ☐    Other than a plea agreement or motion by the parties for a variance

    **C.    18 U.S.C. § 3553(a) and other reason(s) for a variance** *(Check all that apply)*
      ☑ The nature and circumstances of the offense pursuant to 18 U.S.C. § 3553(a)(1)
        ☐    Mens Rea        ☐    Extreme Conduct      ☐    Dismissed/Uncharged Conduct
        ☐    Role in the Offense      ☐    Victim Impact     Guidelines range overstates Defendant's conduct
        ☑    General Aggravating or Mitigating Factors *(Specify)*
      ☑ The history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)
        ☐    Aberrant Behavior      ☐    Lack of Youthful Guidance
        ☐    Age        ☐    Mental and Emotional Condition
        ☑    Charitable Service/Good      ☐    Military Service
            Works
        ☑    Community Ties      ☐    Non-Violent Offender
        ☐    Diminished Capacity      ☐    Physical Condition
        ☐    Drug or Alcohol Dependence      ☐    Pre-sentence Rehabilitation
        ☑    Employment Record      ☐    Remorse/Lack of Remorse
        ☑    Family Ties and      ☐    Other: *(Specify)*
            Responsibilities
        ☐    Issues with Criminal History: *(Specify)*
      ☐ To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
        (18 U.S.C. § 3553(a)(2)(A))
      ☐ To afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))
      ☐ To protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))
      ☐ To provide the defendant with needed educational or vocational training (18 U.S.C. § 3553(a)(2)(D))
      ☐ To provide the defendant with medical care (18 U.S.C. § 3553(a)(2)(D))
      ☐ To provide the defendant with other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D))
      ☑ To avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6)) (Specify in section D)
      ☐ To provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))
      ☐    Acceptance of Responsibility      ☐    Conduct Pre-trial/On Bond      ☐    Cooperation Without Government Motion for
      ☐    Early Plea Agreement      ☐    Global Plea Agreement      Departure
      ☐    Time Served *(not counted in sentence)*      ☐    Waiver of Indictment      ☐    Waiver of Appeal
      ☐ Policy Disagreement with the Guidelines *(Kimbrough v. U.S., 552 U.S. 85 (2007)*: *(Specify)*

      ☐ Other: *(Specify)*

    **D.    State the basis for a variance.** *(Use Section VIII if necessary)*
      The vast majority of sentences in similar cases in this District are below the Guidelines range.

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Attachment (Page 4) — Statement of Reasons

Not for Public Disclosure

DEFENDANT: Stephen Johnson
CASE NUMBER: CR 22-176 (CJN)
DISTRICT:          District of Columbia

# STATEMENT OF REASONS

## VII.    COURT DETERMINATIONS OF RESTITUTION

A. ☐    **Restitution Not Applicable**.

B. **Total Amount of Restitution: $**    12,000.00

C. **Restitution not ordered:** *(Check only one)*

1. ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

2. ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

3. ☐    For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

4. ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s)'(s) losses were not ascertainable (18 U.S.C. § 3664(d)(5)).

5. ☐    For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s) elected to not participate in any phase of determining the restitution order (18 U.S.C. § 3664(g)(1)).

6. ☐    Restitution is not ordered for other reasons. *(Explain)*

D. ☐    **Partial restitution is ordered for these reasons *(18 U.S.C. § 3553(c))*:**

## VIII.    ADDITIONAL BASIS FOR THE SENTENCE IN THIS CASE *(If applicable)*

| | |
|---|---|
| Defendant's Soc. Sec. No.:    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 | Date of Imposition of Judgment        10/31/2024 |
| Defendant's Date of Birth:    9/2/1987 | *Carl J. Nichols* |
| | Signature of Judge |
| Defendant's Residence Address:    2641 Myrtle Avenue, NE Washington, DC 20018 | Carl J. Nichols    U.S. District Judge |
| | Name and Title of Judge |
| Defendant's Mailing Address:    2641 Myrtle Avenue, NE Washington, DC 20018 | Date Signed        11/4/2024 |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 1:22-cr-00176 (CJN)** |
| **STEPHEN JOHNSON** | |
| **Defendant.** | |

## NOTICE OF APPEAL

Notice is hereby given that Defendant Stephen Johnson in the above-captioned case appeals to the United States Court of Appeals for the District of Columbia Circuit from the final judgment and sentence entered in this action on November 4, 2024 (ECF No. 219), and all orders and judgments merged or subsumed therein, including without limitation the jury's finding of guilt as to Counts 1-2, 5, 7-8 and 16 of the Second Superseding Indictment after a jury trial on April 17, 2024 (ECF No. 166), and orders denying Mr. Johnson's motion for a new trial and motions to suppress. *See, e.g.,* ECF No. 210; 4/2/24 Tr.

Dated: November 13, 2024

Respectfully Submitted,

*/s/ Courtney R. Forrest*
Courtney R. Forrest (D.D.C. No. 996740)
Washington, D.C. 20005
Phone: (202) 640-2850
Fax: (202) 280-1034
cforrest@kaiserlaw.com

*Counsel for Stephen Johnson*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of November 2024, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the District of

Columbia Document Filing System (ECF) and the document is available on the ECF system.

<p align="center"><i><u>/s/ Courtney R. Forrest</u></i><br>Courtney R. Forrest</p>